# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT, a project of the
Urban Justice Center, Inc., on behalf of itself
and its clients,
40 Rector St, 9th Fl
New York, NY 10006;

HIAS, Inc., on behalf of itself and its clients,
1300 Spring Street, Suite 500
Silver Spring, MD 20910;

ALLAN HAKKY,
10629 Rivers Bend Lane
Potomac, MD 20854;

SAMANEH TAKALOO,
4701 Willard Avenue, Apt. 821
Chevy Chase, MD 20815;

JOHN DOES # 1-4; and JANE DOE #1,

       *Plaintiffs*,

       v.

DONALD TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20035;

DEPARTMENT OF HOMELAND
SECURITY,
Serve on:  John F. Kelly,
Secretary of Homeland Security
Washington, D.C. 20528;

DEPARTMENT OF STATE,
Serve on:  Rex W. Tillerson,
Secretary of State
2201 C Street NW
Washington, D.C. 20520;

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE,
Serve on:  Michael Dempsey,

Civil Action No.:

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Acting Director of National
Intelligence
Washington, D.C. 20511;

JOHN F. KELLY
In his official capacity as Secretary of
Homeland Security
Washington, D.C. 20528;

REX W. TILLERSON
In his official capacity as Secretary of State
2201 C Street NW
Washington, D.C. 20520;

MICHAEL DEMPSEY,
In his official capacity as Acting Director of
National Intelligence
Washington , D.C. 20511

*Defendants.*

**INTRODUCTION**

1.      On January 27, 2017, the President signed an Executive Order entitled "Protecting the Nation from Terrorist Entry into the United States."  The Order, which Plaintiffs challenge in its entirety, was intended and designed to target and discriminate against Muslims, and it does just that in operation.

2.      The President has been very clear about his desire to prevent Muslims from entering the United States.  He specifically promised to do so as a candidate.  Presented with early objections to that proposal, he asked advisors how he could implement a Muslim ban indirectly, and they helped him craft the Executive Order challenged here.  President Trump further admitted on national television that through the Order he intended to favor Christian refugees over Muslim refugees.  Rarely in American history has governmental intent to discriminate against a particular faith and its adherents been so plain.

3.      The Executive Order violates two of our most cherished constitutional protections: the guarantee that the government will not establish, favor, discriminate against, or condemn any religion, and the guarantee of equal protection of the laws.

4.      The United States was born in part of an effort to escape religious persecution, and the Religion Clauses of the First Amendment reflect the harrowing history of our Founders. More than two centuries later, our nation is one of the most religiously diverse in the world and has become a sanctuary for immigrants and visitors of all faiths and no faith, including refugees fleeing persecution in their homelands.

5.      The Executive Order flies in the face of our historical commitment to welcoming and protecting people of all faiths, and no faith, and it violates the "clearest command of the Establishment Clause"—"one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

6.      The United States was likewise founded on the principle that all people—regardless of their faith or where they are born—are created equal.  Like the Religion Clauses, the equal protection guarantee of the Fifth Amendment reflects this country's rejection of official preferences on the basis of race, color, creed, or national origin.  The Executive Order—which was motivated by animus toward Muslims and expressly discriminates on the basis of national origin—runs afoul of this core constitutional value as well.

7.      Plaintiffs challenge the Executive Order under the Establishment Clause; the equal protection guarantee of the Due Process Clause of the Fifth Amendment; the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*; the anti-discrimination provisions of the INA, 8 U.S.C. § 1152(a)(1)(A); the Refugee Act of 1980, as amended; and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(D).

8.      Plaintiffs respectfully request that the Court issue appropriate declaratory relief and preliminarily and permanently enjoin the Executive Order as a whole.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution and federal statutes.  The Court has additional remedial authority under 28 U.S.C. §§ 2201-02.

10.      Venue is proper under 28 U.S.C. §1391(e) and Local Rule 501.4.a.ii.  Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States. Plaintiffs HIAS, Allan Hakky, Samaneh Takaloo, and John Doe #1 reside in the Southern Division of this District.  No real property is involved in this action.

## PARTIES

11.      Plaintiff International Refugee Assistance Project ("IRAP"), a project of the Urban Justice Center, Inc., provides and facilitates free legal services for vulnerable populations around

2

the world, including refugees, who seek to escape persecution and find safety in the United States and other Western countries.

12.     Founded in 2008 as a student organization at Yale Law School, IRAP initially served Iraqi refugees who were victims of the Iraq War.  In 2010, IRAP became part of the Urban Justice Center and now has offices in New York as well as the Middle East.  IRAP has expanded its client base since its inception to assist refugees from Afghanistan, Egypt, Eritrea, Ethiopia, Iran, Jordan, Kuwait, Libya, Pakistan, Palestine, Somalia, Sudan, Syria, Turkey, and Yemen. Through in-house casework, as well as supervision of 1,200 students from 29 law schools in the United States and Canada and pro bono attorneys from over 75 international law firms and multinational corporations, IRAP directly assists thousands of refugees in urgent registration, protection, and resettlement cases every year.

13.     IRAP lawyers provide legal assistance to refugees and other immigrants to the United States throughout the resettlement process.  IRAP lawyers advise their clients on the resettlement process, write legal briefs and compile physical evidence in advance of clients' interviews with United States Citizenship and Immigration Services ("USCIS"), prepare them for their oral testimony in their interviews, and then conduct regular follow-up with USCIS until the client is safely resettled.

14.     IRAP assists many individuals in the United States who need assistance filing family reunification petitions for family members overseas.  IRAP also assists U.S.-based Iraqi and Syrian citizens and lawful permanent residents in filing petitions in order to get their family members overseas into the Direct Access Program of the United States Refugee Admissions Program.  Finally, IRAP also assists countless Iraqi and Afghan citizens who have served the United States government to obtain Special Immigrant Visas, with the support of U.S. citizen veterans of Iraq and Afghanistan.

15.     Since its inception, IRAP has helped to resettle over 3,200 individuals to 55 countries, with the majority resettled to the United States.  It has provided legal assistance to nearly 20,000 more individuals.

16.     The overwhelming majority of IRAP's clients, including clients abroad and those within the United States, identify as Muslim.

17.     As set forth in greater detail below, implementation of the Executive Order has caused substantial harm to IRAP and its clients, and will continue to harm them.  IRAP asserts claims on behalf of itself and its clients in the United States and abroad.  The rights of its clients that IRAP seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own name.

18.     Plaintiff HIAS, the world's oldest refugee resettlement agency, is a faith-based organization that aims to rescue people around the world whose lives are in danger. The organization works toward a world in which refugees find welcome, safety, and freedom. Founded in 1881 to assist Jews fleeing pogroms in Russia and Eastern Europe, HIAS now serves refugees and persecuted people of all faiths and nationalities around the globe.  Since HIAS's founding, the organization has helped more than 4.5 million refugees start new lives.

