**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | |
| Plaintiffs, | Civil Action No.: 8:17-CV-00361-TDC |
| v. | |
| DONALD TRUMP, et al, | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION OF § 5(D) OF THE EXECUTIVE ORDER & MEMORANDUM OF LAW IN SUPPORT THEREOF** |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL AND LEGAL BACKGROUND .......................................................................... 2

    Pre-1980 History of Refugee Resettlement ................................................................... 3

    The Refugee Act of 1980 .............................................................................................. 5

    Background on Refugee Resettlement Process .............................................................. 6

    The Effects of § 5(d) on Refugee Resettlement ............................................................ 9

LEGAL STANDARD ......................................................................................................... 12

ARGUMENT ...................................................................................................................... 13

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT § 5(D) VIOLATES THE REFUGEE ACT ............................................................ 13

    II.    PLAINTIFFS AND THEIR CLIENTS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION ............................................................ 20

    III.    THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS FAVOR AND AN INJUNCTION IS IN THE PUBLIC INTEREST ................................................ 23

CONCLUSION .................................................................................................................... 24

CERTIFICATE OF SERVICE ........................................................................................... 26

APPENDIX ................................................................................................................... App 1

## INTRODUCTION

Plaintiffs respectfully move this Court to preliminarily enjoin Defendants from enforcing § 5(d) of President Trump's January 27, 2017 Executive Order, "Protecting the Nation from Foreign Terrorist Entry into the United States."  Section 5(d) reduces the annual number of refugees who may be admitted to the United States this year by more than half.  Pursuant to this section, the federal government has already all but halted refugee processing interviews abroad, effectively cutting off the pipeline of refugees who have already endured months, if not years, of processing and security screenings to be resettled in the United States.  If § 5(d) is not enjoined, no additional refugees can be approved and admitted for resettlement this fiscal year. Thousands of those already approved will not be allowed to resettle in the United States.[1]

The statutory framework that controls the setting of the annual refugee admissions level, which was created by the Refugee Act of 1980, embraces two basic principles: first, that the President's determination not be made unilaterally, and second, that the determination be stable enough to permit the orderly resettlement of refugees in the United States while still permitting the President to admit more refugees than planned in response to humanitarian crises.  The statute does not allow the President to order a midyear reduction in the level of refugee admissions—a step which it appears no President has ever taken before—much less to do so without consulting Congress; to the contrary, it states expressly that the "number of refugees who may be admitted" in a particular fiscal year "*shall* be such number as the President determines, *before* the beginning of the fiscal year and *after* appropriate consultation, is justified by humanitarian concerns or is

---

[1] As noted during the February 13 telephone conference, Plaintiffs are not moving for preliminary relief with regard to other provisions of the Order at this time in light of the other injunctions in effect, but may do so depending on how the situation evolves.

otherwise in the national interest."  8 U.S.C. § 1157(a)(2) (emphases added).  Section 5(d) of the Order flies in the face of these principles and violates the Refugee Act and the Administrative Procedure Act.

Section 5(d) has already irreparably harmed organizational Plaintiffs International Refugee Assistance Project ("IRAP") and HIAS, as well as the clients they serve.  As a result of § 5(d), the refugee resettlement process has largely ground to a halt, with a devastating impact on tens of thousands of refugee applicants—nearly all of whom have already been waiting for years to move forward with processing and resettlement.  Section 5(d) prolongs, potentially indefinitely, a period of life-threatening insecurity and uncertainty for these applicants that, on January 26, 2017, they had every reason to believe would soon be over.  Plaintiffs IRAP and HIAS' very mission—to aid in the resettlement of refugees in the United States—is threatened as result of § 5(d)'s unauthorized shutdown of the U.S. refugee resettlement program, which forces them to divert critical organizational resources to deal with its effects.  Section 5(d) further promises direct financial harm to HIAS that is so severe it is irreparable.

The United States Refugee Admissions Program ("USRAP") was on track to hit its admissions target for Fiscal Year 2017 when the Executive Order at issue here was signed.  The disruptions caused by the Order generally, and § 5 specifically, however, have likely already put that target out of reach.  Nonetheless, injunctive relief from § 5(d), particularly obtained quickly, could still save the lives of tens of thousands of individuals, driven from their homes, who seek sanctuary here.  Plaintiffs therefore seek a preliminary injunction of § 5(d).

## FACTUAL AND LEGAL BACKGROUND

On September 28 of last year—two days before the beginning of the current fiscal year—and after "appropriate consultation," President Obama made a determination pursuant to the

Refugee Act that "[t]he admission of up to 110,000 refugees to the United States during Fiscal Year (FY) 2017 is justified by humanitarian concerns or is otherwise in the national interest." Presidential Determination on Refugee Admissions for Fiscal Year 2017, 81 Fed. Reg. 70315 (Oct. 11, 2016) (citing 8 U.S.C. § 1157).  In accordance with that determination, the federal government instructed refugee resettlement agencies, including HIAS, to prepare to resettle their proportionate share of those 110,000 refugees.  Declaration of Mark Hetfield ("Hetfield Decl.) ¶¶ 10-11, J.R. 7.

President Trump was inaugurated on January 20, 2017.  A week later, he issued the Executive Order challenged in this case.  Section 5(d) of the Executive Order provides as follows:

> Pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any such entry until such time as I determine that additional admissions would be in the national interest.

Exec. Order No. 13769, 82 Fed. Reg. 8977, 8979.

**Pre-1980 History of Refugee Resettlement**

For most of its history, the United States did not have a formal process for admitting refugees; instead, refugees were generally subject to the same restrictions applicable to other types of immigrants.  Nevertheless, the United States provided sanctuary to millions of political, religious, and economic refugees, particularly from Europe, until the 1920s, when United States law first imposed rigid numerical limits on immigration.  World War II, which displaced an estimated 60 million people worldwide,[2] exposed problems with the inflexibility of the United States' immigration system at the time.  Some refugees fleeing Europe during the war did find

---

[2] For approximately 70 years, this was the largest number of people displaced at any one time, but it was surpassed at the end of last year, when more than 65 million people were displaced worldwide.  *See* UNHCR, *Global Trends: Forced Displacement in 2015* (June 20, 2016), *available at* https://s3.amazonaws.com/unhcrsharedmedia/2016/2016-06-20-global-trends/2016-06-14-Global-Trends-2015.pdf).

sanctuary here, but their numbers were limited by America's restrictive immigration quotas, which generally made no particular allowances for refugees.

