**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| INTERNATIONAL REFUGEE<br>ASSISTANCE PROJECT, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD TRUMP, President of the<br>United States, et. al.,<br><br>　　　　Defendants. | CASE NO.  17-CV-00361-TDC |

## DECLARATION OF NATASHA HALL

I, Natasha Hall, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am currently the Community Engagement Director with Mayday Rescue, an international non-profit organization that works to save lives and empower communities affected by war, natural disasters, and other crises. I have over a decade of experience working with refugees and on conflict, with a specialization in the Middle East. In particular, from January 2012 to August 2015, I was an immigration officer for United States Citizenship and Immigration Services ("USCIS"), during which time I conducted in-person interviews with hundreds of refugees from 20 different nationalities in 10 countries. As an immigration officer, I interviewed refugees from all of the banned countries identified in the January 27, 2017 Executive Order signed by President Trump. I was also intimately involved in USCIS's Middle East Refugee Processing Training program, a week-long training conducted every fiscal quarter that focuses on country conditions, spotting red flags, and the vetting procedure for Syrians, Iraqis, and Iranians.

2. In addition to my work with USCIS, I have extensive professional experience working with humanitarian emergencies, particularly in the Middle East. I was a Fulbright Scholar in Jordan (2006-2007) and a Boren Fellow in Syria (2010). I have worked with RAND Corporation and other organizations on Middle East concerns, including salafi jihadi rhetoric, counter-terrorism, and stabilization. This work required a Top Secret/Sensitive Compartmented Information security clearance (2008-2009). In 2008 I went to Iraq at the behest of Ambassador Ryan Crocker to conduct an assessment of reconstruction efforts. I subsequently received a Master's degree from Georgetown in International Relations and Security (2009-2011) with a certificate in Refugees and Humanitarian Emergencies.

J.R. 00001

Since leaving USCIS in 2015, I have conducted in-depth research on Syria with Center for Civilians in conflict (2015-2016) and have been involved in the humanitarian response to the conflict through my work with Mayday Rescue.

3.  I am familiar with the Executive Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States," signed by President Trump on January 27, 2017 (the "Executive Order").

4.  I have serious concerns about the disruptive and devastating impact the Executive Order has had, is having, and will have on the United States Refugee Assistance Program ("USRAP") and the overall global refugee crisis. I am primarily concerned for three reasons.

5.  First, the drastic cut in the number of refugees admissible to the United States for the current fiscal year provides no logical benefit to the purported national security concerns articulated in the Executive Order. Refugee resettlement has never represented a profound threat to Americans' safety. According to a report recently released by the Cato Institute, the annual chance of being killed in the United States by a terrorist attack committed by a refugee is 1 in 3.6 billion. Out of millions of refugees resettled to the United States over several decades, just 20 have committed or attempted attacks. These attacks killed three people, all in the 1970s, before the creation of the modern screening system that exists today.

6.  It is clear, moreover, that whoever drafted the Executive Order has no understanding of that screening system, to say nothing of United States immigration laws, international law, and the security threats facing our nation. The process for any citizen of a Middle Eastern or majority-Muslim country to get into the United States is tortuous and has become more so over the past 15 years, with additional screenings, interviews, and other background checks.

7.  For most refugees, the process starts with the United Nations' refugee agency, the U.N. High Commissioner for Refugees ("UNHCR"). After registering with the UNHCR, refugees are interviewed about their story and biographical details, submit documents, and are subjected to screenings, such as home country reference checks and biological screenings such as iris scans. The UNHCR then decides if an applicant is suitable for resettlement and to which country the applicant can apply.

8.  Refugees then go through a further screening process conducted by non-governmental organization ("NGO") or an international organization that manages a Resettlement Support Center ("RSC"), which assists in refugee processing. RSC staff conduct prescreening interviews of prospective refugees and prepare cases for submission to USCIS, which handles refugee adjudications. They look carefully for discrepancies between UNHCR interviews and their own interviews, as well as accompanying documentation, and relay this information to USCIS officers.

9.  By the time an immigration officer from USCIS at the Department of Homeland Security is ready to conduct an interview, the officer has a stack of biographical information on

J.R. 00002

the refugee. Immigration officers devoted to refugee processing go on "circuit rides" to countries where applicants reside to conduct detailed interviews and take biometrics (fingerprints). These officers are part of a specific division, the Refugee Affairs Division, which is tasked specifically with refugee processing. They undergo endless trainings to spot red flags, use immigration law effectively in adjudications, study country conditions, and analyze the information available from the nine different intelligence and national security agencies who vet each refugee applicant. They bring specialized fingerprinting and camera equipment to each location and take pictures and fingerprints themselves. All of this biographical and biometric information is filtered through all relevant United States government agencies.

10. Since 9/11 and since two Iraqi refugees were caught communicating with Al Qaeda in Kentucky, coordination and information sharing between agencies has significantly improved, and the Refugee Affairs Division is devoted to coordinating the entire screening process. Over the past ten years, this screening process has grown increasingly intense. While refugee officers interview about six cases per day in Asia, refugee officers now interview only one to two Syrian or Iraqi cases per day because of extensive vetting questions, many of which are based on terrorism related inadmissibility grounds ("TRIG").

11. The interview process with a USCIS immigration officer is extremely detailed. While there are standard questions that need to be covered, each interview is not the same. The interview process follows a fluid progression where subjects must be covered but not always in the same way. Therefore, refugee applicants cannot memorize answers in response to a set number of questions. The interviews are transcribed so they can be matched up with other documentation and past interviews; they last hours and also cover travel patterns, discrepancies, and TRIG and other inadmissibility grounds, such as a refugee's criminal record. Every detail of a refugee's case is pored over and exhaustively analyzed. Oftentimes for Iraqis, Iranians, and Syrians in particular, they are re-interviewed by DHS officers to cover issues not previously discussed or new information as it arises.

12. Next, the United States government performs its own intensive screening. The refugees' information and fingerprints (also taken by Homeland Security officers) are run through the databases of nine law enforcement, intelligence and security agencies and matched against criminal databases and biographical information, such as past visa applications. Behind the scenes, officers and supervisors of varying political stripes debate and discuss each case endlessly. At USCIS headquarters, officers conduct more research, reconciling multiple interview notes, country conditions, and background checks. These officers, like the officers who go on circuit rides, are trained to spot red flags or issues that might make someone inadmissible. If a national security threat emerges, certain nationalities are placed under tighter scrutiny.

13. If and when refugees are finally approved by USCIS, they go through medical tests and cultural orientation. They come to the United States on a plane ticket, which they are supposed to pay back. They only receive 6 months of minimal help upon their arrival and then they are on their own. Integration, hospitality, and job and school placement are

J.R. 00003

therefore the most important aspects of the process once they arrive in the US. After one year in refugee status in the United States, refugees are required to apply to adjust to lawful permanent resident ("LPR") status.

14. During nearly four years as an immigration officer performing circuit rides, I interviewed hundreds of refugees. I saw countless refugees break down crying in my interview room because of the length and severity of the vetting process. While the average wait time from start to finish has been cited as 18-24 months for all refugees, many Syrians and Iraqis wait years rather than months for resettlement. In the case of Somalis, many wait their entire life for the opportunity to resettle to the US to the point where there is a word in the Somali language for obsession with resettlement. Many of these refugees wait for years in a camp, freezing in tents and unable to put their children in school. Some continue to receive threats; some are killed while waiting to be processed.

15. The Executive Order contains no acknowledgement of the extensive, labor-intensive, time-consuming, and emotionally taxing process that refugees must endure to be admitted to the United States; nor does it recognize how effective this process is. As mentioned above, millions of refugees have resettled to the United States over several decades, but only 20 have committed or attempted domestic terror attacks. The Order's sharp reduction in the overall number of admissible refugees, complete shutdown of Syrian refugees, as well as its call for more extensive vetting and uniform screening of refugees and other immigrants, is completely divorced from the real world and completely ignores the immense apparatus already in place to screen refugees.

16. My second concern with the Executive Order is that the radical reduction in the number of refugees admissible to the United States for the current fiscal year has had immediate and devastating consequences on USRAP, as well as on the refugees who have been waiting for years to be allowed entry to the United States.

17. The Refugee Act allows the President to set, at the beginning of each fiscal year, the annual number of U.S. refugee admissions (the "refugee cap"), as well as the allocation of these numbers by region of the world, after a consultation process with Congress. As part of the consultation process, the President is required to provide Congress with a range of information, including a description of the current refugee system, an analysis of the conditions of the countries from which refugees will be received, an analysis of the social, economic, and demographic impact of refugee admission on the United States, and an analysis of the impact the United States' participation in refugee resettlement will have on the country's foreign policy interests.

18. This consultation process and the setting of the refugee cap occur before the beginning of the fiscal year because the U.S. vetting process for refugees, already described above, is extremely time consuming, involving coordination between numerous NGOs, international organizations, and U.S. federal agencies. The process is labor-intensive and is difficult to ramp up or ramp down in response to changing conditions.

19. At the beginning of the fiscal year last October, President Obama set the cap on refugee admissions at 110,000 due to, among other things, the Syrian refugee crisis, which the

J.R. 00004

United Nations High Commissioner on Refugees ("UNHCR") has called the "biggest humanitarian and refugee crisis of our time." Before President Trump's Executive Order, the United States aimed to consider for resettlement at least half of the refugees referred by the United Nations High Commissioner for Refugees ("UNHCR") worldwide each year.

20. The Executive Order has slashed the refugee cap for fiscal year 2017 by more than half, to 50,000. The fiscal year runs through the end of September 2017, but as of February already 41,000 refugees have been resettled in the United States. There are tens of thousands more refugees in the pipeline nearing the end of their years-long journey to get to the United States. These include thousands of people in vulnerable and dangerous situations, many of whom have begun selling their belongings, learning English, and taking their children out of school. Many of these people are in the process to come to the United States specifically, instead of another refugee resettlement country, because of family ties in the United States, because they worked for the United States government, or because there is simply no capacity elsewhere in the global refugee resettlement system.

21. The Executive Order means that families will not be reunited. It means that mothers may be separated from their children, husbands, and providers. These familial separations can have painful repercussions for integration into the United States; building a small familial network is essential to building a life in, and being able to contribute positively to a new country.

22. Already, USCIS has halted all circuit rides to conduct refugee processing interviews abroad. Even refugees who are nearly approved are now waiting, in limbo, while USCIS implements a triage system to determine which of the many thousands of waiting refugees will still be able to be resettled under the new cap. During this time, the security checks that refugees go through have begun to expire, which means that applicants will have to begin the process again, which will in turn slow the process for new applicants and create an enormous backlog.

23. The consequences of the refugee cap reduction are real and severe. About 60 percent of the 11,000 Syrians resettled in the United States last year were children. The forthcoming delays could consume entire childhoods.

24. I am, moreover, personally aware of Syrian activists who risked their lives to document the crimes of ISIS who have been shot dead, in broad daylight, in Turkey while awaiting the processing of their refugee applications by USCIS. The abandonment of these and many other refugees in the region is, without hyperbole, a death sentence.

25. If the United States—already the largest resettlement country—refuses to accept refugees who have already begun the vetting process under the 110,000 cap set by President Obama at the beginning of the fiscal year, these refugees may not be able to continue in the resettlement process with another country and will therefore be stuck in limbo in extremely dangerous situations.

J.R. 00005

26. In my decade of experience working with refugees in humanitarian crises, I have never observed a curtailment or drawdown in the USRAP program without a precipitating reason or significant event. The Executive Order's reduction of the number of refugees admissible to the United States has no precedent, even without taking into account the fact that there has been no precipitating world event to prompt such a drastic cut.

27. Finally, I am concerned about the Executive Order and its effect on the United States' relationship with other countries and its own citizens.

28. With respect to the former, slashing the number of refugees resettled to the United States isolates us further from our allies and international law. Syria is facing the worst humanitarian crisis since World War II. The United States itself is directly responsible for destabilization in Iraq and Libya. Sudan witnessed what some have called a genocide. During these catastrophic events, the United States refugee resettlement program is a gesture to refugees and to our allies around the world to show that we are trying to do our part.

29. The United States has long been a place where immigrants and refugees have been able to assimilate and be welcomed as Americans. More than anything else, the Executive Order is insulting to our allies in the Middle East, Africa, Asia, and Europe who have taken on millions of refugees.

30. With respect to the latter, the Executive Order is also detrimental to the most important part of our refugee and immigration process: integration. As mentioned above, the cut in the refugee cap means that families who have been torn apart by horrific events well beyond their control will never be reunited in the United States. This has untold detrimental effects on the integration process for refugees here in the United States. Alienating these refugees in their new country—many of whom have and will become Americans—is a constitutional, socioeconomic, and national security disaster.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 18, 2017 at Istanbul, Turkey.

_____
Natasha Hall

6

**J.R. 00006**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | |
| Plaintiffs, | Civil Action No.: 8:17-CV-00361-TDC |
| v. | **DECLARATION OF MARK HETFIELD, PRESIDENT AND CEO OF HIAS, INC., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD TRUMP, et al., | |
| Defendants. | |

**<u>DECLARATION OF MARK HETFIELD, PRESIDENT AND CEO OF HIAS, INC.</u>**

I, Mark Hetfield, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the President and Chief Executive Officer of HIAS, Inc., a Plaintiff in the above-captioned case.

2.      HIAS was founded in 1881 as the Hebrew Immigrant Aid Society to assist Jews fleeing pogroms in Russia and Eastern Europe.  It is the world's oldest—and only Jewish—refugee resettlement agency.   Today, HIAS serves refugees and persecuted people of all faiths and nationalities around the globe.  Since HIAS's founding, the organization has helped more than 4.5 million refugees start new lives. In 2016 alone, HIAS provided services to more than 350,000 refugees and asylum seekers globally.

3.      HIAS has offices in twelve countries worldwide, including its headquarters in Silver Spring, Maryland, its principal place of business, and additional domestic offices in New York City and Washington, D.C.

4.      HIAS's refugee resettlement work is grounded in, and an expression of, the organization's sincere Jewish beliefs. The Torah, Judaism's central and most holy text, commands

1

followers to welcome, love, and protect the stranger.  The Jewish obligation to the stranger is repeated in various ways throughout the Torah, more than any other teaching or commandment. HIAS believes that this religious commandment demands concern for and protection of persecuted people of all faiths.  The Torah also teaches that the Jewish people are to welcome, protect, and love the stranger because "we were strangers in the land of Egypt" (Leviticus 19:34).  Throughout their history, violence and persecution have made the Jewish people a refugee people.  Thus, both our history and our values lead HIAS to welcome all refugees in need of protection.  A refusal to aid persecuted people of any one faith, because of stigma attached to that faith, violates HIAS's deeply held religious convictions.

5.     HIAS's client base includes refugees and their families abroad and those located in the United States who are from Syria, Iraq, Iran, Sudan, Somalia, Yemen, Ukraine, Bhutan, the Democratic Republic of the Congo, Afghanistan, Eritrea, Tanzania, Ethiopia, Central African Republic, Burundi, South Sudan, Uganda, Russia, Belarus, Burma, and El Salvador, among other countries.  HIAS also provides services to individuals entering the United States under the Special Immigrant Visa ("SIV") program available to persons who worked with the U.S. Armed Forces as a translator or interpreter in Iraq or Afghanistan.

6.     HIAS is one of nine non-profit organizations, called "Resettlement Agencies," designated by the federal government to undertake this humanitarian work through cooperative agreements with the U.S. Department of State and the U.S. Department of Health and Human Services.   To serve these refugees, HIAS currently holds sub-agreements with 18 local organizations ("affiliates") who operate and oversee 21 resettlement sites across the country.  A resettlement site is an office of one of the Resettlement Agencies; it could be either an affiliate or a sub-office of an affiliate.  There may be more than one resettlement site in a single city,

J.R. 00008

depending on how many national agencies have offices there.  HIAS itself also directly operates a resettlement site in New York City, and, before the Executive Order was signed, was on the verge of expanding to an additional resettlement site in Westchester County, New York, which had been approved by the Department of State.

7.     HIAS is assigned clients via the Department of State's allocation process, which determines which refugee clients will be resettled by HIAS. Others clients—already residing in the United States—connect with HIAS when they come to one of HIAS's local affiliates to file paperwork to initiate requests for refugee status for their relatives abroad.

8.     HIAS's work with the federal government occurs pursuant to several different cooperative agreements, including a Cooperative Agreement with the Department of State that provides funding for the Reception and Placement program. In Federal Fiscal Year ("FFY") 2017, HIAS's approved budget through this agreement was $11.4 million, including funding for headquarters, affiliates, and direct assistance to refugees.  Through headquarters staff, HIAS interfaces with the Department of State's contractor for refugee processing, places cases with local affiliates, monitors the refugees' travel to the United States and their final destination in the United States, monitors affiliates for ongoing compliance, and works with the affiliates to ensure effective and timely service delivery to the new arrivals.  The total budget under the cooperative agreement is approved at the beginning of the fiscal year, although the Department of State allocates the funds in portions throughout the year, depending on the amount of funding approved by Congress.

9.     The largest source of funding for refugee resettlement by HIAS and its affiliates is the funding for Reception and Placement services for new refugee arrivals.  These funds are provided by the government on a per capita basis, currently at the rate of $2,075 per refugee.  That amount includes $1,125 of direct assistance per refugee and $950 for affiliate staff support per

J.R. 00009

refugee.  The funding provided by the Department of State through the Reception and Placement program is intended to cover expenses for the refugees' initial period of resettlement, up to three months after arrival.  With this funding, HIAS and its affiliates must find housing for the refugees, provide them with money for rent and utilities for up to three months, and supply them with initial food and medical care before government-funded benefits begin.  In addition, with this funding, the affiliates pay for case management services for the refugees, which include meeting the refugees at the airport and bringing them to their new homes, providing initial safety orientation followed by weeks of extensive cultural orientation to adjust them to life in America, and assisting them in enrolling in ESL classes, school, employment services, and benefits programs (including Medicare, food stamps and Supplemental Security Income for the elderly and disabled).

10.     In FFY 2016, HIAS's Cooperative Agreement with the Department of State provided that HIAS and its affiliates would resettle 3,768 refugees and SIVs in the United States. However, as the number of refugees and SIV's approved for admission increased, HIAS eventually resettled 4,191 individuals that year. The Department of State, aware that it would significantly increase capacity for refugees in FFY 2017, then requested that HIAS apply for higher numbers of arrivals as the refugee program expanded.  As a result, in its cooperative agreement for FFY 2017, HIAS was engaged to resettle 4,794 refugees and SIVs.

11.     The Presidential Determination on Refugee Admissions for Fiscal Year 2017, signed in September 2016, authorized the admission of up to 110,000 refugees.  Under the Section 5(d) of the Executive Order, however, that number will be drastically reduced to 50,000 refugees. As a result, HIAS and its affiliates will not be able to resettle a significant portion of planned-for arrivals.  Indeed, the Department of State just notified HIAS that, because of the Executive Order's cap, HIAS's resettlement obligation for FFY 2017 would be reduced by 39 percent to 2,912

J.R. 00010

refugees and SIVs. Attached hereto as Exhibits 1 and 2 are true and correct copies of two email communications sent to HIAS staff by the Department of State, dated February 16, 2017 and February 17, 2017 respectively, outlining the changes mandated as a result of Section 5(d) of the Executive Order.  Because HIAS is projected to have already resettled 1,924 refugees and SIVs for this fiscal year by the end of February, it will be permitted to resettle only 988 additional refugees and SIVs for the remainder of the year.

12.     The financial losses to HIAS and its affiliate network—up to $2.2 million—will be crippling, especially for many of HIAS's affiliates, which are heavily dependent on funding that flows through HIAS.

13.     The risk that Section 5(d) of the Executive Order poses to the viability of HIAS, its affiliates, and the vital services they provide to refugees is very real.  World Relief, one of the other nine resettlement agencies that partners with the government, has already announced that it will be forced to lay off 140 staff members and close five of its offices due to the Executive Order. Even though enforcement of some provisions of the Executive Order have been enjoined, the mandate to reduce refugee admissions to 50,000 remains in place; it will significantly impede HIAS's work for the government and the services provided to refugees, causing irreparable harm to HIAS, its affiliates, and its clients. HIAS itself has already been precluded from refilling key positions, and will likely find itself in the same position as World Relief vis-à-vis layoffs if the Section 5(d) continues to be implemented.  These staff losses negatively impact the services that HIAS is able to provide to refugees.

14.     Affiliates, who hold sub-agreements under HIAS, operate and oversee a number of resettlement sites and are an integral part of the resettlement process; indeed, without them, it would be nearly impossible to ensure that refugees are properly resettled and integrated into

J.R. 00011

communities. However, as a result of the financial losses stemming from the cap on refugees, some of HIAS's affiliates will be forced to shut down permanently or significantly pare back their resettlement programs and sites. Several affiliates have already laid off staff in response to the Executive Order. For example, HIAS's affiliate in Ohio—US Together—has already laid off 6.5 employees at just one resettlement site. Many of the staff who have lost their jobs or are likely to be laid off are staff who work directly with refugee clients, and are often former refugees themselves. HIAS also operates a direct resettlement site out of its New York office. If Section 5(d) of the Executive Order remains in place, it is likely that reductions in funding will require HIAS to lay off employees at its New York site.

15. When sites are shuttered or their capacity significantly decreased through staff layoffs and cut resources, the local expertise and relationships—developed by affiliate staff, often over years and years—is lost entirely or substantially diminished. Building a new resettlement site can take months or years of relationship-building, including cooperation with local government and elected officials, businesses who would be potential employers, landlords, and the refugee communities themselves.

16. In particular, in establishing and operating these sites, affiliates depend heavily on volunteer networks and support within interfaith religious communities to assist in carrying out resettlement; once sites close or are reduced in size, these volunteer networks will become disengaged and eventually dissipate. In Wilmington, Delaware, for example, a site that opened in FFY 2017, the Jewish Family Services office has developed a coalition of 28 organizations and faith communities. The coalition consists of large numbers of local churches, including Presbyterian, Mormon, and Methodist churches, as well as mosques and synagogues—all eager to support refugees. They have, in fact, already prepared to welcome newcomers to their

6

communities.  Building these relationships, which are key to a site's operation, takes months of staff time.  Thus, once a resettlement program or site is shut down or reduced in capacity, reopening or re-expanding it (even if the limitation in Section 5(d) were later lifted and funds were to flow once again through HIAS) could take months or years, if it is able to be done at all. And, if the limitation in Section 5(d) were later lifted and an influx of refugees allowed in, HIAS and its affiliates would be left with a diminished ability to serve that influx of refugees all at once.

17.     Closure or reduction in size of resettlement sites and affiliate programs in the middle of the program year not only will leave refugees at those sites in a lurch and without desperately needed support, but it will also place strain on other sites supported by HIAS. The availability of fewer sites for refugee resettlement imposes a significant burden on other sites, pressuring them to accept more refugees. As sites grow too large, services become too diffuse and local integration of the refugee population becomes more difficult.

18.     Moreover, the existence of fewer sites within HIAS's resettlement affiliate network limits the type of assistance refugees can receive because it results in less variety in terms of specialization by site and ability within the network to welcome different kinds of refugees with different vulnerabilities.  For example, one of the affiliate sites with which HIAS currently works has been specially set up to address the unique challenges faced by LGBTI refugees.  The Jewish Family and Community Services East Bay in Walnut Creek, California, has developed a specialization in serving this population by connecting them to appropriate, available community resources.  As another example, the Jewish Family Services of Buffalo and Erie County operates a program to serve deaf refugees, offering services otherwise unavailable from other HIAS affiliates.  And the US Together site in Toledo is managed by a Resettlement Director who is from the Syrian community, and the site has staff with language and cultural competency to specifically

7

serve this population.  If some of these sites are forced to close due to funding and arrival cuts, the quality and range of specialized services that HIAS can provide to refugees facing special challenges will be diminished.

19.     For these reasons, and in reliance on the Department of State's representation that it needed HIAS to take on increased numbers of refugees, HIAS began developing a formal plan to add new resettlement sites to its network and to expand existing sites. HIAS secured private funding and allocated funding from HIAS's private fundraising to support affiliate program expansion.  For example, prior to securing any public funding for new sites, HIAS gave some affiliates grant funding of between $50,000 and $100,000 to build their capacity. These were typically matched by local fundraising, all through private fundraising dollars.

20.     In addition, in reliance on the Department of State's representation that it needed HIAS to take on increased numbers of refugees, two staff members were hired to develop new partnerships and conduct a thorough review to identify and develop strong new resettlement sites. This process included developing an index to measure a locality for its strength as a potential resettlement site, including analyses of affordable housing, job growth, and involvement in welcoming community efforts.  HIAS's staff then developed relationships with various local organizations to gauge interest in site development over a period of several months. The process culminated in the selection of six new sites in Wilmington, Delaware; Pittsfield, Massachusetts; Niagara Falls, New York; Tacoma, Washington; Westchester, New York; and Madison, Wisconsin — all of which were approved by the Department of State to host 50 refugees each.  While timelines may vary, a typical site may require an initial investment of approximately 9-12 months of effort and then additional years to strengthen the site and cultivate additional resources and relationships, allowing the site to scale to accept greater numbers of refugee arrivals.  In addition,

J.R. 00014

HIAS's staff invests considerable time into training and coaching employees and volunteers at new sites, which is necessary because the refugee program is complex, involving extensive, detailed requirements.

21.     Because of the Section 5(d) directive to drastically cut refugee admissions, several of these sites, which took months or even years to develop, already have suspended operations and may be forced to close. The resources expended to identify and establish these new sites, as well to expand several other existing sites, are not recoverable.  For example, the new site in Wilmington invested in new staff, built community and volunteer relationships, and established the infrastructure for the new program.  The program had expected to receive 50 refugees but has received only nine refugees so far, and anticipates just fourteen more.  These numbers are insufficient to justify a continuing staff, and the agency faces a loss of initial funding.

22.     Because of the devastating toll that the cap will take on HIAS, its affiliates, and the services they provide, the injury and harm that HIAS will suffer is irreparable, and HIAS cannot be made whole by a payment of damages at the end of this litigation.

23.     HIAS's clients will also suffer irreparable injury as a result of Section 5(d) of the Executive Order.  Clients already in the United States and clients who are allowed to enter will received diminished and more limited services than would otherwise be available through HIAS and its affiliates.  Meanwhile, if the Executive Order remains in place, many clients will be denied entry entirely or their entry will be substantially delayed because of Section 5(d).

24.     At the time that the Executive Order was signed, there were 67,689 approved refugees in the U.S. pipeline. This included 13,928 Somalis, 10,680 Iraqis, 8,886 Syrians, 1,805 Sudanese, 983 Iranians, and 29 Yemenis.  These refugees were spread across the nine Resettlement Agencies, including HIAS.  Specifically, HIAS has identified more than 1,360 clients worldwide

9

who were allocated through the Department of State process, have been vetted, and have been approved for refugee status.   These refugees have already been allocated and assured to one of HIAS's resettlement sites.   However, because of the recent notice that HIAS's resettlement commitment will be cut by 39 percent, some of these refugees will not be able to enter the country in FFY 2017.   Moreover, even those for whom travel is eventually booked for FFY 2017 will be severely delayed in arrival. Every day that these clients' resettlement is delayed, they remain in precarious situations.

25.   Many of HIAS's clients abroad, whose refugee status has been approved but have yet to be scheduled for travel, have family members in the United States, also HIAS clients, who will suffer as a result of the delay in reuniting with their family members.   Some of these U.S. ties are, in fact, individuals who petitioned for refugee status (often through HIAS) for their family members. For example, some HIAS clients have been granted refugee status through the Central American Minors program, which permits U.S. relatives of persecuted children in Central America to petition for these children to immigrate here.   These children remain in vulnerable and dangerous situations in their home countries, despite having been approved for refugee status, and their U.S. family members are forced to endure continued separation from and concern for these children.

26.   In addition, more than 1,300 refugee applications initiated through HIAS by family members residing in the United States remain pending for HIAS clients abroad. The adjudication of these applications has been or will be substantially delayed because of Section 5(d) of the Executive Order.  In fact, since the order was signed, consideration of most refugee applicant cases in need of security checks have been suspended.   This means that, for many refugees in the pipeline, security checks that typically lasted 18-24 months will now be paused and restarted, potentially adding years to their wait for stable resettlement.   The delay in processing of these

10

applications will subject these clients to further risk of persecution and abuse in their current situations, and their family members who petitioned for them to come to the United States will remain in limbo as to whether they will ever be reunited.

27.     The refugees that HIAS assists in entering the country are well-vetted by the U.S. government.  These are individuals and families who are granted refugee status because they have fled their own countries due to certain kinds of persecution. These refugees are selected for third-country resettlement precisely because they have vulnerabilities that make continued residence in first countries of asylum or repatriation to their home countries unsafe.  They are people who simply want to live a life in safety and freedom, and, to my knowledge, none who have been assisted by HIAS has ever been implicated in any terrorist act.  I've set forth in the paragraphs below just a few examples of HIAS clients who have been affected by the Executive Order and will likely be harmed by the drastic cut in the number of refugees that will be allowed to enter the United States this year.

28.     Fawzia[1] is a Muslim Somali refugee who fled her country in 2011 because of the ongoing persecution.  Her sister was raped and her brother was shot by armed groups in Somalia. Her family originally fled Somalia to India where she met and married her husband, another refugee of the civil war in Somalia.  Fawzia, however, was resettled to the United States without her husband and has not seen him for two years.  She talks to him every day and finds it extremely hard to live without him.  Her husband is not yet scheduled to enter the United States.

29.     Yessenia is a Salvadoran woman who has been living in the United States since 1999.  She left her daughter behind in El Salvador and has created a new life for herself in this country.  Yessenia, who has lawful status here, expects to soon marry her U.S. citizen fiancé.  Her

---

[1] All refugee and family names in this affidavit have been changed to protect client identities.  Declarations are on file in HIAS' headquarters in Silver Spring, Maryland.

J.R. 00017

daughter Maria, however, has faced increased risk from the gangs in El Salvador.  They have targeted her because she has family in the United States and have been extorting her.  The gangs are threatening to kill Maria, her older brother, her grandmother (Yessenia's mother), and the rest of the family living in El Salvador.  Children like Maria are victims of gang violence every day in El Salvador.  Maria has been approved as a refugee through the Central American Minors program but is not yet scheduled to travel to the United States.

30.     Magan is an elderly refugee from Somalia who has been in the United States for more than a year.  He is waiting for his daughter and her children, his grandchildren, to join him in the United States through the refugee program.  He reports that he has not been able to sleep since learning of the Executive Order for fear that they will be blocked from finally finding safety in the United States.  Magan's family was scheduled to travel to the United States in February but their flight was cancelled after the Executive Order was signed.   Magan worries that he will die without seeing his daughter again, and as a Muslim, he reads the Quran and makes extra prayers for his family's health and safety.  Magan feels that he has already suffered enough as he lost his first wife in the conflict in Somalia.  He is waiting in the hope that he will be reunited with his family.

31.     Elias, his sister, and his sister's children are Muslim refugees in the United States who fled the conflict in Syria.  Elias and his sister arrived here without their mother and father, who fled Syria to Jordan four years ago when their lives were endangered.  It is illegal for Elias's parents to work in Jordan so they are struggling financially, and heartbroken over being separated from their children and grandchildren. They are only able to pay rent for an apartment because Elias sends them money.  Elias knows his parents have already been interviewed three times by the UNHCR and the US government but is waiting for further information.

12

32.     Sunam is a lawful permanent resident, originally from Nepal, whose brother remains in a refugee camp in Eastern Nepal.  Sunam's brother has been in the camp his entire life. Sunam knows how difficult life is in the camp, which she left in 2014 after being resettled in the United States.  Sunam and her brother talk on the phone nearly every week.  Sunam understands that the basic rations being delivered to the refugee camp have been cut off.  Sunam does not know when they will come in again.  Sunam's brother was fully approved to enter the United States as a refugee and was supposed to travel in June of 2016, but his travel was delayed for medical reasons and has not been rescheduled.  Sunam hopes that her brother is able to join her soon.

33.     Eden is a lawful permanent resident who came to the United States from Eritrea in 2010.   She taught herself English, attends nursing school and has just applied for citizenship. Eden recently had her first child, a joyful occasion that was tinged with sadness because her mother could not be with her.  Eden's mother remains in a precarious situation in Ethiopia, where she has been waiting to come to the United States as a refugee.  She had to flee from Eritrea after being harassed for her religion as a Pentecostal Christian.  Eden's mother has been fully vetted and approved as a refugee, but her travel was cancelled around the time of the Executive Order and has not been rescheduled.  Eden has not seen her mother for seven years.  She worries about her getting older, with worsening health, and is desperate for her son to meet his grandmother.

34.     Even though certain portions of the Executive Order have been enjoined, many of the vetted and approved refugees discussed above will not be scheduled for travel to the United States before the 50,000 limitation set forth in Section 5(d) is reached, while others who have refugee applications pending will suffer enormous delays in their adjudication.

J.R. 00019

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Mark Hetfield

Executed this 22nd day of February 2017

14

J.R. 00020

# EXHIBIT  1

## to Hetfield Declaration

**J.R. 00021**

| | |
|---|---|
| **From:** | O'Connor, Margaret R <OconnorMR@state.gov> |
| **Sent:** | Thursday, February 16, 2017 5:27 PM |
| **To:** | |

Mark Hetfield;

| | |
|---|---|
| **Cc:** | PRM-Admissions-Domestic; Day, Barbara J; Santos, Carol T |
| **Subject:** | FY 2017 RA Revised Budget Request |
| **Attachments:** | RP Budget Summary and Detail Template - FY 2017 revisions.xls; RP Consolidated Placement Plan_FY2017 Revisions.xlsx |

Dear colleagues,

With the adoption of Executive Order (EO) 13769, Protecting the Nation from Terrorist Activities by Foreign Nationals, PRM is implementing the revised target of 50,000 refugee arrivals and an estimated 15,000 SIVs for FY 2017.

Each agency's overall capacity will remain at the proportion of arrivals approved at the beginning of FY 2017 (for instance, if your agency was approved to resettle 10% of 107,000, you will now receive 10% of 65,000 arrivals). In order to issue funding for the remainder of FY 2017, PRM requires the submission of updated program and budget documents to reflect the revised ceiling of the U.S. Refugee Admissions Program. Your Program Officer will notify you of your revised approved network capacity for FY 2017.

We expect the updated Headquarters Management budget to reflect a careful assessment of the funding necessary to fulfill the revised workload expectations in a cost-efficient manner. It should be based on requirements to manage arrivals for the balance of FY 2017. Please consider if any currently planned program activities should be canceled or postponed. Proposals should include an outline of the specific actions being taken to adjust staffing, organizational structure and management, and other activities to appropriate levels. We understand that significant changes to affiliate networks, headquarters staffing, and other program requirements may have associated costs, however, we expect that revised full-year budgets will reflect savings from the significant reductions in estimated arrivals.

Please include the following documents by **Friday, March 3, 2017**:
- FY 2017 budget showing funds awarded to date (October 2016 – March 2017), Q3 and Q4 projected needs, and full-year funding requirements
  - Please use the attached template and submit as an excel spreadsheet
- Revised budget narrative (with changes tracked) detailing any new or updated activities to right-size the network (e.g. travel costs associated with restructuring or closing a site)
- Updated consolidated placement plan (attached) reflecting your revised capacity
  - Include a narrative detailing the strategy used in determining the revised plan
- Executive Summary outlining all changes from the originally-approved proposal, including staffing and operational changes and their associated impact on the budget
- Signed completed SF-424 and SF-424A
- Most recent Negotiated Indirect Cost Rate Agreement (NICRA)
- Signed and dated cover letter

PRM plans to issue additional per capita awards in early March given the robust arrivals through February. We will provide additional details in the coming weeks. Quarter 3 Headquarters Management awards will be issued after the proposed program adjustments have been finalized.

1

**J.R. 00022**

Please contact your Program Officer with any questions. Send your revised proposals to me and your Program Officer by **March 3, 2017**.

Sincerely,
Margaret

**Margaret O'Connor**
**Budget Analyst, Refugee Admissions • Bureau of Population, Refugees, and Migration • U.S. Department of State**
2025 E Street NW, Washington, DC 20520 | phone: 202.453.9262| fax: 202.453.9393| email: oconnormr@state.gov

**Official**
**UNCLASSIFIED**

J.R. 00023

# EXHIBIT  2

## to Hetfield Declaration

**J.R. 00024**



**From:** Jones, J Irving <JonesJI2@state.gov>
**Sent:** Friday, February 17, 2017 10:37 AM
**To:**
**Subject:** HIAS Revised FY 2017 Capacity

Hi

Your revised capacity for FY 2017 is below.  This includes SIVs

| CAPACITY & ARRIVALS | ESTABLISHED AGENCY CAPACITY | % by agency | REVISED CAPACITY - 65,000 |
|---|---|---|---|
| **HIAS** | 4,794 | 4.5% | **2,912** |

Let me know if you have any questions.

Regards,
Irving

**Irving Jones**
**Program Officer for Domestic Resettlement, Refugee Admissions • Bureau of Population, Refugees, and Migration**
**U.S. Department of State**
2025 E Street NW, Washington, DC 20520 | phone: 202.453.9248| fax: 202.453.9393| email: JonesJI2@state.gov

This email is UNCLASSIFIED.

**Official**
**UNCLASSIFIED**

J.R. 00025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | |
| Plaintiffs, | Civil Action No.: 8:17-CV-00361-TDC |
| v. | **DECLARATION OF REBECCA HELLER, DIRECTOR OF IRAP, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD TRUMP, et al., | |
| Defendants. | |

## DECLARATION OF REBECCA HELLER

I, Rebecca Heller, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. §1746 and declare as follows:

1.      I am the Director and co-founder of the International Refugee Assistance Project ("IRAP"), a project of the Urban Justice Center, Inc., a Plaintiff in the above-captioned case.  I have been with IRAP since August 2008.

