# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

_____ )
                                         )
INTERNATIONAL REFUGEE                    )
ASSISTANCE PROJECT, *et al*.,            )
                                         )
        Plaintiffs,                      )
                                         )
        v.                               )          No. 8:17-cv-00361-TDC
                                         )
DONALD TRUMP, in his official capacity   )
as President of the United States, *et al*.,  )
                                         )
        Defendants.                      )
_____ )

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION OF § 5(d) OF THE EXECUTIVE ORDER

Dated:  March 8, 2017

CHAD A. READLER
Acting Assistant Attorney General

ROD J. ROSENSTEIN
United States Attorney

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Director, Federal Programs Branch

ARJUN GARG (Bar No. 806537)
MICHELLE R. BENNETT (Bar No. 806456)
DANIEL SCHWEI
BRAD P. ROSENBERG
Trial Attorneys
United States Department of Justice
Civil Division,  Federal Programs Branch

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

    A.    Presidential Authority under the Immigration and Nationality Act and Article II of the Constitution. ......................................................................... 2

    B.    The Refugee Act. ........................................................................................ 4

    C.    Executive Order No. 13,769. ....................................................................... 5

STANDARD OF REVIEW .......................................................................................... 6

ARGUMENT ............................................................................................................... 6

  I.    Plaintiffs Do Not Clearly Demonstrate They Are Likely to Prevail on the Merits. 6

    A.    Plaintiffs Do Not Properly Invoke This Court's Subject Matter Jurisdiction. 7

    B.    Plaintiffs Lack an Applicable Private Right of Action. ............................... 10

        1.    The Refugee Act Provides No Private Right of Action. ................... 11

        2.    Presidential Action Is Not Reviewable under the APA. ................... 16

    C.    The President Properly Exercised His Statutory and Constitutional Power. 19

        1.    The President Acted at the Apex of His Authority. ......................... 19

        2.    The Refugee Act Does Not Restrict the Action Taken. .................... 20

        3.    The President Validly Exercised His Discretion. ............................ 24

  II.    Plaintiffs Do Not Clearly Show Irreparable Harm. .............................................. 27

  III.  The Balance of the Equities and the Public Interest Weigh Against Relief. ........ 28

  IV.  Any Relief Should Be Narrowly Tailored to Address Plaintiffs' Own Harm. ..... 31

CONCLUSION ............................................................................................................ 33

## INTRODUCTION

The President is authorized by statute to "suspend the entry of . . . any class of aliens" whenever the President determines their entry "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  Invoking that statutory authority and his constitutional authority to control the entry of aliens into this country, on January 27, 2017, the President issued Executive Order No. 13,769, titled "Protecting the Nation from Foreign Terrorist Entry Into the United States."  *See* 82 Fed. Reg. 8977 (Jan. 27, 2017).  The purpose of that Executive Order, as its preamble states, is "to protect the American people from terrorist attacks by foreign nationals admitted to the United States."  *Id.*  At Section 5(d) of the Executive Order, the President "proclaim[ed] that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend[ed] any such entry until such time as [the President] determine[s] that additional admissions would be in the national interest."  On March 6, 2017, the President issued a new Executive Order, which takes effect on March 16, 2017 and revokes Executive Order No. 13,769.  *See* ECF No. 79-1 ("New Executive Order").  The New Executive Order, at Section 6(b), similarly limits the entry of more than 50,000 refugees in fiscal year 2017.

Plaintiffs have moved the Court for entry of a preliminary injunction of Section 5(d) of Executive Order No. 13,769.  This is an "extraordinary remedy," which Plaintiffs bear a heavy burden to justify.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  That is especially true in this case given that the President is acting pursuant to his statutory and constitutional authority to make determinations regarding national security and the admissibility of aliens.  For the reasons demonstrated below, Plaintiffs fall far short of carrying this heavy burden.  Plaintiffs have not demonstrated a clear likelihood of success on the merits, because (1) they have not

properly invoked this Court's subject matter jurisdiction, (2) they lack an applicable private right of action to challenge Section 5(d), and (3) Section 5(d) is a lawful determination of the President operating at the apex of his authority under a congressional delegation of plenary power and his own Article II powers.  Each of those three points is alone fatal to Plaintiffs' motion.  Moreover, Plaintiffs have not demonstrated irreparable harm, and the balance of the equities and the public interest further weigh against interfering with the President's exercise of statutory and constitutional power that reflects his judgment about the tolerable level of risk to the Nation's security.  A preliminary injunction is thus unwarranted.

Prior to filing this brief, Defendants conferred with Plaintiffs to inquire whether Plaintiffs wished first to revise their motion in light of the subsequently issued New Executive Order.  Plaintiffs declined.  Defendants submit this opposition brief even though, by the time the Court is scheduled to hear argument on Plaintiffs' motion on March 28, 2017, *see* ECF No. 59, Executive Order No. 13,769 will have been revoked.  Although the motion would be moot at that time with respect to Section 5(d) of Executive Order No. 13,769, Plaintiffs' arguments would apply to the substantially similar Section 6(b) of the Executive Order issued March 6, 2017.  For efficiency, Defendants are amenable to the Court considering the parties' briefing, *mutatis mutandis*, to deny a preliminary injunction of Section 6(b) of the New Executive Order.

## BACKGROUND

### A.      Presidential Authority under the Immigration and Nationality Act and Article II of the Constitution.

In the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 et seq., as amended, Congress established "a comprehensive and complete code covering all aspects of admission of aliens to this country." *Elkins v. Moreno*, 435 U.S. 647, 664 (1978).  The INA reflects "Congress's plenary power over immigration and naturalization." *Johnson v. Whitehead*, 647 F.3d

2

120, 126 (4th Cir. 2011) (citing *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).  Central to the Court's

consideration of the issue before it, at Section 212(f) of the INA, 8 U.S.C. § 1182(f), Congress

delegated to the President broad discretionary authority to suspend or impose restrictions on the

entry of aliens into the United States:

> **(f) Suspension of entry or imposition of restrictions by President**
> Whenever the President finds that the entry of any aliens or of any class of aliens
> into the United States would be detrimental to the interests of the United States, he
> may by proclamation, and for such period as he shall deem necessary, suspend the
> entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose
> on the entry of aliens any restrictions he may deem to be appropriate. . . .

"The President's sweeping proclamation power" under 8 U.S.C. § 1182(f) "provides a safeguard

against the danger posed by any particular case or class of cases that is not covered by one of the"

INA's other statutory bases for excluding aliens.  *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2

(D.C. Cir. 1986).  Numerous Presidents have invoked this Section 1182(f) authority to suspend or

impose restrictions on the entry of certain aliens or classes of aliens.[1]

This congressional delegation of authority to deny entry to any aliens or to any class of

aliens, based on the President's findings regarding the national interest, falls in the heartland of

(and is bolstered by) the President's broad authority under Article II relating to foreign affairs and

national security.  *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The

exclusion of aliens is a fundamental act of sovereignty . . . inherent in the executive power to

control the foreign affairs of the nation."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S.

