# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban Justice Center, Inc., on behalf of itself and its clients, 40 Rector St, 9th Fl New York, NY 10006; | |
| HIAS, Inc., on behalf of itself and its clients, 1300 Spring Street, Suite 500 Silver Spring, MD 20910; | Civil Action No.: 8:17-CV-00361-TDC |
| MIDDLE EAST STUDIES ASSOCIATION of North America, Inc., on behalf of itself and its members, 3542 N. Geronimo Avenue Tucson, AZ 85705; | |
| Muhammed Meteab 43 Jefferson Avenue Springfield MA 01107; | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Paul Harrison 1800 Fuller Wiser Road, #717 Euless, TX  76039-4610; | |
| Ibrahim Ahmed Mohomed 631 Brent Boulevard, Apt. C3 Columbus, OH 43228 | |
| JOHN DOES # 1 & 3; | |
| JANE DOE #2, | |
| *Plaintiffs*, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, 1600 Pennsylvania Avenue NW Washington, D.C. 20035; | |
| DEPARTMENT OF HOMELAND SECURITY, | |

Serve on:  John F. Kelly,
Secretary of Homeland Security
Washington, D.C. 20528;

DEPARTMENT OF STATE,
Serve on:  Rex W. Tillerson,
Secretary of State
2201 C Street NW
Washington, D.C. 20520;

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE,
Serve on:  Michael Dempsey,
Acting Director of National
Intelligence
Washington, D.C. 20511;

JOHN F. KELLY
In his official capacity as Secretary of
Homeland Security
Washington, D.C. 20528;

REX W. TILLERSON
In his official capacity as Secretary of State
2201 C Street NW
Washington, D.C. 20520;

MICHAEL DEMPSEY,
In his official capacity as Acting Director of
National Intelligence
Washington , D.C. 20511

*Defendants*.

**INTRODUCTION**

1.      On March 6, 2017, President Trump signed an Executive Order entitled "Protecting the Nation from Terrorist Entry into the United States" (the "March 6 Order" or "Executive Order"). The March 6 Order, which Plaintiffs challenge in its entirety, was intended and designed to target and discriminate against Muslims, and it does just that in operation.

2.      Once effective, the March 6 Order will rescind and replace a similar Executive Order, signed on January 27, 2017 (the "January 27 Order"; together, we refer to the January 27 and March 6 Executive Orders as the "Executive Orders"), that had the same purpose and effect, the implementation of which prompted chaos and widespread civil rights abuses in airports across the country. As a result of legal challenges to the January 27 Order, numerous courts enjoined several key provisions that banned the entry to the United States of both refugees and the nationals of seven predominantly Muslim countries.

3.      The major provisions of the March 6 Order are nearly identical to those of the January 27 Order. The new order bans individuals from six of the seven predominantly Muslim countries identified in the January 27 Order—Yemen, Libya, Somalia, Sudan, Iran, and Syria—from entering the United States for at least 90 days. Like the previous order, the March 6 Order suspends the entire United States Refugee Admissions Program for at least 120 days and reduces the number of refugees allowed into the United States for the current fiscal year from 110,000 to 50,000. The March 6 Order also contains language that associates Muslims with violence, terrorism, bigotry, and hatred, inflicting stigmatic and dignitary harms. As a result, the March 6 Order will have the same discriminatory and stigmatizing impact on Muslims as the January 27 Order, which was itself a product of the President's clearly expressed intent to prevent Muslims from entering the United States.

1

4.      While the March 6 Order contains various additions and revisions intended to insulate it from the legal claims that led to the enjoining of the January 27 Order, the Trump Administration has made clear that the March 6 Order is intended to effectuate the same policy outcome as the January 27 Order.  The March 6 Order likewise suffers from the same fundamental constitutional and statutory defects as the January 27 Order.

5.      The President has been very clear about his desire to prevent Muslims from entering the United States.  He specifically promised to do so as a candidate.  Presented with early objections to that proposal, he asked advisors how he could implement a Muslim ban indirectly, and they helped him craft the January 27 Order.  President Trump further admitted on national television that through the January 27 Order he intended to favor Christian refugees over Muslim refugees.  Rarely in American history has governmental intent to discriminate against a particular faith and its adherents been so plain.

6.      After key provisions of the January 27 Order were preliminarily enjoined, a Trump Administration spokesperson explained that the revised Executive Order (which was ultimately signed on March 6) would have only minor, technical changes from the original Order, and would thus produce the same basic policy outcome.  That basic goal and outcome was, and remains, the exclusion of Muslims from the United States.

7.      Like the January 27 Order, the March 6 Order violates two of our most cherished constitutional protections: the guarantee that the government will not establish, favor, discriminate against, or condemn any religion, and the guarantee of equal protection of the laws.

8.      The United States was born in part of an effort to escape religious persecution, and the Religion Clauses of the First Amendment reflect the harrowing history of our Founders.  More than two centuries later, our nation is one of the most religiously diverse in the world and has

2

become a sanctuary for immigrants and visitors of all faiths and no faith, including refugees fleeing persecution in their homelands.

9.     Both the January 27 Order and the March 6 Order fly in the face of our historical commitment to welcoming and protecting people of all faiths, and no faith, and it violates the "clearest command of the Establishment Clause"—"one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

10.     The United States was likewise founded on the principle that all people—regardless of their faith or where they are born—are created equal.  The March 6 Order—which, like the January 27 Order, was motivated by animus toward Muslims and expressly discriminates on the basis of national origin—runs afoul of this core constitutional value as well.

11.     Plaintiffs challenge the March 6 Order under the Establishment Clause; the equal protection guarantee of the Due Process Clause of the Fifth Amendment; the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*; the anti-discrimination provisions of the INA, 8 U.S.C. § 1152(a)(1)(A); the Refugee Act of 1980, as amended; and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(D).

12.     Plaintiffs respectfully request that the Court issue appropriate declaratory relief and preliminarily and permanently enjoin the March 6 Order as a whole.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution and federal statutes.  The Court has additional remedial authority under 28 U.S.C. §§ 2201-02.

14.     Venue is proper under 28 U.S.C. §1391(e) and Local Rule 501.4.a.ii.  Defendants are officers or employees of the United States acting in their official capacities, and agencies of the

United States. Plaintiffs HIAS and John Doe #1 reside in the Southern Division of this District. No real property is involved in this action.

## PARTIES

15.    Plaintiff International Refugee Assistance Project ("IRAP"), a project of the Urban Justice Center, Inc., provides and facilitates free legal services for vulnerable populations around the world, including refugees, who seek to escape persecution and find safety in the United States and other Western countries.

16.    Founded in 2008 as a student organization at Yale Law School, IRAP initially served Iraqi refugees who were victims of the Iraq War.  In 2010, IRAP became part of the Urban Justice Center and now has offices in New York as well as the Middle East.  IRAP has expanded its client base since its inception to assist refugees from Afghanistan, Egypt, Eritrea, Ethiopia, Iran, Jordan, Kuwait, Libya, Pakistan, Palestine, Somalia, Sudan, Syria, Turkey, and Yemen.  Through in-house casework, as well as supervision of 1,200 students from 29 law schools in the United States and Canada and pro bono attorneys from over 75 international law firms and multinational corporations, IRAP directly assists thousands of refugees in urgent registration, protection, and resettlement cases every year.

17.    IRAP lawyers provide legal assistance to refugees and other immigrants to the United States throughout the resettlement process.  IRAP lawyers advise their clients on the resettlement process, write legal briefs and compile physical evidence in advance of clients' interviews with United States Citizenship and Immigration Services ("USCIS"), prepare them for their oral testimony in their interviews, and then conduct regular follow-up with USCIS until the clients are safely resettled.

18.    IRAP assists many individuals in the United States who need assistance filing family reunification petitions for family members overseas.  IRAP also assists U.S.-based Iraqi and Syrian

citizens and lawful permanent residents in filing petitions in order to get their family members overseas into the Direct Access Program of the United States Refugee Admissions Program. Finally, IRAP also assists countless Iraqi and Afghan citizens who have served the United States government to obtain Special Immigrant Visas, with the support of U.S. citizen veterans of Iraq and Afghanistan.

19.     Since its inception, IRAP has helped to resettle over 3,200 individuals to 55 countries, with the majority resettled to the United States.  It has provided legal assistance to nearly 20,000 more individuals.

20.     The overwhelming majority of IRAP's clients, including clients abroad and those within the United States, identify as Muslim.

21.     As set forth in greater detail below, implementation of the Executive Orders has caused substantial harm to IRAP and its clients, and will continue to harm them.  IRAP asserts claims on behalf of itself and its clients in the United States and abroad.  The rights of its clients that IRAP seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own name.

22.     Plaintiff HIAS, the world's oldest refugee resettlement agency, is a faith-based organization that aims to rescue people around the world whose lives are in danger. The organization works toward a world in which refugees find welcome, safety, and freedom.  Founded in 1881 to assist Jews fleeing pogroms in Russia and Eastern Europe, HIAS now serves refugees and persecuted people of all faiths and nationalities around the globe.  Since HIAS's founding, the organization has helped more than 4.5 million refugees start new lives.

23.     HIAS has offices in twelve countries worldwide, including headquarters in Silver Spring, Maryland, which is its principal place of business, and another domestic office in New York City.  HIAS also provides resettlement experts in support of the United Nations High

Commissioner for Refugees (UNHCR).  Refugee resettlement lies at the heart of HIAS's work in the United States.  It is one of nine non-profit organizations designated by the federal government to undertake this humanitarian work through contracts with the Department of State and the Department of Health and Human Services.

24.      In 2016, HIAS provided services to more than 350,000 refugees and asylum seekers globally.  HIAS's client base includes refugees abroad and in the United States who are from Syria, Iraq, Iran, Sudan, Somalia, Yemen, Ukraine, Bhutan, the Democratic Republic of Congo, Afghanistan, Eritrea, Tanzania, Ethiopia, Burundi, South Sudan, Uganda, Russia, Belarus, and Burma, among other countries.  Many of these clients are Muslim.

