**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | Civil Action No.: 8:17-CV-00361-TDC |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER OF THE EXECUTIVE ORDER & MEMORANDUM OF LAW IN SUPPORT THEREOF** |
| v. | |
| DONALD TRUMP, et al, | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………1

BACKGROUND…………………………………………………………………1

LEGAL STANDARD…………………………………………………………...4

ARGUMENT……………………………………………………………………..4

    I.     Plaintiffs Are Likely to Succeed on Their Claims That the Executive Order Violates the Establishment Clause, the Fifth Amendment's Guarantee of Equal Protection, and the Immigration and Nationality Act …………………..4

    II.    Plaintiffs Have Standing and Will Suffer Irreparable Harm Absent an Injunction …………………………………………………………..29

    III.   The Balance of Harms and Public Interest Militate Heavily in Favor of a Temporary Restraining Order and Preliminary Injunction ………………...37

CONCLUSION………………………………………………………………38

Plaintiffs hereby seek a preliminary injunction and/or temporary restraining order enjoining Executive Order 13780 in its entirety.

## INTRODUCTION

Executive Order 13780 (the "Executive Order" or the "March 6 Order"), signed on March 6, 2017, shares the same core constitutional problems as its predecessor issued five weeks earlier: it discriminates on the basis of religion and nationality, violating the Constitution and the Immigration and Nationality Act ("INA").   The government "may not adopt programs or practices . . . which . . . oppose any religion."  *Larson v. Valente*, 456 U.S. 228, 246 (1982) (citation and punctuation omitted).  "This prohibition is absolute."  *Id.*  Voluminous evidence— including public statements by the President and his close associates—demonstrates that the March 6 Order, both in purpose and effect, discriminates against Muslims and their religion, Islam.  It also violates the clear statutory prohibition on nationality-based discrimination by the executive branch.  Moreover, the Executive Order causes severe and irreparable injury to the individual plaintiffs, the organizational plaintiffs, and the organizational plaintiffs' clients, separating family members from one another, stranding people in unsafe locations overseas, and stigmatizing and demeaning one religious group. The government's own actions demonstrate that there is no legitimate justification for this discriminatory Order.   Accordingly, Plaintiffs respectfully request that this Court enjoin its enforcement during the pendency of this case by issuing either a temporary restraining order or a preliminary injunction prior to the Order's effective date of March 16, 2017.

## BACKGROUND

President Donald Trump was inaugurated on January 20, 2017, having promised that, if elected, he would enact a "shutdown of Muslims entering the United States."  *See, e.g.*, Hausman

1

Decl. Ex. E, J.R. 85 (Statement by Donald J. Trump on Preventing Muslim Immigration (Dec. 7, 2015) [hereinafter Trump Statement on Preventing Muslim Immigration]).   One week later, on January 27, 2017, he signed Executive Order No. 13769.   Among other things, the January 27 Executive Order barred all admissions of individuals from seven Muslim-majority countries for an initial 90-day period; provided for the possibility of an indefinite extension of the ban on those countries; banned Syrian refugees indefinitely; banned all other refugees for 120 days; lowered the annual level of refugee admissions from 110,000 to 50,000; and created a mechanism to give preference to Christian refugees living in Muslim-majority countries.

The January 27 Order created massive chaos and confusion in its short period of full operation.   It placed people at risk of persecution and torture, separated families, disrupted workplaces, and interfered with courses of study.   It was immediately challenged in several courts, and was quickly enjoined in large part, most significantly by a nationwide injunction issued by the District Court for the Western District of Washington on February 3, 2017.   *See Washington v. Trump,* No. C17–0141–JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) (enjoining Sections 3(c), 5(a)-(c), and 5(e) of the January 27 Executive Order); *Darweesh v. Trump*, No. 17 CV 480, 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017) (prohibiting the government from removing individuals pursuant to the Order); *Aziz v. Trump*, ___ F. Supp. 3d ___, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) (granting preliminary injunction of portions of Order on Establishment Clause grounds).   The Ninth Circuit Court of Appeals issued an opinion declining to stay the Washington injunction on February 9, 2017. *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).

On February 16, 2017, the government informed the Ninth Circuit that "the President intends in the near future to rescind the Order and replace it with a new, substantially revised

Executive Order."  Gov't en banc brief, *Washington v. Trump*, Doc. 154.  A senior White House official explained that the "revised" order would include "mostly minor technical differences" from the original order, resulting in "the same basic policy outcome for the country." [1]

Notwithstanding the claimed national security risk allegedly caused by the decisions enjoining the first Order, the revised Order—Executive Order 13780—was not issued until March 6, 2017, more than a month later.[2]  The revised Order shares the same basic design as the original: it bans individuals from six of the seven Muslim-majority countries banned in the January 27 Order for 90 days, with additional bans or restrictions possible after the initial period ends; and it bans all refugees for 120 days and reduces the annual level of refugee admissions from 110,000 to 50,000.  The revisions to the Order, such as exempting green card holders and individuals who currently hold a valid visa, removing Iraq from the list of banned countries, no longer indefinitely banning Syrian refugees, and removing an explicit preference for certain refugees who are religious minorities do not, and cannot, cure the constitutional defects of the original Order.

On February 7, 2017, Plaintiffs filed a complaint for declaratory and injunctive relief, challenging the January 27 Executive Order.  *See* Compl. (doc. #1). Because a nationwide injunction had been previously entered in the *Washington* litigation, Plaintiffs moved for a preliminary injunction only as to the provision of the Order limiting refugee admissions to 50,000 for the current fiscal year, and only on the basis of that provision's violation of the Refugee Act.  *See* Mot. for Prelim. Inj. (doc. # 64).  Following the issuance of the March 6

---

[1] Hausman Decl. Ex. B, J.R. 76-78 (Matthew Nussbaum, Josh Gerstein and Cristiano Lima, *White House creates confusion about future of Trump's travel ban*, Politico,  Feb. 21, 2017).

[2] At least part of that delay was attributed to the desire to avoid cutting short the positive press the President received in the days following the President's address to Congress. Hausman Decl. Ex. FF, J.R. 276-77 (Laura Jarrett, Ariane de Vogue, and Jeremy Diamond, "*Trump delays new travel ban after well-reviewed speech*," CNN.com, March 1, 2017).

Executive Order, Plaintiffs amended their Complaint, *see* FAC (doc. # 89), and—in light of the irreparable injury they will suffer because of the new Order—now file this motion, seeking to immediately enjoin implementation of the new Order in its entirety.

## LEGAL STANDARD

Motions for temporary restraining orders and preliminary injunctions are governed by the same four-factor test: Courts consider whether plaintiffs have shown: (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188-89 (4th Cir. 2013) (en banc) (outlining *Winter* standard). To show a likelihood of success on the merits, plaintiffs "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).

## ARGUMENT

**I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT THE EXECUTIVE ORDER VIOLATES THE ESTABLISHMENT CLAUSE, THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION, AND THE IMMIGRATION AND NATIONALITY ACT**

The Executive Order's purpose is to prevent Muslims from coming to the United States. Overwhelming evidence establishes this impermissible discriminatory purpose, including repeated statements by the President and his closest advisors, the text of the Order itself, the process leading up to its issuance, and the disconnect between its provisions and its stated purposes.

When the government discriminates on the basis of religion, it violates both the Establishment Clause and the equal protection component of the Fifth Amendment's Due Process Clause. Those provisions impose slightly different doctrinal requirements, as explained

4

below, *see infra* Part I.B, but they share a common underlying rule:  The government may not

target a particular religion for disfavored treatment.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612

(1971) (enactment "must have a secular legislative purpose" under the Establishment Clause);

*Larson*, 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one

religious denomination cannot be officially preferred over another."); *City of New Orleans v.*

*Dukes*, 427 U.S. 297, 303 (1976) (per curiam) (describing "inherently suspect distinctions such

as . . . religion" under the Equal Protection Clause).  As Justice O'Connor put it, "the Religion

Clauses . . . and the Equal Protection Clause as applied to religion [] all speak with one voice on

this point:  Absent the most unusual circumstances, one's religion ought not affect one's legal

rights or duties or benefits."  *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S.

687, 715 (1994) (O'Connor, J., concurring in part and concurring the judgment).   The Executive

Order violates this basic rule.

