**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| INTERNATIONAL REFUGEE<br>ASSISTANCE PROJECT, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, et al,<br><br>Defendants. | Civil Action No.: 8:17-CV-00361-TDC<br><br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION OF THE REDUCTION IN REFUGEE ADMISSIONS FOR FY17** |

## TABLE OF CONTENTS

Page(s)

I.  PLAINTIFFS HAVE STANDING, & THIS COURT HAS JURISDICTION, BECAUSE THE EXECUTIVE ORDERS IRREPARABLY HARM PLAINTIFFS & THEIR CLIENTS ...................................................................................1

II. THE ADMINISTRATIVE PROCEDURE ACT PROVIDES A CAUSE OF ACTION AGAINST THE AGENCY DEFENDANTS ..............................................10

    A.  Plaintiffs Challenge *Agency* Action, Reviewable Under APA .......................10

    B.  Plaintiffs have Alleged Final Agency Action ..................................................12

III. PLAINTIFFS ARE LIKELY TO SUCCEED AS THE ORDR VIOLATES THE REFUGEE ACT AND IS NOT AUTHORIZED BY § 212(f) ..................................14

IV. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGHS IN FAVOR OF AN INJUNCTION ...........................................................................18

V.  THE COURT SHOULD ENJOIN § 5(D) WITHOUT THE EXCEPTIONS DEFENDANTS' REQUEST ....................................................................................19

CONCLUSION...............................................................................................................20

In Defendants' view, the Executive has broad power to unilaterally override the text of the Refugee Act.   Though Defendants wish to ignore the Refugee Act's requirements, the Administrative Procedure Act (APA) erects a barrier against such runaway agency action.

The Refugee Act was passed after careful deliberation in Congress and was designed to ensure: (1) that the United States sets its annual refugee admissions level only after "appropriate consultation"; and (2) that the United States establishes a stable annual figure to ensure the orderly and predictable resettlement of refugees.   The statutory text does not permit the unilateral slashing of the previously established refugee admissions level, even if the President requests executive agencies to carry out such a command.[1]   For the reasons discussed in Plaintiffs' opening brief and below, Plaintiffs respectfully request that this Court enter a preliminary injunction of the implementation and enforcement of § 5(d) of the January 27 Executive Order (Jan. 27 Order) and the soon-to-be-effective and identical § 6(b) of the March 6 Executive Order (Mar. 6 Order).[2]

## I.   PLAINTIFFS HAVE STANDING, AND THIS COURT HAS JURISDICTION, BECAUSE THE EXECUTIVE ORDERS IRREPARABLY HARM PLAINTIFFS AND THEIR CLIENTS.

To establish Article III standing, a plaintiff must demonstrate "(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citation omitted).   Here, multiple parties have standing, although "the Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Id.*

---

[1] In addition to the statutory claim, Plaintiffs have also asserted constitutional claims against § 5(d)—specifically that it and the rest of the Executive Orders violate the Establishment Clause and equal protection—any one of which is a sufficient basis for enjoining it.

[2] This brief refers to § 5(d) of the Jan. 27 Order because it remains in effect, but as Defendants acknowledge, the Court may consider the parties' briefing to apply with equal force to the identical § 6(d) of the Mar. 6 Order provision, and Plaintiffs respectfully request that the Court do so. *See* Defs.' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. of § 5(d) (hereinafter "Opp.") at 2.

(citation omitted).  Absent injunctive relief, § 5(d) will irreparably harm plaintiffs and their clients, including by placing at unnecessary additional risk family members abroad, and preventing or delaying their reunification with loved ones.

Nowhere in their opposition do Defendants dispute any of the evidence submitted by Plaintiffs, including that the reduction in FY 2017 refugee admissions has already created an enormous backlog, further delaying the processing and resettlement of thousands of refugees already in USRAP or who will be referred thereto.  *See, e.g.*, Hall Decl. ¶¶ 20-22, Dkt. 64-1, J.R. 5; 1st Hetfield Decl. ¶¶ 11, 24-26, Dkt. 64-1, J.R. 10-11, 15-17; 1st Heller Decl., ¶¶ 9, 11-21, Dkt. 64-1, J.R. 28-29.  This delay has real-world consequences for plaintiffs and their clients and loved ones.

First, Plaintiffs IRAP and HIAS have both suffered significant harm directly.  Both Executive Orders are forcing IRAP to divert significant resources away from its core mission, which is to provide and facilitate free legal services for refugees who seek safety here and in other Western countries.  2nd Heller Decl. ¶ 4, Dkt. 95-1, J.R. 1. Each of its clients who is diverted from USRAP or frozen therein represents a waste of significant resources—typically hundreds of hours of legal representation over many years spent navigating USRAP for that client.  *Id.* ¶¶ 8-9, J.R. 3-4.  IRAP has also had to scale back its representation in certain new cases, which before the Jan. 27 Order would have received full representation.  *Id.* ¶ 11, J.R. 4-5.  Additionally, IRAP has had to respond to hundreds of emails concerning the Executive Orders from individuals throughout the country, to educate its network of over 2,000 pro bono attorneys to address the Orders, to represent clients who were detained by Defendants because of the first Order, and to develop materials for attorneys and people both here and abroad affected by the Orders—all of which are not in the

normal scope of IRAP's work.[3]  *Id.* ¶¶ 8-10, J.R. 3-4.  Such diversion of resources from core

activities to address other harms are precisely the type that *Havens* and its progeny have held

sufficient for Article III standing.[4]  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379

(1982); *Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 725-728 (D. Md. 2011).

