**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> Defendants. | Civil Action No: 8:17-CV-00361-TDC |

**HISTORY PROFESSORS AND SCHOLARS' MOTION FOR LEAVE TO FILE
*AMICI CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER**

*Amici curiae* respectfully move the Court for leave to file a brief in support of Plaintiffs' Motion for a Temporary Restraining Order.  A copy of the proposed brief is attached as Exhibit A to this motion.  Plaintiffs have consented to the filing of the attached brief.  Defendants were asked for their position on the filing of this motion and the attached *amicus* brief, but they had not provided a response by the time of the filing of this motion.

I.      *Amici Curiae*

*Amici* are professors who are experts in U.S. and world history.  They have identified troubling parallels between the criminal reporting requirements in Section 11 of Executive Order 13780 and similar actions that have been taken in the past to stigmatize targeted populations, and wish to bring them to the Court's attention.

1

*Amici* are the following: [1]

>Professor Alicia Schmidt Camacho
>Professor Crystal N. Feimster
>Professor David Scott Fitzgerald
>Professor Estelle B. Freedman
>Professor Glenda Elizabeth Gilmore
>Professor Kelly Lytle Hernandez
>Professor Matthew Frye Jacobson
>Professor Karl Jacoby
>Professor Benjamin H. Johnson
>Professor Khalil Gibran Muhammad
>Professor Mae M. Ngai
>Professor A. Naomi Paik
>Professor Stephen Pitti
>Professor Todd Presner
>Professor Geoffrey Robinson
>Professor Elliott Young

II.     *Amici* Should Be Permitted to Submit Their Brief

*Amici*'s brief focuses on the criminal reporting requirements in Section 11 of the

Executive Order.  *Amici* offer concrete examples of past experience with race- or national origin-

based criminal reporting and criminal associations like those in Section 11, to illustrate that such

measures both cause discriminatory effect and are motivated by discriminatory animus.  For

these reasons, *amici* respectfully request that the Court grant this motion for leave to file the

attached brief.

DATED:  March 13, 2017                    By:   ___/s/ Sirine Shebaya_____
                                                      Sirine Shebaya

                                          Sirine Shebaya (Bar No. 07191)
                                          Civil Rights and Immigration Attorney
                                          P.O. Box 42219
                                          Washington, DC 20015
                                          Tel: (202) 656-4788
                                          Email: Sirine.Shebaya@aya.yale.edu

---

[1] *Amici* are acting on their own behalf and not on behalf of any organizations with which they are associated.  No party's counsel authored the brief in whole or in part, and no person other than counsel for *amici* contributed money that was intended to fund preparing or submitting this brief.

Katherine Huang*
Carlos Singer*
HUANG YBARRA SINGER & MAY LLP
550 South Hope Street, Suite 1850
Los Angeles, CA  90071
Tel: (213) 884-4900
Email: Katherine.Huang@hysmlaw.com
        Carlos.Singer@hysmlaw.com

*Admission pro hac vice pending

*Counsel for Amici Curiae*

**Exhibit A**

Proposed *Amicus* Brief by History Professors and Scholars

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT, et al.,

      Plaintiffs,

      v.

DONALD J. TRUMP, et al.,

      Defendants.

Civil Action No: 8:17-CV-00361-TDC


**HISTORY PROFESSORS AND SCHOLARS' *AMICI CURIAE* BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER**

Katherine Huang*
Carlos Singer*
HUANG YBARRA SINGER & MAY LLP
550 South Hope Street, Suite 1850
Los Angeles, CA  90071
Tel: (213) 884-4900
Email: Katherine.Huang@hysmlaw.com
      Carlos.Singer@hysmlaw.com

*Admission pro hac vice pending

Sirine Shebaya (Bar No. 07191)
Civil Rights and Immigration Attorney
P.O. Box 42219
Washington, DC 20015
Tel: (202) 656-4788
Email: Sirine.Shebaya@aya.yale.edu


