# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

---

|  |  |  |
|---|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 8:17-cv-00361-TDC |
| DONALD TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER OF THE EXECUTIVE ORDER

Dated:  March 13, 2017

CHAD A. READLER
Acting Assistant Attorney General

ROD J. ROSENSTEIN
United States Attorney

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Director, Federal Programs Branch

ARJUN GARG (Bar No. 806537)
MICHELLE R. BENNETT (Bar No. 806456)
DANIEL SCHWEI
BRAD P. ROSENBERG
Trial Attorneys
United States Department of Justice
Civil Division,  Federal Programs Branch

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    Statutory Background. ......................................................................................3

    B.    The Revoked Order. .........................................................................................4

    C.    Litigation Challenging the Revoked Order. ....................................................5

    D.    The Order. ........................................................................................................6

        1.    The Order's Temporary Entry Suspension. .........................................6

        2.    The Order's Temporary Refugee Program Suspension. .....................8

STANDARD OF REVIEW ................................................................................................ 9

ARGUMENT ................................................................................................................... 10

I.      Plaintiffs Do Not Clearly Demonstrate They Are Likely to Prevail on the Merits. ..........10

    A.    Plaintiffs' Challenges to the Order Are Not Justiciable............................................11

        1.    The Organizational Plaintiffs Lack Standing In Their Own Right or on

            Others' Behalf. ...................................................................................11

        2.    The Individual Plaintiffs Lack Standing. .......................................15

    B.    The Order Is a Valid Exercise of the President's Statutory Authority. ....................18

        1.    The Order Falls Squarely Within the President's Broad Authority under

            Sections 1182(f) and 1185(a)........................................................19

        2.    The Other Statutes Plaintiffs Invoke Do Not Restrict the President's Broad

            Authority under Sections 1182(f) and 1185(a). ...........................20

    B.    The Order Does Not Discriminate Based on Religion...............................................25

        1.    The Order Draws Distinctions on the Basis of Risk of Terrorism, Not

            Religion.............................................................................................26

2.      The Order Cannot Be Enjoined on the Basis of Campaign Statements or the

Revoked Order. ............................................................................................28

II.     Plaintiffs Do Not Clearly Show Irreparable Harm. ...........................................................32

        A.     Individual Plaintiffs. ................................................................................................33

        B.     Organizational Plaintiffs. ........................................................................................34

III.    The Balance of the Equities and the Public Interest Weigh Against Relief. .....................36

IV.     The Facial, Sweeping Relief Plaintiffs Seek Is Unwarranted............................................38

CONCLUSION .................................................................................................................................. 40

## INTRODUCTION

Invoking his statutory and constitutional authority to control the entry of aliens into this country, on March 6, 2017, the President issued Executive Order No. 13,780, titled "Protecting the Nation from Foreign Terrorist Entry Into the United States."  *See* 82 Fed. Reg. 13209 (Mar. 9, 2017) ("Order").  Pertinent to issues that Plaintiffs raise, the Order (i) suspends entry for 90 days of certain foreign nationals from six countries; (ii) creates a case-by-case waiver process that is integrated into the visa application and admission processes; (iii) creates a 120-day suspension of certain aspects of the U.S. Refugee Admissions Program, which does not apply to refugee applicants who already have been formally scheduled for transit, and also allows for case-by-case waivers; and (iv) contemplates the entry of up to 50,000 refugees in fiscal year 2017.

The Order takes effect on March 16, 2017 and replaces Executive Order No. 13,769 ("Revoked Order"), which was issued on January 27, 2017.  After the Ninth Circuit declined to stay a nationwide injunction against the Revoked Order, the President decided to issue a new Order to address the court's concerns rather than engage in protracted litigation.  The Order applies only to aliens outside the United States who do not have a visa—that is, individuals who "ha[ve] no constitutional rights regarding" their admission.  *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).  Even as to them, the Order includes a comprehensive waiver process to mitigate any undue hardship.  The Order also eliminates any preference for religious minorities.

Despite these revisions, Plaintiffs ask this Court for extraordinary relief at an extraordinary pace.  They seek a preliminary injunction or temporary restraining order enjoining the Order in its entirety, and—although they did not file their motion until March 10—they insist that this relief is urgently required before the Order takes effect on March 16.  But no immediate upheaval occurs as a result of the new Order taking effect on that date: No visa is revoked.  No lawful permanent

1

resident traveling abroad is barred from returning.  Nobody lawfully in the United States loses any

prior ability to leave the country to travel and later return.  Ten days' advance notice was given.

Plaintiffs, in short, identify no cataclysm that will befall them on March 16 or any time

soon thereafter.  The unadmitted, non-resident aliens whose entry Plaintiffs seek have already been

waiting months or years.  And Plaintiffs have already been confronting reduced refugee flows for

over six weeks under a provision of the Revoked Order that was never enjoined and that Plaintiffs

earlier agreed to address on a longer schedule.

Thus, no emergency exists that supports the need to hear and resolve Plaintiffs' challenge

before the Order even takes effect.  This case presents weighty issues concerning the President's

exercise of statutory and constitutional authority to make determinations regarding national

security and the admissibility of aliens.  These issues deserve, and may properly wait for, more

deliberate presentation by the parties and less hurried consideration by the Court.

In any event, Plaintiffs have fallen far short of their heavy burden to justify the

extraordinary remedy they seek.  Plaintiffs have not demonstrated a clear likelihood of success on

the merits, because (1) their claims are not justiciable; (2) two separate provisions of the

immigration laws grant the President broad authority plainly encompassing the Order's temporary

entry and refugee suspensions; and (3) the Order does not discriminate on the basis of religion, but

rather its text and purpose are explicitly religion-neutral.   Moreover, Plaintiffs have not

demonstrated irreparable harm, and the balance of the equities and the public interest further weigh

against interfering with the President's exercise of statutory and constitutional power that reflects

his judgment about the tolerable level of risk to the Nation's security.  Finally, Plaintiffs seek

overbroad relief that is not narrowly tailored to harms they assert.  For these reasons, Plaintiffs'

motion should be denied.

# BACKGROUND

## A.      Statutory Background.

The Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, governs entry of aliens into the United States.  Admission (aside from lawful permanent residents) generally requires a valid immigrant or nonimmigrant visa (or another entry document, such as a refugee travel document). *Id.* §§ 1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203.  The process of obtaining a visa typically includes an in-person interview and results in a decision by a State Department consular officer.  *Id.* §§ 1201(a)(1), 1202, 1204.  Eligibility for a visa depends on many factors, including nationality. *See*, *e.g.*, 8 U.S.C. §§ 1184(e), 1735.  While a visa may be necessary for admission, it does not guarantee admission if the alien, upon arriving, is found "inadmissible."  *Id.* §§ 1201(h), 1225(a).

Congress has created a Visa Waiver Program enabling nationals of participating countries to seek temporary admission for tourism or certain business purposes without a visa.  8 U.S.C. §§ 1182(a)(7)(B)(iv), 1187.  In 2015, however, Congress excluded from the Program individuals with connections to specific countries.  *Id.* § 1187(a)(12).  Congress itself specifically excluded nationals of countries participating in the Program who are dual nationals of or had recently visited Iraq or Syria, where "[t]he Islamic State of Iraq and the Levant (ISIL) . . . maintain[s] a formidable force," and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1]  8 U.S.C. §1187(a)(12)(A)(i)-(ii). Congress also authorized the Department of Homeland Security ("DHS") to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country . . . increases the likelihood that the alien is a credible threat to" U.S.

---

[1]      U.S. Dep't of State, *Country Reports on Terrorism* 6 (2016), https://www.state.gov/documents/organization/258249.pdf.

national security, *id.* § 1187(a)(12)(D)(i)-(ii), (D), and in February 2016 DHS excluded recent

visitors to Libya, Somalia, and Yemen, noting the designation was "indicative of the Department's

continued focus on the threat of foreign fighters."[2]  In short, Congress and the prior Administration

determined that the conditions in these seven countries warranted individualized review in

admitting aliens into our Nation's borders.

Separately, the U.S. Refugee Admissions Program ("Refugee Program") allows aliens who

have been (or have a well-founded fear of being) persecuted on account of race, religion,

nationality, or other specified grounds to seek admission.  8 U.S.C. § 1101(a)(42); *see id.* § 1157.

Refugees are screened for eligibility and admissibility abroad; if approved, they may be admitted

without a visa.  *Id.* §§ 1157(c)(1), 1181(c).  Congress expressly authorized the President to

determine the maximum number of refugees to be admitted each fiscal year.  *Id.* § 1157(a)(2)-(3).

Although Congress created these various avenues to admission, it accorded the Executive

broad discretion to restrict or suspend admission of aliens.  First, Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  Second, Section 1185(a)(1) makes it unlawful for an alien to enter or attempt

to enter the country "except under such reasonable rules, regulations, and orders, and subject to

such limitations and exceptions as the President may prescribe."  8 U.S.C. § 1185(a)(1).

### B.    The Revoked Order.

On January 27, 2017, the President issued the Revoked Order.  It directed the Secretaries

of Homeland Security and State to assess current screening procedures to determine whether they

---

[2]      https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

were sufficient to detect individuals who were seeking to enter this country to do it harm.  Revoked Order § 3(a)-(b).  While that review was ongoing, the Revoked Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program.  *Id.* § 3(c).  It authorized the Secretaries, however, to make case-by-case exceptions to the suspension.  *Id.* § 3(g).

