**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | Civil Action No.: 8:17-CV-00361-TDC |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER OF THE EXECUTIVE ORDER & MEMORANDUM OF LAW IN SUPPORT THEREOF** |
| v. | |
| DONALD TRUMP, et al, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 1

    I.   THE PLAINTIFFS HAVE STANDING. ...................................................... 1

        A.  The Organizational Plaintiffs Have Standing. ...................................... 1

        B.  The Individual Plaintiffs Have Standing................................................ 4

        C.  The Plaintiffs' Claims Are Ripe. .......................................................... 6

    II.  THE EXECUTIVE ORDER VIOLATES THE CONSTITUTION. ................... 7

        A.  The New Order, Like the Old One, Is Unconstitutional Religious
            Discrimination....................................................................................... 7

        B.  The Order Is Subject to Normal Constitutional Review ...................... 12

    III. THE EXECUTIVE ORDER VIOLATES IMMIGRATION LAW. ................ 14

    IV. THE PLAINTIFFS FACE IRREPARABLE HARM. ..................................... 16

    V.  A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST. ............. 17

    VI. THE COURT SHOULD FACIALLY ENJOIN THE EXECUTIVE ORDER ON ITS
        FACE. ......................................................................................................... 17

CONCLUSION....................................................................................................... 18

## INTRODUCTION

President Trump ran on a promise to stop Muslim immigration, and he proposed to accomplish that goal by banning individuals from Muslim countries.  One week after inauguration, he indeed signed an Executive Order banning travel from seven Muslim countries. Its text was filled with pernicious stereotypes about Islam—ones the President had repeatedly and recently linked directly to Muslims.  And now the President has replaced that Order with a second Order that aims to achieve "the same, basic policy outcome for the country," *see* Mot. for TRO/Prelim. Inj., Dkt. No. 95 (Pls.' Mot.) at 8, with tweaks aimed at avoiding judicial review, as well as post-hoc rationalization that—after weeks of research by the executive branch—is remarkably thin and contradicted by the government's own reports.

The evidence of improper purpose in this case is overwhelming and undisputed.  The government simply asks the Court to disregard this mountain of evidence and defer to the Order's bare recital of security needs.  Settled law requires otherwise.

There are some goals the Constitution simply does not allow.  Banning Muslim immigration, even imprecisely, is one of them.  The Court should enjoin the Order in its entirety.

## ARGUMENT

## I.     THE PLAINTIFFS HAVE STANDING.

### A.     The Organizational Plaintiffs Have Standing.

As extensively discussed previously,[1] the Executive Orders have forced IRAP to divert significant resources away from its core mission in order to, among other things, find alternative

---

[1] *See* Mot. for Prelim. Inj. on § 5(d), Dkt. No. 64 p. 20-24; Mot. for TRO/Prelim. Inj., Dkt. No. 95 p. 36-37; Pls.' Reply, Dkt. No. 98 p. 4-5.

routes to safety for its hundreds of clients;[2] educate its clients and pro bono attorneys about such alternative routes and the effects of the Orders; represent clients unlawfully detained; and respond to hundreds of emails concerning the Executive Orders.  *See* 2d Heller Decl. ¶¶ 8-13, J.R. 3-5.  Unlike the "mere expense" at issue in *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012), these actions involve a significant reorientation of IRAP's personnel and other resources, have undercut IRAP's core mission, and have "perceptibly impaired" IRAP's mission by forcing it to scale back its representation in other cases.  *Id.* at 674 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see* 2d Heller Decl., ¶ 8-12, J.R. 3-5.

HIAS, too, has been injured by the Orders, in the form of significant, concrete financial losses caused by the drastic reduction in refugee admissions.[3]  *See Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016) ("The loss of funds for social services [that a refugee resettlement agency] provides its Syrian refugee clients, and will provide in the near future, is an injury" for Article III purposes.).[4]  The basis of HIAS's standing is not, as the government contends, that HIAS is legally entitled to resettle a specific number of refugees.  It is that the Executive Orders have caused crippling financial harm to HIAS and harm to its clients in the form of delay in entry to the United States, as well as opprobrium and stigmatization based

---

[2] Moreover, each client who is diverted from USRAP or frozen therein represents a waste of hundreds of hours of legal representation over many years spent navigating USRAP.

[3] *See* Mot. for Prelim. Inj. on § 5(d), Dkt. No. 64 p. 20-24; Mot. for TRO/Prelim. Inj., Dkt. No. 95 p. 36-37; Pls.' Reply, Dkt. No. 98 p. 5-6.

