# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT, *a project of the
Urban Justice Center, Inc., on behalf of itself
and its clients,*
HIAS, INC., *on behalf of itself and its clients,*
MIDDLE EAST STUDIES ASSOCIATION *of
North America, Inc., on behalf of itself and its
members,*
MUHAMMED METEAB,
PAUL HARRISON,
IBRAHIM AHMED MOHOMED,
JOHN DOES Nos. 1 & 3, and
JANE DOE No. 2,

     Plaintiffs,

     v.

DONALD J. TRUMP, *in his official capacity
as President of the United States,*
DEPARTMENT OF HOMELAND
SECURITY,
DEPARTMENT OF STATE,
OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE,
JOHN F. KELLY, *in his official capacity as
Secretary of Homeland Security,*
REX W. TILLERSON, *in his official capacity
as Secretary of State,* and
MICHAEL DEMPSEY, *in his official capacity
as Acting Director of National Intelligence,*

     Defendants.

Civil Action No. TDC-17-0361

## MEMORANDUM OPINION

On March 6, 2017, President Donald J. Trump issued an Executive Order which bars,

with certain exceptions, the entry to the United States of nationals of six predominantly Muslim

countries, suspends the entry of refugees for 120 days, and cuts by more than half the number of refugees to be admitted to the United States in the current year. This Executive Order follows a substantially similar Executive Order that is currently the subject of multiple injunctions premised on the conclusion that it likely violates various provisions of the United States Constitution. Pending before the Court is Plaintiffs' Motion for a Temporary Restraining Order or a Preliminary Injunction, filed on March 10, 2017. At issue is whether the President's revised Executive Order, set to take effect on March 16, 2017, should likewise be halted because it violates the Constitution and federal law. For the reasons set forth below, the Motion is GRANTED IN PART and DENIED IN PART.

## INTRODUCTION

On January 27, 2017, President Trump issued Executive Order 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("First Executive Order" or "First Order"), 82 Fed. Reg. 8977 (Jan. 27, 2017). On February 7, 2017, Plaintiffs filed a Complaint alleging that the First Executive Order violated the Establishment Clause of the First Amendment to the United States Constitution, U.S. Const. amend. I; the equal protection component of the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537 (2012); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 (2012); the Refugee Act, 8 U.S.C. §§ 1521-1524 (2012); and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2012). On March 6, 2017, in the wake of several successful legal challenges to the First Executive Order, President Trump issued Executive Order 13,780 ("Second Executive Order" or "Second Order"), which bears the same title as the First Executive Order. 82 Fed. Reg. 13209

(Mar. 9, 2017). The Second Executive Order, by its own terms, is scheduled to go into effect and supplant the First Executive Order on March 16, 2017.

On March 10, 2017, Plaintiffs amended their Complaint to seek the invalidation of the Second Executive Order. Plaintiffs substituted certain individual plaintiffs and added an organizational plaintiff. Their causes of action remain the same. That same day, Plaintiffs filed the pending Motion, seeking to enjoin the Second Executive Order in its entirety before it takes effect. Defendants have received notice of the Motion and filed a brief in opposition to it on March 13, 2017. After Plaintiffs filed a reply brief on March 14, 2017, the Court held a hearing on the Motion on March 15, 2017. With the matter fully briefed and argued, the Court construes the Motion as a Motion for a Preliminary Injunction. The Court now issues its findings of fact and conclusions of law and rules on the Motion.[1]

## FINDINGS OF FACT

### I.    Executive Order 13,769

The stated purpose of the First Executive Order is to "protect the American people from terrorist attacks by foreign nationals admitted to the United States." 1st Order Preamble. To that end, the First Executive Order states that the United States must be "vigilant during the visa-issuance process," a process that "plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States." 1st Order § 1. The First Executive Order therefore mandates, as relevant here, two courses of action. The first, set forth in Section 3

---

[1]    On February 22, 2017, Plaintiffs filed a Motion for a Preliminary Injunction of § 5(d) of the Executive Order, ECF No. 64, requesting that the Court enjoin a specific provision of the First Executive Order. With the agreement of the parties, the Court set a briefing and hearing schedule extending to March 28, 2017. The Court will resolve that Motion, which the parties have agreed should be construed to apply to the successor provision of the Second Executive Order, in accordance with the previously established schedule.

entitled "Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern," invokes the President's authority under 8 U.S.C. § 1182(f) to suspend for 90 days "the immigrant and nonimmigrant entry into the United States of aliens" from the countries of Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen as "detrimental to the interests of the United States." 1st Order § 3(c). Each of these countries has a predominantly Muslim population, including Iraq, Iran, and Yemen which are more than 99 percent Muslim. In addition to providing certain exceptions for diplomatic travel, the provision contains exceptions on a "case-by-case basis" when such an exception is "in the national interest," a term not defined elsewhere in the Order. 1st Order § 3(g). During this 90-day period, the Secretary of Homeland Security, the Secretary of State, and the Director of National Intelligence are to "immediately conduct a review to determine the information needed from any country" to assess whether an individual from that country applying for a "visa, admission, or other benefit . . . is not a security or public-safety threat" and provide a report on their review to the President within 30 days of the issuance of the Order. 1st Order § 3(a)-(b).

The second course of action relates to refugees. As set out in Section 5(d), the President ordered, pursuant to § 1182(f), that "the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States" and thus suspended the entry of any refugees above that figure. 1st Order § 5(d). The Order also immediately suspended the U.S. Refugee Admissions Program ("USRAP") for 120 days and imposed an indefinite ban on the entry of refugees from Syria. The Order further required changes to the refugee screening process "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." 1st Order § 5(b).

The drafting process for the First Executive Order did not involve traditional interagency review by relevant departments and agencies. In particular, there was no consultation with the Department of State, the Department of Defense, the Department of Justice, or the Department of Homeland Security. When the Order was issued in the early evening of Friday, January 27, 2017, the State Department immediately stopped conducting visa interviews of, and processing visa applications from, citizens of any of the seven banned countries. Between 60,000 and 100,000 visas have been revoked.

## II.    Legal Challenges to the First Executive Order

The First Executive Order prompted numerous legal challenges, including an action filed by the State of Washington and the State of Minnesota in the United States District Court for the Western District of Washington based on the Due Process, Establishment, and Equal Protection Clauses of the Constitution that resulted in a nationwide temporary restraining order against several sections of the First Order. On February 9, 2017, the United States Court of Appeals for the Ninth Circuit, construing the order as a preliminary injunction, upheld the entry of the injunction. *Washington v. Trump*, 847 F.3d 1151, 1165-66 (9th Cir. 2017). Although it did not reach the Establishment Clause claim, the Ninth Circuit noted that the asserted claim raised "serious allegations" and presented "significant constitutional questions." *Id.* at 1168. On February 13, 2017, the United States District Court for the Eastern District of Virginia found that plaintiffs had shown a likelihood of success on the merits of an Establishment Clause claim and issued an injunction against enforcement of Section 3(c) of the First Executive Order as to Virginia residents or students enrolled a Virginia state educational institution. *Aziz v. Trump*, --- F. Supp. 3d ---, No. 1:17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017). These injunctions remain in effect.