19.     HIAS has offices in twelve countries worldwide, including headquarters in Silver Spring, Maryland, which is its principal place of business, and another domestic office in New York City.  HIAS also provides resettlement experts in support of the United Nations High Commissioner for Refugees (UNHCR).  Refugee resettlement lies at the heart of HIAS's work in the United States.   It is one of nine non-profit organizations designated by the federal government to undertake this humanitarian work through contracts with the Department of State and the Department of Health and Human Services.

20.     In 2016, HIAS provided services to more than 350,000 refugees and asylum seekers globally.  HIAS's client base includes refugees abroad and in the United States who are from

4

Syria, Iraq, Iran, Sudan, Somalia, Ukraine, Bhutan, the Democratic Republic of Congo, Afghanistan, Eritrea, Tanzania, Ethiopia, Burundi, South Sudan, Uganda, Russia, Belarus, and Burma, among other countries.  Many of these clients are Muslim.

21.     HIAS provides programs and services to refugees, including employment, psychosocial, and legal services. HIAS has also been approved to refer cases of particularly vulnerable refugees directly for third-country resettlement to the United States and other countries.  Around the world, HIAS provides legal services to protect the rights of refugees, and to register, document, and secure the status of refugees.

22.     HIAS is also assigned clients via the State Department's allocation process, which determines which refugee clients will be resettled by HIAS.  For clients who have newly arrived in the United States, HIAS either provides direct resettlement services or partners with other organizations across the country to do so.   These services include arranging housing and providing essential furnishings, food, clothing, initial cash assistance, initial health screening, cultural and community orientation, and, through case management services, assistance with enrollment in English language classes and employment services, as well as referrals for health and legal services.

23.     HIAS, directly and through affiliated agencies, also provides assistance to refugee and asylee clients in the United States who are seeking to gain entry for family members abroad who still face persecution.  As set forth in greater detail below, implementation of the Executive Order has caused substantial harm to HIAS and its clients, and will continue to harm them. HIAS asserts claims on behalf of itself and its clients.  The rights of its clients that HIAS seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own name.

24.     Plaintiff Allan Hakky is a United States citizen of Iraqi Kurdish origin who lives in Potomac, Maryland with his wife, also a U.S. citizen.  Mr. Hakky is a Shia Muslim.  He has been

in the United States since 1991, when he immigrated from the United Kingdom with his mother and three siblings.  He has been a U.S. citizen since 1996.

25.     Plaintiff Samaneh Takaloo is a U.S. citizen of Iranian origin who lives in Chevy Chase, Maryland.  She is from a Muslim family.  Ms. Takaloo came to the United States from Iran in May 2010 on a K-1 fiancée visa and has been a U.S. citizen since June 2015.  She works in Washington, D.C. as a sales associate.

26.     Plaintiff John Doe #1 is a lawful permanent resident and national of Iran who lives in Montgomery County, Maryland.  He is a scientist.  He came to the United States in 2014 on an exchange visitor visa.  In 2016, he obtained his lawful permanent resident status through the National Interest Waiver program for people with extraordinary abilities.  His pioneering scholarly works are recognized as cutting edge in the sciences.  Both John Doe #1 and his wife, who is not a party, are non-practicing Muslims.

27.     Plaintiff John Doe #2 is a U.S. citizen from Iraq who lives in Baltimore County, Maryland.  John Doe #2 came to the United States in 2009, along with his wife and two daughters, as a refugee.  All four are now U.S. citizens, as is John Doe #2's third daughter, who was born in the United States.  John Doe #2 is a Shiite Muslim, as is his father, whereas his mother is a Sunni Muslim.

28.     Plaintiff John Doe #3 is a lawful permanent resident and national of Iran who lives in Anne Arundel County, Maryland.  He came to the United States in 2011 through the Green Card lottery.  John Doe #3 worked as a teacher in Iran, and currently works in the engineering field.

29.     John Doe #4 and Jane Doe #1, a married couple, are U.S. citizens of Iraqi descent who live in Alabama.[1]  John Doe #1 was born in Mosul, Iraq, and immigrated to the United

_____

[1] A motion for leave of the Court for John Does #1-4 and Jane Doe to proceed under pseudonyms is filed contemporaneously herewith.

States at the age of three; he is now a physician.  Jane Doe #1 arrived in 2009 as a refugee.  Both are Sunni Muslims.

30.     As set forth in greater detail below, implementation of the Executive Order has caused and will continue to cause harm to Plaintiffs Allan Hakky, Samaneh Takaloo, John Does #1 through #4, and Jane Doe #1 (collectively, the "Individual Plaintiffs").

31.     Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Executive Order challenged in this suit.

32.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").  CBP's responsibilities include inspecting and admitting immigrants and nonimmigrants arriving with U.S. visas at international points of entry, including airports and land borders.  USCIS's responsibilities include adjudicating requests for immigration benefits for individuals located within the United States.  ICE's responsibilities include enforcing federal immigration law within the interior of the United States.  The Executive Order assigns DHS a variety of responsibilities regarding its enforcement.

33.     Defendant U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government.  DOS is responsible for the issuance of immigrant and nonimmigrant visas abroad.  The Executive Order assigns DOS a variety of responsibilities regarding its enforcement.

34.     Defendant Office of the Director of National Intelligence ("ODNI") is an independent agency of the United States federal government. The ODNI has specific responsibilities and obligations with respect to implementation of the Order.

35.     Defendant Rex Tillerson is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Executive Order by all DOS staff. He is sued in his official capacity.

36.     Defendant John Kelly is the Secretary of Homeland Security. Secretary Kelly has responsibility for overseeing enforcement and implementation of the Executive Order by all DHS staff. He is sued in his official capacity.

37.     Defendant Michael Dempsey is the Acting Director of National Intelligence, and has responsibility for overseeing enforcement and implementation of the Executive Order by all ODNI staff. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### President Trump's Expressed Intent To Target Muslims and To Favor Christians Seeking to Enter the Country

38.     President Trump has repeatedly made clear his intent to enact policies that exclude Muslims from entering the United States and favor Christians seeking to enter the United States.

39.     On December 7, 2015, then-Presidential candidate Trump issued a statement on his campaign website. Entitled, "DONALD J. TRUMP STATEMENT ON PREVENTING MUSLIM IMMIGRATION," the statement declared that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."

40.     The statement, which remains on President Trump's campaign website to this day, invokes stereotypes of Muslims, falsely suggesting that all Muslims believe in "murder against non-believers who won't convert" and "unthinkable acts" against women.

41.     Defending his proposed Muslim ban the next day, candidate Trump told Good Morning America, "What I'm doing is I'm calling very simply for a shutdown of Muslims

entering the United States—and here's a key—until our country's representatives can figure out what is going on."