Beginning with President Eisenhower in 1956, successive Administrations directed the Attorneys General to exercise their authority under § 212(d)(5) of the Immigration and Nationality Act of 1952 ("INA") to parole tens of thousands of refugees into the country.[3]  Although Congress eventually ratified these uses of the parole authority through one-off legislative enactments— which was required for the refugees to adjust status, as parolees were not considered "admitted"[4]— this process was heavily criticized as effectuating an "unstated, hidden and ad hoc refugee admission policy" without "standardized procedures . . .  to structure and guide its implementation."  Cox. Decl. Ex. 5, J.R. 85-166 (Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 San Diego L. Rev. 9, 19 (1981)).  Furthermore, given that the President had essentially unfettered discretion to use the parole authority—or not—to benefit favored groups of refugees, the use of parole "became a highly politicized admission device."  J.R. 97 (*Id.* at 20 n.49).

Eventually, "a practice evolved whereby the Attorney General would consult with ranking members of the Judiciary Committees of the House and Senate" regarding anticipated uses of the parole authority to address emergent refugee crises.  J.R. 96 (*Id.* at 19) (footnotes omitted).  "No formal guidelines, however, existed on the conduct of the consultations or the dimensions of the congressional role."  J.R. 97 (*Id.* at 20).

---

[3] *See* S. Rep. No. 96-256, at 6 (1979) (listing uses of the parole authority for refugees).

[4] *See* INA § 212(d)(5) (1952); 8 U.S.C. § 1182(d)(5) (1952) ("parole of such alien shall not be regarded as an admission of the alien").

**The Refugee Act of 1980**

After more than a decade of hearings and debate of various proposals, *see* J.R. 97-119 (*id.* at 20-42), Congress enacted the Refugee Act of 1980 ("the Act") as an amendment to the INA in order to provide, for the first time, "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212 § 101(b), 94 Stat. 102, 102.[5] Most relevant for present purposes are following features of the Act, which, as amended, still governs refugee admissions today:

*First*, the Act contained an express statutory commitment to refugee admissions as a matter of humanitarian (as opposed to political, ideological, or other) concern. *See, e.g.*, *id.* § 101 (declaration of purpose), *codified at* 8 U.S.C. § 1521 note; S. Rep. No. 96-256 (1979) at 1; H.R. Rep. No. 96-608 (1979) at 12-14 (explaining that by changing the statutory phrase "special concern" to "special humanitarian concern" in what became § 1157(a), the House committee "intends to emphasize that the plight of the refugees themselves, as opposed to national origins or political considerations, should be paramount in determining which refugees are to be admitted to the United States"); *see also* Pub. L. No. 96-212 § 201 (a) (providing a universal, nondiscriminatory definition of "refugee" closely paralleling that of the United Nations

---

[5] In so doing, Congress also declared "that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States." Pub. L. No. 96-212 § 101(a).

Conventions Relating to the Status of Refugees (1951)), *codified at* 8 U.S.C. § 1101(a)(42); J.R. 94, 96-97; J.R. 114-118, 123-25 (Anker & Posner, *supra*, at 37-41, 46-48).

*Second*, and relatedly, the Refugee Act provides no numerical limits on the number of refugees who can be admitted, but instead creates a process whereby the President sets an annual level of refugee admissions after consultation with Congress.  *See* 8 U.S.C. § 1157.  The one exception to the general rule that the number of refugees that may be admitted "shall be" set prior to the beginning of the fiscal year is that, under certain circumstances, the President can *increase* the number of refugees who may be admitted.  *See* 8 U.S.C. § 1157(b).  The Act provides no mechanism for reducing the number of refugees who may be admitted after the fiscal year has begun.

The consultation process between the Congress and the Executive Branch codified in the Refugee Act is similar to what had evolved with regard to the use of the parole authority for refugee admissions.  Under the Refugee Act, each of the aforementioned presidential determinations about which and how many refugees to admit to this country can only be made "after appropriate consultation," 8 U.S.C. § 1157(a) & (b), with "appropriate consultation" given a precise and exhaustive definition, *id.* § 1157(e).

*Third*, the Refugee Act codified a role for private non-profit organizations that had long provided assistance to refugees in the resettlement process.  Some of these organizations—referred to herein as "resettlement agencies," and sometimes referred to in the Refugee Act as "voluntary agencies," or "VOLAGS"—trace their roots to the late 19th century, before the United States had a statutory framework for admitting refugees.[6]  Plaintiff HIAS, which was founded in 1881 as the

---

[6] During that period, Congress enacted statutory prohibitions on the immigration of anyone "likely to become a public charge."  Immigration Act of 1891, 26 Stat. 1084, 1084; *see also* Immigration

Hebrew Immigrant Aid Society, is the oldest continuously operating organization of this kind, and now provides services without regard to religious affiliation.  Hetfield Decl. ¶ 2, J.R. 7.  Several *ad hoc* legislative measures related to refugees enacted between 1945 and 1980 utilized the infrastructure these voluntary organizations had already created to deliver services to refugees resettled in this country.  *See* Bier & La Corte, *supra* at 5-6.  Acknowledging what had proven to be a successful model, Congress wrote the role of the resettlement agencies directly into the Refugee Act of 1980.[7]

### Background on Refugee Resettlement Process

Under the INA, as amended by the Refugee Act, refugee status may be granted to foreign nationals located outside of the United States who have been persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion, or who have a well-founded fear of persecution on one or more of the same bases; who have not participated themselves in the persecution of others; and who are otherwise admissible.  *See* 8 U.S.C. § 1101(a)(42) (defining "refugee"); 8 U.S.C. § 1182(a) (bases of inadmissibility).  With limited exceptions, individuals must generally be outside of their country of origin to be considered for refugee status.  *See* 8 U.S.C. § 1101(a)(42); 8 U.S.C. § 1157(b).