2.      As IRAP's Director, I oversee all of IRAP's operations and activities, including programming and development.  I am in constant, regular communication with my staff who provide legal representation to vulnerable individuals and consult with pro bono attorneys and law students working on IRAP cases. I also represent a number of refugee and visa cases myself, consult with numerous attorneys working on related cases, monitor field conditions on the ground in the Middle East/North Africa Region, liaise with the U.S. government and the United Nations around refugee and visa processing issues, and coordinate partnerships with numerous NGOs working with and advocating for refugees and immigrants in the U.S. and abroad.

1

J.R. 00026

Throughout my eight and a half years working on Middle East refugee issues, I have overseen, consulted on and/or represented thousands of cases.

3.      I also teach a seminar on refugee law and practice at Yale Law School.

4.      Founded in 2008, IRAP's mission is to provide and facilitate free legal services for vulnerable populations around the world, including refugees, who seek to escape persecution and find safety in the United States and other Western countries.

5.      IRAP lawyers provide legal assistance to refugees and other immigrants to the United States throughout the resettlement process. IRAP also assists many individuals (including refugees, asylees, Lawful Permanent Residents and U.S. Citizens) inside the United States who need assistance filing family reunification petitions for family members overseas.  IRAP has provided legal counseling and assistance to nearly 20,000 individuals.

6.      Since its inception, IRAP has helped to resettle over 3,200 individuals from 55 countries of origin, with the majority resettled to the United States.

7.      IRAP's client base includes refugees from Iraq, Afghanistan, Egypt, Eritrea, Ethiopia, Iran, Jordan, Kuwait, Libya, Pakistan, Palestine, Somalia, Sudan, Syria, Turkey, and Yemen.  The overwhelming majority of IRAP's clients, including clients abroad and those within the United States, identify as Muslim.

8.      Implementation of the Executive Order, specifically Section 5(d) lowering the number of refugees allowed into the U.S. from 110,000 to 50,000 for fiscal year 2017, frustrates IRAP's mission and imposes a significant burden on its work.  Section 5(d) of the Executive Order has caused substantial harm to IRAP as well as to its clients, and will continue to harm them.  By drastically reducing the number of resettlement slots available, Section 5(d) forces IRAP to invest significant time and energy exploring alternative routes to safety for its clients

J.R. 00027

(many of whom are in imminent and life-threatening danger) and educating its network of over 2,000 pro bono attorneys and law students about those alternate routes. IRAP attorneys must also counsel their own clients about the changes in law as well as pursue other resettlement options for them, even though they were already being processed in the U.S. Refugee Admissions Program ("USRAP"). Section 5(d) has also wasted significant resources (typically hundreds of hours of legal representation over the course of many years navigating USRAP), forcing IRAP and our clients to make the Hobson's choice between starting the process over with another country, attempting to shelter in place in spite of life-threatening circumstances, or undertaking dangerous journeys to reach safety across other borders.

9.      Section 5(d) of the Executive Order is creating a significant backlog in the USRAP, delaying the processing of many of IRAP's clients' cases. This delay forces IRAP to exhaust more of its resources, as the average lifespan of a case now grows significantly. IRAP has a legal department composed of staff attorneys who advise and provide consultation to its network of pro bono legal volunteers on their casework. Because of delays in processing, IRAP's attorneys must spend significantly more time on each case, providing guidance about alternative routes to safety and possible exemptions.  In addition to IRAP's staff attorneys' existing and ongoing responsibilities, they must now also draft and review additional submissions to State and to the Department of Homeland Security ("DHS"), such as waiver requests for admission to the United States for their clients, which will be reviewed by a case-by-case basis under the Executive Order. Further, IRAP's field staff must largely give up their work on refugee case processing and focus primarily on ensuring the local safety of refugees who thought their lives would be saved for resettlement, and who are now caught in life-threatening limbo.

3

J.R. 00028

10.     Because the U.S. is backing out of its resettlement commitment, IRAP is also diverting resources to work to secure resettlement referrals to other countries. However, other countries set their refugee numbers based on the representation from the U.S. that the U.S. would admit 110,000 refugees this year. They also have their own quotas and pipelines, which are filled with other refugees referred specifically to those countries. All this means that there are very few additional open slots for refugees already in USRAP. The United Nations in Turkey, for example, has told IRAP that only Syrian refugees have even a chance at re-referral to another country and other nationalities should not bother applying. The United Nations in Saudi Arabia told IRAP that all resettlement interviews have been suspended pending further notice. The United Nations in Jordan has told IRAP that it has reduced the thousands of resettlement slots to the United States for Syrians to mere hundreds.

11.     Additionally, other resettlement countries take very few, if any, refugees from the Middle East and North Africa who are not from Syria. The U.S. takes the overwhelming majority of refugees from countries like Iraq, Somalia, and Sudan. UNHCR is generally unable to make referrals for those nationalities to other countries because they will not accept them due to their extremely limited resettlement programs and their emphasis on taking in Syrian refugees. Thus, USRAP is essential to providing protection to tens of thousands of refugees who have no alternative resettlement options and will be left completely stranded as a result of the lower cap.

12.     Section 5(d)'s lower cap on refugee admissions went into effect four months into the current fiscal year. This has caused significant harm to IRAP's clients. For Fiscal Year 2017, which began on October 1, 2016, approximately 36,000 refugees have arrived in the United States. Upon information and belief, there are currently between 150,000 and 200,000 cases at various stages of the USRAP process, including 31,000 Syrians. Of those, nearly 1,000 people

4

J.R. 00029

are booked for travel, and approximately 10,500 have cleared all security and medical checks, have been approved by DHS, and are awaiting booking for travel.

13.     As a result of the Executive Order, U.S. Citizenship and Immigration Services ("USCIS") has cancelled nearly all refugee interviews globally, and in the Middle East/North Africa region.  These in-person interviews are an essential and critical part of USRAP as all refugees must go through them as part of their refugee adjudication and vetting processes.  It often takes years for a refugee applying for resettlement in the U.S. to reach the USCIS interview stage of the process.  The cancellation and suspension of these interviews has a devastating impact on the tens of thousands of refugees who have been waiting to move forward with processing.  Moreover, under a new 50,000 refugee cap, it is highly likely that these interviews will either not be rescheduled in this fiscal year, or they will be extremely limited given the number of refugees who have already been resettled in the U.S.

14.     Many of IRAP's clients have been referred to the US for resettlement by the UN refugee agency, the United Nations High Commissioner for Refugees ("UNHCR").  UNHCR only refers the most vulnerable refugees for resettlement, such as unaccompanied minors, women-at-risk, and individuals with urgent medical or protection concerns.  Less than 1% of refugees worldwide are referred for resettlement by UNHCR.  If UNHCR refers an individual to USRAP, they are likely extremely vulnerable and have strong, pre-vetted refugee claims.  Further, once UNHCR refers a refugee to USRAP, it precludes them from referring the refugee to another country until the USRAP process is completed.

15.     IRAP works with some of the most vulnerable individuals in the world, including U.S.-affiliated refugees, LGBTI refugees, women who have survived trafficking, sexual and gender-based violence, and children with emergency medical needs.  We estimate that

5

J.R. 00030

approximately 700 IRAP clients are now trapped in the limbo of a halted U.S. Refugee

Admissions Program as a result of the Executive order. Their prospects of coming to the U.S.

any time soon have evaporated.

16.      These 700 individuals are all frozen in USRAP at different stages of the

processing. Some clients already completed their USCIS interview and are simply waiting to

travel. Some had their USCIS interviews cancelled and are now waiting for them to be

rescheduled. All our clients are incredibly vulnerable and need to come to the U.S. as soon as

possible for safety because they are still in danger while waiting in a neighboring country. Many

need to reunite with family members who are already living in the U.S.

17.      The vast majority of refugees continue to face significant hardships in countries of

first asylum (typically neighboring countries) because they are afforded few, if any, rights while

they remain there. They often have no right to work and very limited access to adequate

healthcare, housing, or education. They almost never have a pathway to residence in

neighboring countries, so they have limited options for stability. They cannot return to their

home countries, where they have been persecuted, so resettlement or risking their lives by getting

smuggled to Europe are often their only options.

18.      Refugees may also be subject to additional persecution in a neighboring country

since it can be relatively easy for a persecutor to follow them there and continue harming

them. For LGBTI refugees, single women, and religious minorities in particular, they may not

find safety in neighboring countries, which often have similar societal attitudes as their country

of origin, and so they may face the same types of persecution but from different persecutors.

19.      Additionally, many refugees face constant harassment, discrimination, and worse

by the local population in countries of first asylum. For example, many of our Somali and

6

Sudanese clients face extreme racism and discrimination in Jordan, Lebanon, Egypt, and Turkey. In Jordan, several children have reported serious injuries at or on the way to school, and that Jordanian officials refuse to provide protection or assistance. Also in Jordan, in spring 2015, a Sudanese national was murdered. His body was strung up on a light pole, and to the best of our knowledge, no one was ever prosecuted for the murder. Syrians and Iraqis are also treated poorly as refugees and are quickly identified by their names and accents.

20.     Refugees are provided little protection by the governments in countries of first asylum. For example, in Jordan, the government deported over 800 Sudanese refugees, most of whom fled persecution from Darfur, back to Sudan in December 2015 in direct violation of international law. Families were split, and infants were left without their parents. Furthermore, refugees rarely feel safe reporting any incidents of crime or harassment to local police who will often downplay the events, mistreat the refugees, or even blame them for any problems they face.

21.     All of IRAP's clients are in limbo and irreparably harmed because their cases have been indefinitely stalled. Many are at imminent risk of persecution and death where they currently reside, and many others now face indefinite separation from family members already in the United States.

22.     One example of an IRAP client whose life is immediately at risk because of the Executive Order is a 25-year-old, transgender Iraqi woman in Lebanon. She has been interviewed by USCIS and has received a certificate for completion of her cultural orientation sessions, which indicates she should be traveling imminently but for the new cap as a result of Section 5(d) of the Executive Order. Our client fled Iraq when her family learned about her gender identity and her parents had her adjudged by a tribal council that sentenced her to death. Fortunately, she was able to escape just in time. Recently, a friend of our client who had chats

J.R. 00032

and photos that identify and endanger her was kidnapped by his family. She is afraid that her persecutors will learn where she is. Her life continues to be at risk; the longer her resettlement process drags on, the more likely she will be found and killed.

23.     Another example is a 37-year-old Iraqi IRAP client who has faced death threats because of her brother's former work as a security guard for a contractor with the U.S. government. Her brother came to the U.S. as a refugee and is now a U.S. Citizen. She was denied refugee status but successfully filed a Request for Review in 2013 that overturned the denial pending a new interview. Due to USCIS's tremendous delays in processing, she was not granted a new interview until May 2016. At that interview, she was informed that she needed to have a second interview in order to add her husband to the case. That interview was scheduled for February 18, 2017 but was cancelled as a result of the Executive Order. She has been waiting in limbo and in danger for years, and will be further delayed as a result of the lower cap.

24.     Some IRAP refugee clients have strong U.S. ties already, including close family members, fiancés, and other relatives who are green card holders or U.S. citizens. IRAP also represents several U.S. citizens and Legal Permanent Residents who have filed USCIS Form I-130s on behalf of their Iraqi or Syrian relatives to enter USRAP through a special direct access program. Because of the delays and halting of cases, IRAP's refugee clients are being irreparably harmed by prolonged family separation.

25.     For example, one of IRAP's clients is a 55-year-old Iraqi widow whose husband was killed working for the U.S. Army in Iraq. She fled to Turkey where she lives with some of her children. One of her sons served as an interpreter to the U.S. Army and was able to come to the U.S. on a Special Immigrant Visa. He is now in the U.S. Army and is a U.S. citizen. She has

8

J.R. 00033

been referred into USRAP by UNHCR Turkey and is awaiting further processing.  She needs prescreening interviews by both the U.S.'s Resettlement Support Center, operated by International Catholic Migration Commission, and by USCIS, which cannot happen because of the growing backlog.  As a result, she continues to be separated from her son and unable to come into the U.S.

26.    Another client of IRAP is a 36-year-old Syrian refugee who fled to Yemen and then Saudi Arabia with her husband and two young children.  Her sister is a U.S. Citizen, living in the United States, who filed an I-130 petition for her to come to the United States.  The petition has been approved and our client is now waiting to access USRAP through the Direct Access Program for Syrian Beneficiaries of Approved I-130 Petitions.  She cannot return to Syria, where she was persecuted for her religion.  She remains in great risk in Saudi Arabia, where she lives in a refugee-designated area near the Yemeni border where there are regular rocket attacks and ongoing military conflict.

*

*

*

*

*

*

*

*

*

*

J.R. 00034

27.     IRAP's clients had a high likelihood of resettlement to the U.S. when the cap was 110,000, but with a lower cap for the fiscal year (and an indefinite ban on Syrians), they have few options.  As discussed above, other countries' resettlement programs are much more limited than the U.S., especially for non-Syrians.  Most other resettlement countries generally do not accept non-Syrian refugees for resettlement, leaving refugees from countries like Sudan, Somalia, Iran, Iraq, in a particularly desperate situation. As such, USRAP is a critical lifeline for refugees from all over the world.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.  Executed at the Urban Justice Center, 40 Rector Street, New York, NY 10006, on February 22, 2017.

Rebecca Heller

10

J.R. 00035

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT, et al.,

      Plaintiffs,

      v.

DONALD TRUMP, et al,

      Defendants.

Docket No. 8:17-cv-00361-TDC

**DECLARATION OF REP. ZOE
LOFGREN**

      I, Zoe Lofgren, upon my personal knowledge, hereby submit this declaration
pursuant to 28 U.S.C. § 1746 and declare as follows:

      1.     I am a former immigration attorney and law professor. I was elected to the House
of Representatives as a Democratic Member in 1995 and I represent the 19th District of
California. I am Chair of the California Democratic Congressional Delegation, consisting of
thirty-nine Democratic members of the House of Representatives from California.

      2.     I am a member of the House Committee on the Judiciary, and have been since
1995. I am the highest ranking Democrat and former chair of the Subcommittee on Immigration
and Border Security.

      3.     As part of my responsibilities as a member of the Judicary Committee, I routinely
consult with members of the Executive Branch on topics related to refugees and refugee
resettlement.  As part of these consulations, Executive Branch officials periodically provide us
with detailed information about the international refugee situation and plans for addressing it,

1

J.R. 00036

including but not limited to through the resettlement of refugees to the United States as part of the U.S. Refugee Admissions Program ("USRAP").

4.     These consultations provide the committee members with valuable information that is crucial to our oversight responsibilities.  The consultations help to ensure that decisions made by the Executive Branch regarding refugees are based on sufficient facts and are aligned with our historical commitment to providing refuge and protection to those fleeing persecution, as reflected in the Refugee Act.

5.     Unfortunately, and notwithstanding its effects on refugees and other immigrants, the current Administration did not consult with me and the Administration did not consult with the entire House Judiciary Committee prior to the issuance of the January 27, 2017 Executive Order entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States."  In fact, I first learned about this Executive Order after it was issued.

6.     I am very concerned about President Trump's attempt to decrease the number of refugees who may be admitted this fiscal year from 110,000 to 50,000.  Not only did President Trump bypass the consultation process required under the Refugee Act, but I am unaware of any facts that would justify a decrease in the level of refugee admissions at all, much less such a significant decrease mid-year.

7.     I am additionally concerned about the consequences that this decision will have on USRAP, which relies on non-profit organiations to deliver essential services to refugees who are resettled in this country.  Those organiations were given representations about the number of refugees who would be resettled this year, and I worry that such a drastic cut to that number will have adverse effects on their ability to provide services to refugees in this and future years.

2

8.      Finally, and most of all, I am very concerned about the consequences that this decision will have on refugees themselves, particularly those to whom we, as a country, made a commitment to resettle.  I worry that the unwarranted decision to reduce the number of refugees we will admit this year could contribute to the unnecessary loss of lives.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.  Executed at Washington, D.C., on February 22, 2017.

Zoe Lofgren

3

J.R. 00038

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | |
| Plaintiffs, | Civil Action No.: 8:17-CV-00361-TDC |
| v. | **DECLARATION OF JUSTIN B. COX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD TRUMP, et al., | |
| Defendants. | |

<u>**DECLARATION OF JUSTIN B. COX**</u>

I, Justin B. Cox, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. §1746 and declare as follows:

1.      I am an attorney with the National Immigration Law Center (NILC) and am counsel of record for Plaintiffs in the above-referenced action.

2.      Attached as **Exhibit 1** is a true and correct copy of what appears to be a draft version of the Executive Order at issue in this case.  The draft was obtained and published by Vox Media, and is available online at https://cdn0.vox-cdn.com/uploads/chorus_asset/file/7872557/Protecting_the_Nation_from_Terrorist_Attacks_by_Foreign_Nationals.0.pdf.  *See also* Matthew Yglesias & Dara Lind, *Read Leaked Drafts of 4 White House Executive Orders on Muslim Ban, End to DREAMer Program, and More* (Jan. 25, 2017), http://www.vox.com/policy-and-politics/2017/1/25/14390106/leaked-drafts-trump-immigrants-executive-order.

1

J.R. 00039

3.      Attached as **Exhibit 2** is a true and correct copy of the Joint Declaration of Madeleine K. Albright, et. al, submitted on February 6, 2017 in Washington v. Trump, No. 17-35105 (9th Cir.).  A copy of the declaration is also available on the website of the Ninth Circuit Court of Appeals at http://cdn.ca9.uscourts.gov/datastore/general/2017/02/06/17-35105%20opposition%20exhibit.pdf.

4.      Attached as **Exhibit 3** is a true and correct copy of a press release issued on February 15, 2017 by World Relief entitled, "Evangelical Relief Organization World Relief Announces the Layoff of 140+ Staff and Closure of Five Local Offices Due to the Trump Administration's Reduction in Refugee Resettlements in the U.S."  The press release is also available on the website of World Relief at https://static1.squarespace.com/static/569ed9b3a976af229c5ff3cd/t/58a4ec3a5016e189aff42095/1487203386908/WR_Press_Release_OfficeClosings_2017.pdf.

5.      Attached as **Exhibit 4** is a true and correct copy of the Congressional Research Service report entitled, "Executive Authority to Exclude Aliens: In Brief," by Kate M. Manuel, dated January 23, 2017.

6.      Attached as **Exhibit 5** is a true and correct copy of the law review article by Deborah E. Anker and Michael H. Posner entitled, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 San Diego L. Rev. 9 (1981).


I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.  Executed in Atlanta, Georgia on February 22, 2017.


/s/ Justin B. Cox_____
Justin B. Cox

2

J.R. 00040

# EXHIBIT  1
## to Cox Declaration

**J.R. 00041**

**THE WHITE HOUSE**
WASHINGTON
1/23/2017

ACTION

MEMORANDUM FOR THE PRESIDENT

THROUGH:     ANDREW BREMBERG

SUBJECT:     Executive Order on Protecting the Nation from Terrorist Attacks by
Foreign Nationals

## Purpose

With this Executive Order, President Trump will helpful fulfill several campaign
promises by protecting Americans and legal immigrants from foreign nationals who
intend to commit terrorist attacks in the United States by preventing such individuals
from exploiting U.S. immigration laws.

## Background

The visa adjudication and issuance process plays a crucial role in detecting individuals
with terrorist ties and stopping them from entering the United States.  Since the terrorist
attacks of September 11, 2001, there have been at least 380 foreign-born individuals
convicted of terrorism or terrorism-related offenses in the United States (representing the
large majority of all such convictions in the United States). Each of these cases
demonstrates, in our fight against terrorism, that the enemy is not only capable of
bypassing screening, but also of recruiting and radicalizing others after they are admitted
to the United States.

The U.S. State Department issued over 11 million visas during FY 2015, and U.S.
Citizenship and Immigration Services (USCIS) receives and adjudicates six million
immigration-benefits petitions per year. Such a high number provides ample opportunity
for a foreign national with malicious intent to exploit our system in order to do us harm,
especially when coming from a country without the law-enforcement infrastructure
necessary to allow even rudimentary vetting.

## Discussion

This Executive Order fulfills several key campaign promises related to immigration by,
among other things: (1) suspending visa issuances to countries where adequate screening
cannot occur; (2) implementing uniform screening standards across all immigration
programs to ensure that those who come to the United States do not pose a risk to public
safety or national security; (3) suspending the Refugee Admissions Program for 120 days
to determine which nationalities post the least risk for admission to the United States; (3)
expediting completion of the biometric entry-exit system; (4) ensuring that applicants for

1

visas are, in fact, interviewed before approval; and (5) aligning visa-validity periods with the law.

## **Recommendation**
I recommend that you sign the attached Executive Order.

Approve_____

Disapprove_____

Needs more discussion_____

2

Executive Order—Protecting the Nation from Terrorist Attacks by Foreign Nationals

EXECUTIVE ORDER
- - - - - -

## PROTECTING THE NATION FROM TERRORIST ATTACKS BY FOREIGN NATIONALS

By the authority vested in me as President by the Constitution and laws of the United States of America, including the Immigration and Nationality Act (8 U.S.C. 1001 et seq.) (INA), and section 301 of title 3, United States Code, and to protect the American people from terrorist attacks by foreign nationals admitted to the United States, it is hereby ordered as follows:

**Section 1.** *Purpose.* The visa-issuance process plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States. Perhaps in no instance was that more apparent than with the terrorist attacks of September 11, 2001, when State Department policy prevented consular officers from properly scrutinizing the visa applications of several of the 19 foreign nationals who went on to murder nearly 3,000 Americans. And while the visa-issuance process was reviewed and amended after the September 11 attacks to better detect would-be terrorists from receiving visas, these measures did not stop attacks by foreign nationals who were admitted to the United States.

Hundreds of foreign-born individuals have been convicted or implicated in terrorism-related crimes since September 11, 2001, including foreign nationals who entered the United States after claiming asylum; after receiving visitor, student, or employment visas; or through the U.S. refugee resettlement program. Deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter our country. The United States must be vigilant during the visa-issuance process to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism.

In order to protect Americans, we must ensure that those admitted to this country do not bear hostile attitudes toward our country and its founding principles. We cannot, and should not, admit into our country those who do not support the U.S. Constitution, or those who would place violent religious edicts over American law. In addition, the United States should not admit those who engage in acts of bigotry and hatred (including "honor" killings, other forms of violence against women, or the persecution of those who practice other religions) or those who would oppress members of one race, one gender, or sexual orientation.

**Sec. 2.** *Policy.* It is the policy of the United States to: (a) protect our citizens from foreign nationals who intend to commit terrorist attacks in the United States; and

3

J.R. 00044

(b) prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes.

**Sec. 3.** *Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern.* (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country for adjudication of any visa, admission, or other benefit under the INA (adjudications) adequate to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National intelligence, shall submit to the President a report on the results of the review described in subsection (a), including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order  (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, and C-2 visas for travel to the United Nations).  The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and Director of National Intelligence.

(c) To temporarily reduce investigative burdens to relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent the terrorist or criminal infiltration of foreign nationals, pursuant to section 212(f) of the INA  I hereby find that the immigrant and nonimmigrant entry into the United States of aliens from countries designated pursuant to Division O, Title II, Section 203 of the 2016 consolidated Appropriations Act (H.R. 2029, P.L. 114-113), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 30 days from the date of this order.

(d) Immediately upon receipt of the report described in subsection (b) of this section regarding the information needed for adjudications, the Secretary of State shall request all foreign governments that do not supply such information to start providing such information regarding their nationals within 60 days of notification.

(e) After the 60-day period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit the entry of foreign nationals (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, and C-2 visas for travel to the United Nations) from countries that do not provide the information requested pursuant to subsection (d) of this order until compliance occurs.

4

(f) At any point after submitting the list described in subsection (e) of this section, the Secretary of State or the Secretary of Homeland Security may submit to the President the names of any additional countries recommended for similar treatment.

(g) Notwithstanding a suspension pursuant to subsection (c) of this section or pursuant to a Presidential proclamation described in subsection (e) of this section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

(h) The Secretaries of State and Homeland Security shall submit to the President a joint report on the progress in implementing this order within 30 days of the date of this order, a second report within 60 days of the date of this order, a third report within 90 days of the date of this order, and a fourth report within 120 days of the date of this order.

**Sec. 4.** *Implementing Uniform Screening Standards for all Immigration Programs.*(a) The Secretary of State, the Secretary of Homeland Security, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation shall implement a program during the adjudication process for immigration benefits to identify individuals seeking to enter the United States on a fraudulent basis, with the intent to cause harm, or who are at risk of causing harm subsequent to their admission . This program will include the development of uniform screening standards and procedures, such as in-person interviews; the creation of a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that the applicant is who the applicant claims to be; a process to evaluate the applicant's likelihood of becoming a positive contributing member of society, and the applicant's ability to make contributions to the national interest; and, a mechanism to assess whether or not the applicant has the intent to commit criminal or terrorist acts after entering the United States.

(b) The Secretary of Homeland Security, in conjunction with the Secretary of State, Director of National Intelligence, and the Director of the Federal Bureau of Investigation, shall submit to the President an initial report on the progress of this directive within 60 days of the date of this order, a second report within 100 days of the date of this order, and a third report within 200 days of the date of this order.

**Sec. 5.** *Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.*  (a) The Secretary of State shall suspend the U.S. Refugee Admissions Program (USRAP) for 120 days. During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security, shall review the USRAP application and adjudication process to determine what additional procedures can be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures. Refugee applicants who are already in the USRAP process may be admitted upon the initiation and completion of these revised procedures. Upon the date that is 120 days after this order, the Secretary of

5

State shall resume USRAP admissions only for nationals of countries for whom the Secretary of Homeland Security, the Secretary of State, and the Director of National Intelligence have jointly determined that sufficient safeguards are in place to ensure the security and welfare of the United States.

(b) Upon the resumption of USRAP admissions, the Secretary of State, in consultation with the Secretary of Homeland Security, is further directed to make changes, to the extent permitted by law, to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality.  Where necessary and appropriate, the Secretaries of State and Homeland Security shall recommend legislation to the President to assist with such prioritization.

(c) The Secretaries of State and Homeland Security, as appropriate, shall cease refugee processing of and the admittance of nationals of Syria as refugees until such time as I have determined that sufficient changes have been made to the USRAP to ensure its alignment with the national interest.

(d) Notwithstanding any previous Presidential determination regarding the number of refugee admissions for Fiscal Year 2017, the Secretaries of State and Homeland Security may only process and admit a total of 50,000 refugees during Fiscal Year 2017.  During the 120-day suspension provided by section 5(a), the Secretary of State and the Secretary of Homeland Security shall initiate appropriate consultations in connection with this determination, including with respect to the allocation among refugees of special humanitarian concern to the United States.

(f) Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretaries of State and Homeland Security may admit individuals to the United States as refugees on a case-by-case basis when in the national interest. Further, during the temporary suspension period described in subsection (a), the Secretaries of State and Homeland Security may continue to process as refugees those refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality.

(g) The Secretary of State shall submit to the President an initial report on the progress of the directive in subsection (b) of this section regarding prioritization of claims made by individuals on the basis of religious-based persecution within 100 days of the date of this order and shall submit a second report within 200 days of the date of this order.

**Sec. 6.** *Establishment of Safe Zones to Protect Vulnerable Syrian Populations.* Pursuant to the cessation of refugee processing for Syrian nationals, the Secretary of State, in conjunction with the Secretary of Defense, is directed within 90 days of the date of this order to produce a plan to provide safe areas in Syria and in the surrounding region in which Syrian nationals displaced from their homeland can await firm settlement, such as repatriation or potential third-country resettlement.

6

J.R. 00047

**Sec. 7.** *Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.*  The Secretaries of State and Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority in section 212 of the INA relating to the terrorism grounds of inadmissibility, as well as any related implementing memoranda. .

**Sec. 8.** *Expedited Completion of the Biometric Entry-Exit Tracking System.* (a) The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for all travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b) The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive contained in subsection (a) of this section.  The initial report shall be submitted within 100 days of the date of this order, a second report shall be submitted within 200 days of the date of this order, and a third report shall be submitted within 365 days of the date of this order. Further, the Secretary shall submit a report every 180 days thereafter until the system is fully deployed and operational.

**Sec. 9.** *Visa Interview Security.* (a) The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, which requires that all individuals seeking a nonimmigrant visa, undergo an in-person interview, subject to specific statutory exceptions.

(b) To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that non-immigrant visa interview wait times are not unduly affected.

**Sec. 10.** *Visa Validity Reciprocity.*  The Secretary of State shall review all nonimmigrant visa reciprocity agreements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as urged by sections 221(c) and 281 of the INA, and other treatment. If a country does not treat U.S. nationals seeking nonimmigrant visas in a reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of U.S. nationals by the foreign country, to the extent practicable.

**Sec. 11.** *Transparency and Data Collection.*  To be more transparent with the American people, and in order to more effectively implement policies and practices that serve the national interest, the Secretary of Homeland Security shall, consistent with applicable law, collect and make publicly available within 180 days, and every 180 days thereafter:

(a) information regarding the number of foreign-born individuals in the United States who have been charged with terrorism-related offenses; convicted of terrorism-related offenses; or removed from the United States based on terrorism-related activity,

7

affiliation, or material support to a terrorism-related organization, or any other national security reasons;

(b) information regarding the number of foreign-born individuals in the United States who have been radicalized after entry into the United States and engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States; and

(c) information regarding the number and types of acts of gender-based violence against women or honor killings by foreign-born individuals in the United States.

**Sec. 12.** *General Provisions.*(a) Nothing in this order shall be construed to impair or otherwise affect:

> (i) the authority granted by law to an executive department, agency, or the head thereof; or

> (ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

8

# EXHIBIT  2

## to Cox Declaration

**J.R. 00050**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 17-35105

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al. | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | **JOINT DECLARATION OF** |
| vs. | ) | **MADELEINE K. ALBRIGHT,** |
| | ) | **AVRIL D. HAINES** |
| | ) | **MICHAEL V. HAYDEN** |
| | ) | **JOHN F. KERRY** |
| | ) | **JOHN E. McLAUGHLIN** |
| DONALD J. TRUMP, President of the | ) | **LISA O. MONACO** |
| United States, et al., | ) | **MICHAEL J. MORELL** |
| | ) | **JANET A. NAPOLITANO** |
| Defendants-Appellants. | ) | **LEON E. PANETTA** |
| | ) | **SUSAN E. RICE** |
| | ) | |
| | ) | |
| | ) | |

We, Madeleine K. Albright, Avril D. Haines, Michael V. Hayden, John F. Kerry, John E. McLaughlin, Lisa O. Monaco, Michael J. Morell, Janet A. Napolitano, Leon E. Panetta, and Susan E. Rice declare as follows:

1.      We are former national security, foreign policy, and intelligence officials in the United States Government:

   a.   Madeleine K. Albright served as Secretary of State from 1997 to 2001.  A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997 and has been a member of the Central Intelligence Agency External Advisory Board since 2009 and the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

   b.   Avril D. Haines served as Deputy Director of the Central Intelligence Agency from 2013 to 2015, and as Deputy National Security Advisor from 2015 to January 20, 2017.

   c.   Michael V. Hayden served as Director of the National Security Agency from 1999 to 2005, and Director of the Central Intelligence Agency from 2006 to 2009.

   d.   John F. Kerry served as Secretary of State from 2013 to January 20, 2017.

e. John E. McLaughlin served as Deputy Director of the Central Intelligence Agency from 2000-2004 and Acting Director of CIA in 2004. His duties included briefing President-elect Bill Clinton and President George W. Bush.

f. Lisa O. Monaco served as Assistant to the President for Homeland Security and Counterterrorism and Deputy National Security Advisor from 2013 to January 20, 2017.

g. Michael J. Morell served as Acting Director of the Central Intelligence Agency in 2011 and from 2012 to 2013, Deputy Director from 2010 to 2013, and as a career official of the CIA from 1980. His duties included briefing President George W. Bush on September 11, 2001, and briefing President Barack Obama regarding the May 2011 raid on Osama bin Laden.

h. Janet A. Napolitano served as Secretary of Homeland Security from 2009 to 2013.

i. Leon E. Panetta served as Director of the Central Intelligence Agency from 2009-11 and as Secretary of Defense from 2011-13.

j. Susan E. Rice served as U.S. Permanent Representative to the United Nations from 2009-13 and as National Security Advisor from 2013 to January 20, 2017.

2.      We have collectively devoted decades to combatting the various terrorist threats that the United States faces in a dynamic and dangerous world. We have all held the highest security clearances. A number of us have worked at senior levels in administrations of both political parties. Four of us (Haines, Kerry, Monaco and Rice) were current on active intelligence regarding all credible terrorist threat streams directed against the U.S. as recently as one week before the issuance of the Jan. 27, 2017 Executive Order on "Protecting the Nation from Foreign Terrorist Entry into the United States" ("Order").

3.      We all agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States. We all are nevertheless unaware of any specific threat that would justify the travel ban established by the Executive Order issued on January 27, 2017. We view the Order as one that ultimately undermines the national security of the United States, rather than making us safer. In our professional opinion, this Order cannot be justified on national security or foreign policy grounds. It does not perform its declared task of "protecting the nation from foreign terrorist entry into the United States." To the contrary, the Order disrupts thousands of lives, including those of refugees and visa holders all previously vetted by standing procedures that the Administration has not shown to be inadequate. It could do long-term damage to our national security and foreign policy interests, endangering U.S. troops in the field and disrupting counterterrorism and national security partnerships. It will aid ISIL's propaganda effort and serve its recruitment message by feeding into the narrative that the United States is at war with Islam. It will hinder relationships with the very communities that law enforcement professionals need to address the threat. It will have a damaging humanitarian and economic impact on the lives and jobs of American citizens and residents. And apart from all of these concerns, the Order offends our nation's laws and values.

J.R. 00052

4.     There is no national security purpose for a total bar on entry for aliens from the seven named countries.  Since September 11, 2001, not a single terrorist attack in the United States has been perpetrated by aliens from the countries named in the Order.  Very few attacks on U.S. soil since September 11, 2001 have been traced to foreign nationals at all.  The overwhelming majority of attacks have been committed by U.S. citizens.  The Administration has identified no information or basis for believing there is now a heightened or particularized future threat from the seven named countries.  Nor is there any rational basis for exempting from the ban particular religious minorities (e.g., Christians), suggesting that the real target of the ban remains one religious group (Muslims).  In short, the Administration offers no reason why it abruptly shifted to group-based bans when we have a tested individualized vetting system developed and implemented by national security professionals across the government to guard the homeland, which is continually re-evaluated to ensure that it is effective.

5.     In our professional opinion, the Order will harm the interests of the United States in many respects:

    a.   The Order will endanger U.S. troops in the field.  Every day, American soldiers work and fight alongside allies in some of the named countries who put their lives on the line to protect Americans.  For example, allies who would be barred by the Order work alongside our men and women in Iraq fighting against ISIL.  To the extent that the Order bans travel by individuals cooperating against ISIL, we risk placing our military efforts at risk by sending an insulting message to those citizens and all Muslims.

    b.   The Order will disrupt key counterterrorism, foreign policy, and national security partnerships that are critical to our obtaining the necessary information sharing and collaboration in intelligence, law enforcement, military, and diplomatic channels to address the threat posed by terrorist groups such as ISIL.  The international criticism of the Order has been intense, and it has alienated U.S. allies.  It will strain our relationships with partner countries in Europe and the Middle East, on whom we rely for vital counterterrorism cooperation, undermining years of effort to bring them closer.  By alienating these partners, we could lose access to the intelligence and resources necessary to fight the root causes of terror or disrupt attacks launched from abroad, before an attack occurs within our borders.

    c.   The Order will endanger intelligence sources in the field.  For current information, our intelligence officers may rely on human sources in some of the countries listed.  The Order breaches faith with those very sources, who have risked much or all to keep Americans safe – and whom our officers had promised always to protect with the full might of our government and our people.

    d.   Left in place, the Executive Order will likely feed the recruitment narrative of ISIL and other extremists that portray the United States as at war with Islam.  As government officials, we took every step we could to counter violent extremism.  Because of the Order's disparate impact against Muslim travelers and immigrants, it feeds ISIL's narrative and sends the wrong message to the Muslim community here at home and all over the world:  that

J.R. 00053

the U.S. government is at war with them based on their religion.  The Order may even endanger Christian communities, by handing ISIL a recruiting tool and propaganda victory that spreads their message that the United States is engaged in a religious war.

e. The Order will disrupt ongoing law enforcement efforts.  By alienating Muslim-American communities in the United States, it will harm our efforts to enlist their aid in identifying radicalized individuals who might launch attacks of the kind recently seen in San Bernardino and Orlando.

f. The Order will have a devastating humanitarian impact.  When the Order issued, those disrupted included women and children who had been victimized by actual terrorists.  Tens of thousands of travelers today face deep uncertainty about whether they may travel to or from the United States: for medical treatment, study or scholarly exchange, funerals or other pressing family reasons.  While the Order allows for the Secretaries of State and Homeland Security to agree to admit travelers from these countries on a case-by-case basis, in our experience it would be unrealistic for these overburdened agencies to apply such procedures to every one of the thousands of affected individuals with urgent and compelling needs to travel.

g. The Order will cause economic damage to American citizens and residents.  The Order will affect many foreign travelers, particularly students, who annually inject hundreds of billions into the U.S. economy, supporting well over a million U.S. jobs.  Since the Order issued, affected companies have noted its adverse impacts on many strategic economic sectors, including defense, technology, medicine, culture and others.