304, 320 (1936) (discussing "the very delicate, plenary and exclusive power of the President as

---

[1]      *See, e.g.*, Presidential Proclamation No. 5517, 51 Fed. Reg. 30470 (Aug. 22, 1986)
(President Reagan); Exec. Order No. 12,807, 57 Fed. Reg. 23133 (May 24, 1992) (President
George H.W. Bush); Presidential Proclamation No. 6958, 61 Fed. Reg. 60007 (Nov. 22, 1996)
(President Clinton); Presidential Proclamation No. 8342, 74 Fed. Reg. 4093 (Jan. 21, 2009)
(President George W. Bush); Presidential Proclamation No. 8693, 76 Fed. Reg. 44751 (July 24,
2011) (President Obama).

the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress").

### B.       The Refugee Act.

The Refugee Act of 1980 amended the INA to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States," and "to provide comprehensive and uniform provisions for [their] effective resettlement." Pub. L. No. 96-212, 94 Stat. 102, § 101(b). The Refugee Act provides that the number of refugees that may be admitted annually shall generally be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultation [with Congress], is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).[2]

For the fiscal years 1980, 1981, and 1982, Congress specified that the number of refugees admitted "may not exceed fifty thousand," unless the President determined otherwise after appropriate consultation with Congress. *Id*. § 1157(a)(1). In each of fiscal years 2013 through 2015, President Obama set an annual limit of "up to" 70,000 refugees. *See* 77 Fed. Reg. 61507 (Sept. 28, 2012); 78 Fed. Reg. 62415 (Oct. 2, 2013); 79 Fed. Reg. 69753 (Sept. 30, 2014). For fiscal year 2017, President Obama authorized the admission of "up to" 110,000 refugees—the highest number authorized under 8 U.S.C. § 1157(a)(2) in over twenty years. *See* 81 Fed. Reg. 70315 (Sept. 28, 2016).

Notwithstanding the limit established for any given fiscal year, there is no requirement to admit the full number of refugees authorized. *See* 8 U.S.C. § 1157(a)(2) (discussing "the number of refugees who *may* be admitted" (emphasis added)). Indeed, actual admissions frequently fall

---

[2]        The federal government's fiscal year runs from October 1 through September 30.

well short of the ceiling a President sets under Section 1157(a)(2).  For example, the annual limit was set to allow "up to" 70,000 refugees for fiscal years 2002 and 2003,[3] but less than 30,000 refugees were actually admitted in each of those fiscal years.[4]

### C.     Executive Order No. 13,769.

Invoking his constitutional and statutory authority, on January 27, 2017, the President issued Executive Order No. 13,769 "to protect the American people from terrorist attacks by foreign nationals admitted to the United States."  Exec. Order No. 13,769, pmbl.  As pertinent to Plaintiffs' motion, Section 5(d) of that Executive Order declares:

> (d)   Pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any such entry until such time as I determine that additional admissions would be in the national interest.

On March 6, 2017, the President issued the New Executive Order, which takes effect on March 16, 2017 and revokes Executive Order No. 13,769.  *See* ECF No. 79-1.  Like Section 5(d) of Executive Order No. 13,769, Section 6(b) of the New Executive Order declares:

> (b)   Pursuant to section 212(f) of the INA, I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any entries in excess of that number until such time as I determine that additional entries would be in the national interest.

The New Executive Order states that, "[s]ince 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States," including "individuals who first entered the country as refugees."  New Executive Order § 1(h); *see also* Executive Order No.

---

[3]      *See* 66 Fed. Reg. 63487 (Nov. 21, 2001); 67 Fed. Reg. 65469 (Oct. 16, 2002).

[4]      The ceiling set by the President and the actual number of refugees admitted in fiscal years 2001 to 2016 can be found at http://www.wrapsnet.org/s/Refugee-Admissions-Report-2017_02_28.xls.  Data at that website is maintained and made available to the public by the U.S. Department of State in the ordinary course of business.

13,769 § 1.  The New Executive Order also notes that "[t]he Attorney General has reported . . . that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation."  New Executive Order § 1(h).

## STANDARD OF REVIEW

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances."  *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).  As an "extraordinary remedy," a preliminary injunction is "never awarded as of right," but rather only "upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22, 24.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id*. at 20.  The plaintiff bears the burden as to these "four requirements, each of which must be satisfied."  *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345-47 (4th Cir. 2009), *vacated*, 559 U.S. 1089 (2010), *reinstated in relevant part by* 607 F.3d 355 (4th Cir. 2010).

## ARGUMENT

### I.    Plaintiffs Do Not Clearly Demonstrate They Are Likely to Prevail on the Merits.

"[A] party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits."  *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (alterations omitted).  This "requirement that the plaintiff clearly demonstrate that it will *likely succeed* on the merits is far stricter than" a "requirement that the plaintiff demonstrate only a grave or serious *question* for litigation."  *Real Truth*, 575 F.3d at 346-47.  Here, Plaintiffs fail in at least three respects to demonstrate a clear likelihood of success on the merits.  First, Plaintiffs lack standing

to bring this challenge, and they seek relief that the Court lacks jurisdiction to grant.  Second, Plaintiffs have not identified a private right of action that permits them to challenge Section 5(d) of the Executive Order.  And third, Section 5(d) is a lawful exercise of the President's statutory and constitutional authority.

### A.       Plaintiffs Do Not Properly Invoke This Court's Subject Matter Jurisdiction.

"The party 'seeking to adjudicate a matter in federal court must allege and, when challenged, must demonstrate the federal court's jurisdiction over the matter.'"  *Gaines Motor Lines, Inc. v. Klaussner Furniture Indus., Inc.*, 734 F.3d 296, 301 (4th Cir. 2013).  Plaintiffs' challenge to Section 5(d) fails at the threshold for at least three jurisdictional reasons.

*First*, none of the Plaintiffs here has suffered an injury-in-fact sufficient to provide Article III standing.  The Complaint brings claims on behalf of seven individuals, but none of them allege any connection to the refugee program or any harms stemming from Section 5(d) of the Executive Order.  *See* Compl. ¶¶ 24-30, 125-141 (ECF No. 1).  Thus, they do not have standing to challenge Section 5(d).  As for the two organizational Plaintiffs—International Refugee Assistance Project ("IRAP") and HIAS—neither one alleges, let alone submits evidence supporting, a sufficient injury-in-fact.

With respect to IRAP, that organization "provide[s] legal assistance to refugees and other immigrants to the United States throughout the resettlement process."  Decl. of Rebecca Heller ¶ 5 (ECF No. 64-1 at J.R. 27).  The organization claims a harm from having to expend resources "exploring alternative routes to safety for its clients . . . and educating its network of over 2,000 pro bono attorneys and law students about those alternate routes."  *Id.* ¶ 8.  Although impairment of an organization's core activities may provide Article III standing in some circumstances, at a minimum the impairment must result in a "consequent drain on the organization's resources."