25.      HIAS provides programs and services to refugees, including employment, psychosocial, and legal services. HIAS has also been approved to refer cases of particularly vulnerable refugees directly for third-country resettlement to the United States and other countries. Around the world, HIAS provides legal services to protect the rights of refugees, and to register, document, and secure the status of refugees.

26.      HIAS is also assigned clients via the State Department's allocation process, which determines which refugee clients will be resettled by HIAS.  For clients who have newly arrived in the United States, HIAS either provides direct resettlement services or partners with other organizations across the country to do so.  These services include arranging housing and providing essential furnishings, food, clothing, initial cash assistance, initial health screening, cultural and community orientation, and, through case management services, assistance with enrollment in English language classes and employment services, as well as referrals for health and legal services.

27.      HIAS, directly and through affiliated agencies, also provides assistance to refugee and asylee clients in the United States who are seeking to gain entry for family members abroad who

still face persecution.  As set forth in greater detail below, implementation of the January 27 Order has caused substantial harm to HIAS and its clients, and the March 6 Order will continue to harm them.  HIAS asserts claims on behalf of itself and its clients.  The rights of its clients that HIAS seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own name.

28.     Plaintiff Middle East Studies Association (MESA) is a non-profit learned society that brings together scholars, educators, and those interested in the study of the Middle East from all over the world.  From its inception in 1966 with 51 founding members, MESA has increased its membership to more than 2,400 and now serves as an umbrella organization for fifty-five institutional members.  MESA's membership includes both graduate students and faculty working in the field of Middle East studies.

29.     As set forth in greater detail below, MESA and its members will be harmed in a variety of ways by the Executive Order.  MESA asserts claims on behalf of itself and its members.

30.     Plaintiff John Doe #1 is a lawful permanent resident and national of Iran who lives in Montgomery County, Maryland.  He is a scientist.  He came to the United States in 2014 on an exchange visitor visa.  In 2016, he obtained his lawful permanent resident status through the National Interest Waiver program for people with extraordinary abilities.  His pioneering scholarly works are recognized as cutting edge in the sciences.  Both John Doe #1 and his wife, who is not a party, are non-practicing Muslims.

31.     Plaintiff John Doe #3 is a lawful permanent resident and national of Iran who lives in Anne Arundel County, Maryland.  He came to the United States in 2011 through the Green Card lottery.  John Doe #3 worked as a teacher in Iran, and currently works in the engineering field.

32.     Plaintif Jane Doe #2 is a U.S. citizen of Syrian origin who lives in Mecklenburg County, North Carolina. She is from a Muslim family and is enrolled in college where she is

studying to become a healthcare technician. She filed a family-based visa petition for her sister who is a Syrian refugee currently living in a refugee-designated area in Saudi Arabia with her husband and two young children.

33.     Plaintiff Mohammed Meteab is a lawful permanent resident of the United States who lives in Springfield, Massachusetts.  He came to the United States in 2015 as a refugee along with his wife and two children.  He now has a third child, a U.S. citizen born in the United States. Plaintiff Meteab is one of five brothers; he, his wife, his two elder children, and all five brothers are Iraqi.  One brother came to the United States as a refugee.  The other three brothers have been approved as refugees by the United Nations High Commission for Refugees and remain in Jordan, awaiting resettlement.  Two of the three are approved to come to the United States but do not yet have travel documents.  Mr. Meteab is a Sunni Muslim, as are his brothers.

34.     Plaintiff Paul Harrison is a citizen of the United States by birth who lives in Euless, Texas.  In November 2015, he met his partner, an Iranian national who lives in Tehran, Iran. In March 2016, Mr. Harrison petitioned for his partner—now his fiancé—to join him in the United States on a K-1 visa. After his November 2016 interview at the U.S. Embassy in Ankara, Turkey, his application was approved and administrative processing complete on January 17, 2017. A visa has not yet been issued, however.

35.     Plaintiff Ibrahim Ahmed Mohomed is a United States citizen of Somali origin who lives in Columbus, Ohio. He came to the United States as a refugee in 2009. In 2013, his wife and nine children were approved to come to the United States as refugees but they are still in Ethiopia awaiting authorization to travel to the United States to join Mr. Mohomed. Mr. Mohomed and his family are Muslim.

36.     As set forth in greater detail below, implementation of the Executive Orders has caused and will continue to cause harm to Plaintiffs Meteab, Harrison, Mohomed, Jane Doe #2 and John Does #1 and #3 (collectively, the "Individual Plaintiffs").

37.     Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Executive Orders challenged in this suit.

38.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").   CBP's responsibilities include inspecting and admitting immigrants and nonimmigrants arriving with U.S. visas at international points of entry, including airports and land borders.  USCIS's responsibilities include adjudicating requests for immigration benefits for individuals located within the United States.  ICE's responsibilities include enforcing federal immigration law within the interior of the United States.  The Executive Orders assign DHS a variety of responsibilities regarding their enforcement.

39.     Defendant U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government.  DOS is responsible for the issuance of immigrant and nonimmigrant visas abroad.  The Executive Orders assign DOS a variety of responsibilities regarding their enforcement.

40.     Defendant Office of the Director of National Intelligence ("ODNI") is an independent agency of the United States federal government. The ODNI has specific responsibilities and obligations with respect to implementation of the Executive Orders.

41.     Defendant Rex Tillerson is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Executive Orders by all DOS staff.  He is sued in his official capacity.

42.    Defendant John Kelly is the Secretary of Homeland Security.  Secretary Kelly has responsibility for overseeing enforcement and implementation of the Executive Orders by all DHS staff.  He is sued in his official capacity.

43.    Defendant Michael Dempsey is the Acting Director of National Intelligence, and has responsibility for overseeing enforcement and implementation of the Executive Orders by all ODNI staff.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### President Trump's Expressed Intent To Target Muslims and To Favor Christians Seeking to Enter the Country

44.    President Trump has repeatedly made clear his intent to enact policies that exclude Muslims from entering the United States and favor Christians seeking to enter the United States.

45.    On December 7, 2015, then-Presidential candidate Trump issued a statement on his campaign website.  Entitled, "DONALD J. TRUMP STATEMENT ON PREVENTING MUSLIM IMMIGRATION," the statement declared that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."

46.    The statement, which remains on President Trump's campaign website to this day, invokes stereotypes of Muslims, falsely suggesting that all Muslims believe in "murder against non-believers who won't convert" and "unthinkable acts" against women.

47.    Defending his proposed Muslim ban the next day, candidate Trump told Good Morning America, "What I'm doing is I'm calling very simply for a shutdown of Muslims entering the United States—and here's a key—until our country's representatives can figure out what is going on."

48.    When asked the same day on MSNBC how his Muslim ban would be applied by customs officials, candidate Trump said, "That would be probably—they would say, are you

Muslim?"  A reporter followed up by asking, "And if they said yes, they would not be allowed in the country[?]" Candidate Trump responded, "That's correct."

49.    Candidate Trump repeatedly reiterated his support for targeting Muslims seeking to enter the United States.

50.    On March 9, 2016, candidate Trump stated, "I think Islam hates us.  There's . . . a tremendous hatred there . . . . There's an unbelievable hatred of us . . . . We can't allow people coming into this country who have this hatred of the United States . . . and [of] people that are not Muslim . . . ."

51.    The next day, during a debate, candidate Trump said he would "stick with exactly" what he had said the night before.  When asked if he was referring to all 1.6 billion Muslims worldwide, he explained, "I mean a lot of them."  Candidate Trump stated later in the same debate, "There is tremendous hate.  There is tremendous hate.  Where large portions of a group of people, Islam, large portions want to use very, very harsh means."

52.    On March 22, 2016, candidate Trump stated that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country," adding, "You need surveillance.  You have to deal with the mosques whether we like it or not . . . . These attacks aren't . . . done by Swedish people. That I can tell you."

53.    The same day, candidate Trump stated on Twitter that a Democratic candidate for President, Hillary Clinton, wanted to "let the Muslims flow in."

54.    On June 13, 2016, candidate Trump stated, "I called for a ban after San Bernardino and was met with great scorn and anger.  But now many . . . are saying that I was right to do so."

55.    In an interview aired on 60 Minutes on July 17, 2016, when asked about the proposed Muslim ban, candidate Trump replied: "Call it whatever you want. We'll call it territories, ok?" Asked again whether Muslims would be banned, candidate Trump said that "there's nothing like"

the Constitution "[b]ut it doesn't necessarily give us the right to commit suicide, as a country, okay?" He again reiterated: "Call it whatever you want."

56.     In a July 24, 2016 interview on Meet the Press, candidate Trump was asked if a plan similar to the now-enacted Executive Order was a "rollback" from "[t]he Muslim Ban." Candidate Trump responded: "I don't think so. I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories."

57.     Candidate Trump continued: "People were so upset when I used the word Muslim. Oh, you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim."

58.     This explanation that the Muslim ban would use nationality as a proxy was later confirmed by Rudolph Giuliani, an advisor to candidate Trump and later an advisor to him as President. After the Executive Order was signed, Mr. Giuliani explained that "when [candidate Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" In response to this edict, according to Mr. Giuliani, the commission decided to focus on territories, rather than explicitly naming Muslims as the subjects of the ban.

**The January 27 Order**

59.     After conducting a campaign in which a ban on Muslim admissions was a key promise, President Trump took action to carry out that promise by issuing the January 27 Order one week after being inaugurated.

60.     Statements made by President Trump and his advisors around the time of the signing of the January 27 Order confirm President Trump's intent to discriminate against Muslims. In an interview with the Christian Broadcasting Network released the same day that he signed the January 27 Order, President Trump stated that the Order was designed to give Christians priority

when applying for refugee status. "If you were a Muslim you could come in [to the United States], but if you were a Christian, it was almost impossible," he said. "[T]hey were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them."

61.     Consistent with this expressed religious animus towards Muslims and preference for Christians, the January 27 Order disfavors Muslims while giving special treatment to non-Muslims.

62.     Section 3, for example, bans any entry for 90 days for individuals from seven countries, each of which is more than ninety percent Muslim: Syria, Sudan, Iraq, Iran, Libya, Somalia, and Yemen.