## A.      The Executive Order Was Motivated By Anti-Muslim Bias and Intended to Target Muslims.

"Determining whether invidious discriminatory purpose was a motivating factor

demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see*

*also Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985).  Courts look to a number of factors in

assessing the purpose behind challenged governmental conduct, including, among others, the

nature and degree of disparate impact; the historical background and specific series of events

leading to enactment; the legislative or administrative history, contemporaneous statements made

by the decisionmakers; previous versions of the policy; and any departures from normal

processes or substantive considerations.  *See Hunter*, 471 U.S. at 227-28; *Arlington Heights*, 492

U.S. at 266-68; *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 861-66 (2005); *Church of the*

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993).  In other words, this Court must consider not only the text and effect of the Order, but also the "the contemporaneous legislative history," "the historical context," and "the specific sequence of events leading to [its] passage."  *McCreary*, 545 U.S. at 862 (internal quotation marks omitted); *accord Washington*, 847 F.3d at 1167 ("It is well established that evidence of purpose beyond the face of the challenged law may be considered.").  Here, these factors all point to one conclusion, and overwhelmingly so—that Defendants' predominant purpose was to target Muslims and single them out for disfavor.

First, the direct evidence of intent in this case is striking and unusually extensive.  *Cf. Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) (noting that elected officials "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority").  As a candidate, President Trump expressly stated numerous times that he intended, if elected, to ban Muslim immigrants from entering the United States.[3]  Hausman Decl. Ex. E, J.R. 85 (Statement by Donald J. Trump on Preventing Muslim Immigration (Dec. 7, 2015) [hereinafter Trump Statement on Preventing Muslim Immigration]) (stating that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on").  Indeed, the President's campaign website, which he continues to update and maintain as President, to this day contains the same "statement on preventing Muslim

---

[3] *See also id.*, J.R. 85 (asserting that "there is great hatred towards Americans by large segments of the Muslim population," and "it is obvious to anybody the hatred is beyond comprehension"); *id.* at Ex. V, J.R. 209 (Donald J. Trump (@realDonaldTrump), Twitter (December 7, 2015, 1:47 PM)); *id.* at Ex. W, J.R. 211-12 (Jenna Johnson, *Trump calls for 'total and complete shutdown of Muslims entering the United States'*, Wash. Post (Dec. 7, 2015)) (noting that in addition to the call for the complete shutdown of Muslims entering the United States, President Trump had signaled his support for "heavy surveillance of mosques" and that he "would consider establishing a database to track all Muslims in the country").

immigration."[4]  These statements are highly probative.  *See id.*; *see also, e.g.*, *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982) (considering statements made by proponents during an initiative campaign to determine whether voters adopted an initiative for an improper purpose); *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 148-49 (E.D.N.Y. 2011) (considering campaign materials as probative of an illicit intent); *cf. Edwards v. Aguillard*, 482 U.S. 578, 587-93 (1987) (examining statements by law's sponsor to determine intent); *Busbee v. Smith*, 549 F. Supp. 494, 500 (D.D.C. 1982) (three-judge district court) (considering attitudes and remarks of elected official who "played the instrumental role" in the challenged action), *aff'd* 459 U.S. 1166 (1983).  He has never repudiated that commitment.

When confronted with widespread objections to his ban, President Trump began to use territory as a proxy for religion, but confirmed that it was still the same scheme.[5]  These statements continued after the election.  When asked almost two months later whether he still intended to ban Muslim immigrants from the United States, President-elect Trump indicated that his plans had not changed.[6]  Indeed, two days after the original Executive Order was issued, Rudolph Giuliani, an advisor to President Trump, stated that then-candidate Trump had asked Mr. Giuliani for help in "legally" creating a "Muslim ban"; that in response, Mr. Giuliani and others decided to use territory as a proxy; and that this idea was reflected in the signed Order.[7]

---

[4] Hausman Decl. Ex. E, J.R. 85 (Trump Statement on Preventing Muslim Immigration).

[5] Hausman Decl. Ex. X, J.R. 219-20 (*Meet the Press* (NBC television broadcast July 24, 2016) (in response to being asked if a plan similar to the now-enacted Order was a "rollback" from "[t]he Muslim Ban," then-candidate Trump stated: "I actually don't think it's a rollback.  In fact, you could say it's an expansion. . . . I'm looking now at territory.  People were so upset when I used the word Muslim.  Oh, you can't use the word Muslim.  Remember this.  And I'm OK with that, because I'm talking territory instead of Muslim.").

[6] Hausman Decl. Ex. Y, J.R. 245 (Katie Reilly, *Donald Trump on Proposed Muslim Ban: 'You Know My Plans*,' Time (Dec. 21, 2016)).

[7] Hausman Decl. Ex. Z, J.R. 247 (Amy B. Wang, "*Trump asked for a 'Muslim ban,' Giuliani says – and ordered a commission to do it 'legally'*", Wash. Post (Jan. 29, 2017)) (Mr. Giuliani

*Compare with Hunter*, 471 U.S. at 229-33 (rejecting attempt to launder discriminatory motive by choosing facially-neutral criteria that would, when applied, have the desired discriminatory effect).

The same intent animates the revised Executive Order, which carries on the purpose of the original Order.  In a press conference on February 16, 2017, President Trump, discussing the Ninth Circuit decision leaving the previous Order enjoined, said, "[W]e can tailor the order to that decision and get just about everything, in some ways, more."[8]  Days later, White House advisor Stephen Miller affirmed President Trump's statement, explaining that any changes to the first Executive Order would be "mostly minor, technical differences" with "the same, basic policy outcome for the country."[9]  White House spokesperson Sean Spicer echoed these comments on March 6, explaining, after President Trump signed the revised Order, "The principles of the executive order remain the same."[10]

Thus, while the revised Order differs in some respects from the first, it is no less a reflection of discriminatory intent than the previous version.  *Cf. United States v. Fordice*, 505 U.S. 717, 729-30 (1992) ("If policies traceable to the [unconstitutionally discriminatory] system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable . . . ."). Indeed, even without the President's and his advisors' explicit statements to that effect, the progression of the policies makes this plain.  The Orders have identical titles, enact the same basic 90- and 120-day travel bans, and cite the same purported

---

explaining that "when [then-candidate Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it legally.'").

[8] Hausman Decl. Ex. G, J.R. 109 (*Full Transcript: President Donald Trump's News Conference*, CNN, February 17, 2017).

[9] Hausman Decl. Ex II, J.R. 318 (Matt Zapotsky, *A new travel ban with 'mostly minor technical differences'? That probably won't cut it, analysts say*, Wash. Post, Feb. 22, 2017).

[10] Hausman Decl. Ex. H, J.R. 118 (William Gallo & Victoria Macchi, *Trump Signs New Travel Ban Order*, VOA News, Mar. 6, 2017).

need to review vetting procedures.   The Supreme Court has explained that the "development of the . . . [challenged policy] should be considered when determining its purpose." *McCreary*, 545 U.S. at 850-51; *see Wallace v. Jaffree*, 472 U.S. 38, 56-60 (1985) (concluding that statute had improper religious purpose after weighing legislative history and text of related, predecessor statute).   In *McCreary*, the Court rejected the suggestion that a court could only examine "the last in a series of governmental actions, however close they may all be in time and subject."   545 U.S. at 866.   It explained, "the world is not made brand new every morning," and "our precedents sensibly forbid an observer to turn a blind eye to the context in which [the] policy arose."   *Id.   See also Aziz*, 2017 WL 580855, at *8 (rejecting government's request to limit the "temporal scope of the purpose inquiry" to President Trump's post-inauguration statements, noting, "a person is not made brand new simply by taking the oath of office").