These harms, moreover, cannot be alleviated absent preliminary injunctive relief.  *See N.C. State*

*Conference of the NAACP v. N.C. State Bd. of Elections*, No. 16-1274, 2016 WL 6581284, at *9

(M.D.N.C. Nov. 4, 2016) (finding continued diversion of resources in the absence of relief satisfies

burden to show a likelihood of suffering irreparable harm).

Likewise, HIAS has already suffered direct financial injuries due to § 5(d).  The reduction

in refugee admissions translates into a crippling loss of up to $2.2 million in revenue, exacerbated

by the fact that, in reliance on the government's representations at the beginning of the fiscal year

that *more* refugees would be resettled, not fewer, HIAS invested significant resources to expand

its staff, affiliate network, and resettlement sites.[5]  1st Hetfield Decl. ¶ 11-13, Dkt. 64-1, J.R. 10-

---

[3] Similarly, and as a direct result of the decrease in annual refugee admissions and attendant freeze in refugee processing, IRAP has been prevented from opening new law school chapters and beginning new relationships with law firms to place cases for direct representation, a significant part of its core mission. This will result in the potential loss of hundreds of volunteers and relationships with numerous law firms because IRAP is unable to provide them with a way to partner with IRAP on cases, 2nd Heller Decl. ¶ 12, Dkt. 95-1, J.R. 5, which also supports Article III standing. *See Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 724 (D. Md. 2011) ("An organization's activities can be 'impeded' from growing as quickly as they would have absent a diversion of resources . . . .").

[4] Defendants' citation to *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994), is inapposite.  In that case, the plaintiff organization filed one lawsuit to vindicate the rights of one set of clients, which was dismissed for lack of standing; under these circumstances, the court held that there was no harm to support standing "where the only resources 'lost' are the legal costs of the particular advocacy lawsuit." *Id.* at 244. IRAP's standing does not derive from the costs of this lawsuit, however, and the diversion of its resources away from its core mission to address the fall-out of the executive orders represents significantly more than the costs associated with a single lawsuit.

[5] The severe reduction to HIAS' refugee resettlement this year will result in a loss of goodwill from and engagement of its partners, which will cause long-term and irreparable harm to HIAS's

11; 2nd Hetfield Decl. ¶¶ 8-10, Dkt. 95-2, J.R. 13-15.  This type of concrete and particularized injury is more than sufficient to support standing.  *See Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016), *aff'd* 838 F.3d 902 (7th Cir. 2016) (holding that "the loss of funds for social services [a refugee resettlement agency] provides its Syrian refugee clients, and will provide in the near future, is an injury to [it]" and "demonstrates that it has Article III standing").  In fact, in finding that a local affiliate of a resettlement agency was injured in comparable circumstances, the *Exodus* court rejected the same arguments made by Defendants here—that because the number of refugees allocated to the plaintiff for resettlement were in flux and never guaranteed, "there is no injury, or that it is at least hypothetical."  *Id.* at 729; *compare with* Opp. 11 (arguing that "resettlement agencies have no legal entitlement or protection in being able to resettle their expected number of refugees" and the funds HIAS will lose due to § 5(d) are merely "a potential future benefit to which it had no entitlement"). The *Exodus* court rightly found otherwise, holding that the plaintiff had standing because "it will be economically harmed by the State's decision to withhold federal funds from Exodus," and "[t]his loss of federal funds is detrimental to the programming Exodus can provide to its clients."  *Id.* at 730.

Second, IRAP and HIAS also have standing to vindicate the rights of their clients, who will be irreparably injured absent injunctive relief.  HIAS, for example, currently has pending more than 1,300 refugee applications on behalf of its clients in the United States who seek to be reunited with their family members who remain abroad, at least a significant portion of whom will be delayed (at a minimum), and in dangerous conditions, because of § 5(d).  *See* 1st Hetfield Decl. ¶¶ 25-26, Dkt. 64-1, J.R. 15-17; *see also* 2nd Hetfield Decl. ¶ 25, Dkt. 95-2, J.R. 11 (estimating that

---

ability to use these resources now and in the future.  *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 536, 551-52 (4th Cir. 1994) (irreparable injury satisfied by loss or likelihood of loss of goodwill).