*Counsel for Amici Curiae*

1

**TABLE OF CONTENTS**

STATEMENT OF INTEREST ............................................................................................1

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................3

     I.      NAZI GERMANY…………………………………………………………….3

     II.     THE UNITED STATES' PAST USES OF RACE- AND…………………..4
            NATIONAL ORIGIN-BASED CRIME REPORTING
            TO EXCLUDE PARTICULAR IMMIGRANTS

            A. Use of Criminal Association to Exclude Italian Immigrants ...................5

            B. Use of Criminal Association to Exclude Chinese Immigrants.................7

            C. Immigrants Portrayed as Sexual Threats to U.S. Citizens .......................8

     III.    STEREOTYPING OF AFRICAN AMERICAN MEN AS RAPISTS..........9

CONCLUSION.................................................................................................................11

## STATEMENT OF INTEREST

*Amici* are professors who are experts in U.S. and world history. [1]  They are compelled to submit this brief because of the troubling parallels between the criminal reporting requirements in Section 11 of Executive Order 13780 and similar actions that have been taken in the past to stigmatize targeted populations, advance widespread inequities, and stir up hatred and violence. *Amici* offer concrete examples of actual experience with race- or national origin-based criminal reporting like that in Section 11, to illustrate that such measures both cause discriminatory effect and are motivated by discriminatory animus, and thus are precisely the types of invidious actions that the United States Constitution is meant to guard against.

## INTRODUCTION

Throughout modern history, criminal reporting targeting particular groups have been used to demonize those groups and incite bigotry.  Section 11 of Executive Order 13780 sets up just this type of hate-mongering.  It directs the Secretary of Homeland Security to collect and make publicly available every 180 days the following information: (i) the number of foreign nationals who have been charged with, convicted of, or removed from this country based on terrorism-related activity; (ii) the number of foreign nationals who have "been radicalized" and engaged in "terrorism-related acts;" (iii) the number and types of acts of "gender-based violence against women, including so-called 'honor killings,' in the United States by foreign nationals," and (iv) any other information "relevant to public safety and security…including information on the immigration status of foreign nationals charged with major offenses."  These provisions follow on the heels of another Executive Order that requires the Secretary of Homeland Security to, "on a weekly basis, make public a comprehensive list of criminal actions committed by

---

[1] *Amici* are identified in Attachment 1.

aliens." Executive Order 13768 of January 25, 2017, Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 18, at § 9(b).

The Court need go no farther than the plain language of Section 11 to find discrimination. The criminal reporting requirements apply to only one class of people: "foreign nationals." Moreover, Section 11 singles out "honor killings," which are often associated with Islam and mistakenly believed to be a common, accepted ritual in Muslim communities.  The Court undoubtedly also is aware of evidence of the Executive Branch's comments equating immigrants and Muslims with criminals despite facts -- scientific and empirical evidence -- establishing that immigrants and Muslims do not, in fact, commit more crime or inflict more violence on women than non-Muslim individuals born on U.S. soil.

 This *amicus* brief does not repeat these arguments, but instead provides historical context for Section 11's criminal reporting requirements.  From Nazi Germany to the post-Reconstruction American South to the exclusionary laws passed in the early twentieth century, historical studies have shown that crime reporting that disproportionately focuses on members of a social or political minority has routinely been used as a tool of mass stigmatization and criminalization, anchoring disparate human outcomes including nation-based exclusion from the United States.  In some instances, the association of a particular community with criminality, and the reinforcement of that association in the public mind through official government action and rhetoric, have led to widespread state and vigilante violence against members of the identified group.

In this case, the targeted group consists of "foreign nationals."  As the Supreme Court recognizes, race, alienage, and national origin are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice

2

and antipathy--a view that those in the burdened class are not as worthy or deserving as others."

*City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432, 440 (1985).  History has borne this out, demonstrating that laws and actions like Section 11 of the Executive Order serve no purpose but to brand people as criminals based solely on race or national origin.  As such, Section 11 violates the bedrock principles of equal protection in the United States Constitution.[2]

## ARGUMENT

While the reporting requirements in Section 11 of the Executive Order do not map squarely onto similar policies that have been imposed in the past, they do share one key element: the targeted association of a particular minority population with criminality.  The historical examples discussed below demonstrate that equating groups with criminals is aimed at marginalizing, excluding, and suppressing the targeted groups, and do in fact cause severe dignitary harm to them.