The Revoked Order similarly directed a review of the Refugee Program, and, pending that review, suspended entry under the Program for 120 days, subject to case-by-case waivers.  Revoked Order § 5(a), (c).  It also suspended admission of Syrian refugees until the President determined "that sufficient changes have been made to the [Refugee Program] to ensure that admission of Syrian refugees is consistent with the national interest."  *Id.* § 5(c).  Finally, it sought to assist victims of religious persecution by directing agencies to prioritize refugee claims premised on religious-based persecution, provided the religion at issue was "a minority religion in the individual's country of nationality."  *Id.* § 5(b).

### C.    Litigation Challenging the Revoked Order.

The Revoked Order was challenged in multiple courts.  The State of Washington filed suit in Seattle, seeking to enjoin Sections 3(c), 5(a)-(c), and 5(e).  *Washington v. Trump*, No. 2:17-cv-141 (W.D. Wash.).  On February 3, 2017, the district court enjoined those provisions nationwide.  2017 WL 462040 (W.D. Wash. Feb. 3, 2017).  On February 9, following accelerated briefing and argument, a Ninth Circuit panel issued a per curiam order declining to stay the Washington district court's injunction pending appeal.  *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).  Although acknowledging that the injunction may have been "overbroad," the court declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so.  *Id.* at 1166-67.

Plaintiffs here did not file suit until February 7, 2017.  Fifteen days later, they moved for a preliminary injunction of Section 5(d) of the Revoked Order, which had not been enjoined, and

moved for expedited discovery.  After the Order was issued, Plaintiffs on March 10 amended their

complaint, moved to enjoin the Order entirely, and renewed their motion for expedited discovery.

### D.      The Order.

Responding to the Ninth Circuit's invitation, on March 6, 2017—at the joint urging of the

Attorney General and Secretary of Homeland Security[3]—the President issued the Order, which

takes effect March 16, revokes the Revoked Order, and replaces it with substantially revised

provisions that address the Ninth Circuit's concerns.

### 1.      The Order's Temporary Entry Suspension.

The Order's central, explicit purpose is to enable the President and his Administration to

assess whether current screening and vetting procedures are sufficient to detect terrorists seeking

to infiltrate the Nation.   Order § 1(f).  To facilitate that important review, the President ordered a

90-day pause on entry of certain foreign nationals from six nations previously "identified as

presenting heightened concerns about terrorism and travel to the United States" by Congress or

the prior Administration: Iran, Libya, Somalia, Sudan, Syria, and Yemen.  *Id.* § 1(d)-(f).

### a.      Temporary Suspension of Entry by Certain Aliens from Six Countries.

As the Order explains, each of those countries "is a state sponsor of terrorism, has been

significantly compromised by terrorist organizations, or contains active conflict zones," which is

why Congress and the Secretary of Homeland Security previously designated them as "countries

of concern."  Order § 1(d).  The Order details the circumstances of each country that give rise to

"heightened risk[s]" that terrorists from those countries would attempt to enter the United States

and that those countries' governments may lack the "willingness or ability to share or validate

---

[3]      *See* Joint Ltr. to President (Mar. 6, 2017), available at https://www.dhs.gov/sites/default/
files/publications/17_0306_S1_DHS-DOJ-POTUS-letter_0.pdf.

important information about individuals seeking to travel to the United States" to screen them properly.  Order § 1(d)-(e).

To that end, the Order "suspend[s] for 90 days" the "entry into the United States of nationals of" those six countries.  Order § 2(c).  In response to the Ninth Circuit's ruling, however, the Order clarifies that the suspension applies only to aliens who: (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, *and* (3) did not have a valid visa on the effective date of the Revoked Order.  Order § 3(a).  It expressly excludes other categories of aliens that concerned the Ninth Circuit, including (among others) any lawful permanent resident; any foreign national admitted to or paroled into the United States; any individual with a document other than a visa permitting travel to the United States; and any foreign national granted asylum, any refugee already admitted to the United States, or any individual granted certain protections from removal.  *See id.* § 3(b).  Consequently, an alien in the United States on the Order's effective date and seeks to leave will not be subject to the Order's temporary suspension upon return; instead, he will be subject to the pre-existing rules governing visa application and admission.

### b.      Case-by-case waivers.

The Order also contains a detailed waiver provision.  Order § 3(c).  It permits consular officials (and the U.S. Customs and Border Protection Commissioner) to grant case-by-case waivers where denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest." *Id.*  Moreover, it lists circumstances where waivers could be considered, including for (among others):

- foreign nationals who were previously "admitted to the United States for a continuous period of work, study, or other long-term activity" but who are currently outside the country and seeking to reenter;

- individuals who seek entry for "significant business or professional obligations"; and

- individuals who seek entry "to visit or reside with a close family member (*e.g.*, a spouse, child, or parent) who is a [U.S.] citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa."

*Id.* These provisions providing examples of instances where a waiver may be warranted expand significantly on the Revoked Order's provisions regarding waivers.

Finally, the Order specifies that requests for waivers will be processed "as part of the visa issuance process." Order § 3(c); *see also* Dep't of Homeland Security, *Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States* (Mar. 6, 2017);[4] U.S. Dep't of State, *Executive Order on Visas* (Mar. 13, 2017).[5] Consular officers reviewing visa applications will carefully review each request under these criteria.

### 2.    The Order's Temporary Refugee Program Suspension.

The Order also directs an immediate review to determine whether the Refugee Program's processes adequately identify terrorist threats, and "what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat" to the country. Order § 6(a). To facilitate that review, the Order suspends Refugee Program travel for 120 days. "Terrorist groups have sought to infiltrate various nations through refugee programs," and "some of those who have entered the United States through our immigration system"—including "individuals who first entered the country as refugees"—"have proved to be threats to our national security." *Id.* § 1(b)(iii), (h). More than 300 persons who entered the U.S. as refugees are currently the subject of counterterrorism investigations. *Id.* §1(h). The Order concludes that pausing the Refugee Program is necessary to ensure that those seeking to harm the Nation do not enter as refugees while the new Administration assesses the adequacy of current screening procedures.

---

[4]    *See*    https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-foreign-terrorist-entry-united-states.

[5]    *See* https://travel.state.gov/content/travel/en/news/important-announcement.html.

The Order authorizes the Secretaries of State and Homeland Security jointly to make "case-by-case" exceptions where doing so is "in the national interest and does not pose a threat" to the Nation's security or welfare—*e.g.*, if "denial of entry would cause undue hardship." Order § 6(c). Unlike the Revoked Order, the Order does not prioritize refugee claims based on persecution against religious minorities. It also omits the provision indefinitely suspending refugee applications of Syrian nationals, and exempts refugee applicants the State Department has formally scheduled for transit as of the Order's effective date. *Id*. § 6(a). As with the Revoked Order, the Order continues to suspend entries in excess of 50,000 refugees in fiscal year 2017. *Id*. § 6(b).

## STANDARD OF REVIEW

"The substantive standards for granting a TRO or a preliminary injunction are . . . identical." *Alston v. Equifax Info. Servs., LLC*, No. 13-cv-1230-TDC, 2014 WL 6388169, at *4 (D. Md. Nov. 13, 2014). Both "are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). A movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that [the relief] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The movant bears the burden as to these "four requirements, each of which must be satisfied." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345-47 (4th Cir. 2009), *vacated*, 559 U.S. 1089 (2010), *reinstated in relevant part by* 607 F.3d 355 (4th Cir. 2010). Emergency relief that "deeply intrudes into the core concerns of the executive branch"—such as foreign affairs and national security—requires "an extraordinarily strong showing" on each element. *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978).

Plaintiffs assert facial challenges to the Order. "Facial challenges are disfavored" compared to as-applied challenges. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). They are thus "the most difficult challenge[s] to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs must show more than that the Order "*might* operate unconstitutionally under some conceivable set of circumstances." *Id.* (emphasis added). Instead, they bear the "heavy burden" of "establish[ing] that no set of circumstances exist under which the [Order] would be valid." *id.*, or "that the law lacks any plainly legitimate sweep." *Tepeyac v. Montgomery Cty.*, 5 F. Supp. 3d 745, 753 (D. Md. 2014). Thus, Plaintiffs must show that all or almost all applications will result in the unlawful exclusion of foreign nationals seeking entry into the United States.

## ARGUMENT

Plaintiffs do not come close to meeting their extraordinary burden. The Order applies only to individuals outside the U.S. and without a visa and, even as to them, provides comprehensive, case-by-case waivers. Plaintiffs, therefore, either lack standing or their claims are not ripe. They also fail on the merits. The Order falls well within the President's statutory authority and does not, either in word or deed, differentiate based on religion. Plaintiffs' motion should be denied.

## I.     Plaintiffs Do Not Clearly Demonstrate They Are Likely to Prevail on the Merits.

"[A] party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (alterations omitted). This "requirement that the plaintiff clearly demonstrate that it will *likely succeed* on the merits is far stricter than" a "requirement that the plaintiff demonstrate only a grave or serious *question* for litigation." *Real Truth*, 575 F.3d at 346-47. Here, Plaintiffs fail in at least three respects to demonstrate a clear likelihood of success on the merits.