[4] The government's attempt to distinguish *Exodus* is unavailing.  *See* Opp'n to Mot. for TRO/Prelim. Inj., Dkt. No. 122 (Opp.) at 14-15 & n.8.  In form and function, HIAS is identical to the *Exodus* plaintiff:  Both are resettlement agencies that provide services to refugees who are already resettled in the United States and to refugees who will be resettled in the future based on the State Department's projections.  Both are "economically harmed" by the withholding of federal funds for the social services they provide to their clients, and "[t]his loss of federal funds is detrimental to the programming [they] can provide to [their] clients."  165 F. Supp. 3d at 730.

on their religion.  These are concrete harms redressable by the Court, and so HIAS has Article III standing.

IRAP and HIAS also have standing to vindicate the rights of their clients.  The government's only argument specific to third-party standing is that IRAP's and HIAS's clients have "no legally protected interests"[5] because they are "unadmitted and nonresident alien[s]."  Opp. 14 (citation omitted).  It ignores that many of these clients are in the United States, and are seeking to be reunited with family members abroad.  *See* Hetfield Decl. ¶¶ 28-37, J.R 23-26; 1st Heller Decl. ¶¶ 5, 21-26, J.R. 27, 32-34; 2d Heller Decl. ¶ 27, J.R. 9-10.  The government does not dispute that these individuals have constitutional rights, or that IRAP and HIAS meet the other elements for third-party standing.  *See Powers v. Ohio*, 499 U.S. 400, 410-11 (1991); *Exodus*, 165 F. Supp. 3d at 730-33; Pls.' Reply, Dkt. No. 90 p. 4-7.

Contrary to the government's claims, MESA's injuries are traceable to the Executive Order and are not speculative.  First, it claims that MESA's decline in applications to participate in its conference could not have been caused by the March 6 Order, because of the February 15 deadline for submissions to the conference.  *See* Opp. 11.  This ignores the fact that the revised Order's operative ban was also part of the January 27 Order.  Second, it points out that the annual conference is slated to take place outside of the 90-day period.  *See* Opp. 11.  But the ban may still make it impossible for some individuals to get visas in time and complete other arrangements necessary to attend the conference.[6]  Moreover, the government does not (and

---

[5] *Doe v. Sebelius*, 676 F. Supp. 2d 423, 429 (D. Md. 2009) (cited Opp. 14), involved fetuses, not individuals abroad.

[6] For example, an Iranian MESA member had concrete plans to attend the meeting, but she will be unable to do so unless the travel ban is lifted.  Baron Decl., Dkt. No. 95-3 ¶ 5, J.R. 37.  MESA also has many U.S.-based faculty members who will be unable to exchange ideas and scholarship

cannot) assert that the Order's "pause" will dissipate after 90 days.  To the contrary, Defendants have given every indication that portions of the ban are likely to continue indefinitely, and may even expand.  *See, e.g.*, Revised Order § 2(e), (f) (contemplating extension and expansion); Hausman Decl. Ex. L, J.R. 150-51 (Daniella Diaz, *Kelly: There are "13 or 14" more countries with questionable vetting procedures*, CNN.com, Mar. 7, 2017) (Secretary Kelly stating that, even after the Order's initial ban expires, "there will be minimum citizens from those countries that visit our country").  This ongoing cloud of uncertainty is disrupting MESA's ability to organize its conference and fulfill its mission as an organization.  Baron Decl. ¶¶ 11-13, J.R. 39-40.[7]

## B.      The Individual Plaintiffs Have Standing.

The government fundamentally misapprehends the harms that form the basis of the individual Plaintiffs' standing, and accordingly, its arguments miss the mark.  The individual Plaintiffs' injuries stem from the discriminatory delays the Executive Orders have caused, and will continue to cause, in Plaintiffs' reunification with their loved ones.  Such delay constitutes Article III injury.  Indeed, in arguing on before the Ninth Circuit that Washington lacked standing, the government noted that individuals like the plaintiffs *would* have standing.  *See* Oral Arguments Before the U.S. Court of Appeals for the Ninth Circuit, *State Of Washington, et al., v. Donald J. Trump, et al.*, 2017 WLNR 4070578 (conceding that "a U.S. citizen with a connection

---

with potential students outside the U.S. affected by the Orders, harming these members' pedagogical and academic work.  *Id.* ¶ 8, J.R. 38.