### III.    Executive Order 13,780

On March 6, 2017, President Trump issued a revised Executive Order, to become effective on March 16, 2017, at which point the First Executive Order will be revoked. 2d Order §§ 13, 14. The Second Executive Order reinstates the 90-day ban on travel for citizens of Iran, Libya, Somalia, Sudan, Syria, and Yemen ("the Designated Countries"), but removes Iraq from the list based on its recent efforts to enhance its travel documentation procedures and ongoing cooperation between Iraq and the United States in fighting ISIS. The scope of the ban, however, was narrowed expressly to respond to "judicial concerns." 2d Order § (1)(i). The Order states that it applies only to individuals outside the United States who did not have a valid visa as of the issuance of the First Executive Order and who have not obtained one prior to the effective date of the Second Executive Order. In addition, the travel ban expressly exempts lawful permanent residents ("LPRs"), dual citizens traveling under a passport issued by a country not on the banned list, asylees, and refugees already admitted to the United States. The Second Executive Order also provides a list of specific situations in which a case-by-case waiver "could be appropriate." 2d Order § 3(c).

The refugee provisions continue to suspend USRAP for 120 days and to reduce the number of refugees to be admitted in fiscal year 2017 to 50,000. However, the minority religion preferences in refugee applications and the complete ban on Syrian refugees have been removed entirely.

Unlike the First Executive Order, the Second Executive Order provides certain information relevant to the national security concerns underlying the decision to ban the entry of citizens of the Designated Countries. The Second Order notes that "the conditions in these

6

countries present heightened threats" because each country is "a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." 2d Order § 1(d). It provides information from the State Department's *Country Reports on Terrorism 2015* identifying Iran, Sudan, and Syria as longstanding state sponsors of terrorism and describing the presence of members of certain terrorist organizations within those countries. The asserted consequences of these conditions are that the governments of these nations are less willing or less able to provide necessary information for the visa or refugee vetting process, and there is a heightened chance that individuals from these countries will be "terrorist operatives or sympathizers." 2d Order § (1)(d). In light of these factors, the Second Order concludes, the United States is unable "to rely on normal decision-making procedures about travel" as to individuals from these nations, making the present risk of admitting individuals from these countries "unacceptably high." 2d Order § 1(b)(ii), (f). The Second Order expressly disavows that the First Executive Order was motivated by religious animus.

The Second Order also states that "Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States" and references two Iraqi refugees who were convicted of terrorism-related offenses and a naturalized U.S. citizen who came to the United States from Somalia as a child refugee and has been convicted of a plot to detonate a bomb at a Christmas tree lighting ceremony. 2d Order § 1(h). The Second Order further states that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations. It does not identify any instances of individuals who came from Iran, Libya, Sudan, Syria, or Yemen engaging in terrorist activity in the United States.

7

The same day that the Second Executive Order was issued, Attorney General Jeff Sessions and Secretary of Homeland Security John Kelly submitted a letter to the President recommending a temporary suspension on the entry to the United States of nationals of certain countries so as to facilitate a review of security risks in the immigration system, for reasons that largely mirror the statements contained in the Second Executive Order.

## IV.    Public Statements About the Executive Orders

On December 7, 2015, then-presidential candidate Donald Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website in which he "call[ed] for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on." J.R. 85.   Trump promoted the Statement on Twitter that same day, stating that he had "[j]ust put out a very important policy statement on the extraordinary influx of hatred & danger coming into our country.  We must be vigilant!" J.R. 209.  In a March 9, 2016 interview with CNN, Trump professed his belief that "Islam hates us," and that the United States had "allowed this propaganda to spread all through the country that [Islam] is a religion of peace."  J.R. 255-57.   Then, in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, explaining that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." J.R. 261.  In a July 24, 2016 interview on Meet the Press soon after he accepted the Republican nomination, Trump asserted that immigration should be immediately suspended "from any nation that has been compromised by terrorism." J.R. 219.  When questioned whether his new formulation was a "rollback" of his December 2015 call for a "Muslim ban," Trump characterized it instead as an "expansion." J.R. 220.  He explained that "[p]eople were so upset when I used the word Muslim," so he was

instead "talking territory instead of Muslim." J.R. 220. On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President-Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.R. 245. In a written statement about the events, he lamented the attack on people "prepared to celebrate the Christmas holiday" by "ISIS and other Islamic terrorists [who] continually slaughter Christians in their communities and places of worship as part of their global jihad." J.R. 245.

On January 27, 2017, a week after his inauguration, President Trump stated in an interview on the Christian Broadcasting Network that the First Executive Order would give preference in refugee applications to Christians. Referring to Syria, President Trump stated that "[i]f you were a Muslim you could come in, but if you were a Christian, it was almost impossible," a situation that he thought was "very, very unfair." J.R. 201. When President Trump was preparing to sign the First Executive Order later that day, he remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.' We all know what that means." J.R. 142 The day after the Order was issued, former New York City Mayor Rudolph W. Giuliani appeared on Fox News and asserted that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally." J.R. 247. Giuliani, in consultation with others, proposed that the action be "focused on, instead of religion . . . the areas of the world that create danger for us," specifically "places where there are [sic] substantial evidence that people are sending terrorists into our country." J.R. 247-248.

In response to the court-issued injunctions against provisions of the First Executive Order, President Trump maintained at a February 16, 2017 news conference that the First Executive Order was lawful but that a new Order would be issued. J.R. 91. Stephen Miller, Senior Policy Advisor to the President, described the changes being made to the Order as

"mostly minor technical differences," emphasizing that the "basic policies are still going to be in effect." J.R. 319. White House Press Secretary Sean Spicer stated that "[t]he principles of the [second] executive order remain the same." J.R. 118. As of February 12, 2017, Trump's Statement on Preventing Muslim Immigration remained on his campaign website. J.R. 207.

Upon the issuance of the Second Executive Order, Secretary of State Rex Tillerson described it as "a vital measure for strengthening our national security." J.R. 115. In a March 7, 2017 interview, Secretary of Homeland Security Kelly stated that the Order was not a Muslim ban but instead was focused on countries with "questionable vetting procedures," then noted that there are 13 or 14 countries with questionable vetting procedures, "not all of them Muslim countries and not all of them in the Middle East." J.R. 150.

In a joint affidavit, 10 former national security, foreign policy, and intelligence officials who served in the White House, Department of State, Department of Homeland Security, and Central Intelligence Agency in Republican and Democratic Administrations, four of whom were aware of the available intelligence relating to potential terrorist threats to the United States as of January 19, 2017, have stated that "there is no national security purpose for a total bar on entry for aliens" from the Designated Countries and that they are unaware of any prior example of a president suspending admission for such a "broad class of people." J.R. 404, 406. The officials note that no terrorist acts have been committed on U.S. soil by nationals of the banned countries since September 11, 2001, and that no intelligence as of January 19, 2017 suggested any such potential threat. Nor, the former officials assert, is there any rationale for the abrupt shift from individualized vetting to group bans. J.R. 404.

## V.     The Plaintiffs

Plaintiffs, comprised of six individuals and three organizations, assert that they will be harmed by the implementation of the Second Executive Order.  Collectively, they assert that because the Individual Plaintiffs are Muslim and the Organizational Plaintiffs serve or represent Muslim clients or members, the anti-Muslim animus underlying the Second Executive Order inflicts stigmatizing injuries on them all.  The Individual Plaintiffs, who each have one or more relatives who are nationals of one of the Designated Countries and are currently in the process of seeking permission to enter the United States, also claim that if the Second Executive Order is allowed to go into effect, their separation from their loved ones, many of whom live in dangerous conditions, will be unnecessarily prolonged.