42.     When asked the same day on MSNBC how his Muslim ban would be applied by customs officials, candidate Trump said, "That would be probably—they would say, are you Muslim?"  A reporter followed up by asking, "And if they said yes, they would not be allowed in the country[?]" Candidate Trump responded, "That's correct."

43.     Candidate Trump repeatedly reiterated his support for targeting Muslims seeking to enter the United States.

44.     On March 9, 2016, candidate Trump stated, "I think Islam hates us.  There's . . . a tremendous hatred there . . . . There's an unbelievable hatred of us . . . . We can't allow people coming into this country who have this hatred of the United States . . . and [of] people that are not Muslim . . . ."

45.     The next day, during a debate, candidate Trump said he would "stick with exactly" what he had said the night before.  When asked if he was referring to all 1.6 billion Muslims worldwide, he explained, "I mean a lot of them."  Candidate Trump stated later in the same debate, "There is tremendous hate.  There is tremendous hate.  Where large portions of a group of people, Islam, large portions want to use very, very harsh means."

46.     On March 22, 2016, candidate Trump stated that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country," adding, "You need surveillance.  You have to deal with the mosques whether we like it or not . . . . These attacks aren't . . . done by Swedish people. That I can tell you."

47.     The same day, candidate Trump stated on Twitter that a Democratic candidate, Hillary Clinton, wanted to "let the Muslims flow in."

48.     On June 13, 2016, candidate Trump stated, "I called for a ban after San Bernardino and was met with great scorn and anger.  But now many . . . are saying that I was right to do so."

9

49.    In a July 24, 2016 interview on Meet the Press, candidate Trump was asked if a plan similar to the now-enacted Executive Order was a "rollback" from "[t]he Muslim Ban." Candidate Trump responded: "I don't think so.  I actually don't think it's a rollback.  In fact, you could say it's an expansion.  I'm looking now at territories."

50.    Candidate Trump continued: "People were so upset when I used the word Muslim. Oh, you can't use the word Muslim.  Remember this.  And I'm okay with that, because I'm talking territory instead of Muslim."

51.    That explanation tracks one later provided by Rudolph Giuliani, an advisor to candidate Trump and later an advisor to him as President.  After the Executive Order was signed, Mr. Giuliani explained that "when [candidate Trump] first announced it, he said, 'Muslim ban.' He called me up.  He said, 'Put a commission together. Show me the right way to do it legally.'" In response to this edict, according to Mr. Giuliani, the commission decided to focus on territories, rather than explicitly naming Muslims as the subjects of the ban.

### The Discriminatory Executive Order

52.    After conducting a campaign in which a ban on Muslim admissions was a key promise, President Trump took action to carry out that promise by issuing the challenged Executive Order one week after being inaugurated.

53.    Contemporaneous statements made by President Trump and his advisors around the signing of the Executive Order confirm President Trump's intent to discriminate against Muslims.  For instance, during the signing ceremony for the order, President Trump made clear that the order was targeted at Muslims, pledging that it would "keep radical Islamic terrorists out of the United States of America."

54.    In an interview with the Christian Broadcasting Network released the same day that he signed the Executive Order, President Trump stated that the Order was designed to give Christians priority when applying for refugee status.  "If you were a Muslim you could come in

10

[to the United States], but if you were a Christian, it was almost impossible," he said.  "[T]hey were chopping off the heads of everybody but more so the Christians.  And I thought it was very, very unfair.  So we are going to help them."

55.     Consistent with this expressed religious animus towards Muslims and preference for Christians, the Executive Order will clearly disfavor Muslims while giving special treatment to non-Muslims.

56.     Section 3, for example, bans any entry for 90 days for individuals from seven countries, all of which are predominantly Muslim: Syria, Sudan, Iraq, Iran, Libya, Somalia, and Yemen.

57.     All seven banned countries have overwhelmingly Muslim populations.

58.     Moreover, 82% percent of all Muslim refugees who entered the United States in fiscal years 2014 through 2016 hailed from those seven countries.

59.     The Executive Order does not single out any countries for disfavored treatment that are not majority-Muslim.

60.     Section 5 of the Executive Order prohibits refugee admissions for 120 days, except for Syrian refugees, who are banned indefinitely.

61.     The Executive Order discriminates between persons of majority and minority faiths in their country of origin.  Section 5(b) requires the government to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality" once the 120-day ban on refugee admissions is complete.

62.     During those 120 days, moreover, Section 5(e) allows the admission of certain refugees on a discretionary case-by-case basis, "only so long as [the Secretaries of State and Homeland Security] determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality

facing religious persecution."   As the President has conceded, these provisions are intended to allow Christian refugees to enter the United States, even while Muslim refugees from the same countries are prohibited from doing so.

63.     There is no basis in the Refugee Act of 1980, as amended—which governs the admission of refugees to the United States and their resettlement herein—to prioritize refugees fleeing persecution on the basis of religion, as opposed to the other congressionally-recognized bases.  *See* 8 U.S.C. § 1101(a)(42) (defining "refugee").

64.     Muslims will be severely disadvantaged under the minority-faith preferences set forth in Sections 5(b) and 5(e).  During the past three fiscal years, only 12% of Muslim refugees hailed from a country where Islam is a minority faith.  Thus, based on recent data, approximately 88% of Muslim refugees would be ineligible for the minority-faith preference, even if they can assert strong claims of religious persecution.

65.     By contrast, during the past three fiscal years more than half (53%) of non-Muslim refugees hail from countries where they are in the minority faith, and would thus be eligible for the minority-faith preference if they are able to assert religious persecution claims.

66.     There is no statutory, regulatory, or constitutional basis for favoring refugees from minority faiths over refugees from majority faiths.

67.     In operation, the Executive Order not only disfavors Muslims while giving preference to non-Muslims, but also entangles the executive branch in questions of religious doctrine and practice.   Under these provisions, the government is required to categorize a religion as "minority" or "majority" in each country.

68.     Drawing these lines will necessarily entail inquiry into the religious beliefs, practices, and faith identification of billions of people.

69.     The indefinite ban on Syrian refugees also effectuates President Trump's intent to limit the entry of Muslims into the United States.  In fiscal year 2016, Muslim Syrian refugees made up 32% of all Muslim refugees who entered the United States.

70.     Furthermore, Section 5(g) seeks to expand the limited role State and local governments have in the refugee resettlement process beyond that envisioned by Congress in order to authorize and facilitate the stated desire and intent of some states and localities in the United States to discriminate against lawfully-admitted refugees on the basis of their nationality and/or religion.  *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902 (7th Cir. 2016) (affirming preliminary injunction on equal protection grounds of state executive order issued by then-Governor of Indiana, Mike Pence, that sought to prevent the resettlement in the State of refugees from Syria).