Most foreign nationals seeking refugee status register with the United Nations High Commissioner for Refugees ("UNHCR"), which refers for resettlement the most vulnerable refugees, such as unaccompanied minors, women-at-risk, and individuals with urgent medical or

---

Act of 1882, 22 Stat. 214, 214.  In order to avoid public charge determinations that would prohibit immigration, mutual-aid societies in the United States were established or expanded to help track down relatives of would-be immigrants; those relatives, in turn, could serve as sponsors to avoid the public charge prohibition.  *See* David Bier & Matthew La Corte, Private Refugee Resettlement in U.S. History 3-6 (Niskanen Center Apr. 26, 2016), http://bit.ly/2mewgPh.

[7] *See, e.g.* 8 U.S.C. § 1522.

protection concerns. Declaration of Rebecca Heller ("Heller Decl.") ¶ 14, J.R. 30.   After conducting interviews, collecting documents, and running home-country reference checks and biological screenings for each registrant, the UNHCR decides which individuals are suitable for resettlement and to which country a refugee can apply.  Declaration of Natasha Hall ("Hall Decl.") ¶ 7, J.R. 2.  For those referred to USRAP, applicants go through a further screening process conducted by a Resettlement Support Center ("RSC"), which conducts additional interviews, collects relevant documents, looks carefully for discrepancies between RSC interviews and those conducted by the UNHCR, and prepares cases to send to USCIS, which handles refugee applications.  *Id.*

Applicants referred to USCIS undergo further extensive vetting, including a lengthy and detailed interview with an immigration officer trained in to spot red flags and study country conditions; fingerprinting and photographing; security vetting from more than nine different intelligence and national security agencies; screening that matches each individual's biographical and biometric information against criminal databases and immigration records; and intensive research and analysis by officers at USCIS headquarters who reconcile multiple interview notes, country conditions, and background checks.  Hall Decl. ¶¶ 9-12, J.R. 3. The initial interview process alone is so extensive for refugees from the Middle East that refugee officers can only interview one or two applicants per day, compared to approximately six applicants per day in East Asia.  Hall Decl. ¶ 10, J.R. 3.  As a refugee's case moves through the vetting process, the system has multiple checks to allow for further interviews and vetting if previous screening proves to be insufficient, new information arises, or a new national security threat emerges and requires tighter scrutiny.  *Id.* ¶¶ 11-12, J.R. 3.  The entire process lasts 18 to 24 months for most refugees, but many refugees from the Middle East wait years longer due to more stringent security screening.

*Id.* ¶ 14, J.R. 4. Although they are no longer in their country of origin, many of these refugees wait for processing while freezing in tents in a refugee camp, unable to put their children through school, and in some cases, continuing to receive death threats.  *Id.*  Some have been killed while awaiting the processing of their applications by USCIS.  *Id.* ¶¶ 14, 24, J.R 4-5.

If and when refugees are finally approved by USCIS, they must go through medical tests and an optional cultural orientation before they come to the United States on a plane ticket, which they are obligated to repay, and are resettled in a specific city.  *Id*. ¶ 13, J.R. 3-4.  Upon their arrival, they receive six months of assistance from a resettlement agency, such as plaintiff HIAS, to smooth the transition to the United States.  *Id.*  After one year in the United States, refugees are required to apply to adjust to lawful permanent residence status.  *Id.*

### The Effects of § 5(d) on Refugee Resettlement

As noted above, § 5(d) of the Executive Order reduces the number of refugee admissions for fiscal year 2017 from 110,000 to 50,000.  Agency implementation of § 5(d) has been swift, and its effects have been immediate.  USCIS has already halted refugee processing interviews abroad and suspended security checks of refugee applicants.  Hall Decl. ¶ 22, J.R. 5; Hetfield Decl. ¶ 26, J.R. 16-17; Heller Decl. ¶ 13, J.R. 29-30.  The Bureau of Population, Refugees, and Migration ("PRM") of the U.S. Department of State has begun "implementing the revised target of 50,000 refugee arrivals . . . for FY 2017" and has revised the number of refugees assigned to resettlement agencies such as plaintiff HIAS.  Exs. 1 & 2 to Hetfield Decl., J.R. 21-25.

Meanwhile, the many refugees nearing what was to be the end of their years-long journey towards resettlement in the United States are now facing delays of unknown duration.  As of February 2017, somewhere between 35,000 and 41,000 refugees had already been resettled in the United States, leaving few additional slots available until the end of September 2017.  Hall Decl.

¶ 20, J.R. 5; Heller Decl. ¶ 12, J.R. 29.  At least 2,000 approved individuals, however, are already currently booked for travel, and another 12,000 more have been approved by USCIS, have cleared all final security and medical checks and completed cultural orientation, and are awaiting booking for travel.  Heller Decl. ¶ 12, J.R. 29.  Like many refugees referred for resettlement in the United States, many of these individuals have family ties in the country or worked for the U.S. government.  Hall Decl. ¶ 20, J.R. 5.  If § 5(d) remains in place, no further refugees in the pipeline can be approved and admitted in this fiscal year, and many of those who have *already* been approved and are awaiting only travel booking will not be allowed to enter the United States.

USCIS has begun implementing a triage system to determine which of the many thousands of already vetted and approved refugees will be resettled under the new, lower level of 50,000 refugee admissions.  In the meantime, the security checks that these refugees already passed have begun to expire, which means that applicants will have to begin the security check process again.  Hall Decl. ¶ 22, J.R. 5.  This in turn slows the process for new applicants and will create an enormous backlog on top of delays already imposed by the reduction in the refugee admission levels and the effective cessation of USCIS interviews.  *Id.*  Thousands of refugees are therefore stuck in limbo, and because they have already been referred for resettlement in the United States, it is highly unlikely that they will be able to secure referral to another country this year or, in fact, ever; other resettlement countries set their own annual refugee numbers based on the understanding that the United States would accept 110,000 for fiscal year 2017—i.e., had they known we would accept fewer, they may have accepted more—and their own quotas and pipelines are already full with other refugees.  Heller Decl. ¶ 10, J.R. 29.