6. As a national security measure, the Order is unnecessary.  National security-based immigration restrictions have consistently been tailored to respond to: (1) specific, credible threats based on individualized information, (2) the best available intelligence and (3) thorough interagency legal and policy review.  This Order rests not on such tailored grounds, but rather, on (1) general bans (2) not supported by any new intelligence that the Administration has claimed, or of which we are aware, and (3) not vetted through careful interagency legal and policy review.  Since the 9/11 attacks, the United States has developed a rigorous system of security vetting, leveraging the full capabilities of the law enforcement and intelligence communities.  This vetting is applied to travelers not once, but multiple times.  Refugees receive the most thorough vetting of any traveler to the United States, taking on the average more than a year.  Successive administrations have continually worked to improve this vetting through robust information-sharing and data integration to identify potential terrorists without resorting to a blanket ban on all aliens and refugees.  Because various threat streams are constantly mutating, as government officials, we sought continually to improve that vetting, as was done in response to particular threats identified by U.S. intelligence in 2011 and 2015.  Placing additional restrictions on individuals from certain countries in the visa waiver program –as has been done on occasion in the past – merely allows for more individualized vettings before individuals with particular passports are permitted to travel to the United States.

7. In our professional opinion, the Order was ill-conceived, poorly implemented and ill-explained.  The "considered judgment" of the President in the prior cases where courts have

4

deferred was based upon administrative records showing that the President's decision rested on cleared views from expert agencies with broad experience on the matters presented to him. Here, there is little evidence that the Order underwent a thorough interagency legal and policy processes designed to address current terrorist threats, which would ordinarily include a review by the career professionals charged with implementing and carrying out the Order, an interagency legal review, and a careful policy analysis by Deputies and Principals (at the cabinet level) before policy recommendations are submitted to the President. We know of no interagency process underway before January 20, 2017 to change current vetting procedures, and the repeated need for the Administration to clarify confusion after the Order issued suggest that that Order received little, if any advance scrutiny by the Departments of State, Justice, Homeland Security or the Intelligence Community. Nor have we seen any evidence that the Order resulted from experienced intelligence and security professionals recommending changes in response to identified threats.

8.      The Order is of unprecedented scope. We know of no case where a President has invoked his statutory authority to suspend admission for such a broad class of people. Even after 9/11, the U.S. Government did not invoke the provisions of law cited by the Administration to broadly bar entrants based on nationality, national origin, or religious affiliation. In past cases, suspensions were limited to particular individuals or subclasses of nationals who posed a specific, articulable threat based on their known actions and affiliations. In adopting this Order, the Administration alleges no specific derogatory factual information about any particular recipient of a visa or green card or any vetting step omitted by current procedures.

9.      Maintaining the district court's temporary restraining order while the underlying legal issues are being adjudicated would not jeopardize national security. It would simply preserve the status quo ante, still requiring that individuals be subjected to all the rigorous legal vetting processes that are currently in place. Reinstating the Executive Order would wreak havoc on innocent lives and deeply held American values. Ours is a nation of immigrants, committed to the faith that we are all equal under the law and abhor discrimination, whether based on race, religion, sex, or national origin. As government officials, we sought diligently to protect our country, even while maintaining an immigration system free from intentional discrimination, that applies no religious tests, and that measures individuals by their merits, not stereotypes of their countries or groups. Blanket bans of certain countries or classes of people are beneath the dignity of the nation and Constitution that we each took oaths to protect. Rebranding a proposal first advertised as a "Muslim Ban" as "Protecting the Nation from Foreign Terrorist Entry into the United States" does not disguise the Order's discriminatory intent, or make it necessary, effective, or faithful to America's Constitution, laws, or values.

J.R. 00055

10.     For all of the foregoing reasons, in our professional opinion, the January 27 Executive Order does not further – but instead harms – sound U.S. national security and foreign policy.

Respectfully submitted,

**s/MADELEINE K. ALBRIGHT***
**s/AVRIL D. HAINES**
**s/MICHAEL V. HAYDEN**
**s/JOHN F. KERRY**
**s/JOHN E. McLAUGHLIN**
**s/LISA O. MONACO**
**s/MICHAEL J. MORELL**
**s/JANET A. NAPOLITANO**
**s/LEON E. PANETTA**
**s/SUSAN E. RICE**

*All original signatures are on file with Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, CT. 06520-8215 203-432-4932

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. [Individual signature pages follow]

**J.R. 00056**

EXECUTED this 5th day of February, 2017

_____

**MADELEINE K. ALBRIGHT**

EXECUTED this 5th day of February, 2017

AVRIL D. HAINES

J.R. 00058

EXECUTED this 5th day of February, 2017

_____

**MICHAEL V. HAYDEN**

**J.R. 00059**

EXECUTED this 5th day of February, 2017

_____

JOHN F. KERRY

J.R. 00060

_____
**JOHN E. McLAUGHLIN**

EXECUTED this 5th day of February, 2017

_____

**LISA O. MONACO**

J.R. 00062



EXECUTED this 5th day of February, 2017

MICHAEL J. MORRELL

EXECUTED this 5th day of February, 2017


_____/s/_____
**JANET A. NAPOLITANO**

**J.R. 00064**

02/05/2017 3:34PM  FAX  8316593775                                                     ☑0002/0002

02/05/2017 18:20 FAX17-35105 02/06/2017 DC10302AND2 DktEntry: 28-2 Page 16 of 17    ☑002
Case 8:17-cv-00361-TDC  Document 64-1  Filed 02/22/17  Page 65 of 166

13

EXECUTED this 5th day of February, 2017

LEON E. PANETTA

J.R. 00065

EXECUTED this 5th day of February, 2017

_____/s/_____
**SUSAN E. RICE**

J.R. 00066

# EXHIBIT  3

## to Cox Declaration

**J.R. 00067**

## world relief®

7 E. Baltimore Street, Baltimore, MD 21202
T 443.451.1900 | F 443.451.1955 | worldrelief.org

**FOR IMMEDIATE RELEASE**
15 February 2017

Contact: Christina Klinepeter |  cklinepeter@wr.org, 773.724.0605
Matthew Soerens | msoerens@wr.org, 920.428.9534

## Evangelical Relief Organization World Relief Announces the Layoff of 140+ Staff and Closure of Five Local Offices Due to the Trump Administration's Reduction in Refugee Resettlements in the U.S.

"America is now less able to help those around the world who need our help the most." — Tim Breene, CEO of World Relief

**BALTIMORE, MD** – As a direct result of the recent decision by the Trump Administration to dramatically reduce the number of refugees resettled in the U.S. throughout fiscal year 2017, World Relief has been forced to make the difficult decision to layoff 140+ staff members across its U.S. Ministry and close local offices in Boise, Idaho; Columbus, Ohio; Miami, Florida; Nashville, Tennessee; and Glen Burnie, Maryland. Collectively, these five offices have resettled more than 25,000 refugees over the past four decades.

"It has been our great privilege to serve both local churches and resilient refugee and immigrant families in each of these communities," says World Relief President Scott Arbeiter. "Our staff at each of these locations have served diligently and sacrificially—some of them for many years—and we are deeply saddened to have to make this difficult decision. These staff members are also experts whose vast experience has brought an effectiveness and professionalism to their work. This represents a loss of more than 140 jobs—which by itself is deeply troubling—but also decades of organizational expertise and invaluable capacity to serve the world's most vulnerable people."

Tim Breene, CEO of World Relief, is making it clear that World Relief's organizational mandate and ministry will continue on. "We fully intend to continue the critical work of resettling refugees and serving other immigrants in the communities where we serve throughout the United States," says Breene. "The unfortunate truth is that given the unprecedented nature of the global refugee crisis, there are simply more people than ever that need our support and our compassion. We are redoubling our efforts to find solutions to serve displaced peoples in the Middle East, sub-Saharan Africa, and elsewhere around the globe. We urge the Trump Administration to renew and reinvigorate efforts to work together with the global humanitarian community to meet this urgent crisis head on."

Private citizens, churches, and charities that would like to contribute to World Relief's efforts here and abroad may do so at www.worldrelief.org.

###

World Relief is a global humanitarian relief and development organization that stands with the vulnerable and partners with local churches to end the cycle of suffering, transform lives and build sustainable communities. With over 70 years of experience, World Relief has offices in the United States that specialize in refugee and immigration services, and works in 20 countries worldwide through disaster response, health and child development, economic development and peacebuilding.

Website: worldrelief.org | Twitter: @WorldRelief

**J.R. 00068**

# EXHIBIT  4

## to Cox Declaration

**J.R. 00069**



# Executive Authority to Exclude Aliens: In Brief

**Kate M. Manuel**

Acting Section Research Manager

January 23, 2017

**Congressional Research Service**

7-5700

www.crs.gov

R44743

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

The Immigration and Nationality Act (INA) provides that individual aliens outside the United States are "inadmissible"—or barred from admission to the country—on health, criminal, security, and other grounds set forth in the INA. However, the INA also grants the Executive several broader authorities that could be used to exclude certain individual aliens or classes of aliens for reasons that are not specifically prescribed in the INA.

Section 212(f) of the INA is arguably the broadest and best known of these authorities. It provides, in relevant part, that

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Over the years, Presidents have relied upon Section 212(f) to suspend or otherwise restrict the entry of individual aliens and classes of aliens, often (although not always) in conjunction with the imposition of financial sanctions upon these aliens. Among those so excluded have been aliens whose actions "threaten the peace, security, or stability of Libya"; officials of the North Korean government; and aliens responsible for "serious human rights violations."

Neither the text of Section 212(f) nor the case law to date suggests any firm legal limits upon the President's exercise of his authority to exclude aliens under this provision. The central statutory constraint imposed on Section 212(f)'s exclusionary power is that the President must have found that the entry of any alien or class of aliens would be "detrimental to the interests of the United States." The statute does not address (1) what factors should be considered in determining whether aliens' entry is "detrimental" to U.S. interests; (2) when and how proclamations suspending or restricting entry should be issued; (3) what factors are to be considered in determining whether particular restrictions are "appropriate"; or (4) how long any restrictions should last. The limited case law addressing exercises of presidential authority under Section 212(f) also supports the view that this provision confers broad authority to bar or impose conditions upon the entry of aliens. Key among these cases is the Supreme Court's 1993 decision in *Sale v. Haitian Centers Council, Inc.*, which held that the U.S. practice of interdicting persons fleeing Haiti outside U.S. territorial waters and returning them to their home country without allowing them to raise claims for asylum or withholding of removal did not violate the INA or the United Nations Convention Relating to the Status of Refugees. The U.S. practice had been established by Executive Order 12807, which was issued, in part, under the authority of Section 212(f) and "suspend[ed] the entry of aliens coming by sea to the United States without necessary documentation." However, depending on their scope, future executive actions under Section 212(f) could potentially be seen to raise legal issues that have not been prompted by the Executive's prior exercises of this authority.

Beyond Section 212(f), other provisions of the INA can also be seen to authorize the Executive to restrict aliens' entry to the United States. Most notably, Section 214(a)(1) prescribes that the "admission of any alien to the United States as a nonimmigrant shall be for such time and under such conditions as [the Executive] may by regulations prescribe." Section 215(a)(1) similarly provides that "it shall be unlawful for any alien" to enter or depart the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." For example, President Carter cited Section 215(a)—rather than Section 212(f)—when authorizing the revocation of immigrant and nonimmigrant visas issued to Iranian citizens during the Iran Hostage Crisis.

# Contents

Section 212(f) of the INA .......................................................................................................... 1

    Statutory Language and Executive Branch Interpretations ....................................................... 2

    Judicial Constructions of Section 212(f) ................................................................................. 3

Other Provisions of the INA ...................................................................................................... 10

# Tables

Table 1. Categories of Aliens Excluded under INA § 212(f) .......................................................... 6

# Contacts

Author Contact Information ......................................................................................................... 12

**J.R. 00072**

The Immigration and Nationality Act (INA) provides that individual aliens outside the United States are "inadmissible"—or generally barred from admission to the country[1]—on health, criminal, security, and other grounds set forth in the INA.[2] However, the INA also grants the Executive several broad authorities that could be used to exclude certain individual aliens or classes of aliens for reasons that are not specifically set forth in the INA. Section 212(f) of the INA is arguably the broadest and best known of these provisions,[3] but Sections 214(a)(1) and 215(a)(1) can also be seen to authorize the Executive to restrict aliens' entry or admission to the United States.[4]

This report provides a brief overview of the Executive's authority under these provisions of the INA. It begins with and focuses primarily on Section 212(f). It also briefly notes other provisions.

# Section 212(f) of the INA

The provisions currently in Section 212(f)—which have been part of the INA since its enactment in 1952[5]—state, in relevant part, that

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.[6]

Legislative history materials from the time of the INA's enactment suggest that these provisions were seen to grant the President broad authority to bar or impose conditions upon the entry of aliens,[7] and Presidents over the years have relied upon Section 212(f) to suspend or restrict the entry of various groups of aliens, often (although not always) in conjunction with the imposition of financial sanctions upon them. Among those so excluded have been aliens whose actions

---

[1] The INA defines "admission" to mean "the lawful entry of an alien into the United States after inspection and authorization by an immigration officer." INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A). The INA is codified in Title 8 of the United States Code, and references to the INA in this report also include references to the corresponding sections of Title 8.

[2] *See* INA § 212(a), 8 U.S.C. § 1182(a) (prescribing the inadmissibility of, among others, aliens who have a communicable disease of public health significance; have been convicted of two or more criminal offenses; have engaged in a terrorist activity; are permanently ineligible for citizenship; or have previously voted in violation of any federal, state, or local law). Certain of these grounds of inadmissibility may be waived. *See, e.g.*, INA § 212(a)(9)(B)(v), 8 U.S.C. § 1182(a)(9)(B)(v) (authorizing the Executive to waive the 3- and 10-year bars upon the admission of aliens who have been unlawfully present in the United States for more than 180 days if the refusal of admission to the alien would result in "extreme hardship" to a parent or spouse who is a U.S. citizen or lawful permanent resident (LPR)).

[3] 8 U.S.C. § 1182(f).

[4] 8 U.S.C. §§ 1184(a)(1), 1185(a)(1). As is discussed later in this report, the term "entry" is no longer defined for purposes of the INA. *See* Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), P.L. 104-208, § 301(a), 110 Stat. 3009-575 (Sept. 30, 1996) (amending INA § 101(a)(13) so that it defines "admission," instead of "entry"). However, at one time, the INA defined the term "entry" to mean "any coming of an alien into the United States, from any foreign port or place or from an outlying possession, whether voluntarily or otherwise." INA § 101(a)(13), 8 U.S.C. § 1101(a)(13) (1994). *See infra* notes 26-27 and accompanying text.

[5] 8 U.S.C. § 1182(f).

[6] *See* P.L. 82-414, § 212(e), 66 Stat. 188 (June 27, 1952).

[7] *See, e.g.*, H.R. Rᴇᴘᴛ. 1365, 82d Cong., 2d Sess., at 53 (Feb. 14, 1952) ("The bill vests in the President the authority to suspend the entry of all aliens if he finds that their entry would be detrimental to the interests of the United States, for such period as he shall deem necessary.").

"threaten the peace, security, or stability of Libya";[8] officials of the North Korean government or the Workers' Party of North Korea;[9] aliens who have participated in "serious human rights violations";[10] and others noted in **Table 1** below.

Neither the text of Section 212(f) nor the case law to date suggests any firm legal constraints upon the President's exercise of his authority under Section 212(f), as is explained below. However, future executive actions under INA § 212(f) could potentially be seen to raise legal issues that have not been prompted by the Executive's prior exercise of this authority.[11]

## Statutory Language and Executive Branch Interpretations

On its face, Section 212(f) would appear to give the President broad authority to preclude or otherwise restrict the entry into the United States of individual aliens or classes of aliens who are outside the United States and lack recognized ties to the country.[12] The central statutory constraint imposed on Section 212(f)'s exclusionary power is that the President must have found that the entry of any aliens or class of aliens would be "detrimental to the interests of the United States" in order to exclude the alien or class of aliens.[13] The statute does not address (1) what factors should be considered in determining whether aliens' entry is "detrimental" to U.S. interests; (2) when and how proclamations suspending or restricting entry should be issued; (3) what factors are to be considered in determining whether particular restrictions are "appropriate"; or (4) how long any restrictions should last. There also do not appear to be any regulations addressing the exercise of presidential authority under Section 212(f).

The Department of State's *Foreign Affairs Manual* (FAM) seemingly provides the only publicly available executive branch guidance on the President's Section 212(f) authority. In relevant part, the FAM notes that Section 212(f) proclamations "typically" grant the Secretary of State authority to identify individuals covered by the proclamation and to waive its application for foreign policy

---

[8] *See* Executive Order 13726, Blocking Property and Suspending Entry Into the United States of Persons Contributing to the Situation in Libya, 81 Fed. Reg. 23559 (Apr. 21, 2016).

[9] *See* Executive Order 13687, Imposing Additional Sanctions With Respect To North Korea, 80 Fed. Reg. 819 (Jan. 6, 2015).

[10] *See* Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses, 76 Fed. Reg. 49277 (Aug. 9, 2011).

[11] Not knowing the form that future restrictions might take, or the grounds upon which such restrictions might be subject to legal challenges, it would be premature to assess whether specific restrictions might be within the Executive's authority. However, it is important to note that aliens outside the United States who have no ties to the country generally have limited ability to challenge the denial of visas or admission to them. *See, e.g.*, Shaughnessy v. Mezei, 345 U.S. 206, 216 (1953) ("Whatever our individual estimate of that policy and the fears on which it rests, respondent's right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate."); United States *ex rel.* Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950) ("[A]n alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall prescribe."). *But see* Kleindienst v. Mandel, 408 U.S. 753, 762-63 (1972) (recognizing that U.S. persons adversely affected by the denial of a visa waiver to an alien outside the United States may have a right to challenge the denial under certain circumstances).

[12] LPRs who leave the United States for a brief period of time are distinguishable from, for example, refugees seeking to be admitted to the United States. *See, e.g.*, Landon v. Plasencia, 459 U.S. 21, 32 (1982) (discussing due process concerns raised by the application to an LPR of a statute which provided for the exclusion of any alien who "at any time shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law").

[13] INA § 212(f), 8 U.S.C. § 1182(f).

or other national interests.[14] The FAM also notes that such proclamations may bar entry based on either affiliation or "objectionable" conduct. In addition, it provides that Section 212(f) may reach persons who are inadmissible under other provisions of law, in which case, the "statutory inadmissibilities are to be considered prior to determining whether a Presidential Proclamation applies."[15] However, the FAM is generally not seen as having the force of law to bind the executive branch.[16] Thus, the Executive would not need to engage in notice-and-comment rulemaking in order to alter particular practices contained in the FAM that have historically been associated with exercises of Section 212(f) authority (e.g., not relying on a 212(f) proclamation to bar the admission of aliens who are inadmissible on other grounds).[17]

## Judicial Constructions of Section 212(f)

The limited case law addressing exercises of presidential authority under Section 212(f) also supports the view that this provision of the INA confers broad authority to suspend or restrict the entry of aliens. Key among these cases is the Supreme Court's 1993 decision in *Sale v. Haitian Centers Council, Inc.*, which held that the U.S. practice of interdicting persons fleeing Haiti outside U.S. territorial waters and returning them to their home country without allowing them to raise claims for asylum and withholding of removal did not violate either the INA or the United Nations Convention Relating to the Status of Refugees.[18] The U.S. practice had been established by Executive Order 12807, which was issued, in part, under the authority of Section 212(f) of the INA[19] and "suspend[ed] the entry of aliens coming by sea to the United States without necessary documentation."[20] Although the *Sale* Court was primarily concerned with whether the INA and UN Convention provisions regarding withholding of removal applied extraterritorially,[21] it is arguably important for understanding the scope of the President's Section 212(f) authority. In particular, the *Sale* decision arguably helped clarify the relationship between exercises of the authority granted by Section 212(f) and those granted by other provisions of the INA, as well as the meaning of *entry* for purposes of Section 212(f).

---

[14] 9 FAM § 302.11-3(B)(1), *available at* h https://fam.state.gov/Fam/FAM.aspx (last accessed: Jan. 3, 2017).

[15] *Id.*

[16] *See, e.g.,* Patel v. U.S. Dep't of State, No. 11-cv-6-wmc, 2013 U.S. Dist. LEXIS 108592, at *13 (W.D. Wis. Aug. 2, 2013) ("[T]he Foreign Affairs Manual is an internal guideline that sets forth agency practice and procedures. Because internal guidelines and agency manuals like the Foreign Affairs Manual are not subject to [Administrative Procedure Act] APA rulemaking procedures, they lack the force of law and do not bind agency discretion.").

[17] For more on the constraints of the rulemaking process, see generally CRS Report R41546, *A Brief Overview of Rulemaking and Judicial Review*, by Todd Garvey and Daniel T. Shedd; CRS Report RL32240, *The Federal Rulemaking Process: An Overview*, coordinated by Maeve P. Carey.

[18] 509 U.S. 155, 158-59 (1993). Specifically at issue in *Sale* were the provisions currently in INA § 241(b)(3)(B) and Article 33 of the Convention, which both bar the return of aliens to countries where their life or freedom would be threatened because of their race, religion, nationality, political opinion, or membership in a particular social group. The United States is technically a party to the 1967 UN Protocol Relating to the Status of Refugees, not the 1951 Convention Relating to the Status of Refugees. However, the Protocol incorporated articles 2 to 34 of the Convention, and it is customary for commentators to refer to the Convention, not the Protocol, when discussing these articles.

[19] Executive Order 12,807 also cited INA § 215(a)(1), which provides that "[u]nless otherwise ordered by the President, it shall be unlawful for any alien to depart from or enter ... the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). For further discussion of this provision, see *infra* "Other Provisions of the INA".

[20] *See* Interdiction of Illegal Aliens, 57 Fed. Reg. 23133 (June 1, 1992). President George H.W. Bush initially issued this order, but President Clinton left the order in place without modifications when he took office. It remained in effect at the time of the Court's decision in *Sale*. *See generally* 509 U.S. at 165.

[21] *Sale*, 509 U.S. at 173-88.

In particular, the Court rejected the view of the U.S. Court of Appeals for the Second Circuit ("Second Circuit") that interdiction was prohibited because of the INA's prohibition upon the then-Attorney General returning an alien to a country where he or she would be persecuted.[22] The Second Circuit had reached this conclusion by noting that the Attorney General was the President's "agent" in matters of immigration.[23] Therefore, it found that INA's prohibition on the Attorney General returning aliens to countries where the alien's life or freedom would be threatened because of the alien's race, religion, nationality, political opinion, or membership in a particular social group should be imputed to the rest of the executive branch.[24] The Supreme Court disagreed, however, holding that the interdiction program created by the President did not "usurp[] authority that Congress has delegated to, or implicate[] responsibilities that it has imposed on, the Attorney General alone."[25] The Court reached this conclusion, in part, because it viewed the INA as restricting only the then-Attorney General's immigration-related responsibilities under the act. It did not view the INA as restricting the President's actions in geographic areas outside of where Congress had authorized the Attorney General to act in the immigration context (i.e., outside the United States).[26] The upshot of this reasoning was that the Court declined to find that the interdiction program implemented under the authority of Section 212(f) ran afoul of statutory or treaty-based restrictions.

The *Sale* decision also helped define what is meant by the term *entry* as that term is used in Section 212(f). At the time when *Sale* was decided, the INA explicitly defined *entry* to encompass "any coming of an alien into the United States, from any foreign port or place or from an outlying possession, whether voluntarily or otherwise."[27] Therefore, consistent with this definition, the Court distinguished between (1) aliens who are "on our shores seeking admission" or "on the threshold of initial entry," and (2) aliens who are within the United States after entry, regardless of the legality of that entry.[28] While the statutory definition of *entry* that the Court relied upon was deleted from the INA as part of the amendments made by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 (P.L. 104-208),[29] the *Sale* Court's construction of *entry* has persisted in discussions of Section 212(f) and in other contexts.[30]

---

[22] *Id.* at 171-72. For several decades, the authority to interpret, implement, and enforce the provisions of the INA was primarily vested in the Attorney General. The Attorney General, in turn, delegated this authority to the Immigration and Naturalization Service (INS) within the Department of Justice. Following the establishment of the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002 (P.L. 107-296), the INS was abolished and its functions were generally transferred to DHS. *See* 6 U.S.C. § 251. Although the INA still refers to the Attorney General in multiple places, such references are generally (although not universally) taken to mean the Secretary of Homeland Security. *See generally* CRS Legal Sidebar WSLG553, *Does It Matter Whether the INA Says DOJ or DHS?: An Example Involving Revocation of Asylum*, by Kate M. Manuel.

[23] Haitian Centers Council, Inc. v. McNary, 969 F.2d 1350, 1360 (2d Cir. 1992).

[24] *Id.* ("[W]e reject the government's suggestion that since [the relevant provision of the INA] restricts actions of only the attorney general, the President might in any event assign the same "return" function to some other government official. Congress understood that the President's agent for dealing with immigration matters is the attorney general, and we would find it difficult to believe that the proscription of [the INA]—returning an alien to his persecutors—was forbidden if done by the attorney general but permitted if done by some other arm of the executive branch.").

[25] *Sale*, 509 U.S. at 172.

[26] *Id.* at 173. *See also* INA § 103(a)(1), 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President.... ").

[27] INA § 101(a)(13), 8 U.S.C. § 1101(a)(13) (1994).

[28] *Sale*, 509 U.S. at 174.

[29] P.L. 104-208, § 301(a), 110 Stat. 3009-575 (amending Section 101(a)(13) of the INA to define *admission*, instead of (continued...)

Lower court decisions provide some further discussion of exercises of 212(f) authority that would seem to be consistent with *Sale*. The most recent of these, an unpublished 2003 decision by the Second Circuit in *Sesay v. Immigration and Naturalization Service [INS]*, granted deference to the Board of Immigration Appeals' (BIA's) determination that the alien petitioner was ineligible for asylum because a grant of asylum necessarily requires entry, and the petitioner's entry was barred by Presidential Proclamation 7062.[31] Previously, in its 1992 decision in *Haitian Refugee Center, Inc. v. Baker*, the U.S. Court of Appeals for the Eleventh Circuit had noted various precedents characterizing the power to exclude aliens from the country as an "inherent executive power" when opining that Section 212(f) "clearly grants the President broad discretionary authority to control the entry of aliens into the United States."[32] A lower court, the U.S. District Court for the Northern District of California, similarly emphasized the breadth of the executive's power over entry in conjunction with its discussion of Section 212(f) in its 1996 decision in *Encuentro del Canto Popular v. Christopher*, stating,

> The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.[33]

Collectively, *Sale* and these other decisions suggest that Section 212(f) gives the Executive significant power to bar or impose conditions upon the entry of aliens "on our shores seeking admission" or "on the threshold of initial entry."[34] None of these decisions note any limitations upon the President's power under Section 212(f). This silence could, however, be seen, in part, to reflect the arguably limited nature of the Executive's use of its Section 212(f) authority to date. As **Table 1** below illustrates, prior exercises of presidential authority under Section 212(f) have

---

(...continued)

*entry*). *See supra* note 5.

[30] *See, e.g.*, Sesay v. INS, 74 Fed. App'x 84, 86 (2d Cir. 2003) (considering the meaning of "entry" in the course of addressing whether a grant of asylum requires entry into the United States); *Matter of* Rosas-Ramirez, 22 I. & N. Dec. 616, 617 (BIA 1999) (discussing whether adjustment of status while within the United States constitutes an "admission" for purposes of INA § 237(a)(2)(A)(iii), and noting that admission is defined, in part, in terms of "entry").

[31] 74 Fed. App'x at 86. The BIA is the highest administrative tribunal for interpreting and applying immigration law. The Second Circuit noted, but did not address, arguments as to the relationship between Sections 212(d) and 212(f) in its decision. The Secretary of Homeland Security's authority to parole aliens into the United States under Section 212(d), however, could be seen as a counterpart to the President's authority under Section 212(f) in that the President may "parole"—or permit the entry into the United States—almost any alien, regardless of whether the alien is subject to one or more of the grounds of inadmissibility set forth in Section 212(a). *See* INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General [later, Secretary of Homeland Security] may [subject to certain restrictions involving refugees and alien laborers] in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States.... ").

[32] 953 F.2d 1498, 1506-08 (11th Cir. 1992).

[33] 930 F. Supp. 1360, 1365 (N.D. Cal. 1996) (quoting Knauff v. Shaughnessy, 338 U.S. 537 (1949) (upholding the executive branch's determination to exclude the alien wife of a former U.S. servicemember, who was eligible for admission under the War Brides Act of 1945, because of concerns that her admission would endanger public safety)). The *Christopher* case arose from a challenge to the denial or revocation of visas to certain Cubans pursuant to Presidential Proclamation 5377, which suspended the entry of individuals whom the Secretary of State (or a designee) considered to be officers or employees of the Cuban government or Cuban Communist Party. As the district court noted, although the plaintiffs at times seem to have suggested that Section 212(f) itself is invalid, their argument was best construed as being that Presidential Proclamation 5377 was invalid because it conflicted with Section 901 of the Foreign Relations Authorization Act for FY1988-1989. *Id.* at 1363.

[34] *Sale*, 509 U.S. at 174.

differed in terms of which and how many aliens are subject to exclusion. In no case to date, though, has the Executive purported to take certain types of action, such as barring all aliens from entering the United States for an extended period of time or explicitly distinguishing between categories of aliens based on their religion. Any such restrictions could potentially be seen to raise legal issues that were not raised by prior exclusions. For example, if the Executive were to seek to bar the entry of all aliens, as immigrants or nonimmigrants, for an extended time, questions could be raised about whether the President's action was consistent with Congress's intent in enacting statutes which prescribe criteria for the issuance of family- and employment-based immigrant and nonimmigrant visas and authorize the issuance of certain numbers of such visas each year.[35] Similarly, if the President were to purport to exclude aliens based on their religion, an argument could potentially be made that this action is in tension with U.S. treaty obligations[36] or the First Amendment.[37] (Distinctions between aliens based on nationality, in contrast, have historically been viewed as a routine feature of immigration legislation and subjected to deferential "rational basis" review by the courts.[38])

### Table 1. Categories of Aliens Excluded under INA § 212(f)

Arranged Chronologically, from the Most to the Least Recent,
by the Date of Their Publication in the *Federal Register*

| Date & President | Nature of the Exclusion |
| --- | --- |
| 2016, Apr. 21 – Obama<br>*Executive Order 13726, 81 Fed. Reg. 23559* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have "contributed to the situation in Libya" in specified ways (e.g., engaging in "actions or policies that threaten the peace, security, or stability" of that country or may lead to or result in the |

[35] For example, Section 203(a)(1) provides that "[q]ualified immigrants who are the unmarried sons or daughters of citizens of the United States *shall* be allocated visas in a number not to exceed 23,400" (with some additions possible) each year. *See* 8 U.S.C. § 1153(a)(1). "Shall" has been construed to indicate mandatory agency action when used in other contexts. *See, e.g.,* Kirtsaeng v. John Wiley & Sons, Inc., 136 S. Ct. 1979, 1983 (2016); Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1977 (2016); Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923, 1931 (2016).

[36] For example, Article 2 of the International Covenant on Civil and Political Rights provides that "[e]ach State Party ... undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind" based on religion, among other things. United Nations, Human Rights, Office of the High Commissioner, International Covenant on Civil and Political Rights, http://www.ohchr.org/en/professionalinterest/pages/ccpr.aspx (last accessed: Jan. 14, 2017). The United States ratified this Convention in 1992, with certain reservations, understandings, and declarations. *See, e.g.,* Kristina Ash, *U.S. Reservations to the International Covenant on Civil and Political Rights: Credibility Maximization and Global Influence,* 3 NW. J. INT'L HUM. RTS. 1, 2 (2005). However, "Congress has not made the treaty enforceable in U.S. courts," and commentators have disagreed as to whether it or other provisions of law (e.g., the First Amendment) could serve as basis for invalidating the exclusion of certain aliens because of their religion. *See, e.g.,* Debra Cassens Weiss, *Would SCOTUS Uphold Trump's Plan to Bar Muslim Immigrants,* ABA J., Dec. 9, 2015, http://www.abajournal.com/news/article/would_scotus_uphold_trumps_plan_to_bar_muslim_immigrants.

[37] Aliens outside the United States without recognized ties to the country might have difficulty in maintaining such a challenge. *See id.* However, in certain cases, a ban on the entry of persons based on religion could potentially be seen to impinge upon the First Amendment rights of U.S. citizens by, for example, excluding officers and teachers of that religion. *Cf.* Kleindienst v. Mandel, 408 U.S. 753, 762-63 (1972) (recognizing that U.S. persons whose constitutional rights are adversely affected by the denial of a visa way to an alien outside the United States may have the right to challenge the denial in certain circumstances).