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). But here, IRAP does not identify any additional expenditures necessary to counteract the effects of Section 5(d).

IRAP states that it must focus its efforts on *different* activities—*i.e.*, pursuing alternative resettlement options outside the United States. *See* Decl. of Rebecca Heller ¶¶ 8-10 (ECF No. 64-1 at J.R. 27-28). But IRAP does not demonstrate that those activities result in greater expenditures of resources, or that the organization's mission is impaired simply because it must attempt to resettle a refugee in a country other than the United States. This type of diversion of resources to different activities, without an impairment of the organization's core activities, is insufficient to establish standing. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) ("Although a diversion of resources might harm the organization by reducing the funds available for other purposes, it results not from any actions taken by the defendant, but rather from the organization's own budgetary choices." (alterations omitted)).

Indeed, legal counseling organizations such as IRAP are particularly ill-suited for expanding *Havens Realty* to provide standing, given that such a theory would allow a legal organization to challenge virtually any policy that negatively affects its potential future clients. *See Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization. . . . If this were not so, then, for example, indigent defender organizations established pursuant to the Criminal Justice Act or any other self-styled advocacy group could assert standing to sue whenever it believed the rights of its targeted beneficiaries had been violated.").

With respect to HIAS, this refugee resettlement agency contends that it has suffered a financial harm because Section 5(d) causes it to settle fewer refugees than previously expected. *See* Decl. of Mark Hetfield ¶¶ 10-12 (ECF No. 64-1 at J.R. 10-11).  But an organization cannot establish standing simply because it does not receive a potential future benefit to which it had no entitlement.  To demonstrate injury-in-fact under Article III, the plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Here, HIAS cannot point to any invasion of a legally protected interest because refugee resettlement agencies have no legal entitlement or protection in being able to resettle their expected number of refugees.  Nowhere does HIAS assert such a right or interest, which forecloses its ability to demonstrate an Article III injury-in-fact here.  *See 24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 633 (4th Cir. 2016) ("Because neither Virginia law nor the Plan gives Moxley 'a legally protected interest' in determining the nomination method in the first place, he fails to make out 'an *invasion* of a legally protected interest,' i.e. actual injury, in this case."); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (2003) (holding that a group of plaintiffs lacked standing because their asserted interest was in a non-existent right, and "[t]his claim of injury by the [particular] plaintiffs is, therefore, not to a legally cognizable right").[5]

*Second*, neither IRAP nor HIAS is within the relevant zone of interests.  *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987) ("[T]he interest sought to be protected by the complainant

---

[5]     HIAS also cannot establish standing to sue based on expenditures made in reliance on its legally unprotected expectation about the number of refugees it would be assisting.  *See, e.g.*, Decl. of Mark Hetfield ¶¶ 19-22 (ECF No. 64-1 at J.R. 14-15).  Those expenditures are effectively "self-created harms," *Beck v. McDonald*, 848 F.3d 262, 276 (4th Cir. 2017), and recognizing them as sufficient for Article III would create an exception that swallows the rule—*i.e.*, that a party can sidestep the bar on standing for invasions of non-legally protected interests simply by making expenditures in pursuit of those unprotected interests.

[must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." (alteration omitted)); *see generally Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014).   Here, IRAP and HIAS seek to bring their challenge under the Administrative Procedure Act ("APA") based on provisions of the Refugee Act, as well as under the Refugee Act directly.   *See* Compl. ¶¶ 166-72.   As the D.C. Circuit has held, however, refugee assistance organizations are not properly within the zone of interests of the Refugee Act.   *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 813 (D.C. Cir. 1987) (rejecting argument that "the zone of interests Congress intended the Refugee Act to protect or regulate includes an organization's interest in representing, and its members' interests in associating with, Haitian refugees").   To hold to the contrary would drastically expand the statutory zone of interest test. *See id.* ("If any person or organization interested in promoting knowledge, enjoyment, and protection of the rights created by a statute or by a constitutional provision has an interest that falls within the zone protected or regulated by the statute or constitutional provision, then the zone-of-interest test is not a test because it excludes nothing.").   Accordingly, the two organizational Plaintiffs here are not within the zone of interests necessary to bring their challenge.

*Third,* the Court lacks jurisdiction to provide the relief Plaintiffs seek.   It is well-settled that courts have no jurisdiction "to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).   Accordingly, the President cannot be the subject of any injunctive order.   *Id.*; *see also Franklin v. Massachusetts*, 505 U.S. 788, 826 (1992) (Scalia, J., concurring in part and concurring in judgment).   For these reasons, Plaintiffs' challenge fails at the threshold and Plaintiffs cannot demonstrate that they will succeed on the merits.

### B.    Plaintiffs Lack an Applicable Private Right of Action.

Plaintiffs' theory is that Section 5(d) of Executive Order No. 13,769 "violates the Refugee Act and the Administrative Procedure Act."   Pls.' Mot. at 2 (ECF No. 64).   But the Refugee Act

itself gives Plaintiffs no right to sue for enforcement, and a President's actions are not otherwise reviewable under the APA.   Plaintiffs thus have not identified an actionable basis for their challenge to proceed.

### 1.        The Refugee Act Provides No Private Right of Action.

"The Supreme Court has long held that private plaintiffs may not bring suits to enforce statutes that do not provide a private cause of action."  *L.J. v. Wilbon*, 633 F.3d 297, 307 (4th Cir. 2011).  "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  "To create a private right of action, Congress must 'speak with a clear voice,' and the statute must 'unambiguously' express the intent 'to create not just a private *right* but also a private *remedy*."  *Clear Sky Car Wash LLC v. City of Chesapeake,* 743 F.3d 438, 444 (4th Cir. 2014) (alteration omitted) (quoting *Gonzaga Univ. v. Doe,* 536 U.S. 273, 280, 283, 284 (2002)).  Where the necessary intent is absent, "a cause of action does not exist and courts may not create one."  *Sandoval*, 532 U.S. at 286-87.

Courts have found in various contexts that the Refugee Act—including 8 U.S.C. § 1157, the particular provision at issue here—does not create a cause of action.  *See Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1506 (11th Cir. 1992) ("8 U.S.C. § 1157, which applies to refugees seeking admission from outside the United States, makes no provision for judicial review."); *Rodriguez v. Ridge*, 310 F. Supp. 2d 1242, 1245 (S.D. Fla. 2004) ("§ 1157 does not provide for judicial review."); *Alabama v. United States*, 198 F. Supp. 3d 1263, 1268-73 (N.D. Ala. 2016) (finding the Refugee Act gives States no cause of action to enforce 8 U.S.C. § 1522(a)(2)(A)); *Texas Health & Human Servs. Comm'n v. United States*, 193 F. Supp. 3d 733, 739 (N.D. Tex. 2016) (finding "neither section 1522(a)(2)(A) nor section 1522(a)(2)(D) confers a private right of action for States to challenge" compliance with the Refugee Act).