63.     The January 27 Order does not single out any countries for disfavored treatment that are not majority-Muslim.

64.     The January 27 Order provides a mechanism for the government to extend and/or expand the 90-day ban at the end of the 90 day period. Sections 3 of the Order directs the Secretary of Homeland Security to "immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat," and to "submit to the President a report on the results of the review … within 30 days of the date of this order." At that point, the "Secretary of State shall request all foreign governments that do not supply such information to start providing such information," and 60 days after that—precisely at the end of the initial 90 day ban period—the January 27 Order provides for the President to issue a proclamation indefinitely banning travelers from a list of countries deemed to be non-compliant "until compliance occurs." On information

and belief, the 30-day review to be conducted by the Secretary of Homeland Security has not yet resulted in a report to the President.

65.     Section 5 of the January 27 Order prohibits refugee admissions for 120 days, except for Syrian refugees, who are banned indefinitely.

66.     The January 27 Order discriminates between persons of majority and minority faiths in their country of origin.  Section 5(b) requires the government to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality" once the 120-day ban on refugee admissions is complete.

67.     During those 120 days, moreover, Section 5(e) allows the admission of certain refugees on a discretionary case-by-case basis, "only so long as [the Secretaries of State and Homeland Security] determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution."

68.     As the President conceded, these provisions are intended to allow Christian refugees to enter the United States, even while Muslim refugees from the same countries are prohibited from doing so.   And indeed, Muslims would be severely disadvantaged under the minority-faith preferences set forth in Sections 5(b) and 5(e).  During the past three fiscal years, only 12% of Muslim refugees hailed from a country where Islam is a minority faith.

69.     There is no statutory, regulatory, or constitutional basis for favoring refugees from minority faiths over refugees from majority faiths.  There is no basis in the Refugee Act of 1980, as amended—which governs the admission of refugees to the United States and their resettlement herein—to prioritize refugees fleeing persecution on the basis of religion, as opposed to other congressionally-recognized bases.  *See* 8 U.S.C. § 1101(a)(42) (defining "refugee").

70.     Section 5(d) reduces, by more than half, the annual refugee admissions allotment that was set prior to the current fiscal year by President Obama (reducing from 110,000 to 50,000).

71.     Upon information and belief, as of February 2017, approximately 41,000 refugees had already been resettled in the United States.  Upon information and belief, the number of refugees already somewhere in the U.S. Refugee Admissions Program pipeline—well over 50,000—would put the U.S. refugee resettlement total above Section 5(d)'s reduced admissions allotment of 50,000.

72.     As a result, upon information and belief, Defendants have already undertaken various actions to bring to a halt the U.S. refugee resettlement process as a result of Section 5(d)'s reduction in this fiscal year's figure.

73.     For example, upon information and belief, shortly after the January 27 Order was signed, USCIS, a component of Defendant Department of Homeland Security, cancelled nearly all refugee processing interviews abroad.

74.     Additionally, upon information and belief, Defendant Department of State has suspended security checks for refugees, a process that typically takes between 18-24 months.

75.     Upon information and belief, Section 5(d)'s reduction in the annual refugee admissions allotment has all but ground to a halt the United States' refugee resettlement process.

76.     Furthermore, Section 5(g) seeks to expand the limited role State and local governments have in the refugee resettlement process beyond that envisioned by Congress in order to authorize and facilitate the recently-stated desire and intent of some states and localities in the United States to discriminate against lawfully-admitted refugees on the basis of their nationality and/or religion. *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902 (7th Cir. 2016) (affirming preliminary injunction on equal protection grounds of state executive order issued by then-

Governor of Indiana, Mike Pence, that sought to prevent the resettlement in the State of refugees from Syria).

77.     In addition to Sections 3 and 5, other sections of the January 27 Order reinforce stereotypes about Muslims and discriminate against them.   Multiple sections, for example, associate Muslims with violence, bigotry, and hatred, inflicting stigmatic and dignitary harms, among other types of injury.   These include Sections 1 and 2, which portray the ban as protecting citizens from foreign nationals "who would place violent ideologies over American law" and "who intend to commit terrorist attacks in the United States"; and Section 10, which requires the Secretary of Homeland Security to periodically publish information about the number of "foreign nationals" involved in, among other things, terrorism-related activities, radicalization, and "gender-based violence against women, including honor killings"—direct echoes of then-candidate Trump's broad statements denigrating Islam and Muslims.

78.     Further, on information and belief, since the January 27 Order was signed, CBP has questioned foreign nationals entering from certain countries about their religious beliefs to determine whether or not they are Muslim, and has subjected Muslim travelers from countries other than the seven designation nations to disproportionate and unwarranted scrutiny and interrogation.

79.     There is no sound basis for concluding that Muslims generally, or Muslims from particular countries, are more likely to commit violent acts of terror.

80.     A previous program to track certain foreign nationals predominantly from Muslim-majority countries, the National Security Entry-Exit Registration System ("NSEERS"), did not lead to the conviction or even identification of a single terrorist, even though it subjected tens of thousands of people to additional screening and investigation.

81.     Many alternatives exist that do not involve targeting individuals based on their faith or using nationality as a proxy for faith, are less restrictive than the January 27 Order, and are more closely tailored to legitimate national security concerns.

82.     The January 27 Order remains in effect until March 16, 2017, when the March 6 Order becomes effective and rescinds and replaces the January 27 Order.

### The Chaotic and Irregular Implementation of the January 27 Order

83.     The preparation and implementation of the January 27 Order were extremely unusual and chaotic. Upon information and belief, the White House bypassed regular channels for input and cooperation with other components of the Executive Branch, including the Secretaries of Homeland Security, Defense, and State.  Moreover, upon information and belief, CBP was not given clear operational guidance during critical times in the implementation of the January 27 Order.

84.     The January 27 Order was signed without final review or legal analysis from DHS, which—along with the DOS—is principally charged with implementing the Order.

85.     Secretary of Homeland Security Kelly was reportedly in the midst of a conference call to discuss the January 27 Order when someone on the call learned from watching television that the Order they were discussing had been signed.

86.     Similarly, Secretary of Defense Mattis, who had publicly criticized President Trump's proposal to ban Muslims from the United States, reportedly did not see a final version of the January 27 Order until the day it was signed and was not consulted during its preparation.

87.     The January 27 Order did not arise out of the usual process of consulting with the relevant cabinet-level officials and agencies before issuing an Executive Order. Instead, the January 27 Order was primarily drafted by a small team of Presidential aides, overseen by chief White House strategist Stephen K. Bannon.

88.     Mr. Bannon has previously made anti-Muslim comments. He criticized former President George W. Bush for referring to Islam as "a religion of peace," calling President Bush "one of the dumbest presidents in the history of these United States."

89.     Congressional staff who worked on the January 27 Order reportedly were required to sign nondisclosure agreements, and not even the members of Congress they served were allowed to know of their work on the January 27 Order.  On information and belief, this arrangement was also highly unusual.

90.     During the days leading up to and following the signing of the January 27 Order, its scope and provisions were changed without any rational relationship to the purported reasons for the January Order.

91.     For example, the night before the January 27 Order was signed, the Department of Homeland Security issued guidance interpreting § 3(c) of the January 27 Order as not applying to lawful permanent residents.  Overnight, the White House overruled that guidance, applying the January 27 Order to lawful permanent residents subject to a case-by-case exception process, in a decision closely associated with Mr. Bannon.

92.     After the detention at airports of many individuals, including lawful permanent residents, led to chaos nationwide, Secretary Kelly issued a statement "deem[ing] the entry of lawful permanent residents to be in the national interest."  Secretary Kelly's statement was made pursuant to Section 3(g) of the order, which requires such a decision to be made jointly with the Secretary of State and "on a case-by-case basis."

93.     Finally, on February 1, the Counsel to the President purported to interpret the January 27 Order as exempting lawful permanent residents from the ban entirely.

94.     Similarly, initial guidance from the Department of State indicated that individuals with dual citizenship, with one country of citizenship subject to the ban, would be banned from entering

the United States.  Word of a change in that policy spread irregularly, with notice being given to airlines and foreign nations but contradicted in official U.S. government communications.

95.     Finally, CBP announced a changed policy, explaining, in response to the question "Does 'from one of the seven countries' mean citizen, national or born in?" that "Travelers are being treated according to the travel document they present."  According to this policy, currently in place, the very same individual both is and is not subject to the travel ban depending only on the travel document she presents.

96.     The government also reversed itself on its policy toward holders of Special Immigrant Visas from Iraq. Holders of these visas are clearly banned under the terms of the January 27 Order, and they were refused entry when it went into effect.  However, on February 2, 2017, the government changed course and allowed them to enter the United States despite the January 27 Order.

97.     Still other aspects of the January 27 Order and its implementation demonstrate utter disregard for the individuals affected by it.  For example, the Administration knew that the January 27 Order would bar the entry of individuals who were literally mid-air when the order was issued. Nonetheless, and absent any exigency that would justify it, the order was signed late on a Friday afternoon.  That decision had a number of predictable consequences, including: making it more difficult for the federal employees tasked with enforcing the order to obtain instruction on how to interpret and enforce the order's sloppily-written provisions; prolonging the detentions at airports of those affected, and leading many to be wrongfully deported; and increasing the difficulty advocates had in accessing their clients and the courts.

98.     In a tweet on January 30, 2017, President Trump appeared to justify the rushed implementation of the January 27 Order by claiming that "[i]f the ban were announced with a one

19

week notice, the 'bad' would rush into our country during that week.  A lot of bad 'dudes' out there!"

99.    Even once advocates were able to access the courts and obtain temporary injunctive relief against aspects of the Executive Order, DHS officials frequently refused or otherwise failed to comply with the court orders, undermining bedrock constitutional principles and inflicting further unlawful injury on the affected individuals.

100.    Other actions taken by DHS and DOS to enforce the January 27 Order exhibit a zealous desire to go beyond even the draconian measures the order actually requires.