Second, the language of both the January 27 and March 6 Orders are replete with exactly the kind of language the Supreme Court has found to indicate intent to discriminate on the basis of religion.   *See, e.g.*, *Lukumi*, 508 U.S. at 534-35 (holding that, in context, statutory references to "sacrifice" and "ritual" bespoke intent to target a particular religion, noting that "on this record it cannot be maintained[] that city officials had in mind a religion other than Santeria"). The January 27 Order employed multiple barely veiled references to stereotypes regarding Islam. The Order referred to "honor killings," Order §§ 1, 10(a)(iii); "violent ideologies," Order § 1; "persecution of those who practice religions different from their own," Order § 1; and "foreign nationals" being "radicalized," Order § 10(a)(ii).   Although two of these references were scrubbed from the revised Order, two others—pertaining to "honor killings" and "foreign

nationals" being "radicalized"—remain.   Revised Order § 11(ii), (iii).[11]   And while these references are clear enough on their own terms, their meaning is undeniable when read against the backdrop of the President's prior statements regarding Islam, which invoked the same false stereotypes about Muslims.[12]

Moreover, while the revised Order exempts LPRs and other individuals, *see* Revised Order § 3(a), (b), it retains the first Order's focus on banning travel from certain Muslim-majority countries.   With the exception of Iraq, the original and revised Orders bar travel into the United States by foreign nationals of the same countries.   *Id.* § 2(c).   All of them—Iran, Libya, Somalia, Sudan, Syria, and Yemen—are over 90% Muslim.   *See* Hausman Decl. Ex. R, J.R. 184-98 (Central Intelligence Agency's World Factbook).   No non-Muslim majority countries are designated in either the original or revised Order, and thus the Order will disproportionately affect Muslims seeking to travel or enter the United States,[13] which is of course probative of intent.   *See, e.g.*, *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) ("[I]mpact of an official action is often probative of why the action was taken in the first place since people

---

[11]   Unsurprisingly, the March 6 Order's targeting of Muslims was apparent to those who supported the Order, as well as those who opposed it.   For example, a Breitbart article published the same day indicated that "honor killings" are exclusively committed by Muslims, describing them as "a brutal practice wherein Muslim males will murder or mutilate female family members accused of bringing shame and dishonor to their families and Islam," and predicted that the March 6 Order "will likely increase the broad support Trump's immigration policies enjoy." Hausman Decl. Ex. NN, J.R. 419-20 (Katie McHugh, *Trump's Executive Order Mandates Government Reports on Honor Killings Committed by Migrants*, Breitbart.com, Mar. 6, 2017).

[12]   Hausman Decl. Ex. JJ, J.R. 337 (*Transcript of Donald Trump's Aug. 21, 2016 Immigration Speech*, N.Y. Times, Sept. 1, 2016) (mentioning "honor killings" in the same sentence as "Radical Islam").

[13]   The revised Order does provide for some exceptions to this six-country ban, Revised Order § 3(c), but the waiver is subject to individual CBP officers' unfettered discretion.   In any case, the possibility of discretionary waivers for some cannot cure the Order's discriminatory purpose and effect.

usually intend the natural consequences of their actions (citing *Arlington Heights*, 429 U.S. at 266)).

Third, the Orders are riddled with indications that the proffered security rationale neither shaped the Order's contours nor motivated its development.  When the government proffers a secular reason for challenged conduct, a court must assess whether the reason is "genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864; *see Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (explaining "the duty of the courts to distinguish a sham secular purpose from a sincere one") (internal quotation marks and alteration omitted); *cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (noting "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" (citation omitted)).

To begin, the White House adopted the January 27 Order without consulting *any* of the agencies tasked with protecting national security—including the Departments of State, Justice, Homeland Security, and Defense.[14]  In other words, if security was the goal, the government used a patently irrational and highly irregular process for achieving that goal.  This is strong evidence of improper intent.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."); *Smith*, 682 F.2d at 1066 ("[D]eviations from the procedural norm by governmental decisionmakers  . . . are suspect when they lead to results impacting more harshly on one race than on another"); *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013) ("procedural irregularities" evidence of discriminatory intent).  If the January 27

---

[14] This fact was widely reported.  *See, e.g.*, Hausman Decl. Ex. I, J.R. 122-25  (Evan Perez et al., *Inside the Confusion of the Trump Executive Order and the Travel Ban*, CNN, Jan. 30, 2017); Hausman Decl. Ex. J, J.R. 131-32 (Michael D. Shear et al., *Judge Blocks Trump Order on Refugees Amid Chaos and Outcry Worldwide*, N.Y. Times, Jan. 28, 2017).

Order had actually been an effort to devise a policy response to a security concern, it is inconceivable that its sweeping changes would have received *no* input from those in the executive branch with expertise in homeland security, visa processing, or refugee admissions.[15] But that is what all the evidence suggests, and, as the court in *Aziz* put it, the government has never "described the process by which the [P]resident concluded that this action was necessary." *Aziz,* 2017 WL 580855, at *3.

The original Order's scope also belies its stated purpose.  Despite its professed aim "[t]o temporarily reduce investigative burdens" and improve "the screening of foreign nationals," January 27 Order § 3(c), the Order barred entry by LPRs and people who had already been issued visas.  Put simply, LPRs and visa holders impose no "investigative burdens" because they are not subject to any further "screening."   There is no way that their exclusion could have advanced the goals stated in the text of the Order.  This disconnect between the Order's stated purposes and its actual provisions further bespeaks pretext.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 267 ("Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."); *Greater New Orleans Fair Hous. Action Ctr.*, 648 F. Supp. 2d 805, 814-19 (E.D. La. 2009) (evaluating the city's proffered justifications for its actions, finding them factually unsupported, and concluding that the challenged governmental action therefore was pretextual and an invidious motive could be inferred); *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 549, 552 (S.D.N.Y. 2006) (same); *see also Cent. Ala. Fair Housing Center v. Magee*, 835 F.

---

[15] As one commentator put it, "in the rational pursuit of security objectives, you don't marginalize your expert security agencies and fail to vet your ideas through a normal interagency process."   Hausman Decl. Ex. K, J.R. 141-42 (Benjamin Wittes, *Malevolence Tempered by Incompetence: Trump's Horrifying Executive Order on Refugees and Visas*, Lawfare, Jan. 28, 2017) ("This is the first policy the United States has adopted in the post-9/11 era about which I have ever said this.").

Supp. 2d 1165, 1188-91 (M.D. Ala. 2011) (discussing at length how state law that had a disparate impact on Latino children substantively departed from historical treatment of children in general, thereby providing evidence of an intent to discriminate), *vacated as moot*, 2013 WL 2372302 (11th Cir. May 13, 2013).

The revised Order introduces additional inconsistencies and irrationalities.  It removes Iraq from the list of banned countries.  But because the primary reasons it points to were just as true on January 27 as they are on March 6, *see* Revised Order § 1(g),  by removing Iraq, the government has fundamentally undermined any argument that either the seven-country list, or a selective subset of it, is inherently well-suited to the Order's purported non-discriminatory aims. Further, the government can no longer claim that the list is insulted from any discriminatory purpose because Congress or a previous administration compiled it.

In the March 16 Order, the government also spotlights a case—presumably one of the best the administration could find—in which a former refugee from Somalia was convicted of a terrorism-related offense.  *See* Revised Order § 1(h).  But that person entered the United States as a toddler;[16] improved refugee screening obviously could not have predicted his behavior more than a decade later.

The revised Order also resets the clock to zero, announcing fresh three- and four-month bans for covered countries and refugees, respectively.  Critically, the 30-day deadline for the government to have completed and reported on its country-by-country analysis of available vetting information under section 3(a) of the January 27 Order had already passed by the time the March 6 Order was signed—and section 3(a) was never enjoined by any court.  Yet the March 6 Order simply starts an entirely new 30 day period for the government to conduct the analysis that

---

[16]  Hausman Decl. Ex. HH, J.R. 291-92 (Nicolas Medina Mora & Mike Hayes, *The Big (Imaginary) Black Friday Bombing*, Buzzfeed, Nov. 15, 2015).

it was supposed to have already completed.  *See* Revised Order, § 2(a), (b).  The government's apparent failure to take any real steps toward implementing this portion of the January 27 Order suggests that the Orders' purpose is what the President and his advisors have said all along—to reduce Muslim immigration to the United States—not some national security purpose divorced from most of the actions the government has actually taken.

In a post-hoc attempt to justify the Orders, the revised Order points to several pieces of evidence that supposedly provide a security rationale for the ban.  *See* Revised Order § (d), (e), (f), (h).  At the outset, these newfound explanations carry no weight in the intent analysis, because they came about after the underlying policy was already chosen.  After-the-fact investigations by the implementing agencies are not probative of the decision-makers' pre-investigation motives.[17]  Nevertheless, it is striking how little those investigations produced.  The revised Order explains how the banned countries were selected, *see id.* § 1(b)(i), but it gives virtually no explanation for why the President concluded that already-heightened screening procedures for those countries might be inadequate.  *See Aziz,* No. 2017 WL 580855, at *3.