HIAS has 1,395 clients abroad who have been vetted and approved for refugee status and "allocated and assured to a HIAS resettlement site[]"); 1st Heller Decl. ¶ 15, Dkt. 64-1, J.R. 30 (estimating that approximately 700 IRAP clients are trapped in limbo because of the freezing of USRAP); *id.* ¶¶ 5, 21-26 (explaining that IRAP also assists individuals in the United States file family reunification petitions, and that many remain in dangerous conditions); *see also* Hall Decl. ¶¶ 14, 24, Dkt. 64-1, J.R. 4-5 (explaining dangerous conditions refugees abroad are in and consequences of delay).

IRAP and HIAS meet the requirements for asserting third-party standing on behalf of their clients. *See Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004).  In addition to having suffered an injury-in-fact itself—which, as explained above, both organizations have—plaintiffs seeking to assert the rights and interests of others must demonstrate a "'close' relationship with the person who possesses the right," as well as "a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)).  Both elements are plainly met here.

On the relationship element, courts consider whether enjoyment of the third party's right asserted by the litigant is "inextricably bound up with the activity the litigant wishes to pursue," such that the court can be assured that enjoyment of that right will be affected by the outcome of the suit. *Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976).  IRAP and HIAS seek to vindicate the rights of their clients, with whom they have pre-existing relationships, and to whom they provide legal and social services.  *See, e.g.*, 2nd Heller Decl. ¶¶ 4-7, 21, Dkt. 95-1, J.R. 2, 7; 2nd Hetfield Decl. ¶¶ 5-9, Dkt. 95-2, J.R. 12-14.  HIAS additionally seeks to vindicate the rights of the refugee clients to whom, but for the Executive Order, it would be providing a variety of services related to their resettlement here.  2nd Hetfield Decl. ¶¶ 10-12, Dkt. 95-2, J.R. 14-16.  Moreover, the rights

IRAP and HIAS seek to vindicate—the constitutional and statutory rights not to be denied resettlement or family reunification based on religion, nationality, or illegal agency action—are inextricably bound up with the activity IRAP and HIAS wish to pursue: the continued delivery of legal and social services related to the travel, resettlement, and family reunification of their clients. Violation of their clients' rights harms IRAP and HIAS's very missions, such that these organizational Plaintiffs are "fully, or very nearly, as effective a proponent of" their clients' rights as their clients would be themselves. *Singleton*, 428 U.S. at 115. As explained by a district court in a situation whereby a refugee resettlement agency—an affiliate of an organization like HIAS— asserted the equal protection rights of its Syrian refugee clients, who were being discriminated against by an executive order of then-Governor of Indiana Mike Pence[6]:

> Exodus certainly has a close relationship with its Syrian refugee clients. Its entire purpose and mission is to resettle refugees escaping dire circumstances . . . . To do so, Exodus uses federal grant funds to provide its clients an entire range of services, including social, medical, and employment. Exodus seeks to assert its Syrian refugee clients' equal protection rights so that it may continue to receive federal funding to provide social services to those clients, which the State is currently withholding only as to refugees from Syria.
>
> This demonstrates that the enjoyment of the Syrian refugee's equal protection rights "is inextricably bound up with the activity [Exodus] wishes to pursue." Put differently, Exodus wishes to receive the funding necessary to provide social services to its Syrian clients, but it is being prevented from doing so by conduct it contends violates those clients' rights under the Equal Protection Clause . . . .

*Exodus*, 165 F. Supp. 3d at 732 (citations omitted).

As a practical matter, moreover, IRAP and HIAS's clients face daunting obstacles to protecting their own interests. *See Singleton*, 428 U.S. at 117 (holding that obstacles need not be "insurmountable" and that privacy interests are sufficient hindrance); *Powers*, 499 U.S. at 411

---

[6] *Cf.* First Am. Compl. ¶ 76 (alleging that § 5(g) of the Jan. 27 Order—§ 6(d) of the Mar. 6 Order—is intended to facilitate this type of discrimination in the resettlement process).

(holding that only "some hindrance to the third party's ability to protect his or her own interests" is necessary and that lack of incentive to bring suit is a sufficient hindrance). The third parties whose rights HIAS and IRAP seek to vindicate are refugees and other immigrants, both here and abroad. Those in the United States have only been here a short period, and have little familiarity with its laws and customs; something as simple as filling out a form is often baffling to those who did not grow up here. 2nd Heller Decl. ¶ 27, Dkt. 95-1, J.R. 9. Many have suffered significant trauma, about which they may feel shame or stigma, that poses additional barriers. *See id.* Many also come from countries where standing up to government wrongdoing would be to put oneself in harm's way, *see id.*; expecting them to shed those fears shortly after arrival here is unrealistic, particularly now, when they are considered suspect because of their religion, ethnicity, and immigration status. Here again, the *Exodus* court thoughtfully addressed this element, noting that refugees understandably would not want to draw attention to themselves in such circumstances. *Exodus*, 165 F. Supp. 3d at 732 (explaining Syrian refugees "natural-desire to 'lay low'" (citation omitted)). In sum, HIAS and IRAP have standing to assert the rights and interests of their clients, and so the Court may consider the irreparable injury that would befall those third parties absent an injunction as well.