## I.   <u>NAZI GERMANY</u>

In Nazi Germany, Jews (and other minority groups) were subject to targeted and disproportionate charges of criminality that quickly led to the mass stigmatization of those groups, the deprivation of rights and citizenship, and, finally, outright deportation and mass murder in concentration and death camps.

The equation of Jews with criminality, which has a long European history, was a pervasive and recurrent part of Nazi rhetoric and policy.  In the Nazi weekly *Der Stürmer*, for

---

[2] *See, e.g.*, *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (laws that classify people by race, alienage, or national origin are constitutional only if they are narrowed tailored to further a compelling state interest); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (laws violate equal protection principles if they are administered in a discriminatory fashion); *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (facially neutral law with a discriminatory effect violates equal protection if a discriminatory intent or purpose was a motivating factor for the law).

example, Jews were consistently portrayed as "born criminals" who undermined the well-being

of Germany and defiled the German race.  While *Der Stürmer* often featured pictures of

individual Jews accused of crimes (along with their names and addresses), it primarily portrayed

Jews as a group to be guilty of murder, degeneracy, sexual perversion, fraud, and rape.

Throughout the 1930s and early 40s, Nazi organizations and government-supported

research institutes undertook countless "criminological studies" to articulate what they

considered to be the fundamental linkage between Jewishness and hereditary criminality.[3]

State-supported organizations such as the Institute for History of the New Germany and its

affiliated Research Department for the Jewish Question, the Nazi Party Institute for Research on

the Jewish Question, and the Reich Security Main Office, published statistics, anthropological

studies, and research reporting on alleged "Jewish criminality."  Seizing on data purportedly

demonstrating the inherency of criminality in Jews as a race, State authorities accused Jews of

causing moral and spiritual degeneracy, defiling the German race, and weakening the German

nation.  This directly paved the way for more radical measures to exclude Jews from the

political, social, economic, and cultural life of Germany, and ultimately to the systematic

rounding-up, deportation, and annihilation of Jews.

## II.   THE UNITED STATES' PAST USES OF RACE- AND NATIONAL ORIGIN-BASED CRIME REPORTING TO EXCLUDE PARTICULAR IMMIGRANTS

The United States has its own shameful history of using crime statistics and mass

criminalization to justify excluding immigrants and to incite hatred, even violence, against

---

[3] Robert G. Waite, "'Judentum und Kriminalität' – Rassistische Deutungen in kriminologischen Publikationen 1933-1945," in: *Rassismus, Faschismus, Antifaschismus*, eds. Manfred Weissbecker and Reinhard Kühnl (Papy Rossa Verlag, 2000), 46-62; Michael Berkowitz, *The Crime of my Very Existence: Nazism and the Myth of Jewish Criminality* (University of California Press, 2007); Alan Steinweis, *Studying the Jew: Scholarly Antisemitism in Nazi Germany* (Harvard University Press, 2006).

4

targeted groups.  In the late nineteenth and early twentieth century, the Anglo-American

Protestant elite fueled crime scares associated with "criminal aliens" from particular European

nations and constructed the image of opium-addicted deviants from China.  One writer opined

that the "overwhelming influx from south Europe" would "change our type of crime—murder,

rape and sex immorality will become more common than the Anglo-American crimes of

burglary, drunkenness and vagrancy."  Nativists manipulated crime statistics to justify their

xenophobic policies, resulting in the passages of the Chinese Exclusion Act and the Immigration

Act of 1924.

### A.      Use of Criminal Association to Exclude Italian Immigrants

The treatment of immigrants from Italy provides one example of how criminalization has

been used as an exclusionary tactic.  From the onset of large-scale Italian immigration in the late

nineteenth century, newspapers and government reports routinely slurred Italians as criminals.

An 1891 editorial in *The New York Times* praised the lynchings of six Italians for eliminating

"sneaking and cowardly Sicilians, the descendants of bandits and assassins, who have

transported to this country the lawless passions, the cut-throat practices, and the oath-bound

societies of their native country," who were "to us a pest without mitigations."  Writing in the

*North American Review* in 1908, New York's police chief singled out Italians – particularly

"medieval criminals" from Southern Italy – and lamented that "our streets are overrun with

foreign prostitutes, and foreign anarchists openly advocate murder and arson in our slums."