A. **Plaintiffs' Challenges to the Order Are Not Justiciable.**

1. **The Organizational Plaintiffs Lack Standing In Their Own Right or on Others' Behalf.**

None of the three organizational Plaintiffs has established its standing to sue, either on its own behalf or on behalf of its members or third parties. At bottom, each organization asserts "nothing more than a setback to an 'abstract social interest,' . . . which is insufficient to support Article III standing." *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 738 (D. Md. 2001).

Plaintiff MESA claims that its organizational mission and finances will be harmed because "many of its members" will not be able to "attend[] its annual meeting" in the United States because of the Order's 90-day suspension of entry for certain aliens from the six designated countries. Pls.' Mot. at 35. Plaintiffs fail to mention, however, that the annual meeting will not take place until November 2017—eight months from now.[6] The claim that the Order will impact attendance is therefore entirely speculative. MESA notes that fewer people submitted papers in advance of the 2017 annual meeting than in a prior year. *See* Decl. of Beth Baron ¶ 17 (ECF No. 91-3). But the submission deadline was February 15, 2017, *id.*, before issuance of the Order challenged here. This decline could not have been caused by the Order. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (plaintiff's injury must be caused by the challenged conduct).

Nor does MESA have standing to sue on behalf of its members, as it has not identified any member that "would otherwise have standing to sue in [his] own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). MESA's allegations of injury to its members relate almost exclusively to members located in the United States. *See* Decl. of Beth Baron ¶¶ 6-10 (ECF No. 91-3). The suspension of entry, however, does not apply to such individuals. *See* Order § 3(a). And as to the sole non-U.S. based member MESA mentions, MESA does not identify any

---

[6]     *See* http://www.mesana.org/annual-meeting/index.html.

conferences she plans to attend during the 90-day suspension of entry or any other concrete and non-speculative injury. *See* Decl. of Beth Baron ¶ 5 (ECF No. 91-3). At most she alleges an intent to some day visit the U.S., but "[s]uch 'some day' intentions—without any description of concrete plans . . . —do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564. And even if this member did have standing, she would be eligible to seek a waiver, which, the Order makes clear, may be considered for "significant business or professional obligations." Order § 3(c)(iii). The appropriate course, therefore, would be to seek to bring an as-applied challenge if and when a waiver is denied.[7]

Plaintiff IRAP fares no better. It "provide[s] legal assistance to refugees and other immigrants to the United States throughout the resettlement process," and claims it will be harmed by having to expend resources "exploring alternative routes to safety for its clients . . . and educating its network of over 2,000 pro bono attorneys and law students about those alternate routes." Second Decl. of Rebecca Heller ¶¶ 5, 8 (ECF No. 91-1). But for impairment of an organization's core activities to provide Article III standing, at a minimum, the impairment must result in a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Here, however, IRAP does not identify any additional expenditures that will be necessary to counteract the purported effects of the Order.

IRAP asserts that it is injured because it must focus its efforts on *different* activities—*i.e.*,

---

[7]      MESA's claims of injury relate solely to the Order's 90-day suspension of entry for certain foreign nationals from the six designated countries. Accordingly, even if MESA had standing (and it does not), it could challenge and obtain relief only with respect to this provision. *See Covenant Media Of SC, LLC v. City Of N. Charleston*, 493 F.3d 421, 430 (4th Cir. 2007) ("[A] plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions."); *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 350 (6th Cir. 2007) (A plaintiff's standing with respect to one provision of an ordinance "does not magically carry over to allow it to litigate other independent provisions of the ordinance without a separate showing of an actual injury under those provisions.").

pursuing alternative resettlement options outside the United States.  *See* Second Decl. of Rebecca

Heller ¶¶ 8-10 (ECF No. 91-1).  But IRAP does not demonstrate that those activities result in

greater expenditures of resources, or that the organization's mission is impaired simply because it

must attempt to resettle a refugee in a country other than the United States.  This type of diversion

of resources to different activities, without an impairment of the organization's core activities, is

insufficient to establish standing.  *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012)

("Although a diversion of resources might harm the organization by reducing the funds available

for other purposes, it results not from any actions taken by the defendant, but rather from the

organization's own budgetary choices." (alterations omitted)).  Legal counseling organizations

such as IRAP are particularly ill-suited for expanding *Havens Realty* to provide standing, given

that such a theory would allow a legal organization to challenge virtually any policy that negatively

affects its potential future clients.  *See Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental

Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994).

Plaintiff HIAS, a refugee resettlement agency, contends that it will suffer financial harm

because the 120-day suspension of certain aspects of the Refugee Program will cause it to settle

fewer refugees than previously expected.  *See* Decl. of Mark Hetfield ¶¶ 10-12 (ECF No. 91-2).

But an organization cannot establish standing simply because it does not receive a potential future

benefit to which it had no entitlement.  To demonstrate injury-in-fact under Article III, the plaintiff

must show "an invasion of a legally protected interest" that is "concrete and particularized" and

"actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan*, 504 U.S. at 560.  Here, HIAS

cannot point to any invasion of a legally protected interest because refugee resettlement agencies

have no legal entitlement or protection in being able to resettle their expected number of refugees.

Nowhere does HIAS assert such a right or interest, which forecloses its ability to demonstrate an

Article III injury-in-fact here.[8]  *See 24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 633 (4th Cir. 2016) ("Because neither Virginia law nor the Plan gives Moxley 'a legally protected interest' in determining the nomination method in the first place, he fails to make out 'an *invasion* of a legally protected interest,' i.e. actual injury, in this case."); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (2003) (holding that a group of plaintiffs lacked standing because their asserted interest was in a non-existent right, and "[t]his claim of injury by the [particular] plaintiffs is, therefore, not to a legally cognizable right").[9]

Finally, IRAP and HIAS also lack third-party standing to assert the rights of their clients. *See* Pls.' Mot. at 36-38.  First, as explained above, these organizations have not themselves suffered an injury in fact, and thus, they fail to meet the first criterion for third-party standing.  *See Powers v. Ohio*, 499 U.S. 400, 411 (1991).  Second, these organizations cannot "assert the rights of" their refugee applicant clients, *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004), because those clients have no legally protected interest.  *See Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ("an unadmitted and nonresident alien [has] no constitutional right of entry to this country as a nonimmigrant or otherwise"); *Doe v. Sebelius*, 676 F. Supp. 2d 423, 429 (D. Md. 2009) (no third-party standing for organization acting on behalf of party that lacked legally protected interest).

The *Exodus* case is not to the contrary.  *See* Pls.' Mot. at 37.  There, the organization's

---

[8]     In contrast to HIAS, the resettlement agency plaintiff in *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 729 (S.D. Ind. 2016), had a legal entitlement to reimbursement for social services it had "already provid[ed] . . . to Syrian refugees."

[9]     HIAS also cannot establish standing to sue based on expenditures made in reliance on its legally unprotected expectation about the number of refugees it would be assisting.  *See, e.g.*, Decl. of Mark Hetfield ¶¶ 19-21 (ECF No. 91-2).  Those expenditures are effectively "self-created harms," *Beck v. McDonald*, 848 F.3d 262, 276 (4th Cir. 2017), and recognizing them as sufficient for Article III would create an exception that swallows the rule—*i.e.*, that a party can sidestep the bar on standing for invasions of non-legally protected interests simply by making expenditures in pursuit of those unprotected interests.

14

clients were already in the United States and being "provid[ed] reimbursable social services." *Exodus*, 165 F. Supp. 3d at 732.  The unadmitted refugee clients of IRAP and HIAS can rely on no similar statutory right to services provided to already-admitted persons.  Further, in contrast to the challenged action in *Exodus,* the 120-day suspension challenged here is directed at refugees, not the resettlement agency, a fact the *Exodus* court found pivotal.  *See id*. at 733.[10]

## 2.    The Individual Plaintiffs Lack Standing.

In order to satisfy the injury-in-fact requirement, "plaintiffs must demonstrate that they suffer an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent," *Southern Blasting Servs., Inc. v. Wilkes Cty., NC*, 288 F.3d 584, 594 (4th Cir. 2002), and must also be "judicially cognizable."  *Lujan*, 504 U.S. at 560.  But while Plaintiffs repeatedly allege that they "have suffered and will continue to suffer harm" because other individuals stand to be delayed in receiving admission, or may ultimately be denied admission, this harm does not arise from a *legally protected* interest and, in any event, is not ripe.