[7] The government argues that the organizational plaintiffs in this case only have standing to challenge certain sections (i.e. MESA can only challenge the 90-day ban, HAIS and IRAP can only challenge the refugee provisions).  This argument ignores the fact that all of these Organizational plaintiffs have either members, Baron Decl., Dkt. No. 95-3 ¶ ¶¶11, J.R. 39, or clients, 2d Hetfield Decl., ¶ 37, J.R. 15-16, who are Muslim and who will be harmed by the stigmatic effects of an executive order that was intended to discriminate against their faith.

to someone seeking entry" would have standing and "across the country there are many lawsuits where there is clearly is standing" brought by "people impacted by this order"). *See also LAVAS v. Dep't of State*, 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) ("[T]he State Department's conduct prolongs the separation of immediate family members . . . . We have previously found injury in fact where the plaintiffs were far less aggrieved than in the case at bar."). Plaintiffs are lawful permanent residents and U.S. citizens with protected constitutional rights, and the delay in the processing of their petitions for their loved ones, for no other reason than their religion and nationality, gives rise to a cognizable Article III injury.

Moreover, the government's reliance on *Newdow* to challenge Plaintiffs' standing for their Establishment Clause claim is misplaced. *See* Opp. 17 (citing *Newdow v. Lefevre*, 598 F.3d 638 (9th Cir. 2010)). Cases addressing whether plaintiffs are personally affected by the government's general promotion of religion, like *Newdow*, are qualitatively distinct from Establishment Clause challenges to government action that singles out one faith—the individual plaintiffs' faith—for opprobrium and disfavored treatment. Here, Plaintiffs challenge an Executive Order that is unprecedented not only in its scope, but also its many procedural and substantive irregularities, its blatant targeting and negative stereotyping of Muslims, and the obvious animus motivating it. *See* Pls.' Mot. at 6-17. The Executive Order "target[s] and condemn[s] a specific religion," Islam, and that disapprobation has impaired the way Plaintiffs lead their everyday lives and directly resulted in disfavored treatment of Plaintiffs and their loved ones. *Awad v. Ziriax*, 670 F.3d 1111, 1122-23 (10th Cir. 2012); *see also*, *e.g.*, *Catholic League for Religious and Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) ("It would be outrageous if the government . . . could condemn the religion of its . . .

citizens, yet those citizens could not defend themselves in court against their government's preferment of other religious views."). In subjecting the adherents of Islam to differential treatment and associating them with terrorism, violent extremism, hatred, and bigotry, the Orders condemn Islam and directly inflict injuries on Plaintiffs that support their standing.

## C.    The Plaintiffs' Claims Are Ripe.

The government argues that because the Order contains a discretionary waiver provision, the individual plaintiffs' claims cannot be ripe "unless and until they seek and are denied a waiver." *See* Opp. 16-17 (citing Revised Order, § 3(c)).   But the imposition of the waiver procedure itself makes their claims ripe.  The individual Plaintiffs' loved ones are banned by the Order.  The only way they can surmount the ban is by obtaining a waiver.  When an "additional hurdle [is] interposed with discriminatory purpose," the "additional hurdle itself is illegal whether or not it might have been surmounted." *Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1541 (11th Cir. 1994); *see also, e.g.*, *United States v. Village of Palatine*, 37 F.3d 1230, 1233 n.3 (7th Cir. 1994) (indicating that a discriminatory intent claim can be ripe under similar circumstances); *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 610 (S.D.N.Y. 2013) (ripeness satisfied where plaintiffs claimed that defendant "adopted the challenged ordinances with a discriminatory purpose," even though plaintiffs had not sought permits under the discriminatory ordinances).

Nor does the revised Order expand the availability of waivers beyond the original Order, as the government maintains.  *See* Opp. 8, 17 (citing Revised Order, §§ 3(c)(iv), 6(c)).   The revised Order still requires that the waiver applicant "demonstrate[] to the officer's satisfaction that denying entry during the suspension period would cause undue hardship," *and* "that his or her entry would not pose a threat to national security," *and* that the waiver "would be in the

national interest." *Id.* § 3(c)(iv) (emphasis added). The revised Order's list of illustrative cases—where waivers merely "*could* be appropriate"—serves if anything to narrow the original Order's more open-ended waiver authority. *Id.* § 3(c). *Compare* Jan. 27 Order, § 3(g) (allowing waivers simply "when in the national interest"). Defendants offer no assurance that any plaintiff will receive a waiver.[8]