Two of the Organizational Plaintiffs, the Hebrew Immigrant Aid Society and the International Refugee Assistance Project, which provide services to refugees, assert that injuries they have suffered under the First Executive Order will continue if the Second Executive Order goes into effect, including lost revenue arising from a reduction in refugee cases that may necessitate reductions in staff.  They also assert that their clients, many of whom are refugees now re-settled in the United States, will be harmed by prolonged separation from relatives in the Designated Countries currently seeking to join them.  Plaintiff Middle East Studies Association, many of whose members are nationals of one of the Designated Countries, claims that the Second Executive Order would make it more difficult for certain members to travel for academic conferences and field work, and that the inability of its members to enter the United States threatens to cripple its annual conference, on which it relies for a large portion of its yearly revenue.

In light of these alleged imminent harms, Plaintiffs now ask this Court to preliminarily enjoin enforcement of the Second Executive Order.

## CONCLUSIONS OF LAW

In this Motion, Plaintiffs seek a preliminary injunction based on their claims that the Second Executive Order violates (1) the Immigration and Nationality Act and (2) the Establishment Clause.

## I.     Standing

Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To invoke this power, a litigant must have standing. *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013). A plaintiff establishes standing by demonstrating (1) a "concrete and particularized" injury that is "actual or imminent," (2) "fairly traceable to the challenged conduct," (3) and "likely to be redressed by a favorable judicial decision." *Id.*; *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007). Standing must be demonstrated for each claim. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). The presence of one plaintiff with standing renders a claim justiciable. *Id.* at 370-71.

### A.     Immigration and Nationality Act

Several Individual Plaintiffs, specifically John Doe No. 1, John Doe No. 3 and Jane Doe No. 2, have standing to assert the claim that the travel ban for citizens of the Designated Countries violates the INA's prohibition on discrimination in the issuance of immigrant visas on the basis of nationality, 8 U.S.C. § 1152(a). These Individual Plaintiffs are all U.S. citizens or lawful permanent residents who have sponsored relatives who are citizens of one of the Designated Countries and now seek immigrant visas to enter the United States. They argue that

the delay or denial of the issuance of visas will cause injury in the form of continued separation from their family members. *Cf. Covenant Media*, 493 F.3d at 428 (stating that not having an application processed in a timely manner is a form of cognizable injury).

Although neither the United States Supreme Court nor the United States Court of Appeals for the Fourth Circuit has explicitly endorsed this basis for standing, the Supreme Court has reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner challenging the application of the immigration laws to that foreign individual. *See Kerry v. Din*, 135 S. Ct. 2128, 2131, 2138-42 (2015) (considering an action brought by a U.S. citizen challenging the denial of her husband's visa that failed to result in a majority of the Court agreeing whether the plaintiff had a constitutionally-protected liberty interest in the processing of her husband's visa); *Kleindienst v. Mandel*, 408 U.S. 753, 756, 762-65 (1972) (considering the merits of a claim brought by American plaintiffs challenging the denial of a visa to a Belgian journalist whom they had invited to speak in various academic forums in the United States); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998) (stating that because standing relates to a court's power to hear and adjudicate a case, it is normally "considered a threshold question that must be resolved in [the litigant's] favor before proceeding to the merits"); *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986) ("Presumably, had the Court harbored doubts concerning federal court subject matter jurisdiction in *Mandel*, it would have raised the issue on its own motion."). Other courts have done the same. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (considering an action by a United States citizen challenging the denial of her husband's visa and holding that the citizen had a procedural due process right to a "limited judicial inquiry regarding the reason for the decision"); *Allende v. Shultz*, 845 F.2d 1111, 1114 & n.4 (1st Cir. 1988) (evaluating the merits of a claim brought by

scholars and leaders who extended invitations to a foreign national challenging the denial of her visa).

The United States Court of Appeals for the District of Columbia Circuit has found that U.S. citizens and residents have standing to challenge the denial of visas to individuals in whose entry to the United States they have an interest. *See Abourezk*, 785 F.2d at 1050 (finding that U.S. citizens and residents had standing to challenge the denial of visas to foreigners whom they had invited to "attend meetings or address audiences" in the United States); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). In *Legal Assistance*, the court specifically held that U.S. resident sponsors had standing to assert that the State Department's failure to process visa applications of Vietnamese citizens in Hong Kong violated the provision at issue here, 8 U.S.C. § 1152. *Id.* at 471. The court articulated the cognizable injury to the plaintiffs as the prolonged "separation of immediate family members" resulting from the State Department's inaction. *Id.* Here, the three Individual Plaintiffs who seek the entry of family members from the Designated Countries into the United States face the same harm of continuing separation from their respective family members. This harm is "fairly traceable to the challenged conduct" in that the Second Executive Order and its implementation, in barring their entry, would cause the prolonged separation, and the injury is "likely to be redressed by a favorable judicial decision" because invalidation of the relevant provisions of the Executive Order would remove a barrier to their entry. *Hollingsworth*, 133 S. Ct. at 2661.

Defendants nevertheless argue that the Individual Plaintiffs' harm does not arise from a "legally protected interest," citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (describing an "injury in fact" as a "legally protected interest" which is "concrete and

14

particularized"). However, the case cited by *Lujan* in referencing the "legally protected interest" requirement referred to an injury "deserving of legal protection through the judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972), *cited with approval in Lujan*, 504 U.S. at 561. Indeed, in *Lujan*, the Court also noted that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63. Since *Lujan*, courts have clarified that a party is not required to have a "substantive right sounding in property or contract" to articulate a legally protected injury. *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001) (recognizing aesthetic and recreational enjoyment as a legally protected interest); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (explaining that although standing "often turns on the nature and source of the claim asserted," "standing in no way depends on the merits" of a plaintiff's claim); *Judicial Watch, Inc. v. United States Senate*, 432 F.3d 359, 363-66 (D.C. Cir. 2005) (Williams, J., concurring) (suggesting that a legally protected interest is merely another label for a judicially cognizable interest). Plaintiffs' interests arising from the separation from family members are consistent with the injury requirement.

Because this claim is a statutory cause of action, these Individual Plaintiffs must also meet the requirement of having interests that fall within the "zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014). The APA grants standing to a person "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394 (1987). In the context of the APA, the "zone of interests" test is "not especially demanding." *Lexmark*, 134 S. Ct. at 1389. A plaintiff's interest need only "arguably" fall within the zone of interests, and the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent

with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (internal quotation marks omitted) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012)). Because implementing the "underlying intention of our immigration laws regarding the preservation of the family unit" is among the INA's purposes, the interests of these Individual Plaintiffs, who have sponsored family members who will be denied entry pursuant to the Second Executive Order, fall within the zone of interest protected by the statute. *Legal Assistance*, 45 F.3d at 471-72 (quoting H.R. Rep. No. 82-1365, at 29 (1952), *as reprinted in* 1952 U.S.C.C.A.N. 1653, 1680). The Court therefore finds that these three Individual Plaintiffs have standing to assert the claim under 8 U.S.C. § 1152.

Finally, although some of the Individual Plaintiffs' relatives may be eligible for a waiver under the Second Executive Order, because the waiver process presents an additional hurdle that would delay reunification, their claims are ripe. *See Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1541 (11th Cir. 1994) (finding in a Fair Housing Act action that plaintiffs' claim was ripe where, "assuming that [plaintiffs] successfully prove at trial that this [challenged] additional hurdle was interposed with discriminatory purpose and/or with disparate impact, then the additional hurdle itself is illegal whether or not it might have been surmounted").

### B.     Establishment Clause

At least three of the Individual Plaintiffs, Muhammed Meteab, John Doe No. 1, and John Doe No. 3, each of whom is a Muslim and a lawful permanent resident of the United States, have standing to assert the claim that the Second Executive Order violates the Establishment Clause. John Doe No. 1 and John Doe No. 3 each has a wife who is an Iranian national, currently residing in Iran, who would be barred from entry to the United States by the Executive Orders.