71.     In addition to Sections 3 and 5, other sections of the Executive Order reinforce stereotypes about Muslims and discriminate against them.  Multiple sections, for example, associate Muslims with violence, bigotry, and hatred, inflicting stigmatic and dignitary harms, among other types of injury.  These include Sections 1 and 2, which portray the ban as protecting citizens from foreign nationals "who would place violent ideologies over American law" and "who intend to commit terrorist attacks in the United States"; and Section 10, which requires the Secretary of Homeland Security to periodically publish information about the number of "foreign nationals" involved in, among other things, terrorism-related activities, radicalization, and "gender-based violence against women, including honor killings"—direct echoes of then-candidate Trump's broad statements denigrating Islam and Muslims.

72.     Further, on information and belief, since the Order was signed, CBP has questioned foreign nationals entering from certain countries about their religious beliefs to determine whether or not they are Muslim, and has subjected Muslim travelers from countries other than the seven designation nations to disproportionate and unwarranted scrutiny and interrogation.

73.     There is no sound basis for concluding that Muslims generally, or Muslims from particular countries, are more likely to commit violent acts of terror.

74.     A previous program to track certain foreign nationals predominantly from Muslim-majority countries, NSEERS, did not lead to the conviction or even identification of a single terrorist, even though it subjected tens of thousands of people to additional screening and investigation.

75.     Many alternatives exist that do not involve targeting individuals based on their faith or using nationality as a proxy for faith, are less restrictive than the Executive Order, and are more closely tailored to legitimate national security concerns.

### The Chaotic and Irregular Implementation of the Order

76.     The preparation and implementation of the Executive Order were extremely unusual and chaotic. Upon information and belief, the White House bypassed regular channels for input and cooperation with other components of the Executive Branch, including the Secretaries of Homeland Security, Defense, and State.  Moreover, upon information and belief CBP was not given clear operational guidance during critical times in the implementation of the Executive Order.

77.     The Executive Order was signed without final review or legal analysis from DHS, which—along with the DOS—is principally charged with implementing the Order.

78.     Secretary of Homeland Security Kelly was reportedly in the midst of a conference call to discuss the Order when someone on the call learned from watching television that the Order they were discussing had been signed.

79.     Similarly, Secretary of Defense Mattis, who had publicly criticized President Trump's proposal to ban Muslims from the United States, reportedly did not see a final version of the Order until the day it was signed and was not consulted during its preparation.

14

80.     This Order did not arise out of the usual process of consulting with the relevant cabinet-level officials and agencies before issuing an Executive Order. Instead, the Order was primarily drafted by a small team of Presidential aides, overseen by chief White House strategist Stephen K. Bannon.

81.     Mr. Bannon has previously made anti-Muslim comments. He criticized former President George W. Bush for referring to Islam as "a religion of peace," calling President Bush "one of the dumbest presidents in the history of these United States."

82.     Congressional staff who worked on the Executive Order reportedly were required to sign nondisclosure agreements, and not even the members of Congress they served were allowed to know of their work on the Order.  On information and belief, this arrangement was also highly unusual.

83.     During the days leading up to and following the signing of the Executive Order, its scope and provisions were changed without any rational relationship to the purported reasons for the Order.

84.     For example, the night before the Order was signed, the Department of Homeland Security issued guidance interpreting the Order as not applying to lawful permanent residents. Overnight, the White House overruled that guidance, applying the Order to lawful permanent residents subject to a case-by-case exception process, in a decision closely associated with Mr. Bannon.

85.     After the detention at airports of many individuals, including lawful permanent residents, led to chaos nationwide, Secretary Kelly issued a statement "deem[ing] the entry of lawful permanent residents to be in the national interest."  Secretary Kelly's statement was made pursuant to Section 3(g) of the order, which requires such a decision to be made jointly with the Secretary of State and "on a case-by-case basis."

86.     Finally, on February 1, the Counsel to the President purported to interpret the Order as exempting Lawful permanent residents from the ban entirely.

87.     Similarly, initial guidance from the Department of State indicated that individuals with dual citizenship, with one country of citizenship subject to the ban, would be banned from entering the United States.  Word of a change in that policy spread irregularly, with notice being given to airlines and foreign nations but contradicted in official U.S. government communications.

88.     Finally, CBP announced a changed policy, explaining, in response to the question "Does 'from one of the seven countries' mean citizen, national or born in?" that "Travelers are being treated according to the travel document they present."  According to this policy, currently in place, the very same individual both is and is not subject to the travel ban depending only on the travel document she presents.

89.     The government also reversed itself on its policy toward holders of Special Immigrant Visas from Iraq. Holders of these visas are clearly banned under the terms of the Order, and they were refused entry when it went into effect.  However, on February 2, 2017, the government changed course and allowed them to enter the United States despite the Executive Order.

90.     Still other aspects of the Executive Order and its implementation demonstrate utter disregard for the individuals affected by it.  For example, the Administration knew that the Executive Order would bar the entry of individuals who were literally mid-air when the order was issued.  Nonetheless, and absent any exigency that would justify it, the order was signed late on a Friday afternoon.  That decision had a number of predictable consequences, including: making it more difficult for the federal employees tasked with enforcing the order to obtain instruction on how to interpret and enforce the order's sloppily-written provisions; prolonging the detentions at airports of those affected, and leading many to be wrongfully deported; and increasing the difficulty advocates had in accessing their clients and the courts.

16

91.     Even once advocates were able to access the courts and obtain temporary injunctive relief against aspects of the Executive Order, DHS officials frequently refused or otherwise failed to comply with the court orders, undermining bedrock constitutional principles and inflicting further unlawful injury on the affected individuals.

92.     Other actions taken by DHS and DOS to enforce the Executive Order exhibit a zealous desire to go beyond even the draconian measures the order actually requires.

93.     Notwithstanding that Section 3 of the Executive Order only bars "entry into the United States of aliens from" one of the aforementioned seven Muslim-majority countries, DHS interpreted it to prohibit the granting of *any* immigration-related benefit to anyone from those countries—including to individuals who are already in the United States.  That decision would have wide-ranging consequences, including: delaying naturalization of lawful permanent residents ("LPRs") from those countries who wish to become U.S. citizens; rendering asylees from those countries unable to be lawfully employed once their Employment Authorization Documents expire; and either expelling or making undocumented any individuals here on nonimmigrant visas (including student, employment, and tourist) that otherwise could have been renewed.

94.     DOS, at the request of DHS, issued a letter purporting to provisionally revoke *all* immigrant and nonimmigrant visas of nationals of the seven designated countries on a categorical basis.  The letter is dated January 27, 2017, but only came to light on January 31, 2017, when Department of Justice lawyers filed it in pending litigation. DOS has stated that this action was taken to "implement[]" the Executive Order.