The consequences of these delays are real and severe: although refugees have fled their country of origin, many have not succeeded in fleeing persecution.  One client of plaintiff IRAP,

for example, is a 25-year-old transgender Iraqi woman who fled Iraq when her family learned about her gender identity and had her adjudged by a tribal council, which sentenced her to death. *Id.* ¶ 22, J.R. 32.  Her persecutors persist in attempting to locate her in Lebanon.  *Id.*  The longer her resettlement process is delayed, the likelier it is that she will be found and killed.  *Id.*  Although she is still alive, others are not.  Likewise, activists who risked their lives to document the crimes of ISIS have been shot dead in Turkey, in broad daylight, while awaiting the processing of their refugee applications by USCIS.  Hall Decl. ¶ 24, J.R. 15-16.  The abandonment of these and many other refugees in the region can be, without hyperbole, a death sentence.  *See id.*

Even for those refugees who escape death, every day that their resettlement is delayed they remain at risk of the very persecution and abuse that they are fleeing, and face hardship and indefinite separation from family members in the United States.  Hetfield Decl. ¶¶ 25-26, J.R. 16-17, ¶¶ 28-33, J.R. 17-19; Heller Decl. ¶ 21, J.R. 32.  Refugees have few, if any rights in the neighboring countries to which they have fled, and it remains relatively easy for persecutors to follow them.  Heller Decl.  ¶ 17, J.R. 32. Particularly vulnerable populations, such as LGBTI refugees and single women, often face the same types of persecution—just from different persecutors—because neighboring countries often share similar societal attitudes as their country of origin.  *Id.* ¶ 18, J.R. 31.  Many refugees also face extreme racism and discrimination in the countries in which they have sought asylum; they often have no right to work and very limited access to adequate healthcare, housing, or education.  *Id.* ¶¶ 17-18, J.R. 31.  Prolonged delay and danger, moreover, is particularly harmful to children, who make up a sizeable percentage of all refugees, and about 60 percent of the 11,000 Syrians resettled in the United States in fiscal year 2016.  Hall Decl. ¶ 23, J.R. 5.

Section 5(d) also means that families torn apart by horrific events will not be reunited here in the United States.  It means that children persecuted in Central America must remain in vulnerable and dangerous situations, separated from their relatives here, even though they have been approved for refugee status.  Hetfield Decl. ¶¶ 25, 39, J.R. 16-18.  It means that mothers will be separated from their children, husbands, and familiar support.  Hall Decl. ¶ 21, J.R. 5.  These familial separations have untold detrimental effects on the integration process for refugees here in the United States; building a familial network is essential to building a life in, and being able to contribute positively to, a new country.  *Id.* ¶¶ 21, 30, J.R. 5-6.

USRAP is a critical lifeline for the most vulnerable refugees all over the world.  President Trump's Executive Order has unlawfully cut it by more than half.

## LEGAL STANDARD

In order to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *WV Ass'n of Club Owners v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).  To establish a likelihood of success on the merits, plaintiffs need not show "a certainty of success."  *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).  Preliminary injunctions are appropriate for purposes of preserving the status quo preceding the controversy during the course of litigation in order to prevent irreparable harm and to preserve the ability of the court to render meaningful relief on the merits.  *In re Microsoft Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *see also Pashby*, 709 F.3d at 320 (defining the status quo as the "'last uncontested

status between the parties which preceded the controversy'") (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)).

## ARGUMENT

### I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT § 5(D) VIOLATES THE REFUGEE ACT

The Refugee Act is clear on its face.  It states that the "number of refugees who may be admitted" in a particular fiscal year "*shall* be such number as the President determines, *before* the beginning of the fiscal year and *after* appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest."  8 U.S.C. § 1157(a)(2) (emphases added).[8]  Under this section, the President's authority to set the number of annual refugee admissions is governed by two explicit requirements: (1) that the determination be made before the start of the new fiscal year, and (2) that it be determined only after appropriate consultation, which the statute goes on to describe in great detail.  Section 5(d) of the Executive Order violates both of these requirements.

Where, as here, a statute's meaning is clear on its face, the plain text determines its meaning.  *See Tankersley v. Almand*, 837 F. 3d 390, 395 (4th Cir. 2016) ("[A] fundamental principle of statutory interpretation . . . directs that we 'presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'") (internal citation

---

[8] The provision provides in full:

> Except as provided in subsection (b), the number of refugees who may be admitted under this section in any fiscal year after fiscal year 1982 shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.

8 U.S.C. § 1157(a)(2).  Section 1157, in its entirety, is set out in an Appendix to this memorandum.

omitted).   Before the current fiscal year, President Obama determined, pursuant to the statutory requirements, that the admission of up to 110,000 refugees to the United States would be in the national interest.   *See* Presidential Determination on Refugee Admissions for Fiscal Year 2017, 81 Fed. Reg. at 70315.   Pursuant to the Refugee Act, therefore, 110,000 is *the* number of refugees who may be admitted this fiscal year.   *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.") (internal citation omitted); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion.").   President Trump's unprecedented attempt to change that number by fiat, completely outside the procedures and timing established by Congress, is thus invalid.