[38] *See, e.g.,* Rajah v. Mukasey, 544 F.3d 427, 435-36 (2d Cir. 2008) (quoting an earlier decision to the effect that the "most exacting level of scrutiny that we will impose on immigration legislation is rational basis review"); Narenji v. Civiletti, 617 F.2d 745, 748 (D.C. Cir. 1980) ("[C]lassifications among aliens based upon nationality are consistent with due process and equal protection if supported by a rational basis.... ").

| Date & President | Nature of the Exclusion |
|---|---|
| | misappropriation of Libyan state assets) |
| 2016, Mar. 18 – Obama<br>*Executive Order 13722, 81 Fed. Reg. 14943* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have engaged in certain transactions involving North Korea (e.g., selling or purchasing metal, graphite, coal, or software directly or indirectly to or from North Korea, or to persons acting for or on behalf of the North Korean government or the Workers' Party of Korea) |
| 2015, Nov. 25 – Obama<br>*Executive Order 13712, 80 Fed. Reg. 73633* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have "contributed to the situation in Burundi" in specified ways (e.g., engaging in "actions or policies that threaten the peace, security, or stability of Burundi," or "undermine democratic processes or institutions" in that country) |
| 2015, Apr. 2 – Obama<br>*Executive Order 13694, 80 Fed. Reg. 18077 (later amended by Executive Order 13757, 82 Fed. Reg. 1 (Jan. 3, 2017))* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have engaged in "significant malicious cyber-enabled activities" (e.g., harming or significantly compromising the provision of services by a computer or computer network that supports an entity in a critical infrastructure sector) |
| 2015, Mar. 11 – Obama<br>*Executive Order 13692, 80 Fed. Reg. 12747* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have "contributed to the situation in Venezuela" in specified ways (e.g., engaging in actions or policies that undermine democratic processes or institutions, significant acts of violence or conduct that constitutes a serious abuse or violation of human rights) |
| 2015, Jan. 6 – Obama<br>*Executive Order 13687, 80 Fed. Reg. 819* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens with specified connections to North Korea (e.g., officials of the North Korean government or the Workers' Party of Korea) |
| 2014, Dec. 24 – Obama<br>*Executive Order 13685, 79 Fed. Reg. 77357* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have engaged in certain transactions involving the Crimea region of Ukraine (e.g., materially assisting, sponsoring, or providing financial, material, or technological support for, or goods or services to or in support of, persons whose property or interests are blocked pursuant to the order) |
| 2014, May 15 – Obama<br>*Executive Order 13667, 79 Fed. Reg. 28387* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have contributed to the conflict in the Central African Republic in specified ways (e.g., engaging in actions or policies that threaten the peace, security, or stability of that country, or that threaten transitional agreements or the political transition process) |
| 2014, Apr. 7 – Obama<br>*Executive Order 13664, 79 Fed. Reg. 19283* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have engaged in certain conduct as to South Sudan (e.g., actions or policies that "have the purpose or effect of expanding or extending the conflict" in that country, or obstructing reconciliation or peace talks or processes) |
| 2014, Mar. 24 – Obama<br>*Executive Order 13662, 79 Fed. Reg. 16169* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have contributed to the situation in Ukraine in specified ways (e.g., operating in the financial services, energy, metals and mining, engineering, or defense and related materiel sectors of the Russian Federation economy) |
| 2014, Mar. 19 – Obama<br>*Executive Order 13661, 79 Fed. Reg. 15535* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens determined to have contributed to the situation in Ukraine in specified ways (e.g., officials of the government of the Russian Federation, or persons who operate in the arms or related materiel sector) |
| 2014, Mar. 10 – Obama<br>*Executive Order 13660, 79 Fed.* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens determined to have contributed to the situation in Ukraine in specified ways (e.g., engagement in or responsibility for misappropriation of state assets of |

| Date & President | Nature of the Exclusion |
|---|---|
| *Reg. 13493* | Ukraine or of economically significant entities in that country) |
| 2013, June 5 – Obama<br>*Executive Order 13645, 78 Fed. Reg. 33945* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who have engaged in certain conduct related to Iran (e.g., materially assisting, sponsoring, or providing support for, or goods or services to or in support of, any Iranian person included on the list of Specially Designated Nationals and Blocked Persons) |
| 2012, Oct. 12 – Obama<br>*Executive Order 13628, 77 Fed. Reg. 62139* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have engaged in certain actions involving Iran (e.g., knowingly transferring or facilitating the transfer of goods or technologies to Iran, to entities organized under Iranian law or subject to Iranian jurisdiction, or to Iranian nationals, that are likely to be used by the Iranian government to commit serious human rights abuses against the Iranian people) |
| 2012, July 13 – Obama<br>*Executive Order 13619, 77 Fed. Reg. 41243* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to threaten the peace, security, or stability of Burma in specified ways (e.g., participation in the commission of human rights abuses, or importing or exporting arms or related materiel to or from North Korea) |
| 2012, May 3 – Obama<br>*Executive Order 13608, 77 Fed. Reg. 26409* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who are determined to have engaged in certain conduct as to Iran and Syria (e.g., facilitating deceptive transactions for or on behalf of any person subject to U.S. sanctions concerning Iran and Syria) |
| 2012, Apr. 24 – Obama<br>*Executive Order 13606, 77 Fed. Reg. 24571* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens determined to have engaged in specified conduct involving "grave human rights abuses by the governments of Iran and Syria via information technology" (e.g., operating or directing the operation of communications technology that facilitates computer or network disruption, monitoring, or tracking that could assist or enable serious human rights abuses by or on behalf of these governments) |
| 2011, Aug. 9 – Obama<br>*Proclamation 8697, 76 Fed. Reg. 49277* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who participate in serious human rights and humanitarian law violations and other abuses (e.g., planning, ordering, assisting, aiding and abetting, committing, or otherwise participating in "widespread or systemic violence against any civilian population" based, in whole or in part, on race, color, descent, sex, disability, language, religion, ethnicity, birth, political opinion, national origin, membership in a particular social group, membership in an indigenous group, or sexual orientation or gender identity) |
| 2011, July 27 – Obama<br>*Proclamation 8693, 76 Fed. Reg. 44751* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens subject to U.N. Security Council travel bans and International Emergency Economic Powers Act sanctions |
| 2009, Jan. 22 – Bush<br>*Proclamation 8342, 74 Fed. Reg. 4093* | Suspending the entry into the United States, as immigrants or nonimmigrants, of foreign government officials responsible for failing to combat trafficking in persons |
| 2007, July 3 – Bush<br>*Proclamation 8158, 72 Fed. Reg. 36587* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons responsible for policies or actions that threaten Lebanon's sovereignty and democracy (e.g., current or former Lebanese government officials and private persons who "deliberately undermine or harm Lebanon's sovereignty") |
| 2006, May 16 – Bush<br>*Proclamation 8015, 71 Fed. Reg. 28541* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons responsible for policies or actions that threaten the transition to democracy in Belarus (e.g., Members of the government of Alyaksandr Lukashenka and other persons involved in policies or actions that "undermine or injure democratic institutions or impede the transition to democracy in Belarus") |
| 2004, Jan. 14 – Bush<br>*Proclamation 7750, 69 Fed. Reg.* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons who have engaged in or benefitted from corruption in specified ways (e.g., current or former public officials whose solicitation or acceptance of articles of |

| Date & President | Nature of the Exclusion |
|---|---|
| 2287 | monetary value or other benefits has or had "serious adverse effects on the national interests of the United States") |
| 2002, Feb. 26 – Bush<br>*Proclamation 7524, 67 Fed. Reg. 8857* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons responsible for actions that threaten Zimbabwe's democratic institutions and transition to a multi-party democracy (e.g., Senior members of the government of Robert Mugabe, persons who through their business dealings with Zimbabwe government officials derive significant financial benefit from policies that undermine or injure Zimbabwe's democratic institutions) |
| 2001, June 29 – Bush<br>*Proclamation 7452, 66 Fed. Reg. 34775* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons responsible for actions that threaten international stabilization efforts in the Western Balkans, or are responsible for wartime atrocities that region |
| 2000, Oct. 13 – Clinton<br>*Proclamation 7359, 65 Fed. Reg. 60831* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who plan, engage in, or benefit from activities that support the Revolutionary United Front or otherwise impede the peace process in Sierra Leone |
| 1999, Nov. 17 – Clinton<br>*Proclamation 7249, 64 Fed. Reg. 62561* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens responsible for repression of the civilian population in Kosovo or policies that obstruct democracy in the Federal Republic of Yugoslavia (FRY) or otherwise lend support to the government of the FRY and the Republic of Serbia |
| 1998, Jan. 16 – Clinton<br>*Proclamation 7062, 63 Fed. Reg. 2871* | Suspending the entry into the United States, as immigrants or nonimmigrants, of members of the military junta in Sierra Leone and their family |
| 1997, Dec. 16 – Clinton<br>*Proclamation 7060, 62 Fed. Reg. 65987* | Suspending the entry into the United States, as immigrants or nonimmigrants, of senior officials of the National Union for the Total Independence of Angola (UNITA) and adult members of their immediate families |
| 1996, Nov. 26 – Clinton<br>*Proclamation 6958, 61 Fed. Reg. 60007* | Suspending the entry into the United States, as immigrants or nonimmigrants, of members of the government of Sudan, officials of that country, and members of the Sudanese armed forces |
| 1996, Oct. 7 – Clinton<br>*Proclamation 6925, 61 Fed. Reg. 52233* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons who "formulate, implement, or benefit from policies that impede Burma's transition to democracy" and their immediate family members |
| 1994, Oct. 27 – Clinton<br>*Proclamation 6749, 59 Fed. Reg. 54117* | Suspending the entry into the United States, as immigrants or nonimmigrants, of certain aliens described in U.N. Security Council Resolution 942 (e.g., officers of the Bosnian Serb military and paramilitary forces and those acting on their behalf, or persons found to have provided financial, material, logistical, military, or other tangible support to Bosnian Serb forces in violation of relevant U.S. Security Council resolutions) |
| 1994, Oct. 5 – Clinton<br>*Proclamation 6730, 59 Fed. Reg. 50683* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who formulate, implement, or benefit from policies that impede Liberia's transition to democracy and their immediate family |
| 1994, May 10 – Clinton<br>*Proclamation 6685, 59 Fed. Reg. 24337* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens described in U.N. Security Council Resolution 917 (e.g., officers of the Haitian military, including the police, and their immediate families; major participants in the 1991 Haitian coup d'etat) |
| 1993, Dec. 14 – Clinton<br>*Proclamation 6636, 58 Fed. Reg. 65525* | Suspending the entry into the United States, as immigrants or nonimmigrants, of aliens who formulate, implement, or benefit from policies that impede Nigeria's transition to democracy and their immediate family |
| 1993, June 23 – Clinton<br>*Proclamation 6574, 58 Fed. Reg.* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons who formulate or benefit from policies that impede Zaire's transition to democracy and their immediate family |

| Date & President | Nature of the Exclusion |
|---|---|
| 34209 | |
| 1993, June 7 – Clinton<br>*Proclamation 6569, 58 Fed. Reg. 31897* | Suspending the entry into the United States, as immigrants or nonimmigrants, of persons who formulate, implement, or benefit from policies that impede the progress of negotiations to restore a constitutional government to Haiti and their immediate family |
| 1992, June 1 – Bush<br>*Executive Order 12807, 57 Fed. Reg. 23133* | Making provisions to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any covered vessel carrying such aliens |
| 1988, Oct. 26 – Reagan<br>*Proclamation 5887, 53 Fed. Reg. 43184* | Suspending the entry of specified Nicaraguan nationals into the United States as nonimmigrants (e.g., officers of the Nicaraguan government or the Sandinista National Liberation Front holding diplomatic or official passports) |
| 1988, June 14 – Reagan<br>*Proclamation 5829, 53 Fed. Reg. 22289* | Suspending the entry into the United States, as immigrants or nonimmigrants, of certain Panamanian nationals who formulate or implement the policies Manuel Antonio Noriega and Manuel Solis Palma, and their immediate families |
| 1986, Aug. 26 – Reagan<br>*Proclamation 5517, 51 Fed. Reg. 30470* | Suspending the entry of Cuban nationals as immigrants with certain specified exceptions (e.g., Cuban nationals applying for admission as immediate relatives under INA § 201(b)) |
| 1985, Oct. 10 – Reagan<br>*Proclamation 5377, 50 Fed. Reg. 41329* | Suspending the entry of specified classes of Cuban nationals as nonimmigrants (e.g., officers or employees of the Cuban government or the Communist Party of Cuba holding diplomatic or official passports) |
| 1981, Oct. 1 – Reagan<br>*Proclamation 4865, 46 Fed. Reg. 48107* | Suspending the entry of undocumented aliens from the high seas, and directing the interdiction of certain vessels carrying such aliens |

**Source:** Congressional Research Service, based on various sources cited in **Table 1**.

**Note**: In a number of cases, the exclusions listed in **Table 1** were expressly said to be waivable, in the Executive's discretion, when the entry of a particular alien otherwise subject to exclusion "would not be contrary to the interests of the United States." *See, e.g.,* 50 Fed. Reg. 41329, at § 2 (Oct. 10, 1985).

# Other Provisions of the INA

Beyond Section 212(f), other provisions of the INA can also be seen to authorize the Executive to restrict aliens' entry to the United States.[39] Most notably, Section 214(a)(1) prescribes that the "admission of any alien to the United States as a nonimmigrant shall be for such time and under such conditions as [the Executive] may by regulations prescribe."[40] (Nonimmigrants are aliens admitted to the United States for a specific period of time and purpose pursuant to one of the

---

[39] In addition, yet other provisions of the INA could be seen to give the Executive discretion as to whether certain categories of aliens are admitted. For example, Section 207(a)(2) of the INA could be seen to give the Executive broad discretion in determining how many aliens are admitted to the United States as refugees each year. *See* 8 U.S.C. § 1157(a)(2). Other provisions outside immigration law could apply. *See* National Defense Authorization Act for FY2017, P.L. 114-328, §§ 1261-1265,—Stat.—(Dec. 23, 2016) (sanctions for human rights abusers); Consolidated Appropriations Act, P.L. 114-113, § 7031(c), 129 Stat. 2755 (Dec. 18, 2015) (providing that certain foreign officials involved in "significant corruption" and their immediate family are ineligible for entry to the United States); Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012, P.L. 112-208, §§ 404-406, 126 Stat. 1505-1509 (Dec. 14, 2012) (excluding certain aliens involved in human rights abuses).

[40] 8 U.S.C. § 1184(a)(1).

"lettered" visas set forth in Section 101(a)(15) of the INA.[41]) Section 215(a)(1) similarly provides that "it shall be unlawful for any alien" to enter or depart the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."[42] In the past, the Executive has relied upon Section 215(a)(1), in particular, to exclude certain aliens. For example, President Carter cited to Section 215(a) when authorizing the revocation of immigrant and nonimmigrant visas issued to Iranians during the Iran Hostage Crisis.[43]

The current Section 215(a) was enacted as part of the INA in 1952.[44] However, similar language appeared in earlier immigration-related statutes.[45] Both the earlier language and the initial version of Section 215(a) granted the President the power to impose additional restrictions upon aliens' entry into and departure from the United States during times of war and, in some cases, "national emergency."[46] The President's exclusion of certain aliens under this authority[47] was upheld in several court cases, the most notable of which was arguably the Supreme Court's 1950 decision in *United States* ex rel. *Knauff v. Shaughnessy*.[48] There, the Court rejected a challenge to the exclusion of a German "war bride" under regulations promulgated pursuant to Presidential Proclamation 2523, which was itself issued under the authority of a predecessor of Section 215(a).[49] In so doing, the Court rejected the excluded bride's argument that both the regulations and the underlying statute constituted an impermissible delegation of legislative power, reasoning that "[t]he exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not

---

[41] *Id.* § 1101(a)(15) (defining an "immigrant" to mean "every alien *except* an alien who is within one of the following classes of nonimmigrant aliens.... ") (emphasis added).

[42] *Id.* § 1184(a)(1).

[43] *See* Executive Order 12172, Delegation of Authority With Respect to Entry of Certain Aliens Into the United States, 44 Fed. Reg. 67947, 67947 (Nov. 28, 1979) (authorizing the Secretary of State and the Attorney General to exercise "in respect of Iranians holding *nonimmigrant visas*, the authority conferred upon the President by section 215(a)(1) of the Act of June 27, 1952 (8 USC 1185).... ") (emphasis added); Executive Order 12206, Amendment of Delegation of Authority with Respect to Entry of Certain Aliens Into the United States," 45 Fed. Reg. 24101, 24201 (Apr. 7, 1980) (amending Executive Order 12172 to cover *immigrant*, as well as nonimmigrant visas). The exclusion addressed in *Sale* was also effectuated, in part, under the authority of Section 215(a). *See supra* note 19.

[44] *See* P.L. 82-414, § 212(e), 66 Stat. 190 (June 27, 1952).

[45] *See* P.L. 65-164, 40 Stat. 559 (May 22, 1918) ("[W]hen the United States is at war, if the President shall find that public safety requires that restrictions and prohibitions ... be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful [f]or any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe."); P.L. 77-113, 55 Stat. 252 (June 20, 1941) (similar).

[46] *See* 66 Stat. 190 (war and national emergency); 55 Stat. 252 (war); 40 Stat. 559 (war).

[47] *See, e.g.*, Proclamation 3,004, Control of Persons Leaving or Entering the United States, 18 Fed. Reg. 489 (Jan. 17, 1953) (President Truman relying, in part, on a predecessor to Section 215(a) to impose restrictions on the entry of aliens into the Panama Canal Zone and American Samoa); Proclamation 2,850, 14 Fed. Reg. 5173 (Aug. 19, 1949) (President Truman relying, in part, on a predecessor to Section 215(a) in excluding aliens whose entry executive officials deem "would be prejudicial to the interests of the United States"); Proclamation 2,523, Control of Persons Entering and Leaving the United States, 6 Fed. Reg. 2617 (Nov. 18, 1941) (similar, President Roosevelt).

[48] 338 U.S. 537 (1950). *See also* Shaughnessy v. United States *ex rel*. Mezei, 345 U.S. 206 (1953) (noting the President's power to exclude aliens in the course of finding that an alien who was so excluded, but whom no other country would accept, was not entitled to release into the United States). The *Mezei* Court, in particular, cited a number of precedents for the proposition that "the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." 345 U.S. at 210 (citing Harisiades v. Shaughnessy, 342 U.S. 580 (1952); The *Chinese Exclusion Case*, 130 U.S. 581 (1889); and Fong Yue Ting v. United States, 149 U.S. 698 (1893)).

[49] *Knauff*, 338 U.S. at 540-42.

from legislative power but is inherent in the executive power to control the foreign affairs of the nation."[50] Therefore, in the Court's view, Congress could not have run afoul of the non-delegation doctrine by authorizing the President to exercise this power "for the best interests of the country" during wartime because the President already possessed such authority.[51] The *Knauff* Court similarly rejected the argument that the regulations in question were not "reasonable," as required by the statutory authority under which they were issued—which in relevant part, made it unlawful for an alien to enter the United States "except under such reasonable rules ... as the President may prescribe."[52] The Court did so because it viewed the regulations excluding aliens whose entry was "deemed prejudicial to the public interest" as "reasonable in the circumstances of the period for which they were authorized, namely, the national emergency of World War II."[53]

The statutory language regarding war and national emergency—which arguably factored into the Court's decision in *Knauff*—was deleted from Section 215(a) in 1978.[54] However, it seems unlikely that this deletion would serve as a basis for overruling the *Knauff* Court's conclusions about whether the power in question was impermissibly delegated to the Executive,[55] or about what constitutes a "reasonable" regulation for purposes of Section 215(a).[56] *Knauff's* statements about the inherent power of nations to exclude aliens outside the United States with no recognized ties to the country would also generally seem to remain good law.[57]

# Author Contact Information

Kate M. Manuel
Acting Section Research Manager
kmanuel@crs.loc.gov, 7-4477

---

[50] *Id*. at 542.

[51] *Id*. at 542-43 ("[T]here is no question of inappropriate delegation of legislative power involved here."). The non-delegation doctrine precludes Congress from handing over its legislative powers to other branches of the federal government. However, Congress may "confer[] decisionmaking authority upon agencies, so long as it "lays down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001) (internal quotations omitted).

[52] 338 U.S. at 544.

[53] *Id*.

[54] P.L. 95-426, § 707(a), 92 Stat. 992-93 (Oct. 7, 1978).

[55] *Cf.* Cass R. Sunstein, *Nondelegation Canons*, 67 U. CHI. L. REV. 315, 315 (2000) ("Since 1935, the Supreme Court has not struck down an act of Congress on nondelegation grounds.... ").

[56] There does not appear to be any court cases establishing what is meant by the term "reasonable regulations" for purposes of Section 215(a) and its predecessors. However, courts may grant considerable deference to the Executive's determinations in this area, given the "plenary power" that the political branches are generally seen to have over immigration. *See, e.g.,* Mathews v. Diaz, 426 U.S. 67, 81 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").

[57] *See, e.g.,* Jean v. Nelson, 472 U.S. 847, 875 (1985) ("It is in the area of entry] that the Government's interest in protecting our sovereignty is at its strongest and that individual claims to constitutional entitlement are the least compelling."); Fiallo v. Bell, 430 U.S. 787, 792 (1977) (citing cases finding that the power to exclude is a "fundamental sovereign attribute"); Kleindienst v. Mandel, 408 U.S. 753, 765 (similar) (1972). Certain limits to this power have, however, been recognized, particularly as to aliens with recognized ties to the United States or who would need to be detained in the United States to effectuate their exclusion. *See, e.g.,* CRS Legal Sidebar WSLG1695, *Supreme Court to Hear Challenge to Aliens' Detention Pending Removal Proceedings*, by Kate M. Manuel.

# EXHIBIT  5

## to Cox Declaration

**J.R. 00085**

# The Forty Year Crisis: A Legislative History of the Refugee Act of 1980

DEBORAH E. ANKER* & MICHAEL H. POSNER**

*This article analyzes the legal responses of the United States to is-sues of refugee and asylum policy in the post-World War II pe-riod that culminated in the enactment of the Refugee Act of 1980. The authors describe the consensus for a humanitarian, nondis-criminatory policy which led to the passage of the Refugee Act. This legislative history demonstrates the effort to develop a coher-ent and flexible refugee admission policy and to create statutory mechanisms to mediate the conflict between the executive and legislative branches over the control and standards for refugee admissions. The article evaluates the implementation of the Refu-gee Act, proposals by recent administrations for reform, and of-fers a series of recommendations for future refugee and asylum policy.*

"In good measure, our country's humanitarian tradition of extending a welcome to the world's homeless has been accomplished in spite of, not be-cause of our laws relating to refugees."[1]

---

\* Member of the Massachusetts Bar. B.A., Brandeis University, 1969; J.D., Northeastern University, 1975; Chairperson of Boston Immigration Committee of the National Lawyers Guild; Member of the Committee on Asylum and Refugees of the American Immigration Lawyers Association. Currently Ms. Anker is Direc-tor of the International Institute of Boston.

\*\* Member of the California and Illinois Bars. B.A., University of Michigan 1972; J.D., University of California at Berkley (Boalt Hall) 1975. Currently Mr. Pos-ner is Executive Director of the Lawyer's Committee for International Human Rights in New York City. (The authors wish to express their gratitude for edito-rial assistance to Ms. Sue Kaplan, Harvard Law School; Mr. Evan Slavitt attorney with the Antitrust Division of the United States Department of Justice; and Pro-fessor Michael Schwartz, Sociology Department, State University of New York at Stonybrook, New York).

1. Statement of Congresswoman Elizabeth Holtzman, *Hearings on H.R. 2816 Before the Subcomm. on Immigration, Refugees and International Law of the*

J.R. 00086

The series of refugee crises which have erupted during the past four decades has evolved into a chronic, worldwide condition. Beginning with the people displaced by World War II, and continuing through the Hungarians, the Palestinians, the Cubans, the Vietnamese, the Haitians and the Afghani, the United States has struggled to define its proper role in coping with the refugee problem. Not only were the mechanisms for dealing with the refugee problem at issue, the very definition of a refugee constantly changed. Further, the developmental process of such mechanisms exemplifies the tug of war between Congress and the Executive to control the resolution of the problem.

With the coalescence of United States power in the international arena following World War II, the American political leadership projected the country's image as a haven for refugees from persecution. While the United States attempted to build new alliances with nations in different parts of the world, foreign policy aims were continually frustrated by the restrictive and xenophobic immigration policy embodied in the national origins system and codified in the Immigration and Nationality Act of 1952 (INA).[2] Moreover, while the INA defined immigration quotas along ethnic lines, inhibiting the United States' ability to offer refuge to certain nationalities, it also made no separate provision for the admission of refugees. The national quotas were characterized as a slur to those people with whom the United States was trying to build alliances. At the same time the United States was unable to respond adequately to the international refugee crisis through a specific and permanent refugee admission policy. Gradually, the United States publicly assumed responsibility for refugees who were fleeing new conflicts in the developing world as well as those displaced following World War II. The instability of the post-war era evolved into a chronic condition and the United States found itself a leader in a world that by 1980 had a population of over fifteen million refugees.[3]

When the permanent refugee admission quota was finally written into law in 1965,[4] its geographic, ideological and numerical qualifications were already completely inadequate to deal with

_House Comm. of the Judiciary_, 96th Cong., 1st Sess. (1979) [hereinafter cited as _Hearings on H.R. 2816]._

2. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163. (Codified as 8 U.S.C. §§ 1101-1157 (1952)).

3. Figures _reprinted_ in _United States Refugee Programs: Hearings before the Senate Comm. on the Judiciary_, 96th Cong., 2d Sess. 381 (1980) [hereinafter cited as _U.S. Refugee Programs_].

4. The Immigration and Nationality Act Amendments of 1965, Pub. L. No. 89-239, 79 Stat. 911 (1965) [hereinafter cited as the 1965 Amendments]. These amendments were repealed in part by 8 U.S.C. §§ 1157-1159 (1980).

the scope of the refugee problem. The permanent statute constrained the implementation of broader goals, and the executive branch looked to other legal mechanisms for the admission of refugees. Such a mechanism emerged through the use of the Attorney General's parole authority contained in section 212(d)(5) of the INA.[5] The friction between the flexibility of this *ad hoc* admission procedure, administered by the executive branch, and the carefully delineated statute, passed by the Congress, was the source of repeated conflict between the two branches of government.

The culmination of these developments was the Refugee Act of 1980 (Refugee Act),[6] the most comprehensive United States law ever enacted concerning refugee admissions and resettlement. This legislation, the result of extensive efforts by Congress and the executive branch, creates for the first time a legal framework for the admission of refugees to the United States that is coherent, comprehensive and practical. The Refugee Act incorporates the international definition of refugee from the United Nations Convention Relating to the Status of Refugees (UN Convention).[7] In so doing, it eliminates the geographical and ideological preferences that have dominated our system for the past three decades. By adopting a universal approach to refugee admissions consistent with international standards and norms, the new law places primary emphasis on "special humanitarian concerns".[8] On the other hand, the Refugee Act is a recognition that the United States cannot accept an unlimited number of refugees from around the world. It creates the basis for a refugee policy that considers the existing limitations on our nation's resources and the practical problems in administering such a program while maintaining our national humanitarian commitment. The Refugee Act also establishes, for the first time, the legal status and statutory rights of asylum.[9] It mandates a uniform asylum proce-

---

5. 8 U.S.C. § 1182(d)(5) (1952) (amended 1980).

6. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. (Codified as 8 U.S.C. §§ 1157-1159 (1980)).

7. United Nations Conventions Relating to the Status of Refugees (1951) as incorporated into U.S. law by the United Nations Protocol Relating to the Status of Refugees (1967). 19 U.S.T. 6223, T.I.A.S. No. 6577 (entered into force with respect to the United States on November 1, 1968) [hereinafter cited in UN Convention].

8. 8 U.S.C. §§ 1101-1157 (1980).

9. 8 U.S.C. § 1158 (1980).

11

dure be established to evaluate asylum applications on a systematic and equitable basis.

This article focuses on three principal aspects of the United States' refugee and asylum policy. First, it traces refugee programs of the United States dating back to post-World War II admissions from Europe. Second, it examines the legislative history of the Refugee Act, a history showing the evolution of a consensus for the humanitarian, nondiscriminatory policy finally embodied in the Refugee Act. The history also highlights the purpose of the Refugee Act, which is to move away from *ad hoc* refugee admission procedures and to create mechanisms to resolve the ongoing friction between the Executive and Congress over control of and standards for refugee admissions. Third, with the legislative history of the Refugee Act as background, the article evaluates the implementation of the Refugee Act and advances a number of specific recommendations.

These recommendations address problems in implementing existing law. We believe that the Refugee Act provides a sound and practical legislative base from which a successful refugee policy can be developed. Accordingly, we do not recommend nor do we believe that it would be wise to modify the Refugee Act as enacted in 1980.

## REFUGEE LAW AND POLICY, 1948-1969[10]

From the end of World War II until 1970, the history of refugee admissions into the United States is the story of a series of temporary responses to emergency crises. The national origins framework[11] established for immigration quotas insured that any legislative or administrative measures for refugees would be created on an *ad hoc* basis. As time passed, however, the divergence in approach between the executive and the legislative branches became striking. Insofar as Congress was willing to make exceptions to the restrictive immigration policy of the post-war era, refugees were admitted within narrowly circumscribed limits to

---

10. The material in this section is based in part upon the following: a) P. Glist, History of the Seventh Preference (unpublished, on file with Hogan & Hartson, Washington, D.C.); b) a background discussion of U.S. refugee laws and policies contained in the House Report on the Refugee Act of 1979, H.R. REP. NO. 608, 96th Cong., 1st Sess. (1979) [hereinafter cited as H.R. REP. NO. 608]; c) SEN. COMM. ON THE JUDICIARY, A REPORT UPON THE FORMATION OF THE SELECT COMMISSION ON IMMIGRATION AND REFUGEE POLICY: U.S. IMMIGRATION LAW AND POLICY: 1952-1979, 96th CONG., 1st Sess. (Comm. Print 1979) [hereinafter cited as U.S. IMMIGRATION LAW AND POLICY: 1952-1979].

11. The national origins quota system was repealed by 1965 Amendments, Pub. L. No. 89-239, 79 Stat. 911 (1965), see note 4 *supra.* For discussion of the national origins system see note 18 *infra.*

12

discharge responsibilities towards persons uprooted by the war, or as a gesture to the anti-communist preoccupation of the Cold War Era. Each legislative enactment was not to be viewed as "any precedent or commitment."[12] The executive branch, on the other hand, viewed refugee admissions as an instrument of foreign policy. As a result, it had a more expansive perspective on the United States' responsibilities in refugee crises, and began to bypass the formal immigration limits through the device of the Attorney General's parole authority.

*The Displaced Persons Act of 1948*

Congress enacted the first refugee legislation of the post-war era, the Displaced Persons Act of 1948,[13] only after eighteen months of executive pressure.[14] Eligibility requirements were highly selective. The Act provided sanctuary only for certain displaced, forced laborers from states conquered by Germany and for certain refugees who qualified under the United Nations (UN) refugee standards, particularly those who had fled Nazi or Fascist persecution and those fleeing Soviet persecution. Technical cut-off dates precluded the issuance of visas to ninety percent of the displaced Jews who entered Germany, Austria and Italy.[15] These limits were modified to some extent by subsequent amendments to the Act in 1950 and 1951.[16]

---

12. *See, e.g.*, Conf. Rep., 83rd Cong., 1st Sess., *reprinted in* [1953] U.S. CODE CONG. & AD. NEWS 2122-23, which assured that the 1953 Refugee Relief Act, Pub. L. No. 203, 67 Stat. 400 (1953) was an "emergency relief measure designed to implement certain phases of American foreign policy. It is not intended to represent any precedent or commitment on the part of the Congress or the Government of the United States to participate as an immigrant receiving country in any international endeavors aimed at a permanent solution of the problem: of surplus populations as it now apparently exists in certain parts of Europe and Asia."

13. Pub. L. No. 80-774, 62 Stat. 1009 (1948).

14. *See* S. REP. No. 950, 80th Cong., 2d Sess., *reprinted in* [1948] U.S. CODE CONG. & AD. NEWS 2028, 2035; H.R. REP. No. 1854, 80th Cong., 2d Sess. 7 (1948).

15. S. REP. No. 950; H.R. REP. No. 1854, *supra* note 14; President's Press Release of June 25, 1948, upon the signing of Pub. L. No. 80-774, 62 Stat. 1009 (1948). The 1948 Displaced Persons Act was severely criticized by Truman for adopting these technical cut-off dates.

16. Amendment to Displaced Persons Act of 1948, Pub. L. No. 81-555, 64 Stat. 219 (1950). The amendment permitted new visas to be issued to anti-communist refugees as an encouragement to anti-communists within the Soviet sphere; to take in refugees from the People's Republic of China; to change the cut-off dates previously used to prevent Jewish immigration (although only upon assurances that the changes benefitted Soviet dissenters and that few "racial outcasts" would immigrate). See H.R. REP. No. 581, 81st Cong., 1st Sess. 15 (1950). The Displaced

13

The INA[17] made some modification in the national origins system in effect since 1924 but like its predecessor contained no specific provision for the admission of refugees.[18] As a result, refugees had to be admitted through special enactments outside the permanent admissions scheme. The emphasis in these measures was less on broad humanitarian goals than on giving encouragement and support to anti-communists. In furtherance of this policy, Congress formulated the Refugee Relief Act of 1953[19] to allow admission of refugees including victims of natural calamities and those from communist-dominated parts of Europe and the Middle East. Special allotments were provided for Sweden, Iran, and Greece (countries viewed as bulwarks of democracy against Soviet expansionism).[20] The Refugee Relief Act was extended in 1957,[21] and visas were issued to "refugee escapees" defined as victims of racial, religious, or political persecution who were from communist or communist-dominated countries or a country in the Middle East.

With each of these legislative initiatives Congress maintained a circumscribed policy and repeatedly ignored appeals by the State Department to broaden the refugee admission criteria. When over 200,000 Hungarians fled Hungary following the Soviet invasion of that country in October 1956, President Eisenhower found existing immigration legislation inadequate to deal with the scope of the commitment the United States was called upon to make.

---

Persons Act was amended again by Pub. L. No. 82-60, 65 Stat. 96 (1951), thereby extending the Act an additional 6 months.

17. 8 U.S.C. §§ 1101-1157 (1952).

18. The 1952 Act modified and carried forward provisions of the two prior major immigration laws. The Immigration Act of 1917, 39 Stat. 874 (1917), set forth qualitative exclusion grounds. The Immigration Act of 1924, 43 Stat. 153 (1924), for the first time provided numerical immigration restrictions based on maintaining proportions of different races and nationals in the population through the use of a "national origins" formula. (The 1952 Act also included provisions of the Internal Security Act of 1950, 64 Stat. 987.) The modified formula of the 1952 Act "set the annual quota for an area at 1/6 of 1 percent of the number of inhabitants in the continental United States in 1920 whose ancestry or national origin was attributable to that area." U.S. IMMIGRATION LAW AND POLICY: 1952-1979, *supra* note 10, at 7. The national origins quota system was combined with a four-category selection system in the allocation of visas to Eastern Hemisphere countries. There were no numerical restrictions placed on Western Hemisphere immigration.

19. *See* note 12 *supra*.

20. H.R. REP. No. 608, *supra* note 10, at 2. The 209,000 visas issued under the Act of 1953 were made available for these specific categories of refugees, separate and distinct from visas available under the national origins quotas of the 1952 immigration law. During the approximately three and a half years that the 1953 Act was in effect some 189,000 refugees were either admitted or adjusted their status to immigrant.

21. Pub. L. No. 85-316, 71 Stat. 639 (1957).

14

With the "eyes of the world . . . fixed on Hungary" the United States could not afford to make a mere token gesture.[22] In late November 1956, President Eisenhower announced an offer of asylum to a total of 21,500 Hungarian refugees. Sixty-five hundred of this number received visas under the expiring Refugee Relief Act. Following informal discussions with congressional leaders, the President authorized the admission of the remaining refugees by requesting the Attorney General to exercise his parole authority.[23] The Attorney General's power to parole aliens into the United States is contained in section 212(d)(5) of the INA which (prior to the enactment of the Refugee Act) read as follows:

> The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any applicant for admission to the United States.[24]

Section 212(d)(5) was originally enacted to authorize the parole of otherwise inadmissible aliens. Derived from early administrative practice and operational instructions, it was designed to overcome some of the stringent entry requirements contained in the INA without allowing the alien the legal protections granted with formal entry into the United States.[25] While both the prior administrative practice and the legislative history of the INA indicate a purpose to benefit *individual* aliens in emergency situations, the 1956 Hungarian crisis heralded "the first, but by no means the last," use of the parole provision for the *mass* admission of refugees.[26]

---

22. *See* H.R. DOC. No. 85, 85th Cong., 1st Sess. 1 (1957).

23. The State Department was informed by spokespeople of both the House and Senate Judiciary Committees that parole was "the proper and lawful instrumentality for coping with the emergency in a manner consistent with the policy outlined by the President. . ." *See Hearings on H.R. 7700 Before the Subcomm. on Immigration and Naturalization of the House Comm. on the Judiciary*, 90th Cong., 1st Sess. 485 (1964) [hereinafter cited as *Hearings on H.R. 7700*].

24. 8 U.S.C. § 1182(d)(5) (1952) (amended 1980).

25. For an excellent discussion of the administrative and legislative history of the parole authority, see Comment, *Refugee-Parolee: The Dilemma of the Indochina Refugee*, 13 SAN DIEGO L. REV. 175 (1975), and Kap, *Refugees Under United States Immigration Law*, 24 CLEVELAND STATE L. REV. 528 (1975).

26. U.S. IMMIGRATION LAW AND POLICY: 1952-1979, *supra* note 10, at 18. A total of 38,000 Hungarian refugees were eventually resettled in the United States utiliz-

J.R. 00092

Congress acquiesced to executive leadership in paroling refugees by enacting the Fair Share Law of 1960.[27] The Attorney General gained the authority to admit, under the mandate of the United Nations High Commissioner for Refugees (UNHCR), a fair share of the refugees remaining in refugee camps in Europe. That "fair share" was specified to be twenty-five percent of the number of similar refugees resettled in nations other than the United States. Allowance was also made for adjustment of status after two years presence in the United States.[28] Other provisions were highly restrictive. For example, a State Department suggestion to extend the terms of the Act to certain non-Europeans was rejected.[29] The Fair Share Law was criticized for its discrimination against certain groups of refugees and for its failure to establish by permanent statute a refugee admission procedure.[30]

## *The Refugee Assistance Act of 1962*

In 1961 and 1962, the practice of wholesale parole of refugees was adopted.[31] Also in 1962, Congress passed the Migration and Refugee Assistance Act of 1962.[32] This Act was to provide for the resettlement needs of Cubans as well as to establish better fund-

---

ing the parole authority. The parole authority represented the one statutory mechanism with sufficient flexibility to circumvent the structures of the legislative enactments. One serious drawback, however, was that these refugees, were not legally admitted into the United States; subsequent legislation was required to allow for their adjustment of status.

27.  Pub. L. No. 86-648, 74 Stat. 504(1960). Congress has been accused of taking a contradictory attitude toward the use of the parole authority for refugee admissions. On the one hand, it has criticized the Executive's use of the authority for refugee admission programs, but has also "endorsed" that use by subsequently enacting legislation for the adjustment of status of refugees paroled under various programs. *See* note 26 *supra*. The "Fair Share Law" is only one, albeit major, example of congressionally mandated and approved parole. In fact, on a number of occasions Congress itself had initiated a refugee parole request. Congress has not necessarily been critical of refugee parole in the abstract, but rather has been wary of the unfettered and unmonitored use of parole for refugee admissions by the Executive.

28.  H.R. REP. NO. 608, *supra* note 10, at 3.

29.  S. REP. NO. 1651, 86th Cong., 2d Sess., *reprinted in* [1960] U.S. CODE CONG. & AD. NEWS 3124, 3140. The State Department had proposed that the definition of "refugee" be broadened by deleting the requirement that refugees fall under the mandate of the UNHCR. That proposal was rejected with a terse reminder that the Act's "primary aim . . . is to contribute to the closing of the remaining displaced persons and refugee camps in Europe, such aim coinciding with the determined camp liquidation program of the United Nations High Commissioner for Refugees". *Id.* at 3140.

30.  *See, e.g.*, comments made on the floor of the House of Representatives recorded at 106 CONG. REC. 14387(1960).

31.  *See* U.S. IMMIGRATION LAW AND POLICY: 1952-1979, *supra* note 10, at 46.

32.  Act of June 28, 1962, Pub. L. No. 87-510, 76 Stat. 121(1962)

16

ing and coordination for international refugee assistance pro-
grams. The Migrations and Refugee Assistance Act had a limited
effect on refugee admission policy. This legislation is, however,
significant for refugees because it was the first measure to vali-
date and adopt a nondiscriminatory definition of refugee. In omit-
ting any special reference to refugees from communist-dominated
areas or "cold war" responsibilities, the statute also broadened
our national perspective on the origin and cause of refugee move-
ments, and implied our willingness to assist all who had fled their
homes. This was important in view of developing refugee
problems in Africa and elsewhere.[33] The more limited congres-
sional view was beginning to broaden.

*The 1965 Amendments to the INA:  Creation of the Seventh
Preference for Refugees*

The first permanent statutory basis for the admission of refu-
gees was established by the 1965 Amendments to the INA.[34]
These amendments represented legislative recognition of the per-
manent nature of the refugee crisis and the United States' respon-
sibility to contribute to its alleviation. In most respects, however,
the amendments were essentially a codification of the restrictive
refugee standards developed for emergency relief since 1948. Sec-
tion 203(a)(7)[35] provided for the use of up to six percent of the
total Eastern Hemisphere immigration quota (10,200 visas) for the
conditional entry of refugees as a new seventh "preference" cate-
gory for admission.

The basic eligibility standards for the refugee preference were
derived from the Refugee Escape Act of 1957.[36] A provision of the
1953 Act[37] for victims of natural calamities was also included.