11

To analyze Plaintiffs' claim, "[w]e begin with the presumption that if a statute does not expressly create a private cause of action, one does not exist." *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 805 (4th Cir. 1996).  Plaintiffs do not, and cannot, contend that the Refugee Act expressly creates a private cause of action to enforce 8 U.S.C. § 1157 judicially.  The absence of an express provision is dispositive here, as "an express statement by Congress" is required before "the President's performance of his statutory duties" is subject to judicial review.  *Franklin*, 505 U.S. at 801; *see also id*. at 800 ("Out of respect for the separation of powers and the unique constitutional position of the President, . . . textual silence is not enough to subject the President['s]" actions to judicial review.); *cf. Nixon v. Fitzgerald*, 457 U.S. 731, 748-49 (1982) (Supreme Court would require an express statement by Congress before assuming Congress had created a damages action against the President for his official acts).

Even assuming *arguendo* that an express statement from Congress were not required in these circumstances, Plaintiffs would be required to search for an implied cause of action in 8 U.S.C. § 1157.  But "implied rights of action are disfavored, and will not be found in the absence of clear evidence of legislative intent." *Prousalis v. Moore*, 751 F.3d 272, 278 (4th Cir. 2014).  "In the absence of congressional intent the Judiciary's recognition of an implied private right of action runs contrary to the established principle that the jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation." *Id*. (alteration omitted) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 164 (2008)).  "The regulation of access to the courts is largely a legislative task, and one that courts should hesitate to undertake." *Smith v. Reagan*, 844 F.2d 195, 201 (4th Cir. 1988).

Nothing in 8 U.S.C. § 1157 evinces a legislative intent sufficient to discover an implied right of action supporting Plaintiffs' challenge.  "It is axiomatic that we will not recognize an

12

implied right of action under a statute 'where the text and structure of [the] statute provide no indication that Congress intend[ed] to create new individual rights.'" *Clear Sky*, 743 F.3d at 443-44 (alterations in original) (quoting *Gonzaga*, 536 U.S. at 286). "The mere fact that the statute was designed to protect certain individuals does not require the implication of a private cause of action on their behalf. The dispositive question remains whether Congress intended to create any such remedy." *Smith*, 844 F.2d at 201-02 (internal citation and alterations omitted).

With respect to evaluating statutory text, "the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979). "Where a statute does not include this sort of explicit 'right- or duty-creating language,' [the Supreme Court] rarely impute[s] to Congress an intention to create a private right of action." *Gonzaga*, 536 U.S. at 284 n.3. "'Rights-creating language' is language that 'explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff.'" *In re Miller*, 124 F. App'x 152, 154 (4th Cir. 2005) (alterations in original) (quoting *Cannon*, 441 U.S. at 690 n.13). For example, in *Sandoval*, the Supreme Court found a statute "decree[ing] that 'no person shall be subjected to discrimination'" contains rights-creating language, and, therefore, creates an implied right of action. 532 U.S. at 289-90 (alterations omitted). By contrast, the Supreme Court does not find rights-creating language where Congress "has framed the statute simply as a general prohibition or a command to a federal agency." *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981); *see also id.* 772-73 (finding language in Davis-Bacon Act that requires certain federal contracts to contain a provision stating minimum wages to be paid to laborers and mechanics "does not confer rights directly on those individuals" and "provides no support for the implication of a private remedy").

13

Here, nothing in the statute either explicitly or implicitly suggests a private cause of action. Plaintiffs focus on the statute's statement that "the number of refugees who may be admitted under this section in any fiscal year . . . shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest."  8 U.S.C. § 1157(a)(2).  This language (applying to the President rather than any agency) is, at most, tantamount to "a command to a federal agency."  *Coutu*, 450 U.S. at 772.  It does not come close to "explicitly conferr[ing] a right directly on a class of persons that include[s] the plaintiff[s]."  *Cannon*, 441 U.S. at 690 n.13.  To the contrary, it is precisely the sort of language that "create[s] duties on the part of persons for the benefit of the public at large," a scenario where courts are "especially reluctant to imply causes of actions."  *Id*.

Turning to the structure of the statute, Plaintiffs recognize that—through requirements of "appropriate consultation" and "oversight reporting," 8 U.S.C. § 1157(d)-(e)—the statute provides "Congress a voice and a modicum of control over a process that ultimately grants the President considerable discretion."  Pls.' Mot. at 16.  "Provision for congressional oversight does not necessarily rule out congressional intent to provide for private enforcement, but it is evidence that Congress set forth with some care the enforcement scheme it intended to create."  *Smith*, 844 F.2d at 201.  Indeed, within the broader context of federal immigration laws, Congress has expressly authorized judicial review of only certain federal agency actions.  *See, e.g.*, 8 U.S.C. § 1252 (authorizing judicial review of a final order of removal).  Where Congress has created a comprehensive statutory scheme with express provision for private enforcement in certain circumstances, "it is highly improbable that Congress absentmindedly forgot to mention an intended private action."  *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979).

Instead, "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Id.* at 19; *see also Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 423-24 (4th Cir. 2005) (stating similar rationale in rejecting implied private right of action under 8 U.S.C. § 1182(n) of the INA).

Finally, an implied cause of action is particularly improbable because the subject at issue here is the admission of refugees. Such individuals have no right to admission to the United States. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application[.]"). The admission of aliens, moreover, has traditionally been the province of the political branches, not the courts. It would be anomalous, indeed, for Congress to have meant for a private cause of action to exist, without expressly saying so, when such aliens generally have no right of admission at all and "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952); *cf. Smith*, 844 F.2d at 201 ("Because the Hostage Act treads on matters of foreign policy which have long been recognized as the exclusive province of the political branches, we must be especially certain of congressional intent before inferring a private cause of action.").

The more natural implication is that Congress did not intend private recourse to the courts, because "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999). Apropos here, "when Congress deems it necessary for the courts to become involved in sensitive matters, such as those involving enemy terrorists, it enacts careful statutory guidelines to ensure that litigation does not

come at the expense of national security concerns." *Lebron v. Rumsfeld*, 670 F.3d 540, 555 (4th Cir. 2012).

Plaintiffs have no express right of action to enforce 8 U.S.C. § 1157 judicially, nor should the Court imply one. "It is not the role of courts to blaze new trails into uncharted territory in the absence of any clear textual or precedential mandate for doing so. Considerations of judicial restraint and modesty militate against such an untethered venture." *Prousalis*, 751 F.3d at 279; *see also Lebron*, 670 F.3d at 547 ("refusing to imply a new cause of action" in suit challenging "designations of persons and groups as special threats to national security").

### 2. Presidential Action Is Not Reviewable under the APA.

Plaintiffs also cannot obtain review of Section 5(d) of the President's Executive Order under the APA. Judicial review under the APA can be available only with respect to "agency action." 5 U.S.C. §§ 702, 704. The President, however, is not an "agency" within the meaning of the APA, and thus his actions are not reviewable under that statute. *See Flue-Cured Tobacco Coop. Stabilization Corp. v. E.P.A.*, 313 F.3d 852, 860 n.7 (4th Cir. 2002) (citing *Franklin*, 505 U.S. at 800-01).