101.    Notwithstanding that Section 3 of the January 27 Order only bars "entry into the United States of aliens from" one of the aforementioned seven Muslim-majority countries, DHS interpreted it to prohibit the granting of *any* immigration-related benefit to anyone from those countries—including to individuals who are already in the United States.  That decision would have wide-ranging consequences, including: delaying naturalization of lawful permanent residents ("LPRs") from those countries who wish to become U.S. citizens; rendering asylees from those countries unable to be lawfully employed once their Employment Authorization Documents expire; and either expelling or making undocumented any individuals here on nonimmigrant visas (including student, employment, and tourist) that otherwise would have been renewed.

102.    DOS, at the request of DHS, issued a letter purporting to provisionally revoke *all* immigrant and nonimmigrant visas of nationals of the seven designated countries on a categorical basis.  The letter is dated January 27, 2017, but only came to light on January 31, 2017, when Department of Justice lawyers filed it in pending litigation.  DOS has stated that this action was taken to "implement[]" the Executive Order.

103.    Upon information and belief, DOS has never before revoked a broad swath of valid visas in this manner.  Nor, on information and belief, is visa revocation ordinarily undertaken in

secret, with no notice to the visa holder and no individualized consideration of whether any particular visa should be revoked.

104.    Still further evidence of discriminatory intent and effect is reflected in the statements by President Trump and his Administration seeking to defend and justify the January 27 Order after it was issued.

105.    President Trump, for example, falsely stated that only 109 people were detained over the weekend following the issuance of the January 27 Order, even though he knew or should have known that the number was far higher.

106.    Indeed, pursuant to a federal district court order, the federal government has since revealed that at least 746 individuals were detained over a period of just 27 hours during the weekend after the January 27 Order was signed.  This 27-hour period did not begin until a day after the January 27 Order went into effect.

107.    These chaotic, irregular, and irrational policies, policy changes, and statements indicate that the purported justifications for the January 27 Order are pretextual and that it was at least substantially motivated by an intent to discriminate against Muslims.

**The Nationwide Preliminary Injunction Enjoining the January 27 Order**

108.    A February 3, 2017, order issued by the District Court for the Western District of Washington currently prohibits the government from enforcing Sections 3(c), 5(a), 5(b), and 5(e) of the January 27 Order.  Upon issuance of this Order, which the District Court described as a temporary restraining order, the government appealed to the Ninth Circuit and sought a stay pending appeal.

109.    After hearing oral argument, the Ninth Circuit declined to stay the Order, noting that "although courts owe considerable deference with respect to immigration and national security, it

is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

110.   In reaching its holding, the Court noted that "[t]he government has pointed to no evidence that any alien from any of the countries named in the order has perpetrated a terrorist attack in the United States." *Id.* at 1168.

111.   The Court also acknowledged "evidence of numerous statements by the President about his intent to implement a 'Muslim ban'" and observed that "[i]t is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." *Id.* at 1167.

112.   The Court also found that the February 3 Order, although styled a TRO, should be treated as a preliminary injunction.

113.   Shortly after the Ninth Circuit's opinion issued, President Trump tweeted, "SEE YOU IN COURT, THE SECURITY OF OUR NATION IS AT STAKE!" He subsequently denounced the opinion as "a political decision" and stated, "[W]e're going to see them in court, and I look forward to doing that. It's a decision that we'll win, in my opinion, very easily."

114.   On March 7, 2017, the government withdrew its appeal of the February 3 Order, leaving in place the preliminary injunction of Sections 3(c), 5(a), 5(b), and 5(e) of the January 27 Order.

**The March 6 Order**

115.   In the weeks preceding the issuance of the March 6 Order, Stephen Miller, a senior advisor to President Trump, explained that the administration was preparing a new executive order "to be responsive to the judicial ruling" of the Ninth Circuit. He explained that the changes would be "mostly minor, technical differences. Fundamentally, you are still going to have the same, basic policy outcome for the country."

22

116.    Consistent with Mr. Miller's statement, the March 6 Order, explicitly referring to the Ninth Circuit's ruling, exempts certain categories of noncitizens that have "prompted judicial concerns" from the ban, and alters the original order's "approach to certain other issues or categories of affected aliens" "in order to avoid spending additional time pursuing litigation" over the constitutionality of the January 27 Order.

117.    Indeed, notwithstanding an expanded "Policy and Purpose" section and certain other changes discussed more fully below, the March 6 Order is extremely similar to the January 27 Order in most important respects.

118.    Like the January 27 Order, the March 6 Order bans entry for a new 90 day period for individuals from the six of the same seven predominantly Muslim countries identified in the January 27 Order: Syria, Sudan, Iran, Libya, Somalia, and Yemen (Section 2(c)).

119.    Like the January 27 Order, the March 6 Order also provides a mechanism for the government to extend and/or expand the 90-day ban at the end of the 90 day period. Section 2 of the Order directs the Secretary of Homeland Security to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat."  In addition, the March 6 Order explicitly provides that the review need not be conducted in a consistent matter between countries: "The Secretary of Homeland Security may conclude that certain information is needed from particular countries even if it is not needed from every country." Again, the order provides for the submission of a report on this review within 30 days of the date of the order, a period (50 days rather than 60) for countries to respond to the order, and a provision for the President to thereafter issue a proclamation indefinitely banning travelers from a list of countries deemed to be non-compliant.

120.    The corresponding provisions of the January 27 Order were never suspended and remain in effect.

121.    The country-by-country report required by the January 27, 2017 Order was due on February 26, 2017, eight days before the March 6 Order was issued. On information and belief, this report was not produced.

122.    The March 6 Order states that "Iraq presents a special case" because of the "close cooperative relationship between the United States and the democratically elected Iraqi government" and because the "Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal" (Section 4).  With this justification, the March 6 Order exempts foreign nationals of Iraq from the categorical ban on entry applicable to other countries originally targeted by the January 27 Order.  Instead, Iraqis are subject to "thorough review" and "consideration of whether the applicant has connections with ISIS or other terrorist organizations."

123.    Like the January 27 Order, the March 6 Order allows for waivers to this ban on a discretionary case-by-case basis (Section 3(c)).  In contrast to the January 27 Order, which simply stated that visas and other immigration benefits may be issued "when in the national interest," the March 6 Order provides nine examples of situations in which a waiver would be appropriate, such as when "the foreign national is an infant, a young child or adoptee" or "an individual needing urgent medical care" (Sections 3(c)(i)-(ix)). These and other similar circumstances enumerated in the March 6 Order reflect specific examples of individuals whose denial of entry pursuant to the January 27 Order resulted in the filing of lawsuits and widespread public outcry.

124.    The March 6 Order also contains exceptions to this ban for, among others, lawful permanent residents and dual nationals traveling on passports issued by a non-designated country (Section 3(b)).

125.    Like the January 27 Order, the March 6 Order cuts the number of refugees admissible to the United States for fiscal year 2017 from 110,000 to 50,000 and prohibits refugee admissions for 120 days, with an exception for discretionary case-by-case admissions (Sections 6(a), 6(b)). The March 6 Order also expressly suspends decisions on applications for refugee status for 120 days (Section 6(a)).

126.    Defendant Department of State has informed Plaintiff HIAS that only refugees who are already booked for travel to the United States arriving at their port of entry through the end of March 15, 2017, i.e., before the March 6 Order's effective date of March 16, 2017 at 12:01 am, will be permitted to enter the United States. Defendant Department of State has indicated that no further bookings may be made.

127.    Defendant Department of State has informed Plaintiff HIAS that all DHS screening interviews will continue to be suspended until further notice, unless exceptions are arranged on an individual basis.

128.    Defendant Department of State has informed Plaintiff HIAS that no new Interagency Checks (IAC) and Security Advisory Opinion (SAC) security checks may be requested.  Upon information and belief, all refugees must undergo both IAC and SAO security checks before traveling and being admitted to the US.

129.    In addition to the provisions discussed above, the March 6 Order contains near-verbatim reproductions of all the other substantive provisions of the January 27 Order, including:

- Former Section 4(a), now Section 5(a), which requires the Secretaries of State and Homeland Security, the Attorney General, and the Director of National Intelligence to implement uniform screening standards to identify individuals "who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of

violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry."

- Former Section 5(g), now Section 6(d), which seeks to expand the limited role State and local governments have in the refugee resettlement process, potentially facilitating the stated desire and intent of some states and localities in the United States to discriminate against lawfully-admitted refugees on the basis of their nationality and/or religion. *See, e.g.*, *Exodus Refugee Immigration*, 838 F.3d 902.

- Former Section 6, now Section 7, which directs the Secretaries of State and Homeland Security to consider rescinding certain waivers of terrorism-related inadmissibility grounds ("TRIG waivers") authorized by previous administrations. TRIG waivers have historically been used to facilitate the admission to the United States of certain individuals or groups of individuals—often refugees fleeing persecution—who have been forced to give aid to terrorist organizations under duress.

- Former Section 8, now Section 9, which suspends the Visa Interview Waiver Program.

- Former Section 10, now Section 11, which requires the Secretary of Homeland Security to periodically publish information about the number of "foreign nationals" involved in, among other things, terrorism-related activities, radicalization, and "gender-based violence against women, including so-called 'honor killings.'"

130.    The signing and implementation of the March 6 Order was reportedly delayed because of the positive media reviews President Trump received after his address to a joint session of Congress on February 28, 2017.  Although the Trump Administration had previously intended on releasing the revised executive order the following day, on March 1, 2017, White House officials stated that they delayed the release of the revised Executive Order so that President Trump's speech could continue to receive positive press attention.

131.    Upon information and belief, the delay following President Trump's congressional address marked the third time the administration put off the issuance of the revised Executive Order.

132.    Before signing the March 6 Order, President Trump ordered the Department of Homeland Security and the Department of Justice to produce an intelligence report to demonstrate that the seven Muslim-majority countries originally identified in the January 27 Order present a substantial security threat and have exported terrorism to the United States.

133.    Upon information and belief, such an attempt to reverse-engineer a national security justification for an executive action is not common practice.

134.    In response, analysts at the Department of Homeland Security prepared a draft report, released to the press on February 24, 2017, indicating that there was insufficient evidence that the nationals of the seven Muslim-majority countries included in in the January 27 Order pose a terror threat to the United States.