The Order's other pieces of evidence likewise present implausibly thin security reasons for such a drastic change in immigration policy.  Like its precursor, the Order identifies zero people from any of the banned categories who have committed an act of terrorism.  The only conviction it cites—beyond the Somali refugee who arrived as a toddler—is a conviction that took place in the context of a government-designed sting operation.  *See id.*  The defendants in

---

[17] Moreover, the Secretary of Homeland Security acknowledged in an interview that the six banned countries were not even the majority of those that might raise security concerns. "There's probably thirteen or fourteen other countries—not all of them Muslim countries, not all of them in the Middle East—that have very questionable vetting procedures that we can rely on." Hausman Decl. Ex. L, J.R. 150-51 (Daniella Diaz, *Kelly: There are "13 or 14" more countries with questionable vetting procedures*, CNN.com, Mar. 7, 2017). The Secretary offered no explanation for why, given these apparent security concerns, only Muslim countries were targeted in the Executive Order.

that case were from Iraq, which is no longer subject to the ban, and were never accused of planning or carrying out an attack in the United States.  The Order also claims that "more than 300 persons who entered the United States as refugees are currently subjects of counterterrorism investigations by the Federal Bureau of Investigation."  *Id.* § 1(h).  This statement is virtually meaningless without further context, because the FBI opens thousands of terrorism assessments each month.  For instance, the FBI began 11,667 assessments in just *four months* from December 2008 to March 2009.[18]  Of those, only 427—less than 4%—led to more intensive investigations. The government has declined to publish any further information about its FBI statistic.

Nor has the government even attempted to refute multiple internal documents suggesting that the Order is irrational as a security measure.  One recent DHS study concluded that an individual's "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity" and that "few of the impacted countries [under the EO] have terrorist groups that threaten the West."[19]  Another study by the DHS Office of Intelligence and Analysis, disclosed publicly last week, determined that "most foreign-born, U.S.-based violent extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry because of national security concerns."[20]

In fact, numerous security, foreign policy, and intelligence officials have submitted evidence that the Orders in fact "undermine[] the national security of the United States, rather than making us safer," and "cannot be justified on national security or foreign policy grounds." Hausman Decl. Ex. MM, J.R. 403 (Joint Declaration of Madeleine K. Albright, et al.).  Four of

---

[18] Hausman Decl. Ex. M, J.R. 153 (Charlie Savage, *F.B.I. Casts Wide Net Under Relaxed Rules for Terror Inquiries, Data Show*, N.Y. Times, Mar. 26, 2011).

[19] Hausman Decl. Ex. N, J.R. 158-59 (Ron Nixon, *People From 7 Travel-Ban Nations Pose No Increased Terror Risk, Report Says*, N.Y. Times, Feb. 25, 2017).

[20] Hausman Decl. Ex. O, J.R. 165 (*TRMS Exclusive: DHS document undermines Trump case for travel ban*, The Maddow Blog, Mar. 2, 2017).

the signatories to that declaration "were current on active intelligence regarding all credible terrorist threat streams directed against the U.S. as recently as one week before the issuance of the" Order, and yet know of no "specific threat that would justify the travel ban." *Id.* As these experts have pointed out, "[t]he Administration has identified no information or basis for believing there is now a heightened or particularized future threat from the seven named countries." *Id.* Instead, the Order "will aid ISIL's propaganda effort and serve its recruitment message by feeding into the narrative that the United States is at war with Islam," and will harm troops deployed abroad, the ability to gather intelligence, and law enforcement operations. *Id.*; *see also Aziz*, 2017 WL 580855, at *3, *9 (extensively citing similar declaration); Hausman Decl. Ex. LL, J.R. 360-400 (Amicus Brief of Former National Security Officials).

Here, as in *McCreary*, "[n]o reasonable observer could swallow the claim that the . . . [defendants] ha[ve] cast off the objective so unmistakable" in their public statements and in the original Executive Order. 545 U.S. at 872. To uphold the Order, the Court would have to ignore a mountain of evidence that the Order's primary purpose is to exclude Muslims from the United States. The Supreme Court has not hesitated to strike down enactments where the record was "wholly barren" of evidence that the policy would serve the proffered neutral purpose. This Court should therefore enjoin the Executive Order in its entirety.[21]

---

[21] The proper remedy is to enjoin the entire Order because discriminatory intent underlies the whole thing. When an "entire policy [is] tainted with the vice of illegality," courts usually enjoin the entire action. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 46 (1960) (quotation marks and alteration omitted). *See, e.g.*, *City of Richmond v. United States*, 422 U.S. 358, 378 (1975) ("An official action . . . taken for the purpose of discriminating . . . has no legitimacy at all."); *United Gas Pipeline Co. v. Terrebonne Parish Police Jury*, 319 F. Supp. 1138, 1141 (E.D. La. 1970) ("Because every section is interwoven and infected with this feature, this court finds that the entire statute . . . is invalid."). In this case, the Order does not offer separate justifications for other provisions beyond the two bans. For example, it provides no explanation whatsoever for why its drastic reduction in FY 2017 refugee admissions is in "the interests of the United States." Revised Order § 6(b). These ancillary provisions are part and parcel with the Order's basic

**B.      By Intentionally Discriminating Against Muslims, The Executive Order Violates Multiple Establishment Clause and Equal Protection Prohibitions**

The Executive Order's discriminatory purpose violates all of the tests imposed by the Religion Clauses, which protect people of all faiths.  *See Awad v. Ziriax*, 670 F.3d 1111, 1133 (10th Cir. 2012) (upholding preliminary injunction against state constitutional amendment that would have banned state courts from considering Sharia law and prevented Muslims from seeking effective relief from state courts in family law and other matters).  As described above, *see* Part I.A, the primary purpose of the Order is to disadvantage Muslims.  It must therefore be enjoined under any one of the following tests.

**1.      The Executive Order fails the *Lemon* test.**

The Order violates the Establishment Clause because it fails the three-part test set forth in *Lemon v. Kurtzman*¸ 403 U.S. 602, 612-13 (1971).  Under this standard, government action: (1) must have a secular primary purpose, (2) may not have the principal effect of advancing or inhibiting religion, and (3) may not foster excessive entanglement with religion.  *Id.*  The test is disjunctive, so that failure to satisfy any one prong violates the Establishment Clause.  *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 343 (5th Cir. 1999).  The Executive Order runs afoul of both the first and second prongs.

Under *Lemon*, the Court must "inquire as to the purpose of the government action to determine whether it is predominantly secular in nature."  *See Trunk v. City of San Diego*, 629 F.3d 1099, 1107 (9th Cir. 2011); *cf. McCreary*, 545 U.S. at 845 (holding that "there can be no neutrality when the government's ostensible object is to take sides").

---

discriminatory goals.  *Cf.* Hausman Decl. Ex. KK, J.R. 356 (Jens Krogstad & Jynnah Radford, Pew Res. Ctr., *Key Facts About Refugees to the U.S.*, Jan. 30, 2017) ("Muslims made up nearly half (46%) of refugee admissions" in FY 2016.).  In addition, the Court should enjoin the refugee-cap reduction for the reasons stated in Plaintiffs' previous motion for preliminary injunction.  *See* ECF No. 64.

When the government acts with the purpose of promoting or inhibiting a particular faith, the resulting conduct or law is unconstitutional, regardless of the effect.  *McCreary*, 545 U.S. at 869 (holding Ten Commandments displays by counties unconstitutional, where the evidence showed that the counties posted the displays with the intent of promoting their religious dictates); *see also Edwards v. Aguillard*, 482 U.S. 578, 585-86, 596-97 (1987) (rejecting state's claimed purpose—to protect academic freedom—for law requiring equal time for public-school instruction in creationism and evolution and holding that the law violated *Lemon*'s purpose prong).  Purpose can be dispositive because, as the Supreme Court has explained, "the purpose apparent from government action can have an impact more significant than the result expressly decreed."  *McCreary*, 545 U.S. at 860-61.

The facts and analysis of *McCreary* are particularly illuminating in this case.  At issue there were displays of the Ten Commandments in two county courthouses.  545 U.S. at 851.  As initially posted, the Ten Commandments hung, standing alone, in the hallways of the County courthouse.  The unveiling of one display featured the county executive's minister, who "testified to the certainty of the existence of God."  *Id.* at 868-69.  After a lawsuit was filed, the counties modified their displays, posting other historical documents with "highlighted references to God as their sole common element."  *Id.* at 870.  A third version of the display was mounted when the county hired new attorneys.  *Id.*  The "Foundations of American Law and Government" exhibit "placed the Commandments in the company of other documents the Counties thought especially significant in the historical foundation of American government," and the counties argued that the third display resulted from permissible purposes, "including a desire 'to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government.'"  *Id.* at 870-71.

18

In analyzing whether the third display was constitutional, the Court rejected the counties' demand that it "abandon concern with purpose wholesale," *id.* at 863, and explained, "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *Id*. at 860.  Nor was the Court willing, as the county suggested, to trivialize the purpose inquiry so that "any transparent claim to secularity would satisfy it . . . to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances." *Id.* at 863-64.  The Court explained that

> the world is not made brand new every morning, and the Counties are simply asking us to ignore perfectly probative evidence; they want an absentminded objective observer, not one presumed to be familiar with the history of the government's actions and competent to learn what history has to show . . . The Counties' position just bucks common sense: reasonable observers have reasonable memories, and our precedents sensibly forbid an observer "to turn a blind eye to the context in which [the] policy arose."