Finally, several individual plaintiffs are also harmed by § 5(d). Plaintiff Meteab and his four brothers, for example, cooperated with the U.S. military in Iraq, which resulted in them receiving death threats and attempts on their lives, leading them to flee Iraq. *See* Meteab Decl. ¶¶ 4-7, Dkt. 95-6, J.R. 51. Although he and one brother have since come to the United States as refugees, three other brothers remain in Jordan. *Id.* ¶¶ 8-9, J.R. 51-52. Two of these brothers and their families have been approved for resettlement here, and only await travel documents, but due

to § 5(d)'s cut in refugee admissions, it is not clear if or when they will ever be resettled.  *Id.* ¶¶ 10-13, J.R. 52-53.

Likewise, Plaintiff Mohomed came to the United States as a refugee, fleeing persecution as a member of a minority clan.  Mohomed Decl. ¶¶ 1-2, Dkt. 95-8, J.R. 1-2.  After being resettled here, he petitioned to be reunited with his wife and children, whom he has not seen for two years.  *Id.* ¶¶ 3, 6, J.R. 60-61.  His family's refugee applications were approved in 2013 and they are currently in Ethiopia, waiting for authorization to travel.  *Id.* ¶ 3, J.R. 60. While they remain there, his children are not able to attend school because they do not speak the language. *Id.* ¶ 5, J.R. 61.  The possibility and timing of his family's resettlement here are imperiled by § 5(d).

Section 5(d) similarly affects Jane Doe #2, who has been certified as a refugee by the UNHCR and is currently living in refugee housing on the Saudi-Yemeni border with her husband and two young children. Jane Doe #2 Decl. ¶¶ 3-7, Dkt. 95-7, J.R. 55-57.  Her family is subject to severe discrimination because they are Syrian and live in deplorable conditions, with constant shelling from the Yemeni side of the border.  *Id.* ¶¶ 7-8, J.R. 56-57.  Their building is infested with bugs, human refuse from the bathroom of the unit above leaks into their room, and the Saudi Arabian government often shuts off the power to the building to make living conditions so intolerable that the refugees will leave.  *Id.* ¶ 7, J.R. 56-57.  As a result, their family is constantly sick, and for over a year, their children, now aged 2 and 7, did not believe that the sun rises and sets in Saudi Arabia because they lived in a room with no windows, and were allowed to emerge only occasionally from the building at night, when they could be accompanied by their father.  *Id.* ¶ 8, J.R. 57.  Jane Doe #2 has filed an I-130 petition for her sister so that once her visa is approved, she may access USRAP through the Priority-2 Direct Access Program for Iraqi and Syrian Beneficiaries of Form I-130 Petition for Alien Relatives ("P-2/DAP"), a program set up

specifically for Iraqi and Syrian refugees with relatives in the United States. *Id.* ¶ 10, J.R. 57-58. Under normal circumstances, if Jane Doe #2's petition for her sister was processed through P-2/DAP, her sister would have the chance to enter the United States in one to two years. Without access to USRAP and P-2/DAP, the normal I-130 visa process would take at least 13 years.

Section 5(d) thus imposes a significant barrier to these Plaintiffs' reunification with their families and loved ones, inflicting a cognizable injury. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471 (D.C. Cir. 1995) (vacated on other grounds) (finding "injury in fact" to U.S. residents whose immigrant visa petitions for relatives abroad were adversely affected by a change in State Department policy that "prolong[ed] the separation of immediate family members"); *see also Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007) (holding that "the injury of not having an application processed timely is distinct from the injury of ultimate denial of that application"). These harms are immediate and irreparable, and can only be remedied by injunctive relief.

In addition, contrary to Defendants' contentions, Plaintiffs fall squarely within the zone of interests of the Refugee Act, and have prudential standing to challenge § 5(d) under the APA. When determining whether plaintiffs may sue under the APA, courts consider whether their grievance "arguably falls within the zone of interest protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 154 (1997) (punctuation and citation omitted). This prudential standing test is "'not meant to be especially demanding,'" and should be conducted "in a manner consistent with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (internal citations omitted). A plaintiff falls outside the group to whom Congress granted

a cause of action only when its interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

HIAS, the world's oldest refugee resettlement agency; IRAP, an organization whose mission is to provide and facilitate free legal services to refugees seeking to escape persecution; and Plaintiffs Meteab, Mohomed, and Jane Doe #2, some of whom are refugees themselves and all of whom have family members who are refugees seeking entry to the United States, fall within the zone of interests that Congress intended to be protected by the Refugee Act.  As previously noted, the Act was enacted "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States," Pub. L. No. 96-212 § 101(a) *amended by* Pub. L. No. 103-236, *codified as amended at* 8 U.S.C. § 1521; it would be antithetical to that codified purpose to say that the interests' of refugees themselves are only "marginally related" the Act.  *Clarke*, 479 U.S. at 399.  Similarly, the Refugee Act expressly regulates HIAS and other resettlement agencies by constructing the refugee resettlement process directly on their demonstrated commitment to and expertise in resettling refugees.  *See, e.g.*, 8 U.S.C. § 1522.  Here, too, it cannot be seriously contended that HIAS is not within the statutory zone of interests.[7]

## II.    THE ADMINISTRATIVE PROCEDURE ACT PROVIDES A CAUSE OF ACTION AGAINST THE AGENCY DEFENDANTS.

### A.  Plaintiffs Challenge *Agency* Action, Which Is Reviewable Under the APA

---

[7] Defendants' reliance on *Haitian Refugee Center ("HRC") v. Gracey*, 809 F.2d 794, 813 (D.C. Cir. 1987), is thus to no avail.  HRC was not one of the nine voluntary agencies who are regulated by the Refugee Act; those who it sought to assist were not refugees as defined by the Refugee Act; and HRC had no preexisting relationship with them.