A joint House-Senate congressional commission known as the Dillingham Commission

published a series of reports between 1907 and 1910 that further stigmatized Italians as

criminals.  Some of the reports drew on arrest and incarceration reports to argue that Italians

were disproportionately likely to commit violent crimes.  Other reports asserted that Southern

Italians or Italians were "regarded by many as racially undesirable" because of "their ignorance, low standards of living, and the supposedly great criminal tendencies among them."

Accepting the view of "the not unfounded belief that certain kinds of criminality are inherent in the Italian race," the Dillingham Commission recommended reducing immigration from Italy and other countries in Southern and Eastern Europe.  Senator Henry Cabot Lodge, a member of the public Dillingham Commission and of the private Immigration Restriction League, promoted a literacy test for immigrants knowing it would "bear most heavily upon the Italians, Russians, Poles, Hungarians, Greeks, and Asiatics, and very light, or not at all upon English- speaking emigrants or Germans, Scandinavians, and French."   After the literacy bill was passed in 1917, immigration from Italy fell from 283,738 in 1914 to 95,145 in 1920.

To further reduce Southern European immigration while allowing entry to large numbers from northern and western Europe, the Emergency Quota Act of 1921 was passed to restrict the annual number of immigrants admitted from any country to three percent of the number of residents from that same country living in the United States in the 1910 census.  This, in effect, permitted "old-stock" immigration from northern and western Europe at the prewar level, while cutting immigration from "new-stock" southern and eastern Europe to a fifth of its prewar level.

The Immigration Act of 1924 heightened the preference for "old-stock" European immigrants by rolling back the base year for calculating the quotas from 1910 to 1890. The 1924 act established an annual maximum quota for each nationality that would be two percent of the total population of that nationality as recorded in the 1890 census, with a minimum quota of 100. In practice, that meant that the share of the quotas reserved for southern and eastern Europeans fell from 45 to 16 percent. The House committee report adopting the 1890 baseline acknowledged that its goal was to reduce the flow of "races from southern and eastern Europe."

6

In the case of Italians, the annual quotas were reduced from 42,057 in 1921 to 3,845 in 1924.  It was not until 1965 that Congress ended the national origins quota system.[4]

### B.      Use of Criminal Association to Exclude Chinese Immigrants

During the late nineteenth and early twentieth centuries, journalists reported that opium threatened American society because it made users insane, promiscuous, and nonproductive. As the *Reno Evening Gazette* put it in February 1879, opium addiction was a "foul blot on society – a hideous, loathsome moral leprosy, paralyzing the mind and wrecking the body. It is a foul cancer, eating the vitals of society and destroying all who are drawn within its horrible spell."

Although British immigrants and Anglo-Americans were active members of the opium trade, the press nearly exclusively reported Chinese immigrants as the purveyors of opium within the United States.  According to one story, Chinese immigrants were "directly responsible for this blighting vice. They imported and introduced the curse, and at their door must it be laid with a thousand other moral sins."  When cities and states began passing anti-opium laws during the 1870s, such reporting disproportionately cast Chinese immigrants as a criminal class even though in actuality, very few Chinese immigrants were involved in the opium trade.

With this disproportionate focus on the Chinese as opium dealers, anti-opium campaigns were inevitably swept into a broader anti-Chinese movement.  In 1882, Congress passed the Chinese Exclusion Act, which prohibited Chinese laborers from entering the United States for ten years.  It was extended in 1892 and made permanent in 1902.

The passage of the Chinese Exclusion Act, and the laws that followed, marked a pivotal turning point in U.S. history. Never before had a national group been banned from entry at U.S.