The individual Plaintiffs' claims are barred by the doctrine of consular nonreviewability, which has long provided that an alien abroad cannot obtain judicial review of the denial of a visa. *See Brownell v. Tom We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956).  As another district court in this Circuit has explained, "courts have consistently held that a consular officer's decision to grant or deny a visa is not subject to judicial or administrative review [and] [i]mportantly, the doctrine of nonreviewability of consular officers' visa determinations is essentially without exception."  *Romero v. Consulate of U.S., Barranquilla, Colombia*, 860 F. Supp. 319, 322 (E.D. Va. 1994).  Courts have likewise concluded that there is no standing based on the purported injury

---

[10]    IRAP's and HIAS's alleged injuries relate to the Order's provisions addressing refugees. Thus, even if these organizations had standing (and they do not), they could not challenge or obtain relief with respect to the Order's 90-day suspension of entry for certain foreign nationals from the six designated countries. *See, e.g.*, *Covenant Media*, 493 F.3d at 430.

of a delay in visa decision-making, as several Plaintiffs allege here. *See, e.g.*, *Catholic Charities CYO v. Chertoff*, 622 F. Supp. 2d 865, 878-80 (N.D. Cal. 2008) (holding no standing and that claims were unripe); *Kodra v. Sec'y, Dep't of State*, 903 F. Supp. 2d 1323, 1327 (M.D. Fla. 2012) (no standing to challenge delay of visa determination).   These precedents, "well-grounded in established principles of national sovereignty and in sensible public policy," *Romero*, 860 F. Supp. at 324, deprive the visa applicant of any judicially cognizable claim and the actual Plaintiffs have no greater claim to review than the applicants themselves. *See id.* at 324 n.13 ("an alien who seeks admission to this country may not do so under any claim of right . . . [s]uch privilege is granted to an alien only upon such terms as the United States shall prescribe" (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)).[11]

In any event, if the individual Plaintiffs had standing to challenge the denial of others' visa or refugee admission applications, those claims are not ripe.  "The doctrine[] of . . . ripeness . . . originate[s] in Article III's 'case' or 'controversy' language, no less than standing does." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 351 (2006).  Ripeness ensures that courts "avoid[] . . . premature adjudication," particularly where future agency decision-making or factual determinations may change the character of the controversy or obviate the need for judicial relief

---

[11]      Plaintiffs cite a vacated D.C. Circuit case, *LAVAS v. State*, 45 F.3d 469 (D.C. Cir. 1995), for the proposition that third parties may suffer a legally cognizable injury in the denial of a visa. *See* Pls.' Reply at 9 (ECF No. 98).  The United States petitioned for a writ of certiorari in that case on the grounds that the court had "erred, as a threshold matter, by disregarding the doctrine of consular non-reviewability," *see* No. 95-1521 (Petition), 1996 WL 33438454, and argued that judicial review was unavailable in its brief to the Court. *See* Petitioner's Brief, 1996 WL 435939. However, the Supreme Court vacated after Congress amended the law on which the underlying merits claim was based just days before oral argument in the case. *See* Reply Brief for Petitioner, 1996 WL 582487.  Courts have continued to hold that the judicial power does not extend to actions in which one spouse or family member tries to intervene in the denial of a visa for another. *See, e.g.*, *Udugampola v. Jacobs*, 795 F. Supp. 2d 96, 102-04 (D.D.C. 2011); *Movimiento Democracia, Inc. v. Chertoff*, 417 F. Supp. 2d 1350, 1353-54 (S.D. Fla. 2006); *De Castro v. Fairman*, 164 F. App'x 930, 932-34 (11th Cir. 2006).

altogether. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

Here, the facts as pleaded demonstrate that each of the individual Plaintiffs' foreign family member claims is unripe. The wives and children of John Doe #1, John Doe #3, and Plaintiff Mohomed, as well as the fiancé of Plaintiff Harrison, are individuals for whom the Order specifically contemplates the possibility of a waiver. *See* Order §§ 3(c)(iv), 6(c). Their claims, therefore, are not ripe unless and until they seek and are denied a waiver. The same is true for other foreign family members seeking admission to the United States as refugees. The Order does not predetermine the decision on any of their refugee applications, and case-by-case waivers are possible for refugee applicants. See Order § 6(c). Thus, there may be no need for this Court to adjudicate the purported immigration-related injuries on the part of the Plaintiffs' family members.

There is also no standing to support the individual Plaintiffs' Establishment Clause claims. Plaintiffs assert standing based on purported "stigmatizing harms" associated with the alleged "effort to target Muslims" in the Order. Pls.' Mot. at 30. But an "'abstract stigmatic injury' resulting" from the perception that government action "turns [religious adherents] into political outsiders . . . is insufficient to confer standing." *Newdow v. Lefevre*, 598 F.3d 638, 643 (9th Cir. 2010). To the contrary, as with any other Article III case or controversy, standing for an Establishment Clause claim requires a litigant to "allege or [] prove *personal* injury." *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) (emphasis added); *see also Kurtz v. Baker*, 829 F.2d 1133, 1141 (D.C. Cir. 1987) ("allegations of stigmatic injury will not suffice to link a plaintiff personally to the conduct he challenges unless . . . the plaintiff personally has been denied a benefit") (citing *Allen v. Wright*, 468 U.S. 737, 755-56 (1984)); *Newdow*, 598 F.3d 643 (same). In *Moss*, the Fourth Circuit held that standing was satisfied for plaintiffs who not only felt a "stigmatic injury" from their "passionate disagreement" with a school policy

allegedly promoting religion, but to whom the school promoted that policy directly, and who evidenced this injury by deciding to continue their education outside the state. 683 F.3d at 605-07. None of the Plaintiffs except Mr. Meteab actually alleges having felt like an outsider, *see* First Am. Compl. ¶¶ 199, and unlike the plaintiffs in *Moss*, Mr. Meteab's perceived stigmatic injury is linked to the actions of third parties who allegedly "star[ed] at his wife" or failed "to stop . . . at crosswalks." In contrast to the *Moss* plaintiffs, he" cannot "show these claimed injuries are traceable to the Defendants," precluding those injuries from serving as the basis of standing. *Newdow*, 598 F.3d 643.

To the extent Plaintiffs assert standing based on the intersection of an alleged Establishment Clause violation and the denial of a visa to a family member, they have identified no court that has ever recognized an Establishment Clause claim based on a third-party's visa application. And for good reason: because every denied visa applicant either has, or does not have, religious beliefs, recognizing an Establishment Clause exception to the doctrine of consular nonreviewability would circumvent that doctrine and permit challenges to any visa denial based on an allegation of improper religious purpose on the government's part.

### B.      The Order Is a Valid Exercise of the President's Statutory Authority.

Even if Plaintiffs' challenges to the Order were justiciable, they would not warrant emergency relief because none is likely to succeed. The Order's temporary suspension of entry of certain classes of aliens during a review of the Nation's screening and vetting procedures is a valid exercise of the President's broad statutory authority to "suspend the entry of any aliens or of any class of aliens" (Section 1182(f)) and to prescribe the terms on which aliens may enter (Section 1185(a)(1)). Plaintiffs do not even acknowledge the express grant of authority in Section 1185(a)(1). Instead, they argue that other statutes limit Section 1182(f) authority—arguments that no court has accepted and that fundamentally misconstrue the statutes. *See* Pls.' Mot. at 24-27.

1.      **The Order Falls Squarely Within the President's Broad Authority under Sections 1182(f) and 1185(a).**

"'[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of the government.'" *Mandel*, 408 U.S. at 765.  Congress has conferred expansive authority on the President, including in two statutory provisions that the Order expressly invokes.  Order §2(c).

First, Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or of any class of aliens as immigrants or nonimmigrants," or "impose on the entry of aliens any restrictions he deems to be appropriate."  "The President's sweeping proclamation power [under Section 1182(f)] provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).  Every President over the last thirty years has invoked that authority to suspend or restrict entry of certain classes of aliens.[12]

Second, Section 1185(a) broadly authorizes the "President" to "prescribe" reasonable "rules, regulations, and orders," and "limitations and exceptions" regarding entry of aliens.  That provision is the latest in a line of statutory grants of authority tracing back nearly a century.  *See* Pub. L. No. 65-154, §1(a), 40 Stat. 559 (1918).  Originally limited to times of war or declared

---

[12]     *See, e.g.*, Presidential Proclamation ("Proclamation") 5517 (1986) (Reagan; Cuban nationals); Exec. Order No. 12,807 (1992) (George H.W. Bush; government officials who impeded anti-human-trafficking efforts); Proclamation 8342 (2009) (George W. Bush; same); Proclamation 6958 (1996) (Clinton; Sudanese government officials and armed forces); Proclamation 8693 (Obama; aliens subject to U.N. Security Council travel bans).

national emergency, Congress removed that limitation in 1978, when it enacted Section 1185(a) in its current form.  Pub. L. 95-426, §707(a), 92 Stat. 963, 992-93 (1978).

Both of those provisions comfortably encompass the Order's temporary suspension of entry of aliens under the Refugee Program and from six countries that the President—in consultation with the Attorney General and the Secretaries of State and Homeland Security— concluded required special precautions while the review of existing screening and vetting protocols is completed.  That temporary measure is a paradigmatic exercise of the President's authority to "suspend the entry" of "any class of aliens" he finds may be "detrimental to the interests of the United States," 8 U.S.C. §1182(f), and to prescribe reasonable "limitations" on entry, *id.* §1185(a)(1).

> ### 2. The Other Statutes Plaintiffs Invoke Do Not Restrict the President's Broad Authority under Sections 1182(f) and 1185(a).
>
> #### a. Section 1152 Does Not Prevent the President from Suspending the Entry of Nationals from the Designated Countries.