## II.    THE EXECUTIVE ORDER VIOLATES THE CONSTITUTION.

### A.    The New Order, Like the Old One, Is Unconstitutional Religious Discrimination.

The silences in the government's opposition speak volumes. The government does not—and, of course, cannot—deny that the President repeatedly promised to implement a ban on the entry of members of one particular religion. It does not contest that the extraordinary evidence of discriminatory intent adduced in this case, as well as the evidence linking the President's statements to both the old and new Orders, is more than enough to carry Plaintiffs' burden to establish improper purpose under well-established legal principles. Nor, despite all its invocations of the President's purportedly broad powers, does the government contend that if the President officially acknowledged that he was instituting a Muslim ban (whether partial or total), he could do so consistent with the Establishment Clause and equal protection.

The government nevertheless argues that the Court cannot or should not look beyond the text of the Order. Courts have already roundly rejected that contention, for good reason. *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) ("It is well established that evidence

---

[8] The government makes no argument that either of the two elements of ripeness is not satisfied here. *See* Opp. 16-17. The ripeness inquiry considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Plaintiffs' facial claims are clearly fit for review, and they would suffer hardship from the delay and stigma of requesting a purely discretionary waiver under a policy whose basic purpose is to exclude them. *See Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 970 (D.C. Cir. 2011).

of purpose beyond the face of the challenged law may be considered."); *Aziz v. Trump*, ___ F. Supp. 3d ___, 2017 WL 580855 at *8 (E.D. Va. Feb. 13, 2017).  This is not a contract dispute, in which "parol" or "extrinsic" evidence is excluded.  *See* Opp. 28, 30.   Whether under the Establishment Clause or equal protection, a court's assessment of "whether invidious discriminatory purpose" is involved "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 862 (2005); Pls.' Mot. 5-6, 19.  Here, as Plaintiffs have already explained at length, the direct and circumstantial evidence is overwhelming.  Pls.' Mot. 6-16.

In the face of this evidence, the government contends that the Establishment Clause directs the Court to look away.  Quite the opposite.  The question whether government action has the predominant purpose or effect of advancing or inhibiting religion is examined through the eyes of a reasonable, objective observer who is aware of the *entire context* in which the challenged conduct arose and was implemented.  Pls.' Mot. 18-20.  An objective observer could read the President's own campaign statements—which, while originally issued some time ago, the President continues to publish, without modification or explanation, on one of his websites to this day—and would be aware of the many statements by the President and others explaining that a nationality-based ban would be adopted as a pretextual way to carry out then-candidate Trump's promises.  *See* Pls.' Mot. 6-8.[9]

---

[9] As plaintiffs have explained, the outcome is the same whether the Court analyzes this case under the *Lemon* or *Larson* test.  Pls.' Mot. 17-22.  The government does not address *Larson* beyond suggesting that it requires "explicit" discrimination.  Opp. 26.  But as *Larson* recognized, the "clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," and *Larson* itself addressed a statute that targeted a particular religion without explicitly naming it.  *Larson v. Valente*, 456 U.S. 228, 244, 255 (1982).

The government's reliance on *McCreary* on this score is particularly misplaced. Rejecting the argument that "true 'purpose' is unknowable," the Court explained that "[e]xamination of purpose is a staple of statutory interpretation," and "a key element of a good deal of constitutional doctrine." 545 U.S. at 861 (citing, *inter alia*, equal protection and Free Exercise case law). Here, taking the President at his word, broadcast on his website and in nationally televised interviews, hardly amounts to "judicial psychoanalysis of a drafter's heart of hearts." *Id.* at 862; *see also id.* (citing "detailed public comments" of a statute's sponsor as appropriate objective evidence); *id.* at 851 (citing statements of a county official and his pastor at a ceremony); *Green v. Haskell County*, 568 F.3d 784, 801-02 (10th Cir. 2009) (considering statements to the press in determining purpose under the Establishment Clause). Under the Establishment Clause, the reasonable observer at the heart of the *Lemon* inquiry, Pls.' Mot. 19-20, is deemed aware of all the "openly available data [which] support[s] a common sense conclusion" that the primary purpose of the order was to target Muslims and that the Order conveys a message of hostility and disfavor toward the Islamic faith, *McCreary*, 545 U.S. at 863.[10]