John Doe No. 1 has stated that the travel ban has "created significant fear, anxiety, and insecurity" for him and his wife and that the "anti-Muslim views" underlying the Executive Orders have caused him "significant stress and anxiety" to the point that he "worr[ies] that I may not be safe in this country." J.R. 45. John Doe No. 3 has stated that the "anti-Muslim attitudes that are driving" the Executive Orders cause him "stress and anxiety" and lead him to "question whether I even belong in this country." J.R. 49. Meteab, who has Iraqi family members seeking entry as refugees but who are now subject to the Executive Orders' suspension of refugee admissions, has stated that the "official anti-Muslim sentiment" of the Executive Orders has caused "mental stress" and has rendered him "isolated and disparaged" in his community. J.R. 53.

Courts have recognized that for purposes of an Establishment Clause claim, non-economic, intangible harms to "spiritual, value-laden beliefs" can constitute a particularized injury sufficient to support standing. *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1086 (4th Cir. 1997); *Awad v. Ziriax*, 670 F.3d 1111, 1122-23 (10th Cir. 2012) (holding that a Muslim plaintiff residing in Oklahoma suffered a cognizable injury in the form of condemnation of his religion and exposure to "disfavored treatment" based on a voter-approved state constitutional amendment prohibiting Oklahoma state courts from considering Sharia law); *Catholic League v. City & Cty. of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) (stating that a "psychological consequence" constitutes a concrete injury where it is "produced by government condemnation of one's own religion or endorsement of another's in one's own community"). The injury, however, needs to be a "personal injury suffered" by the plaintiff "*as a consequence* of the alleged constitutional error." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). Such a "personal injury" can result, for

17

example, from having "unwelcome direct contract with a religious display that appears to be endorsed by the state," *Suhre*, 131 F.3d at 1086, or from being a member of the geographic community in which the governmental action disfavoring their religion has an impact, *see Awad*, 670 F.3d at 1122-23; *Catholic League*, 624 F.3d at 1048 (finding that two devout Catholics and a Catholic advocacy group, all based in San Francisco, had standing to challenge an allegedly anti-Catholic resolution passed by the city government). Here, where the Executive Order was issued by the federal government, and the three Individual Plaintiffs have family members who are directly and adversely affected in that they are barred from entry to the United States as a result of the terms of the Executive Orders, these Individual Plaintiffs have alleged a "personal injury" as a "consequence" of the alleged Establishment Clause violation. *Valley Forge Christian Coll.*, 454 U.S. at 485.

The harm is "fairly traceable to the challenged conduct" in that the Second Executive Order and its implementation will allegedly effect the disfavoring of Islam, and the injury is "likely to be redressed by a favorable judicial decision" invalidating the relevant provisions of the Executive Order. *Hollingsworth*, 133 S. Ct. at 2661. The Court therefore finds that these three Individual Plaintiffs have standing to assert an Establishment Clause challenge.

Having identified at least one plaintiff with standing to assert the claims to be addressed on this Motion, the Court need not address the standing arguments of the other Plaintiffs.

## II.    Legal Standard

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v.*

*Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## III. Likelihood of Success on the Merits

Because "courts should be extremely careful not to issue unnecessary constitutional rulings," *Am. Foreign Serv. Ass'n v. Garfunkel*, 490 U.S. 153, 161 (1989) (per curiam), the Court first addresses the statutory claim and then proceeds, if necessary, to the constitutional claim.

### A. Immigration and Nationality Act

Plaintiffs assert that the President's travel ban violated provisions of the INA. The formulation of immigration policies is entrusted exclusively to Congress. *Galvan v. Press*, 347 U.S. 522, 531 (1954). In the Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, Congress delegated some of its power to the President in the form of what is now Section 212(f) of the INA, codified at 8 U.S.C. § 1182(f) ("§ 1182(f)"), which provides that:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). In the Second Executive Order, President Trump invokes § 1182(f) in issuing the travel ban against citizens of the Designated Countries. *See* 2d Order § 2(c).

Plaintiffs argue that by generally barring the entry of citizens of the Designated Countries, the Second Order violates Section 202(a) of the INA, codified at 8 U.S.C. § 1152(a) ("§ 1152(a)"), which provides that, with certain exceptions:

> No person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of his race, sex, nationality, place of birth, or place of residence[.]

8 U.S.C. § 1152(a)(1)(A).

Section 1152(a) was enacted as part of the Immigration and Nationality Act of 1965, which was adopted expressly to abolish the "national origins system" imposed by the Immigration Act of 1924, which keyed yearly immigration quotas for particular nations to the percentage of foreign-born individuals of that nationality who were living in the continental United States, based on the 1920 census, in order to "maintain, to some degree, the ethnic composition of the American people." H. Rep. No. 89-745, at 9 (1965). President Johnson sought this reform because the national origins system was at odds with "our basic American tradition" that we "ask not where a person comes from but what are his personal qualities." *Id.* at 11.

At first glance, President Trump's action appears to conflict with the bar on discrimination on the basis of nationality. However, upon consideration of the specific statutory language, the Court finds no direct conflict. Section 1182(f) authorizes the President to bar "entry" to certain classes of aliens. 8 U.S.C. § 1182(f). Section 1152(a) bars discrimination based on nationality in the "issuance of an immigrant visa." *Id.* § 1152(a)(1)(A). Although entry is not currently defined in the INA, until 1997 it was defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, voluntary or otherwise." *Id.* § 1101(a)(13) (1994). In the same section of the current INA, the term "admission" is defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A). The term "immigrant visa" is separately defined as "an immigrant visa required by this chapter and properly issued by a

20

consular officer at his office outside the United States to an eligible immigrant under the provisions of this chapter." *Id.* § 1101(a)(16).   The INA, in turn, makes clear that "[n]othing in this Act shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted to the United States." *Id.* § 1201(h).   Thus, § 1152(a) and § 1182(f) appear to address different activities handled by different government officials.   When two statutory provisions "are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).   Accordingly, an executive order barring entry to the United States based on nationality pursuant to the President's authority under § 1182(f) does not appear to run afoul of the provision in § 1152(a) barring discrimination in the issuance of immigrant visas.

Although the Second Executive Order does not explicitly bar citizens of the Designated Countries from receiving a visa, the Government acknowledged at oral argument that as a result of the Second Executive Order, any individual not deemed to fall within one of the exempt categories, or to be eligible for a waiver, will be denied a visa.   Thus, although the Second Executive Order speaks only of barring entry, it would have the specific effect of halting the issuance of visas to nationals of the Designated Countries.   Under the plain language of the statute, the barring of immigrant visas on that basis would run contrary to § 1152(a).   Just as § 1152(a) does not intrude upon the President's § 1182(f) authority to bar entry to the United States, the converse is also true:   the § 1182(f) authority to bar entry does not extend to the issuance of immigrant visas.   The power the President has in the immigration context, and certainly the power he has by virtue of the INA, is not his by right, but derives from "the statutory authority conferred by Congress." *Abourezk*, 785 F.2d at 1061.   Notably, the

Government has identified no instance in which § 1182(f) was invoked to bar the issuance of visas based on nationality, a step not contemplated by the language of the statute.