95.     On information and belief, DOS has never before revoked a broad swath of valid visas in this manner.  Nor, on information and belief, is visa revocation ordinarily undertaken in secret, with no notice to the visa holder and no individualized consideration of whether any particular visa should be revoked.

17

96.     Still further evidence of discriminatory intent and effect is reflected in the statements by President Trump and his Administration seeking to defend and justify the Executive Order after it was issued.

97.     President Trump, for example, falsely stated that only 109 people were detained over the weekend following the issuance of the Executive Order, even though he knew or should have known that the number was far higher.

98.     Following the issuance on February 3 of a temporary restraining order of various parts of the Executive Order, President Trump personally attacked the Honorable James Robart, who issued the order.  President Trump referred to Judge Robart as a "so-called judge," calling his opinion "outrageous," "ridiculous," and "terrible."  President Trump falsely claimed that one consequence of Judge Robart's order is that now "anyone, even with bad intentions" must be allowed to enter the country, saying that the judge had "open[ed] up our country to potential terrorists" and put it in "such peril."  President Trump advised the public to "blame him and the court system" if "something happens."  Comments like this by a President about a sitting judge are extremely unusual, if not unprecedented, and further underline the extent to which the ordinary norms and processes of government have been cast aside with respect to this Order.

99.     These chaotic, irregular, and irrational policies, policy changes, and statements indicate that the purported justifications for the Executive Order are pretextual and that it was at least substantially motivated by an intent to discriminate against Muslims.

**The Nationwide Temporary Restraining Order**

100.    The February 3, 2017, temporary restraining order ("TRO") issued by Judge Robart currently prohibits the government from enforcing Sections 3(c), 5(a), 5(b), and 5(e) of the Executive Order.  The government has appealed to the Ninth Circuit and sought a stay pending

appeal.  That stay motion was fully briefed by 3:00 pm Pacific Standard Time on February 6, 2017.

101.    In response to the TRO, the government issued assurances that, while the TRO remained in place, entry procedures would revert to those in place before the Order was signed; visas purportedly revoked by the DOS letter would be reinstated; airlines would be informed that they could fly individuals from the banned countries to the United States; and visa processing and interviews overseas would resume.

102.    Presumably, should the TRO be dissolved, the government will also unwind all of these changes, and thereby reinstate the Executive Order in its entirety (except as limited by other Executive Branch decisions, like the decision to allow Special Immigrant Visa holders to enter the United States, or by other court orders).

**The Grave Harm to Plaintiffs and Their Clients**

103.    Implementation and enforcement of the Order has already caused Plaintiffs and their clients substantial, concrete, and particularized injury, and will continue to harm Plaintiffs if not permanently enjoined.

104.    The Executive Order, which suspends refugee resettlement and intentionally discriminates against Muslim immigrants, frustrates IRAP's mission and imposes a significant burden on IRAP's work.  As a direct result of the imposition and enforcement of the Executive Order, IRAP and its clients have suffered substantial, concrete injuries.

105.    IRAP serves refugees and displaced persons of all faiths, but the vast majority of its client base is Muslim.  IRAP counsels persecuted individuals on various legal avenues to safe countries and represents them throughout these processes, with a majority of its clients resettling to the United States.

106.    The Order has severely restricted IRAP's ability to carry out its work and mission.  In the ten days immediately following the issuance of the Executive Order, IRAP provided assistance to more than forty individuals from Iraq, Iran, Sudan, Libya, Syria, Somalia, and Yemen who, despite being vetted and given permission to enter the United States, had been prevented by the Order from doing so.

107.    Of its 583 open cases, 419 families are from Iraq, Syria, Iran, Sudan, Somalia, Libya, or Yemen or are refugees from other countries and therefore potentially affected by this Order. IRAP has already used a significant portion of its financial resources and time to represent these 419 clients through legal adjudications and to provide counseling through the demanding vetting process.  Restricting entry into the United States has rendered that investment of resources and time a waste.

108.    Furthermore, the Executive Order will create a significant backlog in the U.S. Refugee Admissions Program, delaying the processing of many of IRAP's clients' cases.  This delay forces IRAP to exhaust more of its resources, as the average lifespan of a case now grows significantly.

109.    The delay also greatly endangers the lives of IRAP's clients, because the longer it takes for their cases to be decided, the longer they are in life-threatening environments.  In addition, some of the IRAP clients abroad have familial ties to IRAP clients already in the United States, and those U.S. clients are suffering harm as a result of the ongoing delay in reunification with their family members, as well as the risk that their family members may suffer persecution or death in the meantime.

110.    The Executive Order, moreover, marginalizes IRAP's Muslim clients and subjects them to suspicion, scrutiny, and social isolation on the basis of religion and national origin, and inflicts stigmatic and dignitary injuries.

111.    The Executive Order has furthermore forced IRAP to devote substantial resources to addressing the order's effects on IRAP's clients and those similarly situated.  Following the signing of the Executive Order on January 27, 2017 at 4:42 P.M. EST, two IRAP clients, Mr. Hameed Khalid Darweesh and Mr. Haider Sameer Abdulkhaleq Alshawi, were detained at John F. Kennedy Airport ("JFK") despite being the recipients of valid visas.   As a result, IRAP attorneys were present at JFK from 2 am to 6:30 pm on January 28, 2017 attempting to secure their lawful release.   Furthermore, together with co-counsel, IRAP filed a habeas petition on behalf of those two clients, together with a motion for class certification (*Darweesh et al. v. Trump et al.*, No. 1:17-cv-480 (E.D.N.Y. filed Jan. 28, 2017)).   That litigation is ongoing.   These actions are not in the scope of normal IRAP legal assistance, as previous IRAP clients were allowed to enter at U.S. Ports of Entry after receiving final approval to travel.

112.    The Order has further caused IRAP to divert its resources as IRAP has become the focal point organization for volunteer attorneys all across the country who have gone to airports to attempt to secure the release of individuals detained pursuant to this Order.   In addition to being the first organization to put out a call to volunteer attorneys, IRAP created and maintains a unique hotline email address (airport@refugeerights.org) to advise attorneys and affected individuals.   Since the creation of this email address on January 28, 2017, IRAP has received and responded to nearly 800 email messages.   IRAP has also developed templates and informational materials for attorneys, affected family members in the United States, and individuals overseas who have been denied travel pursuant to the Order.

113.    HIAS has likewise been significantly harmed by the Executive Order. HIAS's refugee resettlement work is grounded in, and an expression of, the organization's sincere Jewish beliefs.   The Torah, Judaism's central and most holy text, commands followers to welcome, love, and protect the stranger.   The Jewish obligation to the stranger is repeated throughout the Torah, more than any other teaching or commandment.   HIAS believes that this religious commandment

21

demands concern for and protection of persecuted people of all faiths.  The Torah also teaches that the Jewish people are to welcome, protect, and love the stranger because "we were strangers in the land of Egypt" (Leviticus 19:34).  Throughout their history, violence and persecution have made the Jewish people a refugee people.  Thus, both history and values lead HIAS to welcome refugees in need of protection.  A refusal to aid persecuted people of any one faith, because of stigma attached to that faith, violates HIAS's deeply held religious convictions.