The context of § 1157(a)(2) supports the same conclusion.   Congress included in the Refugee Act only one procedure for the President to adjust the number of refugees in the middle of the fiscal year.   But that procedure is limited to adjusting the number *up*—i.e., to admit additional refugees—if justified by unforeseen humanitarian crises.   *See* 8 U.S.C. § 1157(a)(2) ("Except as provided in subsection (b) . . . . ").[9]   The logical implication is that Congress did not

---

[9] This provision, to adjust the admissions level up, states in its entirety:

> If the President determines, after appropriate consultation, that (1) an unforeseen emergency refugee situation exists, (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest, and (3) the admission to the United States of these refugees cannot be accomplished under subsection (a), the President may fix a number of refugees to be admitted to the United States during the succeeding period (not to exceed twelve months) in response to the emergency refugee situation and such admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after the appropriate consultation provided under this subsection.

intend to permit the mid-year revising of that number *down*.  *See Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1181 (2013) (noting that the rule of *expressio unius est exclusio alterius*, which "instructs that when Congress includes one possibility in a statute, it excludes another by implication," may be used to "reinforce[] what the text makes clear") (internal citations omitted). To the extent that any doubt remains on that score, Congress specifically indicated that the Refugee Act's procedures are comprehensive.  *See* The Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102 (1980) ("The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.").

Section 5(d) of the Executive Order also violates the Refugee Act by sidestepping the consultative process Congress required.[10]  In enacting the Act, Congress spelled out in tremendous detail the consultative process required before the President is permitted to set the annual refugee

---

8 U.S.C. § 1157(b).

[10] Notably, a draft version of the Executive Order published by the media—the effective equivalent of the legislative history of the Order—contemplated at least some consultation, using language that echoes the consultation requirement of the Refugee Act.  Section 5(d) of that draft version states as follows:

> Notwithstanding any previous Presidential determination regarding the number of refugee admissions for Fiscal Year 2017, the Secretaries of State and Homeland Security may only process and admit a total of 50,000 refugees during Fiscal Year 2017. During the 120-day suspension provided by section 5(a), the Secretary of State and the Secretary of Homeland Security shall initiate appropriate consultations in connection with this determination, including with respect to the allocation among refugees of special humanitarian concern to the United States.

J.R. 42-43.  The kind of post-facto consultation contemplated by this draft version would have been insufficient under the plain terms of the Refugee Act.  But the final Order—apparently purposefully—eliminated even this subsequent consultation provision.

admissions level.  *See* 8 U.S.C. § 1157(d).  The Act further defines what Congress intended by "appropriate consultation" under subsection (e), specifying that a "designated Cabinet-level representative of the President" must have "discussions in person" with members of the Committees on the Judiciary of both the Senate and House regarding enumerated topics, and that the designee must provide the members with long and detailed list of information, plus any other information that "may be appropriate or requested."[11]  *Id.* § 1157(e).  In attempting to revise down the number of refugees who may be admitted this year, President Trump ignored all of these requirements.  *See* Decl. of Rep. Zoe Lofgren ¶¶ 3-6, J.R. 37.

As discussed *supra*, Congress had very good reasons for including these detailed consultative procedures.  Not only were they intended to give Congress a voice and a modicum of control over a process that ultimately grants the President considerable discretion, but they also serve a deliberation-forcing function, ensuring that at minimum the President's decisions would be well-informed as to the realities of the refugee situation and the United States' statutorily codified commitment to addressing it, and not simply based on political considerations, *see id.* ¶ 4, J.R. 37, as the prior uses of the parole authority were too often perceived to be, *see* J.R. 96-97

---

[11] *See also* 8 U.S.C. § 1157(d)(2) (requiring the "substance" of the "appropriate consultation" to be printed in the Congressional Record as soon as possible after the "appropriate consultation" is "initiate[d]"); *id.* § 1157(d)(3) (requiring, with limited exceptions, a hearing on the President's "proposed determination" of the number of refugees to admit after the initiation of "appropriate consultation" but prior to a final determination).

The role of Congress in determining annual refugee admissions was a major topic of disagreement, with many members of Congress favoring a significantly more robust role for the legislature, including a legislative veto of presidential proposals regarding annual refugee admissions.  *See generally* J.R. 111-13, 121, 123, 126-31, 133, 135, 140 (Anker & Posner, *supra*, at 34-36, 44, 46, 49-54, 56, 58, & 63).  Ultimately, a legislative veto was rejected, with many individuals expressing particular concern about its possible effects on the orderly resettlement of refugees.  *See, e.g.*, Cong Rec., H12374 (1979); Hearings on H.R. 3056 Before the Subcomm. on Immigration, Citizenship & Int'l Law of the H. Comm. on the Judiciary, 95th Cong., 1st Sess. (1977), at 79.

(Anker & Posner, *supra*, at 19-20).  President Trump's attempt, a mere week into his presidency, to cut the number of refugees who may be admitted this year by more than half—and to do so without engaging in appropriate consultation—could hardly be more antithetical to these concerns, which are reflected in the Refugee Act itself.

President Trump's mid-year slashing of refugee admissions cannot be justified by the source of authority on which it is purportedly based, § 212(f) of the INA, which states in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

The meaning of this statutory provision is, of course, a matter of statutory interpretation. But despite its broad language, it cannot be read to authorize what President Trump has sought to do here.

To begin, § 5(d) of the Executive Order is a dubious application of § 212(f), even on its own terms.  Whatever other limits there may be on § 212(f), it is certainly limited to restricting the entry of a particular "class" or group of noncitizens.[12]  But § 5(d) identifies no such class.  It does not specify *which* refugees will be excluded and which will be permitted entry.  Whether a given refugee is allowed into the country or not has nothing to do with any identifiable attribute related to him or her, but rather is solely about where the refugee stands in line.  Only a strained reading

---

[12] The historical use of § 212(f) reflects this understanding.  *See* J.R. 78-82 (Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief*, at 5-10, https://fas.org/sgp/crs/homesec/R44743.pdf (documenting all past § 212(f) proclamations).

of "class" could shoehorn into § 212(f) this attempted end run around the procedures Congress established in the Refugee Act.

Moreover, President Trump's attempted use of § 212(f) conflicts with the detailed procedures Congress set out in the Refugee Act, as already noted.  In light of this conflict, the Refugee Act must be read to control for three reasons.