To come within the ambit of section 203(a)(7) the alien had to
prove: 1) departure from a communist-dominated country or from
a country within the general area of the Middle East; 2) the de-
parture constituted a flight; 3) such flight was caused by persecu-
tion or fear of persecution on account of race, religion, or political
opinion; and 4) an inability or unwillingness to return. Further-

---

33. A. SCHWARTZ, THE OPEN SOCIETY 142 (1968), *cited in* U.S. IMMIGRATION LAW
AND POLICY: 1952-1979, *supra* note 10, at 48.
34. *See* note 4 *supra.*
35. *See* 8 U.S.C. § 1153(a)(7) (1952) (repealed by 8 U.S.C. § 1101(c)(7) (1980)).
36. Pub. L. No. 85-316, 71 Stat. 639 (1957).
37. *See* note 12 *supra.*

17

more, the application could only be made through an immigration officer in a noncommunist or noncommunist-dominated country. Those who met ideological and geographical qualifications were still excluded if they did not find their way to a noncommunist country where the Immigration and Naturalization Service (INS) had established a processing office.[38]

Under section 203(a)(7) aliens were admitted as conditional entrants. The provision for conditional entry admission status was derived from the Fair Share Law[39] which had created a legislatively endorsed parole status for refugees. While conditional entry was not a legal admission to the United States, a refugee entering under that section could acquire permanent resident status after two years in the United States without special legislation.[40]

The 1965 Amendments repealed the national origins system and substituted a system of priorities based primarily on reunification of families and job skills. This substitution represented "the most far-reaching revisions of immigration policy."[41] In terms of reform of refugee admission policy, however, the amendments were of limited effect because of the restriction imposed based on geography and ideology. Proposals to extend refugee relief to North Africa were rejected along with an administration suggestion to reserve a pool of visas for emergency refugee relief free of geographic restrictions.[42]

By creating a permanent refugee admission provision in section 203(a)(7), Congress attempted to reassert its primacy in dealing with the refugee problem and stated its express intent that parole authority return to its original use for "emergent, individual, and

---

38. The 1965 Amendments *supra* note 4. *See* 8 C.F.R. 235.9(a) (1981) for INS processing centers.

39. Pub. L. No. 86-648, 74 Stat. 540 (1960).

40. In contrast see note 26 *supra*. Nonimmigrants physically present in the U.S. after two years who met the same eligibility requirements also could apply for classifications as refugees and for permanent resident status.

41. See IMMIGRATION LAWS OF THE UNITED STATES, 21-22 (3d ed. 1975). Harper at 38 (1975) *cited in* U.S. IMMIGRATION LAW AND POLICY: 1952-1979, supra note 10, at 51.

42. *See, e.g., Hearings on H.R. 7700, supra* note 23, at 559; *Hearings on H.R. 2580 Before the Subcomm. of the House Comm. on the Judiciary*, 88th Cong., 2d Sess. 68(1965).

The Administration's recommendations would have been to reserve up to twenty percent of the visas available for refugees whose "sudden dislocation would require special treatment". Kennedy, *The Immigration Act of 1965*, 367 THE ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE 140(1966). Sen. Kennedy, then Chairman of the Subcommittee to Investigate Problems connected with Refugees and Escapees of the Committee on the Judiciary of the U.S. Senate, also advocated a flexible refugee admission policy. 111 CONG. REC. 28033 (1965) (remarks of Sen. Kennedy).

18

isolated" situations.[43] At the same time Congress recognized that the parole authority could still be utilized for the admission of refugees "if such were deemed in the national interest of our country."[44]

Congress failed in its efforts, however, because the permanent refugee admission provision of section 203(a)(7) was inadequate even as it was written. Despite the legislative admonition, the parole authority continued to be required on a supplemental basis. This was dramatically illustrated by President Johnson signing the 1965 Amendments while simultaneously announcing the Cuban airlift program, which thereby initiated an open-ended invitation for thousands of Cuban refugees to enter the United States.[45] In the years following 1965, the Executive continued to use parole authority for refugee admissions, often to circumvent the obsolete numerical and geographical restrictions imposed by Congress.[46]

The use of parole as the major vehicle for refugee admissions became increasingly awkward as it was never designed for that purpose. In essence, the use of parole authority camouflaged an unstated, hidden and *ad hoc* refugee admission policy. Critics argued that the use of parole violated the legislative intent of the INA, and that no standardized procedures had been developed to structure and guide its implementation. In partial mitigation of those attacks, a practice evolved whereby the Attorney General would consult with ranking members of the Judiciary Committees of the House and Senate.[47] Gradually the consultation procedure

43. S. REP. No. 748, 89th Cong., 1st Sess., 3335 (1965).

44. In floor debate, Sen. Thurmond cautioned that despite language in the House report scoring the past use of parole authority to admit refugees, and "attempt(ing) to exclude its application to large groups of refugees, . . . I would expect this general rule of thumb would not forego in all cases the use of Section 212(d)(5) of the INA for the conditional entry of refugees, if such were deemed in the national interest of our country". 111 CONG. REC. 24237 (1965).

45. Signing of the Immigration bill, the President's remarks at the ceremony on Liberty Island, with his offer of asylum for Cuban refugees, Oct. 3, 1965. 1 WEEKLY COMP. OF PRES. DOC. 364-67 (Oct. 11, 1965).

46. As previously discussed, the parole authority was used as a supplemental device in later years to avoid the numerical limits set by the statute. *See, e.g.,* the discussion of the 1970 Czechoslovakian and Polish refugee parole programs note 52 *infra.* Parole has been used since 1972 for the admission of Soviet and other Eastern European refugees. See discussion note 92 *infra.*

In addition, parole has been used for the admission of refugees ineligible under the ideological and geographic limitations of the statute. *See, e.g.,* the discussion of the Ugandan and Chilean parole programs notes 76 and 91 respectively *infra.*

47. Some early parole programs were initiated either without prior congres-

19

J.R. 00096

became more institutionalized and hearings were often held on specific parole requests.[48] No formal guidelines, however, existed on the conduct of the consultations or the dimensions of the congressional role.[49]

EARLY REFUGEE REFORM PROPOSALS 1970-1976

The Refugee Act was not a minerva springing from the heads of Senator Edward Kennedy and Congresswoman Elizabeth Holtzman. It was, instead, the culmination of various attempts during the 1970's to complete the tasks begun with passage of the 1965 Amendments to the INA.

While the 1965 Amendments represented a dramatic change in the principles underlying immigration admission policy, compromises made during the legislative process had left many gaps. The amendments did not, for example, include Western Hemisphere selection priorities in conformity with the Eastern Hemisphere preference system, nor did they create a worldwide immigration numerical ceiling. The first congressional efforts to change refugee policy emerged as parts of other bills that were attempting to satisfy the objectives of the 1965 Amendments.

Various refugee reform provisions appeared in omnibus immigration bills introduced through 1976 in the 94th Congress. These reform proposals constituted a new approach to the definition of refugee, as well as to how, and by whom, the admission of refugees was to be controlled. While none was adopted into law, the evolution of these different refugee proposals and the hearings in which they were discussed helped to define the parameters of the debate that finally resulted in refugee reform in 1980. These hearings reveal the disparate interests of various congressional committees and executive departments (particularly State and Justice), and the compromises made as negotiations progressed.

---

sional approval or with informal congressional endorsement. See note 23, *supra*, for discussion of the original parole of Hungarian refugees in 1956.

48. *Proposed Amendments to the Immigration and Nationality Act: Hearings on H.R. 9112, H.R. 15092 and H.R. 173370 Before Subcomm. No. 1 of the House Comm. on the Judiciary*, 91st Cong., 1st Sess. 40 (1970) [hereinafter cited as *INA Hearings*].

49. In addition to the lack of guidelines on consultation, the parole authority had no predefined eligibility criteria; these conditions were entirely a matter of the Attorney General's discretion. Parole thus became a highly politicized admission device. For example, the Hungarians were admitted under liberal eligibility criteria consisting of flight from Hungary after October 23, 1956, and qualification under the regular provisions of the immigration law. *See* Swing, *Hungarian Escapee Program*, 6 I. & N. REP. 43(1965). Chinese refugees paroled from Hong Kong in 1962, on the other hand, were subjected to far more restrictive requirements. *See* In Chai, 12 I. & N. Dec. 81(1967).

In July and August of 1970 a House Judiciary Subcommittee conducted hearings on three bills which proposed various refugee reforms.[50] Congressman Peter Rodino, in his opening statement at the hearings, expressed the spirit in which the refugee reform aspects of these bills were being offered:

> Since World War II, the Congress has enacted several major statutes authorizing the admission of refugees, but it was not until the 1965 amendments that a refugee provision became part of the permanent law. Although this provision was laudable, it was obvious that this provision was inadequate . . . . The position of the United States as a world leader demands that we, with other countries of the free world, be in a position to offer asylum to the oppressed. We must be able to take quick, effective, and affirmative action to permit the orderly entry into the United States of a fair share of refugees seeking freedom. We must uphold America's tradition as an asylum for the oppressed.[51]

That same year inherent problems had become evident with the regular refugee admission provisions in the seventh preference supplemented by the parole authority. In less than six months, the 10,200 seventh preference numbers for 1970 already had been exhausted by Czechoslovakian and Polish refugees. Members of Congress, including every member of the House Judiciary Committee, approached a reluctant Attorney General to urge him to exercise his parole authority. Attorney General Mitchell doubted his authority because of the legislative history of the 1965 amendments. As Congressman Rodino stated, "[i]n agreeing with this request, the Attorney General advised the Committee that legislation in the refugee field was urgently needed and that the general parole authority would be invoked for refugees only temporarily."[52]

At the same time Congress encouraged this use of the parole authority, it disapproved unmonitored exercise of that authority for refugee admissions by the Executive and the Attorney General. In these 1970 hearings, for example, subcommittee members noted the lack of prior congressional consultation in the mass admission of Hungarians and Cubans. Representatives of the Exec-

---

50. *INA Hearings, supra* note 48. One bill was introduced in the Senate by Sen. Kennedy. S. 3202, 91st Cong., 1st Sess., 115 CONG. REC. 36964 (1969). Three bills were introduced in the House: H.R. 15093, 91st Cong., 1st Sess., 115 CONG. REC. 36942 (1969) (Companion bill to S. 3202 introduced by Congressman Feighan); H.R. 9112, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969) Congressman Celler; H.R. 17370, 91st Cong., 2d Sess., 116 CONG. REC. 13823(1970) Congressman Rodino. Congressmen Celler's and Rodino's bills contained similar refugee provisions.

51. *INA Hearings, supra* note 48, at 57.

52. *Id.* at 58.

J.R. 00098

utive conceded that not until after 1965 had that branch begun consulting with Congress before initiating a refugee parole program.[53]

In attempting to address the inadequacy of the 1965 Amendments Congress reviewed the refugee provisions of the bills considered during the 91st Congress. The bills had three major objectives: to adopt a refugee definition which would embody a changed admission policy; to establish a new numerical framework; and to create a statutory mechanism for refugee admissions which would include flexible procedures, usable standards, and a system of consultations with Congress. Each of the bills contained a definition of refugee without ideological or geographical restriction.[54] A refugee was defined in three parts, including: 1) an alien fleeing persecution from a communist-dominated country; 2) an alien fleeing persecution from *any* country; and 3) an alien uprooted by natural calamity or military operations and who is unable to return to his usual place of abode. In the second part of the definitions two of the bills required that to be a refugee an alien must "in the opinion of the Attorney General [have a] well-founded reason for being unwilling to return to any country due to persecution or fear of persecution."[55] Senator Kennedy's and Congressman Feighan's bill more closely tracked the language of the UN's Protocol[56] by expanding the bases of persecution and eliminating any reference to the Attorney General's discretionary finding. In support of his bill Senator Kennedy stated:

> A comprehensive asylum policy for refugees is long overdue. We should . . . broaden the definition of a refugee from its present European and

---

53. *Id.* at 200.

54. In the same sections the bills also eliminated the requirement that a refugee be admitted from a third country and they prohibited the admission of an alien refugee who was firmly settled. *See* companion bills of Kennedy and Feighan, S. 3202/H.R. 15093 § 6(a), 91st Cong., 1st Sess., 115 CONG. REC. 36964 (1969); Celler's H.R. 9112 § 9, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969); Rodino's 17370 § 9, 91st Cong., 2d Sess., 116 CONG. REC. 13823 (1970).

55. Celler's H.R. 9112 § 9, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969); Rodino's H.R. 17370 § 9, 91st Cong., 2d Sess., 116 CONG. REC. 13823 (1970).

56. *See* note 54 *supra* for provisions of congressional bills. Pursuant to U.S. accession to the UN Convention, *supra* note 7, regulations were promulgated to protect the right to apply for political asylum (prior to 8 C.F.R. § 208 (1980)). This right has been in addition to 8 U.S.C. 1253(h) (1952) regarding relief from deportation based upon a claim of persecution. *See* Note, *Judicial Review of Administrative Stays of Deportation: Section 243(h) of the Immigration and Nationality Act of 1952*, 1976 WASH. U.L.Q., 59., 114-20. Article I of the UN Convention states:

> [O]wing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country of his former habitual residence . . . is unable or, owing to such, fear is unwilling to return to it.

22

> cold war framework, to include the homeless throughout the world—in
> South America, southern Africa, and elsewhere. I would strongly suggest
> a definition similar to that contained in the convention relating to the sta-
> tus of refugees of the United Nations High Commissioner for Refugees.
> Its inclusion in the basic immigration statute is a logical extension of ac-
> cession by the United States, to the United Nations Protocol Relating to
> the Status of Refugees in 1968.[57]

The Kennedy/Feighan definition was generally supported at the hearings with the exception of State Department witnesses who expressed some ambivalence, revealing the contradictory pull of foreign policy concerns. While State Department witnesses called for a liberal asylum policy, they cautioned that "despite the overriding importance of the humanitarian side of the picture, the broadened definition could present some difficulties to the United States."[58] They were reluctant to endorse an expanded definition of refugee which might imply that a country "persecutes some of its inhabitants,"[59] a matter of considerable sensitivity. The State Department had been essentially satisfied with the procedures that had evolved because continued access to open-ended parole authority readily met foreign policy needs. If the broadened definition were adopted, the State Department insisted upon a strong role for the President or Secretary of State in defining and restricting the types of admissions "after a determination was made that it was in the interests of the United States."[60]

As their second objective, the bills attempted to create an admission mechanism with sufficient numerical flexibility to be responsive both to the unpredictable nature of refugee crises and to the perceived humanitarian responsibility of the United States in world affairs. Two different models to achieve this aim were proposed. Congressmen Celler's and Rodino's bills repealed the seventh preference and provided for admission of refugees outside the numerical immigration preference system. Through an amendment to the parole power the Attorney General would have permanent statutory authorization to parole alien refugees without predefined numerical, ideological or geographical limits.[61] This amended device would become the means of refugee admissions, and the Attorney General's job would be "inestimably eas-

---

57. *Hearings, supra* note 48, at 87.
58. *Id.* at 168.
59. *Id.*
60. *Id.* at 167.
61. *See* note 55 *supra*.

J.R. 00100

ier" by lending legislative weight to the use of parole.[62]
Congressman Rodino, commenting upon the combined effect of
the new definition and the amended parole provision, stated:

> This global authority in the absence of restrictions as to the number of
> refugees who could be accepted would provide maximum flexibility in the
> pursuit of humanitarian and foreign policy objectives. The United States
> would be better able to cope with any arising emergency or other type of
> refugee problems in a manner consistent with broader objectives.[63]

Senator Kennedy and Congressman Feighan in their bill also
favored legitimization of the Attorney General's parole power but
as an emergency provision only. They wanted, however, to main-
tain and improve the seventh preference with a nondiscrimina-
tory refugee definition and to apply it worldwide in an expanded
numerical framework.[64] Thus, they proposed that refugees consti-
tute ten percent as opposed to six percent of the worldwide ceil-
ing. Senator Kennedy explained at the hearings that his desire to
maintain a numerically fixed regular refugee admission category
sprang from practical considerations regarding present economic
problems of the United States and potential difficulties in devel-
oping political and popular support for this legislation.[65]

Both State Department and Justice Department witnesses testi-
fied in favor of the Kennedy/Feighan[66] model. They viewed the
United States as unique among nations of the world in having a
regular statutory provision for the admission of refugees which
"along with its forerunners over the past twenty-five years repre-
sent an historical commitment to the admission of refugees in an
orderly and systematic way."[67] A refugee preference establishing
the admission of a set number and fair share of the world's refu-
gees emphasized the United States' humanitarian concerns for
refugees and, according to State Department witnesses, "its elimi-
nation might well be misinterpreted."[68] At the same time, volun-
tary agencies involved in the resettlement of refugees testified in

---

62. *Western Hemisphere Immigration: Hearings on H.R. 981 Before the Sub-
comm. No. 1 of the House Comm. on the Judiciary*, 93d Cong., 1st Sess. 249(1973)
[hereinafter cited as *Hearings on H.R. 981*]. In recognition of the foreign policy
dimensions of the refugee admission process, and past practice with refugee pa-
role programs, Congressman Rodino's bill conditioned the parole of refugees upon
a determination by the Attorney General after consultation with the Secretary of
State that such parole would promote the national interest. This was viewed as
consistent with the Migration and Refugees Assistance Act of 1962, *supra* note 32,
governing the use of funds for assistance in behalf of various categories of
refugees.

63. *INA Hearings, supra* note 48, at 58.

64. Kennedy's S. 3202 § 7/Feighan's H.R. 15092 § 6(a), 91st Cong., 1st Sess., 115
CONG. REC. 36964 (1969).

65. *Id.* at 89.

66. *Id.* at 161.

67. *Id.* at 96.

68. *Id.* at 92.

24

favor of maintaining a refugee preference. These agencies were wary of leaving all the determination to the administrative course and wanted an assurance of at least a fixed number of refugee admissions.[69]

The general need for congressional participation in the refugee admissions process was the third major focus of the 1970 hearings. The legislative proposals were evidence that subcommittee members supported increased numerical and procedural flexibility in refugee admissions. At the same time, Congress wanted control over admissions. Both Congressman Celler's and Congressman Rodino's bills provided for semiannual reports to Congress by the Attorney General listing individual paroled aliens and for congressional veto and subsequent termination of the parole authorization by congressional enactment within ninety days of such report.[70] Neither Congressmen Celler's nor Rodino's bills, however, were reported on favorably by the House Judiciary Committee, and the Kennedy/Feighan bill died in Senate subcommittee.[71]

During the 93rd Congress, Congressman Rodino again introduced legislation (H.R. 981)[72] with two main goals: Western Hemisphere reform and a worldwide quota on United States immigration. H.R. 981 contained refugee provisions very similar to those in Rodino's previous bill (H.R. 17370), calling for a numerically unrestricted and legislatively endorsed parole mechanism as the exclusive means of refugee admission. Significantly, Rodino modified the refugee definition to more clearly conform with the UN Convention.

While maintaining the tripartite definition of refugee, H.R. 981 amended the second part to refer to an alien fleeing from and unwilling to return to any country owing to a well founded fear of

---

69. *Id.* at 181.

70. Celler's H.R. 9112 § 9, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969); Rodino's H.R. 17370 § 9, 91st Cong., 2d Sess., 116 CONG. REC. 13823 (1970).

71. The Senate Subcommittee on Immigration and Naturalization which had jurisdiction over the legislation was headed by Sen. Eastland. Sen. Eastland was also Chair of the full Senate Judiciary Committee. Sen. Kennedy, as Chair of the Subcommittee to Investigate Problems connected with Refugees and Escapees, had no legislative jurisdiction. Sen. Eastland was known to be hostile to refugee reform efforts, and his chairmanship of the Committee and Subcommittee until 1978 was certainly a significant inhibiting factor in passage of a refugee reform measure. Conversation with Jerry M. Tinker, former Counsel for Immigration and Refugee Affairs, Committee on the Judiciary, U.S. Senate (Sept. 8, 1980).

72. H.R. 981 § 9, 93rd Cong., 1st Sess., 119 CONG. REC. 61 (1973).

J.R. 00102

persecution "by reason of race, religion, nationality, or member-ship in a particular social group, or of political opinion."[73] In this respect, Congressman Rodino's H.R. 981 more closely paralleled Senator Kennedy's former bill than his own earlier proposal. Fur-thermore, while the bills introduced by Congressmen Rodino and Celler in the 91st Congress had provided that fear of persecution was to be established in the opinion of the Attorney General, H.R. 981 contained no comparable qualification allowing for the Attor-ney General's discretionary finding. Although the Department of Justice urged inclusion of this limitation during subcommittee hearings,[74] the phrase remained out of the bill in the final mark-up. Unlike its posture in earlier hearings, the State Department officially endorsed the broadened refugee definition, although only in general terms.[75]

During the 1973 hearings on H.R. 981, discomfort with the aber-rant use of the parole authority for refugees was more evident than it had been in the 1970 hearings. This was due in part to the launching of additional parole programs in the interim: the parole of 200 Soviet Jews in 1972, resulting from a request to the Attor-ney General by the House Judiciary Committee, and the parole of 1500 Ugandan Asians based on a recommendation by the State Department.[76] While Attorney General Mitchell's objections to the exercise of his parole authority were less strenuous in these instances, subcommittee members expressed considerable con-cern over the lack of congressional involvement in the decision-making process surrounding parole requests. The Attorney Gen-eral's office was already committed to a policy of consultation with Congress on refugee parole. The State Department, which initiated most of the requests, for the first time promised to have regular, formal hearings. The State Department, however, was re-luctant to make consultation a statutory requirement.[77] The ten-sion surrounding the consultation issue markedly escalated.

When H.R. 981 was reported out by the House Judiciary Com-mittee, the worldwide ceiling and preference system for the West-ern Hemisphere were proposed.[78] The refugee definition had been clarified and liberalized. In response to the urgings of Jus-

---

73. *Id.* In contrast see note 55 *supra.* See enumeration of the basis of perse-cution track language of the UN Convention.

74. *Hearings on H.R. 981*, supra note 62, at 95.

75. *Id.* at 97.

76. *Id.* at 161. In 1973, 200 Soviet Jews who succeeded in leaving the USSR were paroled into the U.S. INS Ann Rep. 5(1973-74). On September 30, 1972, a deci-sion was made to parole into the U.S. 1000 Ugandan Asians. An additional 500 were added to the parole program on April 3, 1973. INS Ann. Rep. 5 (1973-74).

77. *Hearings on H.R. 981, supra* note 62, at 163.

78. *See* H.R. Rep. No. 461, 93d Cong., 1st Sess. (1973).

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

tice Department witnesses,[79] the redundant definition including both refugees from *communist* countries and refugees from *any country* was deleted.[80] The model of a permanent refugee preference with a back-up emergency parole provision had been adopted,[81] but with an explicit requirement for consultation among the Secretary of State, the Attorney General and Congress. As with the bills in the 91st Congress, refugees were to be admitted as conditional entrants without geographic or ideological restrictions under an amended refugee definition in conformity with the UN Convention.

The House bill proposed a broad and nondiscriminatory refugee policy. The effect of amended H.R. 981 would have created a refugee preference without ideological restriction for the Western Hemisphere. A specific intent to provide for refugees from the Western Hemisphere who were fleeing right-wing dictatorships (as opposed to those from Cuba) was emphasized during floor debates on the bill on September 25, 1973. As stated in these debates, "recent events in Latin America, particularly in Chile and Argentina . . . seem to indicate the need for this important revision in the law. Now the beleagured peoples of these lands will have the opportunity to escape to freedom."[82]

In the amended H.R. 981 the provision for an open-ended parole authority as the vehicle for refugee admissions had been abandoned. Instead, refugees were to be accommodated "within the preference system and within the immigration limit"[83] as seventh preference conditional entrants.

Specific authorization was given to the Attorney General for the parole of groups or classes of refugees beyond those permitted under the conditional entry provision, but only under what the House report described as "exceptional or emergency circumstances."[84] Moreover, a group or class of refugees still had to satisfy the definition of refugee, the Secretary of State had to recommend the group for parole and find parole in the national[85]

---

79. *Hearings on H.R. 981, supra* note 62, at 95.
80. *See* H.R. 981 § 5, 93d Cong., 1st Sess., 119 CONG. REC. 31359 (1973).
81. *See* H.R. REP. No. 1553, 94th Cong., 2d Sess. 25(1976).
82. 119 CONG. REC. 31363 (1973) (remarks of Rep. Holtzman). The reference was to the overthrow of the Allende government in Chile by a military coup and to a military coup in Argentina.
83. *Id.*
84. *See* note 78 *supra*, at 11.
85. H.R. 981 § 6, 93rd Cong., 1st Sess., 119 CONG. REC. 61 (1973).

27

interest, and the Attorney General had to consult with Congress.

Congress wanted to avoid the possible creation of mass refugee parole programs without prior congressional consultation. The House report cited a history of the use of parole authority for mass refugee admission programs, criticizing the parole provision for being "simultaneously ambiguous and far too broad."[86] The Committee strongly expressed its desire that this authority be brought under congressional control, asserting the importance of consultation in the administration of the parole function. The Committee report further stated that consultation meant, at a minimum, consultations by the Departments of State and Justice with the appropriate judiciary subcommittees.[87]

In the final analysis, Committee members were willing to maintain a flexible refugee admission policy if Congress was duly informed and consulted. When the bill was debated on the floor, Congressman Rodino reiterated this position, stating, "unless there is full consultation by the Department of State and Justice with the Congress regarding use of the flexible refugee parole authority, we will necessarily have to return to a more restrictive position."[88]

On September 26, 1973, the House passed H.R. 981[89] but the Senate Judiciary Committee took no action on the bill. In the 94th Congress, however, two bills[90] were again introduced which contained refugee provisions identical to those in the earlier version of H.R. 981, which the House had passed. Hearings were held on these bills as well as an administration bill (containing no new refugee parole provisions) in September, October, and December of 1975 and in March of 1976.[91] The complexity of the refugee

---

86. *See* note 78 *supra*, at 12.

87. *Id.* at 25.

88. 119 CONG. REC. 31365(1973). It is significant that while the committee had written in the amended H.R. 981 requirement of consultation for emergency group parole, the provision in the original bill for a detailed report on paroled aliens as well as for a congressional veto had been eliminated.

89. 119 CONG. REC. 31477 (1973).

90. The two bills H.R. 981, 94th Cong., 1st Sess., 131 CONG REC. 504 (1975) and H.R. 367, 94th Cong., 1st Sess., 121 CONG REC. 193 (1975), introduced by Rodino and Eilberg respectively, concerned Western Hemisphere immigration reform and contained refugee provisions identical to the earlier H.R. 981. The Administration's bill was H.R. 10323, 94th Cong., 1st Sess., 121 CONG. REC. 33719 (1975). *See* H.R. REP. NO. 1553, 94th Cong., 2d Sess. 25 (1976).

91. *Proposed Amendment to the Immigration and Nationality Act: Hearings on H.R. 367 Before the House Comm. on the Judiciary,* 94th Cong., 1st Sess. 74 (1974-75) [hereinafter cited as *Hearings on H.R. 367*]. The initiation of Chilean and Indochinese parole programs in the previous year may have dampened congressional enthusiasm for the proposed reforms. Following the coup in that country, a Chilean parole program involving at different times foreign nationals in Chile, Chilean refugees in Peru and internally detained political prisoners had been con-

28

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

question and the need for action on other proposals led to questions as to the propriety of immediate action on refugee reform. While the UN refugee definition was again endorsed by a variety of witnesses testifying at these 1975-1976 hearings, Congressman Eilberg, new Chairman of the Subcommittee, voiced some doubts as to the advisability of broadening the definition in light of an expansive parole authority. He was most disturbed with the *ad hoc* nature for the consideration of parole in each emergency and the need for uniform standards and criteria "to help prepare Congress and INS for future emergencies."[92] Eilberg questioned whether "in view of the nature of the emergencies that we have faced and the troubles that exist in various parts of the world right now [it would be] practical to adopt the UN definition without further deliberation."[93] INS Commissioner Chapman agreed that "the time [had] come to standardize the procedure and principles under which a refugee situation is handled in the future."[94] He also agreed with the recommendation of Chairman Eilberg to separate the refugee provisions from the rest of the bills and to consider the refugee matter separately.[95]

Subsequent to these hearings, the subcommittee markup resulted in a clean bill which became Public Law No. 94-571.[96] The bill as passed was "non-controversial remedial legislation" limited to that aspect of immigration law in most urgent need of reform, "the inequitable regulation of Western Hemisphere immigra-

---

sidered. Consultation hearings with the Immigration Subcommittees of the House and Senate had taken place. This was one of the first parole programs involving refugees from a right-wing dictatorship and, thus, tested United States commitment to a broadened refugee policy.

The proposed Chilean program had generated considerable controversy but minimal action on the part of the Department of State, INS and Congress. While the plight of the Chileans was being deliberated in subcommittee hearings in the Spring of 1975, the evacuation of Indochina precipitated a request for one of the largest parole programs ever, resulting in emergency congressional consultation. The difference in scale between the Chilean and Indochinese programs, the discrepancies in their criteria for admission, and their differing administration epitomized the problems inherent in the amorphous, discretionary parole mechanism. For an excellent discussion of the Chilean parole programs, see Note, *Behind the Paper Curtain: Asylum Policy versus Asylum Practice*, 7 N.Y.U. REV. OF L. AND SOC. CHANGE 107 (1978).

92. *Hearings on H.R. 367, supra* note 91, at 74.
93. *Id.*
94. *Id.* at 75.
95. *Id.*
96. Act of Oct. 20, 1976, Pub. L. No. 94-571, 90 Stat. 2703 (1976).

29

J.R. 00106

tion."[97] Public Law No. 94-571 extended the seventh preference to the Western Hemisphere, a measure of limited utility since the former restrictive refugee definition was retained.

Action on refugee reform, like other components of the overall 1965 package, was postponed. However, the issues and structure of the debate had been well laid out in these early hearings and bills. Congress was increasingly supportive of a nondiscriminatory refugee definition and policy; each bill introduced was more closely in conformity with the terms of the UN Convention. The wide latitude of the Executive's authority in refugee admissions led to a demand for more congressional control and a statutory consultation requirement in refugee programs, a pervasive theme throughout this six-year debate. At the same time Congress was calling for legislative action the Executive was relatively content with the *status quo*. The State Department, in particular, acknowledged the administrative problems in the parole provisions but was jealous of the prerogative it had by virtue of this undefined authority. These were the tensions that had surfaced and remained to be resolved. The problems consequent to the massive Indochinese parole program would crystalize these issues even further and provide the final motivation for the statutory formulation of a new refugee policy.

THE INDOCHINESE PAROLE PROGRAM AND THE 1977-1978 HEARINGS ON THE ADMISSION OF REFUGEES

In 1976, over 130,000 refugees were evacuated from Indochina. Most were paroled and resettled in the United States. While the Indochinese as refugees from communism were technically eligible for conditional entry, the magnitude of the exodus and the resettlement effort made parole the only feasible method for their admission.[98]

The use of the parole authority as a vehicle for Indochinese admissions further underscored the inadequacies of the *ad hoc* procedures which were not supported by specific policy or planned objectives. It was apparent from the time of the 1975 evacuation that a regular flow of refugees would be leaving Indochina for a foreseeable period, yet the unstructured nature of the parole mechanism encouraged the executive branch to avoid planning for this apparent inevitability. Instead, "the Executive was put in the position of waiting repeatedly until the number of refugees in

---

97. H.R. REP. No. 1553, *supra* note 90, at 7.
98. SEN. COMM. ON THE JUDICIARY, REVIEW OF U.S. REFUGEE RESETTLEMENT PROGRAMS AND POLICIES, 96th Cong., 1st Sess. 10 (Comm. Print 1979) [hereinafter cited as REVIEW OF U.S. REFUGEE RESETTLEMENT 1979].

30

the countries of first asylum reached crisis proportions and then declaring an emergency which required yet another special program."[99]

The sequence of *ad hoc* parole programs,[100] the elimination of refugee clauses from the 1976 Act, an announcement by the Ford Administration of a moratorium on new parole programs[101] and a pledge by President Ford to cooperate in legislative efforts at refugee reform, motivated a new congressional effort to formulate a refugee law. The immediate result was the initiation of hearings in 1977 (continuing through 1978) before the House Subcommittee on Immigration, Citizenship and International Law on admission of refugees into the United States.[102] During these hearings two bills (H.R. 3056 and H.R. 7175) "to review the procedures for the admission of refugees" were considered.[103]

Concurrently, the Indochinese crisis continued to escalate, and the plight of the boat people received increasing world attention. The Carter Administration, not considering itself bound by President Ford's moratorium, initiated yet another parole program in 1977. Informal consultation with Congress on this program, involving 15,000 Vietnamese boat and land refugees, occurred during these 1977 congressional hearings on refugees. The Subcommittee disapproved of the confused procedures involved

---

99. 125 CONG. REC. S.3037 (1979) (Remarks of Sen. Kennedy) The Indochinese parole program was the most dramatic but not the only example of the problem (at least as perceived by certain congressional members) of the use of the parole authority for refugee admissions. The insufficiency of the seventh preference numbers could no longer be viewed as a sporadic occurrence, but the parole authority was regularly being used as a "supplementary" provision. Thus, for example, a major and on-going Soviet refugee program was being developed during this period. In January of 1977, 4,000 Soviet refugees were paroled into the U.S.; an additional 5,000 were authorized in December of 1977. By the end of the hearings on the Admission of Refugees (note 102 *infra*), an additional 12,000 person parole program was authorized from the Soviet Union and other Eastern European countries. *See* U.S. IMMIGRATION LAW AND POLICY: 1952-1979 *supra* note 10, at 107.

100. For a description of the different parole programs with varied selection criteria initiated through May 1976, see Review of U.S. Refugee Resettlement 1979, *supra* note 98 at 10-11.

101. *Id.* at 11.

102. *Hearings on H.R. 3056 Before the Subcomm. on Immigration, Citizenship and Int'l Law of the House Comm. on the Judiciary*, 95th Cong., 1st Sess. (1977) [hereinafter cited as *Hearings on Admission of Refugees into the United States*]. *Admission of Refugees, Part II: Indochinese Refugees and U.S. Refugee Policy*, 95th Cong., 1st & 2d Sess. (1977-78) [hereinafter cited as *Admission of Refugees, Part II*].

103. H.R. 3056, 95th Cong., 1st Sess., 123 CONG. REC. 3413 (1977); H.R. 7175, 95th Cong., 1st Sess., 123 CONG. REC. 14648 (1977).

31

J.R. 00108

in the request, the lack of selection criteria, and the abandonment of those criteria formulated in the 1976 program.[104] While Chairman Eilberg pressed for more formal consultation procedures, the Administration viewed the existing informal requirement of consultation with Congress as an impediment to effective response to the emergency at hand.[105] Subcommittee members complained that they received no facts or figures during consultations on emergency parole requests "so that about all that the Administration was accomplishing at various points in these various programs was conveying to us their sense of emergency but certainly no sense of refugee policies."[106]

Chairman Eilberg criticized the Administration for initiating the parole request without a proper presentation of facts, either by the State Department to the Attorney General or by the Attorney General to the Congress. Even the informal procedures were being ignored. In fact, Subcommittee members came to view the Attorney General as a mere conduit for White House requests, a scheme which successfully insulated the White House from accountability. Congressman Eilberg complained that, over the preceeding year, he had repeatedly requested the INS and the Attorney General to establish guidelines and regulations governing the conditions for parole, but had received no response. The Subcommittee saw the parole request as "a classic case, which demonstrates the need for legislation."[107] The impetus for refugee reform deepened as the Executive, as well as the Congress, was

---

104. Description of the criteria found in *The Indochinese Exodus, A Humanitarian Dilemma*, GAO Report to Congress, May 24, 1979 [hereinafter cited as GAO Report].

105. *Admission of Refugees, Part II, supra* note 102, at 25. In fact the subcommittee had not acted for several months on the May 1976 parole request. This congressional "sabotage" was cited during later hearings as a reason for executive branch resistance to formalized consultation procedures. *See, e.g., The Refugee Act of 1979: Hearings on S. 643 Before the Sen. Comm. on the Judiciary*, 96th Cong., 1st Sess. 36 (1979).

106. *Hearings on Admission of Refugees into the United States, supra* note 102, at 9.

107. *Admission of Refugees, Part II, supra* note 102, at 28. The previous Attorney General, Edward Levi, had agreed not to grant parole if a majority of either the House or Senate Judiciary Committees disapproved. But Attorney General Bell, when questioned during the hearings, made it clear that while consultation with Congress was essential, he still had the ultimate authority and responsibility to exercise the parole power. At the same time the Attorney General reiterated his own discomfort with the unguided nature of the parole authority. *Id.*, at 23. In testimony before the House Committee on the Judiciary on Nov. 28, 1978, he summarized these problems. "I am not comfortable about the use of the parole authority in . . . situations where I have exercised that authority in the past. Nor is this discomfort unique to me. Every Attorney General before me, faced with such requests, has voiced similar reservations because the intent of Congress, in establishing the parole authority, was to provide a safety valve for unusual, individual cases of compelling need that could not otherwise be met. It was not to provide

32

experiencing the effect of a poorly focused and unorganized refugee admission policy. The absence of a coherent refugee policy, as demonstrated by the use of sporadic, *ad hoc* parole actions, created needless uncertainties for voluntary agencies and for United States officials participating in resettlement.[108] In addition, it confused other nations, causing them to become less motivated to share in refugee relief.[109]

Congress, in response to the severe limitations and consequences of the existing *ad hoc* policy, considered bills during the 1977-1978 hearings (H.R. 3056 and its successor H.R. 7175),[110] which contained more explicit and elaborate structures for refugee admission than had earlier bills. In many respects, the two bills were a compendium of previously debated legislation. The refugee definition closely resembled the UN Convention definition, which received for the first time the unambiguous endorsement of the State Department.[111] The bill contained a ban against firmly resettled refugees,[112] a provision which had appeared in every reform proposal since the 91st Congress. Like the admissions models that had been agreed upon in the earlier hearings, the bill set out a two-tier admissions structure. It included a numerically defined "normal flow" admission category of 20,000 annually accompanied by a separate provision for emergency admissions initiated only after consultation with the House Judiciary Committee and the Senate Judiciary Committee.[113]

---

the means to end-run the other provisions of the immigration law." REVIEW OF U.S. REFUGEE RESETTLEMENT 1979, *supra* note 98, at 9.