APA review cannot be predicated on Plaintiffs' arguments that "the U.S. Department of State has begun implementing the revised target of 50,000 refugee arrivals" and U.S. Citizenship and Immigration Services "has begun implementing a triage system" in connection with the "level of 50,000 refugee admissions." Pls.' Mot. at 9, 10. These are only "ministerial act[s] . . . to carry out Executive Order" No. 13,769, whereas it is the "Executive Order . . ., and not [these acts], that dictate[s]" allowing the entry of up to 50,000 refugees in fiscal year 2017. *Chamber of Commerce of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 733 (D. Md. 2009); *cf. Senior Execs. Ass'n v. United States*, No. 8:12-cv-02297-AW, 2013 WL 1316333, at *17 (D. Md. Mar. 27, 2013) ("[A]n agency's execution of a nondiscretionary, ministerial action in compliance with an express

statutory mandate is not agency action under the APA."). The Executive Order, not the agency's ministerial implementation of it, "is the proximate cause of the legal consequences of which Plaintiffs complain." *Id.* at *18.

Furthermore, the "bar on APA review of actions by the President extend[s] to the actions of agencies when they act under a delegation of presidential authority." *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 402 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012). In *Coin Collectors*, a statute assigned to the President various responsibilities that the President delegated to an Assistant Secretary of the U.S. Department of State. *See* 801 F. Supp. 2d at 401. Although the Plaintiff challenged "actions by the State Department and Assistant Secretary, not actions directly undertaken by the President," the court reasoned that "the State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA." *Id.* at 402, 403. Here, similarly, the APA provides no right of action to challenge Section 5(d), which was a decision of the President made via an Executive Order and implemented by agencies acting to carry out the directive on his behalf.

Moreover, even if an APA cause of action were available, any claim would be meritless because courts cannot review "agency action [that] is committed to agency discretion by law[.]" 5 U.S.C. § 701(a)(2). That limitation on review applies when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, the President in Section 5(d) expressly exercised his authority under 8 U.S.C. § 1182(f)—a statute that, by its plain terms, vests in the President the discretion to determine whether "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States" for the period "as he shall deem necessary," and to impose such conditions of entry as "he may deem appropriate." 8

U.S.C. § 1182(f).  In making these determinations, the statute does not require the President to state any basis for such a finding, nor does it require ratification of such a finding by any other entity.  In short, "8 U.S.C. § 1182(f) clearly grants the President broad discretionary authority to control the entry of aliens into the United States."  *Haitian Refugee*, 953 F.2d at 1507.

In this regard, *Haitian Refugee Center, Inc. v. Baker*, 789 F. Supp. 1552 (S.D. Fla. 1991), is directly on point.  There, the district court squarely held that because § 1182(f) "is geared to Executive 'find[ings]' and what is 'deem[ed]' necessary or appropriate, the statute provides no discernable standards by which this court can review the challenged actions under the APA," and thus "the actions in question are committed to agency discretion by law."  *Id*. at 1575-76 (alterations in original).

Other courts have reached similar conclusions when confronted with comparable statutory language.  *See Webster v. Doe*, 486 U.S. 592, 594, 600-01 (1988) (holding that Director of Central Intelligence's termination of an Agency employee, pursuant to statute authorizing such termination whenever the Director "shall deem such termination necessary or advisable in the interests of the United States," was not subject to judicial review under the APA because the statute "foreclose[d] the application of any meaningful judicial standard of review"); *Dep't of Navy v. Egan*, 484 U.S. 518, 527-29 (1988) (decision whether security clearance was "clearly consistent with the interests of the national security" was "committed by law to the appropriate agency of the Executive Branch"); *Bernardo ex rel M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 485-86 (1st Cir. 2016) ("[T]he language 'for what [the Secretary] deems to be good and sufficient cause' makes clear that what constitutes 'good and sufficient cause' is within the Secretary's discretion" (alteration in original)); *Claybrook v. Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997) (decision about whether to adjourn a meeting based on whether such adjournment was "in the public interest" was "the kind

18

of decision that resists judicial review").  Thus, even if Plaintiffs had an APA cause of action available, their challenge would necessarily fail because the President's decision under Section 1182(f) about what is "detrimental to the interests of the United States" is non-reviewable under the APA, as committed to the President's discretion by law.[6]

### C. The President Properly Exercised His Statutory and Constitutional Power.

Even if Plaintiffs had a cause of action to challenge Section 5(d), they fail to demonstrate that the President's action is unlawful.  Plaintiffs miss the mark in arguing that Section 5(d) is not authorized by the Refugee Act at 8 U.S.C. § 1157(a)(2).  *See* Pls.' Mot. at 13-17.  Section 5(d) does not purport to be an exercise of authority under Section 1157(a)(2), which provides ordinary procedures for setting the annual authorization of refugee admissions.  Instead, the President expressly promulgated Section 5(d) "[p]ursuant to section 212(f) of the INA, 8 U.S.C. 1182(f)." Exec. Order No. 13,769 § 5(d).  That statute—a broad delegation of plenary power that applies in special circumstances and buttresses the President's constitutional power—plainly authorizes the President's action, contrary to Plaintiffs' contention.  *See* Pls.' Mot. at 17-20.

### 1. The President Acted at the Apex of His Authority.

An analysis of the lawfulness of Section 5(d) must begin by considering the scope of the President's authority in this area.  The Supreme Court's "cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  *Fiallo*, 430 U.S. at 792 (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)).  In promulgating Section 5(d), the President acted pursuant to an express delegation of Congress's plenary power coupled with his own

---

[6]     For similar reasons, Plaintiffs cannot obtain non-statutory *ultra vires* review of the President's actions.  *See generally Coin Collectors*, 801 F. Supp. 2d at 405 & n.22 (citing *Dalton v. Specter*, 511 U.S. 462, 474-76 (1994)).

Article II authority over foreign affairs and national security, which means that the President's authority was "at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (Jackson, J., concurring)).

8 U.S.C. § 1182(f) "specifically grants the President, where it is in the national interest to do so, the extreme power to prevent the entry of any alien or groups of aliens into this country as well as the lesser power to grant entry to such person or persons with any restriction on their entry as he may deem to be appropriate." *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980). For example, with respect to Executive Order No. 12,807, 57 Fed. Reg. 23133 (May 24, 1992)—which, among other things, suspended entry of undocumented aliens by sea—the Supreme Court found "[i]t is perfectly clear that 8 U.S.C. § 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 164 n.13, 187 (1993). Even Plaintiffs concede the "broad language" of Section 1182(f). Pls.' Mot. at 17.

## 2.      The Refugee Act Does Not Restrict the Action Taken.

Despite the President's broad discretionary power under 8 U.S.C. § 1182(f), Plaintiffs nevertheless contend the statute did not authorize the President to promulgate Section 5(d). According to Plaintiffs, this use of Section 1182(f) to adjust the authorized number of refugees is restricted by the procedures set forth in Section 1157. *See* Pls.' Mot. at 18-20. Nothing in the text of Section 1157 even purports to override Section 1182(f), however, and "[i]t is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976).