135.    The draft report found that citizenship is an "unlikely indicator" of terrorism threats to the United States, and that few people from the countries identified in the January 27 Order have carried out attacks or been involved in terrorism-related activities in the United States since Syria's civil war started in 2011.

136.    A second Department of Homeland Security report, dated March 1, 2017, found that of the limited number of the foreign-born, U.S.-based violent extremists, most become radicalized after living in the U.S. for a number of years.

137.    The Executive Order does not acknowledge or rely on either of these recent, specific security appraisals from the Department of Homeland Security. Instead, it relies on the State Department's Country Reports on Terrorism 2015 (June 2016).  In relying on those reports, however, the Order disregards other countries that the State Department describes as safe havens

for terrorists, and that pose a similar if not larger threat. For example, the State Department noted in its 2015 chapter on Terrorist Safe Havens that Venezuela has become a haven for terrorist groups, explaining that the country's "porous border with Colombia has made [it] attractive to the Revolutionary Armed Forces of Colombia and the National Liberation Army." Similarly, the State Department concluded that "[t]here are ungoverned, under-governed, and ill-governed areas of Mali that terrorist groups have used to organize, plan, raise funds, communicate, recruit, train and operative in relative security."

138.    The Secretary of Homeland Security also said in an interview that many other countries not banned in the Executive Order raise similar security concerns. "There's probably thirteen or fourteen other countries—not all of them Muslim countries, not all of them in the Middle East— that have very questionable vetting procedures that we can rely on."

139.    The Order also states that "more than 300 persons who entered the United States as refugees are currently subjects of counterterrorism investigations by the Federal Bureau of Investigation." The Order does not note that very few F.B.I. initial assessments of terrorism threats become intensive investigations: for example, in the four months from December 2008 to March 2009, the F.B.I. began 11,667 "assessments" related to terrorism, only 427 of which—less than 4%—led to more intensive investigations.

140.    Over 970,000 individuals have been admitted to the United States as refugees between 2001 and the present.

141.    The March 6 Order was motivated by the same anti-Muslim purpose that motivated the January 27 Order. In replicating much of the substance of the January 27 Order, the March 6 Order seeks to prevent the entry of Muslims into the United States and reinforces stereotypes about Muslims by associating them with terrorism, violence, bigotry, and hatred.  .

142.    White House spokesperson Sean Spicer echoed these comments on March 6, explaining, after President Trump signed the revised Order, "The principles of the executive order remain the same."

### The Grave Harm to Plaintiffs and Their Clients

143.    Implementation and enforcement of the January 27 Order has already caused Plaintiffs and their clients substantial, concrete, and particularized injury. Implementation of the March 6 Order threatens them with continued irreparable harm if not permanently enjoined.

144.    Both Executive Orders suspend refugee resettlement and intentionally discriminate against Muslims.  Both Executive Orders therefore frustrate IRAP's mission and impose a significant burden on IRAP's work.  As a direct result of the imposition and enforcement of the January 27 Order, IRAP and its clients have suffered substantial, concrete injuries.  Because the March 6 Order is substantively the same, these injuries will continue once the March 6 Order takes effect.

145.    IRAP serves refugees and displaced persons of all faiths, but the vast majority of its clients are Muslim.  IRAP counsels persecuted individuals on various legal avenues to safe countries and represents them throughout these processes, with a majority of its clients resettling in the United States.

146.    The January 27 Order has already severely restricted IRAP's ability to carry out its work and mission.  In the ten days immediately following the issuance of the January 27 Order, IRAP provided assistance to more than forty individuals from Iraq, Iran, Sudan, Libya, Syria, Somalia, and Yemen who, despite being vetted and given permission to enter the United States, had been prevented by the Order from doing so.

147.    Of IRAP's 599 open cases, 402 families are from Syria, Iran, Sudan, Somalia, Libya, or Yemen or are refugees from other countries and therefore potentially affected by the new March

6 Order.  IRAP has already used a significant portion of its financial resources and time to represent these 402 families through legal adjudications and to provide counseling through the demanding vetting process.  Restricting issuance of visas wastes that investment of resources and time.

148.    Furthermore, the March 6 Order will create a significant backlog in the U.S. Refugee Admissions Program, delaying the processing of many of IRAP's clients' cases.  This delay forces IRAP to exhaust more of its resources, as the average lifespan of a case now grows significantly.

149.    IRAP attorneys are not providing only limited representation in certain new cases, which, prior to the Executive Order would have received full representation, as a result of the exorbitant delays in USRAP processing that the Executive Order will cause.

150.    IRAP relies on volunteers from its law school chapters and pro bono firms to meet the needs of their vast client base. With the increased demands of their caseload resulting from the Executive Order, IRAP now has very limited capacity to open new law school chapters or begin new relationships with law firms to place cases for direct representation.

151.    Under the Executive Order's freeze of the USRAP, IRAP may also be unable to place new cases with existing chapters or law firms because there is no movement on any refugee cases. IRAP risks losing hundreds of volunteers, and relationships with numerous law firms, because they are unable to provide them with a way to partner with them on cases.

152.    IRAP's law firm partners also provide financial support to IRAP. If IRAP no longer has cases to place at law firms, and thus have to decrease our number of law firm partners, it will significantly cut into the corporate funding IRAP receives.

153.    As a result of the Executive Order, IRAP's Resettlement Deployment Scheme with UNHCR, which allows IRAP resettlement experts since early 2016 to be deployed to UNHCR for assisting with their resettlement operations, may be terminated due to the drastic decrease in

resettlement slots available in the United States and worldwide. This would lead to the termination of three IRAP staff as well as a revenue loss of approximately $260,000.

154.    The delay also endangers the lives of IRAP's clients, because the longer it takes for their cases to be decided, the longer they are in life-threatening environments.  In addition, some of the IRAP clients abroad have family ties to IRAP clients already in the United States, and those U.S. clients are suffering harm as a result of the ongoing delay in reunification with their family members, as well as the risk that their family members may suffer persecution or death in the meantime.

155.    Both the January 27 Order and the March 6 Order, moreover, marginalize IRAP's Muslim clients, subject them to suspicion, scrutiny, and social isolation on the basis of religion and national origin, and inflict stigmatic and dignitary injuries.  IRAP clients who are already inside the U.S. are afraid and fear they are not welcome. Some IRAP clients have been subjected to harassment by law enforcement agencies allegedly conducting "new" security checks. Others have been detained at airports, or rejected from flights multiple times even though they are presenting valid visas.

156.    Both the January 27 Order and the March 6 Order, furthermore, have forced IRAP to devote substantial resources to addressing the order's effects on IRAP's clients and those similarly situated.  Following the signing of the January 27 Order on January 27, 2017 at 4:42 P.M. EST, two IRAP clients, Mr. Hameed Khalid Darweesh and Mr. Haider Sameer Abdulkhaleq Alshawi, were detained at John F. Kennedy Airport ("JFK") despite having valid entry documents.  As a result, IRAP attorneys were present at JFK from 2 am to 6:30 pm on January 28, 2017 attempting to secure their lawful release.  Furthermore, together with co-counsel, IRAP filed a habeas petition on behalf of those two clients, together with a motion for class certification (*Darweesh et al. v. Trump et al.*, No. 1:17-cv-480 (E.D.N.Y. filed Jan. 28, 2017)).  That litigation is ongoing.  These

actions are not in the scope of normal IRAP legal assistance, as previous IRAP clients were allowed to enter at U.S. Ports of Entry after receiving final approval to travel.

157.    Both the January 27 Order and the March 6 Order have further caused IRAP to divert its resources as IRAP has become the focal point organization for volunteer attorneys all across the country who have gone to airports to attempt to secure the release of individuals detained pursuant to both Executive Orders.  In addition to being the first organization to put out a call to volunteer attorneys, IRAP created and maintains a unique hotline email address (airport@refugeerights.org) to advise attorneys and affected individuals.  Since the creation of this email address on January 28, 2017, IRAP has received and responded to over a thousand email messages.  IRAP has also developed templates and informational materials for attorneys, affected family members in the United States, and individuals overseas who have been denied travel pursuant to the Order.

158.    IRAP also provides safe housing for clients whose lives are in immediate danger while they await the outcomes of USRAP. Clients in urgent situations who face additional four-month delays on their applications (at a minimum) will require IRAP to expend significant funding to ensure continued safe housing.

159.    HIAS and its clients have likewise been significantly harmed by the January 27 and March 6 Orders.  HIAS's refugee resettlement work is grounded in, and an expression of, the organization's sincere Jewish beliefs. The Torah, Judaism's central and most holy text, commands followers to welcome, love, and protect the stranger.  The Jewish obligation to the stranger is repeated throughout the Torah, more than any other teaching or commandment.  HIAS believes that this religious commandment demands concern for and protection of persecuted people of all faiths.  The Torah also teaches that the Jewish people are to welcome, protect, and love the stranger because "we were strangers in the land of Egypt" (Leviticus 19:34).  Throughout their history,

violence and persecution have made the Jewish people a refugee people.  Thus, both history and values lead HIAS to welcome refugees in need of protection.  A refusal to aid persecuted people of any one faith, because of stigma attached to that faith, violates HIAS's deeply held religious convictions.

160.    Like the January 27 Order, the March 6 Order severely impedes HIAS's religious mission and work by intentionally discriminating against Muslims and prohibiting the entry of all refugees into the United States for 120 days.

161.    Before the January 27 and March 6 Orders were signed, arrangements had been made for many of HIAS's refugee clients to arrive in the United State in January, February, and the coming months.  Despite having been previously vetted and granted refugee status, however, clients from Iran, Sudan, Somalia, Ukraine, Bhutan, the Democratic Republic of Congo, Afghanistan, Eritrea, Tanzania, Ethiopia, Uganda, Russia, Belarus, and Burma were delayed in or prevented from entering the country because of the January 27 Order.  If the Temporary Restraining Order barring enforcement of the January 27 Order is lifted, or if the March 6 Order goes into effect, HIAS's clients will continue to face significant delays or be denied entry into the United States altogether.