*Id.* at 866 (quoting *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290 (2000); other internal citations omitted).  And, in *McCreary*, notwithstanding the "new statements of purpose . . . presented only as a litigating position," 545 U.S. at 871, the history and context, the history and context in which the third display arose pointed to one conclusion: [T]he "Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality." *Id.* at 873.

Under this analysis, the Order likewise fails the purpose prong of the *Lemon* test.  As described in Part I.A, the ample indicia of intent—the President's statements both before and after the election, his advisor's statements both before and after the Orders, the Orders' stereotyping language, their targeting of majority-Muslim countries only, the complete absence of any security-focused process, and the numerous ways in which the Orders' provisions do not

rationally advance their stated objectives—all make plain that the purpose of the Orders all along has been to disadvantage Muslims.   Moreover, Defendants have ensured that a clear line continues to connect the two Orders:   The March 6 Order directly references and defends the January 27 Order, they share clear provisions and language, and President Trump and his aides have made clear that the new Order is intended as a mere revision, with only minor tweaks to aide in defending the Order in court.   As in *McCreary*, the government here is grasping at straws for any way it can continue to advance its unconstitutional purpose.

Though the Court could end its inquiry with *Lemon's* purpose prong, the Executive Order also fails *Lemon's* effects prong and its sister inquiry, the endorsement test.[22]   These related standards consider "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval" of religion.   *Mellen v. Bunting*, 327 F.3d 355, 374 (4th Cir. 2003) (internal quotation marks and other alterations omitted).   In applying these tests to statutes, this Court would determine whether an objective observer, "acquainted with the text, legislative history, and implementation of the statute," would perceive it as a state endorsement of a religion or state-sponsored disapproval of religion.   *Santa Fe*, 530 U.S. at 308.   Here, an objective and informed reasonable observer—aware of the context in which the revised Order was conceived and signed, as discussed at length above—would perceive it as conveying a message of hostility and condemnation toward Islam and Muslims. *Cf. Larson*, 456 U.S. at 253 (holding state law violated *Lemon's* "principal effect" prong because it authorized "the selective legislative imposition of burdens and advantages upon particular

---

[22] Federal appellate courts have concluded that the endorsement test is the same, or very similar to, *Lemon's* effects prong and typically have treat the endorsement inquiry as informing the *Lemon* analysis. *See, e.g.*, *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 282 (3d Cir. 2011) ("The endorsement test and the second *Lemon* prong are essentially the same.").

denominations"); *Awad*, 670 F.3d at 1123 (recognizing the harm imposed by an official message of "exclusion and disfavored treatment" and condemnation of the Islamic faith).

<h3 style="text-align:center">2.    The Order fails the *Larson* test.</h3>

Under *Larson*, a law that is designed "to burden or favor selected religious denominations" is subject to strict scrutiny.  *See Larson*, 456 U.S. at 255; *Lukumi v. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (holding that such a law "is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest").  Because, by intent and design, the Executive Order will disfavor Muslim visa applicants, *see supra* Part I.A, it must survive strict scrutiny.  The government must demonstrate that the revised Order is closely fitted to furthering a compelling governmental interest. *See*, *e.g.*, *Larson*, 456 U.S. at 247; *accord Lukumi*, 508 U.S. at 531 (law must be narrowly tailored to advance a compelling governmental interest).  This standard is exacting, and the government has not met it here.

In analyzing the government's asserted compelling interest in cases involving strict scrutiny, courts have recognized that it not enough merely to assert a compelling interest without showing that the challenged policy "actually furthers" that interest.  *See Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (reversing prison's denial of religious accommodation for Muslim prisoner's beard); *Rich v. Fla. Dep't. of Corrs*., 716 F.3d 525, 533 (11th Cir. 2013) ("While safety and cost can be compelling governmental interests, the Defendants have not carried their burden to show that Florida's policy [denying Jewish inmates kosher meals] in fact furthered these two interests.").

Even examining only the security rationale, the government has not met its heavy burden of showing that the Order actually furthers the asserted compelling interest.  As discussed above,

*supra* ___, the Department of Homeland Security and numerous national security experts have concluded that the travel bans Defendants seek to impose do not advance national security interests; on the contrary, they may harm the very interests Defendants claim to protect. Moreover, the examples that the Executive Order provides as evidence for its security rationale are inapposite. Finally, the government's actions—in delaying the vetting assessment called for by the original order, in delaying the release of the new order for press purposes, and in stating that it could have applied the ban to other, non-Muslim countries, but chose not to—all indicate that the national security justification for the ban is pretextual.

With no evidence that the Order actually furthers its asserted compelling interest, the government is left to rely on conjecture and blatant appeals to stereotypes, like those repeated by President Trump and his aides.  But these are insufficient and, indeed, prohibited. *See, e.g., Exodus Refugee Immigration, Inc. v. Penc*e, 838 F.3d 902, 904-05 (7th Cir. 2016) (Posner, J.) (rejecting then-Governor Pence's argument that excluding Syrians from state refugee assistance program was not discriminatory because it was "based solely on the threat he thinks they pose to the safety of residents of Indiana" and comparing it an invalid argument that "forbid[ding] black people to settle in Indiana" would not be discriminatory if ostensibly based on fear, rather than race); *Hassan*, 804 F. 3d at 309 ("'[T]o infer that examples of individual disloyalty prove group disloyalty and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights.'" (quoting *Korematsu* dissent)).

### 3.     The Order violates equal protection.

The Constitution's guarantee of equal protection also prohibits the Order's discrimination on the basis of religion.  *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per

curiam) (describing "inherently suspect distinctions such as race, religion, or alienage"); *United States v. Brown*, 352 F.3d 654, 668 (2d Cir. 2003) ("Religion, like race and gender, is an impermissible consideration in government decisionmaking.") (citation and internal quotation marks omitted)*; see also Washington*, 847 F.3d at 1167-68; *Brown*, 352 F.3d at 669 n. 18.[23]  For the same reasons that the Order is invalid under the Establishment Clause, it fails strict scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause.

### C.     The Revised Order Violates INA § 202 and Is Not Authorized by INA § 212(f).

By suspending visa issuance to nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen, the Order contravenes the INA's prohibition on nationality discrimination and therefore exceeds the President's statutory authority to exclude noncitizens.  Section 202(a)(1)(A) of the INA, 8 U.S.C. § 1152(a)(1)(A), provides, with limited and immaterial exceptions, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of," among other things, the person's "nationality."  Passed in 1965, at the height of the civil rights movement, Section 202 was an explicit repudiation of nationality discrimination in immigration policy. *See Olsen v. Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997) ("The legislative history surrounding the 1965 Act is replete with the bold anti-discriminatory principles of the Civil Rights Era.").  President Johnson, in his signing statement, declared that "for over four decades the immigration policy of the United States has been twisted and has been distorted by the harsh injustice of the national origins quota system."  Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill (October 3, 1965).

---

[23] Courts rely on the shared principles of these constitutional provisions in adjudicating claims. *See Lukumi*, 508 U.S. at 532, 534, 540 (discussing common thread in equal protection and the Religion Clauses).

The Order violates Section 202's anti-discrimination command by relying on nationality to suspend the issuance of visas and to ban entry. The Order explicitly acknowledges, multiple times, that it is regulating "the visa-issuance process." Revised Order §§ 1(a), 1(g), 3(c). This directly contravenes Section 202(a)(1)(A)'s prohibition on "discriminat[ion] . . . in the issuance of an immigrant visa because of . . . nationality." Courts have interpreted this prohibition broadly. *See, e.g.*, *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995) (striking down a "nationality-based regulation" under Section 202 because "Congress has unambiguously directed that no nationality-based discrimination shall occur") (vacated on other grounds); *Olsen*, 990 F. Supp. at 38 (applying Section 202 to the issuance of "nonimmigrant visa[s]"). And while the claimed source of authority—Section 212(f) of the INA—speaks to barring "entry," the revised Order does not bar "entry" at all. Nationals of the six banned countries with valid visas can enter the country at any time, even while the Order is in effect. *See* Revised Order § 3(a). As to people from those countries, the Order's *only* effect is to discriminate in the issuance of visas. By denying visas to "certain groups solely on the basis of their nationality," *id.*, the Order does precisely what Section 202 prohibits.