Contrary to Defendants' assertions, Plaintiffs challenge the actions of federal agencies to implement § 5(d) of the Executive Order, not the President's action in signing the Order itself. Opp. 16. "[F]inal agency action for which there is no other adequate remedy in a court" is subject to judicial review under the APA. 5 U.S.C. § 704. The exceptions to judicial review—when a statute precludes judicial review or the agency action is committed to agency discretion by law, *see id.* § 701(a)—are inapplicable here.

The APA reflects a strong presumption in favor of judicial review. *Sackett v. Envtl. Prot. Agency,* 566 U.S. 120, 128 (2012). In relevant part, the APA authorizes a court to: "hold unlawful and set aside an agency action, findings, and conclusions found to be— arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(A), (C).

Defendants attempt to insulate § 5(d) from judicial review by cloaking it as a Presidential act alone. Opp. 16-17. Defendants ignore, however, that § 5(d) is not self-executing—Department of State ("DOS") and Department of Homeland Security ("DHS"), specifically, both of which are Defendants—must and have undertaken actions to implement its mandate in keeping with their delegated authority to admit refugees. The President has no authority to immunize these actions from judicial review. Defendants claim these agency actions are merely "ministerial," and cannot form the basis of an APA claim. Opp. 16-17. But the cases on which the Defendants rely are inapposite because they involve nondiscretionary ministerial actions taken under an express *statutory* mandate. *See Id.* (citing *Senior Execs. Ass'n v. United States*, No. 12-02297, 2013 WL

11

1316333 *17 (D. Md. Mar. 27, 2013); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 402 (D. Md. 2011)).[8]

Similarly, Defendants' argument that § 5(d) should be considered agency action committed to agency discretion by law, and therefore exempt from judicial review, lacks merit. *See* Opp. 17. As an initial matter, the Supreme Court has made clear that this exception applies only to the "rare case" where "there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830-31 (1985). That is clearly not the case where the Refugee Act imposes a clear procedural command. Moreover, Defendants' own argument that INA § 212(f) justifies the lowering of the refugee admission number makes clear that even Defendants agree there is law to apply—the parties simply dispute what law controls.[9] Defendants also cite cases in which the text or structure of a statute demonstrated an intent to foreclose judicial review, s*ee* Opp. 18-19, but those cases are inapposite, as no such evidence exists in the text or structure of the Refugee Act. Here, the agency's reliance on invalid grounds—applying a purported ceiling on refugee admissions that violates the statute, rather than the legally binding ceiling properly established under the requirements of § 1157—is contrary to law and in excess of statutory authority, and therefore must be set aside.

## B.  Plaintiffs have Alleged Final Agency Action

Defendant DOS' and DHS' actions challenged here constitute "final agency action" within the meaning of 5 U.S.C. § 704. Agency action is "final" when two conditions are met: (1) "the

---

[8] *Chamber of Commerce of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 733 (D. Md. 2009), which Defendants also cite, does not involve an APA claim.

[9] Defendants' reliance on *Haitian Refugee Center, Inc. v. Baker*, Opp. 18, lacks merit because, on review, the Eleventh Circuit rejected the idea that § 212(f) provides no discernable standards for review, and instead found that plaintiffs could not assert an APA claim because, among other reasons, the relevant provisions of the Immigration and Nationality Act "provide the sole and exclusive avenue for judicial review" for the particular claim the plaintiff was asserting there, 953 F.2d 1498, 1506-07 (11th Cir. 1992).

action marks the consummation of the agency's decisionmaking process" and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 176.  Here, DOS and DHS have undertaken multiple actions that are reviewable under the APA.  For example, DOS has suspended the security checks required for processing of refugees under USRAP and has announced that the suspension will continue under the new Order.  *See* FAC ¶¶ 74, 128.  Shortly after § 5(d) went into effect, DOS issued a directive to U.S. embassies advising that they should delay booking travel for refugees awaiting final resettlement in the United States after March 3.  *See* Maria Abi-Habib, "U.S. Orders Slowdown of Refugee Resettlements," Wall Street J. (Feb. 16, 2017) http://on.wsj.com/2kP2mRx. The directive explicitly pointed to § 5(d)'s admissions reduction and the fact that admissions were already approaching the new 50,000 ceiling as justification for the slowdown in refugee resettlements.  *Id.* Similarly, and as a result of § 5(d), Defendant DHS has suspended all screening interviews and has indicated that the freeze will continue under the new Order.  FAC ¶¶ 73, 127. These actions are "final" under the two-part test in *Bennett*.