---

[4] For more information, see: FitzGerald, David and David Cook-Martín. *Culling the Masses: The Democratic Roots of Racist Immigration Policy in the Americas* (Harvard University Press, 2014); and Alba, Richard. *Italian Americans: Into the Twilight of Ethnicity* (Prentice Hall, 1985).

borders, and it not only excluded immigrants at the borders, but it also assaulted the dignity of

Chinese Americans already living within the United States and subjected them to increased state

surveillance.  The Chinese exclusion laws also set the foundation for a series of immigration

bans that, by 1924, expanded into a system of total Asian exclusion from the United States.

The disproportionate reporting of Chinese immigrants as criminals thus buoyed the mass

stigmatization of Chinese immigrants and cast them, as well as other Asian groups, as

categorically unwelcome in the United States.[5]

### C.      Immigrants Portrayed as Sexual Threats to U.S. Citizens

The stereotyping of immigrants from certain countries as sexual threats further fueled the

hostility to the "new immigrants."  At first, the demonization of immigrants as sexually immoral

focused on prostitution.  One of the earliest immigration restriction laws, the Page Act of 1875,

attempted to limit the importation of women for "the purposes of prostitution."  Particularly

directed at Chinese women, it helped pave the way for the Chinese Exclusion Act.

In the 1920s, male Filipino laborers became associated with endangering white women

and police in some cities were authorized to arrest Filipinos seen with white women.  The vice

investigations conducted in most major cities in the early twentieth century included exposés of

southern European men depicted as procurers or pimps and of young female Jewish "sex

delinquents" arrested for prostitution.

While concerns about the immorality of immigrants typically identified the risks to young

women, they also alluded to same-sex relations.  A California physician wrote that sexually-

---

[5] For more information, see: Erika Lee, *At America's Gates: Chinese Immigration during the Exclusion Era, 1882 – 1943* (University of North Carolina Press, 2003); Diana L. Ahmad, *The Opium Debate and Chinese Exclusion Laws in the Nineteenth-Century American West* (University of Nevada Press, 2007).

transmitted diseases were once rare, but "since the influx of foreigners from those countries where unnatural practices are common, more cases are now seen."  On the West Coast, nativists warned that the Chinese would bring "paganism, incest, sodomy" to America.  Authorities became particularly alarmed about "immoral boys who pander to the passions of vicious Greeks."  Although Greek immigrants represented less than one percent of the male population of Portland, Oregon at the turn of the twentieth century, they appeared in over eleven percent of the arrests in that city during a 1912 sex scandal over homosexuality.[6]

## II.   STEREOTYPING OF AFRICAN AMERICAN MEN AS RAPISTS

In the late nineteenth and early twentieth century, governmental authorities in the American South used rape charges to demonize, disenfranchise, and terrorize African Americans.  Southern politicians found that rape fears could be an extremely useful tool for disenfranchising African American men, who had gained the vote in 1870 with the ratification of the Fifteenth Amendment.  Arguing that the political authority of black men would lead to sexual access to white women, white politicians fomented fears of black lust while supporting the practice of vigilante lynching in the name of defending white womanhood.

The press further encouraged the association between black men and rape.  *The Arkansas*

---

[6] For more information, see: Najia Aarim-Heriot, *Chinese Immigrants, African Americans and Racial Anxiety in the United States, 1848-1882* (University of Illinois Press, 2003); Rick Baldoz, *The Third Asiatic Invasion: Empire and Migration in Filipino America, 1898-1946* (New York University Press, 2011); Peter Boag, *Re-Dressing America's Frontier Past* (University of California Press, 2012);  Brian Donovan, *White Slave Crusades: Race, Gender, and Anti-Vice Activism, 1887-1917* (University of Illinois Press, 2006); Matthew Frye Jacobson, *Whiteness of a Different Color: European Immigrants and the Alchemy of Race* (Harvard University Press, 1998); Vivien M. L. Miller, *Crime, Sexual Violence, and Clemency: Florida's Pardon Board and the Penal System in the Progressive Era* (University Press of Florida, 2000); Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton University Press, 2005); and, Siobhan B. Somerville, *Queering the Color Line: Race and the Invention of Homosexuality in American Culture* (Duke University Press, 2000).