Plaintiffs first contend that Section 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the allocation of immigrant visas, bars the President from drawing nationality-based distinctions under Sections 1182(f).  *See* Pls.' Mot at 24-26.  Even if that were correct, it would not justify the relief Plaintiffs seek because Section 1152(a)(1)(A) applies only to aliens seeking *immigrant* visas—a small fraction of those affected by the Order.  In any event, Plaintiffs are wrong that Section 1152(a)(1)(A) disables the President from drawing nationality-based distinctions under Sections 1182(f) (and 1185(a)), as Presidents have done for decades.

Even under Plaintiffs' reading, Section 1152(a)(1)(A) has no bearing on the vast majority of the Order's applications.  By its terms, that provision governs only issuance of "immigrant" visas.  8 U.S.C. § 1152(a)(1)(A); *see id.* § 1101(a)(15)-(16), (20).  However, the vast majority— more than 70%—of visas issued in the last two fiscal years to nationals of the six countries at issue

were *nonimmigrant* visas.[13]  Most of the aliens Plaintiffs claim will be affected by the Order—students, employees, tourists, and family visiting relatives—would likewise seek to enter on nonimmigrant visas.  By its plain terms, Section 1152(a)(1)(A) has no application to such aliens. It likewise has no application to those entering under the Refugee Program, who do not receive visas at all.  *See* 8 U.S.C. § 1181(c).  Even where Section 1152(a)(1)(A) applies, moreover, Congress made clear that it does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications," *id.* § 1152(a)(1)(B), which at most is all the Order's temporary pause does.  Plaintiffs, therefore, cannot meet the "heavy burden" of "establish[ing] that no set of circumstances exist under which the [Order] would be valid." *Salerno*, 481 U.S. at 745, or "that the law lacks any plainly legitimate sweep." *Tepeyac*, 5 F. Supp. 3d at 753.  To the contrary, it would still be valid in the vast majority of applications.

In any event, Plaintiffs' statutory argument is wrong.  Even where it applies, Section 1152(a)(1)(A) does not restrict the President's authority to draw nationality-based distinctions under Sections 1182(f) and 1185(a).  Section 1152(a)(1)(A) was enacted in 1965 to abolish the prior system of nationality-based quotas for immigrant visas.  Congress replaced that system with uniform, per-country percentage limits.  Section 1152(a)(1)(A) addresses the subject of relative "preference" or "priority" (and reciprocal disadvantage or "discrimination") in the allocation of immigrant visas by making clear that the uniform percentage limits are the only limits that may be placed on the number of immigrant visas issued to nationals of any country.

Section 1152(a)(1)(A) thus governs the ordinary process of allocating and granting immigrant visas.  Its plain text governs only "the issuance of an immigrant visa"; it does not purport

---

[13]     *See*        https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/ report-of-the-visa-office-2016.html;        https://travel.state.gov/content/visas/en/law-and-policy/ statistics/annual-reports/report-of-the-visa-office-2015.html.

to restrict the President's antecedent, longstanding authority to suspend entry of "any class of aliens" or to prescribe reasonable "rules, regulations, and orders" regarding entry as he deems appropriate.  And it has never been understood to prohibit the President from drawing nationality-based distinctions under Section 1182(f).  For example, President Reagan invoked Section 1182(f) to "suspend entry into the United States as immigrants by all Cuban nationals," subject to exceptions.   Proclamation No. 5517 (1986).   Moreover, the Supreme Court has deemed it "perfectly clear that [Section 1182(f)] grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993).

Section 1185(a), too, has long been understood to authorize nationality-based distinctions. In 1979, the Office of Legal Counsel construed it as authorizing the President to "declare that the admission of Iranians or certain classes of Iranians would be detrimental to the interests of the United States."  *Immigration Law and Iranian Students*, 4A Op. O.L.C. 133, 140 (Nov. 11, 1979). Two weeks later, President Carter invoked Section 1185(a) to direct "limitations and exceptions" regarding "entry" of certain "Iranians."  Exec. Order 12,172 (1979).  Plaintiffs are thus wrong to characterize the Order as a dramatic departure from past practice as to drawing nationality-based distinctions in administering the immigration laws.  *See* Pls.' Mot at 27; *cf. Narenji v. Civiletti*, 617 F.2d 745, 746-748 (D.C. Cir. 1979) (upholding regulation that required nonimmigrant-alien post-secondary-school students who were Iranian natives or citizens to provide residence and immigration status to INS).

Interpreting Section 1152(a)(1)(A) to prohibit the President from drawing nationality-based distinctions would also raise serious constitutional questions that the Court must avoid if possible.  *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485

U.S. 568, 575 (1988).  Limiting the entry of nationals of particular countries can be critical to the President's ability to conduct the Nation's foreign affairs and protect its security.  Yet Plaintiffs' statutory interpretation would completely disable the President from restricting the entry of immigrants from any country—even one with which the United States was on the verge of war.

Plaintiffs offer no sound reason to adopt that constitutionally dubious interpretation or to upset the long-settled understanding of the President's statutory authority.  Plaintiffs cite two decisions addressing nationality-based distinctions in other immigration contexts, neither involving an exercise of the President's authority under Section 1182(f) or Section 1185(a).[14]  *See* Pls.' Mot. at 25.  Those decisions do not reflect a general bar on nationality-based distinctions in immigration.  In fact, "given the importance to immigration law of, *inter alia*, national citizenship, passports, treaties, and relations between nations, the use of such classifications is commonplace and almost inevitable."  *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).

Plaintiffs contend that Section 1152(a)(1)(A) overrides the President's Section 1182(f) authority because it was enacted later in time.  *See* Pls.' Mot. at 25-26.  In fact, Plaintiffs have it backwards: to read Section 1152(a)(1)(A) as narrowing the President's Section 1182(f) authority would be to treat it as a partial "'repeal[] by implication,'" which courts will not do unless Congress's "'intention'" is "'clear and manifest.'"  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife (NAHB)*, 551 U.S. 644, 662, 664 n.8 (2007); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).  Sections 1152(a)(1)(A) and 1182(f) can, and therefore must, be reconciled by reading Section 1152(a)(1)(A)'s general, default provisions as not affecting the President's authority to suspend entry under Section 1182(f) based on a finding about the national

---

[14]    *See LAVAS*, 45 F.3d at 472-73 (processing immigrant visas), *vacated on other grounds*, 519 U.S. 1 (1996); *Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997) (issuance of nonimmigrant visas by individual consular officers).

23

interest.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012)

("'[I]t is a commonplace of statutory construction that the specific governs the general.'").

Furthermore, even if Section 1152(a)(1)(A) could be construed to narrow Section 1182(f),

it cannot be read to narrow Section 1185(a)—which was substantially amended in 1978, *after*

Section 1152(a)(1)(A)'s enactment.  Nothing in Section 1185(a)'s current text or post-1978 history

limits the President's authority to restrict entry by nationals of particular countries.

### b.      Section 1182(a) Does Not Prevent the President from Suspending the Entry of Nationals from the Designated Countries.

Plaintiffs also contend that the Order's entry suspension exceeds the President's Section

1182(f) authority because the suspension is based on terrorism concerns, and Congress has already

set forth criteria for denying admission on terrorism-related grounds in Section 1182(a)(3)(B).  See

Pls.'s Mot. at 26-27.  Plaintiffs' argument unpersuasively assumes that the President may not

exercise his Section 1182(f) authority based on any general concern that also underlies one of

Section 1182(a)'s many specific grounds for inadmissibility.  That cramped understanding of

Section 1182(f) contravenes the text and structure of the statute as well as decades of practice.

Section 1182(a) sets forth numerous specific grounds of inadmissibility, including grounds

relating to "[h]ealth[]," "[c]riminal" history, "[s]ecurity," and "[f]oreign policy."  8 U.S.C. §

1182(a)(1), (2), (3), (3)(C).  Recognizing that specific statutory criteria cannot anticipate every

threat to national interests, Section 1182(f) supplements them by granting the President broad

authority to "suspend the entry" of additional aliens or classes of aliens.  Nothing in Section

1182(f)'s text suggests the President cannot exercise that authority in response to concerns that

overlap with one of Section 1182(a)'s inadmissibility grounds.  Indeed, given the breadth and

variety of those grounds, it is difficult to conceive of a plausible exercise of Section 1182(f)

authority that could *not* be characterized as touching a topic already addressed in Section 1182(a).

Experience confirms that Section 1182(f) is not confined to topics on which Section 1182(a) is silent.  For example, Congress identified certain crimes that render aliens inadmissible, 8 U.S.C. § 1182(a)(2), yet Presidents have invoked Section 1182(f) to suspend the entry of aliens who committed criminal offenses.[15]  Similarly, Section 1182(a) renders inadmissible aliens who have participated in certain human-rights violations, including "genocide," "torture," and "extrajudicial killing," 8 U.S.C. §1182(a)(3)(E)(ii)-(iii), yet presidents have invoked Section 1182(f) to suspend entry of aliens linked to other human-rights abuses.[16]  More broadly, Section 1182(a)(3)(C) deems an alien inadmissible if the Secretary of State "has reasonable ground to believe" that his entry "would have potentially serious adverse foreign policy consequences."  Virtually every invocation of Section 1182(f) addresses foreign policy and reflects the President's determination that "it is in the foreign policy interests of the United States to suspend the entry" of the affected aliens.  Proclamation No. 7062 (Jan. 14, 1998).[17]  So, too, Section 1182(a)(3)(B)'s exclusion for any alien who has "engaged in" or "is likely to engage" in "terrorist activity" does not bar the President from temporarily suspending certain entries to assess whether existing procedures are adequate to detect potential terrorists.