Moreover, even setting aside this incorrect understanding of the Establishment Clause, the government does not even attempt to argue that the President's many statements and the other highly probative evidence should be ignored under the well-settled principles of equal protection analysis. *See* Pls.' Mot. 5 (explaining that courts examine a wide variety of evidence

---

[10] The government cites *Trunk v. City of San Diego*, 629 F.3d 1099, 1108 (9th Cir. 2011), in arguing that the Court should defer to the President's stated reasons, Opp. 27. But *Trunk* recognized that the stated purpose "must be genuine, not a sham," and examined the legislative history, the role of advocates, and hundreds of pages of other materials in concluding that Congress's purpose was secular. *Trunk*, 629 F.3d at 1108-09 & n.9. Moreover, neither *Trunk*, nor *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 288 (4th Cir. 2000), also cited by the government, featured anything close to the evidence of blatant religious discrimination at issue in this case, and which the government does not seriously dispute.

including contemporaneous statements, disparate impact, and substantive and procedural departures from normal processes); *id*. at 22-23 (addressing equal protection); *see also id*. 6-16 (addressing the evidence falling into the various categories discussed by the Supreme Court); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982) (holding that "despite its facial neutrality there is little doubt that [an] initiative was effectively drawn" with discriminatory purpose). The government's brief has no response, mentioning equal protection just once. Opp. 26 (baldly asserting that "there is no violation of . . . equal protection").

To the extent the government urges a bright-line rule that campaign statements can never bear on the purpose of legislation, it is mistaken. *See* Pls.' Mot. 7 (citing examples of reliance on campaign statements and materials). Nor does the fact that this case involves the President place it beyond the competence of the courts. *United States v. Lee*, 1 S. Ct. 240, 261 (1882) ("No man in this country is so high that he is above the law.").[11]

Moreover, this case does not involve, and the Court need not address, a passing comment on the campaign trail or a clear example of campaign puffery.[12] Rather, the Court is presented with a consistent pledge to take discriminatory action; a closely associated Executive Order issued one week into the term in office; a subsequent order that is acknowledged to be a

---

[11] The government's reliance on the Nixon cases is misplaced. *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982), involved a damages suit against the President. *United States v. Nixon*, 418 U.S. 683, 708 (1974), involved core questions of executive privilege not implicated here.

[12] To the contrary, and to cite but one source, throughout his campaign and continuing to the present, President Trump has portrayed Muslims as posing categorical terrorist threats, and has done the same with regard to refugees, who he seemingly equates with Muslims. *See, e.g*., https://www.nilc.org/issues/litigation/trump-tweets-with-muslim-muslims/.

continuation of the same intent and policy; and undisputed evidence linking the promise to both Orders.  *See* Pls.' Mot. 6-10.[13]  Such a case is highly unusual, if not entirely unique.[14]

Contrary to the government's argument that the text of the Order is neutral and secular, in fact it remains riddled with indicia of discriminatory purpose.  Pls.' Mot. 9-11 & n.11.  The government protests that the Order's invocation of "honor killings" and "radicalization" *could* refer to people of any faith, Opp. 26 n.18, despite the clear message and evidence that the terms were not used in a neutral way, *see* Pls.' Mot. 9-10 & nn.11, 12.  The Supreme Court has already rejected the idea of a purpose inquiry "so naive that any transparent claim to secularity would satisfy it," cutting "context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances."  *McCreary*, 545 U.S. at 863-64.[15]  Likewise, it is well established that disparate impact is an important indication of

---

[13] The Court is also presented with a proffered security purpose that is impossible to square with the process leading up to the Orders, or with many of their provisions.  *See id.* at 11-14. Strikingly, the government has made no attempt to explain many of these contradictions and irrationalities.  *See* Opp. 27-28.

[14] *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), cited by the government, involved no claim of improper purpose, but rather the Court's willingness to assume it would defer to certain findings made by the President (but not to findings he had not made), *id.* at 623 & n.52.  The government's other cases are likewise inapposite.  *See Republican Party of Minn. v. White*, 536 U.S. 765 (2002) (First Amendment claim against restriction on candidate speech); *Glassman v. Arlington Cty.*, 628 F.3d 140, 147 (4th Cir. 2010) (declining to consider series of emails sent by church members who were not government decisionmakers); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (artist's inspiration or intent not probative of government's decision to display artwork); *Modrovich v. Allegheny Cty.*, 385 F.3d 397, 411-12 (3d Cir. 2004) (declining to consider evidence of motivation of County residents and County officials not involved in decision at issue); *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995) (APA challenge, no allegation of improper purpose); *Phelps v. Hamilton*, 59 F.3d 1058, 1062, 1068 (10th Cir. 1995) (prosecutor's statements during campaign trail, allegedly part of a political vendetta, did not establish bad faith enforcement for purposes of exception to *Younger* abstention).