To the extent the Government argues that § 1152(a) does not constrain the ability of the President to use § 1182(f) to bar the issuance of immigrant visas, the Court finds no such exception.   Section 1152(a) requires a particular result, namely non-discrimination in the issuance of immigrant visas on specific, enumerated bases.   Section 1182(f), by contrast, mandates no particular action, but instead sets out general parameters for the President's power to bar entry.   Thus, to the extent that § 1152(a) and § 1182(f) may conflict on the question whether the President can bar the issuance of immigrant visas based on nationality, § 1152(a), as the more specific provision, controls the more general § 1182(f).   *See Edmond v. United States*, 520 U.S. 651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."); *United States v. Smith*, 812 F.2d 161, 166 (4th Cir. 1987).   Moreover, § 1152(a) explicitly excludes certain sections of the INA from its scope, specifically §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153.   8 U.S.C. § 1152(a)(1)(A).   Section 1182(f) is not among the exceptions.   Because the enumerated exceptions illustrate that Congress "knows how to expand 'the jurisdictional reach of a statute,'" the absence of any reference to § 1182(f) among these exceptions provides strong evidence that Congress did not intend for § 1182(f) to be exempt from the anti-discrimination provision of § 1152(a).   *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) (quoting *Equal Emp't Opportunity Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244, 258 (1991)).

The Government further argues that the President may nevertheless engage in discrimination on the basis of nationality in the issuance of immigrant visas based on 8 U.S.C. § 1152(a)(1)(B), which states that "[n]othing in [§ 1152(a)] shall be construed to limit the authority

of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed." As that statutory provision expressly applies to the Secretary of State, it does not provide a basis to uphold an otherwise discriminatory action by the President in an Executive Order. Even if the Court were to construe Plaintiffs' claim to be that the State Department's anticipated denial of immigrant visas based on nationality for a period of 90 days would run contrary to § 1152(a), the text of § 1152(a)(1)(B) does not comfortably establish that such a delay falls within this exception. Although § 1152(a)(1)(B) specifically allows the Secretary to vary "locations" and "procedures" without running afoul of the non-discrimination provision, it does not include within the exception any authority to make temporal adjustments. Because time, place, and manner are different concepts, and § 1152(a)(1)(B) addresses only place and manner, the Court cannot readily conclude that § 1152(a)(1)(B) permits the imminent 90-day ban on immigrant visas based on nationality despite its apparent violation of the non-discrimination provision of § 1152(a)(1)(A).

Finally, the Government asserts that the President has the authority to bar the issuance of visas based on nationality pursuant to Section 215(a) of the INA, codified at 8 U.S.C. § 1185(a) ("§ 1185(a)"), which provides that:

> Unless otherwise ordered by the President, it shall be unlawful for an alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1). As support for this interpretation, the Government cites President Carter's invocation of 8 U.S.C. § 1185(a)(1) to bar entry of Iranian nationals during the Iran Hostage Crisis in 1979. Crucially, however, President Carter used § 1185(a)(1) to "prescribe limitations and exceptions on the rules and regulations" governing "Iranians holding

nonimmigrant visas," a category that is outside the ambit of § 1152(a). 44 Fed. Reg. 67947, 67947 (1979). The Government has identified no instance in which § 1185(a) has been used to control the immigrant visa issuance process. Under the principle of statutory construction that "all parts of a statute, if at all possible, are to be given effect," *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973), the Court concludes that, as with § 1182(f), the most fair reading of § 1182(a)(1) is that it provides the President with the authority to regulate and control whether and how aliens enter or exit the United States, but does not extend to regulating the separate activity of issuance of immigrant visas.

Because there is no clear basis to conclude that § 1182(f) is exempt from the non-discrimination provision of § 1152(a) or that the President is authorized to impose nationality-based distinctions on the immigrant visa issuance process through another statutory provision, the Court concludes that Plaintiffs have shown a likelihood of success on the merits of their claim that the Second Executive Order violates § 1152(a), but only as to the issuance of immigrant visas, which the statutory language makes clear is the extent of the scope of that anti-discrimination requirement. They have not shown a likelihood of success on the merits of the claim that § 1152(a) prevents the President from barring entry to the United States pursuant to § 1182(f), or the issuance of non-immigrant visas, on the basis of nationality.

Beyond § 1152(a), Plaintiffs make the additional argument under the INA that because the Second Executive Order's nationality-based distinctions are ostensibly aimed at potential terrorist threats, the Order conflicts with 8 U.S.C. § 1182(a)(3)(B), which renders an individual inadmissible based on an enumerated list of terrorism considerations. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I), (IV), and (VII). Plaintiffs contend that these provisions indicate that Congress has established a mechanism for the individualized assessment of the terror risk an

immigrant poses, such that Congress did not envision that terrorism would be addressed through broad nationality- or religion-based bans pursuant to § 1182(f). But Plaintiffs provide no support for their contention and make no showing that § 1182(a)(3)(B) and § 1182(f) "cannot mutually coexist." *Radzanower*, 426 U.S. at 155. Although Plaintiffs try to cast § 1182(a) as an emphatically individualized enterprise, neither § 1182(a) nor § 1182(f) purports to limit the President to barring entry only to classes of aliens delineated in § 1182(a). Thus, Plaintiffs are unlikely to succeed on the merits of this claim.

### B.     Establishment Clause

Plaintiffs assert that the travel ban on citizens from the Designated Countries is President Trump's fulfillment of his campaign promise to ban Muslims from entering the United States. They argue that the Second Executive Order therefore violates the Establishment Clause. The First Amendment prohibits any "law respecting an establishment of religion," U.S. Const. amend. I, and "mandates governmental neutrality between religion and religion, and between religion and nonreligion," *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). When a law does not differentiate among religions on its face, courts apply the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989). Under the *Lemon* test, to withstand an Establishment Clause challenge (1) an act must have a secular purpose, (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) it must not "foster 'an excessive government entanglement with religion.'" *Id.* at 612-613 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)). All three prongs of the test must be satisfied. *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

The mere identification of any secular purpose for the government action does not satisfy the purpose test. *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860, 865 n.13

25

(2005). Such a rule "would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action." *Id.* ("[A]n approach that credits *any* valid purpose . . . has not been the way the Court has approached government action that implicates establishment." (emphasis added)).   Thus, although governmental statements of purpose generally receive deference, a secular purpose must be "genuine, not a sham, and not merely secondary to a religious objective." *Id.* at 864.  If a religious purpose for the government action is the predominant or primary purpose, and the secular purpose is "secondary," the purpose test has not been satisfied.  *Id.* at 860, 862-65; *see also Edwards*, 482 U.S. at 594 (finding a violation of the Establishment Clause where the "primary purpose" of the challenged act was "to endorse a particular religious doctrine").

An assessment of the purpose of an action is a "common" task for courts. *McCreary*, 545 U.S. at 861.  In determining purpose, a court acts as an "objective observer" who considers "the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *McCreary*, 545 U.S. at 862 (internal quotation marks omitted) (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).   An "understanding of official objective" can emerge from "readily discoverable fact" without "judicial psychoanalysis" of the decisionmaker. *Id.*

Plaintiffs argue that the Second Executive Order fails the purpose prong because there is substantial direct evidence that the travel ban was motivated by a desire to ban Muslims as a group from entering the United States.  Plaintiffs' evidence on this point consists primarily of public statements made by President Trump and his advisors, before his election, before the issuance of the First Executive Order, and since the decision to issue the Second Executive Order.   Considering statements from these time periods is appropriate because courts may

consider "the historical context" of the action and the "specific sequence of events" leading up to it. *Edwards*, 482 U.S. at 594-95. Such evidence is "perfectly probative" and is considered as a matter of "common sense"; indeed, courts are "forbid[den] . . . 'to turn a blind eye to the context in which [the] policy arose.'" *McCreary*, 545 U.S. at 866 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000)); *cf. Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1987) (including the "historical background of the decision," the "specific sequence of events leading up [to] the challenged decision," and "contemporary statements of the decisionmaking body" as factors indicative of discriminatory intent), *cited with approval in Edwards*, 482 U.S. at 595.