114.    The Executive Order severely impedes HIAS's religious mission and work by intentionally discriminating against Muslims, prohibiting the entry of all refugees into the United States for 120 days, indefinitely prohibiting Syrian refugees' entry into the United States, and disfavoring majority-faith refugees generally.

115.    Despite having been previously vetted and granted refugee status, HIAS clients from Iraq, Iran, Sudan, Somalia, Ukraine, Bhutan, the Democratic Republic of Congo, Afghanistan, Eritrea, Tanzania, Ethiopia Uganda, Russia, Belarus, and Burma were prevented from entering the country because of the Executive Order and continue to face significant delays.  But for the Temporary Restraining Order, HIAS clients would continue to be barred from entering the country.  Before the Executive Order was signed, arrangements had been made for many of these clients to arrive in the United State in January, February, and the coming months.

116.    Many of these clients are Muslim and hail from Muslim-majority countries and would thus be precluded from using the preference for refugees of a minority faith, even if they have religious persecution claims.  Others are not Muslim but follow faiths that are the majority faiths in their countries of origin and thus would similarly be ineligible for the "minority" faith preference even if they are able to assert religious persecution claims.

117.    Some HIAS clients abroad have refugee referral applications pending with the United States, and will suffer significant delay in the adjudication of those applications because of the Executive Order.  That delay puts them at risk of the very persecution and abuse that they are

fleeing.  Some of these clients are from Syria; therefore, under the Executive Order, adjudication of their refugee applications is suspended indefinitely.  Some of these clients are Muslim and hail from Muslim-majority countries.  They will be precluded, even once refugee resettlement resumes, from benefiting from the preference for refugees of a minority faith.

118.    Some HIAS clients in the United States have relatives abroad who are eligible for resettlement or other immigration applicants.  Some HIAS clients abroad have family ties in the United States.  Those U.S. clients and family members in the United States are suffering harm as a result of the ongoing delay in reunification with their family members, as well as the risk that their family members may suffer persecution or death in the meantime.

119.    HIAS's Muslim clients in the United States have been marginalized as a result of the anti-Muslim message conveyed by the Executive Order and subjected to baseless suspicion, scrutiny, and social isolation on the basis of religion and national origin.

120.    Additionally, as a result of the Executive Order, at least one of HIAS's Muslim clients in the United States has been detained at an airport for an extended period, handcuffed and separated from his family, and many other clients have otherwise had their travel significantly delayed.

121.    Because HIAS is a non-profit resettlement organization that has a cooperative agreement with the federal government on a per-capita basis for each refugee served, and because the Department of State asked HIAS to increase its capacity from the 3,884 refugees resettled in federal fiscal year ("FFY") 2016 to 4,794 refugees in FFY 2017, HIAS would be denied crucial funding as a result of the Executive Order, which bans all refugees for 120 days, bars all entry for the seven Muslim-majority countries for 90 days, indefinitely bars refugees from Syria, and caps the number of refugees to be admitted in the current fiscal year at 50,000, which is less than half the number the Department of State told the resettlement agencies to collectively plan to resettle.

122.    The Executive Order would also result in the waste of HIAS resources.  For example, in the past year, HIAS has devoted substantial private resources to developing a program with several congregations in Westchester, New York, to welcome Syrian refugee families.  Because of the indefinite ban on Syrian refugees and the unexpected and dramatic lowering of the refugee admissions ceiling, the Executive Order would put those resources to waste.  Congregations and family members of HIAS clients have extended resources to prepare for anticipated refugees, by renting apartments and purchasing furnishings.   In addition, some refugees who were anticipating resettlement through HIAS left jobs or travelled through other countries and now face precarious situations as a direct result of this Executive Order.

123.    In the weeks and months prior to the order, HIAS concluded a formal plan with the Department of State to increase HIAS's national resettlement capacity by 23.4% from 3,884 refugees in federal fiscal year 2016 to 4,794 refugees in federal fiscal year 2017. This plan caused HIAS to invest substantial resources into expanding existing resettlement sites and opening new refugee resettlement sites in Wisconsin, Delaware, New York, Illinois, and Massachusetts, as approved by the Department of State.  These resources will be wasted, at least in part, because of the Executive Order.

124.    In addition, HIAS will be forced to divert substantial resources to dealing with the fallout from the Executive Order and its effect on HIAS's clients, including devoting staff time to working with clients, and their families in the United States, who were denied entry and face precarious situations overseas.

125.    Plaintiff Hakky, a U.S. citizen, has suffered and will continue to suffer harm because of the Executive Order.  Mr. Hakky has six sisters-in-law, one of whom lives in the United States and is a lawful permanent resident.  Another sister-in-law lives in London, United Kingdom.  His parents-in-law and four other sisters-in-law are all Iraqi nationals who have valid visitor visas to the United States. One sister-in-law was born in Kuwait and the other three were born in Jordan.

24

Like their parents, all four are considered to be Iraqi nationals and subject to the executive order travel ban.  Mr. Hakky's parents-in-law and sisters-in-law are all Muslim.

126.    Plaintiff Hakky's parents-in-law and sisters-in-law were coming to the United States to visit Mr. Hakky's sister-in-law, a lawful permanent resident who gave birth prematurely to a baby in January, 2017.   Her parents and sisters planned to visit the United States to provide support and assistance and to meet the baby, who is still in the neonatal intensive care unit.  They had planned to travel to the United States in late January but were barred from doing so because of the Executive Order.

127.    Plaintiffs Jane Doe and John Doe #4, U.S. citizens, have suffered and will continue to suffer harm because of the Executive Order.  Jane Doe is pregnant, and she is scheduled for a Caesarean section in mid-February, 2017.  She filed a family-based visa petition for her two parents, who live in Baghdad, in 2016.  That visa petition was approved, and her parents were issued visas, which are facially valid until May 2017.

128.    Jane Doe's mother, who is a Shiite Muslim, and her father, who is a Sunni Muslim, plan to travel to the United States before the date of the Caesarean section and will be unable to do so under the terms of the executive order.  If the executive order banning entry from Iraq is in effect, Jane Doe's parents will not be able to travel to the United States to be present for the birth of their grandchild.

129.    Plaintiff Takaloo, a U.S. citizen, has suffered and will continue to suffer harm because of the Executive Order.  Ms. Takaloo's parents are Muslim and live in Iran.  They received temporary family-based visas, permitting them to become lawful permanent residents upon arrival in the United States.  These visas expire on April 13, 2017.