First, the "later in time" canon provides that insofar as two statutes conflict, the later-enacted law controls.  *See Watt v. Alaska*, 451 U.S. 259, 285 (1981).  Section 212(f) has been a part of the INA since its enactment in 1952, whereas the relevant portions of the Refugee Act were part of its enactment in 1980.  Thus, the later-enacted Refugee Act limits the President's authority under 212(f)—which has never been used in this manner, or in any manner remotely similar to the way President Trump has sought to use it in this Executive Order.  *See* footnote 12, *supra*.

Second, a specific statutory provision controls a more general one.  *See, e.g.*, *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) ("As always, '[w]here there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (emphasis in original))); *S.C. Dep't of Health & Envt'l Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 258 (4th Cir. 2004) ("Pursuant to elementary principles of statutory construction, unless the legislature has indicated that it intends otherwise, a specific statutory provision controls a more general one.").  Here, the Refugee Act specifically requires a determination that the number set "is justified by humanitarian concerns or is otherwise in the national interest."  8 U.S.C. § 1157(a)(2).  In seeking to revise that number down, however, President Trump relied on a different and more general statutory provision, § 212(f), to consider essentially the very same question and reach the opposite determination—that the admission of

18

certain refugees (those above number 50,000) is "detrimental" to the national interest—without any regard for statutorily required consultation or fact-finding required under the significantly more specific procedures outlined in the Refugee Act.  The Refugee Act's provisions relating to the setting of the annual level of refugee admissions are detailed, comprehensive, and specific to the particular determination at issue here, in stark contrast to § 212(f), and so the former controls. *See Crawford Fitting*, 482 U.S. at 445; *see also Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("A general statutory rule usually does not govern unless there is no more specific rule.").

Third, a broad reading of the President's authority under § 212(f) that would authorize § 5(d) conflicts with the legislative design of the Refugee Act in general and 8 U.S.C. § 1157 in particular. As discussed above, Congress rejected the proposal to include a legislative veto over the President's determination of the annual level of refugee admissions.  The legislative debates surrounding the way in which the refugee admissions number would be set make clear that Congress was concerned such a veto power could endanger the lives of refugees, particularly if exercised after the United States had made an international commitment to resettling them here. *See* footnote 11, *supra*.  For similar humanitarian reasons, Congress provided a mechanism for the Executive to increase the number of refugees who may be admitted during the middle of the fiscal year, *see* 8 U.S.C. § 1157(b), but declined to provide for any mechanism to decrease the determination made before the fiscal year begins.  Congress created this system precisely because the Refugee Act addresses humanitarian concerns, which are best served by a year-long commitment that can be increased, if need be, but provides at least a predictable floor of support for refugee resettlement.  The President's invocation of § 212(f) runs roughshod over this Congressional design.

Nor is President Trump's attempt to cut the number of refugees admitted this year justified by national security concerns, as experts have already attested in other cases challenging the Executive Order. *See* J.R. 51-66 (J. Decl. of Madeleine K. Albright, *et al*. in *Washington v. Trump*, No. 17-35105 (9th Cir. filed Feb. 6, 2017)).[13]  As described above, not only do refugees undergo extensive vetting, but there is no rational basis to believe that the 50,001st refugee to be admitted this fiscal year is any more of a threat to national security than the 50,000th.

What President Trump has sought to do here is historically unprecedented, factually unjustified, and statutorily unauthorized.  Plaintiffs are thus likely to succeed on their claim that § 5(d) of the Executive Order, as well as the actions taken by the agency defendants to implement it, are unlawful.

## II.     PLAINTIFFS AND THEIR CLIENTS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION

Plaintiffs will suffer irreparable harm if § 5(d) of the Executive Order is not immediately enjoined.  *Winters*, 129 S. Ct. at 375 (injunction appropriate where irreparable harm "likely").  Here, the organizational plaintiffs will be irreparably harmed because § 5(d) "perceptibly impair[s]" their programs, making it more difficult to carry out their mission. *Action NC v. Strach*, 2016 WL 6304731, at *29 (M.D.N.C. Oct. 27, 2016) (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC.*, 713 F.3d 175, 183 (4th Cir. 2013); *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012)).  These difficulties in carrying out the organizational plaintiffs' mission are caused by the inability to provide services to refugees seeking resettlement

---

[13] *See also Washington v. Trump*, ___ F.3d ___, 2017 WL 526497, at *10 (9th Cir. 2017) ("the government has done little more than reiterate" its interest in combatting terrorism (citation omitted)); *Aziz v. Trump*, ___ F. Supp. 3d ___, 2017 WL 580855, at *21 (E.D. Va. 2017) ("Ironically, the only evidence of in this record concerning national security indicates that the EO may actually make the country less safe.").

in the United States, which results from § 5(d)'s shutdown of the refugee resettlement process, and the resulting harms both to the organizational plaintiffs and their clients. *Cf. E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004) (upholding finding that "undue delay" in starting construction on portions of a pipeline would cause "significant financial harm both to [plaintiff] and some of its putative customers" constituted irreparable injury).

First, § 5(d) has a direct impact on the organizational plaintiffs' ability to provide services to its clients. As result of the reduced level of refugee admissions set by § 5(d), USCIS has cancelled nearly all critical refugee interviews abroad. Hall Decl. ¶ 22, J.R. 5; Hetfield Decl. ¶ 26, J.R. 16-17; Heller Decl. ¶ 13, J.R. 11. The cancellation and suspension of these interviews has a devastating impact on the tens of thousands of refugee applicants who have already been waiting, in some cases for years, to move forward with processing. Heller Decl. ¶ 16, J.R. 31. Wait times for these many thousands of refugees will now be even longer. *See, e.g.*, Heller Decl. ¶ 23, J.R. 33 (detailing client awaiting further processing who is an Iraqi widow whose husband was killed working for the U.S. Army in Iraq but is unable to get the necessary prescreening interviews because of the growing backlog). Many refugees who were referred to the United States will be unable to find refuge in any other country. Heller Decl. ¶ 11, J.R. 29. Indeed, organizational plaintiffs' clients are continuing to experience imminent risk of persecution and death as a result of § 5(d) and the corresponding delays in refugee processing. Heller Decl. ¶¶ 15-21, 22-23, J.R. 30-33; Hetfield Decl. ¶¶ 25-26, J.R. 16, ¶¶ 28-33, J.R. 17-19; Hall Decl. ¶ 14, J.R. 4.