108. *See, e.g.*, GAO REPORT, *supra* note 104, at 6.

109. *Admission of Refugees, Part II, supra* note 102, GAO Report, *supra* note 104, at 6. As Attorney General Bell stated: As a result [of the *ad hoc* nature of the U.S. Refugee policy] we are unable to give clear signals to other nations about the extent of our ability to meet world refugee needs. We are unable to plan effectively . . . . Finally and most regrettably—individual refugees are hostage to a system that necessitates that their plight build to tragic proportions so as to establish the imperative to act.

110. H.R. 3056, 95th Cong., 1st Sess., 123 CONG. REC. 3413 (1977).

111. *Id.* at § 42. For State Dept. endorsement, *see Hearings on Admission of Refugees into the United States, supra* note 102, at 78.

112. *Id.* at § 207(a).

113. *Id.* With the creation of a separate refugee admission process, the seventh preference was to be repealed. The later bill (H.R. 7175) specifically provided for a commensurate reduction in the Eastern and Western Hemisphere quotas. The six percent of the annual Eastern and Western Hemisphere quotas which was allocated to the seventh preference was reassigned to second preference spouses and unmarried sons and daughters of lawful permanent residents. In a provision similar that in the seventh preference, H.R. 3056/H.R. 7175 provided that up to 5,000 of

33

There were, however, major changes signifying the heightened conflict between the Executive and the Congress over two major issues. First, Congress had become increasingly committed to numerical limits. This commitment reflected a growing antagonism within the United States to increased immigration in general, a feeling crystallized by the very large number of Indochinese admitted into the country since 1975. The Executive, on the other hand, wanted unfettered autonomy in deciding the number of refugees admitted while maintaining its ability to be politically selective in excluding some nationalities altogether and allowing extremely generous quotas for others.

The second dimension of the conflict involved competition between the two branches for control over refugee decision-making. Congressional bills consistently sought formalized consultation, and veto power or legislative review over executive action. The Executive persistently sought maximum insulation from congressional oversight. Thus, the Congress' call for limitations was not simply a reflection of a new restrictionist attitude, but an expression of its felt need to structure and control executive decision-making.

The congressional reaction to this conflict was to move away from the flexibility of earlier bills. H.R. 3056, for the first time, contained numerical and categorical limitations on emergency admissions and retained more power and access to information in Congress.[114] Parole as a vehicle for emergency admissions was rejected as too tainted by past executive abuse to receive statutory legitimization. The parole authority was specifically amended to prohibit the parole of a refugee.[115] Instead, the bill established two emergency refugee categories which were to be the exclusive basis for triggering the President's authority to initiate a refugee admission program.[116]

The formulas for these categories, however, were based on past practices. The emergency refugee categories in H.R. 3056 were intended to be modeled on the two principle types of past parole programs: a refugee emergency determined by the President to be of special concern to the United States would authorize the President to admit 20,000 refugees; an appeal from an international refugee organization would enable the President to admit

---

the 20,000 total refugee admissions could be used to adjust the status of non-immigrant aliens who had been in the U.S. for 2 years and qualified as refugees. Both of these concepts were incorporated into the Refugee Act. 8 U.S.C. § 1151(a) (1980); 8 U.S.C. § 1159(b) (1980).

114. H.R. 3056, 95th Cong., 1st Sess., § 123 CONG. REC. 3413 (1977).

115. *Id.* at § 212(d)(5).

116. *Id.* at § 207(b).

34

[VOL. 19: 9, 1981]
*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

fifteen percent of the total involved, or 5,000 refugees, whichever is less. The President was required to solicit the cooperation of the international community in resettling refugees and, in the latter event, to make a determination that other countries in the international community would accept their fair share for resettlement.

Congress attempted to retain more authority than it had in the past. Any emergency refugee program decision had to be made in consultation with the House and Senate Judiciary Committees upon a determination that the emergency admissions would significantly promote the national interest, were justified by grave humanitarian concerns and were not possible under the regular admission provisions.[117] The congressional veto provision was restored,[118] as well as a detailed reporting requirement similar to that contained in the earlier version of H.R. 981 in the 93rd Congress.[119] In reaction to the perfunctory nature of recent consultations and the incongruity and inadequacy of the Attorney General's role as the Executive's agent, responsibility for emergency admissions was shifted from the Attorney General's office to the President. By this transfer, Congress attempted to institutionalize the White House's role and thereby allow the President to draw on the entire resources of the executive branch. Consequently, consultations would be more effective, involving the actual rather than figurehead decision-makers in the executive branch.[120]

While Congressman Eilberg urged numerical and categorical limits on refugee admissions, State and Justice Department witnesses continued to advocate autonomous executive jurisdiction over emergency programs. Numerical and categorical limits on emergency refugee admissions were attacked as antithetical to the nature of international refugee crises which necessitated flexibility.[121]

---

117. *Id.*

118. *Id.*

119. *Id.* at 207(d). The reporting requirements varied to some extent from those provided in H.R. 981. However, the bill did require detailed reports as to each alien admitted under the emergency provisions.

120. *Id.* at 207(b); *Hearings Admission of Refugees into the United States, supra* note 102, at 67. This shift in authority was incorporated into the Refugee Act, see 8 U.S.C. § 1157(b)(1980).

121. The voluntary agencies also opposed the emergency provision. *Hearings on Admission of Refugees into the United States, supra* note 102, at 124-25.

35

J.R. 00112

The Executive's position on numerical limits, however, was not always clear or internally consistent. State Department representatives, for example, maintained their support for a "normal flow" admission category deducted from the overall hemispheric totals in order to leave the absolute numerical limits unchanged "until there is a more solid basis for determining the optimum rate of annual migration to the United States."[122] At the same time, they conceded that the emergency procedures would have to be invoked on a regular basis to accommodate backlogs in ongoing programs (e.g., Soviet refugees awaiting refugee processing in Rome) resulting from the inadequacy of the 20,000 normal flow limit.[123]

In the face of strong congressional support for numerical limits, the State Department compromised and for the first time advocated a statutory consultation.[124] It made a proposal which, with some modifications, would be adopted in the 1980 legislation.[125] State Department witnesses suggested that the terms of an emergency refugee program, including admission quotas, could be "settled between the executive and legislative branch in advance of implementation, through the consultative process provided in the bill."[126]

The Subcommittee, however, was wary of continuing to allow the Executive discretion without enforceable, delineated standards, and a stronger consultation mechanism. H.R.7175 thus provided a specific definition of consultation as personal contact between the President and "appropriate members of the Committee . . . to review the emergent refugee situation, to project the extent of possible United States participation therein" and to pro-

---

122. *Id.* at 61. The State Department argued that the 20,000 number did not represent any actual increase (although the seventh preference allowed for only 17,400 annually). Under the proposed law, accompanying spouse and children would be charged to the new refugee quota, whereas before many had entered the U.S. as non-preference immigrants.

123. *Id.* Congressman Eilberg criticized the Executive's failure to evaluate the social and economic impact to immigration and refugee policy and what he perceived to be the Executive's inability rationally to consider the numerical scope of refugee admissions. Congressional and executive representatives agreed that a "wide ranging study of immigration policy" was necessary; in fact, H.R. 7175 proposed the creation of a Select Commission on Immigration and Refugee Policy. H.R. 7175, 95th Cong., 1st Sess. § 5, 123 CONG. REC. 14648 (1977). But there was strongly voiced sentiment in the Subcommittee to the effect that continuation of *ad hoc* procedures and further procrastination of refugee reform in order to await the results of such a study was intolerable: "We have every intention of moving this legislation in this Congress". *Hearings on Admission of Refugees into the United States, supra* note 102, at 71.

124. *Id.* at 68.

125. *See* 8 U.S.C. § 1157(a)(b)(d) (1980).

126. *Hearings on Admission of Refugees into the United States, supra* note 102, at 70.

36

J.R. 00113

vide the committees with specified types of information.[127] A similar provision would appear later in the Refugee Act.[128]

Congressionally imposed selection standards were established by the bill's requirement of a presidential determination that an emergency admission of "special concern" to the United States, "will significantly promote the national interest. . . ," and is "justified by grave humanitarian concerns."[129] The intended meaning of these terms was suggested by legislative attempts to articulate some general principles and cull some standards from the practice of past parole programs, in order to establish guidelines for future emergency admission policies.

During the hearings, State Department witnesses in defining the "special concern" terminology, repeatedly referred to fundamental humanitarian traditions and principles. When questioned about American "special concern" in Latin America, Assistant Secretary of State for Humanitarian Affairs Patricia Derian responded:

> There are large numbers of people throughout Latin America who have gone from their homeland to another country because they are fleeing for their lives because of political views . . . the special concern of the United States is humanitarian. And also it is connected with our "Human Rights" policy as well.
>
> When we go and ask governments to release people who have been in detention for long periods with no charges, no chance to defend themselves in the orderly method of due process, we have encouraged them to change and try the people or to release them from detention, particularly in the cases of some people who are being abused and mistreated. And these are the cases of special humanitarian and policy concern for us.[130]

When asked what factors were considered by the Department of State in determining American response to appeals from international rescue organizations, a State Department witness stated, "the humanitarian factors, [and] to what extent is it an emergency." He continued:

> We consider our national security, the extent of our concern and interest in particular refugee groups, the interest or lack of interest among the refugees in coming to the United States, our capacity to absorb the refugees—that is, voluntary agency willingness and capacity to provide sponsorships; and . . . resettleability of the refugees in question. Those

---

127. H.R. 7175, 95th Cong., 1st Sess. § 207(b)(4), 123 CONG. REC. 14648 (1977).
128. 8 U.S.C. § 1157(e) (1980).
129. H.R. 3056 § 207(b), 95th Cong., 1st Sess., 123 CONG. REC. 3413 (1977); H.R. 7175 § 207(b), 95th Cong., 1st Sess., 123 CONG. REC. 14648 (1977). For similar section in Refugee Act *see* 8 U.S.C. § 1157(b) (1980).
130. *Admission of Refugees, Part II, supra* note 102, at 269.

37

are some of the factors that are taken into account.[131]

These humanitarian goals were emphasized repeatedly during the hearings as the underlying basis for post-war refugee policy. Humanitarian concern was cited by one State Department witness as the rationale for much of the American foreign policy interest in refugees:

> [W]e should remember that the United States is a land of immigrants, and since the founding of the Republic we have had a special national heritage of concern for the uprooted and persecuted. . . beyond our national ethos of humanitarian concern for the uprooted and persecuted, there are solid foreign policy reasons why we should involve ourselves substantially and regularly in resolving refugee problems . . . it is decidedly in our foreign policy interest to project in countries around the world the image of U.S. humanitarian assistance for refugees. Such humanitarian assistance is a glowing example of the purposes and processes of the free democracy which we are, and of the free society which makes such assistance possible.[132]

Congressman Eilberg himself was confronted with the primacy of the humanitarian factor in admitting refugees. He introduced a list of factors that he believed had been considered in past parole programs and proposed that these be incorporated as statutory guideposts for future determination. Many in fact did appear in the ultimate legislation.[133] Among these factors were: 1) the United States' relationship with the first asylum countries; 2) pressures exerted in the asylum country; 3) pressure exerted by UNHCR; 4) pressures exerted by the voluntary agencies; 5) foreign policy considerations; and 6) domestic considerations such as the unemployment rate and domestic conditions in general. When asked to comment on these factors, General Chapman, the Commissioner of Immigration responded:

> I think each of those is a significant factor. I believe omitted, however, is the most important of all and that's our national tradition of humanitarian concern. It seems to me that it is on that basis and from that point of our national drive and tradition that we have admitted most of the refugees over the past years.[134]

The Executive's interest in maintaining maximum flexibility and a broad humanitarian stance was apparent from its reactions to other parts of H.R. 3056 and H.R. 7175. Executive witnesses objected to the congressional veto because sudden termination of previously agreed upon programs would be "disruptive of a harmonious" relationship between the two branches and could place the United States in "an awkward international position of being

---

131. *Id.* at 47.

132. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 16.

133. 8 U.S.C. § 1157(c) (1980).

134. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 91.

38

unable to honor a commitment to participate in a refugee resettlement of a multilateral character."[135]  State Department witnesses also criticized the "fair share" limitation in the bill.

> We fully agree that the resettlement of refugees is a matter of international concern and that we must vigorously encourage international participation in refugee problems.  To hold back until this participation is assured however, could deny our role as a leader in the field of humanitarian concerns in the international community.  In addition, the United States should not turn its back on refugees simply because other nations may do so.[136]

Justice Department witnesses commented that "humanitarian concerns present in emergent refugee situations should not be made subject to numerical limits inflexibly set by statute."[137]

The executive branch was also concerned about the limitations of the definition of "refugee".  While adopting the UN definition generally, the bills precluded those whose primary motivation for fleeing was economic.[138]  This qualification was sharply and uniformly criticized.  State Department and Justice Department witnesses explained the mixed nature of most refugees' motivation, and the ability of governments to impose economic sanctions for political reasons.  An explicit statutory exclusion of economic refugees might eliminate many bona fide refugees.  "Economic advantage is at least part of the attraction which brings many to our shores, and the chance that the confused refugee in his first dealings with an American officer might admit this to his permanent detriment suggests that the provision not be in the bill."[139]  Others saw the distinction as "spurious" and at least potentially "invidious."[140]

While the statutory definition of refugee in the House bill referred to a person outside the persecuting country, State Department and other executive branch witnesses repeatedly testified to

---

135. *Id.* at 79.  The view was also expressed that the legislative veto was unconstitutional "since Congress would both retain control over enforcement of the legislation in violation of the principle of separation of powers and also be able to repeal a power given to the President without giving the Executive the opportunity to exercise the right of veto conferred by Article I".  Letter from Office of Legal Counsel, Department of Justice, to Congressman Eilberg, quoted in *Admission of Refugees, Part II*, *supra* note 102, at 225.

136. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 79.

137. *Id.* at 82.

138. H.R. 3056, 95th Cong., 1st Sess. § 207(a), 123 CONG. REC. 3413 (1977).

139. *Admission of Refugees, Part II*, *supra* note 102, at 174.

140. *Id.* at 154.

39

the need to assist persons still within their country of nationality. An absolute bar on the use of the parole power was opposed by these witnesses because of its potential usefulness in assisting those applying for entrance at the border and those outside the persecuting country but within a third country where there might be imminent danger of repatriation.[141] Parole, it was contended, should be available for these situations, and the INS should plan to have additional offices in new locales to accommodate the geographically and ideologically broader group which would be seeking admission.[142]

Another focus of discussion was Congressman Eilberg's proposal that the withholding of deportation provisions of section 243 (h) of the INA[143] be made available in exclusion as well as deportation proceedings.[144] In Eilberg's proposal, however, this relief was to be unavailable to those who entered illegally, unless they presented themselves without delay to an immigration officer and could demonstrate good cause for the illegal entry. Aliens who engaged in the persecution of others also would be ineligible for this relief.[145]

While INS, State Department and other witnesses supported Congressman Eilberg's proposal on the extension of section 243 (h) benefits to excludable aliens, they strenuously opposed the exclusion of illegal entrants. The qualification was characterized as excessively harsh treatment which would be "out of character with our traditional concern for refugees and could conflict with

---

141. *Hearings on Admission of Refugees into the United States, supra* note 102, at 80.

142. *Id.* at 76, 92-93.

143. 8 U.S.C. § 1253(h) (1965) (amended 1980).

144. The INA makes a fundamental distinction between those aliens who have effected an entry into the U.S. (whether with a visa or without a visa and without being inspected by immigration officers) and those who have attempted but have not accomplished a formal entry. The former if alleged to be in violation of their status are subject to deportation proceedings under 8 U.S.C. § 1252 (1952). The latter are subject to exclusion proceeding under 8 U.S.C. § 1226 (1952).

As early as 1958, the Supreme Court had held that aliens in exclusion proceedings did not have access to section 243(h). Leng May Ma v. Barber, 357 U.S. 185 (1958). However, the unavailability of section 243(h) or asylum procedures in exclusion hearings had been the subject of administrative and judicial challenges. *See* Matter of Pierre, 14 I. & N. Dec. 467 (1973), vacated and remanded on other grounds, 434 U.S. 962 (1978). Congressman Eilberg's legislative proposal was an obvious response to this litigation, which also resulted in a change in INS procedures. For a more complete discussion, see 56 *Interpreter Release* 189 (1979).

145. The latter exception encompassed those "who have engaged in the persecution of individuals on account of the individuals' race, religion, nationality, membership of a particular social group, or political opinion". It also excluded from the benefits of section 243(h) aliens "who in the opinion of the Attorney General, constitute a danger to the community or to the security of the United States". This was incorporated into the Refugee Act. 8 U.S.C. § 1253(h) (1980).

40

our obligations under the Protocol."[146]

The INS did not initially see the need for a statutory asylum procedure given the proposed reforms in section 243 (h),[147] but Subcommittee members were uncomfortable with continuing to leave the matter to administrative regulation. The Subcommittee advocated a statutory provision in order to prevent dilatory abuse of existing procedures by aliens, and to assure the alien applying for asylum basic due process protections. To support its position, the Subcommittee referred to its report which criticized, on due process grounds, procedures followed by INS in adjudicating Haitian asylum and section 243(h) claims. Because the politicized nature of executive practice in the asylum area concerned Congress, some members supported statutory asylum procedures in order to assure the extension of the asylum remedy to those fleeing persecution from noncommunist countries.[148]

An emerging consensus and a more precise outline of what was to be the Refugee Act of 1980 became apparent in the final session of the hearings in April 1978. In that session the Administration finally responded officially to Congressman Eilberg's proposals on refugee legislation. Compelled by its need to preserve credibility in the international community and to bring order into the refugee admission process, the Administration gave its concrete support to the legislative effort. By this time the Administration achieved some long-term perspectives on its major parole programs and therefore simultaneously requested ongoing parole authorization for Indochinese, Eastern European and Soviet refugees "until new refugee legislation was passed."[149] A major force behind refugee reform, Senator Kennedy a month earlier had introduced legislation in the Senate (S. 2751) which paralleled some of the Administration's positions. This legislation provided the immediate impetus for the Administration to come forth with concrete proposals.[150]

---

146. *Hearings on Admission of Refugees into the United States, supra* note 102, at 63.

147. *Id.* at 94.

148. *Id.* at 126-30.

149. *Admission of Refugees, Part II, supra* note 102, at 217.

150. Sen. Kennedy's S.2751 95th Cong., 2d Sess., 124 CONG. REC. 3746 (1978) (called the Refugee and Displaced Persons Act of 1978) was introduced in the Senate on March 15, 1978. It represented the broadest and most flexible approach to refugee admission policy, giving more discretionary authority to the Executive than the Administration itself was advocating at the time. The refugee definition

J.R. 00118

The Administration's official response, presented on this last day of the hearings, was similar to those views advanced earlier in the hearings by representatives of the State and Justice Departments. There was only one significant change: a new numerical framework was proposed for the "normal flow" admission category. The Administration suggested that the "normal flow" refugee admission be set at "up to 50,000", 20,000 to be taken from the worldwide immigration ceiling plus 30,000 additional admissions. The overall worldwide ceiling including refugees would accordingly be raised from 290,000 to 320,000. The Administration argued that 50,000 refugee allocation represented the actual average number of refugees admitted in recent years and did not involve any numerical increase.[151] Accommodation of the 50,000 within the "normal flow" category would avoid recurring reliance on emergency procedures which would only be utilized in new, unforeseen emergency conditions. The Administration endorsed and extended the "special concern" terminology and supported an inclusive, flexible interpretation. Congressman Eilberg's bill had used "special concern" only in reference to emergency admissions. The Administration, however, suggested that priority in allocating the 50,000 "normal flow" numbers be given to refugees who were, in the opinion of the Attorney General, of "special concern" to the United States. In order to assure that allocations were made in the best interests of the United States, the Administration agreed to report to Congress on this determination at the beginning of each fiscal year in order to keep Congress informed.[152] At the end of testimony, the Administration expressed its readiness "to sit down . . . and negotiate the points of difference remaining between [the Executive and Congress]."[153]

---

included an alien "uprooted by catastrophic natural calamity, civil disturbance or military operations and who is unable to return to his usual place of abode". The bill allowed for a normal flow of 40,000 "refugees and displaced persons" annually to be admitted as permanent residents with immigrant visas. Emergency admissions were authorized upon recommendation of the Secretary of State to the Attorney General, after consultation with the appropriate congressional committee representatives. The Attorney General could implement an emergency admission program immediately after consultation with Congress (or within thirty days of making a request for consultation). Thus, Congress not only would have lacked a veto power but also would have been statutorily prevented from delaying an emergency program. Emergency admissions had to be "not possible or practical" under the regular admission procedures, "justified by emergent or humanitarian reasons", or "in the public interest". The parole authority was expanded to allow parole for "humanitarian reasons", rather than further restricted as it was under Congressman Eilberg's bill. For a detailed discussion of Sen. Kennedy's role regarding the Refugee Act and its legislative history see Kennedy, *The Refugee Act of 1980*, 15 INT'L MIGRATION REV. 41 (1981).

151. *See Admission of Refugees, Part II, supra* note 102, at 217.

152. *Id.* at 218-20.

153. *Id.* at 220. At approximately the same time as the Administration indi-

*Refugee Act of 1980*

REFUGEE ACT OF 1980

*H.R. 2816/S. 643: The Administration's Bill*

From November 1978 through February 1979, intensive consultations occurred between the executive branch and congressional committee staff aimed at drafting a consensus refugee bill. As a result of those deliberations and continuing pressure on the Administration by Kennedy,[154] the Administration's proposed bill was introduced by Senator Kennedy in the Senate as S. 643,[155] and in the House as H.R. 2816[156] by Congressman Rodino and Congresswoman Holtzman. The bill[157] included the universal nondiscriminatory definition of refugee, which since 1970 had remained the area of greatest consensus in the refugee reform debate. Following the specific intention of the bill's sponsors, the proposed definition closely paralleled the UN Convention.[158]

The President's suggestion of up to 50,000 annual admissions as the "normal flow" had been adopted. These 50,000 "normal flow" numbers were to be allocated among groups of refugees the President determined to be of "special concern" to the United States.[159]

For the first time, however, a second annual admissions category was created. The bill provided that in addition to a "normal flow" of up to 50,000, the President could admit an additional specific number of groups of refugees of "special concern" to the United States if that extra number were foreseeable at the begin-

---

cated to the House Subcommittee its willingness to seriously consider a refugee bill, Sen. Kennedy found out that he was to assume the Chair of the Senate Judiciary Committee, following Sen. Eastland's resignation. The major road block to reform in the Senate had, thus, been removed.

154. S. REP. No. 250, 96th Cong., 1st Sess. 3 (1979) (hereinafter cited as S. REP. No. 250).

155. S. 643, 96th Cong., 2d Sess., 125 CONG. REC. 2630 (1979).

156. H.R. 2816, 96th Cong., 1st Sess., 125 CONG. REC. 10554 (1979).

157. S. REP. No. 256, *supra* note 154. This bill for the first time not only addressed the refugee admissions issues but also included a Title III and Title IV under what is now the Refugee Act, 8 U.S.C. §§ 1521-1525 (1980) involving temporary and transitional assistance to refugees. It became one of the important purposes of the Refugee Act to eliminate discrimination in domestic refugee assistance programs, to rationalize those programs, and to make them consistent with a nondiscriminatory refugee admissions policy. *Id.* (remarks of Sen. Kennedy); *see also Id.* at 19-37. This article, however, focuses exclusively upon Titles I and II of the Act, involving the refugee admissions and asylum provisions.

158. H.R. 2816, 96th Cong., 1st Sess. § 201, CONG. REC. (1979).

159. *Id.* at § 207(a)(1).

43

ning of the year.[160] The additional annual admission category was created in order to accommodate exceptional and continuing crises, such as the mass exodus of the "boat people" from Southeast Asia. This category would allow for orderly entry into the United States without setting an artificially higher number for "normal flow" refugee admissions, thus obviating the need for third category emergency procedures. That third category was created for unforeseeable admissions "in response to [an] emergency refugee situation" that might arise after the beginning of the fiscal year and could not be accommodated under the annual admission procedures.[161] These emergency admissions numbers were also to be allocated among groups of "special concern" to the United States.

The bill's consultation requirements were less inclusive than those contained in Congressman Eilberg's bill of the previous year. Prior consultation was required to consider only the number of refugees admitted under the additional admissions and emergency admissions clauses.[162] No consultation was required to review the conferral of "special concern" status upon particular groups of refugees or the allocation of numbers among them. The consultation process itself was not described in detail and the bill did not contain a provision for a congressional veto.

In the case of refugees admitted under the additional annual admissions category, the "designated representatives of the President" were required to provide the Judiciary Committee members a description of the number "and an explanation of the reasons for believing that the admission of more than 50,000 refugees of "special concern" to the United States is in the national interest."[163] For consultations under the emergency provisions, the Judiciary Committee members were to be furnished with "a description of the unforeseen emergency refugee situation" and estimates of the number of prospective refugees and the cost of their resettlement.[164]

Admissions under the additional annual admissions category had to be justified by humanitarian concerns or be "otherwise in the national interest." Emergency admissions had to be justified by "grave humanitarian concerns" or be "otherwise in the national interest."[165] The bill allowed for waivers of certain grounds of excludability, including most significantly the public charge

---

160. *Id.* at § 207(a)(2).
161. *Id.* at § 208(a).
162. *Id.* at §§ 207(a)(2) and 208(a).
163. *Id.*
164. *Id.*
165. *Id.* at §§ 207(a)(2) and 208(a).

44

J.R. 00121

and literacy requirements of the law.[166]

Some of the changes in section 243(h)[167] proposed in prior bills[168] were incorporated into the new bill. These authorized the Attorney General to withhold "the deportation or return of any alien to any country where such alien's life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion."[169] Thus, the protections of this section were extended to apply in exclusion as well as deportation hearings. The proposed section 243(h) also enlarged the bases of persecution to include "nationality and membership in a particular social group." Both of these represented movements towards consonance with the UN Convention.

Unlike the earlier version of Congressman Eilberg's bill, no formal limitations were placed on the parole authority. In the section-by-section analysis of the Administration's bill, however, it was clearly stated that this authority could be used for refugee admissions only if there were "compelling reasons in the public interest related to the individual refugee."[170]

*House and Senate Judiciary Committee Consideration of the Bill*

H.R. 2816 was referred to the Subcommittee on Immigration, Citizenship and International Law which held hearings on the bill in May of 1979.[171] In the Senate, a hearing on S. 643 was held before the Committee on the Judiciary on March 14, 1979.[172] Much of the testimony heard during that hearing was similar to testimony offered during House Subcommittee hearings.[173] Congressional consideration of this bill in House Subcommittee and Senate Judiciary Committee hearings focused on five areas: the refugee definition, allocation of refugee numbers to those of "spe-

---

166. *Id.* at §§ 207(a)(3), 207(b)(2), 209 and 210(b).
167. 8 U.S.C. § 1253(h) (1965) (amended 1980).
168. *See* note 144 *supra* and accompanying text.
169. H.R. 2816, 96th Cong., 1st Sess., 125 CONG. REC. 12376 (1979).
170. 125 CONG. REC. 2633 (1979).
171. *Hearings on H.R. 2816, supra* note 1.
172. *Hearings on S. 643, supra* note 105. Note that the Senate Subcommittee on Immigration had been abolished by Sen. Kennedy when he assumed the Chair of the Committee on the Judiciary. *See also* note 153 *supra*.
173. The Senate hearings were briefer and involved less controversy. The administration's bill, from the time it was first introduced in the Senate through floor amendments in September of 1979, underwent a simpler and smoother process than its companion bill in the House. See notes 150, 153-54 *supra* for Sen. Kennedy's role in advancing the legislation.

45

cial concern," section 243(h), the need for a statutory asylum provision, and the need for a consultation procedure.

The intent to implement a broad, nondiscriminatory refugee policy embodied in the new UN definition was evidenced during committee and subcommittee hearings in both houses. In testifying before the Senate Judiciary Committee, Ambassador Clark criticized the current law's treatment of refugee problems as "inadequate, discriminatory and totally out of touch with today's needs."[174] Describing the diversity of the refugee population he stated, "[w]hile the plight of the boat people in Southeast Asia presents today's most dramatic case, it must not blind us to the hardships of refugees fleeing oppression and persecution in Eastern Europe, Africa, the Middle East, and Latin America."[175] In other parts of the hearing record, the new refugee definition was lauded as installing "a more universal standard based on uprootedness rather than ideology."[176]

While a more general agreement was apparent, Congress continued to focus on monitoring the Executive's power in refugee admissions as it had in earlier hearings. During the House Subcommittee hearing, one major change recommended was an explicit statement of the bill's purpose "to implement and/or reinforce the Convention and Protocol Relating to the Status of Refugees."[177] In addition, witnesses from Amnesty International and other organizations wanted explicit inclusion of displaced persons, political detainees and in general those persons still within their country of nationality within the definition of "refugee."[178] Administration witnesses made it clear that the new refugee definition did not, as in former law, require third country processing of refugee applications. There was nothing, however, in the new bill specifically allowing for processing within the persecuting country. The reference to displaced persons contained in some prior bills, particularly S. 3751,[179] did not appear in the Administration's bill. Amnesty International testified:

> Unless the definition of "refugee" is expanded, it appears that . . . [these] political prisoners, and those displaced from their homes by civil strife will not be eligible for admission to the United States as refugees . . . [g]iven the failure of the Hemispheric Parole Program to even scratch the surface of the political refugee problem in Argentina and other countries of Latin America, Amnesty has great fears that prisoners of conscience will be merely ignored unless a particular individual is seen to be

---

174. *Hearing on S. 643, supra* note 90, at 9.
175. *Id.* at 11.
176. *Id.* at 187, *quoting* Washington Post, March 12, 1979.
177. *Hearings on H.R. 2816, supra* note 1, at 168 (testimony of A. Whitney Ellsworth and Hurst Hannum, Amnesty International).
178. *Id.* at 169.
179. *See* note 150 *supra.*

46

*Refugee Act of 1980*

relevant to the political context of the moment and therefore becomes a "compelling" case whose admission is "required".[180]

Witnesses also focused upon practical problems resulting from the inaccessibility of INS processing centers:

> The definitions . . . don't now require that a person make his application within a third country, but in fact it would be impossible for a person in a country where he is suffering persecution, to be pre-cleared, screened or processed by the Immigration and Naturalization Service.[181]

Another major controversial provision of the bill was allocations of refugee numbers to those of "special concern." Some witnesses expressed the fear that this represented a return to ideological restrictions.[182] This suspicion was reinforced by official pronouncements. The section-by-section analysis, for example stated, "[i]n recent years the refugees who have been a special concern to the United States have included Cubans, Soviets, Eastern Europeans and Indochinese."[183] In attempting to clarify this language, Ambassador Clark referred to traditional considerations for refugee admissions, testifying that special attention would be paid to "whether the refugees have cultural, historical or especially family ties to the United States" or "[w]hether we have a special responsibility because of previous U.S. political involvement with the refugee or his country of origin."[184] At the same time Ambassador Clark explained that the factors he had listed were "simply a summarization of what we've been doing, rather than anything written in stone in terms of projections of the future."[185]

Despite these assurances, subcommittee members and nongovernmental organizations thought that even to suggest that the United States would limit its assistance to refugees of "special concern" would undercut the universal humanitarian standards of the Refugee Act. Witnesses recommended that "special need, and not special political concern, should be the dominant crite-

---

180. *Hearings on H.R. 2816, supra* note 1, at 171.

181. *Id.* at 187 (testimony of David Carliner, American Civil Liberties Union).

182. *See Id.* at 182 (dialogue between Congresswoman Holtzman and Mr. Ellsworth of Amnesty International in which "special concern" was seen as referring to "geopolitical concerns" and a return to "the national origins policy in our immigration law").

183. *See* note 170 *supra.*

184. *Hearings on H.R. 2816, supra* note 1, at 24-25.

185. *Id.* at 26.

47

rion."[186] It was suggested that an important factor to be considered in determining "special concern" was whether refugees were "from a country wherein there exists a consistent pattern of gross violations of internationally recognized human rights".[187]

While dissatisfied with the "special concern" terminology, several members of Congress nonetheless desired statutorily articulated standards. As in earlier hearings, members of Congress insisted upon the need for statutory devices to control the exercise of executive discretion. Chairwoman Holtzman noted:

> I want you to focus on the special concern provisions. I do not think that it is sufficient to come here and say that special concern is a terrible provision because it will provide certain limitations when in fact by selecting 50,000 people out of thirteen million refugees you have to apply some kind of standards and limitations.
>
> The question is whether this discretion will be given completely to any President . . . or whether standards will be set . . . . I agree with you that the decisions with regard to refugees have essentially been political decisions but I don't think you solve that problem even if you take the term "special concern" out of the statute.[188]

The same mistrust of the Executive's use of politically motivated selection criteria that incited controversy over the "special concern" terminology reinforced earlier demands for universal statutory asylum procedures and mandatory requirements in the section 243(h) provisions.[189] Thus, the Administration's proposed section 243(h) provision was criticized for allowing the discretionary withholding of the return of the alien, "[d]espite the mandatory nature of the United States' obligations under international law."[190] Section 243(h) procedures were characterized as "woefully inadequate."[191] Even amended to reflect this concern, section 243(h) was not to be substituted for a statutory asylum provision which would establish the right to apply for asylum either within or outside the United States:

> It seems that it shouldn't be necessary to claim asylum through a procedure designed to allow one to withhold deportation under section 243(h). Those are not necessarily the same questions. There may be many reasons to withhold deportation of an alien, but asylum procedures should be separate. Although the right of asylum has been regarded as an historic tenet of American political policy, it has not been set forth in any statutory provision . . . . In as much as it, in fact, has been woven into the fabric of American history and has achieved international acceptance as a policy in the declarations of the United Nations, it seems appropriate to reinforce that policy by stating it explicitly as a purpose of the "Refugee

---

186. *Id.* at 177 (testimony of Whitney Ellsworth and Hurst Hannum, Amnesty International).
187. *Id.* at 174.
188. *Id.* at 69.
189. 8 U.S.C. § 1253(h) (1980).
190. *Id.* at 193.
191. *Id.* at 169.

48

Case 8:17-cv-00361-TDC   Document 64-1   Filed 02/22/17   Page 126 of 166

[VOL. 19: 9, 1981] *Refugee Act of 1980* SAN DIEGO LAW REVIEW

Act of 1979".[192]

The congressional focus upon the dimensions of its role in the refugee admission process was again reflected in discussions on the proposed consultation provisions. This was especially the case since the veto provisions of the former bills had been eliminated, and there was no explicit description of the consultation process as had appeared in Congressman Eilberg's H.R. 2816.[193] Members of the House Subcommittee felt that the consultation provision's informality and nonspecificity would discourage "good faith, real efforts" to obtain congressional input into presidential decisions to raise the numerical limit over 50,000.[194] House members also were critical about their lack of participation in decisions allocating numbers and their inability to influence changes after the beginning of the fiscal year. The Executive's decision to raise the numbers of admissions was qualified only by the required determination that the increase was "in the national interest" or justified by "humanitarian" concerns. Administration witnesses admitted that these terms created no discernable limits, since they were impossible to define.[195]

In response to these objections Attorney General Bell, representing the Administration, attempted to define the implicit congressional control in the statutory consultation process:

> This morning we are in the process of making legislative history and I will give you my view of what the consultation process means, or ought to mean. There are legal writings on this approach. I would treat the consultation process as a report-and-wait provision. Report-and-wait provisions are prone to the law of legislative veto. The executive department and the President, by consulting, reports to the Congress what he wants to do and gives it a certain period of time within which not only to consult but to act, if it wishes to act. You might say we don't agree with that; we want to block that. But I wouldn't make it a set number of days in which the Congress has to act. That's beyond the spirit of a good faith consultation. However, the period of consultation ought to be long enough for the Congress to decide whether or not it agrees.[196]

Despite this statement by the Attorney General, giving Congress an implicit veto power, the Administration insisted upon flexibility and undefined statutory language. Thus, while the "report-and-wait" provision was written into the legislative history,

---

192. *Id.* at 184-86.
193. *See* notes 127-28 *supra* and accompanying text.
194. *Hearings on H.R. 2816, supra* note 1, at 65.
195. *Id.* at 25.
196. *Id.* at 24.

49

J.R. 00126

the Administration did not want it written into the law.[197] But when the suggestion was made to write in detailed description and definition of consultation, as had appeared in the earlier Eilberg bill, the Attorney General had no objection.[198]

## The House and Senate Reports

Following these committee and subcommittee hearings, amendments to the original Administration bill were incorporated into the House[199] and Senate reports[200] on the Refugee Act of 1979. The House and Senate reports reflected different standpoints in the historic struggle over control between executive and congressional forces. The provisions of the House bill attempted to transfer significant power in refugee admission to Congress. Senate leaders, on the other hand, wanted to maintain the flexibility of the admission procedures and not compromise that flexibility by imposing rigid congressional control mechanisms.[201]

There was consistent agreement, however, on certain principles: to strengthen and emphasize the humanitarian and nondiscriminatory underpinnings of the legislation, and further buttress the asylum provisions.[202]

The refugee definition reported out by the House Committee contained an additional Section "B", specifically referring to those persecuted or threatened with persecution in their own country.[203] While the language of the definition did not literally cover them, the Committee's intent was to provide for detainees and political prisoners. According to the Committee report:

---

197. *Id.* at 30.

198. *Id.* at 64-65.

199. H. REP. NO. 608, *supra* note 10; Bill introduced in the House of Representatives as H.R. 2816, 96th Cong., 1st Sess., 125 CONG. REC. 12376 (1979).