Plaintiffs' resulting effort to impute a "conflict" between these two statutes is misguided. Pls.' Mot. at 18. There is no conflict. Section 1157 explains how the President is to set the *upper*

*limit* on refugee admissions in each fiscal year, "before the beginning of the fiscal year."  8 U.S.C. § 1157(a)(2).   There is no requirement, in Section 1157 or otherwise, that the full number of refugees authorized in a fiscal year actually be admitted.   *See id.* (discussing "the number of refugees who *may* be admitted" (emphasis added)); *see also* Pls.' Mot. at 14 (noting that "the word 'may' . . . implies discretion").   Indeed, as noted above, actual admissions often fall well short of the ceiling a President sets under Section 1157(a)(2).   There may be any number of reasons that the annual cap set pursuant to Section 1157 is not reached in a given year, including budget constraints, processing delays, the number of refugees throughout the world, or, as here, a proclamation under Section 1182(f) that reaching the cap set at the beginning of the fiscal year would be detrimental to the interests of the United States.   Because nothing in Section 1157 requires the United States to admit the maximum number of refugees set at the beginning of a fiscal year, no conflict arises when a President determines under Section 1182(f) to admit a lesser number where, as here, he finds that meeting the maximum number "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).

   In any event, even if there were some potential conflict between the two provisions, "settled rules of statutory construction teach that the proper course is to interpret them harmoniously to eliminate any conflict."  *Baltimore Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721, 741 (D. Md. 2001) (citing *Radzanower*, 426 U.S. at 155).   "The proper starting point for the Court's analysis is to recognize the general rule that 'when two statutes are capable of coexistence,' as the Court [should] find[] the relevant provisions here to be, 'it is the duty of the courts, absent clearly expressed Congressional intentions to the contrary, to regard each as effective.'"   *Thomas v. GMAC Residential Funding Corp.*, 309 B.R. 453, 454 (D. Md. 2004) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

Section 1182(f) is easily reconciled with Section 1157 to give both statutes harmonious effect: Section 1157 explains how the President generally is to set the upper limit on refugee admissions in each fiscal year, whereas Section 1182(f) governs the specific, exceptional situation in which the President proclaims that entry of any "class of aliens" would be "detrimental to the interests of the United States."   Here, as Section 5(d) of the Executive Order involves such a "detrimental" finding, Section 1182(f) controls.

By contrast, under Plaintiffs' view, the President could never, after the beginning of a fiscal year, reduce the number of refugees to be admitted to the United States in that fiscal year to take account of intervening circumstances. *See* 8 U.S.C. § 1157(a)(2) (requiring upper limit on refugee admissions to be set "before the beginning of the fiscal year").   That theory runs is unsupported by the history of refugee admissions since the Refugee Act was passed, as actual admissions have frequently fallen short of the ceiling set under Section 1157.   Moreover, "[t]he President's sweeping proclamation power" under 8 U.S.C. § 1182(f) "provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the" INA's other statutory bases for excluding aliens.  *Abourezk*, 785 F.2d at 1049 n.2.   Adopting Plaintiffs' construction of the two statutes thus vitiates Section 1182(f) rather than reconciling it, and contravenes the President's constitutional role.

Plaintiffs err in relying on "the 'later in time' canon" to suggest that Section 1157 controls as the later-enacted law.  Pls.' Mot. at 18.   In the absence of an affirmative expression of an intent to repeal an earlier-enacted statute, courts will find that Congress has implicitly repealed an earlier statute by enacting a later one only when there is an "'irreconcilable conflict' [between the statutes] in the sense that there is a positive repugnancy between them or that they cannot mutually coexist."

*Radzanower*, 426 U.S. at 155.  As explained above, however, Sections 1182(f) and 1157 *can and do* mutually coexist.

Trying to show that Section 1157 implicitly effected a partial repeal of Section 1182(f), Plaintiffs argue that the exercise of Section 1182(f) allowed the President to reach a different determination regarding the admission of refugees in fiscal year 2017 than had been reached previously under Section 1157, even though both statutes involve consideration of the national interest.  *See* Pls.' Mot. at 18-19.  Plaintiffs' observation is of no consequence.  "It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem."  *Radzanower*, 426 U.S. at 155.  As discussed, the two statutes mutually coexist.  And even if the two statutes did direct the President "to consider essentially the very same question," Pls.' Mot. at 18, that same question can lead to different outcomes at different moments in time—which again highlights the importance of having Section 1182(f) operate as a comprehensive "safeguard against the danger posed by any particular case or class of cases" notwithstanding the existence of other statutory provisions addressing the same or similar topic.  *Abourezk*, 785 F.2d at 1049 n.2.

Plaintiffs also misstep in relying on the legislative history of the Refugee Act to argue that Section 1157 was meant to displace the President's ability to exercise Section 1182(f) authority as he did in Section 5(d).  *See* Pls.' Mot. at 19.  Seeking to overcome the plain meaning of Section 1182(f), Plaintiffs must confront that "legislative history suggesting an interpretation contrary to a statute's plain meaning is not necessarily sufficient to override the Plain Meaning Rule."  *In re Sunterra Corp.*, 361 F.3d 257, 270 (4th Cir. 2004); *see also id.* at 265 (defining the Plain Meaning Rule as the principle that "unless there is some ambiguity in the language of a statute, a court's

analysis must end with the statute's plain language").  And here, Plaintiffs identify nothing in the legislative history of the Refugee Act that focuses on the interaction of Sections 1157 and 1182(f).

Plaintiffs nevertheless argue that Congress intended to override the plain language of Section 1182(f) because Congress included in Section 1157 a mechanism for a mid-year increase, but not for a mid-year decrease, in the number of refugees who may be admitted.  *See* Pls.' Mot. at 19.  But there was no need for Congress to create a mechanism for a mid-year decrease.  The procedure set out in Section 1157 is used to set an *upper limit* on refugee admissions in a given year, not to establish the exact number of refugees that must be admitted during the year notwithstanding a presidential determination under Section 1182(f).  *See* 8 U.S.C. § 1157(a)(2) (describing the process for setting "the number of refugees who *may* be admitted" (emphasis added)).  Thus, the absence of a provision in Section 1157 for a mid-year decrease simply reflects the fact that such a provision is unnecessary—Section 1157 is used to set a cap and the Government is not required to reach that cap, whether because of the President's exercise of his power under Section 1182(f) or otherwise.  In short, this is not even arguably "the sort of conclusive legislative history that would trump contrary language in the statute."  *Sunterra*, 361 F.3d at 270 (quoting *Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 306 (4th Cir. 2000)).  Accordingly, Plaintiffs are wrong to assert that 8 U.S.C. § 1157 somehow constrains the broad authority that Congress expressly delegated to the President in 8 U.S.C. § 1182(f).