162.    Specifically, HIAS has identified nearly 1,400 clients worldwide who were allocated through the Department of State process, have been vetted, and have been approved for refugee status.  These refugees have already been allocated and assured to one of HIAS's resettlement sites.  Of these clients, less than 60 have been scheduled for travel following the signing of the March 6 Order.  That means that any travel for the remaining approved refugees will be significantly delayed, and many will be unable to come at all in this Fiscal Year.

163.    Under the Executive Order, the earliest that refugee resettlement could resume would be early July 2017.  This would leave Resettlement Agencies, at most, with only two-and-a-half

months before the end of the fiscal year to resettle hundreds or thousands of refugees who were supposed to be resettled over a much longer period of time.  Refugee processing would be impacted by the 120-day ban since security checks and processing would be suspended during that time.  Because security and medical clearances have expiration dates, it is likely that some refugees would lose their readiness for travel during the suspension period and lengthy checks would need to be repeated.

164.    In addition, after the January 27 Order was issued, the U.S. Department of State notified HIAS that its resettlement commitment will be cut by 39 percent for the remainder of FFY 2017 due to the Order's drastic reduction in the planned level of refugee admission from 110,000 to 50,000.  Thus, some of HIAS's clients who have been vetted and approved as refugees will simply not be able to enter the country in FFY 2017.

165.    Of the nearly 1,400 HIAS clients worldwide who were allocated through the Department of State process, have been vetted, and have been approved for refugee status, 500 are nationals of one of the six banned countries.  The overwhelmingly majority of these individuals are Muslim.  Because they are national of the six banned countries, they will likely be ineligible for the case-by-case exception to the 120-day ban on for refugee applicants set forth in Section 6(c) of the March 6 Executive Order.

166.    Every day that HIAS clients' entry is delayed, they remain in precarious situations.

167.    Many of HIAS's clients abroad, whose refugee status has been approved but have yet to be scheduled for travel, including clients from the six banned countries, have family members in the United States, also HIAS clients, who will suffer as a result of the delay in reuniting with their family members.  Some of these U.S. ties are, in fact, individuals who petitioned for refugee status (often through HIAS) for their family members.

34

168.    In addition, more than 1,300 refugee applications initiated through HIAS by family members residing in the United States remain pending for HIAS clients abroad.  The adjudication of these applications has been or will be substantially delayed because of the March 6 Order.  In fact, since the Orders were signed, consideration of most refugee applicant cases in need of security checks have been suspended.  This means that, for many refugees in the pipeline, security checks that typically lasted 18-24 months will now be paused and restarted, potentially adding years to their wait for stable resettlement.  The delay in processing of these applications will subject these clients to further risk of persecution and abuse in their current situations, and their family members who petitioned for them to come to the United States will remain in limbo as to whether they will ever be reunited.

169.    The Executive Orders convey an official message of disapproval and hostility toward HIAS's Muslim clients, making clear that the government deems them outsiders, not full members of the political community.  HIAS's Muslim clients in the United States have been marginalized as a result of this anti-Muslim message, have been subjected to baseless suspicion, scrutiny, and social and political isolation on the basis of religion and national origin, and have suffered other dignitary and stigmatic injuries.

170.    Additionally, as a result of the January 27 Order, at least one of HIAS's Muslim clients in the United States was detained at an airport for an extended period, handcuffed and separated from his family, and many other clients have otherwise had their travel significantly delayed.

171.    Because HIAS is a non-profit resettlement organization that has a cooperative agreement with the federal government on a per-capita basis for each refugee served, and because the Department of State asked HIAS to increase its capacity from the 3,884 refugees resettled in federal fiscal year ("FFY") 2016 to 4,794 refugees in FFY 2017, HIAS would be denied crucial funding as a result of the March 6 Order, which bans all refugees for 120 days, bars all entry for

35

the six Muslim-majority countries for 90 days, and limits the number of refugees to be admitted in the current fiscal year at 50,000, which is less than half the number the Department of State told the resettlement agencies to collectively plan to resettle.

172.    After the January 27 Order was issued, the U.S. State Department notified HIAS that its resettlement obligation for FFY 2017 would be slashed from nearly 4,800 to just over 2900 refugees.   The financial losses to HIAS and its affiliate network—up to $2.2 million—will be crippling, especially for many of HIAS's affiliates, which are heavily dependent on funding that flows through HIAS. These losses will translate to irreparable harm to HIAS, its affiliates, and its clients because they will cause (and have already caused) a substantial reduction in program services and closure of resettlement sites. When this happens, the local expertise, relationships, and good will—developed by affiliate staff, often over years and years—are lost entirely or substantially diminished.   Building a new resettlement site can take months or years of relationship-building, including cooperation with local government and elected officials, businesses who would be potential employers, landlords, volunteers, and the refugee communities themselves. In addition, fewer resettlement sites may limit the type of specialized assistance and services (e.g., for LGBT refugees) that clients can receive.

173.    The January 27 and March 6 Orders would also result in the waste of HIAS resources. For example, in the past year, HIAS has devoted substantial private resources to developing a program with several congregations in Westchester, New York, to welcome Syrian refugee families.   Because of the 90-day and 120-day bans, as well as the unexpected and dramatic lowering of the refugee admissions level, both the January 27 Order and the March 6 Order would put those resources to waste.   Congregations and family members of HIAS clients have extended resources to prepare for anticipated refugees, by renting apartments and purchasing furnishings. In addition, some refugees who were anticipating resettlement through HIAS left jobs or travelled

through other countries and now face precarious situations as a direct result of the January 27 Order and March 6 Order.

174.     In the weeks and months prior to the order, HIAS concluded a formal plan with the Department of State to increase HIAS's national resettlement capacity by 23.4% from 3,884 refugees in federal fiscal year 2016 to 4,794 refugees in federal fiscal year 2017. This plan caused HIAS to invest substantial resources into expanding existing resettlement sites and opening new refugee resettlement sites in Wisconsin, Delaware, New York, Illinois, and Massachusetts, as approved by the Department of State.  These resources will be wasted, at least in part, because of the January 27 Order and the March 6 Order.

175.     In addition, HIAS has been forced to divert substantial resources, and will continue to to do so, to dealing with the fallout from both executive orders and their effect on HIAS's clients, including devoting staff time to working with clients, and their families in the United States, who were denied entry and face precarious situations overseas.

176.     Plaintiff MESA and its members will also be harmed by the March 6 Order.  MESA has members from the six designated countries who are outside the United States and lack U.S. visas.  Because of the March 6 Order, these members will not be able to travel to the United States to attend academic conferences, including an annual meeting sponsored by MESA. Participation in academic conferences is crucial to the professional success of both graduate students and professors, and to their ability to fully engage with the ideas and scholarship of the broader Middle Eastern studies community.  Many important conferences, including the MESA annual meeting, take place in the United States

177.     Graduate students who are MESA members or are studying under MESA members in the United States often leave the country to complete field work for advanced degrees.  Because of the Executive Order, many such students from the six designated countries fear exclusion from

the United States if they leave the country.  The inability to leave the United States with an assurance they will be permitted to reenter will impair their ability to engage in research and participate in academic conferences.  Such students will also lose their ability to visit family and friends abroad with an assurance they will be permitted to reenter.  For example, Iranian students affiliated with MESA have cancelled plans to return home for Persian New Year, an important holiday that will occur on March 21, because of the Executive Order.

178.    MESA members who are U.S.-based faculty will be impacted by the Executive Order because potential students from the designated countries will be unable to obtain visas to study with them in the United States.  Similarly, their current U.S.-based students from the designated countries will not be able to travel abroad for field work with an assurance they will be permitted to reenter, impacting faculty members' ability to facilitate quality research and educational opportunities.  Likewise, U.S.-based MESA faculty members will forego opportunities to travel abroad for research and academic conferences for fear that they will not be readmitted, or will be subjected to harassment or discrimination upon application for reentry to the United States.  MESA members will also be precluded from traveling to the designated countries for research or academic conferences when those countries institute reciprocal actions in response to the Executive Order, as Iran has done.

179.    A large number of MESA members are Muslim or are institutional members whose officers, employees, or members are Muslim.  The Executive Orders convey an official message of disapproval and hostility toward these Muslim members, making  clear that the government deems them outsiders, not full members of the political community.  This marginalizes them, subjects them to suspicion, scrutiny, and social and political isolation on the basis of religion and national origin, and inflicts other stigmatic and dignitary injuries.

180.     MESA itself will also be harmed by the Executive Order.  As part of its goal to advance learning, facilitate communication, and promote cooperation, MESA sponsors an annual meeting that is a leading international forum for scholarship, intellectual exchange, and pedagogical innovation.  Approximately thirty percent of MESA members are based outside of the United States and must travel to the United States to attend MESA's annual conference.  At least 46 citizens of the six designated countries traveled to the United States to attend the last annual meeting.  MESA expects that a substantial number of scholars will be unable to attend this year's meeting because of the restrictions imposed by the Executive Order.  Moreover, in part because of the stigmatic message of the Executive Order, many members based in Europe and the Middle East are likely to heed international calls to boycott academic conferences in the United States in protest of the Executive Order, including the MESA annual conference.  The absence of these scholars, attributable to the Executive Order, will have a substantial negative effect on the meeting. These and other impacts of the Executive Order will negatively impact MESA's mission of fostering the study and public understanding of the Middle East.

181.     In addition, the Executive Order will cause serious financial harms to MESA.  A large portion of MESA's annual budget is funded through annual membership dues and registration fees to attend the annual meeting.  For each individual who cannot or will not attend the annual meeting, MESA will lose $90-250 in registration fees.  MESA will also suffer other financial injuries related to its annual meeting as a result of the executive order.  Some individuals who cannot or will not attend the meeting will allow their MESA membership to lapse as a result.  For each such lapsed membership, MESA will lose $25-300 in membership dues.

182.     Plaintiff John Doe #1, a lawful permanent resident, has suffered and will continue to suffer harm because of the Executive Order.  In August 2016, while John Doe #1's application to become a lawful permanent resident was pending, he married an Iranian national who lives in Iran.