Nor can Section 212(f) override Section 202's nondiscrimination requirement. Section 202 was enacted in 1965, thirteen years after Section 212(f). Section 212(f) provides a general authority, whereas Section 202 imposes a specific restriction. *See_Radzanower v. Touche Ross & Co.*, 426 U.S. 148, n.2 (1976) ("[T]he more specific legislation will usually take precedence over the more general."); *United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (explaining that "[w]here two statutes conflict, the later-enacted, more specific provision generally governs"). As the Supreme Court has cautioned, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v.*

24

*Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).   Read together, Section 202 limits the authority granted in Section 212(f).

Allowing the President to disregard Section 202 here would imply that, under Section 212(f), the President could override *any* of the INA's visa criteria or inadmissibility grounds. Indeed, that is exactly what the Order purports to do:  It erases the normal immigration rules as to the six countries, and it replaces them with categories of the President's choosing.  *See* Revised Order § 3(c)(i)-(ix) (establishing which categories of people may be issued visas).  That cannot be what Section 212(f) allows.  *Cf. Clinton v. City of New York*, 524 U.S. 417, 443 (1998) (holding that Congress may not give the President "the power to cancel portions of a duly enacted statute").  The INA carefully spells out its grounds for admissibility.  *See* 8 U.S.C. § 1182.  While Section 212(f) provides authority to block entry beyond those categories, it does not allow the President to "nullif[y]" the contours of existing inadmissibility grounds or "evade the limitations Congress" has imposed.  *Abourezk v. Reagen*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (rejecting attempt to expand exclusion grounds beyond Congress's "specified categories of excludable aliens").

Moreover, interpreting Section 212(f) to permit the President to engage in group discrimination is inconsistent with the overall scheme Congress created to deal with potential terrorism cases.  The INA contains detailed substantive provisions that make *individual* noncitizens inadmissible on the basis of terrorism related-concerns.   Section 1182(a)(3)(B) states that an alien may be denied admission if, among other things, that alien "has engaged in a terrorist activity"; there is "reasonable ground to believe" that the alien "is engaged in or is likely to engage after entry in any terrorist activity"; or the alien is "a member of a terrorist organization."  8 U.S.C. § 1182(a)(3)(B)(i)(I)-(II), (V)(VI).  *See also Kerry v. Din*, 135 S. Ct.

2128,  2140 (2016) (Kennedy, J., concurring in the judgment) (noting that Congress has "establish[ed] specific criteria for determining terrorism-related inadmissibility").  Thus, Congress itself did not envision that terrorism-related concerns would be addressed through religious or nationality discrimination banning entire groups wholesale, without any evidence that a specific individual presented a threat.  Rather, insofar as particular individuals present a threat—regardless of their religion or nationality—they can be denied admission under the provisions enacted by Congress to address these concerns.[24]

In its 60 year existence prior to the Executive Order, Section 212(f) has never been invoked to justify so broad a nationality-based restriction on entry.  The vast majority of Executive Orders citing 212(f) in the past have suspended the entry not of all foreign nationals from a given country, but rather of noncitizens who have contributed to a specific, harmful situation abroad.  *See* Kate M. Manuel, *Executive Authority to Exclude Aliens: In Brief*, Congressional Research Service, January 23, 2017 (listing Presidential actions pursuant to Section 212(f)).

Furthermore, section 212(f) says nothing of religion, has never been invoked to justify religiously discriminatory exclusion, and should not be read to authorize exclusion of a "class" of noncitizens on the basis of religion.[25]  Indeed, Section 212(f)'s text simply does not allow the President to impose a restriction on entry that is religiously discriminatory.  Rather, in addition to the clear limitations on 212(f) authority imposed by other statutes and the Constitution, Section 212(f) itself requires that it be in "the interests of the United States" to impose the restriction at

---

[24] *Din*, 135 S. Ct.at 2140 (Kennedy, J., concurring in the judgment) (noting that the decision to deny a noncitizen entry under the INA's "terrorism bar" is "legitimate" where there is a "determination"  that the particular individual does "not satisfy the statute's requirements" ).

issue.  The Constitution establishes that the United States has no "interest" in denying entry on a religiously discriminatory basis, *cf. Romer,* 517 U.S. at 634-35, and Section 212(f) therefore cannot be read to authorize the President to impose the ban at issue here.

In subsequent statutes, moreover, Congress has shown particular concern for religious freedom, further undercutting an interpretation of 212(f) that would authorize exclusion of members of a particular faith.  *See, e.g.*, Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §2000bb *et seq.*; *City of Boerne v. Flores*, 521 U.S. 507, 516 (1997) (explaining that RFRA's application is "universal" across the federal government, including all federal statutes, whether adopted before or after its enactment); *see also, e.g.*, Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq*.  Section 212(f) should be understood against the backdrop of these laws and our Constitution's unique emphasis on religious nondiscrimination, and thus should be read to avoid the serious constitutional questions that would be presented by a statute authorizing discrimination on the basis of religion.  *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (explaining that "[w]e have read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation" and describing constitutional avoidance as a "cardinal principle" of statutory interpretation

In light of these considerations, any suggestion that Congress has authorized the President to order a ban disfavoring Muslims is simply wrong.  At minimum, because the statute should be read to avoid the serious constitutional problems that permitting religious discrimination would raise, the Court can rule for Plaintiffs on statutory grounds without reaching the constitutional claims advanced here.  But if Congress did, *sub silentio*, authorize religious discrimination in § 212(f), that application of the provision is unconstitutional.  Neither

Congress nor the President can override the Constitution. *See Washington*, 847 F.3d at 1164-68; *Aziz*, No. 17-0116 at 10-12.

### D.     The Order Is Reviewable.

Despite the government's power in the context of immigration, courts have already roundly rejected its view that the earlier version of the ban was unreviewable, explaining that "it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Washington*, 847 F.3d at 1164; *see also Aziz*, 2017 WL 580855, at *5 ("This is a familiar judicial exercise.") (citation and internal quotation marks omitted). Indeed, "the Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration or are not subject to the Constitution when policymaking in that context." *Washington*, 847 F.3d at 1162 (citing *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *INS v. Chadha*, 462 U.S. 919, 940-41 (1983)); *accord Aziz*, 2017 WL 580855, at *6 ("Every presidential action must still comply with the limits set by Congress' delegation of power and the constraints of the Constitution, including the Bill of Rights.").

Having failed to convince courts to simply rubber-stamp the Order, the government has at times argued for application of the deferential "facially legitimate and bona fide" standard applicable to certain immigration actions. *See Washington*, 2017 WL 526497 at *6; *Aziz*, No. 17-0116 at 16. Such deference is inappropriate in a case, like this one, involving compelling evidence of religious discrimination. *Cf. Aziz*, 2017 WL 580855, at *9 (observing that in light of "the direct evidence of animus presented by the Commonwealth . . . a different picture emerges"). Indeed, the Supreme Court has *never* relied on the government's immigration powers to uphold religious discrimination. *Cf. Lamont v. Woods*, 948 F.2d 825, 835 (2d Cir. 1991) (noting that the Supreme Court "itself has suggested that the constitutional prohibition

28

against establishments of religion targets the competency of Congress to enact legislation of that description—irrespective of time or place").

In any event, the Order could not survive even under deferential review. As Judge Brinkema explained in *Aziz*, if the government's proffered reason "has been given in 'bad faith,' it is not 'bona fide,'" meaning the Court must determine "whether the proffered reason . . . is the real reason." *Aziz*, 2017 WL 580855, at *8 (citing *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 126 (2d Cir. 2009); *accord Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring in the judgment). Here, as set forth above, there is ample evidence that the purported distinction drawn on the basis of nationality is pretext for religious discrimination, and is therefore not bona fide.

## II. PLAINTIFFS HAVE STANDING AND WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

"To establish standing under Article III of the Constitution, a plaintiff must 'allege (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 590 (1992)). While standing is necessary, "the Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article Ill's case-or-controversy requirement." *Id.* (internal quotation marks omitted). Here, all plaintiffs have standing. Moreover, absent a temporary restraining order halting its implementation, the Executive Order will irreparably harm plaintiffs by, among other things, violating their constitutional rights, placing at risk their family members, clients, and members, and preventing or delaying their reunification with loved ones.