The first element for final agency action is satisfied when the agency offers its "last word" on the subject, even if that word is expressed less formally than a rule making or adjudication.  *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1813-14 (2016).  Indeed, courts have previously held that agency directives, such as the DOS directive to U.S. embassies, are final and reviewable under the APA.  *See Croplife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (directive contained in press release reviewable).  Similarly, policy statements and agency guidelines have been held "final" and subject to APA review.  *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 50 (D.C. Cir. 2000) (holding final the agency's policy position as evidenced through statements in rulemaking preambles and guidance statements and letters);

*Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1020-23 (D.C. Cir. 2000) (holding a guidance document reflected a settled agency position and noting that the fact an agency "acts as if a document issued at headquarters is controlling in the field" supports such a finding).

The second prong of the *Bennett* test is also satisfied here.  As Plaintiffs explained in their opening motion (at 9-12), the final agency action challenged here literally means a shutdown of refugee resettlement in the United States, from which legal obligations and consequences flow— particularly to Plaintiffs.  *See Appalachian Power Co.*, 208 F.3d at 1023 (finding the second *Bennett* prong met where "[t]hrough the Guidance, EPA has given the States their 'marching orders' and EPA expects the States to fall in line").  In contrast, cases in which courts have found an absence of final agency action involve situations where the agency's actions fall short of having direct legal effects.  *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 469-71 (1994) (finding the submission of base closure recommendations from the Secretary of Defense to the President was not final agency action because they were "purely advisory" recommendations that did not bind the President); *Franklin v. Mass.*, 505 U.S. 788, 797-800 (1992) (holding the Secretary of Commerce's action did not constitute final agency action where the report tabulating the results of the decennial census to the President carried no consequences, as the President was free to disregard); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 16-17 (D.C. Cir. 2005) (no final agency action in issuing recommended and non-coercive protocol).

### III.    PLAINTIFFS ARE LIKELY TO SUCCEED AS THE ORDER VIOLATES THE REFUGEE ACT AND IS NOT AUTHORIZED BY § 212(f).

Defendants do not contest that the Refugee Act requires that the number of refugees for a given fiscal year "*shall*" be the number the President designates "*before* the beginning of the fiscal year and *after* appropriate consultation."  8 U.S.C. § 1157(a)(2) (INA § 212(f)) (emphases added).

Defendants obviously do not contest that the Executive Order was issued during the current fiscal year; nor, notably, do they assert that the Executive engaged in *any* consultation with Congress.

Instead, Defendants contend the Court should ignore the Refugee Act's mandates because the number of refugees admitted in a given fiscal year has sometimes fallen short of the target set by the President. But such practical considerations do not authorize the President to write Congress's crystal-clear directions out of the statute. Defendants also attempt to repackage this mid-year redetermination as an application of § 212(f). But § 212(f) does not authorize the President unilaterally to rewrite the more detailed and later-enacted provisions of the Refugee Act.

Defendants misconceive the role of the Refugee Act in Plaintiffs' argument. *See* Opp. 19 (asserting that Plaintiffs' argument is that "Section 5(d) is not authorized by the Refugee Act" and noting that the Order purports to exercise § 212(f) authority). It is not simply that the Refugee Act does not authorize the President's actions; to the contrary, it *prohibits* it. Congress carefully considered and dictated precisely when and how the President is to make the determination of the number of refugees to be admitted in a given fiscal year. *See* Pls.' Br. 13-17. The ordinary rules of statutory construction require the conclusion that a mid-year reduction without consultation is prohibited. *Id*. at 13-15. Congress had very good reasons to establish that rule. *See id.* at 5-6, 15-17; Br. For Amicus Harvard Immigration and Refugee Clinical Program ("Refugee Amicus Br."), Dkt. 68, at 2, 5-6 (explaining that Congress sought to ensure regularity in refugee admissions, avoid political considerations in refugee policy, promote humanitarian relief, encourage thorough consideration of annual admission figures, and ensure that Congress would have a robust role in the process.).[10]

---

[10] Defendants protest that Plaintiffs' argument is a mere "line-drawing inquiry." Opp. 26. But that is the point: Congress dictated how and when that line is to be drawn—in consultation with

Defendants primarily argue that the statutorily required figure is merely an "upper limit" on refugee admissions, pointing out that the government does not always process and admit as many refugees as authorized for a given fiscal year.  Opp. 20-22 (citing such practicalities as "budget constraints" and "processing delays").  But such practical circumstances are a world away from what the President has done here.  This case is about the President's asserted authority to revoke and wholesale replace the number of refugees to be admitted, *contrary* to Congress's clear command that the president set that number only at a particular time and in a particular way.  Congress did not intend the specific and mandatory procedures of § 1157(a)(2), binding on the President, to be subject to an implicit exception that could be ignored.