*Gazette* rarely reported rapes by black men before the 1860s, but after black enfranchisement, the paper begin to reprint reports from other papers about black men assaulting white women.  In the North, *The New York Times* described rape as "a crime to which negroes are particularly prone," while the *National Police Gazette* repeatedly used the phrase "The Negro Crime" to headline accounts of the rape of white women.  The paper identified rape as a "characteristic crime" of black men and then used this view to justify vigilantism.

Depicting African Americans as natural rapists allowed southerners to maintain that blacks were incapable of the self-control and morality required for citizenship.  This exclusionary construction in turn justified the disenfranchisement of black male voters, achieved through literacy tests, poll taxes, and all-white primary elections.  Southern politicians also exploited sexual fears to justify racial segregation. One argument for separating the races on public transportation was that the proximity in railway cars and other modes of transport provided opportunities for sexual contact between black men and white women.

The most deadly effect of the demonization of black men as rapists was the epidemic of lynching.  By the 1890s, the practice of replacing court trials with mob violence came to be associated primarily with the intimidation of former slaves and the charge of rape.  Between 1882 and 1929, mobs seized over 3,000 African Americans who had been accused or convicted of a crime, ranging from insolence to consensual interracial sex to murder.  By framing their terrorist acts as a defense of female purity --"lynching as the remedy for rape," as one southern columnist wrote -- white supremacists effectively immobilized much of the opposition to the mob.  In sum, the association of rape as "The Negro Crime" was used to justify the murder and

political intimidation of newly enfranchised black men.[7]

## CONCLUSION

Historical studies illustrate that those in political power motivated by discriminatory intent often wield mass criminalization as a tool for excluding targeted groups.  Historical examples caution us that Section 11's disproportionate focus on crimes allegedly committed by "foreign nationals" and Muslims -- and the resulting (and intended) association of such groups with criminality -- is and will be just as damaging as past criminalization policies based on race or national origin.

DATED:  March 13, 2017

By:   */s/ Sirine Shebaya*
Sirine Shebaya

Sirine Shebaya (Bar No. 07191)
Civil Rights and Immigration Attorney
P.O. Box 42219
Washington, DC 20015
Tel: (202) 656-4788
Email: Sirine.Shebaya@aya.yale.edu

Katherine Huang*
Carlos Singer*
HUANG YBARRA SINGER & MAY LLP
550 South Hope Street, Suite 1850
Los Angeles, CA  90071
Tel: (213) 884-4900
Email: Katherine.Huang@hysmlaw.com
        Carlos.Singer@hysmlaw.com

*Admission pro hac vice pending

*Counsel for Amici Curiae*

---

[7] For more information, see Estelle Freeman, *Redefining Rape: Sexual Violence in the Era of Suffrage and Segregation* (Harvard University Press, 2013).

**Attachment 1**

This brief was submitted by the following *amici*:

**Alicia Schmidt Camacho** is Professor of American Studies and Ethnicity, Race, and Migration at Yale University, and serves as Associate Head of Ezra Stiles College. She is the author of *Migrant Imaginaries: Latino Cultural Politics in the US-Mexico Borderlands* (NYU Press, 2008), winner of the American Studies Association's Lora Romero Prize, and articles about gender violence, migration, labor, and human rights in the Mexico-U.S. border region. Her current book project, *The Carceral Border*, examines the effects of social violence and militarized immigration enforcement on the North American migratory circuit.

**Crystal N. Feimster**, is an associate professor in the Department of African American Studies, the American Studies Program and History Department at Yale University, where she teaches a range of courses in 19th and 20th century African American history, women's history, and southern history. Her manuscript, *Southern Horrors: Women and the Politics of Rape and Lynching* (Harvard University Press, 2009), examines the roles of both black and white women in the politics of racial and sexual violence in the American South.  She is currently working on two book projects: *Sexual Warfare: Rape and the American Civil War* and *Mutiny at Fort Jackson: A Case Study of Wartime Freedom.*

**David Scott FitzGerald** is Theodore E. Gildred Chair in U.S.-Mexican Relations, Professor of Sociology, and Co-Director of the Center for Comparative Immigration Studies at the University of California, San Diego. He is co-author of *Culling the Masses: The Democratic Roots of Racist Immigration Policy in the Americas* (Harvard University Press, 2014), which won best book awards from the American Political Science Association's Migration and Citizenship Section, American Sociological Association's (ASA) Political Sociology Section, and ASA International Migration Section.  He is also the author of *A Nation of Emigrants: How Mexico Manages its Migration* (University of California Press, 2009) and *Negotiating Extra-Territorial Citizenship* (Center for Comparative Immigration Studies, 2000), and co-editor of six books on Mexico-U.S. migration.