### B.      The Order Does Not Discriminate Based on Religion.

The Order does not discriminate on the basis of religion.  It applies to six countries that Congress and the prior Administration determined posed special risks of terrorism.  It applies to *all* individuals in those countries, regardless of religion.  And it excludes numerous individuals with ties to this country, while providing a comprehensive waiver process for others.  Plaintiffs

---

[15]     *E.g.*, Executive Order No. 13,694 (2015); Proclamation No. 7750 (2004).

[16]     *E.g.*, Executive Order No. 13,692 (2015); Executive Order No. 13,606 (2012); Proclamation No. 8697 (2011); Proclamation No. 8015 (2006).

[17]     *See also*, *e.g.*, Proclamation No. 7060 (1997); Executive Order No. 13,726, (2017); Executive Order No. 13,712 (2015); Executive Order No. 13,687 (2015).

nevertheless try to impugn the Order using campaign statements.  As the Supreme Court has made

clear, official action must be adjudged by its "'text, legislative history, and implementation of the

statute or comparable official act[ion],'" not through "judicial psychoanalysis of a drafter's heart

of hearts." *McCreary Cty. v. ACLU*, 545 U.S. 844, 862 (2004) (quoting *Santa Fe Indep. Sch. Dist.

v. Doe*, 530 U.S. 290, 301 (2000)).  Measured against these standards, the Order falls well within

the President's lawful authority.  Stripping away Plaintiffs' assumption that "the primary purpose

of the Order is to disadvantage Muslims," Pls.' Mot. at 18, there is no violation of the *Lemon* test,

the *Larsen* test, or equal protection.  *See id*. at 18-24.

> **1.     The Order Draws Distinctions on the Basis of Risk of Terrorism, Not Religion.**

The Order does not draw "explicit and deliberate distinctions" based on religion.  *Larson

v. Valente*, 456 U.S. 228, 246 n.23 (1982).  The only language in the Revoked Order touching on

religion—a neutral provision intended to assist victims of religious persecution—has been

removed.

The Order's temporary suspensions are expressly premised on the President's finding that

a temporary pause in entry was necessary to "prevent infiltration by foreign terrorists" while the

review of screening and vetting procedures is ongoing.  Order § 2(c).  The six countries covered

were previously designated by Congress and the Executive Branch as presenting particular risks,

and the risk of continued entry from those countries during the review was, in the President's view,

unacceptably high.  *Supra* at 6-7.[18]

---

[18]     Plaintiffs attempt to impute anti-Muslim animus from references in the Order to collecting
and publishing information about foreign nationals who have been "radicalized" and about "so-
called 'honor killings'" among other "acts of gender-based violence against women."  Order § 11.
This is "grasping at straws."  Pls.' Mot. at 21.  A person can be "radicalized" for any reason, and
"[h]onor crimes are not specific to any religion nor are they limited to any one region of the
world." Human Rights Watch, *Oral Intervention at 57th Session of the UN Commission on Human
Rights*, available at  http://pantheon.hrw.org/legacy/press/2001/04/un_oral12_0405.htm.

The Order's stated "secular purpose" is entitled to "deference" so long as it is "genuine," *i.e.*, "not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. Courts judge the genuineness of the government's true "object" by considering the "operation" of its action, as "the effect of a law in its real operation is strong evidence of its object." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). The "Establishment Clause does not look to the veiled psyche of government officers," but rather to "the 'text, legislative history, and implementation of the statute,' or comparable official act." *McCreary*, 545 U.S. at 863. Here, the operation of both suspensions confirms the Order's stated purpose. The suspensions apply irrespective of any alien's religion, and Plaintiffs do not contend otherwise.

Plaintiffs repeatedly note that the six countries covered by the entry suspension are "Muslim-majority." Pls.' Mot. at 3, 4, 11. But that fact does not establish that the suspension's object is to single out Islam. The six countries covered were previously selected by Congress and the Executive through a process that Plaintiffs do not contend was religiously motivated. In addition, those countries represent only a small fraction of the world's 50 Muslim-majority nations, and are home to less than 9% of the global Muslim population.[19] And the suspension covers *every* national of those countries, including millions of non-Muslim individuals in those countries, if they meet the Order's criteria.

Nor does Plaintiffs' disagreement with the President's national security judgment, *see* Pls.' Mot. at 14-17, render the Order's stated purpose a sham. Courts "must defer to [the Executive's] stated reasons if a 'plausible secular purpose . . . may be discerned from the face of the [Order].'" *Trunk v. City of San Diego*, 629 F.3d 1099, 1108 (9th Cir. 2011) (quoting *Mueller v. Allen*, 463

---

[19]     *See* Pew-Templeton Global Religious Futures Project, Muslim Population by Country (2010), http://www.globalreligiousfutures.org/religions/muslims.

U.S. 388, 394-95 (1983)); *see Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 288 (4th Cir. 2000). Such deference is particularly warranted where the Executive is making predictive judgments that "implicate[] sensitive and weighty interests of national security and foreign affairs." *Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1, 33-34 (2010). Here, the Order's aim is to predict where the risk exists *going forward*. And it is well-established that, in making such predictive judgments, the government "is not required to conclusively link all the pieces in the puzzle before [courts] grant weight to its empirical conclusions." *HLP*, 561 U.S. at 35; *see also id.* at 33 (the "evaluation of the facts by the Executive" to support predictive judgments is "entitled to deference"). Consequently, Plaintiffs attempt to undermine the President's judgment here—including through reliance on leaked, draft reports based solely on backward-looking evidence—must be rejected. *See* Pls.' Mot. at 16. Such draft documents could not possibly overcome the forward-looking and final, *official* assessment of the President and multiple Cabinet Secretaries. Joint Ltr. to President (Mar. 6, 2017); *see Nat'l Ass'n of Home Builders v. Defenders of Wildlife* (*NAHB*), 551 U.S. 644, 658-59 (2007).[20]

### 2. The Order Cannot Be Enjoined on the Basis of Campaign Statements or the Revoked Order.

Plaintiffs further argue that the Order targets Islam based on their interpretation of "the process leading up to its issuance" and "statements by the President and his closest advisors," mostly before taking office. Pls.' Mot. at 5. Plaintiffs cannot use either type of parol evidence to evade the Order's stated secular purpose.

---

[20]    Plaintiffs' assertion that the removal of Iraq from the suspension on entry demonstrates an improper purpose because it is not based on any new information is belied by the Order itself. *See* Order § 1(g) (explaining that, since the Revoked Order was issued, "the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal").

As a threshold matter, the Supreme Court has made clear in the immigration context that courts may not "look behind the exercise of [Executive] discretion" taken "on the basis of a facially legitimate and bona fide reason." *Mandel*, 408 U.S. at 777; *see Fiallo v. Bell*, 430 U.S. 787, 794 (1977). That clear rule alone disposes of their Establishment Clause claim. As those cases recognize, Plaintiffs' approach would thrust courts into the untenable position of probing the Executive's judgments on foreign affairs and national security. And it would invite impermissible intrusion on Executive Branch deliberations, which are constitutionally "privilege[d]" against such inquiry, *United States v. Nixon*, 418 U.S. 683, 708 (1974), as well as litigant-driven discovery that would disrupt the President's ongoing execution of the laws, *see, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Searching for governmental purpose outside official pronouncements and the operative terms of governmental action is fraught with practical "pitfalls" and "hazards" that courts should avoid. *Palmer v. Thompson*, 403 U.S. 217, 224 (1971).

Even if the Court could look behind the President's facially legitimate reasons for suspending the entry of certain foreign nationals and refugees, informal statements by the President or his surrogates that do not directly concern the Order are irrelevant. The Supreme Court has declined to rely even on press statements and other informal communications by *incumbent* government officials, recognizing that they may not accurately reflect the government's position. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 624 n.52 (2006); *see also Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599 (5th Cir. 1995). *A fortiori*, statements by private persons cannot reveal "the government's ostensible object." *McCreary*, 545 U.S. at 859-60; *see also Glassman v. Arlington Cty, Va.*, 628 F.3d 140, 147 (4th Cir. 2010) (declining to rely on position of non-government parties); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (same); *Modrovich v. Allegheny Cty., Pa.*, 385 F.3d 397, 411-12 (3d Cir. 2004) (same).

29

Using comments by political candidates to question the stated purpose of later action is particularly problematic.  Candidates are not government actors, and statements of what they might attempt to achieve if elected, which are often simplified and imprecise, are not "official act[s]." *McCreary*, 545 U.S. at 862.  They generally are made without the benefit of advice from an as-yet-unformed Administration, and cannot bind elected officials who later conclude that a different course is warranted.  *See Republican Party of Minn. v. White*, 536 U.S. 765, 780-81 (2002). Permitting campaign statements to contradict official pronouncements of the government's objectives would inevitably "chill political debate during campaigns."  *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995) (declining to rely on campaign statements).  It also would be unworkable, requiring the "judicial psychoanalysis" that *McCreary* repudiated.  545 U.S. at 862.