[15] The government suggests that its elimination of certain egregious aspects of the original order, in response to its loss in the Ninth Circuit, cures any constitutional violation.  Opp. 26, 30, 32.

discrimination.  *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997).  Contrary to the

government's view, Opp. 27, it is not necessary to establish either that *all* members or *only*

members of a disfavored group are impacted—only that the action bears more heavily on that

group.  *Arlington Heights*, 429 U.S. at 266; *Aziz*, 2017 WL 580855, at \*9 ("It is a discriminatory

purpose that matters, no matter how inefficient the execution.").  The government does not deny

that the Order has a wildly disproportionate impact, overwhelmingly excluding Muslims from

the United States.

**B.      The Order Is Subject to Normal Constitutional Review.**

The government yet again argues that the Order need only state a "facially legitimate and

bona fide reason" to pass constitutional muster.  Opp. 29 (quoting *Kleindienst v. Mandel*, 408

U.S. 753, 770 (1972)); *see Washington*, 847 F.3d at 1162 (rejecting this argument); *Aziz*, 2017

WL 580855, at \*8 (same).  Even if *Mandel* applies, *but see* Pls.' Br. 29-30 (explaining why it

does not), it poses no obstacle to this Court's review, because *Mandel* requires that the

government's neutral reasons be "bona fide," *Mandel*, 408 U.S. at 770; *see* Pls.' Mot. at 28-29.

"[I]f the proffered facially legitimate reason has been given in bad faith, it is not bona fide."

*Aziz*, 2017 WL 580855, at \*8 (citations and internal quotation marks omitted).  The

government's brief says nothing about *Mandel*'s "bona fide" requirement.  *See* Opp. at 29.  It

argues that the Court should not "look behind the President's facially legitimate reasons," but

---

As already noted, *McCreary* speaks directly to such an attempt to clean up a tainted action.  Pls.'
Mot. 18-20.  As in *McCreary*, that the government is "simply reaching for any way" to save an
unconstitutional action is clear from the long history of improper purpose of this Order; the
continuing indicia of improper purpose in the new version; and the failure of the new version,
like the old one, to effectuate it purported purpose.  *Id.* at 871-73.  With respect to the third factor
in particular, the evidence all indicates that the new Order, like the old one, will not advance its
purported national security goals.  *See* Pls.' Mot. 14-16; Br. of Nat'l Security Officials as Amici
Curiae in Supp. of Pls., Dkt. No. 123-1; *see also* Amicus Brief of Interfaith Coalition, Dkt. No.
99-1.

that articulation reads the "bona fide" prong out of existence. As Justice Kennedy explained in *Din*, courts may examine "additional factual details beyond" the government's neutral explanation when there is an "affirmative showing of bad faith." *Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring in the judgment); *see Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 137 (2d Cir. 2009) (noting that "a well supported allegation of bad faith" would "render the decision not bona fide"). Here, Plaintiffs have identified voluminous evidence of bad faith. *See* Pls.' Mot. 6-16. Nothing the government has cited requires the Court to look away.

In any case, the *Mandel* standard does not apply to "the President's promulgation of sweeping immigration policy." *Washington*, 847 F.3d at 1162 (emphasis omitted) (holding that the original Executive Order was "plainly not subject to the *Mandel* standard"). *Mandel* involved executive action in a very different context, where individual consular officers denied visas under standards enacted by Congress. *See Mandel*, 408 U.S. at 770 (applying "facially legitimate and bona fide" standard to a decision not to waive inadmissibility); *see also Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the judgment) (explaining that the *Mandel* standard applies to "an executive officer's decision denying a visa"); *id.* (noting that the *Mandel* "decision was based upon due consideration of the *congressional* power to make rules for the exclusion of aliens") (emphasis added); *cf. Fiallo v. Bell*, 430 U.S. 787 (1977) (case involving statutory scheme, not executive action, cited in Opp. at 29). *Mandel*'s reasons for employing that standard—that it would be cumbersome and indeterminate for courts, "in each case," to re-balance the interests on both sides of visa denials, 408 U.S. at 769—do not apply to categorical decisionmaking by the President.