> One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage. This presents no incongruity, however, because purpose matters.

*McCreary*, 545 U.S. at 866 n.14.

Specifically, the evidence offered by Plaintiffs includes numerous statements by President Trump expressing an intent to issue a Muslim ban or otherwise conveying anti-Muslim sentiments. For example, on December 7, 2015, then a Republican primary candidate, Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website "calling for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on." J.R. 85. In a March 9, 2016 interview with CNN, Trump professed his belief that "Islam hates us," and that the United States had "allowed this propaganda to spread all through the country that [Islam] is a religion of peace." J.R. 255-57. Then in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, explaining that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country."

into the country." J.R. 261.   On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President-Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.R. 245.   In a written statement about the events, Trump lamented the attack on people "prepared to celebrate the Christmas holiday" by "ISIS and other Islamic terrorists [who] continually slaughter Christians in their communities and places of worship as part of their global jihad." J.R. 245.

Significantly, the record also includes specific statements directly establishing that Trump intended to effectuate a partial Muslim ban by banning entry by citizens of specific predominantly Muslim countries deemed to be dangerous, as a means to avoid, for political reasons, an action explicitly directed at Muslims.   In a July 24, 2016 interview on Meet the Press, soon after becoming the Republican presidential nominee, Trump asserted that immigration should be immediately suspended "from any nation that has been compromised by terrorism." J.R. 219.   When questioned whether his new formulation was a "rollback" of his call for a "Muslim ban," he described it as an "expansion" and explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." J.R. 220.   When President Trump was preparing to sign the First Executive Order, he remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.'   We all know what that means." J.R. 142.   The day after the First Executive Order was issued, Mayor Giuliani appeared on Fox News and asserted that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally." J.R. 247.   Giuliani, in consultation with others, proposed that the action be "focused on, instead of religion . . . the areas of the world that create danger for us," specifically "places where there are [*sic*] substantial evidence that people are sending terrorists into our country." J.R. 247-48.   These types of public

28

statements were relied upon by the Eastern District of Virginia in enjoining the First Executive Order based on a likelihood of success on an Establishment Clause claim, *Aziz*, 2017 WL 580855, at *11, and the Ninth Circuit in concluding that an Establishment Clause claim against that Order raised "serious allegations" and presented "significant constitutional questions." *Washington*, 847 F.3d at 1168.

These statements, which include explicit, direct statements of President Trump's animus towards Muslims and intention to impose a ban on Muslims entering the United States, present a convincing case that the First Executive Order was issued to accomplish, as nearly as possible, President Trump's promised Muslim ban. In particular, the direct statements by President Trump and Mayor Giuliani's account of his conversations with President Trump reveal that the plan had been to bar the entry of nationals of predominantly Muslim countries deemed to constitute dangerous territory in order to approximate a Muslim ban without calling it one— precisely the form of the travel ban in the First Executive Order. *See Aziz*, 2017 WL 580855, at *4 (quoting from a July 17, 2016 interview during which then-candidate Trump, upon hearing a tweet stating "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional," responded "So you call it territories. OK? We're gonna do territories."). Such explicit statements of a religious purpose are "readily discoverable fact[s]" that allow the Court to identify the purpose of this government action without resort to "judicial psychoanalysis." *McCreary*, 545 U.S. at 862. They constitute clear statements of religious purpose comparable to those relied upon in *Glassroth v. Moore*, 335 F.3d 1282 (11th Cir. 2003), where the court found that a Ten Commandments display at a state courthouse was erected for a religious purpose in part based on the chief justice stating at the dedication ceremony that "in order to establish justice, we must invoke 'the favor and guidance of Almighty God.'" *Id.* at 1286, 1296 ("[N]o

psychoanalysis or dissection is required here, where there is abundant evidence, including his own words, of the Chief Justice's purpose.").

Relying primarily on this record, Plaintiffs asks this Court to issue an injunction against the Second Executive Order on Establishment Clause grounds. In considering this request, the same record of public statements by President Trump remains highly relevant. In *McCreary*, where the Court was reviewing a third attempt to create a courthouse display including the Ten Commandments after two prior displays had been deemed unconstitutional, it held that its review was not limited to the "latest news about the last in a series of governmental actions" because "the world is not made brand new every morning," "reasonable observers have reasonable memories," and to impose such a limitation would render a court "an absentedminded objective observer, not one presumed familiar with the history of the government's action and competent to learn what history has to show." *McCreary*, 545 U.S. at 866.

The Second Executive Order, issued only six weeks after the First Executive Order, differs, as relevant here, in that the preference for religious minorities in the refugee process has been removed. It also removes Iraq from the list of Designated Countries, exempts certain categories of individuals from the ban, and lists other categories of individuals who may be eligible for a case-by-case waiver from the ban. Despite these changes, the history of public statements continues to provide a convincing case that the purpose of the Second Executive Order remains the realization of the long-envisioned Muslim ban. The Trump Administration acknowledged that the core substance of the First Executive Order remained intact. Prior to its issuance, on February 16, 2017, Stephen Miller, Senior Policy Advisor to the President, described the forthcoming changes as "mostly minor technical differences," and stated that the "basic policies are still going to be in effect." J.R. 319. When the Second Executive Order was

signed on March 6, 2017, White House Press Secretary Sean Spicer stated that "[t]he principles of the [second] executive order remain the same." J.R. 118. The Second Executive Order itself explicitly states that the changes, particularly the addition of exemption and waiver categories, were made to address "judicial concerns," 2d Order § 1(i), including those raised by the Ninth Circuit, which upheld an injunction based on due process concerns, *Washington*, 847 F.3d at 1156.

The removal of the preference for religious minorities in the refugee system, which was the only explicit reference to religion in the First Executive Order, does not cure the Second Executive Order of Establishment Clause concerns. Crucially, the core policy outcome of a blanket ban on entry of nationals from the Designated Countries remains. When President Trump discussed his planned Muslim ban, he described not the preference for religious minorities, but the plan to ban the entry of nationals from certain dangerous countries as a means to carry out the Muslim ban. These statements thus continue to explain the religious purpose behind the travel ban in the Second Executive Order. Under these circumstances, the fact that the Second Executive Order is facially neutral in terms of religion is not dispositive. *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 699-702 (1994) (holding that a facially neutral delegation of civic power to "qualified voters" of a village predominantly comprised of followers of Satmas Hasidism was a "purposeful and forbidden" violation of the Establishment Clause); *cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 542 (1993) (holding that a facially neutral city ordinance prohibiting animal sacrifice and intended to target the Santeria faith violated the Free Exercise Clause because "the Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination" and action

targeting religion "cannot be shielded by mere compliance with the requirement of facial neutrality").

Defendants do not directly contest that this record of public statements reveals a religious motivation for the travel ban. Rather, they argue that many of the statements may not be considered because they were made outside the formal government decisionmaking process or before President Trump became a government official. Although *McCreary*, relied upon by Defendants, states that a court considers "the text, legislative history, and implementation" of an action and "comparable" official acts, it did not purport to list the only materials appropriate for consideration.[2] 545 U.S. at 862. Notably, in *Green v. Haskell County Board of Commissioners*, 568 F.3d 784 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit considered quotes from county commissioners that appeared in news reports in finding that a Ten Commandments display violated the Establishment Clause. *Id.* at 701. Likewise, in *Glassroth*, the United States Court of Appeals for the Eleventh Circuit found an Establishment Clause violation based on a record that included the state chief justice's campaign materials, including billboards and television commercials, proclaiming him to be the "Ten Commandments Judge." 335 F.3d at 1282, 1284-85, 1297.