130.    Ms. Tukaloo and her parents have expended substantial amounts of money in obtaining visas for her parents, including fees payable to the U.S. government, costs of travel

outside of Iran for a visa interview because there is no U.S. embassy in Iran, and required medical examinations.

131.    Ms. Takaloo's parents bought plane tickets on Qatar Airlines to travel to the United States on March 7, 2017.  On January 27, 2017, Ms. Takaloo's parents learned through news reports that under President Trump's executive order, Iranian nationals would no longer be permitted to travel to the United States.

132.    Plaintiff John Doe #1, a lawful permanent resident, has suffered and will continue to suffer harm because of the Executive Order.  In August 2016, while John Doe #1's application to become a lawful permanent resident was pending, he married an Iranian national who lives in Iran.  She applied for a visa as John Doe #1's dependent and her application was approved on November 3, 2016.  As of January 9, 2017 John Doe #1 and his wife had submitted all of the requisite documentation and paid immigrant visa processing fees, and were waiting for notification that an interview was scheduled.  At the time the Executive Order went into effect, John Doe #1 expected his wife's interview to be scheduled within no more than six weeks based on information published by the National Visa Center.  Under the Executive Order, John Doe #1's wife will not be interviewed or granted a visa.

133.    The executive order's travel ban on Iranian nationals has created significant fear, anxiety and insecurity for John Doe #1 and his wife regarding their future.  After her mother's unexpected death in 2013, John Doe #1's wife has been alone in Tehran.  The Executive Order's ban forces John Doe to choose between his career and being together with his wife, who remains in Tehran.

134.    Plaintiff John Doe #2, a U.S. citizen, has suffered and will continue to suffer harm because of the Executive Order.  In 2006, John Doe #2's uncle and cousin were killed in Iraq, after which he also received threats.  Three days after his uncle and cousin were killed, John Doe #2 fled to Syria, where he lived for three years.  Because he continued to feel threatened in Syria,

John Doe #2 applied for refugee status in 2007, was approved in 2009, and arrived in the United States in August 2009.

135.    In March 2015, Plaintiff John Doe #2 filed a petition for family-based immigration visas for his parents, still in Iraq, so they could join him and his family in the United States. Plaintiff John Doe #2's parents are Iraqi nationals and retired teachers who worked in the United States in the 1980s.  Plaintiff John Doe #2's parents had an immigration interview at the U.S. Embassy in Baghdad in September 2016, and their visas were subsequently approved, although the visas have not yet been issued.  As of December 2016, the embassy told John Doe #2 that his parents' applications were still being processed.

136.    Expecting to be allowed to join Plaintiff John Doe #2 in the United States in early 2017, John Doe #2's parents sold their furniture and prepared for their move.  When they learned about the Executive Order, they realized that the travel ban would prevent them from joining their son and his family in the United States.

137.    Plaintiff John Doe #2's parents continue to face threats and harassment in Iraq.  His parents are moving between the houses of various friends and relatives to ensure they are not targeted.  John Doe #2 is unable to return to Iraq to see his parents for fear of putting himself, his family in Iraq, or his wife and children in danger.  Leaving the United States also puts John Doe #2 in danger of not being able to return because of the Executive Order.

138.    Plaintiff John Doe #3, a lawful permanent resident, has suffered and will continue to suffer harm because of the Executive Order.  John Doe #3 recently applied to become a naturalized citizen, and that petition remains pending with USCIS.  Should the Executive Order be fully implemented, the processing of that petition, and therefore John Doe #3's naturalization, will be delayed.

139.    In the summer of 2014, John Doe #3 married a national of Iran.  In October 2014, John Doe #3 applied for an immigration visa on her behalf.  Approximately 19 months later, in

May 2016, she had her interview at the U.S. Embassy.  At that time, she was informed that her documentation was complete and she needed to wait for administrative processing, but that she should be able to join her husband in two to three months.  She therefore resigned from her job and began preparing to join her husband in the United States.  The Executive Order, however, puts the couple's plans in peril, as it has at least delayed, and could prevent, John Doe #3's wife from obtaining her visa and joining her husband in United States.

140.    Since moving to the United States, John Doe #3 has returned to Iran on several occasions to visit his wife, but is now fearful of leaving the United States.  He had planned to visit her in February 2017, but put his plans on hold in light of the Executive Order.  John Doe #3 is afraid that if he leaves the United States to see his wife, he will not be permitted to reenter the United States or could be detained by immigration officials at the airport upon his return.

141.    The Executive Order marginalizes the Individual Plaintiffs and their families, and subjects them to baseless suspicion, scrutiny, and social isolation on the basis of religion and national origin, and inflicts stigmatic and dignitary injuries.

**Class Allegations**

142.     Individual Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b) (1) and (b) (2), on behalf of themselves and all other persons in the United States for whom the Executive Order either interferes with family reunification or the ability to travel internationally and return to the United States.  This class includes:

a.  Individuals in the United States who currently have an approved or pending petition to the United States government to be reunited with family members who are nationals of Iran, Iraq, Libya, Somalia, Sudan, Syria or Yemen (the "Designated Countries"), or who will soon file such petition;

b.  Refugees in the United States who have currently pending, or will soon file, a petition to the United States government to be reunited with family members; and

28

c.   Nationals of the Designated Countries who reside in the United States and who wish to travel abroad and return to United States or who, prior to issuance of the Executive Order, did travel abroad with the intent to return and are currently abroad.

143.   The Plaintiff Class is so numerous that joinder is impracticable.  According to the Annual Report of the Visa Office, in 2015, the last year for which data are available, the United States issued approximately 85,000 immigrant and non-immigrant visas to nationals from the seven Designated Countries. The U.S. government has estimated that between 60,000 and 100,000 people are affected by Section 5 of the Executive Order.

144.   The claims of the Plaintiff Class members share common issues of law, including but not limited to whether the Executive Order violates their associational, religious exercise and due process rights under the First and Fifth Amendments, the Religious Freedom Restoration Act, the Immigration and Nationality Act and the Administrative Procedure Act.

145.   The claims of the Plaintiff Class members share common issues of fact, including but not limited to whether the Executive Order is being or will be enforced so as to prevent them or their family members from entering the United States from abroad or from re-entering the United States should they choose to leave the United States briefly, even though they would otherwise be admissible.

146.   The claims or defenses of the named Plaintiffs are typical of the claims or defenses of members of the Plaintiff Class.

147.   The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff class.  The named Plaintiffs have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff class.   The attorneys representing the named Plaintiffs include experienced civil rights attorneys who are considered able practitioners in federal constitutional litigation.  These attorneys should be appointed as class counsel.

148.    Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole.  The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b) (2).