The organizational plaintiffs are devoting substantial resources to deal with the effects of the cut in refugee admissions ordered in § 5(d). For example, the drastic reduction in the number of resettlement slots available is requiring Plaintiff IRAP to invest significant time and energy exploring alternative routes to safety for its clients and educating its network of over 2,000 pro

bono attorneys and law students about those alternate routes.  Heller Decl. ¶¶ 8-9, J.R. 27-28.

IRAP attorneys are also forced to expend time and resources counseling clients who were already

being processed in the USRAP about the changes in law as well as how to pursue other resettlement

options.  *Id.*  To the extent that additional options are available, such as referral to other countries,

IRAP has also been forced to divert resources to secure these resettlement options for its clients.

*Id.*  Such diversion of resources to find alternative ways to achieve the ability of these vulnerable

refugees to find safe harbor impairs IRAP's mission.  *See Action NC*, 2016 WL 6304731 at *29

(finding diversion of resources to voter registration activities constituted irreparable injury where

it meant sacrificing other voter mobilization and voter education efforts).

Likewise, § 5(d) will also cause irreparable harm to the financial viability of plaintiff HIAS

and its affiliates. Hetfield Decl. ¶¶ 11-13, J.R. 10-11. HIAS has contracted with the federal

government that provides funding on a per capita basis for every refugee served to assist with

refugee processing, placing cases with local affiliates, monitoring the refugees' travel to the United

States and their final destination in the United States, and working with its affiliates to ensure

effective and timely service delivery to the new arrivals.  *Id.* ¶¶ 8-9, J.R. 9-10.  Accordingly, the

midyear reduction in refugee admissions, and corresponding reduction in the number of refugees

served, will substantially reduce the amount of revenue HIAS will have to perform services or pass

through to affiliates.  *Id.* ¶¶ 11-12, J.R. 10-11.  Indeed, World Relief, one of the other nine

resettlement agencies that contracts with the government, has already announced that it will be

forced to lay off 140 staff members and close one of its offices due to § 5(d).  *Id.* ¶ 13, J.R. 30;

J.R. 67-68 (Press Release, World Relief, World Relief Announces the Layoff of 140+ Staff and

Closure of Five Local Offices Due to the Trump Administration's Reduction in Refugee

Resettlements in the U.S. (Feb. 15, 2017)).  HIAS has already been precluded from refilling key

positions, and will likely find itself in the same position as World Relief with regard to layoffs if § 5(d) remains in effect, negatively impacting the services that HIAS provides to refugees. Hetfield Decl. ¶ 13, J.R. 11.

Like HIAS, its local affiliates will also suffer financial losses stemming from § 5(d) and will be forced to shut down permanently or significantly pare back their resettlement programs and sites, diminishing capacity, placing strain on other sites, and reducing the quality of services. *Id.* ¶¶ 14-17, J.R. 11-12 (noting that as the geographic range for a given site grows "too large, services become too diffuse and local integration of the refugee population becomes more difficult"); *id.* at ¶ 17, J.R. 13 (noting that reduced availability of sites harms their ability to find placement that properly addresses client needs).  Moreover, when these sites are shuttered or their capacity is significantly decreased through staff layoffs and cut resources, the local expertise and relationships, as well as the critical volunteer networks and support within interfaith religious communities, are lost entirely or substantially diminished, often irrevocably.  *Id.* ¶ 15-16, J.R. 12-13; *cf. Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-52 (4th Cir. 1994) (where failure to grant preliminary relief creates loss or likelihood of loss of goodwill, the irreparable injury prong is satisfied), *abrogated on other grounds by Winter*, 555 U.S. 7.

### III.   THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS FAVOR AND AN INJUNCTION IS IN THE PUBLIC INTEREST

Finally, the balance of harms and public interest weigh strongly in favor of granting a preliminary injunction.  *See Winter*, 555 U.S. at 24.  In contrast to the irreparable injury facing plaintiffs, the government will not be injured by an injunction.  *See Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011) ("[T]he State . . . is in no way harmed by issuance of an injunction that prevents the state from enforcing [unlawful] restrictions.").

The public interest, moreover, also strongly favors a preliminary injunction, not least because the public has an interest in government officials who abide by the laws of this country. As the Supreme Court has noted, "[n]o man in this country . . . is so high that he is above the law. No officer of the law may set that law at defiance with impunity.  All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." *Burton v. United States*, 202 U.S. 344, 368 (1906); *see also Aziz*, 2017 WL 580855, at *10 (holding that an injunction of other provisions of the same Executive Order challenged here would be in the public interest).

## CONCLUSION

For the foregoing reasons, § 5(d) of the Executive Order violates the Refugee Act and the Administrative Procedure Act.  Plaintiffs respectfully request that this Court enter a preliminary injunction of the implementation and enforcement of § 5(d) of the Executive Order.