200. S. REP. NO. 256, *supra* note 157; Bill introduced in the Senate as S.643, 96th Cong., 1st Sess., 125 CONG. REC. 12021 (1979).

201. The Senate Comm. on the Judiciary, under the leadership of Sen. Kennedy, had advocated a greater executive branch role in the refugee admission process. See note 150 *supra*.

202. In the House, subcommittee mark-up on H.R. 2816 took place on August 1, 1979, during which Congresswoman Holtzman offered an amendment in the nature of a substitute making significant changes in the original legislation. After a single subcommittee amendment was approved, the bill with amendments was referred to the full committee mark-up on September 13 and 19, 1979. The committee ordered the bill favorably reported to the House with an amendment by a vote of 20-6. When H.R. 2816 was reported out of the full House committee important changes had been made reflecting many of the areas of discussion during subcommittee hearings in May. See H.R. REP. NO. 608, *supra* note 10, at 7.

On the senate side, the Judiciary Committee, meeting in open session on July 10, 1979, considered and amended the bill. See S. REP. NO. 258, *supra* note 157, at 3.

203. The proposed § 101(a)(42)(B) covered "any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing".

50

> While these individuals are not covered by the U.N. Convention, the Committee believes it is essential in the definition to give the United States sufficient flexibility to respond to situations involving political or religious dissidents and detainees throughout the world.[204]

In explaining the rationale of the provision the Committee referred to Chilean and Cuban prisoners brought directly to the United States and to the hemispheric parole programs for prisoners in Argentina and other Latin American countries, as well as to the evacuation of Saigon in 1975. Members noted that coverage for these "refugees" was noncontroversial; Administration witnesses had indicated their intention to encompass detainees in the original refugee definition written in S. 643/H.R. 2816.[205]

The Senate Committee bill specifically amended the definition of refugee to include "displaced persons." This was done "to insure maximum flexibility in responding to the needs of the homeless who are of concern to the United States."[206]

In the House Committee's version a further amendment was added to the refugee definition to exclude from eligibility for refugee status those who had engaged in the persecution of others. This was viewed as consistent with the UN Protocol which by its terms does not apply to those who "committed a crime against peace, a war crime, or a crime against humanity."[207]

The amendment was also consistent with recently enacted legislation allowing for the deportation of Nazi war criminals,[208] as well as provisions in earlier refugee reform proposals.[209]

The annual and emergency admission provisions were changed in several important respects from the original, Administration version. For example, in the Administration's bill the allocation determination to refugee groups of "special concern" was exclusively within the President's authority, whereas, the House Com-

---

204. H.R. REP. No. 608 *supra* note 10.

205. *Id.*

206. S. REP. No. 256, *supra* note 157, at 4. As in the House version, Part A of the new definition referred to those outside the persecuting country and conformed to the UN Protocol. The Senate Committee's Part B referred to "any person who has been displaced by military or civil disturbance or uprooted because of arbitrary detention of the threat of persecution, and who is unable to to return to his usual place of abode".

207. H.R. 2816, 96th Cong., 1st Sess. § 201(a)(42), 125 CONG. REC. 12367 (1979); 8 U.S.C. § 1101(a)(42) (1980). H.R. REP. No. 608, *supra* note 10, at 10.

208. Act of October 30, 1978, Pub. L. No. 95-549, 92 Stat. 2065 (1978).

209. *See, e.g.*, H.R. 7175, 95th Cong., 1st Sess. § 243(h) 123 CONG. REC. 14648 (1977).

J.R. 00128

mittee bill required that the allocation of refugee admissions to those of "special humanitarian concern" be based on a determination made by the President, *after consultation with Congress*.[210] In effect, the House Committee bill sought to make consultation mandatory as to allocations of refugee admissions in *all* cases, not just with respect to numbers of refugees when such numbers exceeded 50,000.

While amendments made by the House Committee reinforced the role of Congress, many of the Senate changes increased the Executive's power. One example increasing the Executive's power was a change in the provisions for increased refugee admissions. In an added provision for "periodic discussions,"[211] the Senate bill attempted to cover the situation in which after the initial consultation and the submission of the budget request, the President became aware of the need for additional refugee admissions. He could then "conduct additional consultations regarding possible adjustments of estimated normal flow numbers."[212] The provision thus created additional flexibility in the admission process by giving the President a second opportunity to increase the number of annual refugee admissions.

The House and Senate Committee versions of the emergency admission provisions were essentially the same, adopting the Administration's bill language, with the exception that the House report "limited [emergency admissions] to circumstances which are unforeseen prior to the beginning of the fiscal year."[213] The House Committee noted that, while it was not adopting a rigid numerical ceiling on emergency admissions, "the Committee amendment does limit the President's authority to admit refugees under this provision to a maximum twelve month period."[214] The Senate bill contained no similar time restriction but rather the Senate report described the need for unfettered emergency powers. "In such emergency circumstances the consultation process

---

210. H.R. 2816, 96th Cong., 1st Sess. § 207(b), 125 CONG. REC. 12367 (1979); adopted in the Refugee Act at 8 U.S.C. § 1157(b) (1980). The language of the Senate Committee's bill did not require consultation as to allocations.

The Senate report, however, stated "[t]he admission numbers will be allocated to groups of refugees of special concern to the United States" as determined by the President in consultation with Congress". S. REP. NO. 256, *supra* note 185, at 5.

211. "[T]here shall be periodic discussions between designated representatives of the President and members of Committee on the Judiciary regarding the progress of refugee admissions and the possible need for adjustment in the allocation of admissions among groups or classes of refugees." S. 643, 96th Cong., 1st Sess. § 207(a)(1), 125 CONG. REC. 12021 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1157(d) (1980)).

212. S. REP. NO. 256, *supra* note 157, at 5.

213. H.R. 2816, 96th Cong., 1st Sess. § 207(a)-(b), 125 CONG. REC. 12367 (1979).

214. H.R. REP. NO., *supra* note 157, at 12.

52

. . . should be viewed as urgent by both the executive and legislative branches."[215]

The House Committee sought to limit further the Executive's authority to admit refugees in emergencies by adopting Congressman Eilberg's proposed restriction on the use of the parole authority for refugee admissions,[216] prohibiting its use for refugees unless specific justification could be found for the particular alien. By contrast, the Senate version made no statutory change in the parole authority. While the section-by-section analysis in the Senate report expressed the Committee's intent to limit the use of parole for refugee admissions, it still allowed for the parole of refugees by group.

> Once the bill takes effect, however, the Attorney General does not anticipate using this authority with respect to refugees unless he determines that compelling reasons in the public interest related to individual or groups of refugees require that they be paroled into the United States, rather than admitted in accordance with . . . [the annual and emergency admission provisions in the bill].[217]

In the House Committee's version, the consultation provision was strengthened in several respects. The House report stated "the Committee cannot over-emphasize the importance it attaches to consultation."[218] As noted above, a consultation requirement was added for allocations decisions.[219] The Committee's bill also required the President to designate a cabinet member[220] to participate in consultations with the Judiciary Committee. The Committee incorporated the definition of the consultation process contained in Congressman Eilberg's former H.R. 7175,[221] setting forth information that had to be submitted as part of the consultation process, including descriptions of resettlement plans and "the anticipated economic, social and demographic impact of the admission of the refugees in question."[222] The House Committee report went on to state that the former, nonstatutory consultation process, involving consultation with the Chairpersons of the full

---

215. S. REP. NO., *supra* note 150, at 10.
216. *See* note 115 *supra* and accompanying text. *See* 8 U.S.C. § 1253(d)(5)(B) (1980).
217. S. REP. NO. 256, *supra* note 157, at 17.
218. H.R. REP. No. 608, *supra* note 10, at 14.
219. *See* note 210 *supra* and accompanying text.
220. H.R. 2816, 96th Cong., 1st Sess. § 207(e) 125 CONG. REC. 12367 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1157(e) (1980)).
221. *See* note 127 *supra*.
222. H.R. 2816, 96th Cong., 1st Sess. § 207(e) 125 CONG. REC. 12367 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1157(e) (1980)).

53

J.R. 00130

House and Senate Judiciary Committees, and the House Subcommittees on Immigration, Refugees and International Law, as well as ranking minority members of the committees and subcommittees, would be followed. According to the House Committee report, the information required in the defined consultation provision would be submitted by the Executive at least two weeks in advance; the consultation process itself would not take longer than fifteen to twenty days.[223] The House report stated the Committee members' belief that "the Administration cannot move ahead to admit additional refugees after consultation, until some response has been received from the consultative members."[224] The report referred to Attorney General Bell's testimony regarding the implicit "report-and-wait" requirement as support for its position.[225]

In the Senate Committee's version, the consultation process was defined similarly, with a description of the "personal contact" required between the Executive and the Judiciary Committees.[226] Generally, however, the Senate version and report proposed a more flexible consultation process. Rather than stressing the "report-and-wait" provision, the Senate report emphasized the intent of the Committee members *not* to create "a statutory definition of what action is required of the Judiciary Committee of Congress to conclude the consultation process."[227]

The discussions during the hearings regarding the "special concern" terminology resulted in important amendments. The House Committee's bill changed the term "special concern" to "special humanitarian concern"[228] as the standard to be applied in determining allocation of refugee admissions. By making this change "the Committee intend[ed] to emphasize that the plight of the refugees themselves as opposed to national origins or political considerations should be paramount in determining which refugees are to be admitted to the United States.[229] At the same time, the need for flexibility was reiterated:

> The legislation does not—and cannot—further define this phrase. The Committee believes that any attempt to do so would unnecessarily restrict future public policy decisions. The Committee recognizes that determining which refugees are of "special humanitarian concern" to the United States will be a matter to be considered, debated and decided at the time

---

223. H.R. REP. No. 608, *supra* note 10, at 14-15.

224. *Id.* at 15.

225. *Id. See* note 196 *supra* and accompanying text.

226. S.643, 96th Cong., 1st Sess. § 207(a)(2), 125 CONG. REC. 12021 (1979).

227. S. REP. No. 256, *supra* note 157, at 7.

228. H.R. 2816, 96th Cong., 1st Sess. § 207(a) 125 CONG. REC. 12367 (1979) (same language in Refugee Act, 8 U.S.C. § 1157(a) (1980)).

229. H.R. REP. No. 608, *supra* note 10, at 13.

J.R. 00131

[VOL. 19: 9, 1981]

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

refugee situations develop.[230]

In enumerating the factors that could be considered in utilizing the "special humanitarian concern" standard, the House Committee had been influenced by the Amnesty International testimony.[231]   The   Committee   emphasized   humanitarian considerations, placing the plight of the refugees and the pattern of human rights violations in the country of origin as the first factors to be weighed.[232]

Although the term "special concern" was retained in the Senate Committee version as a selection guide in refugee admissions, in defining this term the Senate report made some significant changes which emphasized the humanitarian factors (from the original section-by-section analysis). As in the House report, human rights concerns were stressed. When setting out the guidelines from the past for selecting refugees of the "special concern," the report referred not only to admissions from countries where the United States had had "historic, cultural, or direct involvement" but also noted that refugees had been admitted "to promote family reunion; to respond to human rights concerns embodied in the Universal Declaration of Human Rights; to fulfill foreign policy interests; and when no other country [had] responded to the needs of the homeless. . . ."[233] The report underscored the need for a broader, more inclusive refugee policy. Thus, when giving past examples of countries from which the United States had accepted refugees of "special concern," the report added to those listed in the section-by-section analysis of the original bill,[234] including those "from the Middle East, Uganda, Lebanon, Latin America and elsewhere."[235]

In response to testimony at the hearing advocating the protections of a statutory asylum scheme,[236] both the House and Senate Committee's versions provided a statutory mandate for the Attorney General to establish asylum procedures "for an alien physically present in the United States or at a land border or port of

---

230. *Id.* at 13.
231. *See* note 186 *supra* and accompanying text.
232. H.R. REP. No. 508, *supra* note 8, at 13-14.
233. *Id.* at 15.
234. *See* note 170 *supra*.
235. H.R. REP. No. 608, *supra* note 10, at 15.
236. *See* notes 189-192 *supra* and accompanying text.

55

entry, irrespective of such alien's status. . . ."[237]  The House Committee bill authorized the Attorney General to grant asylum if he determined that the alien was a refugee within the meaning of the bill.[238]  At the same time, the House and Senate Committees eliminated the discretionary element in the withholding provision making its provisions mandatory.[239]  The House bill created certain specified exceptions to the withholding provisions, but these were all explained as consistent with the UN Convention.[240]

*House and Senate Floor Action*

H.R. 2816 was discussed on the floor of the House of Representatives on December 13, 1979, and further debated and amended a week later.[241]  The Senate bill, S. 643 as amended and reported out of the Senate Judiciary Committee, was debated and amended on the floor of the Senate on September 6, 1979.[242]

The formal introduction of the bill in the House, debate and amendments, occurred on December 20, 1979.[243]  Debate centered on congressional control over refugee admissions numbers and strengthening of the consultation process. The liberalization that had been achieved in committee on the refugee admission evoked opposition on the House floor. The members supported a nondiscriminatory policy. At the same time, they were fearful that the effect would be to enact an expansive admission policy not tempered by ascertainable numerical limits nor by meaningful congressional control over the action of the Executive. These perennial fears had not been allayed. The first floor amendments, introduced by Congressman Fascell,[244] modified the House Com-

---

237.  H.R. 2816, 96th Cong., 1st Sess. § 208(a), 125 CONG. REC. 12367 (1979); S.643, 96th Cong., 1st Sess. § 207(b), 125 CONG. REC. 12021 (1979).

238.  H.R. 2816, 96th Cong., 1st Sess. § 208(a) 125 CONG. REC. 12367 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1158 (1980)). The House report stated, "The Committee wishes to insure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law. . . The Committee intends to monitor closely the Attorney General's implementation of the section so as to insure the rights of those it seeks to protect". H.R. REP. NO. 608, *supra* note 10, at 17-18. The Senate Committee bill, § 207(b), made the grant of asylum mandatory upon the appropriate showing, whereas the House version left the decision to grant asylum within the Attorney General's discretion. S. REP. NO. 256, *supra* note 157, at 8-9.

239.  H.R. 2816, 96th Cong., 1st Sess. § 203(e), 125 CONG. REC. 12367 (1979); S.643, 96th Cong., 1st Sess. § 203(e), 125 CONG. REC. 12021 (1979).

240.  H.R. REP. NO. 608, *supra* note 10, at 16.

241.  125 CONG. REC. 11965 (1979).

242.  *See* note 200 *supra.*

243.  *See* note 199 *supra.*

244.  *Id.* at 12369. Two other amendments offered by Congressman Fascell involved the conduct of resettlement assistance programs. Another established a new Title IV of H.R. 2816. It provided federal reimbursement to the states for so-

56

mittee's amended refugee definition which allowed those still within the persecuting country to qualify as refugees. Congressman Fascell stated his view that the Committee change went beyond the UN definition and potentially opened the numerical floodgates. Under Congressman Fascell's amendment, those still within the persecuting country could only qualify for refugee status after being specially designated by the President in consultation with Congress.[245]

An amendment to the admissions provision of the legislation was introduced by Congressman Butler. This "sunset clause" amendment[246] provided that after 1982 the "normal flow" refugee admissions be returned to 17,400, the number of refugee admissions under the current provisions of section 203(a)(7) of the INA.[247] Congressman Sessenbrenner, in approving this amendment, made two major criticisms of the bill: first, refugee policy was left uncoordinated with the legal immigration policy for nonrefugee immigrants; second, the legislation would be passed prior to the report of the Select Commission on Immigration and Refugee Policy.[248] By sunsetting the increased flow of refugees at the end of fiscal year 1982, "it will give Congress an opportunity to review the report of that Commission and its recommendations and hopefully enact a permanent policy relating to both refugees and nonrefugee [*sic*] immigrants."[249] Both amendments, accepted by

cial services provided asylum applicants who had submitted applications prior to November 1, 1979. While not specifically limited to Haitian asylum applicants the amendment was aimed at providing assistance to southern Florida for the costs resulting from the influx of these refugees.

All of Congressman Fascell's amendments were accepted by the House, along with an amendment offered by Congressman Danielson involving the time limits for reimbursement for certain types of domestic assistance to refugees. See REFUGEE PROGRAMS AND POLICIES, *supra* note 10, at 49-50.

245. As to refugees still within the persecuting country, Congressman Fascell's amendment would allow them to be admitted "in such special circumstances as the President after appropriate consultation . . . may specify". 125 CONG. REC. H12369 (1979). This amendment was incorporated into the Refugee Act, 8 U.S.C. § 1101(a)(42)(B) (1980).

246. 125 CONG. REC. 12369 (1979).

247. *See* 8 U.S.C. § 1153(a)(7) (1952) repealed by 8 U.S.C. § 1101(c)(7) (1980).

248. Act of October 5, 1978, Pub. L. No. 95-412, 92 Stat. 907 (1979) established the Select Commission on Immigration and Refugee Policy whose mandate was to study and evaluate "existing laws, policies and procedures governing the admission of immigrants and refugees to the United States and to make such administrative and legislative recommendations to the President and the Congress as are appropriate". The deadline for the final report was originally Sept. 30, 1980, but was extended to March 1, 1981.

249. 125 CONG. REC. H12370 (1979).

57

J.R. 00134

Congresswoman Holtzman, were adopted.

Further amendments introduced on the House floor were designed to strengthen the consultation mechanism. An amendment, introduced by Congressman Hyde, provided for "a hearing to review the proposal to increase refugee admissions" to be held "unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals." Such a hearing was to take place in the case of decisions to increase the "normal flow" above 50,000 (the second annual admissions category), as well as for emergency admissions "to the extent that time and the nature of the emergency refugee situation permit."[250] The amendment was adopted, unopposed by Congresswoman Holtzman. "[T]here is no substitute for public scrutiny, public disclosure, public debate on an issue of such importance, as the admission of refugees to the United States."[251]

The most controversial amendment was offered by Congressman Moorehead. Characterizing the consultation language as "illusory," Congressman Moorehead resurrected the congressional veto from earlier proposed refugee reform bills.[252] The amendment provided that a presidential determination to increase the number of refugees admitted above 50,000 would not go into effect if at the end of fifteen days of continuous session either house passed a resolution stating in substance that it did not approve the determination. The veto would not apply to an emergency determination but would apply only to a foreseeable influx of refugees. The Congressman emphasized that the veto provision would not affect emergency admissions where there was immediate danger to human lives.[253] Congressman Fish, in supporting the amendment, emphasized just how narrow the scope of the amendment was:

> Several months before the beginning of the fiscal year, the President would make a determination if he wishes to ask for the admission of refugees in addition to the 50,000 normal flow. That is where the one-House veto comes into play. It affects no other part of the admission process, or, I might add, of the allocation process, which is also subject to consultation with the Committees on the Judiciary. . . . I think when we read this amendment, together with the Sunset Amendment that has been accepted today and the enlarged consultation amendment, that we are restoring control over admission of aliens to the Congress, the branch of government that is given sole control over immigration by the Constitution.[254]

---

250. *Id.* at 12371. This amendment was incorporated into the Refugee Act in § 207(d)(3)(B).

251. *Id.*

252. *See* discussion of Congressman Eilberg's H.R. 3056 and H.R. 7175 *supra* note 118 and accompanying text.

253. 125 CONG. REC. 12372-73 (1979).

254. *Id.* at 12374-75.

58

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

The amendment, although opposed by Congresswoman Holtzman, was also adopted in the bill as passed. The amended committee bill was then passed on a roll call vote of 328 to 47 and was sent to conference committee.[255]

On the floor of the Senate, four amendments were offered by Senator Huddleston, "the only discernable opponent of the committee-reported bill."[256] However, the differences among Senator Huddleston and Senator Kennedy, the other committee sponsors, and the Administration had been resolved prior to floor debate.[257] As a result, the amendments were all accepted without opposition. As in the case of the amendments offered on the House floor, the major focus of these amendments was to strengthen congressional control and to narrow the scope of the Executive's discretionary powers. The first amendment, for example, was similar to that offered by Congressman Hyde.[258] It required the Judiciary Committees to hold public hearings on a proposal to increase the "normal flow" above 50,000. In addition, it required the submission of a report to Congress within thirty days after the hearing. In offering the amendment, Senator Huddleston stated: "[m]embers of Congress will have the opportunity to either agree or disagree with the proposal at the hearings . . . , I believe that this amendment will firmly establish the principle that Congress, as a whole, will establish immigration policy for the country in an informed and open manner."[259] Senator Huddleston's second amendment substituted the term "special responsibility" for "special concern" as a selection criteria to be used by the Executive in determinations to raise the "normal flow" of refugee admissions above 50,000. He stated that the term would have a narrow meaning, encompassing those with a "close social, economic, cultural or political association that is not shared with other groups of refugees."[260]

Senator Huddleston's third amendment was a "sunset provision,"[261] providing that after 1982, the number of refugees admit-

---

255. *Id.* at 12410. This passage was vacated, and the House passed S. 643 amended with the House-passed language of H.R. 2816 policies, *See* REFUGEE PROGRAMS AND POLICIES, *supra* note 98, at 10.
256. REFUGEE PROGRAMS AND POLICIES *supra* note 98, at 47-48.
257. *Id.*
258. *See* note 250 *supra.*
259. 125 CONG. REC. 12020 (1979).
260. *Id.*
261. *Id.* at 12021. In light of the congressional intent to emphasize humanita-

59

J.R. 00136

ted "be set exclusively by the consultation process."[262] Finally, the Senator further amended the "purpose section" of the Act to state that the new immigration quotas established by this Act should be subjected to a timely review and reevaluation taking into consideration the recommendations of the Select Commission. Senator Huddleston stated that the amendment was being added in order to assure that the Select Commission could carry out its mission and to dramatize the fact that "the increased quota [was] highly controversial."[263]

*The Conference Report*

In its statement of purpose, the final Conference report on the bill adopted the basic structure of the Senate version except that the term "special humanitarian concern" was substituted for "special concern."[264] It expressed the purpose of the bill in terms of "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands" and provided that "the objectives of [the] Act [were] to provide a permanent and systematic procedure for the admission to this country of refugees . . . and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who [were] admitted."[265]

Definition of Refugee

The conference committee adopted the House provision incorporating the UN definition, as well as Congressman Fascell's amendment including presidentially specified persons within their own countries who are persecuted or fear persecution.[266] Both House and Senate sponsors emphasized that the purpose was to create a nondiscriminatory definition of refugee and to make United States law conform to the UN Convention.[267] The provision for "presidentially specified persons" was meant to cover "displaced persons" within their own country in order to

---

rian concerns in the legislation, it is significant that this amendment was not adopted by the Conference Committee.

262. For similar House amendment, see note 246 *supra*, and the Refugee Act, 8 U.S.C. § 1157(a)(2) (1980).

263. 125 CONG. REC. 12021 (1979).

264. S. REP. No. 590, 96th Cong., 2d Sess. 1 (1980) (hereinafter cited as S. REP. No. 590).

265. *Id.* at 19. 8 U.S.C. § 1521 n. on Congressional Policies and Objectives (1980). For a section-by-section discussion of the Refugee Act see 57 INTERPRETER RELEASES 133-39 (1980); Anker, *The Refugee Act of 1980,* 9 IMMIGRATION NEWSLETTER 2 (1980).

266. 8 U.S.C. § 1101(a)(42) (1980).

267. S. REP. No. 590, *supra* note 264, at 19.

60

provide for situations such as the 1975 evacuation of Saigon, "state of seige" detainees in Argentina, and Cuban political prisoners. Specifically excluded were persons within their own country who themselves engaged in persecution.[268]

The bar to refugees who were firmly resettled, which had been included in refugee reform bills since 1970, was retained in the Conference bill. The conferees stated their expectation that regulations regarding firm resettlement would be promulgated by the Attorney General in consultation with the Secretary of State. They further directed the Attorney General to submit periodic reports detailing those refugees "denied admission under the 'firmly resettled' criteria or who are admitted to the United States after having travelled to another country for resettlement."[269]

### Admission of Refugees

The Conference Committee report provides for 50,000 refugee admissions annually through 1982 as the "normal flow" refugee admissions, with allocations to be determined by the President in consultation with Congress. If there is an anticipated need for more than 50,000 admissions at the beginning of any year through 1982, the additional number and allocation would be determined during the consultation process.[270]

The Senate's sunset provision was adopted; it provided that, after fiscal year 1982, the number and nature of admissions would be determined exclusively through the consultation process without a predetermined "normal flow."[271]

These admissions numbers were to be allocated principally among "refugees of special humanitarian concern to the United States."[272] The conferees thus adopted the House language emphasizing the intended humanitarian basis of refugee admission policy. All reference to "special concern" and "special responsibility" had been eliminated.

The refugee admission mechanism created in the bill was intended to be the exclusive means for mass refugee admissions, and the parole authority was accordingly modified. The Confer-

---

268. 8 U.S.C. § 1101(a)(42) (1980).
269. S. REP. No. 590, *supra* note 264, at 19.
270. 8 U.S.C. § 1157(a)(1) (1980).
271. 8 U.S.C. § 1157(a)(2) (1980).
272. 8 U.S.C. § 1157(a)(3) (1980).

J.R. 00138

ence adopted the House amendment limiting the use of parole for individual refugees and requiring a determination that "compelling reasons in the public interest . . . require that the alien be paroled into the United States rather than be admitted as a refugee."[273] The Conference provided for a sixty-day delay in the effective date of these parole provisions in order "to make it clear that existing refugee parole programs will continue until a consultation on future refugee admission programs is held under the terms of this legislation."[274]

For refugees admitted under either the annual or emergency procedures, the bill creates a new conditional status of refugee, allowing for adjustment of status after one year (as opposed to two years as provided in the House bill).[275] The conferees stated that this new "refugee" admission status was intended to be different from either the present "conditional entry" or "parolee" status.[276]

Senator Kennedy, later expanding upon the Conference report on the Senate floor, explained that it was the conferees' intent that aliens in countries outside the United States, qualified as refugees and seeking to be admitted to the United States, need not apply exclusively to an immigration officer. He considered one of the most important effects of the new Act that applications for refugee status could be processed by consular officers in American Embassies, as well as by INS officers-in-charge.[277]

Asylum Provisions

The Conference report adopted the House amendment on asylum procedure, providing for the establishment of procedures for a discretionary grant of asylum to an alien physically present in the United States or at a land border or port of entry, regardless of status.[278] The mandatory nature of the Senate provision was eliminated. Asylum could be terminated due to a change in the political condition in the alien's country of nationality.

The provision for the adjustment of status for asylees adopted by the conferees was essentially that which had appeared in both the Senate and House versions.[279] The Conference bill, however, allowed for application for adjustment of status after one year of physical presence in the United States rather than two.

---

273. 8 U.S.C. § 1182(d)(5) (1980).
274. S. REP. No. 590, *supra* note 264, at 21.
275. 8 U.S.C. §§ 1157(c), 1159 (1980).
276. S. REP. No. 590, *supra* note 264, at 21.
277. 126 CONG. REC. 1754 (1980).
278. 8 U.S.C. § 1158 (1980).
279. 8 U.S.C. § 1159(b) (1980).

62

The conference bill adopted the House amendment of the withholding provision, mandating withholding except under four specific conditions.[280] The conferees were careful, however, to note their intent to conform with international law; the four specific conditions are those set forth in the UN Convention.

> The Conference substitute adopted the House provision with the understanding that it is based directly upon the language of the Protocol and it is intended that the language be construed consistent with the Protocol.[281]

*Final House Passage*

The major issue during the House debates on the Conference bill was the failure to include the legislative veto provision. Congressman Butler suggested the bill be sent back to "clean it up and do it right. . . ."[282] Congressman Rodino, disappointed that the veto had been eliminated, nevertheless voiced his strong support for the bill, characterizing it as "one of the most important pieces of humanitarian legislation ever enacted by a United States Congress. . . . [It] confirm[ed] what this Government and the American people are all about. . . . By their deep dedication and untiring efforts, the United States once again . . . demonstrated its concern for the homeless, the defenseless, and the persecuted peoples who fall victim to tyrannical and oppressive governmental regimes."[283] One of the last members to comment on the bill, Congresswoman Chisholm expressed her hope that the 50,000 number be distributed equitably and would "not be tainted with ideological, geographical or racial or ethnic biases."[284] She pointed out that of the "1.4 to 1.5 million refugees that have entered this country since World War II, . . . fewer than 2,000 have been from Latin America and Africa."[285] The elimination of the legislative veto had, however, struck a nerve in the Congress. The bill passed by a narrow 207 to 192 margin with 34 house members abstaining.[286]

---

280. *See* note 240 *supra*; 8 U.S.C. § 1253(h) (1980).
281. S. REP. No. 590, *supra* note 264, at 20.
282. 126 CONG. REC. 1519 (1980).
283. *Id.* at 1522.
284. *Id.* at 1523.
285. *Id.* at 1524.
286. *Id.* at 1528.

63

In contrast, the Conference bill met very little resistance in the Senate and, in fact, was adopted unanimously. The only Senator to express misgivings was Senator Thurmond who felt that it encouraged welfare dependence and regretted the elimination of the one-house veto provision. He still, however, voted for the bill.[287]

## PROBLEMS IN IMPLEMENTATION

It is in light of this history, and legislative intent, that implementation of the Refugee Act and development of future refugee admission and asylum policy must be viewed. What is most clear from this history is that the Refugee Act is the product of years of debate and compromise. The consensus that is reflected in the Refugee Act represents careful consideration of deep, historic, humanitarian and foreign policy interests of the United States. The major emphasis of the legislation on a nondiscriminatory policy and meaningful congressional participation in decisionmaking cannot be ignored.

Since the Refugee Act passed, a number of significant events have occurred which underscore some key areas of historic concern. Only weeks after passage of the Refugee Act, the influx of over 120,000 Cubans to Florida began, a process which brought into question some of the most basic premises of the Refugee Act and United States policy in general. In addition to these Cubans, more than 20,000 Haitians had arrived in the Miami, Florida area. This massive influx of people into the United States as a country of first asylum raised serious questions about United States policy which are not easily solvable, either under the previous law or the new Refugee Act.[288] The Refugee Act was designed primarily to control the admission of refugees through an orderly admissions process, and these mass claims for asylum have severely strained the existing legal framework.[289]

In an effort to respond to this crisis and as a result of various pressures from the Cuban and Haitian communities in the United States, a broad range of religious, civil rights, social services groups and others, the Carter Administration adopted a special

---

287. *Id.* at 1753-55.

288. At first the Cubans were admitted as refugees under the emergency provisions of the Refugee Act, 8 U.S.C. § 1157(b) (1980); *Presidential Determination No. 18-16*, 45 Fed. Reg. 28,049 (1980). This was later changed, see note 290 *infra*.

289. This article does not specifically consider the issue of treating the U.S. as a country of "first asylum"; the concerns which are raised by the arrival on our shores of large number of asylum seekers. This subject deserves careful and separate treatment. Yet many of the problems in implementation that are discussed here are highly relevant to this general issue.

64

Cuban-Haitian entry program as an interim measure.[290]

This temporary measure did not solve the larger set of problems associated with the mass influx of people from particular countries seeking political asylum. Others will undoubtedly want to focus specific attention on the mass asylum phenomenon in the future. What is important to emphasize in the context of the Refugee Act is that the problems raised by mass influx of asylum seekers will not be solved by overly simplistic changes in the law. While there have been and will continue to be emergency measures proposed and perhaps adopted to address this issue, the phenomenon cannot be prevented in the future. People with a fear of persecution will continue to come to this country, in search of freedom and a better life. This year they may be from Haiti, El Salvador or Iran; in the next five years from Pakistan, Guatemala, Poland or Iran.

Since the adoption of the Refugee Act and the Cuban-Haitian crisis of 1980, two major governmental proposals have been made on United States immigration policy. Both these proposals have examined current refugee and asylum policy.

In March of 1981 the United States Select Commission on Immigration and Refugee Policy (Select Commission) released its report entitled *U.S. Immigration Policy and the National Interest.*[291] In July 1981, the Reagan Administration's Interagency Task Force on Immigration and Refugee Policy made public a series of their proposals for immigration reform.[292]

Significantly, both groups have endorsed the general principles and terms of the Refugee Act.[293] At the same time, both reports suggest a number of specific proposals which threaten to severely undercut certain basic principles of the Refugee Act and notions of fundamental fairness and due process which are basic to our system.

Moreover, since the Refugee Act's enactment, both the INS and the State Department have promulgated implementing regula-

---

290. U.S. Dep't of State, *Cuban-Haitian Arrivals in the U.S.*, DEP'T OF STATE BULL. 193 (1980).

291. SELECT COMM'N ON IMMIGRATION AND REFUGEE POLICY, U.S. IMMIGRATION POLICY AND THE NATIONAL INTEREST, JOINT COMM. REP. No. 88 (1981) (hereinafter cited as REPORT OF THE SELECT COMM'N).

292. U.,S. DEP'T OF JUSTICE, REPORT OF THE TASK FORCE ON IMMIGRATION AND REFUGEE POLICY 2-3 (1981) (hereinafter cited as REPORT OF THE TASK FORCE).

293. REPORT OF THE SELECT COMM'N, *supra* note 291, at 2-3.

65

tions and operation instructions.[294] In addition the first two consultations with Congress regarding the annual admission of refugees have occurred.[295]

In the following pages we will examine the manner in which the Refugee Act has been implemented to date, examine several of the proposals for modifications in the Refugee Act and make a number of comments and recommendations regarding what we perceive to be useful changes in current refugee and asylum practices.

*Terms of the Refugee Definition*

The first element to consider in terms of implementation is the definition of the term "refugee", as adopted by the Refugee Act. In determining who should be given refugee status, it is important to realize that the vast majority of migrants do not leave their countries unless forced to do so by extreme circumstances. There are many reasons that may compel a person to flee his country, but a refugee is set apart from the other migrants because his motivation stems from a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[296] This key phrase of the definition embodies a complex assessment of the alien's subjective perceptions and his objective background situation.[297]

The subjective element included an assessment of the applicant's personality and beliefs. The political or religious convictions of one person may make government policy intolerable. Another person with no such convictions might find the same conditions acceptable. As rated by the UNHCR:

> The essential elements in the evaluation of the subjective feeling are the questions of the degree of that fear and its credibility. In testing the subjective element it may be necessary to examine the background of the applicant and his family and his position in the environment, his membership of a particular racial, religious, national, social or political group, his own interpretation of the situation and an account of his per-

---

294. INS Interim Regulations on Refugee and Asylum Procedures, 45 Fed. Reg. 37,392 (1981); U.S. Dep't of State Interim Guidelines for Processing of Refugee Applications (1980) (unpublished guidelines on file with Office of Refugee Coordinator, U.S. Department of State, Washington, D.C.).

295. U.S. DEP'T OF STATE, REPORT TO CONGRESS ON PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS FOR FISCAL YEAR 1980 (1980), *reprinted in* U.S. Refugee *Programs supra* note 3, at 66 (hereinafter cited as PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1980); U.S. COORDINATOR FOR REFUGEE AFFAIRS, REPORT TO CONGRESS ON PROPOSED REFUGEE ADMISSIONS FOR FISCAL YEAR 1981 (1980) (hereinafter cited as PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1981).

296. 8 U.S.C. § 1101(a)(42) (1980).

297. OFFICE OF THE UNITED NATIONS HIGH COMM'R FOR REFUGEES, HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS (1979) (hereinafter cited as UN HANDBOOK).

sonal experience and observation.[298]

The applicant's frame of mind cannot be considered in isolation but also must be viewed in the context of the objective conditions that exist in his country of origin:

> The fear must be well-founded either on personal experience or some other concrete facts and the examiner is to decide whether the supporting evidence is credible, plausible and sufficient to constitute "well-founded fear" for a given person, making an objective appraisal of the circumstances which have been invoked.[299]

Such circumstances need not have affected the applicant personally. He may have a well-founded fear of persecution if relatives, friends, or other members of the same racial or social group have been persecuted.

The term "persecution" itself requires further analysis. Here again, subjective elements and individual circumstances will, in part, determine whether actions or threats amount to persecution. Persecution may take the form of specific hostile acts or it may consist of an accumulation of adverse circumstances such as discrimination existing in an atmosphere of insecurity and fear. In general, the definition of refugee implies that persecution must emanate from the government itself and not from the local populace. But "where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection."[300]

Persecution must also be distinguished from punishment imposed for a violation of the laws of the applicant's native country. In general, a fugitive from justice is not a refugee. But, where punishment is excessive for the reasons mentioned in the definition or where the law itself or its application is discriminatory, such a person may be considered a refugee. Finally, an applicant with strong dissenting political beliefs who is falsely accused of a "nonpolitical" crime on trumped-up charges will also fall within the definition.

Persecution may also take the form of economic deprivation if that deprivation can be considered to have a political basis. Al-

---

298. LEGAL DIVISION, OFFICE OF THE UNITED NATIONS HIGH COMM'R FOR REFUGEE STATUS, ELIGIBILITY—A GUIDE FOR THE STAFF OF THE OFFICE OF THE UNITED NATIONS COMM'R FOR REFUGEES 69 (1962) (hereinafter cited as ELIGIBILITY GUIDE).
  299. *Id.*
  300. UN HANDBOOK, *supra* note 297, at 18-19.

67

though a pure economic migrant (*i.e.* one who is motivated by exclusively economic considerations) does not qualify under the definition, the distinction between economic and political motivation is often blurred or artificial.[301]

Both the motivation of the applicant and the conditions in his country of origin may involve interrelated economic and political factors. The relative importance of economic and political considerations to the individual applicant should be examined along the continuum of possible motivating forces. The applicant must be considered a refugee only if his *primary* motivation is political.

The effect of the interrelation of economic deprivation and political oppression on the applicant may be divided into three analytical categories. First, the government may use economic measures to effect persecution "on account of race, religion, nationality, membership in a particular social group or political opinion. . . ." Thus, the Soviet dissident who is denied permission to work can clearly be considered a refugee.