### 3.      The President Validly Exercised His Discretion.

Setting aside Section 1157, Plaintiffs proffer two unpersuasive theories attempting to undercut the President's exercise of discretion under Section 1182(f).  First, Plaintiffs suggest that Section 5(d) does not identify a "class" of aliens within the meaning of Section 1182(f).  *See* Pls.' Mot. at 17-18.  A "class" is a "group of people, things, qualities, or activities that have common characteristics or attributes."  Black's Law Dictionary (10th ed. 2014).  Section 5(d) suspends the

entry of an identifiable class: the 60,000 additional aliens whose entry as refugees would otherwise have been authorized for fiscal year 2017.  Those aliens have a common attribute of not being among the first 50,000 refugees admitted in fiscal year 2017.  Nothing more is required to satisfy the statute's application to "any aliens or . . . any class of aliens."  8 U.S.C. § 1182(f).

Second, Plaintiffs invite the Court to question whether Section 5(d) is justified by the Executive Order's stated national security concerns about preventing terrorist attacks.  *See* Pls.' Mot. at 20.  But that invitation clashes with the consideration that "[c]ourts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint."  *Nixon*, 457 U.S. at 753.  The Constitution commits "decision-making in the fields of foreign policy and national security . . . to the political branches of government."  *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).  And Congress expressly authorized the President to do what he has done here based upon a finding, which the President has made here, that "the entry . . . of any class of aliens into the United States would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).

Irrespective whether Plaintiffs disagree with the President's finding, "[c]ases that require courts to second-guess these decisions run the risk not just of making bad law, but also of impinging on explicit constitutional assignments of responsibility to the coordinate branches of our government."  *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 180 (4th Cir. 2015) (alteration omitted).  When faced with a "[p]redictive judgment of this kind" in the realm of "national security affairs," "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive"—either "to review the substance of such a judgment," "to decide whether the . . . necessary affirmative prediction [can be made] with

confidence," or to "determine what constitutes an acceptable margin of error in assessing the potential risk." *Egan*, 484 U.S. at 529-30.

Plaintiffs incorrectly believe they cast doubt on the President's judgment by questioning whether "the 50,001st refugee to be admitted this fiscal year is any more of a threat to national security than the 50,000th." Pls.' Mot. at 20. But Plaintiffs' argument proves too much: the same criticism could be made of *any* numerical limit on refugee admissions, whether it be 20,000, 50,000, or 110,000. Congress required the President to decide upon a particular numerical limit, and Plaintiffs cannot impugn the rationality of the President setting a numerical limit by relying on a feature inherent in *any* such limit. *See Mathews v. Diaz*, 426 U.S. 67, 83 (1976) (rejecting a claim that "it would have been more reasonable for Congress to select" a different length-of-residency requirement for aliens seeking Medicare, because even if "the five-year line drawn by Congress is longer than necessary" it nevertheless "remains true that some line is essential" and "any line must produce some harsh and apparently arbitrary consequences"). The inscrutability of Plaintiffs' contemplated line-drawing inquiry that only underscores why this presidential determination, arising in the national security context, is not well-suited to judicial review.

"[W]hen it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (internal citation omitted). "One reason for that respect is that national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess." *Id.* Thus, contrary to Plaintiffs' misplaced attempt to litigate the President's national security judgment, Section 5(d) of

Executive Order No. 13,679 was a lawful exercise of the President's authority under 8 U.S.C. § 1182(f) and his Article II powers.

## II.      Plaintiffs Do Not Clearly Show Irreparable Harm.

Plaintiffs' motion also should be denied because Plaintiffs have not clearly shown they will suffer irreparable harm absent a preliminary injunction.  "To establish irreparable harm, plaintiffs must show that they are 'likely to be irreparably harmed,' not just that they face a mere possibility of harm."  *Alston v. Equifax Info. Servs., LLC*, No. CIV.A. TDC-13-1230, 2014 WL 6388169, at *5 (D. Md. Nov. 13, 2014) (quoting *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013).  "Thus the 'irreparable harm' to be suffered must be 'neither remote nor speculative, but actual and imminent.'"  *Alston*, 2014 WL 6388169, at *5 (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).  "The irreparable injury requirement erects a very high bar for a movant."  *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  Plaintiffs do not satisfy this high standard.

Plaintiff IRAP's alleged need to divert some of its resources to assist refugees affected by Section 5(d) is not irreparable harm.  *See* Pls.' Mot. at 22.  Even if IRAP alleged sufficient harm to satisfy Article III standing, irreparable harm is a higher hurdle.  *See, e.g.*, *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).  Here, IRAP is merely reallocating resources that it would have used to assist refugees seeking resettlement in the United States to instead help those same refugees "pursue other resettlement options."  Pls.' Mot. at 22.  This reallocation of resources does not constitute irreparable harm.[7]

---

[7]      *Action NC v. Strach*, No. 1:15-cv-1063, 2016 WL 6304731, at *29 (M.D.N.C. Oct. 27, 2016), on which Plaintiffs rely, is not to the contrary.  In that voting rights case, the court found that the alleged harm was irreparable because "once an election passes, there can be no do-over and no redress."  *Id*. (quotation omitted).  The same is not true of refugee resettlement.

Plaintiff HIAS's allegation that it might be "forced to shut down permanently," *id.* at 23, is speculative, given that the organization has been in existence for over one hundred years, provides resettlement services to refugees worldwide, and has withstood lower levels of refugee admissions in the United States than that contemplated by Section 5(d). *See* Decl. of Mark Hetfield ¶ 2 (ECF No. 64-1 at J.R. 7); *supra* at 4-5 (explaining that the United States admitted less than 30,000 refugees in fiscal years 2002 and 2003). Moreover, any alleged financial harm to HIAS is speculative and not irreparable. HIAS receives funding from the Government on a per capita basis, meaning that any reduction in funds received by HIAS this year will be accompanied by a corresponding reduction in the number of refugees HIAS will serve. A reduction of resources that corresponds to a lesser burden is not imminent, irreparable harm.

Finally, Plaintiffs' allegations of harm to refugees and HIAS's local affiliates, which are not plaintiffs in this case, are not relevant to the irreparable harm analysis. *See MicroStrategy*, 245 F.3d at 339 (requiring showing of "irreparable harm *to the plaintiff*" (emphasis added)); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) ("[T]he preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm."). In any event, such harms are speculative, particularly where Plaintiffs concede that refugees often wait years for their applications to be processed even under normal circumstances. *See* Pls.' Mot. at 21.