39

She applied for a visa as John Doe #1's dependent and her application was approved on November 3, 2016.   As of January 9, 2017 John Doe #1 and his wife had submitted all of the requisite documentation and paid immigrant visa processing fees, and were waiting for notification that an interview was scheduled.   At the time the Executive Order went into effect, John Doe #1 expected his wife's interview to be scheduled within no more than six weeks based on information published by the National Visa Center.   Under the Executive Order, John Doe #1's wife will not be interviewed or granted a visa.

183.    The Executive Order's travel ban on Iranian nationals has created significant fear, anxiety and insecurity for John Doe #1 and his wife regarding their future.   After her mother's unexpected death in 2013, John Doe #1's wife has been alone in Tehran.   The Executive Order's ban forces John Doe to choose between his career and being together with his wife, who remains in Tehran.

184.    Plaintiff John Doe #3, a lawful permanent resident, has suffered and will continue to suffer harm because of the Executive Order.   John Doe #3 recently applied to become a naturalized citizen, and that petition remains pending with USCIS.

185.    In the summer of 2014, John Doe #3 married a national of Iran.   In October 2014, John Doe #3 applied for an immigration visa on her behalf.   Approximately 19 months later, in May 2016, she had her interview at the U.S. Embassy.   At that time, she was informed that her documentation was complete and she needed to wait for administrative processing, but that she should be able to join her husband in two to three months.   She therefore resigned from her job and began preparing to join her husband in the United States.   The Executive Order, however, puts the couple's plans in peril, as it has at least delayed, and could prevent, John Doe #3's wife from obtaining her visa and joining her husband in United States.

186.     Since moving to the United States, John Doe #3 has returned to Iran on several occasions to visit his wife, but is now fearful of leaving the United States.  He had planned to visit her in February 2017, but put his plans on hold in light of the Executive Order.  John Doe #3 is afraid that if he leaves the United States to see his wife, he will not be permitted to reenter the United States or could be detained by immigration officials at the airport upon his return. As a result, if John Doe #3 must leave the United States to visit Iran for an urgent family member, he feels he must make plans for his apartment, car, savings account, and other aspects of his personal life in the United States in order to prepare for the possibility that he may not be allowed to return.

187.     Their continued separation has placed extraordinary stress on John Doe #3 and his wife, and their relationship.  John Doe #3 and his wife are young and feel as though they've been unable to start their lives together because of the delays and uncertainty caused by the Executive Order.

188.     Plaintif Jane Doe #2, a U.S. citizen, has suffered and will continue to suffer harm because of the Executive Order.  She is enrolled in a local college where she is studying to become a healthcare technician.  She filed a family-based visa petition for her sister who is a Syrian refugee currently living in Saudi Arabia on the border with Yemen. The petition is currently pending a decision. Approval of the petition would allow Jane Doe #2's sister to access the U.S. Refugee Admissions Program (USRAP).

189.     Jane Doe #2's sister, who is Muslim, was born in Damascus, Syria, where she grew up and spent most of her life.  She worked as a French teacher and her husband was a sales manager at a local business.   They have two young children.   In 2012, continuous bombing of her neighborhood forced her and her family to move to her parent-in-laws with nothing more than their passports and the clothes on their backs. The bombing of her neighborhood continued and she was never able to re-enter her home.

41

190.    While internally displaced in Syria, Jane Doe #2's sister and husband learned that the Syrian government's selective service might be expanded to include men over the age of 30, which would include her husband.  After some of her husband's friends were conscripted for the selective service, they determined that he should flee immediately to Yemen. Because Jane Doe #2's sister was a government employee, she was required to apply for government approval before stopping work and could not flee with him immediately.  As a result, she and her oldest child remained in Syria—at the time she was pregnant with their youngst child. When, in 2013,  she finally received government approval to discontinue work, she and her child fled to join her husband in Yemen. In Yemen, she registered with the U.N High Commissioner for Refugees, which provided her with a temporary protection certificate explaining that she should be protected from forcible return to Syria.

191.    As a result of the war in Yemen, Jane Doe #2's sister and her family had to flee again, this time to Saudi Arabia, where they now live in a refugee hotel close to the border of Yemen. They remain under constant threat from nearby rocket file and military conflict.  The shelling where they currently live is so constant that the local school is only open one to two days per week, if at all.  Jane Doe #2's children are unable to go to school and are receiving no formal education.

192.    The building where Jane Doe #2's family is living is infested with bugs and human refuse from the bathroom in the unit above theirs leaks into their room. Jane Doe #2 and her family, are constantly sick and her children regularly vomit.  The Saudi Arabian government is also regularly turning off the power to the building there they live with other refugees in order to make life so intolerable that they will leave.

193.    Jane Doe #2's sister and her family also face sever discrimination in Saudi Arabia on account of their status as Syrian refugees. Her husband has had a very difficult time finding work and even when he can work, he is often cheated out of his wages and otherwise exploited.  Jane

Doe #2's sister is unable to leave the apartment where they are staying in the daytime because without being accompanied by her husband, the risk that she would be abducted as a Syrian refugee woman is too high.  As a result, her children did not believe that the sun rose and set in Saudi Arabia because the room that they are staying in does not have any windows and they only left the room at night when Jane Doe #2's husband could accompany them.

194.    As Syrian refugees, Jane Doe #2's sister and her family are eligible and qualify for the Priority-2 Direct Access Program for Iraqi and Syrian Beneficiaries of Form I-130 Petition for Alien Relatives.  If the Executive Order remains in effect, Jane Doe #2's sister will not be interviewed or granted a visa.  Moreover, she will have little chance of traveling to the United States as a refugee given the suspension of USRAP, the high likelihood that Syrian refugees will continued to be barred from entry to the United States, and the lowered refugee admissions cap of 50,000.

195.    Plaintiff Meteab, a lawful permanent resident, has also suffered and will continue to suffer harm because of the Executive Order.  After the U.S. invasion of Iraq in 2003, Mr. Meteab and his four brothers all cooperated with the U.S. military in helping to establish the transitional government, in the wake of the conflict in Najaf, Iraq. Because of their cooperation with the U.S. government, they were targeted and threatened by armed militia groups in Iraq.

196.    Mr. Meteab is a Sunni Muslim, as are his brothers. In Iraq, they lived together in a Shi'a neighborhood. In 2013, Mr. Meteab and his family were warned by neighbors and community members that if they failed to leave the area, their family would be killed. In 2013, Mr. Meteab's nephew Mosad was shot in the leg. After this, on December 25, 2013, Plaintiff Meteab's older brother fled to Jordan with his children and two of his nephews, including Mosad. Plaintiff Meteab and his wife and children joined them in Jordan on January 5, 2014. Plaintiff Meteab's three other

brothers also fled to Jordan in 2014. All of them applied for and received recognition as refugees from the United Nations High Commission for Refugees.

197.　　In August 2015, after being approved as a refugee, Plaintiff Meteab came to the United States with his wife and children. His three other brothers, Ali, Abdulateef, and Ahmed, have been approved as refugees but remain in Jordan awaiting resettlement,. Abdulateef was approved for resettlement in Canada but is awaiting final clearance. Mr. Meteab's brothers Ali and Ahmed, were approved for resettlement in the United States.

198.　　In November 2016, Plaintiff Meteab's brothers Ali and Ahmed were told by the International Organization for Migration that while their refugee applications had been approved, they still did not have travel documents to come to the United States. Jewish Family Services notified Plaintiff Meteab's family of this update at the same time. When Mr. Meteab's brothers learned about the Executive Order from the news in January 2017, they realized the travel ban would prevent them from joining him in the United States.

199.　　Since the January 27th Executive Order was released, Mr. Meteab and his wife have experienced anti-Muslim sentiment and felt very uncomfortable and insecure in their community, causing them acute mental stress. They have experienced hostility in public, with people staring at Mr. Meteab's wife, who wears a hijab, and refusing to stop for them at crosswalks. Their nieces, who also came to the United States as refugees, have been harassed in school.

200.　　Plaintiff Harrison has suffered and will continue to suffer harm as a result of the Executive Order. Mr. Harrison is a citizen of the United States and lives in Euless, Texas. His fiancé is a citizen and resident of Iran and is Muslim. They have been together since November 2015.

201.　　In March 2016, Plaintiff Harrison petitioned for a K-1 (fiancé) visa for his partner (now-fiancé) . After the petition was approved, Plaintiff Harrison's partner was interviewed at the

U.S. Embassy in Ankara, Turkey on November 7, 2016. His K-1 visa application was approved and administrative processing completed on January 17, 2017. The U.S. Embassy in Ankara informed Mr. Harrison's partner that he needed to submit his passport for the visa to be issued.

202.    On January 30, 2017, after the January 27 Order was signed, the U.S. Embassy in Turkey emailed Plaintiff Harrison's fiancé and explained that his visa process was on hold and that he should contact them again when the travel ban had been lifted to continue the processing of his visa.

203.    Subsequently on on February 7, 2017, the U.S. Embassy in Turkey sent a follow-up email to Plaintiff Harrison's fiancé, stating that the embassy had been informed of the ruling in *Washington v. Trump* and that he should send in his passport to the U.S. Embassy in Ankara, Turkey.

204.    On March 3, 2017, Plaintiff Harrison and his fiancé traveled again to Turkey to submit the passport and to see one another.  On March 6, 2017, the new executive order was announced. As the embassy has not provided additional information or told Plaintiff Harrison's fiancé that they are no longer processing visas, they submitted his passport on March 8, 2017. They fear the U.S. Embassy in Ankara will not issue the visa before March 16.  Even if there is a waiver process might apply to his fiancé, Mr. Harrison is concerned he may not receive the waiver and/or that his fiancé may be required to start the entire process over, resulting in prolonged separation and anxiety for both of them.

205.    If the Executive Order remains in effect, Plaintiff Harrison and his partner will remain separated. Mr. Harrison cannot currently travel to Iran, which has put in place a reciprocal ban on U.S. citizen visitors, and the travel to Turkey to see one another is a significant financial burden for Mr. Harrison.  Moreover, Plaintiff Harrison's partner has had some negative interactions with

the morality police in Iran, leading to harassment and, in one instance, an assault on Mr. Harrison's partner.