Plaintiffs have standing to assert their Establishment Clause claim based on the dignitary and stigmatizing harms that flow from the government's effort to target Muslims for opprobrium

and expose them to disfavored treatment. *See id.* at 372 (relying in part on stigmatic harms to establish standing). When the government "condemns . . . [a Muslim Plaintiff's] religion and exposes him and other Muslims . . . . to disfavored treatment . . . [it] suffices to establish the kind of direct injury-in-fact necessary to create Establishment Clause standing." See *Awad v. Ziriax*, 670 F.3d 1111, 1123 (10th Cir. 2012); *see also Catholic League for Religious and Civil Rights v. City and Cty. of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) (holding that Catholic residents had standing to challenge city's resolution condemning Catholic Church's directive relating to adoption by same-sex couples). As a result of the Executive Order's anti-Muslim animus, the individual Muslim Plaintiffs, as well as the Muslim clients and members of HIAS, IRAP, and MESA, have been marginalized and isolated in their communities, in addition to their other injuries discussed above. They and their loved ones have been subjected to baseless suspicion and scrutiny, all because Defendants have used their official positions and the Executive Orders as vehicles to condemn Islam and carry out their deep prejudice against Muslims. *See* Doe #1 Decl. ¶ 11, J.R. 45; Meteab Decl. ¶ 14, J.R. 53.

In addition to satisfying the requirements of standing, this kind of harm—arising from the unconstitutional condemnation of one's religion—qualifies as a paradigmatic irreparable injury. *Awad*, 670 F.3d at 1131 ("Damages would be inadequate or difficult to ascertain . . . for a claim of government condemnation of one's religion")(internal citation and quotation marks omitted); *see also, e.g.*, *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 607 F.3d 439, 449 (6th Cir. 2010) ("The fact that Defendants seek to minimize the residue of religious purpose does not mean that Plaintiffs do not suffer continuing irreparable injury so long as the display remains on the walls of the county courthouses."); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006) (holding that "a party alleging a violation of the Establishment

Clause per se satisfies the irreparable injury requirement of the preliminary injunction calculus"); *Am. Civil Liberties Union of Ill. v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986) (holding that damages were inadequate to address Establishment Clause injuries); *accord Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (noting that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (citations and internal quotation marks omitted); *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (same). Indeed, more generally, the violation of plaintiffs' constitutional rights amounts to irreparable injury. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987).

The individual plaintiffs also have standing based on the delay or denial of their loved ones' visas, which will imminently and irreparably harm them, as described in more detail for each Plaintiff below. *See Bostic*, 760 F.3d at 372 (holding that same-sex couple had standing to challenge statute prohibiting their marriage, in part based on their allegation that their marital status had hindered one from visiting the other in the hospital); *Covenant Media Of SC, LLC v. City Of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007) (holding that "the injury of not having an application processed timely is distinct from the injury of ultimate denial of that application"). Damages cannot adequately address this kind of injury.

Plaintiff John Doe #1's wife currently lives in Tehran, where she has been alone since her mother's unexpected death in 2013. Doe #1 Decl. ¶ 3, J.R. 43. Her spousal visa application was approved on November 3, 2016, and as of January 9, 2017, she had submitted all necessary documentation and fees, and was awaiting scheduling of an interview, which was expected in approximately six weeks at the time the Executive Order went into effect. Doe #1 Decl. ¶¶ 5-6,

J.R. 44. Her visa will now be denied or, at least, delayed in order to seek a waiver, and they will remain separated.

Plaintiff John Doe #3's wife, who lives in Iran, completed her visa interview in May 2016, and was told at the time that she only needed to await administrative processing. Doe #3 Decl. ¶ 5, J.R. 48. Her visa will not likewise be denied or delayed. Delay has already placed extraordinary stress on their relationship; communicating by phone is difficult, and visiting Iran is expensive and impractical, particularly given Plaintiff Doe #3's fifteen days of leave per year. Doe #3 Decl. ¶ 7, J.R. 48.

Jane Doe #2 is a U.S. citizen and a Syrian national. After the Syrian government bombed her home in Damascus, Jane Doe #2's sister fled with her husband and young children, first to relatives and then, because her husband feared conscription to the Syrian Army, to Yemen. Jane Doe #2 Decl. ¶¶ 3-4, J.R. 55. In Yemen, her sister's family registered with the United Nations High Commissioner for Refugees and received a temporary protection certificate; however, the area where her family was living in Yemen was subsequently taken over by insurgents. *Id*. ¶¶ 5-6, J.R. 56. The family then fled to Saudi Arabia, where they remain, living in a refugee hotel near the border with Yemen, often without power and in deplorable conditions, with constant shelling from the Yemeni side of the border, and subject to severe discrimination because they are Syrian. *Id*. ¶¶ 7-8, J.R. 56-57. Their visas will likewise be denied or delayed. Moreover, they will have little chance of traveling to the United States as a refugee given the Order's changes to the USRAP.

Plaintiff Meteab's two brothers, who are currently living as refugees in Jordan, both learned in November, 2016 that their refugee applications for the United States had been approved, but that they would have to wait longer for the travel documents. Meteab Decl. ¶ 11,

J.R. 52-53. Plaintiff Meteab's brothers' permission to enter the United States will be denied or delayed because of the Executive Order's suspension and reduction of the refugee program will delay their reunion as a family, and the reduction in the number of refugees who can be resettled each year may create an even longer backlog in the system and delay for Mr. Meteab's family. If they are not able to obtain a waiver they will not be able to travel to the United States for the full length of the suspension of the refugee program. They are currently living in insecurity in Jordan. Meteab Decl. ¶ 13, J.R. 53.

Plaintiff Harrison's fiancé is an Iranian national who lives in Tehran, where he has been harassed and assaulted by morality police as a result of his homosexuality. Harrison Decl. ¶ 11, J.R. 63-64.  Plaintiff Harrison petitioned for a K-1 visa on behalf of his fiancé, and his fiancé had a visa interview in Ankara, Turkey on November 7, 2016.  Harrison Decl. ¶ 3, J.R. 62.  On January 17, 2016, Plaintiff Harrison's fiancé received notification that the visa processing was complete. Harrison Decl. ¶ 4, J.R. 62.  However, on January 30, Plaintiff Harrison's fiancé received a second email informing him that, due to the January 27 Order, the processing of his visa was on hold. Harrison Decl. ¶ 6, J.R. 63.  On February 7, 2017, the Embassy sent another email, this time informing Plaintiff Harrison's fiancé that, because of the Washington court's order, he could submit his passport for processing. Harrison Decl.  ¶ 7, J.R. 63.  Plaintiff Harrison and his fiancé therefore made plans to meet in Turkey in early March.  Harrison Decl. ¶ 8, J.R. 63.   They are currently in Turkey, and they submitted Plaintiff Harrison's fiancé's passport to the embassy by express mail on March 8, 2017.  Harrison Decl. ¶ 9, J.R. 63.  The March 6 Order takes effect, will result in the denial or delay of the visa.

Plaintiff Ibrahim Mohomed's wife and children fled Somalia and have been in Ethiopia since 2011.  They are currently living in Ethiopia where his children are unable to attend school

as they do not speak the language and have limited access to health care. *Id.* ¶ 5, J.R. 61. They were approved for refugee resettlement in 2013 but their travel to the United States has not yet been booked. *Id.* ¶ 3, J.R. 60. The Executive Order suspends the arrival of refugees like Mr. Mohomed's family whose travel dates have not been set, and will delay or prevent their reunion as a family.

Organizational plaintiffs IRAP, HAIS, and MESA, are all likewise harmed by the Executive Order in ways that not only confer Article III standing, but that also constitute irreparable injury necessitating preliminary injunctive relief. *See Winters*, 129 S. Ct. at 375. Here, the organizational plaintiffs will be harmed because the new Executive Order is "perceptibly impair[ing]" their programs, making it more difficult to carry out their mission. *Action NC v. Strach*, 2016 WL 6304731, at *29 (M.D.N.C. Oct. 27, 2016) (citation omitted); *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012)); *see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (injury is irreparable when monetary damages are inadequate or difficult to ascertain), *abrogated on other grounds by Winter*, 555 U.S. 7 (2008).

HAIS and IRAP have previously described some of the injuries caused by what is now § 6(d) in the second Executive Order, *see* Dkt. No. 64 p. 20-23, and those injuries will be exacerbated if the additional provisions in the latest Executive Order go into effect. *See* Heller Decl. ¶¶ 7-8, 17, J.R. 2-3, 6; Hetfield Decl. ¶ 12, J.R. 15-16. The Executive Orders, for example, have and continue to cause IRAP to divert resources away from its core mission to undertake activities that are far afield from the legal representation that it typically provides its clients. *See* Heller Decl. ¶¶ 9-10, J.R. 14-15. Similarly injurious is that IRAP's growth has been impeded by the Order's directives freezing refugee processing and drastically cutting annual

refugee admissions.  *Id.* ¶ 12-16, J.R. 15-18; *see Equal Rights Ctr. v. Equity Residential*, 798 F.

Supp. 2d 707, 724 (D. Md. 2011) ("An organization's activities can be 'impeded' from growing

as quickly as they would have absent a diversion of resources").