Moreover, Defendants' argument that § 1157(a)(2) is irrelevant because it sets only an "upper limit" flies in the face of how resettlement operates in reality.  The United States was on track to admit approximately the 110,000 refugees authorized for this fiscal year, but has dramatically altered its practices to implement the Executive Order.  *See* Pls.' Br. 9-10.[11]  The President's action, replacing the prior President's § 1157(a)(2) determination, has very real effects and is a clear violation of the Refugee Act.

Consistent with their litigation on the Executive Order before other courts, Defendants seek to immunize the President's actions by reference to § 212(f).  That section is a poor fit for the action the President has taken, for several reasons.  First, the President's invocation of § 212(f) is highly implausible, even on its own terms.  *See* Opp. 17-18.  Defendants contend that the "identifiable class" the President seeks to exclude under § 212(f) is the set of individuals sharing

---

Congress and before the fiscal year.  And in dictating the procedure Congress knew that new Presidents would be inaugurated mid-fiscal year, but included no such exception in § 1157(a)(2).

[11] Defendants' argument is also internally contradictory.  The Government asserts that the designated number of refugees is irrelevant as a mere upper limit, but does not explain why it was nonetheless necessary for the President to lower the level in the Executive Order.

the "common attribute of not being among the first 50,000 refugees admitted in fiscal year 2017." Opp. 24-25 (internal quotation marks omitted).  Such a capacious understanding of "class," defined only by reference to Defendants' application processing procedures, would reach far beyond the power to exclude individuals because of something *about them* and instead authorize the President to unilaterally rewrite the immigration laws.  Defendants have offered no reason to believe Congress intended to grant such arbitrary authority, disconnected from the purposes of § 212(f).[12]

A limiting principle is particularly important where, as here, the President's overreaching invocation of § 212(f) runs squarely into a contrary statutory provision.  As Plaintiffs have explained, the Refugee Act establishes specific procedures by which the President may determine how many refugees it is in the "national interest" to admit in a given year.  8 U.S.C. § 1157(a)(2). President Trump has invoked § 212(f) to conclude that the admission of the previously designated number of refugees would be "detrimental to the interests of the United States"—or in other words, to address the very question governed by § 1157(a)(2) without abiding by that statute's procedural requirements.  Pls.' Br. 18-19.  A conflict between the Refugee Act and this invocation of § 212(f) could hardly be clearer.[13]

But there is no necessary conflict between the statutes.  Plaintiffs agree with Defendants that the statutes can and should be interpreted "harmoniously."  Opp. 21 (quoting *Baltimore Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721, 741 (D. Md. 2001) (internal quotation marks

---

[12] The cases on which Defendants rely involving past uses of § 212(f) underscore their error in applying § 212(f) to a class defined by nothing but government processing procedures.  *See, e.g.*, *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (addressing proclamation barring "officers or employees of the Cuban government or the Cuban Communist Party").

[13] Defendants' assertion that the "same question can lead to different outcomes at different moments in time," Opp. 23, is true but irrelevant.  Here, Congress directed *when* the question should be answered: before the fiscal year begins.  The Refugee Act specifies only one exception to that rule, for mid-year *increases*, and does not make an exception for § 212(f).

omitted)).  Recognizing that § 212(f) does not, even alone, authorize the sort of quota-setting the President is engaged in here is one way to harmonize the statutes.  Another is to recognize, as *Baltimore Gas* itself explains, that a specific statute like § 1157(a)(2), which speaks directly to the question here, "compels a narrow reading" of a more general provision like § 212(f), which does not refer to refugees or admission numbers at all, because the "subsequently enacted and more specific" § 1157(a)(2) controls.  *Id.*; *see also* Pls.' Br. 18-19; Refugee Amicus Br. 9-11.[14]

Finally, Defendants suggest that, in seeking to affect an end-run around Congress's command, the President is at the "apex" of his authority.  *See* Opp. 19-20 (citing *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (Jackson, J., concurring)).  But that is simply not so where, as here, the President has chosen to take "measures incompatible with the expressed or implied will of Congress." *Zivotofsky*, 135 S. Ct. at 2084 (internal quotation marks omitted); *see also id.* (observing that in such circumstances presidential power is "at its lowest ebb," and "his claim must be scrutinized with caution").  More generally, the argument that this Executive Order should be insulated from meaningful judicial scrutiny has already been repeatedly rejected.  *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) ("[I]t is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action."); *Aziz v. Trump*, ___ F. Supp. 3d ___, 2017 WL 580855 at *5 (E.D. Va. Feb. 13, 2017) ("This is a familiar judicial exercise.").

## IV.  THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGHS IN FAVOR OF AN INJUNCTION.

---

[14] By contrast, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976), addressed a situation where the later enacted statute was more *general* and the two relevant canons of construction pointed in different directions.  Here, both canons require that the Refugee Act controls.