**Estelle B. Freedman** is the Edgar E. Robinson Professor in U.S. History at Stanford University. The recipient of fellowships from the National Endowment for the Humanities, the American Council of Learned Societies, the Guggenheim Memorial Foundation, and the Center for Advanced Study in the Behavioral Sciences, she has written ten books on the history of women, sexuality, and feminism, including *No Turning Back: The History of Feminism and the Future of Women* (Ballantine 2002); *The Essential Feminist Reader* (Modern Library, 2007); *Feminism, Sexuality, and Politics* (University of North Carolina, 2006); and *Redefining Rape: Sexual Violence in the Era of Suffrage and Segregation* (2013). She is the co-author (with John D'Emilio) of *Intimate Matters: A History of Sexuality in America* (University of Chicago Press, 3d ed., 2012) and has also written two award-winning books on the history of women's prison reform.

**Glenda E. Gilmore** is the Peter V. and C. Vann Woodward Professor of History, African American Studies, and American Studies at Yale University.  She earned her PhD at the

University of North Carolina at Chapel Hill. Her most recent book, co-authored with Tom Sugrue and published by W. W. Norton, is *These United States: A Nation in the Making, 1890 to the Present*. Her current book project is *Bearden's Collage: The Saga of an African American Family from Slavery to Civil Rights*. She is the author of *Gender and Jim Crow: Women and the Politics of White Supremacy in North Carolina, 1898-1920* and *Defying Dixie: The Radical Roots of Civil Rights, 1920-1950*.

**Kelly Lytle Hernandez** is an associate professor of History and African-American Studies at the University of California, Los Angeles. She is one of the nation's leading historians of race, policing, immigration, and incarceration in the United States. Her award-winning book, *MIGRA! A History of the U.S. Border Patrol* (University of California Press, 2010), explored the making and meaning of the U.S. Border Patrol in the U.S.-Mexico borderlands. Her forthcoming book, *City of Inmates: Conquest and the Rise of Human Caging in Los Angeles* (University of North Carolina Press, 2017), discusses the rise of incarceration as a social institution and its effect on certain populations.

**Matthew Frye Jacobson** is the William Robertson Coe Professor of American Studies and History at Yale University. He is the author of several books on race in the United States, including *Roots Too: White Ethnic Revival in Post-Civil Rights America* (2005); *Barbarian Virtues: The United States Encounters Foreign Peoples at Home and Abroad, 1876-1917* (2000); and *Whiteness of a Different Color: European Immigrants and the Alchemy of Race* (1998). He is currently at work on his sixth book, *Odetta's Voice and other Weapons: The Civil Rights Era as Cultural History*. His areas of expertise include race in U.S. political culture 1790-present, immigration and migration, and the juridical structures of U.S. citizenship.

**Karl Jacoby** is professor of history at Columbia University and a specialist in environmental, borderlands, and Native American history. His books include *Crimes Against Nature: Squatters, Poachers, Thieves and the Hidden History of American Conservation* and *Shadows at Dawn: A Borderlands Massacre and the Violence of History*.

**Benjamin H. Johnson** teaches in the history department at Loyola University Chicago. He is co-editor of the *Journal of the Gilded Age and Progressive Era*, and the author of numerous books and articles, including *Revolution in Texas: How A Forgotten Rebellion and Its Bloody Suppression Turned Mexicans into Americans* (Yale University Press, 2003); *Bordertown: The Odyssey of an American Place* (Yale University Press, 2008); and *Bridging National Borders in North America* (Duke University Press, 2010).