Even considering Plaintiffs' proffered extrinsic evidence, none of it demonstrates that *this Order*—adopted after the President took office, to address the Ninth Circuit's concerns—was driven by religious animus.  Plaintiffs' marquee statement proves the point:  they cite a 15-month-old campaign press release advocating a "shutdown of Muslims entering the United States."  Pls.' Mot. at 2-3.  That release and other proffered statements reveal nothing about the Order's aim, because the Order does no such thing.  Far from banning Muslims indefinitely, the Order temporarily suspends the Refugee Program globally, and pauses for 90 days entry from just six countries previously identified as posing particular risks—both subject to religion-neutral exceptions and case-by-case waivers.  There is a complete disconnect between Plaintiffs' imputed purpose and the Order's actual effect.

Plaintiffs repeatedly cite *McCreary* to argue for looking behind the Order's text and legal effects to speculate at its aims.  *See* Pls.' Mot. at 10, 12, 17, 19-20.  In fact, *McCreary* says the opposite.  *McCreary* makes clear that what matters is not a government official's unstated,

subjective motive, but only the "official objective" drawn from "readily discoverable fact." 545 U.S. at 862. As *McCreary* explained, the Supreme Court's previous cases had rested on analysis of objective facts directly related to the law at issue: "In each case, the government's action was held unconstitutional only because openly available data"—a law's text or obvious effects, the policy it replaced, official public statements of the law's purpose, or "comparable *official* act[s]"—"supported a commonsense conclusion that a religious objective permeated the government's action." *Id.* at 862-63 (emphasis added); *see Lukumi*, 508 U.S. at 534-35 (gleaning purpose from ordinances' "text" and "operation").

*McCreary*'s analysis of the counties' purpose therefore centered on the text of the resolutions that serially authorized Ten Commandments displays and the features of those displays. *See* 545 U.S. at 868-74. Although the Court referred to other sources (*e.g.*, official statements made during legislative meetings) in describing the facts, *e.g.*, *id.* at 851, *McCreary*'s reasoning and holding rested on the actions the counties took and inferences fairly drawn from them, *id.* at 868-74. The Court emphatically rejected suggestions that it "look to the veiled psyche of government officers." *Id.* at 863.

The contrast between this case and *McCreary* could not be more stark. There, the religious purpose of the original resolution authorizing the Ten Commandments display was readily evident from the outset. 545 U.S. at 868-69. The counties' second resolution compounded the problem, making the religious aim *explicit*. *Id.* at 870. The counties' third and final display still showed a "sectarian spirit," since it included a different version of the Ten Commandments that "quoted more of the purely religious language of the Commandments than the first two displays had done," and, significantly, was created "without a new resolution or repeal of the old one." *Id.* at 870, 872.

Here, in contrast, the Order does not convey any religious message; indeed, it does not reference religion at all.  The Revoked Order contained provisions addressing religious minorities, but—as the new Order takes care to explain—those provisions did not and never were intended to discriminate along denominational lines.  Order § 1(b)(iv).  Regardless, the current Order responded to concerns about the Revoked Order's aims by removing the provisions that purportedly drew religious distinctions—erasing any doubt that national security, not religion, is the focus.  The Order also reflects the considered views of the Secretary of State, the Secretary of Homeland Security, and the Attorney General, who announced the Order and whose motives have not been impugned.  In short, the President's efforts to accommodate courts' concerns while simultaneously fulfilling his constitutional duty to protect the Nation only confirms that the Order's intention most emphatically is not to discriminate along religious lines.

## II.     Plaintiffs Do Not Clearly Show Irreparable Harm.

Plaintiffs' motion also fails because Plaintiffs have not clearly shown they will suffer irreparable harm absent preliminary relief.  Even if Plaintiffs have alleged sufficient harm to satisfy Article III standing, irreparable harm is a higher hurdle.  *See, e.g.*, *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).  "To establish irreparable harm, plaintiffs must show that they are 'likely to be irreparably harmed,' not just that they face a mere possibility of harm."  *Alston*, 2014 WL 6388169, at *5 (quoting *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013).  "Thus the 'irreparable harm' to be suffered must be 'neither remote nor speculative, but actual and imminent.'"  *Alston*, 2014 WL 6388169, at *5 (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).  "The irreparable injury requirement erects a very high bar for a movant," *Henke v. Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012), which Plaintiffs do not satisfy.

### A.      Individual Plaintiffs.

Examining the alleged circumstances of the particular aliens for whom the individual Plaintiffs seek entry into the United States, there is no immediacy consonant with irreparable harm. Rather, those aliens (and the individual Plaintiffs associated with them) have already been or will irrespective be waiting months or years, and regardless have available to them the possibility of a waiver allowing entry under the Order, either as refugees under Section 6(c) or as "close family member[s]" under Section 3(c)(iv):

- Plaintiff Mohomed's family has already been waiting over three years to travel to the United States since being approved as refugees in 2013.  *See* ECF No. 91-8 ¶ 3.

- Plaintiff John Doe #3 applied for a visa for his wife in 2014, and her visa interview occurred in May 2016, meaning she had already been waiting over seven months for processing before the Revoked Order was issued.  *See* ECF No. 91-5 ¶¶ 4-5.

- Plaintiff Harrison admits that his fiancé, who had his visa interview in November 2016, waited over a month to submit his passport for further visa adjudication after receiving instruction on February 7, 2017 that he could do so.  *See* ECF No. 91-9 ¶¶  3, 7, 9.

- Plaintiff Meteab's brothers were advised in November 2016 to wait for travel documents to come to the United States as refugees, meaning they had already been waiting two months before the Revoked Order was issued.  *See* ECF No. 91-6 ¶ 11.  There is moreover no allegation that the brothers and their families are in danger while awaiting resettlement.

- Plaintiff John Doe #1's wife submitted her paperwork in November 2016, and has already been waiting for a visa application interview since Jan. 9, 2017, encompassing well over a month of time when applicable provisions of the Revoked Order were not in effect.  *See* ECF No. 91-4 ¶ 5.

- Plaintiff Jane Doe #2 has an I-130 petition pending for her sister, and suggests that once approved for that visa her sister can also access the Refugee Program through the Priority-2 Direct Access Program for Iraqi and Syrian Beneficiaries.  *See* ECF No. 91-7 ¶ 10.  But even assuming that the petition would be approved, the sister is a long time off from being able to enter the United States under either of the visa or refugee paths.[21]

Additionally, in showing irreparable harm to the individual Plaintiffs themselves, a "claim of psychological harm" with little evidentiary underpinning may be "too speculative to warrant preliminary relief."  *Moore v. Consolid. Edison Co. of N.Y.*, 409 F.3d 506, 511 (2d Cir. 2005) (Sotomayor, J.).  Nor does it suffice to assert harassment of Muslims that is not proximately traceable to the Order.  *See* ECF No. 91-7 ¶ 14; ECF No. 91-6 ¶ 14.

## B.      Organizational Plaintiffs.

With respect to HIAS and IRAP, Plaintiffs rely almost exclusively on the purported harms inflicted by Section 6(d) of the Executive Order—limiting the entry of more than 50,000 refugees in fiscal year 2017—and assert that "those injuries will be exacerbated if the additional provisions in the latest Executive Order go into effect."  Pls.' Mot. at 35.  As an initial matter, those claimed harms were insufficient even with respect to that particular provision, as Defendants explained in their opposition to that preliminary injunction motion.  *See* ECF No. 82 at 7-9, 27-28.  But even those claimed harms—which the Government disputes—do not translate into irreparable harm for

---

[21]      Upon approval of the I-130 petition, the subsequent wait to receive an immigrant visa for a family-based fourth preference (F-4) sibling petition is many years; even before the Revoked Order, such visa numbers were not yet available for petitions filed after 2004.  *See* https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2017/visa-bulletin-for-january-2017.html.  Alternatively, to pursue entry under the Refugee Program after approval of the I-130 petition, even before the Revoked Order the sister would have faced refugee resettlement processing taking 18-24 months, and sometimes longer.  *See* https://www.state.gov/j/prm/releases/factsheets/2016/254649.htm.

challenging other, distinct provisions.  For example, there is no connection between the purported harms to the organizations' refugee assistance activities and their challenge to Section 2 of the Executive Order, which does not deal with refugees but instead temporarily suspends visa issuances for 90 days for certain nationals of six countries, subject to case-by-case waivers.  And asserting harms stemming from the *reduction* in the number of refugees available for U.S. resettlement is not the same as identifying harms from the potentially delayed *timing* of when those refugees will be resettled, which is what Section 6(a) governs.  Plaintiffs cannot bootstrap harms from one provision as the basis for broader relief as to unrelated provisions of the Order.  *Cf. N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (evaluating whether moving parties "have demonstrated, *with respect to each claim*, that they will suffer irreparable harm in the absence of an injunction" (emphasis added)).