### III.   THE EXECUTIVE ORDER VIOLATES IMMIGRATION LAW.

The Order violates § 202(a)(1)(A) of the INA, 8 U.S.C. § 1152(a)(1)(A), which prohibits nationality discrimination in visa issuance.  The government acknowledges that 30 percent of the visas it issues to nationals of the seven banned countries are immigrant visas, Opp. 21, which are plainly encompassed in the statute's command that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  It argues, however, that nonimmigrant visas are not addressed by § 202, so it is permitted to discriminate with respect to those persons, and that in any event §§ 212(f) and 215(a) trump § 202 in this context.  Neither claim is correct.

In *Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997), one of the few cases addressing § 202, the court relied on the statute to find that discrimination in the issuance of *non*immigrant visas was unlawful, and noted that even the government did not take the position "that the Consulate is permitted to engage in discrimination on the basis of race, ethnicity, or nationality."[16]  Read in the context of the "bold anti-discriminatory principles" that fill the legislative history, *id.* at 37, § 202 prohibits nationality discrimination with respect to both immigrant and nonimmigrant visas.[17]

Moreover, contrary to the government's suggestion, Plaintiffs have never contended that § 202's ban on visa issuance implicitly repealed § 212(f), 8 U.S.C. § 1182(f), or § 215(a), 8

---

[16] The government cites *Olsen* only to note that it did not involve an exercise of Presidential power under § 212(f) or § 215(a). Opp. 23 n.14.

[17] Section 202(a)(1)(B), which exempts "procedures for the processing of immigrant visa applications," does not alter this conclusion: a ban on visa issuance, even with a discretionary waiver exception, cannot be recast as a procedural tweak.

U.S.C. § 1185(a).[18]   Indeed, the provisions are consistent.   The government elsewhere has reconciled the provisions by arguing that because § 202 applies only to the issuance of immigrant visas, it does not apply "to the President's restrictions on entry."   *Washington v. Trump*, No. 17-35105, Gov't Reply in Supp. of Emergency Mot. for Stay Pending Appeal, Dkt. No. 70 p. 4.   The government has abandoned that reading here, now that the Executive Order plainly regulates the issuance of such visas.

Indeed, nationals of the six banned countries with valid visas will remain free to enter despite the ban.   *See* Order Sec. 3(a). Instead, the Order bans the issuance of new visas to nationals of those countries, directly contravening § 202(a)(1)(A).

In any case, §§ 212(f) and 215(a) cannot be read to entirely displace the INA's scheme for the allocation of visas and the admission of noncitizens.   Although the President has in the past decided that "it is in the foreign policy interests of the United States to suspend the entry" of limited classes of noncitizens, Opp. 25; Proclamation No. 7062, 63 Fed. Reg. 2871, Jan. 14, 1998, such a determination has never been so broad as to render irrelevant Congress's careful statutory scheme.   Past orders under 212(f) and 215(a) have typically suspended the entry not of all foreign nationals from a given country, but rather of specific categories of noncitizens who have contributed to a specific, harmful situation abroad.   For example, President Bush suspended the entry "of *persons responsible* for actions that threaten Zimbabwe's democratic institutions." Proclamation 7524, 67 Fed. Reg. 8857, Feb. 22, 2002 (emphasis added); *see also, e.g.*, Executive Order 13687, 80 Fed. Reg. 819, Jan. 2, 2015 (suspending the entry of certain noncitizens with connections to the North Korean government); *cf.* Kate M. Manuel, *Executive Authority to Exclude Aliens: In Brief*, Congressional Research Service, Jan. 23, 2017.   And, of course, no

---

[18] Section 215(a) allows the President prescribe reasonable rules "for any alien to depart from or enter . . . the United States."

Court has suggested that a sweeping visa-issuance ban based on national origin would be consistent with § 202, merely because it was issued under § 212(f) or 215(a).

Finally, the government does not address Plaintiffs' argument that § 212(f) cannot be read to authorize discrimination on the basis of religion. *See* Pls.' Mot. 27-28. That is an independent reason that the Executive Order fails on statutory grounds.