Although statements must be fairly "attributed to [a] government actor," *Glassman v. Arlington Cty.*, 628 F.3d 140, 147 (4th Cir. 2010), Defendants have cited no authority concluding

---

[2]   In *Hamdan v. Rumsfeld*, 548 U.S. 557, 624 n.52 (2006), cited by Defendants, the Court criticized a dissent's reliance on press statements by senior government officials, rather than the President's formal written determination mandated by the Uniform Code of Military Justice, to provide justification for the government's determination that applying court-martial rules to a terrorism suspect's military commission was impracticable. *Id.* at 624 & n.52. It did not address what facts could be considered in assessing government purpose under the Establishment Clause, where courts have held that facts outside the specific text of the government decision may be considered. *See Edwards*, 482 U.S. at 594-95.

that a court assessing purpose under the Establishment Clause may consider only statements made by government employees at the time that they were government employees. Simply because a decisionmaker made the statements during a campaign does not wipe them from the "reasonable memory" of a "reasonable observer." *McCreary*, 545 U.S. at 866. Notably, the record in *Glassroth* also included the fact that the state chief justice, before securing election to that position, had made a campaign promise to install the Ten Commandments in the state courthouse, as well as campaign materials issued by members of his campaign committee. *Glassroth*, 335 F.3d at 1285. Because the state chief justice was the ultimate decisionmaker, and his campaign committee's statements were fairly attributable to him, such material is appropriately considered in assessing purpose under the Establishment Clause. *See id.* at 1285; *Glassman*, 628 F.3d at 147. Likewise, all of the public statements at issue here are fairly attributable to President Trump, the government decisionmaker for the Second Executive Order, because they were made by President Trump himself, whether during the campaign or as President, by White House staff, or by a close campaign advisor who was relaying a conversation he had with the President. In contrast, Defendants' cited case law does not involve statements fairly attributable to the government decisionmaker. *See, e.g., Glassman*, 628 F.3d at 147 (declining to consider statements made by members of a church that was alleged to have benefited from government action); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (declining to consider statements by the artist where the government's display of artwork is challenged); *Modrovich v. Allegheny Cty.*, 385 F.3d 397, 411 (3d Cir. 2004) (declining to consider statements by a judge and county residents about a Ten Commandments display where the county government's purpose was at issue).

Defendants also argue that the Second Executive Order explicitly articulates a national security purpose, and that unlike its predecessor, it includes relevant information about national security concerns. In particular, it asserts that there is a heightened chance that individuals from the Designated Countries will be "terrorist operatives or sympathizers" because each country is "a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," and those governments are therefore less likely to provide necessary information for the immigrant vetting process. 2d Order § 1(d). The Order also references a history of persons born abroad committing terrorism-related crimes in the United States and identifies three specific cases of such crimes. The Order further states that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations.

Plaintiffs argue that the stated national security rationale is limited and flawed. Among other points, they note that the Second Executive Order does not identify examples of foreign nationals from Iran, Libya, Sudan, Syria, or Yemen who engaged in terrorist activity in the United States. They also note that a report from the Department of Homeland Security, Office of Intelligence and Analysis, concluded that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity" and that "few of the impacted countries have terrorist groups that threaten the West." J.R. 158. Furthermore, they note that the 300 FBI investigations are dwarfed by the over 11,000 counterterrorism investigations at any one time, only a fraction of which lead to actual evidence of illegal activity. Finally, they note that Secretary of Homeland Security Kelly stated that there are additional countries, some of which are not predominantly Muslim, that have vetting problems but are not included among the banned

countries. These facts raise legitimate questions whether the travel ban for the Designated Countries is actually warranted.

Generally, however, courts should afford deference to national security and foreign policy judgments of the Executive Branch. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010). The Court thus should not, and will not, second-guess the conclusion that national security interests would be served by the travel ban. The question, however, is not simply whether the Government has identified a secular purpose for the travel ban. If the stated secular purpose is secondary to the religious purpose, the Establishment Clause would be violated. *See McCreary*, 545 U.S. at 864, 866 n.14 (stating that it is appropriate to treat two like acts differently where one has a "history manifesting sectarian purpose that the other lacks"). Making assessments on purpose, and the relative weight of different purposes, is a core judicial function. *See id.* at 861-62.

In this highly unique case, the record provides strong indications that the national security purpose is not the primary purpose for the travel ban. First, the core concept of the travel ban was adopted in the First Executive Order, without the interagency consultation process typically followed on such matters. Notably, the document providing the recommendation of the Attorney General and the Secretary of Homeland Security was issued not before the First Executive Order, but on March 6, 2017, the same day that the Second Executive Order was issued. The fact that the White House took the highly irregular step of first introducing the travel ban without receiving the input and judgment of the relevant national security agencies strongly suggests that the religious purpose was primary, and the national security purpose, even if legitimate, is a secondary *post hoc* rationale.

Second, the fact that the national security rationale was offered only after courts issued injunctions against the First Executive Order suggests that the religious purpose has been, and remains, primary. Courts have been skeptical of statements of purpose "expressly disclaim[ing] any attempt to endorse religion" when made after a judicial finding of impermissible purpose, describing them as a "litigating position." *E.g.*, *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 607 F.3d 439, 444, 448 (6th Cir. 2010). Indeed, the Second Executive Order itself acknowledges that the changes made since the First Executive Order were to address "judicial concerns." 2d Order § 1(i).

Third, although it is undisputed that there are heightened security risks with the Designated Countries, as reflected in the fact that those who traveled to those countries or were nationals of some of those countries have previously been barred from the Visa Waiver Program, *see* 8 U.S.C. § 1187(a)(12), the travel ban represents an unprecedented response. Significantly, during the time period since the Reagan Administration, which includes the immediate aftermath of September 11, 2001, there have been no instances in which the President has invoked his authority under § 1182(f) or § 1185 to issue a ban on the entry into the United States of all citizens from more than one country at the same time, much less six nations all at once. Kate M. Manuel, Cong. Research Serv., R44743, Executive Authority to Exclude Aliens: In Brief (2017); J.R. 405-406. In the two instances in which nationals from a single country were temporarily stopped, there was an articulable triggering event that warranted such action. Manuel, *supra*, at 10-11 (referencing the suspension of the entry of Cuban nationals under President Reagan after Cuba stopped complying with U.S. immigration requirements and the revocation of visas issued to Iranians under President Carter during the Iran Hostage Crisis). The Second Executive Order does not explain specifically why this extraordinary, unprecedented action is the necessary

36

response to the existing risks. But while the travel ban bears no resemblance to any response to a national security risk in recent history, it bears a clear resemblance to the precise action that President Trump described as effectuating his Muslim ban. Thus, it is more likely that the primary purpose of the travel ban was grounded in religion, and even if the Second Executive Order has a national security purpose, it is likely that its primary purpose remains the effectuation of the proposed Muslim ban. Accordingly, there is a likelihood that the travel ban violates the Establishment Clause.