149.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class.  The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b)(1).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Establishment Clause, First Amendment to the U.S. Constitution)

150.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

151.    The Executive Order violates the Establishment Clause by singling out Muslims for disfavored treatment and granting special preferences to non-Muslims.  It is neither justified by, nor closely fitted to, any compelling governmental interest.

152.    In addition, Sections 5(b) and 5(e) of the Executive Order discriminate between "minority religions" and majority religions, explicitly granting official preference to foreign adherents of minority faiths in the refugee-application process.  This express preference is neither justified by, nor closely fitted to, any compelling governmental interest.

### SECOND CLAIM FOR RELIEF
### (Equal Protection, Fifth Amendment to the U.S. Constitution)

153.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

154.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law." The Clause contains an equal protection component.

155.    The Executive Order discriminates on the basis of religion and national origin, each a suspect classification, and is not narrowly tailored to serve a compelling governmental interest, and thereby violates the equal protection component of the Due Process Clause.

156.    Additionally, the Executive Order was substantially motivated by an intent to discriminate against Muslims, on whom it has a disparate effect, in further violation of the equal protection component of the Due Process Clause.

### THIRD CLAIM FOR RELIEF
**(Immigration and Nationality Act & Administrative Procedure Act)**

157.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

158.    The Immigration and Nationality Act provides, with certain exceptions not applicable here, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  8 U.S.C. § 1152(a)(1)(A).

159.    Several clients of IRAP are otherwise eligible and approved for refugee status, but pursuant to the Executive Order, their entry to the United States will be denied or delayed.  The Executive Order on its face purports to deny entry to these clients of IRAP because of their nationality, place of birth, and/or place of residence, in violation of § 1152(a)(1)(A).

160.    Plaintiffs Takaloo, John Does #1 through #4, and Jane Doe #1 have filed petitions for immigrant visas for members of their families, some of whom have subsequently received visas. Pursuant to the Executive Order, the processing of those petitions and/or the subsequent issuance of visas will be delayed or denied, and/or their family members with facially valid visas will be

denied entry.   The Executive Order on its face purports to deny or delay these Plaintiffs' petitions for their family members to receive immigrant visas and/or to use previously-issued, facially valid immigrant visas because of their nationality, place of birth, and/or place of residence, in violation of § 1152(a)(1)(A).

161.    The Executive Order on its face mandates discrimination against those who apply for and/or hold immigrant visas on the basis of their nationality, place of birth, and/or place of residence, in violation of § 1152(a)(1)(A).

162.    The actions of Defendants, as set forth above, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

**FOURTH CLAIM FOR RELIEF**
**(Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.)**

163.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

164.    The Executive Order will have the effect of imposing a special disability on the basis of religious views or religious status, by denying or impeding Muslim Plaintiffs, on account of their religion, from accessing benefits relating to their own or their family members' immigration status. In doing so, the Executive Order places a substantial burden on Muslims' exercise of religion in a way that is not the least restrictive means of furthering a compelling governmental interest.

165.    This substantial burden is not imposed in furtherance of a compelling governmental interest, and is not the least restrictive means of furthering a compelling governmental interest, in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

### FIFTH CLAIM FOR RELIEF
#### (Refugee Act & Administrative Procedure Act)

166.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

167.   The Executive Order purports to limit the number of refugees who may be admitted in fiscal year 2017 to 50,000, despite an earlier proclamation setting a limit of 110,000, in violation of the Refugee Act, 8 U.S.C. § 1157(a)(2).

168.   The Executive Order purports to alter the prior allocation of refugee admissions for fiscal year 2017 by indefinitely prohibiting "the entry of nationals of Syria as refugees," in violation of the Refugee Act, 8 U.S.C. § 1157(a)(3).

169.   President Trump did not engage in "appropriate consultation" prior to altering the number and allocation of refugee admissions for fiscal year 2017, in violation of the Refugee Act, 8 U.S.C. § 1157(a)(3).

170.   The Executive Order's preference for Christian refugees in the resettlement process, and the disfavoring of Muslim and Syrian refugees, violate the congressional mandate that refugee resettlement services "shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion."  8 U.S.C. § 1522(a)(5).

171.   The Executive Order makes other alterations to the refugee admission process that are not authorized by the Refugee Act and are in violation of the Refugee Act.

172.    The actions of Defendants that are required or permitted by Section 5 of the EO, as set forth above, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

## SIXTH CLAIM FOR RELIEF
### (Administrative Procedure Act)

173.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

174.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

175.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are contrary to constitutional right, power, privilege, or immunity, including rights protected by the First and Fifth Amendments to the U.S. Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

176.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

177.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, were without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any portion of the Executive Order;

B.    A declaration pursuant to 28 U.S.C. § 2201 that the entire Executive Order is unlawful and invalid;

C.     An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

D.     Such other and further relief as the Court deems equitable, just, and proper.


 Respectfully submitted,                    Dated:  February 7,  2017

/s/ Justin B. Cox
Justin B. Cox (Bar No. 17550)              Omar C. Jadwat†
National Immigration Law Center            Lee Gelernt†
1989 College Ave. NE                       Hina Shamsi†
Atlanta, GA 30317                          Hugh Handeyside†
Tel: (678) 404-9119                        Sarah L. Mehta†
Fax: (213) 639-3911                        American Civil Liberties Union
cox@nilc.org                               Foundation
                                           125 Broad Street, 18th Floor
                                           New York, NY 10004
Karen C. Tumlin†                           Tel: (212) 549-2600
Nicholas Espíritu†                         Fax: (212) 549-2654
Melissa S. Keaney†                         ojadwat@aclu.org
Esther Sung†                               lgelernt@aclu.org
National Immigration Law Center            hshamsi@aclu.org
3435 Wilshire Boulevard, Suite 1600        hhandeyside@aclu.org
Los Angeles, CA 90010                      smehta@aclu.org
Tel: (213) 639-3900
Fax: (213) 639-3911
tumlin@nilc.org                            Cecilia D. Wang†
espiritu@nilc.org                          Cody H. Wofsy†
keaney@nilc.org                            American Civil Liberties Union
sun@nilc.org                               Foundation
                                           39 Drumm Street
                                           San Francisco, CA 94111
                                           Tel: (415) 343-0770
                                           Fax: (415) 395-0950
                                           cwang@aclu.org
                                           cwofsy@aclu.org

                                           David Cole†
                                           Daniel Mach†
                                           Heather L. Weaver†
                                           American Civil Liberties Union
                                           Foundation
                                           915 15th Street NW
                                           Washington, DC 20005
                                           Tel: (202) 675-2330
                                           Fax: (202) 457-0805

35

dcole@aclu.org
dmach@aclu.org
hweaver@aclu.org


/s/ David Rocah
David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar
No.19670)
American Civil Liberties Union
 Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
steiner@aclu-md.org


†*Pro Hac Vice Applications Forthcoming*

*Counsel for Plaintiffs*