Respectfully submitted,

Dated: February 22, 2017

/s/ Justin B. Cox

Karen C. Tumlin†
Nicholas Espíritu†
Melissa S. Keaney†
Esther Sung†
National Immigration Law Center
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
Tel: (213) 639-3900
Fax: (213) 639-3911
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

Justin B. Cox (Bar No. 17550)
National Immigration Law Center

Omar C. Jadwat†
Lee Gelernt†
Hina Shamsi†
Hugh Handeyside†
Sarah L. Mehta†
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org
lgelernt@aclu.org
hshamsi@aclu.org
hhandeyside@aclu.org
smehta@aclu.org

Cecillia D. Wang†

24

1989 College Ave. NE
Atlanta, GA 30317
Tel: (678) 404-9119
Fax: (213) 639-3911
cox@nilc.org


† Appearing *pro hac vice*

Cody H. Wofsy†
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org
cwofsy@aclu.org

David Cole†
Daniel Mach†
Heather L. Weaver†
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: (202) 457-0805
dcole@aclu.org
dmach@aclu.org
hweaver@aclu.org

David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar
No.19670)
American Civil Liberties Union
  Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
steiner@aclu-md.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of February, 2017, I caused a PDF version of the foregoing document to be electronically transmitted to the Clerk of the Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


By: /s/ Justin B. Cox

# APPENDIX

## 8 U.S.C. § 1157. Annual admission of refugees and admission of emergency situation refugees

**(a)** Maximum number of admissions; increases for humanitarian concerns; allocations

> **(1)** Except as provided in subsection (b) of this section, the number of refugees who may be admitted under this section in fiscal year 1980, 1981, or 1982, may not exceed fifty thousand unless the President determines, before the beginning of the fiscal year and after appropriate consultation (as defined in subsection (e) of this section), that admission of a specific number of refugees in excess of such number is justified by humanitarian concerns or is otherwise in the national interest.

> **(2)** Except as provided in subsection (b) of this section, the number of refugees who may be admitted under this section in any fiscal year after fiscal year 1982 shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.

> **(3)** Admissions under this subsection shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation.

> **(4)** In the determination made under this subsection for each fiscal year (beginning with fiscal year 1992), the President shall enumerate, with the respective number of refugees so determined, the number of aliens who were granted asylum in the previous year.

**(b)** Determinations by President respecting number of admissions for humanitarian concerns

If the President determines, after appropriate consultation, that (1) an unforeseen emergency refugee situation exists, (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest, and (3) the admission to the United States of these refugees cannot be accomplished under subsection (a) of this section, the President may fix a number of refugees to be admitted to the United States during the succeeding period (not to exceed twelve months) in response to the emergency refugee situation and such admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after the appropriate consultation provided under this subsection.

**(c)** Admission by Attorney General of refugees; criteria; admission status of spouse or child; applicability of other statutory requirements; termination of refugee status of alien, spouse or child

> **(1)** Subject to the numerical limitations established pursuant to subsections (a) and (b) of this section, the Attorney General may, in the Attorney General's discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this chapter.

**(2)**

   **(A)** A spouse or child (as defined in section 1101(b)(1)(A), (B), (C), (D), or (E) of this title) of any refugee who qualifies for admission under paragraph (1) shall, if not otherwise entitled to admission under paragraph (1) and if not a person described in the second sentence of section 1101(a)(42) of this title, be entitled to the same admission status as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this chapter.  Upon the spouse's or child's admission to the United States, such admission shall be charged against the numerical limitation established in accordance with the appropriate subsection under which the refugee's admission is charged.

   **(B)** An unmarried alien who seeks to accompany, or follow to join, a parent granted admission as a refugee under this subsection, and who was under 21 years of age on the date on which such parent applied for refugee status under this section, shall continue to be classified as a child for purposes of this paragraph, if the alien attained 21 years of age after such application was filed but while it was pending.

**(3)** The provisions of paragraphs (4), (5), and (7)(A) of section 1182(a) of this title shall not be applicable to any alien seeking admission to the United States under this subsection, and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) or subparagraph (A), (B), (C), or (E) of paragraph (3)) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.  Any such waiver by the Attorney General shall be in writing and shall be granted only on an individual basis following an investigation.  The Attorney General shall provide for the annual reporting to Congress of the number of waivers granted under this paragraph in the previous fiscal year and a summary of the reasons for granting such waivers.

**(4)** The refugee status of any alien (and of the spouse or child of the alien) may be terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe if the Attorney General determines that the alien was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of the alien's admission.

**(d)** Oversight reporting and consultation requirements

**(1)** Before the start of each fiscal year the President shall report to the Committees on the Judiciary of the House of Representatives and of the Senate regarding the foreseeable number of refugees who will be in need of resettlement during the fiscal year and the anticipated allocation of refugee admissions during the fiscal year.  The President shall provide for periodic discussions between designated representatives of the President and members of such committees regarding changes in the worldwide refugee situation, the progress of refugee admissions, and the possible need for adjustments in the allocation of admissions among refugees.

**(2)** As soon as possible after representatives of the President initiate appropriate consultation with respect to the number of refugee admissions under subsection (a) of this section or with respect to the admission of refugees in response to an emergency refugee situation under subsection (b) of this section, the Committees on the Judiciary of the House of Representatives and of the Senate shall cause to have printed in the Congressional Record the substance of such consultation.

**(3)**

> **(A)** After the President initiates appropriate consultation prior to making a determination under subsection (a) of this section, a hearing to review the proposed determination shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

> **(B)** After the President initiates appropriate consultation prior to making a determination, under subsection (b) of this section, that the number of refugee admissions should be increased because of an unforeseen emergency refugee situation, to the extent that time and the nature of the emergency refugee situation permit, a hearing to review the proposal to increase refugee admissions shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

**(e)** "Appropriate consultation" defined

For purposes of this section, the term "appropriate consultation" means, with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information:

> **(1)** A description of the nature of the refugee situation.

> **(2)** A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.

> **(3)** A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.

> **(4)** An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.

> **(5)** A description of the extent to which other countries will admit and assist in the resettlement of such refugees.

(**6**) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.

(**7**) Such additional information as may be appropriate or requested by such members.

To the extent possible, information described in this subsection shall be provided at least two weeks in advance of discussions in person by designated representatives of the President with such members.

(**f**) Training

(**1**) The Attorney General, in consultation with the Secretary of State, shall provide all United States officials adjudicating refugee cases under this section with the same training as that provided to officers adjudicating asylum cases under section 1158 of this title.

(**2**) Such training shall include country-specific conditions, instruction on the internationally recognized right to freedom of religion, instruction on methods of religious persecution practiced in foreign countries, and applicable distinctions within a country between the nature of and treatment of various religious practices and believers.