Second, active objection to the economic situation may in itself be a political act. The country's economic and political problems may be symptoms of the same oppression or violation of human rights. The economic structure may entail political repression or the political system may require oppressive economic measures to insure its survival. Thus, it should be recognized that the trade unionist or farmer who objects to the extortion of government security forces is acting in the political as well as the economic realm.

Finally, the applicant may be directly affected by the political-economic system as described above but may not react politically or see his problem in a political framework. The initial processing of the Haitian applicants is an example of the need for sensitivity in the examination of such a group of applicants. In *Haitian Refugee Center v. Civiletti*,[302] Judge King stated that "[m]uch of Haiti's poverty is a result of Duvalier's efforts to maintain power. Indeed it could be said that Duvalier had made his country weak so that he could be strong."[303] The mass exodus of Haitian intellectuals and professionals that resulted in an inadequate system of education, medical care, and public administration was the outcome of a deliberate government policy of instilling fear among

---

301. The concerns and mistrust of disallowing refugee status to so-called "economic immigrants" was central to congressional debate on the Refugee Act. As a result of these concerns a congressional proposal to explicitly exclude "economic immigrants" from the "refugee" definition was rejected. See notes 138-40 *supra* and accompanying text.

302. Haitian Refugee Center v. Civiletti, 403 F. Supp. 442 (S.D. Fla. 1980).

303. *Id.*

68

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

the elite. The government's fiscal system, in which fifty percent of public revenues were not subject to any form of accounting, resulted in disorganization, inefficiency and corruption. The lack of security due to legal and political uncertainties provided disincentives to workers and reduced the import of private capital. Judge King concluded: "[t]o broadly classify all of the class of plaintiffs as economic refugees; [*sic*] as has been repeatedly done, is therefore somewhat callous. Their economic situation is a political condition."[304]

Clearly not all poor Haitians, or other applicants who would fall within this third category, are refugees, but many who do not express themselves in political terms have, in fact, fled for political reasons. Such an understanding of the applicant's position depends on a sensitive fact-finding process that can deduce the implicit political content of the alien's story and can incorporate complex information on the objective conditions existing in the country of origin.

Compliance with the letter and spirit of the new definition requires a careful understanding of the motivations, beliefs, situation and experience of the applicant. Assessment of these factors is particularly difficult since asylum applicants frequently do not speak English and are almost always unfamiliar with American legal procedures and customs. Many are deeply fearful and suspicious of government officials and resist the open discussion of their circumstances that is so important to a just resolution of their applications.

*The Allocation Process*

Considering this legislative history, the initial implementation of the Refugee Act already suggests several areas where federal authorities have failed to incorporate adequately this "universal refugee standard" in immigration practice. One major element of this problem is the annual refugee allocations process and its implementation.

The Carter Administration's first Annual Report to Congress on April 15, 1980 revealed that of 114,284 refugees admitted into the United States during the first six months of fiscal year 1980, only 120 were from Africa, and only sixty-four from all of Latin

---

304. *Id.*

69

J.R. 00146

America outside of Cuba. The Administration projected that during the second half of fiscal 1980, despite the enactment of the Refugee Act, only 946 refugees would be admitted from Latin America outside of Cuba and only 1,380 from Africa.[305] When viewed in comparison to a projected total annual admission of 230,700, the allocation of 2,500 from all of Africa and Latin America (outside of Cuba) neither constitutes fair, equitable treatment nor primary reliance on humanitarian concerns as mandated by the Refugee Act.

The Administration's April 15, 1980 Report to Congress indicated its intention to continue this geographically discriminatory refugee policy in the future. While devoting considerable attention to the situation in Indochina, from where an estimated 168,000 refugees will be admitted, and Eastern Europe, from where 38,000 refugees will come, there was virtually no discussion of the current situations in Latin America or Africa.

The second consultation in September 1980 reflected a continuation of the discriminatory allocation process. Of 217,000 proposed admissions for fiscal year 1981 only 4,000 were from Latin America (including 2,500 Cubans, half of whom will come from Spain) and 3,000 from Africa. By contrast, the Office of the United States Coordinator for Refugee Affairs proposed the admission of 168,000 people from Indochina and 33,000 from the Soviet Union.[306]

Considering the political instability and on-going violations of basic human rights occurring in countries throughout the Caribbean, Central and South America, 1,500 annual refugee admissions from this entire region fails completely to respond to this crisis. When viewed in comparison to the projected total admission of 217,000 people, the figures for Latin America, Africa and Asia (outside of Indochina) neither constitute equitable treatment nor primary reliance on "humanitarian concerns" as mandated by the Refugee Act.

The long-term character of the refugee problem in the Western Hemisphere cannot be ignored or under-emphasized. The influx in the last year of tens of thousands of Cubans, Haitians, Salvadorians and others from the Caribbean, Central and South America, cannot be dismissed as an isolated or unique occurrence. As long as political, social and economic conditions create instability in these countries, people will leave and seek a better life. Not all can or should be considered refugees under the strict

---

305. PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1980, *supra* note 295, at 66.

306. PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1981, *supra* note 295, at 160.

J.R. 00147

provisions of our law. But as recent patterns have clearly demonstrated, a refusal to recognize the dimensions of the problem in our own hemisphere will not stop people from coming here. Any solution to the problem of uncontrolled entry (mass first asylum) must include some provision for the admission of a certain number of people from refugee-producing countries. While every effort must be made to admit a certain number of people from refugee-producing countries, it is also essential that the procedures adopted assure refuge to those facing the greatest threat of severe persecution such as physical torture or death. While increased refugee admissions will not necessarily stop others from coming here illegally, failure to take such action seriously undermines a strict enforcement policy.

It is not realistic to suggest, as the Select Commission has done, that Latin American allocations can be low, in part, because of a regional tendency "to focus upon local resettlement."[307] The massive influx of Haitians, Cubans, Salvadorians, Nicaraguans, Guatemalans and others clearly refutes this notion, particularly with regard to people who are fleeing countries in our own region, particularly in Central America and the Caribbean.

A more constructive suggestion proposed by the Select Commission is that "[s]pecific numbers be provided for political prisoners, victims of torture and persons under threat of death regardless of their geographic origin."[308] This standard seems sensible, especially when applied to victims of particularly severe physical abuse, as a preferred category for assistance. Yet, it should be applied in the first instance on a worldwide basis when determining refugee admissions, and not as a residual category to allow a few thousand admissions after the bulk of the allocation numbers have been determined on other groups.

A revised allocation formula does not require any change in the law, but simply a carefully considered policy to modify current admissions policy. In this regard it should be emphasized that an equitable admissions program does not mean that a greater number of refugees must or should be admitted to the United States in future years. Rather, it requires only that the allocations be equitably determined so that refugees in search of a new

---

307. REPORT OF THE SELECT COMM'N, *supra* note 291, at 160.
308. *Id.*

J.R. 00148

home are treated humanely and fairly regardless of their national origin.

*Organizational Structures for Admissions*

Allocation problems have been exacerbated by federal regulations promulgated in June 1980. Section 207.4 of these regulations requires an INS officer-in-charge to approve every application for refugee status (Form I-590).[309] However, because there are no INS overseas offices outside of Europe and Hong Kong, this requirement severely restricts refugee determinations.

In an effort to develop some interim solution to this problem, on July 18, 1980 the State Department promulgated interim guidelines for the processing of refugees' applications by consular officials.[310] These guidelines allow consular officers in Africa and Latin America to conduct initial screening of individual refugee applicants and cable information to an INS officer-in-charge who will make the final determination. This procedure seems cumbersome and unnecessary. There is no reason why consular officers cannot make these determinations themselves, working in consultation with the voluntary agencies that are assisting in resettlement.

Recently promulgated INS operating instructions on asylum procedures and State Department interim guidelines to consular officers also suggest that the concept of a nonideologically or geographically based refugee policy has not been completely understood or accepted. On June 16, 1980 the INS Central Office issued operating instructions on asylum and refugee adjustments.[311] Section 208.8 of those instructions creates a preferred category of asylum cases which are termed "immediate-action cases." Under this provision an application for asylum is reviewed immediately, the applicant interviewed expeditiously and the asylum request is decided promptly, subject only to communications with INS central and regional officials and with the State Department. These communications can be carried out by phone and presumably asylum can be granted within a matter of hours. Yet, the benefits of this special provision are limited to several classes of applicants including foreign diplomats, those facing a "serious threat of forcible repatriation", *any national of the Soviet Union*" or any national of fourteen nations (all communist-bloc countries, though not Yugoslavia, Afghanistan or Ethiopia) who is part of an official visit for formal cultural or athletic exchange. (section

309. INS Interim Regulations, *supra* note 294.
310. U.S. Dep't of State Interim Guidelines, *supra* note 294.
311. INS O.I. § 208 (1980), *supra* note 294.

72

J.R. 00149

208.8(a)). The effect of these latter provisions is to reintroduce the discriminatory treatment of refugees from noncommunist countries, despite the clear legislative intent to the contrary.[312]

Similarly, paragraph ten of the State Department interim guidelines is also unfairly discriminatory. It describes those refugees who are deemed to be of special interest to the United States. The list includes close relatives of persons in the United States, persons of "special humanitarian concern," former employees of American organizations or American individuals, and persons trained in the United States or trained abroad under United States auspices.[313] These criteria, which seem arbitrary at best, will have a tremendous impact on decisions concerning admissions. Such a determination of United States priorities should be subject to input from Congress, from nongovernmental and voluntary agencies, from the UNHCR and from the public.

In examining the implementation of the Refugee Act, Congress should review these and other provisions and urge amendments to any regulations or operating instructions that undermine the basic legislative intent of the Act. Congress should also strongly encourage the development of uniform, practical adminstrative procedures.

*Role of INS District Offices*

The first phase of the asylum application process is perhaps the most critical. It is vital at this stage that the applicants be given an initial opportunity to explain the relevant facts of his claim in a nonadversarial setting. A judicial hearing—an event which most Americans find threatening—cannot provide this opportunity. We therefore propose that the local INS offices process asylum applications in the first instance along the lines proposed by the UNHCR in comments dated March, 1980:

> (1) The applicant for asylum should submit at the local INS office his application in the form of a written statement of the relevant facts and motives in his own way. In addition, the applicant should complete a questionnaire concerning his personal data, his passport, relevant visa information, etc.
> (2) The local INS office then should invite the applicant to participate in an interview which shall be recorded in the form of a Sworn Statement. It shall be conducted by the responsible INS official for asylum matters in that district. This interview should be conducted on the basis of guide-

---

312. *Id.*
313. U.S. Dep't of State Interim Guidelines, *supra* note 294.

73

J.R. 00150

lines issued by the INS central office in cooperation with the State Depart-
ment. The guidelines should be designed to enable the local INS official to
take into account special circumstances with respect to the nationality of
the applicant.[314]

The district office procedures should be designed to help appli-
cants to understand the requirements for establishing a political
asylum claim and to provide the evidence necessary to substanti-
ate such a claim. As noted by the UNHCR:

> A refugee often tells his story in nonpolitical terms. Some refugees are
> politically inarticulate in the sense of not being able to express their polit-
> ical views though they may have very definite opinions for which they
> have had to suffer. Others do not wish to discuss politics because they
> have had too much of it and prefer not to be personally involved. There
> are also some who are afraid to say what they think. In such latter cases
> their silence may well be the result of fear of persecution and it may be
> necessary to reveal the applicant's psychological attitudes by indirect
> questioning without the use of political terms or such technical expres-
> sions as "fear" and "persecution."[315]

In such cases refugees particularly need the advice and support
of an attorney. Legal counsel gives substantial assistance in
presenting evidence and conducting cross-examination at the
hearing. Finally and perhaps most importantly, the expertise of a
lawyer is often vital in the preparation of the application for asy-
lum (Form I-589) which includes the organization of affidavits and
documentary evidence so that the client is represented as fairly
as possible. Therefore, the limiting of legal counsel that is inher-
ent in the Administration's proposed policy (contained in Report
of the Task Force) jeopardizes the applicant's right to due process
and fundamental fairness.

To ensure that applicants receive the sympathetic assistance
necessary to a fair resolution of their claims, asylum cases should
be separated out from routine immigration cases and handled by
specially trained officials. The practice of considering asylum
cases under routine immigration procedures ignores the unique
and often complex nature of these cases. Consequently, the
rights of aliens to effectively present their claims for asylum are
often thwarted. In the larger district offices, this may require the
appointment of an Asylum Admissions Officer, an idea presented
in the Select Commission Report of March 1981[316] and by the In-
teragency Task Force in July 1981.[317] The need for coordination at
a supervisory level is particularly apparent in a large district of-
fice such as New York, where an unwieldy administrative struc-
ture often creates additional problems. As a matter of course,

---

314. Office of the United Nation High Comm'n for Refugees, U.S. Asylum Proce-
dures (1980) (unpublished comments).
315. Eligibility Guide, *supra* note 298, at 67.
316. REPORT OF THE SELECT COMM'N, *supra* note 291, at 173-74.
317. REPORT OF THE TASK FORCE, *supra* note 292, at 1.

74

these cases are transferred repeatedly within a district office, re-sulting in lengthy delays, general confusion, and, all too often, loss or misplacement of files.

The Asylum Admissions Officers would supervise all aspects of asylum cases within each office and would also maintain ongoing communications with the State Department. Before beginning their assignments, every supervisor would undergo extensive training as to existing laws and regulations relating to asylum, current State Department and UNHCR practices. Each asylum supervisor would also be required to be familiar with recent directives affecting various groups of aliens and would work with the officers assigned to conduct asylum interviews. Finally, the Asylum Admissions Officer would conduct an in-house training program designed to help officials deal with the particular problems involved in gathering information from refugees, many of whom have suffered persecution and physical mistreatment. In the Administration's recently disclosed policy proposal, the Asylum Admission Officer would make final administrative decisions thus limiting the advisory and appellate roles presently included in the process. Such a decisionmaking responsibility is not included in the Select Commission's concept of an Asylum Admission Officer and serves to hinder the fairness of the application.

Interim federal regulations on asylum, dated June 2, 1980 raise a number of serious issues regarding INS implementation of the Refugee Act.[318] Many of these issues were raised in comments submitted to the INS by various public-interest and human rights organizations in July 1980. A summary of the most critical points follows:

1. We believe that every asylum applicant should have the opportunity for an initial interview with a district director, and that this opportunity should not depend on whether the applicant manages to apply for asylum before the government begins exclusion or deportation proceedings. Accordingly, the district director should have jurisdiction in all cases. The result could be achieved by a provision requiring the immigration judge to remand to the district director any case in which an application for asylum has been filed.

2. Section 208.7 provides that the district director must seek an advisory opinion from the State Department's Bureau of Human

---

318. INS Interim Regulations, *supra* note 294.

J.R. 00152

Rights and Humanitarian Affairs (BHRHA) in all cases. We suggest that the State Department only be consulted and asked to advise INS in those cases where the district office has doubts on factual questions. (See the section on Refugee Review Board on pages 79-81). It is unrealistic to think that BHRHA will have sufficient staff to consider carefully every application for asylum in the country.

3. Furthermore, mandatory reference may encourage district directors to shift the responsibility for decisionmaking; if an overworked State Department fails to respond or responds negatively after a cursory review, district directors may feel relieved from the burden of the careful review necessary to reach a fair determination. Finally, the procedure is costly; it often creates an additional layer of review where none is necessary.

4. The regulations provide no appeal from the denial of an asylum application by a district director (section 208.8(c)). No exception is made for cases in which the BHRHA recommends asylum but the district director denies it. A change granting a right of appeal to the INS regional commissioner in all cases would give asylum applicants a right already accorded in much less sensitive and critical proceedings, such as applications for changes in nonimmigrant status (*e.g.* from visitor status to student status under 8 C.F.R. section 103.1(m)(12)(a) (1980)). At the very least, in cases where the BHRHA recommends asylum and the district director denies it, the application should be certified to the INS regional commissioner for final decision (the procedure under prior regulations).

5. Section 208.8(f) of the regulations provides that the grant of asylum shall be for one year and that the asylee shall be interviewed annually to determine continued eligibility. This provision makes the asylee's position unnecessarily precarious and is totally inconsistent with the UN Convention and Protocol Relating to the Status of Refugees, to which the United States is a party. The UN Convention makes asylum a legal status which can only be withdrawn upon the occurrence of certain specified events.

6. To grant asylum only in one-year increments subject to a yearly eligibility review will make finding employment and otherwise leading a normal existence impossible for many applicants. The yearly review will also place a large and unnecessary burden on the INS in terms of both time and money.[319]

---

319. Unpublished comments to the June 2, 1980 Interim Regulations were submitted by a number of organizations including the Lawyers Committee for International Human Rights, the Alien Rights Law Project of the Washington Lawyers

J.R. 00153

Again federal asylum regulations should also provide that applicants have a right to assistance from counsel or another representative of their choosing in preparing their questionnaires and applications and in making sworn statements to INS officials. As mentioned above, assistance from a lawyer or other trusted person may be the only means by which many applicants will be able to fully state their cases. For this assistance to be meaningful, counsel must, of course, be permitted to participate in the interview, (*i.e.* to clarify questions or to object to improperly transcribed answers). To fairly implement the right to counsel, applicants should be notified of this right and advised of the existence of free legal service programs in the district. It is also important that the regulations provide adequate time during the asylum proceeding for the preparation of the claim. Efficiency is not served by oppressive deadlines which may lead to unjust decisions.

*Role of the United Nations High Commissioner for Refugees*

The problems being discussed are global in nature and demand an internationally coordinated response. Thus, the United States should seek at every opportunity to increase international participation in this process and encourage various resettlement efforts in different countries. This process can best be accomplished by relying more closely on the office of the UNHCR which, since its formation following World War II, has developed into a highly respected and professional international agency—a world expert in refugee matters.

Although the expertise and impartiality of the UNHCR make it uniquely qualified to evaluate claims for asylum and to insure that the United States is complying with international standards, its participation has been largely ignored under existing United States law and practice. The UNHCR has reviewed some individual cases that have been referred to it by the State Department and occasionally has undertaken a more systematic review (*e.g.* with Haitian and Cuban refugees) but its role has not been formally incorporated into the United States asylum process. By

---

Committee for Civil Rights Under Law, the National Lawyers Guild, the International Human Rights Law Group and the American Council of Voluntary Agencies. (Comments on file with the Lawyers Committee for International Human Rights, N.Y., N.Y.).

adopting the Protocol Relating to the Status of Refugees, the United States made a commitment to abide by international law in its treatment of refugees. Congress gave meaning to this commitment by adopting the Refugee Act of 1980 which, as stated above, conforms the definition of "refugee" to that contained in the Protocol. It is now incumbent on the executive branch to make good our intention to comply with international standards by conforming the administration of our refugee law with the advice of UNHCR.

In a number of countries, including Canada and Australia, the Office of the High Commissioner participates directly in procedures established for the determination of refugee status. Such participation is based on Article 35 of the UN Convention and the corresponding Article II of the 1967 Protocol which provide for the cooperation by the contracting states with the High Commissioner's office.[320] Both the Canadian and the Australian models also illustrate the possibility of giving nongovernmental organizations a role in the advisory process.[321]

In light of the procedures adopted by these and other countries and considering the authority and qualification of the UNHCR, we make the following recommendations to provide a formal mechanism for the incorporation of UNHCR into United States refugee and asylum policy:

1. The legal advisor of the State Department or the General Counsel of the INS should consult on a regular basis with representatives from the UNHCR concerning international instruments and their implementation. Such a consultation would allow for clarification of definitional questions and insure that administrative procedures and subsequent guidelines conform to United States international obligations.

2. To insure that the procedures and guidelines are carefully and sensitively applied, the UNHCR should have a formal role in training INS and State Department personnel.

3. The UNHCR should have jurisdiction to give advisory opinions in individual refugee cases. These cases would be submitted by the individual applicant who should be informed that he has a right to contact the UNHCR. Approval for review would be at the discretion of the UNHCR. In selecting cases and in presenting an advisory opinion, the UNHCR should have access to the applicant's entire file. The advisory opinion ultimately reached should

---

320. UN Convention, *supra* note 7.
321. B. Jackman & B. Knaza, Refugees (1980) (unpublished paper presenting a detailed description of the Canadian system. On file with the Lawyers Committee for International Human Rights, N.Y., N.Y.).

then be submitted to the State Department and become part of the record of the case. The role of the UNHCR could best be incorporated into the United States process in the context of a refugee review board.

*Board for the Determination of Refugee Status*

We recommend the establishment of a "Board for the Determination of Refugee Status and Asylum" (Board). Such a board, which is also suggested by the Select Commission,[322] would serve multiple functions such as:

1. Helping to develop and clarify refugee and asylum standards and procedures;

2. Overseeing and reviewing all aspects of implementation of the Refugee Act;

3. Participating in the executive review and determination of annual refugee allocations;

4. Reviewing applications for political asylum deemed frivolous by the district officer; and

5. Consulting with Congress and the Executive when emergency situations arise.

The proposed Board would be composed of seven members: three representatives of the executive branch, including an official of the State Department (representing the BHRHA, Office of the Refugee Coordinator, Office of the Legal Advisor and Bureau of Consular Affairs); an official from the Department of Justice (representing the INS); and perhaps a representative of the Executive Office of the White House. The Board would also include three public members that could represent the various voluntary and church-related agencies that participate in the resettlement process, other charitable, civic, labor and business representatives and perhaps a representative from a nongovernmental human rights organization. These three positions could rotate annually or biannually in order to provide each group with a chance to participate in this process. The seventh member of the Board would be from the office of the UNHCR. The UNHCR would participate in an advisory capacity and would serve in much the same role as it does in Canada, Australia and other countries.

The Board would meet regularly to examine overall United

---

322. REPORT OF THE SELECT COMM'N, *supra* note 291, at 169-71.

79

J.R. 00156

States refugee and asylum policy, concentrating on the following areas:

1. *Development and clarification of refugee and asylum standards and procedures.*

As discussed earlier, in the initial period following the passage of the Refugee Act a number of problems and questions have arisen concerning the standards for determining refugee status, and in developing procedures to make and carry out these determinations. A number of the areas mentioned in this report will require careful and ongoing discussion and study. While the Commission should be able to make a significant initial contribution to that process, ongoing review is critical. The mandate of the Board can and should include these functions. In this context the Board would consider, for example, the criteria for selecting refugees and help to interpret concepts such as "special humanitarian concern" and "national interest."

2. *Overview of the implementation of the Refugee Act.*

For similar reasons, it is essential that ongoing review of the implementation of the Refugee Act be incorporated into the work of the Board. Issues such as the processing of refugees by consular officers overseas could be monitored by the Board at regular intervals. INS processing of asylum applications would be reviewed periodically. The Board would also make recommendations concerning the training of INS personnel and consular officials, and examine organizational structures of these agencies. It would report annually to Congress and the Executive, with specific recommendations for reform.

3. *Participation in the review and determination of annual refugee allocations.*

The Board would have an important advisory and consultative role in the annual refugee allocation process. In this regard we propose that three months prior to the official consultation process provided for by section 207 of the Refugee Act, the Board would hold public hearing examining the worldwide refugee situation in order to formulate an appropriate allocation formula. These hearings would formalize input of the United Nations, various voluntary agencies, human rights organizations, and other concerned groups and individuals, thus helping to broaden and depoliticize the decisionmaking process. These hearings would constitute a world survey of refugees similar to the annual State Department evaluation of human rights. Following the hearings, the Board would be in a position to report on its findings to members of Congress, and to participate, formally and informally, in the consultation process.

80

4. *Review of frivolous cases.*

We propose that three members of the Board, one from the executive branch, one from the public-interest groups, and the UNHCR representative, be involved in reviewing those cases that the district office had deemed frivolous. In such cases the Board would serve an appellate function. If the Board agreed with INS that the cases were frivolous, the applicant would be subject to immediate deportation proceedings. If, as may occasionally happen, the Board disagreed with INS and concluded that a case had merit or needed further information, it would be referred to the State Department for an advisory opinion.

5. *Consultation with Congress and the Executive when emergency situations arise.*

The Board could also be utilized to examine various policy considerations in emergency situations. Thus, for example, the recent crisis involving Cubans and Haitians in Florida could have been evaluated by the Board, which could then have issued a report making observations and recommendations to assist the Congress and the Executive in this crisis.

This outline of potential roles for the Board is by no means definitive. The concept of a refugee board should be flexible in nature and its mandate broad enough to allow it to respond to changing circumstances. Most importantly, the Board provides an opportunity to develop an open and ongoing evaluation of United States refugee policy, a task that can be accomplished most effectively with the cooperation and active participation of the UNHCR and various nongovernmental organizations whose daily work makes them uniquely qualified to contribute to this process.

*The Role of the State Department*

The input of the State Department is important in the evaluation of the objective basis of the applicant's fear of persecution based on race, religion, nationality, membership in a social group or political opinion. An applicant's background cannot be assessed without a current understanding of the political and social situation in his native country. Although the State Department's view of particular countries may be colored by foreign policy considerations, it is still the only government agency charged with the responsibility of gathering and analyzing this necessary information. We therefore believe that the State Department's view

81

should be sought except in cases where their district director has sufficient information to grant asylum.

The Department must have a formal role in the decisionmaking process, not just an option to comment. Such a role can be instituted by mandatory State Department review of unclear cases and through the Department's participation in the "Board for the Determination of Refugee Status and Asylum" mentioned in the preceding section. Procedures have been set forth in the interim regulations to give the State Department a formal role. The regulations provide that the district director must seek an advisory opinion from the BHRHA in all cases. We believe that clearly meritorious cases need not be referred to the BHRHA. Given the problems of staff size and budgetary constraints, the BHRHA cannot consider every application for asylum in the country. Mandatory reference of clearly meritorious cases will detract from the State Department's consideration of truly difficult cases, encourage district directors to shift responsibility for decisionmaking, and unnecessarily burden the administrative process.

In light of these problems, we make the following recommendations for efficient use of State Department resources:

1.  The district directors should be instructed to grant asylum in clearly meritorious cases without reference to the BHRHA and to pass on cases deemed frivolous to the Board also without consulting the BHRHA.

2.  The district offices should be required to report their determination in asylum cases to both the BHRHA and the Board. This would allow the State Department to monitor treatment of asylum applicants throughout the country without participating directly in each decision.

3.  In order to prevent undue delay in the resolution of asylum applications, the regulations should provide that if the State Department fails to respond or set forth reasons requiring an extension within the present forty-five day limit, and if the applicant so requests, the district director shall decide the case without the advisory opinion.

4.  The role and training of consular officers should be reexamined. The procedures outlined in the State Department's July 18, 1980 Interim Guidelines[323] for the processing of refugee applications by consular officers are cumbersome and time consuming. We recommend that consular officers be given independent jurisdiction to make refugee determinations without references to the INS officer-in-charge. This responsibility represents a new under-

---

323.  *See* note 294 *supra.*

82

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

taking for consular officers who traditionally have been concerned with the processing of visa applications. For this reason, it is important that the consular officials be trained and supervised. We propose that the Foreign Service Institute, with the assistance of the UNHCR and nongovernmental organizations, provide the necessary education for prospective officers and training sessions for present officers.

5. Nongovernmental and voluntary organizations should also play a role in providing the officers with information necessary to determine difficult refugee cases. While the State Department section 502(b) Human Rights Country Reports[324] often provide valuable information, they are prepared by a political entity that is also concerned with other foreign policy considerations. Thus, it is crucial that they not be the sole source of information in determining current conditions in a particular area of the world. Reports by Amnesty International and other such groups may be equally if not more informative and should be used by all overseas consular posts. Coordination of the consular officer's work concerning refugees could be provided by a supervisory official on each continent who would be responsible for an up-to-date and detailed knowledge of regulations and operating instructions, an understanding of the social and political climate in each country, and informing the consular officers of new guidelines and procedures.

6. A procedure for appeal of decisions in questionable cases should be established. Neither section 208 of the June INS Interim Regulations nor the subsequently promulgated interim guidelines for consular officers[325] provide a right to appeal to applicants for refugee status. This omission deserves serious consideration by the Select Commission. Refugee cases can, and often do, involve the physical safety of applicants and their families. Yet the current regulations, which grant unfettered discretion to State Department consular officials and INS overseas officers-in-charge, fail to allow any review of these decisions. This policy increases the probability of uncorrected errors and abuses of discretion. These problems are especially serious in the initial

---

324. Published pursuant to §§ 116(d) and 502(b) of the Foreign Assistance Act of 1961 as amended, 22 U.S.C. §§ 2151-2396 (1961). See, e.g., U.S. DEP'T OF STATE, COUNTRY REPORT ON HUMAN RIGHTS (1981).

325. INS Interim Regulations and U.S. Dep't of State Interim Guidelines, *supra* note 294.

83

period, since consular officials are undertaking these responsibilities for the first time, presumably without any formal training, or detailed written instructions as to how to gather information in these cases.

A second complicating factor is the cumbersome and time-consuming procedure that involves the participation of both consular officials and INS overseas officers. Presumably the final decision in these cases will be made by INS officers who will be relying on a cable summary of each case. Often applicants will be thousands of miles away in areas where existing conditions are likely to be unfamiliar to INS officers. According to several administration proposals which are yet to be aired, the new policy will greatly diminish the appeals process by limiting the right to appeal to those applicants who are in status.

We recommend, in view of the difficulties enumerated above, that Congress should enact an appropriate appeals procedure which would allow review of decisions in all questionable cases.

*The Consultation Process*

Clear legislative intent to "assure that Congress has a proper and substantial role in all decisions on refugee admissions" is apparent from the emphasis on the consultation process in section 207 of the Refugee Act and the explicit definition of the procedure provided by section 207(e).[326]

The Refugee Act deliberately institutionalizes what was previously an informal, *ad hoc* process of consultation. Section 207 requires consultation between the President and Congress concerning the allocation of refugee numbers. It specifies that discussions shall occur between "[c]abinet-level representatives of the President" and members of the Judiciary Committees of the House and Senate. The stated purpose of the consultation is:

---

326. 8 U.S.C. § 1157(e) (1980). Congress is to be provided, "to the extent possible", with the information listed below:
  (1) A description of the nature of the refugee situation.
  (2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.
  (3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.
  (4) An analysis of the anticipated social, economic and demographic impact of their admission to the United States.
  (5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees.
  (6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.
  (7) Such additional information as may be appropriate or requested by such members.

84

> [t]o review the refugee situation or emergency refugee situation, to pro-
> ject the extent of possible participation of the United States therein, to
> discuss reasons for believing that the proposed admission of refugees is
> justified by humanitarian concerns or grave humanitarian concerns or is
> otherwise in the national interest . . . .[327]

The consultation process allows for more informed decision mak-
ing concerning the allocation of refugee numbers and helps in the
implementation of a coherent refugee policy.

If this goal is to be accomplished and if the consultation is to be
meaningful, Congress should be informed in detail of the Admin-
istration's refugee plan well in advance of the official consultation.
We believe that "at least two weeks in advance of discussions
. . . ," as provided by Section 207(e), is an insufficient period of
time. As pointed out by several members of the Select Commis-
sion, Congress must have time to evaluate the proposal, allow
public scrutiny of the numbers and obtain the views of nongov-
ernmental organizations, human rights groups and the UNHCR.
For these reasons, we recommend that the allocation numbers be
submitted thirty days before the formal consultation process oc-
curs. Prior to congressional evaluation, the proposed "Board for
the Determination of Refugee Status and Asylum" would hold
hearings in an effort to institutionalize input from the UNHCR,
voluntary agencies and nongovernmental organizations (such as
Amnesty International). These hearings could provide a forum to
review the world refugee situation and to gather information on
human rights conditions that may help predict future refugee
problems. Once the proposed allocation numbers are submitted
to Congress, Congress could then hold informal hearings subse-
quent to those of the Board but prior to the formal consultation.
Here, the allocation figures could be evaluated in light of the find-
ings of the Board and the testimony of the participants. Only
within this expanded time framework can Congress responsibly
perform its role in refugee admissions decisions.

*Summary of Recommendations*

To highlight, some of the more general recommendations are
briefly summarized below:
1.  Amend regulations and instructions:
In light of the legislative intent of the Act, administrative regula-
tions and operating instructions concerning refugee and asylum

---

327. 8 U.S.C. § 1157(e) (1980).

85

processing should be amended to eliminate any ideological or geographical bias. Determination of United States priorities concerning criteria for decisionmaking should be subject to public review, input from Congress as well as nongovernmental and voluntary agencies and the UNHCR.

2.  Role of the INS District Offices:

The district director should have jurisdiction in all asylum cases. Thus, the immigration judge should be required to remand to the district director any case in which an application for asylum has been filed. Asylum cases should be separated from routine immigration cases and handled by specially trained officials. In larger district offices an asylum officer should be appointed and trained. The officer would maintain ongoing communications with the State Department, work with officers assigned to conduct asylum interviews and conduct an in-house training program. Regulations should provide applicants with the right to assistance from counsel when preparing their applications and during their interviews. Applicants should be notified of this right and advised of the existence of free legal service programs in the district.

3.  Role of the UNHCR:

The legal advisor of the State Department or the General Counsel of the INS should consult on a regular basis with representatives from the UNHCR concerning international instruments and their implementation. To insure that the procedures and guidelines are carefully and sensitively applied, the UNHCR should have a formal role in training INS and State Department personnel. The UNHCR should have jurisdiction to give advisory opinions in individual refugee cases. These cases would be submitted by the individual applicant who should be informed that he has a right to contact the UNHCR and approved for review at the discretion of the UNHCR. In selecting cases and in presenting an advisory opinion, the UNHCR should have access to the applicant's entire file. The advisory opinion ultimately reached should then be submitted to the State Department and become part of the record of the case.

4.  Development of a refugee board:

A "Board for the Determination of Refugee Status and Asylum" composed of three representatives of the executive branch, three public members representing voluntary and church-related agencies, and one representative from the UNHCR should be established. This Board would:

a.  help to develop and clarify refugee and asylum standards and procedures;

86

[VOL. 19: 9, 1981]
*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

b. oversee and review all aspects of implementation of the Refugee Act;

c. participate in the executive review and determination of annual refugee allocations;

d. review those applications for asylum deemed frivolous by the district officer; and

e. consult with Congress and the Executive when emergency situations arise.

5. Role of the State Department:

The district directors should be instructed to consult the State Department only in cases where they have doubts on factual questions;

The district offices should be required to report their determination of asylum cases to the BHRHA. This would allow the State Department to monitor treatment of asylum applicants throughout the country without participating directly in each decision;

In order to prevent undue delay in the resolution of asylum applications, the regulations should provide that if the State Department fails to respond or set forth reasons requiring an extension within the present forty-five day limit, and if the applicant so requests, the district director shall decide the case without the advisory opinion.

The role and training of consular officers should be reexamined. In the procedures outlined in the State Department's July 18, 1980 Interim Guidelines for the processing of refugee applications, consular officers should be given independent jurisdiction to make refugee determinations without reference to the INS officer-in-charge. Before undertaking this new responsibility, consular officials should be trained and a supervisory system be established.

The UNHCR and nongovernmental and voluntary organizations should play a role in the education of consular officers and in providing them with information necessary to determine difficult refugee cases. The State Department section 502(b) Human Rights Country Reports which are influenced by foreign policy and political considerations should not be the sole source of information in determining current conditions in particular areas of the world.

Coordination of the consular officers' work concerning refugees could be provided by a supervisory official on each continent who would be responsible for knowledge of regulations and operating instructions, and for understanding of the social and political cli-

87

mate in each country and informing the consular officers of new guidelines and procedures. In order to protect the safety of applicants and their families and to prevent uncorrected erorrs or abuses of discretion, a procedure for appeal of decisions in questionable cases should be established. This is particularly important if INS overseas officers relying on cable summaries are to make the final decision in cases referred to them by consular officers.

6. Role of the allocation process:

A fundamental reevaluation of the allocation process should be undertaken. The allocation of refugee numbers thus far indicates that the geographical and ideological biases embodied in earlier law will be difficult to eliminate. The Commission should give careful consideration to this issue, and advise Congress and the President as to how the allocations process should be modified to ensure fair considerations of all applications.

7. Role of the consultation process:

If the official consultation process provided by the Act is to be meaningful, Congress should be provided with the proposed allocation numbers and the administration analysis of the refugee situation ninety days before the formal consultation is to take place. This would allow time for the proposed "Board for the Determination of Refugee Status and Asylum" to hold hearings, and for Congress to evaluate the proposal, obtain the views of nongovernmental organizations, human rights groups and the UNHCR, and hold its own informal hearings.

CONCLUSION

Throughout the four decades which have passed since the end of World War II, the United States has attempted to define its role in dealing with the refugee problem through administrative and legislative efforts. The result of these efforts is reflected in the enactment of the Refugee Act of 1980. During these past four decades, debate and compromise have taken place in the legislative arena among competing forces interested in refugee and asylum policy. The participating forces have been the Executive, Congress and various nongovernmental agencies concerned with refugee resettlement and human rights.

The records from their past debates are replete with references to certain principles which became increasingly persistent themes. The Refugee Act attempts to embody these themes by recognizing that principled, humanitarian considerations must inform refugee selection procedures; that the expediency of perceived, short-term foreign policy interests should not be the

88

exclusive or even primary criteria in refugee admission policy, nor should politicized decisionmaking dictate asylum determinations; and that Congress and the public must be assured of an appropriate, functional role. The legislation provides a sound basis from which a comprehensive, objective and fair refugee and asylum policy can be instituted. The key to the fulfillment of these goals lies in the implementation of the Refugee Act in a manner that does not violate its purpose or the legislative history that produced it. The recommendations set forth above can provide the guidance necessary to such implementation.

J.R. 00166