## III.    The Balance of the Equities and the Public Interest Weigh Against Relief.

Plaintiffs have not demonstrated that any harm they identify outweighs the harm that a preliminary injunction would cause the Government, or that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two factors merge where, as here, the Government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also James A. Merritt & Sons v. Marsh*, 791 F.2d 328, 331 (4th Cir. 1986) (noting that "the public interest and the potential harm

to the government [may] coincide"). "Courts have accorded great weight to considerations of national security when balancing the interests and equities of the parties." *Nat'l Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *see also Winter*, 555 U.S. at 24; *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 796, 798 (D.C. Cir. 1971) (because of "assertions of potential harm to national security and foreign policy—assertions which [the court] obviously can not appraise—and given the meager state of the record before us, we are constrained to refuse an injunction"). Moreover, in assessing the public interest, a court must heed "the judgment of Congress, deliberately expressed in legislation," and "the balance that Congress has struck." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

These elements weigh heavily in the Government's favor. "[T]he Supreme Court has long acknowledged that 'no governmental interest is more compelling than the security of the Nation.'" *United States v. Abu Ali*, 528 F.3d 210, 240 (4th Cir. 2008) (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)); *accord United States v. Sterling*, 724 F.3d 482, 509 (4th Cir. 2013). "The continuing threat of international terrorism highlights the importance of this interest: the government has no more profound responsibility than the protection of Americans, both military and civilian, against additional unprovoked attack." *Abu Ali*, 528 F.3d at 240 (internal quotation marks omitted).

Despite this "obvious and unarguable" proposition, *Sterling*, 724 F.3d at 509 (quoting *Haig*, 453 U.S. at 307), Plaintiffs seek to enjoin a provision of an Executive Order that suspends the entry into the United States of more than 50,000 refugees in fiscal year 2017 based on the President's determination, pursuant to a statutory delegation of plenary power, that failing to do so would be detrimental to the interests of the United States, including its national security. Inherent in that determination, the President has made a judgment about the tolerable level of risk

29

presented "by foreign nationals admitted to the United States" as refugees, in light of his basic duty "to protect the American people from terrorist attacks."  Exec. Order No. 13,769, pmbl.

It undoubtedly would contravene the public interest for this Court to ignore Congress's judgment that the President should make such determinations, to second-guess the President's determination, or to override the President's determination based on Plaintiffs' policy disagreement.  *See, e.g., Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (vacating preliminary injunction that directed Secretary of State to take action in foreign affairs, which "deeply intrude[d] into the core concerns of the executive branch").

Finally, even if Plaintiffs satisfied the requirements for a preliminary injunction, this Court still would retain its equitable discretion to refrain from issuing relief that would interfere in the Executive Branch's foreign affairs and national security activities.  *See Henderson v. Bluefield Hosp. Co.*, No. 1:16-cv-06305, ___ F. Supp. 3d ___, 2016 WL 5213930, at *4 (S.D.W. Va. Sept. 20, 2016) ("Importantly, 'whether to grant the injunction still remains in the equitable discretion of the [district] court' even when a petitioner has made the requisite showing." (alteration in original) (quoting *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007))).  "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense."  *Wu Tien Li-Shou*, 777 F.3d at 180 (quoting *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991)).  The D.C. Circuit, for example, has held that "[a]t least where the authority for our interjection into so sensitive a foreign affairs matter as this are statutes no more specifically addressed to such concerns than the Alien Tort Statute and the APA, we think it would be an abuse of our discretion to provide discretionary relief."  *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985).  Similarly here, the Court should not intrude upon the President's efforts "to ensure that those approved for admission

do not intend to harm Americans and that they have no ties to terrorism." Exec. Order No. 13,769 § 1.

## IV.     Any Relief Should Be Narrowly Tailored to Address Plaintiffs' Own Harm.

"It is well established that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *accord Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) ("An injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.'"). "Particularly is this so when preliminary relief, on something less than a full record and full resolution of the facts, is granted." *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971).

Here, enjoining Section 5(d) altogether would go further than what is necessary to redress the claimed harms to Plaintiffs IRAP and HIAS that are the basis for seeking a preliminary injunction.[8]  The "diver[sion of] critical organizational resources" and "direct financial harm" that those Plaintiffs assert are alleged to be traceable to specific, limited numbers of refugee applicants with whom Plaintiffs work or expected to work.  *See* Pls.' Mot. at 2; *see also* Decl. of Rebecca Heller ¶¶ 8, 15 (ECF No. 64-1 at J.R. 27-28, 30-31) ("By drastically reducing the number of resettlement slots available, Section 5(d) forces IRAP to invest significant time and energy exploring alternative routes to safety for its [approximately 700] clients" affected); Decl. of Mark

---

[8]     Neither refugee applicants at large nor the particular clients of IRAP and HIAS are themselves parties before the Court over whom the Court has jurisdiction to grant relief, so claimed harms to those cohorts do not support a preliminary injunction. *Cf. Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) ("In this case VSHL is the only plaintiff.   An injunction covering VSHL alone adequately protects it from the feared prosecution."), *overruled on other grounds by The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544 (4th Cir. 2012).

Hetfield ¶¶ 10-12 (ECF No. 64-1 at J.R. 10-11) (asserting financial harm because HIAS receives government funding on a per capita basis for refugees it serves, and HIAS's allotted share of refugees for fiscal year 2017 was reduced).

Redressing the claimed harms of Plaintiffs IRAP and HIAS does not require enjoining Section 5(d) altogether.   Rather, it only requires enjoining Section 5(d) as it applies to those organizations.   "The status quo to be preserved by a preliminary injunction," after all, is "the last uncontested status between the *parties* which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (emphasis added).   As to HIAS, status quo *ex ante* relief implies restoring its allotment of refugees for fiscal year 2017 to the original 4,794 (as set before Executive Order No. 13,769 was issued) from the revised 2,912.   *See* Decl. of Mark Hetfield, Exh. 2 (ECF No. 64-1 at J.R. 25).   IRAP, for its part, claims harm to itself on the basis of approximately 700 IRAP clients who IRAP says are affected.   *See* Decl. of Rebecca Heller ¶ 15 (ECF No. 64-1 at J.R. 30-31).   IRAP's claimed harm could, at most, support restoring that number of additional authorized refugee admissions for fiscal year 2017.   And even that number assumes, favorably for IRAP, that none of those 700 individuals will gain refugee admission within the allowance of 50,000 refugees under Section 5(d), and that all of those 700 individuals would otherwise have gained refugee admission under a cap of 110,000 refugees.

Accordingly, if the Court were to find a preliminary injunction is appropriate, restoring the status quo *ex ante* as to IRAP and HIAS is all the relief that is necessary—and, therefore, all that is permitted.   *See Kentuckians*, 317 F.3d at 436 (vacating "overbroad" district court injunction that "was broader in scope than that 'necessary to provide complete relief to the plaintiff' and . . . did not carefully address only the circumstances of the case").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated:  March 8, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ROD J. ROSENSTEIN
United States Attorney

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Director, Federal Programs Branch

*/s/ Arjun Garg*
ARJUN GARG (Bar No. 806537)
MICHELLE R. BENNETT (Bar No. 806456)
DANIEL SCHWEI
BRAD P. ROSENBERG
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8613
Fax: (202) 616-8470
E-mail: arjun.garg@usdoj.gov
        michelle.bennett@usdoj.gov

*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 8, 2017, I electronically filed the foregoing Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction of § 5(d) of the Executive Order using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

*/s/ Arjun Garg*
ARJUN GARG