206.    Plaintiff Ibrahim Ahmed Mohomed has suffered and will continue to suffer harm as a result of the Executive Order. Mr. Mohomed is a United States citizen of Somali origin who lives in Columbus, Ohio. He came to the United States as a refugee in 2009. He is Muslim.

207.    Mr. Mohomed's wife and nine children have been approved to come to the United States as refugees. They are all in Ethiopia waiting for authorization to travel to the United States.

208.    Plaintiff Mohomed is a member of a minority clan in Somalia. When he and his family were living in Mogadishu, Mr. Mohomed was targeted and threatened by members of the majority clans in Mogadishu, who knew he did not have protection. He came to the United States as a refugee in March 2009.

209.    With the rise of insurgents from al-Shabaab and increased fighting in Mogadishu, after Mr. Mohomed's departure, his wife and children fled first to Yemen and then, in 2011, to Ethiopia, where Mr. Mohomed was able to visit them.  He applied for them to join him in the United States, and in 2013, they were approved for resettlement in the United States. However, they were still waiting for travel documents when the January 27 order was issued.

210.    After the January 27 order was signed, Mr. Mohomed and his family learned from the news that under the new Executive Order, his family would not be able to come to the United States. They remain in Ethiopia waiting to join Mr. Mohomed.

211.    The Executive Orders conveys an official  message of disapproval and hostility toward the individual Muslim Plaintiffs and their families, making clear that the government deems them outsiders or second-class citizens who are not full members of the political community.  This marginalizes them,  subjects them to suspicion, scrutiny, and social and political isolation on the basis of religion and national origin, and inflicts other stigmatic and dignitary injuries.

**Class Allegations**

212.     Individual Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b) (1) and (b) (2), on behalf of themselves and all other persons in the United States for whom the Executive Order either interferes with family reunification or the ability to travel internationally and return to the United States.  This class includes:

a.   Individuals in the United States who currently have an approved or pending petition to the United States government to be reunited with family members who are nationals of Iran, Libya, Somalia, Sudan, Syria or Yemen (the "Designated Countries"), or who will soon file such petition;

b.   Refugees in the United States who have currently pending, or will soon file, a petition to the United States government to be reunited with family members; and

c.   Nationals of the Designated Countries who reside in the United States and who wish to travel abroad and return to United States or who, prior to issuance of the Executive Order, did travel abroad with the intent to return and are currently abroad.

213.     The Plaintiff Class is so numerous that joinder is impracticable.  According to the Annual Report of the Visa Office, in 2015, the last year for which data are available, the United States issued approximately 70,000 immigrant and non-immigrant visas to nationals from the six Designated Countries. The U.S. government previously estimated that between 60,000 and 100,000 people were affected by Section 3(c) of the January 27 Order.

214.     The claims of the Plaintiff Class members share common issues of law, including but not limited to whether the Executive Order violates their associational, religious exercise and due process rights under the First and Fifth Amendments, the Religious Freedom Restoration Act, the Immigration and Nationality Act and the Administrative Procedure Act.

215.     The claims of the Plaintiff Class members share common issues of fact, including but not limited to whether the Executive Order is being or will be enforced so as to prevent them or their family members from entering the United States from abroad or from re-entering the United States should they choose to leave the United States briefly, even though they would otherwise be admissible.

216.     The claims or defenses of the named Plaintiffs are typical of the claims or defenses of members of the Plaintiff Class.

217.     The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff class.  The named Plaintiffs have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff class.  The attorneys representing the named Plaintiffs include experienced civil rights attorneys who are considered able practitioners in federal constitutional litigation. These attorneys should be appointed as class counsel.

218.     Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole.  The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b) (2).

219.     Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class.  The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Establishment Clause, First Amendment to the U.S. Constitution)**

220.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

221.    The Executive Order violates the Establishment Clause by singling out Muslims for disfavored treatment.  It has the purpose and effect of inhibiting religion, and it is neither justified by, nor closely fitted to, any compelling governmental interest.

## SECOND CLAIM FOR RELIEF
### (Equal Protection, Fifth Amendment to the U.S. Constitution)

222.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

223.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law."  The Clause contains an equal protection component.

224.    The Executive Order discriminates on the basis of religion and national origin, each a suspect classification, and is not narrowly tailored to serve a compelling governmental interest, and thereby violates the equal protection component of the Due Process Clause.

225.    Additionally, the Executive Order was substantially motivated by an intent to discriminate against Muslims, on whom it has a disparate effect, in further violation of the equal protection component of the Due Process Clause.

## THIRD CLAIM FOR RELIEF
### (Immigration and Nationality Act & Administrative Procedure Act)

226.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

227.    The Immigration and Nationality Act provides, with certain exceptions not applicable here, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  8 U.S.C. § 1152(a)(1)(A).

228.    Several clients of IRAP are otherwise eligible and approved for refugee status, but pursuant to the Executive Order, their entry to the United States will be denied or delayed.  The

Executive Order on its face purports to deny entry to these clients of IRAP because of their nationality, place of birth, and/or place of residence, in violation of § 1152(a)(1)(A).

229.    Plaintiffs Harrison, Mohomed, Jane Doe #2 and John Does #1 and #3 have filed petitions for immigrant visas for members of their families, some of whom have subsequently received visas. Plaintiff Mohomed's wife and nine children's refugee visa applications have been approved, but they have not received travel documents or had their travel scheduled. Plaintiff Harrison's fiancé's visa has been approved and the processing complete but he still does not have a visa issued.    Pursuant to the Executive Order, the processing of those petitions and/or the subsequent issuance of visas and travel documents will be delayed or denied, and/or their family members will be denied entry.    The Executive Order on its face purports to deny or delay applications because Plaintiffs' family members' nationality, place of birth, and/or place of residence, in violation of § 1152(a)(1)(A).

230.    The Executive Order on its face mandates discrimination against those who apply for and/or hold immigrant visas on the basis of their nationality, place of birth, and/or place of residence, in violation of § 1152(a)(1)(A).

231.    The actions of Defendants, as set forth above, constitute final agency action and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

**FOURTH CLAIM FOR RELIEF**
**(Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.)**

232.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

233.    The Executive Order will have the effect of imposing a special disability on the basis of religious views or religious status, by denying or impeding Muslim Plaintiffs, on account of

their religion, from accessing benefits relating to their own or their family members' immigration status. In doing so, the Executive Order places a substantial burden on Muslims' exercise of religion in a way that is not the least restrictive means of furthering a compelling governmental interest.

234.    This substantial burden is not imposed in furtherance of a compelling governmental interest, and is not the least restrictive means of furthering a compelling governmental interest, in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.

## FIFTH CLAIM FOR RELIEF
### (Refugee Act & Administrative Procedure Act)

235.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

236.    Pursuant to the President's congressionally delegated authority under 8 U.S.C. § 1182(f), the Executive Order purports to limit the number of refugees who may be admitted in fiscal year 2017 to 50,000, despite an earlier proclamation setting a limit of 110,000, in violation of the Refugee Act, 8 U.S.C. § 1157(a)(2).

237.    President Trump did not engage in "appropriate consultation" prior to altering the number and allocation of refugee admissions for fiscal year 2017, in violation of the Refugee Act, 8 U.S.C. § 1157.

238.    The Executive Order makes other alterations to the refugee admission process that are not authorized by the Refugee Act and are in violation of the Refugee Act.

239.    The actions of Defendants that have been undertaken pursuant to Section 6 of the Executive Order, as set forth above, constitute final agency action and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

## SIXTH CLAIM FOR RELIEF
### (Administrative Procedure Act)

240.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

241.     The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

242.     The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are contrary to constitutional right, power, privilege, or immunity, including rights protected by the First and Fifth Amendments to the U.S. Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

243.     The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

244.     The actions of Defendants that are required or permitted by the Executive Order, as set forth above, were without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.     A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any portion of the Executive Order;

B.     A declaration pursuant to 28 U.S.C. § 2201 that the entire Executive Order is unlawful and invalid;

C.     An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

52

D.      Such other and further relief as the Court deems equitable, just, and proper.


    Respectfully submitted,             Dated:  March 10,  2017

/s/ Melissa S. Keaney
Karen C. Tumlin†                        Omar C. Jadwat†
Nicholas Espíritu†                      Lee Gelernt†
Melissa S. Keaney†                      Hina Shamsi†
Esther Sung†                            Hugh Handeyside†
National Immigration Law Center         Sarah L. Mehta†
3435 Wilshire Boulevard, Suite 1600     American Civil Liberties Union
Los Angeles, CA 90010                   Foundation
Tel: (213) 639-3900                     125 Broad Street, 18th Floor
Fax: (213) 639-3911                     New York, NY 10004
tumlin@nilc.org                         Tel: (212) 549-2600
espiritu@nilc.org                       Fax: (212) 549-2654
keaney@nilc.org                         ojadwat@aclu.org
sun@nilc.org                            lgelernt@aclu.org
                                        hshamsi@aclu.org
                                        hhandeyside@aclu.org
                                        smehta@aclu.org
Justin B. Cox (Bar No. 17550)
National Immigration Law Center
1989 College Ave. NE                    Cecilia D. Wang†
Atlanta, GA 30317                       Cody H. Wofsy†
Tel: (678) 678-5441                     American Civil Liberties Union
Fax: (213) 639-3911                     Foundation
cox@nilc.org                            39 Drumm Street
                                        San Francisco, CA 94111
                                        Tel: (415) 343-0770
                                        Fax: (415) 395-0950
                                        cwang@aclu.org
                                        cwofsy@aclu.org

                                        David Cole†
                                        Daniel Mach†
                                        Heather L. Weaver†
                                        American Civil Liberties Union
                                        Foundation
                                        915 15th Street NW
                                        Washington, DC 20005
                                        Tel: (202) 675-2330
                                        Fax: (202) 457-0805
                                        dcole@aclu.org
                                        dmach@aclu.org
                                        hweaver@aclu.org

53

David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar
No.19670)
American Civil Liberties Union
  Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
steiner@aclu-md.org

†Admitted *Pro Hac Vice*

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March, 2017, I caused a PDF version of the foregoing document to be electronically transmitted to the Clerk of the Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Dated:  March 10, 2017                           Respectfully submitted,

/s/ Melissa S. Keaney

55