The Executive Order will also inflict a direct harm to MESA by preventing many of its

members from attending its annual meeting, which is a central part of MESA's organizational

mission.  *See* Barron Decl. ¶¶ 12-20, J.R. 39-41.  In addition to injuring MESA itself, the Order

also directly and irreparably injuries its members, which are properly considered here as well.

*See Virginia Hospital Ass'n v. Baliles*, 868 F.2d 65, 663 (4th Cir. 1989); *Assoc. Utility*

*Contractors of Maryland, Inc. v. Mayor & City Council of Baltimore*, 218 F. Supp. 2d 749, 753

(D. Md. 2002).  Many MESA members are Muslim, and many understand the message of the

prior and current versions of the Order to be an attack on Islam, and have justifiably believe that

the second Order will negatively impact them, their travel, and their work.  *See* Baron Decl. ¶¶ 5-

11, J.R. 37-39.

Additionally, IRAP and HIAS have standing to vindicate the rights of their clients, who

will be irreparably injured absent immediate injunctive relief.  *See* Heller Decl. ¶¶ 19-23, 26, J.R.

6-8, 9 (explaining injuries to IRAP's clients); Hetfield Decl. ¶¶ 22-37, J.R. 20-26 (same

regarding HIAS' clients).  Although litigants typically can only assert their own rights, the

Supreme Court has "recogniz[ed] that there may be circumstances where it is necessary to grant

a third party standing to assert the rights of another."  *Kowalski v. Tesmer*, 543 U.S. 125, 129-30

(2004) (citation omitted).  Establishing third-party (or *jus tertii*) standing requires demonstrating

three elements:

> The litigant must have suffered an "injury in fact," thus giving him or her a
> "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant
> must have a close relation to the third party; and there must exist some hindrance
> to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (citation omitted).  As discussed above, the first element—IRAP and HIAS' own constitutional standing—is plainly present here.  As discussed below, the other two elements, which are factual matters of prudential standing, are met as well.

With regard to the relationship element, courts consider whether enjoyment of the third party's right asserted by the litigant is "inextricably bound up with the activity the litigant wishes to pursue," such that the court can be assured that enjoyment of that right will be affected by the outcome of the suit.  *Singleton v. Wulff*, 428 U.S. 106, 114-14 (1976).  In this case, IRAP and HIAS seek to vindicate the rights of their clients, with whom they have pre-existing relationships, and to whom they provide legal and social services.  *See, e.g.*, Heller Decl. ¶¶ 4-7, 21, J.R. 2, 7; Hetfield Decl. ¶¶ 5-9, J.R. 12-14.  HIAS additionally seeks to vindicate the rights of the refugee clients to whom, but for the Executive Order, it would be providing a variety of services related to their resettlement in the United States.  Hetfield Decl. ¶¶ 10-12, J.R. 14-16. The rights IRAP and HIAS seeks to vindicate, moreover—the constitutional and statutory rights not to be discriminated against because of religion and/or nationality, including in the issuance of visas and other immigration benefits—are "inextricably bound up with the activity" IRAP and HIAS wish to pursue: the continued delivery of legal and social services related to the travel, immigration, and resettlement of their clients.  Courts routinely find that relationships of this nature are sufficiently close to meet this element of the third-party standing standards.  *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016) (holding that refugee resettlement agency had sufficiently close relationship with incoming Syrian refugee clients that it could assert their equal protection rights), *aff'd* 838 F.3d 902 (7th Cir. 2016).[26]

---

[26] *See also, e.g.*, *U.S. Dep't. of Labor v. Triplett*, 494 U.S. 715, 718-72 (1990) (attorney-client relationship); *Caplin & Drysdale, Chartered v. United* States, 491 U.S. 617, 624 n.3 (1989)

Moreover, there are significant practical obstacles to IRAP and HIAS' clients' ability to protect their own interests, including language and cultural barriers, as well as reasonable concerns regarding the public and governmental scrutiny that would accompany them doing so. *See generally* Heller Decl. ¶ 27, J.R. 9.   The obstacles need not be "insurmountable" to meet this element of the third-party standing doctrine,[27] *Singleton*, 428 U.S. at 117; it is sufficient, rather, that there is "*some* hindrance to the third party's ability to protect his or her own interests," *Powers*, 499 U.S. at 411 (emphasis added)); *see, e.g.*, *id.* (lack of incentive to bring suit a sufficient hindrance); *Singleton*, 428 U.S. at 117 (same regarding privacy interests).   The various barriers facing HIAS and IRAP's clients face in asserting their own rights meet this element as well.   *See, e.g.*, *Exodus*, 165 F. Supp. 3d at 732-33.

## III.   THE BALANCE OF HARMS AND PUBLIC INTEREST MILITATE HEAVILY IN FAVOR OF A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION.

The balance of harms and public interest weigh strongly in favor of granting a temporary restraining order and preliminary injunction.   *See Winter*, 555 U.S. at 24.   In contrast to the irreparable injury facing plaintiffs, the government has presented no evidence of harm resulting from an injunction.   The federal government's interest in enforcing laws related to national security, absent any evidence of a threat, cannot outweigh these real harms.   *See Washington*, 847 F.3d at 1168 (dismissing the government's claim of irreparable injury and noting that "the Government has done little more than reiterate" its general interest in combatting terrorism)

(same), *aff'ing sub. nom. United States v. Harvey*, 837 F.2d 637, 642-43 (4th Cir. 1987) (en banc); *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984); *Metromedia, Inc. v. City of Sanddd Diego*, 453 U.S. 490, 504 n.11 (1981) (vendor-customer); *Craig v. Boren*, 429 U.S. 190, 195 (1976) (same); *Scott v. Greenville County*, 716 F.2d 1409, 1414-16 (4th Cir. 1983) (developer and prospective tenants).

[27] Nor does it matter that one of the obstacles facing HIAS and IRAP's clients could be mitigated by proceeding under pseudonyms.   *See Singleton*, 428 U.S. at 117.

(internal citations omitted).  Likewise, the Eastern District of Virginia found that "[i]ronically, the only evidence of in this record concerning national security indicates that the EO may actually make the country less safe."  *Aziz*, 2017 WL 580855, at *10; *see also* Hausman Decl. Ex. MM, J.R. 402-417 (Joint Declaration of Madeleine K. Albright, et al.); *id.* Ex. LL, J.R. 360-400 (Amicus Brief of Former National Security Officials).

Finally, the public interest also strongly favors a preliminary injunction.  As the Ninth Circuit found, "the public . . . has an interest in free flow of travel, in avoiding separation of families, and in freedom from discrimination."  *Washington*, 847 F.3d at 1169.  The Court should therefore issue a temporary restraining order and preliminary injunction.

## CONCLUSION

The Court should grant the motion for a temporary restraining order and preliminary injunction.

Dated: March  11, 2017[28]

                                    Respectfully submitted,

                                    /s/ Omar Jadwat
Justin B. Cox (Bar No. 17550)       Omar C. Jadwat
National Immigration Law Center     Lee Gelernt
1989 College Ave. NE                Hina Shamsi
Atlanta, GA 30317                   Hugh Handeyside
Tel: (678) 404-9119                 Sarah L. Mehta
Fax: (213) 639-3911                 American Civil Liberties Union
cox@nilc.org                        Foundation
Karen C. Tumlin                     125 Broad Street, 18th Floor
Nicholas Espíritu                   New York, NY 10004

---

[28] This brief was updated to reflect the "J.R." page numbering of the exhibits being filed herewith, and to add a table of contents. The brief and the exhibits are otherwise identical to those filed on March 10, 2017.

Melissa S. Keaney
Esther Sung
National Immigration Law Center
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
Tel: (213) 639-3900
Fax: (213) 639-3911
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sun@nilc.org

Tel: (212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org
lgelernt@aclu.org
hshamsi@aclu.org
hhandeyside@aclu.org
smehta@aclu.org

Cecillia D. Wang
Cody H. Wofsy
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org
cwofsy@aclu.org

David Cole
Daniel Mach
Heather L. Weaver
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: (202) 457-0805
dcole@aclu.org
dmach@aclu.org
hweaver@aclu.org

/s/ David Rocah
David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar
No.19670)
American Civil Liberties Union
 Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org

kumar@aclu-md.org
steiner@aclu-md.org


*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2017, I electronically filed this Motion for Plaintiffs with the Court Clerk using the ECF system, which will send notification to Defendants' registered counsel.

Dated: March 11, 2017                                         /s/ Omar Jadwat
                                                              Omar Jadwat