The balance of harms and the public interest, which merge here, Opp. 28-29, weigh strongly in favor of a preliminary injunction.  The Refugee Act itself identifies the public interest at issue: "The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands."  Pub. L. No. 96-212, § 101(b), 94 Stat. 102.  As described above, Congress specified detailed procedures for vindicating this public interest.  Defendants' asserted national security concerns do not alter this conclusion.  The government has never attempted to explain why a cap on the number of refugees—independent of the Executive Order's other restrictions and proposed vetting procedures—would serve any national security purpose whatsoever.  Instead, "the Government has done little more than reiterate" its interest in fighting terror.  *Washington*, 847 F.3d at 1168 .

## V.      THE COURT SHOULD ENJOIN § 5(D) WITHOUT THE EXCEPTIONS DEFENDANTS REQUEST.

If the Court concludes that § 5(d) violates the Refugee Act, Defendants contend that the Court should issue a narrow injunction that would allow them to keep enforcing § 5(d) against all refugees other than Plaintiffs' clients.  *See* Opp. 31-32.  But Defendants' proposed injunction would not in fact provide Plaintiffs with full relief and should accordingly be rejected.

Defendants agree that injunctive relief should extend as far as "necessary to provide complete relief to the plaintiffs."  Opp. 31 (quotation marks omitted).  But the alternative remedies they suggest, Opp. 32, would not "provide complete relief" to HIAS or IRAP.      Most fundamentally, § 5(d) has ground U.S. refugee processing to a halt, with worldwide repercussions that would not be corrected by a simple change in IRAP's or HIAS's allotment numbers.  Because of § 5(d), USCIS has shut down all "circuit rides," where DHS personnel conduct refugee processing interviews abroad.  *See* Hall Decl., ¶ 22, J.R. 5; 1st Heller Decl., ¶ 13, Dkt. 64-1, J.R. 30.  With the processing apparatus frozen, Plaintiffs' delays will intensify, resources will remain

diverted, and clients will remain abroad. *Id.* Circuit rides are necessary for any injunction to be effective, and a numerical allowance just for IRAP or HIAS would not restart them. Complete relief, even just for Plaintiffs, thus requires enjoining § 5(d) in its entirety.

Moreover, for IRAP, merely adding 700 to the reduced nationwide level (as Defendants propose, Opp. 32) would not reach all of its 700 clients, and would not forestall IRAP's delays and diversion of resources. *See* 1st Heller Decl. ¶ 9-10, Dkt. 64-1, J.R. 28-29. For HIAS, restoring its allotment while keeping § 5(d)'s unlawful cap in place, see Opp. 32, would harm all other refugee resettlement agencies, contrary to the requirement that injunctive relief be designed to avoid harm to third parties. In short, to provide Plaintiffs with full relief, it is necessary to enjoin Defendants from implementing § 5(d) across the board.[15]

## CONCLUSION

For the above reasons and those set forth in Plaintiffs' opening brief, the Court should enter a preliminary injunction of the implementation and enforcement of § 5(d) of the Order.

Dated: March 12, 2017                          Respectfully submitted,

                                               /s/ Melissa S. Keaney

                                               Karen C. Tumlin†
                                               Nicholas Espíritu†
                                               Melissa S. Keaney†

---

[15] The fact that an injunction will benefit others is not a reason to issue a narrower injunction. As the Fourth Circuit has held, "[t]he settled rule is that . . . the requested (injunctive) relief generally will benefit not only the claimant but all other persons subject to the practice or the rule under attack." *Sandford v. R.L. Coleman Realty Co., Inc.*, 573 F.2d 173, 178 (4th Cir. 1978); *see also Evans v. Harnett Cty. Bd. of Ed.*, 684 F.2d 304, 306 (4th Cir. 1982) (enjoining an unlawful policy in its entirety "is not prohibited merely because it confers benefits upon individuals who were not plaintiffs"). Moreover, as the Ninth Circuit noted in upholding a nationwide injunction against the Jan. 27 Executive Order, "a fragmented immigration policy would run afoul of the constitutional and statutory requirements for uniform immigration law and policy." *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) (granting nationwide injunction).

Esther Sung†
National Immigration Law Center
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
T: 213.639.3900
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

Justin Cox (Bar No. 17550)
National Immigration Law Center
1989 College Ave. NE
Atlanta, GA 30317
T: 678.404.9119
cox@nilc.org

Omar C. Jadwat†
Lee Gelernt†
Hina Shamsi†
Hugh Handeyside†
Sarah L. Mehta†
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
ojadwat@aclu.org
lgelernt@aclu.org
hshamsi@aclu.org
hhandeyside@aclu.org
smehta@aclu.org

Cecillia D. Wang†
Cody H. Wofsy†
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
cwang@aclu.org
cwofsy@aclu.org

David Cole†
Daniel Mach†
Heather L. Weaver†

American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: (202) 457-0805
dcole@aclu.org
dmach@aclu.org
hweaver@aclu.org

David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar No.19670)
American Civil Liberties Union
Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
steiner@aclu-md.org

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of March, 2017, I caused a PDF version of the

foregoing document to be electronically transmitted to the Clerk of the Court, using the

CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF

registrants.

Dated:  March 12, 2017                           Respectfully submitted,

                                                 /s/ Melissa S. Keaney