**Khalil Gibran Muhammad** is a professor of History, Race, and Public Policy at Harvard's Kennedy School of Government and the Suzanne Young Murray Professor at the Radcliffe Institute for Advanced Study. His academic work focuses on racial criminalization and the origins of the carceral state. He is the author of *The Condemnation of Blackness: Race, Crime, and the Making of Modern Urban America* (Harvard University Press, 2010), which won the 2011 John Hope Franklin Publication Prize for the best book in American studies.

**Mae M. Ngai**, Professor of History and Lung Family Professor of Asian American Studies, is a U.S. legal and political historian interested in questions of immigration, citizenship,

13

and nationalism. She is author of the award winning *Impossible Subjects: Illegal Aliens and the Making of Modern America* (2004) and *The Lucky Ones: One Family and the Extraordinary Invention of Chinese America* (2010).  Ngai has written on immigration history and policy for the Washington Post, New York Times, Los Angeles Times, the Nation, and the Boston Review. She is now working on *Yellow and Gold: The Chinese Mining Diaspora, 1848-1908*, a study of Chinese gold miners and racial politics in the nineteenth-century California, the Australian colony of Victoria, and the South African Transvaal.

**A. Naomi Paik** is an assistant professor of Asian American studies at the University of Illinois, Urbana-Champaign. Her book, *Rightlessness: Testimony and Redress in U.S. Prison Camps since World War II* (UNC Press, 2016), reads testimonial narratives of subjects rendered rightless by the U.S. state through their imprisonment in camps. She has published articles in Social Text, Radical History Review, and Cultural Dynamics, has forthcoming pieces in Humanity and the edited collection, Guantánamo and the Empire of Freedom, and is developing a new project on military outsourcing. Her research and teaching interests include comparative ethnic studies; U.S. imperialism; U.S. militarism; social and cultural approaches to legal studies; transnational and women of color feminisms; carceral spaces; and labor, race, and migration.

**Stephen Pitti** is Professor of History and American Studies at Yale University, where he is also the Director of the Yale Center for the Study of Race, Indigeneity, and Transnational Migration. His academic scholarship focuses on Latinos in the United States, on immigration and migration, and on public history. A Distinguished Lecturer for the Organization of American Historians, he is a member of the National Park Service Advisory Board, the Chair of the National Historic Landmarks Committee, and the author of *American Latinos and the Making of the United States* (2012) and *The Devil in Silicon Valley: Race, Mexican Americans, and Northern California* (2003).

**Todd Presner** is professor of Germanic Languages and Comparative Literature at the University of California, Los Angeles.  He is the Sady and Ludwig Kahn Director of the UCLA Alan D. Leve Center for Jewish Studies and is also the Chair of the Digital Humanities Program. He is the author or co-author of multiple books, including *Mobile Modernity: Germans, Jews, Trains* (Columbia University Press, 2007), *Muscular Judaism: The Jewish Body and the Politics of Regeneration* (Routledge, 2007), *HyperCities: Thick Mapping in the Digital Humanities* (Harvard University Press, 2014), and *Probing the Ethics of Holocaust Culture*, co-edited with Wulf Kansteiner and Claudio Fogu (Harvard University Press, 2016).

**Geoffrey Robinson** is a professor of History at the University of California, Los Angeles where he teaches and writes about political violence, genocide, and human rights, primarily in Southeast Asia. His books include: *The Dark Side of Paradise: Political Violence in Bali* (Cornell University Press, 1995); *East Timor 1999: Crimes against Humanity* (Elsham & Hak, 2006); and *'If You Leave Us Here, We Will Die': How Genocide Was Stopped in East Timor* (Princeton University Press, 2010). He previously worked at Amnesty International's Research Department in London and served as a Political Affairs Officer with the United Nations in Dili, East Timor. His forthcoming book, *The Killing Season: A History of the Indonesian Massacres, 1965-66,* will be published by Princeton University Press in late 2017.

**Elliott Young** is Professor in the History Department and director of Ethnic Studies at Lewis and Clark College. His major scholarly publications include *Alien Nation: Chinese Migration in the Americas from the Coolie Era through WWII* (UNC Press, 2014), *Catarino Garza's Revolution on the Texas-Mexico Border* (Duke University Press, 2004), and *Continental Crossroads* (Duke University Press, 2004).