As for MESA, that organization's allegations are entirely deficient in terms of explaining how the Executive Order's provisions will actually affect their activities, for the reasons expressed above.  *See* Section I.A.1, *supra*.  MESA also fails to explain why these injuries, even assuming they exist, are actually irreparable—*e.g.*, why the organization cannot avoid these harms by rescheduling its meeting or choosing a different location.  *Cf. HCI Techs., Inc. v. Avaya, Inc.*, 446 F. Supp. 2d 518, 521 (E.D. Va. 2006) (finding a lack of irreparable harm because there were "strategic alternatives available" to the plaintiff), *aff'd*, 241 F. App'x 115 (4th Cir. 2007).[22]

Finally, Plaintiffs seek to invoke the harms suffered by refugees and other local clients.  But even if Plaintiffs have established third-party standing to assert the legal rights of refugees, those rights are still asserted *in pursuit of Plaintiffs' own claims*; the refugees or other third parties are

---

[22]      MESA's claimed harms would, at most, allow it to challenge the temporary suspension on visa issuances; MESA does not claim harm from the refugee provisions of the Executive Order.

not considered actual parties for purposes of the preliminary injunction motion. Thus, any harm suffered by those non-parties are irrelevant to the irreparable harm analysis. *See MicroStrategy*, 245 F.3d at 339 (requiring showing of "irreparable harm *to the plaintiff*" (emphasis added)); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) ("[T]he preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm."). And in any event, such harms are speculative, particularly given that Plaintiffs themselves have acknowledged that refugees often wait years for their applications to be processed even under normal circumstances. *See* ECF No. 64 at 21.

## III.   The Balance of the Equities and the Public Interest Weigh Against Relief.

The balance of the equities and the public interest—which merge here, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—counsel strongly in favor of leaving the Order in effect. The President, in consultation with the Attorney General and the Secretaries of State and Homeland Security, determined that, while the review of screening and vetting procedures is ongoing, the "risk of erroneously permitting entry" of an individual who intends to commit terrorist acts "is unacceptably high." Order § 1(f). That risk assessment provides more than sufficient basis to leave the Order's temporary, precautionary safeguards in place.

"Courts have accorded great weight to considerations of national security when balancing the interests and equities of the parties." *Nat'l Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *see also Winter*, 555 U.S. at 24; *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 796, 798 (D.C. Cir. 1971) (because of "assertions of potential harm to national security and foreign policy—assertions which [the court] obviously can not appraise— . . . we are constrained to refuse an injunction" on a limited record). "[T]he Supreme Court has long acknowledged that 'no governmental interest is more compelling than the security of the Nation.'" *United States v. Abu Ali*, 528 F.3d 210, 240 (4th Cir. 2008) (quoting *Haig v. Agee*, 453 U.S. 280,

307 (1981)); *accord United States v. Sterling*, 724 F.3d 482, 509 (4th Cir. 2013). "The continuing threat of international terrorism highlights the importance of this interest: the 'government has no more profound responsibility than the protection of Americans, both military and civilian, against additional unprovoked attack.'" *Abu Ali*, 528 F.3d at 240.

Experience and empirical data already demonstrate the ability of would-be terrorists to infiltrate the country through cracks in screening and vetting processes; some 300 persons who entered as refugees are currently under investigation, and hundreds of foreign-born persons have been convicted of terrorism-related crimes. Order § 1(h). Given that reality, the Executive's obligation, and the Order's aim, is to predict where the greatest risk exists *going forward*. The Order reflects such prediction, identifying six countries that Congress and the prior Administration had found present a "heightened risk" that possibly inadequate screening could enable terrorist infiltration. Order § 1(e). The Order further details the specific concerns with each of the six countries (and why Iraq now presents a different circumstance). *Id.* § 1(e), (g).

The Order reflects the Executive's "[p]redictive judgment," which is entitled to the greatest possible degree of judicial deference. *Dep't of Navy v. Egan*, 484 U.S. 518, 527-29 (1988). Such judgments "have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry," as they "are delicate, complex, and involve large elements of prophecy," and are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). "[W]hen it comes to collecting evidence and drawing factual inferences in this area, the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate." *HLP*, 561 U.S. at 33-34. "One reason for that respect is that national security and foreign policy concerns

arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess." *Id.* at 34.

Plaintiffs offer nothing that could plausibly justify disregarding the considerable deference due to the Executive's analysis and predictive judgments. Plaintiffs' invitation to question those judgments, Pls.' Mot. at 38, clashes with the consideration that "[c]ourts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint." *Nixon*, 457 U.S. at 753. When faced with a "[p]redictive judgment of this kind" in the realm of "national security affairs," "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive"—either "to review the substance of such a judgment," "to decide whether the . . . necessary affirmative prediction [can be made] with confidence," or to "determine what constitutes an acceptable margin of error in assessing the potential risk." *Egan*, 484 U.S. at 529-30. Irrespective whether Plaintiffs or others disagree with the assessment of the President and multiple Cabinet Secretaries, "[c]ases that require courts to second-guess these decisions run the risk not just of making bad law, but also of impinging on explicit constitutional assignments of responsibility to the coordinate branches of our government." *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 180 (4th Cir. 2015) (alteration omitted).

## IV.    The Facial, Sweeping Relief Plaintiffs Seek Is Unwarranted.

"An injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.'" *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993). "Particularly is this so when preliminary relief, on something less than a full record and full resolution of the facts, is granted." *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971). The emergency relief Plaintiffs request—enjoining the Order in its entirety—is plainly overbroad for multiple reasons.

First, Plaintiffs can only plausibly attempt to show harms stemming from the Order's provisions suspending entry of certain foreign nationals from the six countries and suspending aspects of the Refugee Program.  To the extent any of those claimed harms are cognizable and irreparable, harms rooted in those particular provisions do not support enjoining the Order in its entirety.  Moreover, Plaintiffs whose harms stem only from the Refugee Program provisions (e.g., HIAS and IRAP) lack a basis to seek relief from the entry suspension provisions, and *vice versa*.

Second, Plaintiffs have challenged the Order on its face, but they cannot carry their burden of "establish[ing] that no set of circumstances exist under which the [Order] would be valid," *Salerno*, 481 U.S. at 745, or "that the law lacks any plainly legitimate sweep." *Tepeyac*, 5 F. Supp. 3d at 753.  For example, the Order is clearly constitutional as applied to foreign nationals with no immediate relatives in the country and no other significant connection to it.  The appropriate course is thus for persons subject to the Order to challenge it on an as-applied basis, and to do so only if and when they otherwise are found eligible for a visa or travel document but are denied a waiver. Only then can the relevant standing and merits questions be resolved in a concrete factual context.

Third, even if the Court were to grant any emergency relief, it should be strictly limited to only what is necessary to prevent irreparable injuries to Plaintiffs themselves, because "equity requires that injunctions be carefully tailored." *Georgia-Pacific Consumer Prod. LP v. von Drehle Corp.*, 781 F.3d 710, 715 (4th Cir. 2015).  Applying that principle, the Fourth Circuit has repeatedly vacated injunctions that reach beyond the minimum scope necessary to redress the plaintiff's specific harm pending further proceedings.  *See, e.g.*, *Kentuckians for Commonwealth v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003); *Georgia-Pacific* 781 F.3d at 716-17.  For the individual Plaintiffs' claims related to others' visa or refugee applications, an injunction could address at most the applicants' applications for visas or refugee status through procedures

39

unaffected by the Order.  For each organizational Plaintiff, relief is limited to particular persons with whom the organization has a close existing relationship, whom it demonstrates face an imminent risk of injury, and who are eligible for a visa or refugee admission.

Fourth, Plaintiffs do not demonstrate the need for a nationwide injunction—which sweeps far beyond any possible allegation of harm to them.  "Although '[n]ationwide injunctions are appropriate if necessary to afford relief to the prevailing party,' injunctive relief must be no broader than necessary to avoid encroaching "on the ability of other circuits to consider the' questions raised."  *Aziz v. Trump*, ___ F. Supp. 3d ___, 2017 WL 580855, at *10 (E.D. Va. Feb. 13, 2017) (applying *Va. Soc'y for Human Life v. Fed. Election Comm'n*, 263 F.3d 379, 393 (2001) to limit injunctive relief against Revoked Order to "Virginia residents who lawfully held [lawful permanent resident] status" or a valid student or work visa when Revoked Order was issued).  Any request here for a nationwide injunction would reflect a "desire to obtain sweeping relief," but that "cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks.'" *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221-22 (1974) (alteration omitted).

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction and/or temporary restraining order of Executive Order No. 13,780.


Dated:  March 13, 2017                    Respectfully submitted,

                                          CHAD A. READLER
                                          Acting Assistant Attorney General

                                          ROD J. ROSENSTEIN
                                          United States Attorney

                                          JENNIFER D. RICKETTS

Director, Federal Programs Branch

JOHN R. TYLER
Assistant Director, Federal Programs Branch

*/s/ Arjun Garg*
ARJUN GARG (Bar No. 806537)
MICHELLE R. BENNETT (Bar No. 806456)
DANIEL SCHWEI
BRAD P. ROSENBERG
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8613
Fax: (202) 616-8470
E-mail: arjun.garg@usdoj.gov
        michelle.bennett@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2017, I electronically filed the foregoing Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and/or Temporary Restraining Order of the Executive Order using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.


*/s/ Arjun Garg*
ARJUN GARG