## IV.   THE PLAINTIFFS FACE IRREPARABLE HARM.

The government ignores the voluminous evidence of irreparable harm that Plaintiffs have shown is either already occurring or would occur if the March 6 Order were permitted to take effect. Its only rebuttal is to assert that because the individual Plaintiffs have already been waiting significant periods, more delay—even if caused by unconstitutional discrimination against Muslims—cannot be irreparable. *See* Opp. 33. That contention is unsupported by law, facts, or common sense. *Cf. Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007) (holding that "the injury of not having an application processed timely is distinct from the injury of ultimate denial of that application"). Damages cannot adequately address such family separation. To the contrary, for Plaintiffs and their loved ones, any additional delay in this already-lengthy process is irreparable, particularly given the conditions abroad many are living in, the dangers they face there, the family unification that is at stake, the harm to organizational plaintiffs' operations, the threat to their very existence, and the dignitary harm of enduring delay born of anti-Muslim animus. *See, e.g.,* Decl. of Jane Doe #2 ¶ 7, J.R. 56-57; Hetfield Decl. ¶¶ 13-15, J.R. 16-17 (describing office closures and layoffs); *see also Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (noting that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

## V.      A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST.

The government would have this Court find that the public interest weighs against the issuance of an injunction based solely on the government's conclusory statements about national security, without a scintilla of evidence.  The Ninth Circuit has already rejected this argument in the context of the January 27 Order, and the President's addition of boilerplate findings in the revised March 6 Order does not warrant a different outcome.  *See Washington*, 847 F.3d at 1168 (finding lack of irreparable injury where "the Government has done little more than reiterate" its general interest in fighting terrorism); *see also* Br. of Nat'l Security Officials as Amici Curiae in Supp. of Pls., Dkt. No. 123-1 (brief of 40 former national security, foreign policy and intelligence officials stating that the revised executive order cannot be justified on national security or foreign policy grounds).  The public interest does not favor permitting an unconstitutional executive order to take effect.

## VI.     THE COURT SHOULD ENJOIN THE EXECUTIVE ORDER ON ITS FACE.

The government is wrong to suggest that challenges to a facially discriminatory policy must be brought on an as-applied basis.  *See* Opp. 39.  Exactly the opposite is true: an action motivated by religious animus is unconstitutional in all of its applications.  *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 314, 317 (2000).

In arguing for a narrow injunction, Opp. 39-40, the government also fails to address the Ninth Circuit's recent conclusion that "a fragmented immigration policy would run afoul of the constitutional and statutory requirements for uniform immigration law and policy."  *Washington*, 847 F.3d at 1166-67 (9th Cir. 2017) (declining to stay nationwide injunction); *see Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide preliminary injunction), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).  Limiting the injunction's

geographical scope could also cause disruption and confusion on account of "the nation's multiple ports of entry and interconnected transit system." *Washington*, 847 F.3d at 1167.  Once again, the government has proposed no "workable alternative." *Id.*

Finally, as explained in Plaintiffs' other motion for preliminary injunction, a narrow remedy would fail to afford them complete relief.  *See* Dkt. No. 98, at 19-20.  *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (explaining that when courts find government action unlawful, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed"); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17-18 (D.D.C. 2004) (observing that "[t]he Fourth, Fifth, Ninth, and D.C. Circuits have held that an injunction can benefit parties other than the parties to the litigation" and collecting cases).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin the government from enforcing the Executive Order.

Dated: March 14, 2017

<div style="display:flex">

Justin B. Cox (Bar No. 17550)
National Immigration Law Center
1989 College Ave. NE
Atlanta, GA 30317
Tel: (678) 404-9119
Fax: (213) 639-3911
cox@nilc.org

Karen C. Tumlin
Nicholas Espíritu
Melissa S. Keaney
Esther Sung
National Immigration Law Center
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010

</div>

Respectfully submitted,

/s/ Omar Jadwat
Omar C. Jadwat
Lee Gelernt
Hina Shamsi
Hugh Handeyside
Sarah L. Mehta
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org
lgelernt@aclu.org
hshamsi@aclu.org
hhandeyside@aclu.org

Tel: (213) 639-3900
Fax: (213) 639-3911
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sun@nilc.org

smehta@aclu.org

Cecilia D. Wang
Cody H. Wofsy
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org
cwofsy@aclu.org


David Cole
Daniel Mach
Heather L. Weaver
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: (202) 457-0805
dcole@aclu.org
dmach@aclu.org
hweaver@aclu.org

/s/ David Rocah
David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar
No.19670)
American Civil Liberties Union
 Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
steiner@aclu-md.org


*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of March, 2017, I caused a PDF version of the foregoing document to be electronically transmitted to the Clerk of the Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Dated:  March 14, 2017                              Respectfully submitted,

                                                    /s/ Omar Jadwat
                                                    Omar C. Jadwat