Finally, Defendants argue that because the Establishment Clause claim implicates Congress's plenary power over immigration as delegated to the President, the Court need only consider whether the Government has offered a "facially legitimate and bona fide reason" for its action. *See Mandel*, 408 U.S. at 777. This standard is most typically applied when a court is asked to review an executive officer's decision to deny a visa. *See, e.g., Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring); or in other matters relating to the immigration rights of individual aliens or citizens, *see Fiallo v. Bell*, 430 U.S. 787, 790 (1977). The *Mandel* test, however, does not apply to the "promulgation of sweeping immigration policy" at the "highest levels of the political branches." *Washington*, 847 F.3d at 1162 (holding that courts possess "the authority to review executive action" on matters of immigration and national security for "compliance with the Constitution"). In such situations, the power of the Executive and Legislative branches to create immigration law remains "subject to important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (quoting *INS v. Chadha*, 462 U.S. 919, 941-42 (1983)).

Even when exercising their immigration powers, the political branches must choose "constitutionally permissible means of implementing that power." *Chadha*, 462 U.S. at 941. Courts have therefore rejected arguments that they forgo the traditional constitutional analysis

when a plaintiff has challenged the Government's exercise of immigration power as violating the Constitution. *See, e.g., Zadvydas*, 533 U.S. at 695 (rejecting deference to plenary power in determining that indefinite detention of aliens violated the Due Process Clause); *Chadha*, 462 U.S. at 941-43 (stating that Congress's plenary authority over the regulation of aliens does not permit it to "offend some other constitutional restriction" and holding that a statute permitting Congress to overturn the Executive Branch's decision to allow a deportable alien to remain in the United States violated constitutional provisions relating to separation of powers); *Washington*, 847 F.3d at 1167-68 (referencing standard Establishment Clause principles as applicable to the claim that the First Executive Order violated the Establishment Clause). Thus, although "[t]he Executive has broad discretion over the admission and exclusion of aliens," that discretion "may not transgress constitutional limitations," and it is "the duty of the courts" to "say where those statutory and constitutional boundaries lie." *Abourezk*, 785 F.2d at 1061.

Mindful of "the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which Establishment Clause values can be eroded," *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984), the Court finds that the Plaintiffs have established that they are likely to succeed on the merits of their Establishment Clause claim. Having reached this conclusion, the Court need not address Plaintiffs' likelihood of success on their Equal Protection Clause claim.

## IV.    Irreparable Harm

Having concluded that Plaintiffs have established a likelihood of success on the merits, the Court turns to whether they have shown a likelihood of irreparable harm. The Supreme Court has held that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)

(finding irreparable harm upon a violation of the freedom of association). The Fourth Circuit has applied this holding to cases involving the freedom of speech and expression. *E.g.*, *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190, 191-92 (4th Cir. 2013); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). Although the Fourth Circuit has not yet held that a violation of the Establishment Clause likewise necessarily results in irreparable harm, other circuits have. *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006); *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986); *Am. Civil Liberties Union of Ill. v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986) (finding irreparable harm in an Establishment Clause case and stating that the "harm is irreparable as well as substantial because an erosion of religious liberties cannot be deterred by awarding damages to the victims of such erosion").

Here, as in *Elrod*, "First Amendment interests were either threatened or in fact being impaired at the time relief was sought." *Elrod*, 427 U.S. at 373. "[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303. The Court accordingly finds that Plaintiffs have established a likelihood of irreparable harm when the Second Executive Order takes effect.

## V.   Balance of the Equities and the Public Interest

While Plaintiffs would likely face irreparable harm in the absence of an injunction, Defendants are not directly harmed by a preliminary injunction preventing them from enforcing an Executive Order likely to be found unconstitutional. *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Aziz*, 2017 WL 580855, at *10.

Preventing an Establishment Clause violation has significant public benefit beyond the interests of the Plaintiffs.  The Supreme Court has recognized the "fundamental place held by the Establishment Clause in our constitutional scheme." *Wallace v. Jaffree*, 472 U.S. 38, 60 (1985). The Founders "brought into being our Nation, our Constitution, and our Bill of Rights with its prohibition against any governmental establishment of religion" because they understood that "governmentally established religions and religious persecution go hand in hand." *Engel v. Vitale*, 370 U.S. 421, 432-33 (1962).  When government chooses sides among religions, the "inevitable result" is "hatred, disrespect, and even contempt" from those who adhere to different beliefs. *See id.* at 431.  Thus, to avoid sowing seeds of division in our nation, upholding this fundamental constitutional principle at the core of our Nation's identity plainly serves a significant public interest.

At the same time, the Supreme Court has stated that "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981). Defendants, however, have not shown, or even asserted, that national security cannot be maintained without an unprecedented six-country travel ban, a measure that has not been deemed necessary at any other time in recent history.  Thus, the balance of the equities and the public interest favor the issuance of an injunction.

## VI.    Scope of Relief

Plaintiffs have asked the Court to issue an injunction blocking the Executive Order in its entirety.  The Court declines to grant such broad relief.  The Plaintiffs' Establishment Clause and INA arguments focused primarily on the travel ban for citizens of the six Designated Countries in Section 2(c) of the Second Executive Order.  The Court will enjoin that provision only. Although Plaintiffs have argued that sections relating to the temporary ban on refugees also

offend the Establishment Clause, they did not sufficiently develop that argument to warrant an injunction on those sections at this time. As for the remaining portions of the Second Order, Plaintiffs have not provided a sufficient basis to establish their invalidity. Thus, the Court declines to enjoin the Second Order in its entirety.

With respect to Section 2(c), the Court concludes that nationwide relief is warranted. It is "well established" that a federal district court has "wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992); *see also Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (holding that the "Constitution vests the District Court with 'the judicial Power of the United States,'" which "extends across the country" (quoting U.S. Const. art. III § 1)), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). However, nationwide injunctions are appropriate if necessary to afford relief to the prevailing party. *See id.*; *Richmond Tenants Org., Inc.*, 956 F.3d at 1308-39; *Texas*, 809 F.3d at 188.

The Court has found that Plaintiffs are likely to be able to establish that Section 2(c) of the Second Executive Order violates the Establishment Clause. Both the Individual Plaintiffs and clients of the Organizational Plaintiffs are located in different parts of the United States, indicating that nationwide relief may be appropriate. *Richmond Tenants Org., Inc.*, 956 F.3d at 1309 (holding that a nationwide injunction was "appropriately tailored" because the plaintiffs lived in different parts of the country). Moreover, although the Government has argued that relief should be strictly limited to the specific interests of the Plaintiffs, an Establishment Clause violation has impacts beyond the personal interests of individual parties. *Joyner v. Forsyth Cty.*,

653 F.3d 341, 355 (4th Cir. 2011) ("[T]hese plaintiffs are not so different from other citizens who may feel in some way marginalized on account of their religious beliefs and who decline to risk the further ostracism that may ensue from bringing their case to court or who simply lack the resources to do so."); *City of St. Charles*, 794 F.2d at 275 (stating that a violation of the Establishment Clause causes "harm to society"). Here, nationwide relief is appropriate because this case involves an alleged violation of the Establishment Clause by the federal government manifested in immigration policy with nationwide effect. *See Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980) (affirming a nationwide injunction in a facial challenge to a federal statute and regulations on Establishment Clause grounds).

Finally, under these facts, a "fragmented" approach "would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington*, 847 F.3d at 1166-67. "Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*, and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Texas*, 80 F.3d at 187-88 (footnotes and quotation marks omitted). In light of the constitutional harms likely to befall Plaintiffs in the absence of relief, and the constitutional mandate of a uniform immigration law and policy, Section 2(c) of the Second Executive Order will be enjoined on a nationwide basis.

## CONCLUSION

For the foregoing reasons, the Motion is GRANTED IN PART and DENIED IN PART. The Court will issue an injunction barring enforcement of Section 2(c) of the Second Executive Order.  A separate Order shall issue.


Date:  March 15, 2017

THEODORE D. CHUANG
United States District Judge