1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF MARYLAND

3
INTERNATIONAL REFUGEE           )
4  ASSISTANCE PROJECT, et al.,   )
                                 )
5           Plaintiffs,          )
                                 )
6       vs.                      )    CASE NO. 8:17-cv-00361-TDC
                                 )
7  DONALD J. TRUMP, et al.,      )
                                 )
8           Defendants.          )
   _____)
9
                  TRANSCRIPT OF PROCEEDINGS
10          HEARING FOR TEMPORARY RESTRAINING ORDER
            BEFORE THE HONORABLE THEODORE D. CHUANG
11            WEDNESDAY, MARCH 15, 2017; 9:40 A.M.
                      GREENBELT, MARYLAND
12
   FOR THE PLAINTIFFS:
13
        Omar C. Jadwat, Esquire
14      Lee Gelernt, Esquire
        AMERICAN CIVIL LIBERTIES UNION
15      125 Broad Street, 18th Floor
        New York, NY  10004
16
        Justin B. Cox, Esquire
17      NATIONAL IMMIGRATION LAW CENTER
        1989 College Avenue, N.E.
18      Atlanta, GA  30317

19

20
        Proceedings recorded by mechanical stenography, transcript
21  produced by computer.

22  _____

23
                     CINDY S. DAVIS, RPR
24          FEDERAL OFFICIAL COURT REPORTER
             6500 CHERRYWOOD LANE, SUITE 200
25               GREENBELT, MD  20770

```
 1
    FOR THE PLAINTIFFS (continued):
 2
            Karen C. Tumlin, Esquire
 3          Esther Sung, Esquire
            NATIONAL IMMIGRATION LAW CENTER
 4          3435 Wilshire Blvd., Suite 1600
            Los Angeles, CA  90010
 5
            Daniel Mach, Esquire
 6          AMERICAN CIVIL LIBERTIES UNION
            915 15th Street, N.W., Sixth Floor
 7          Washington, DC  20005

 8          David R. Rocah, Esquire
            AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
 9          3600 Clipper Mill Road, #350
            Baltimore, MD  21211
10
    FOR THE DEFENDANTS:
11
            Jeffrey B. Wall, Acting Solicitor General
12          Edwin Kneedler, Deputy Solicitor General
            UNITED STATES DEPARTMENT OF JUSTICE
13          950 Pennsylvania Avenue, N.W.
            Washington, DC  20530-0001
14
            Arjun Garg, Trial Attorney
15          Daniel Schwei, Trial Attorney
            UNITED STATES DEPARTMENT OF JUSTICE
16          Civil Division
            20 Massachusetts Avenue, N.W.
17          Washington, DC  20530

18

19

20

21

22

23

24

25
```

1                              <u>I N D E X</u>

2                                                              <u>P A G E</u>

3   Argument by Mr. Jadwat for Plaintiffs                      5

4   Argument by Mr. Cox for Plaintiffs                        20

5   Argument by Mr. Wall for Defendants                       29

6   Argument by Mr. Garg for Defendants                       62

7   Rebuttal Argument by Mr. Cox for Plaintiffs               66

8   Rebuttal Argument by Mr. Jadwat for Plaintiffs            71

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  The matter now pending before

3       this Court is Civil Number TDC-17-0361, International Refugee

4       Assistance Project, et al., versus Donald J. Trump, et al.

5       We're here for the purpose of a temporary restraining order

6       hearing.

7              Counsel, please identify yourselves for the record.

8              MR. JADWAT:  Omar Jadwat, Your Honor, from the ACLU,

9       for plaintiffs.

10             MR. COX:  Justin Cox, from the National Immigration

11      Law Center, for plaintiffs.

12             MS. TUMLIN:  Good morning Your Honor.  Karen Tumlin,

13      National Immigration Law Center, for plaintiffs.

14             MR. MACH:  Good morning.  Daniel Mach, from the ACLU,

15      for plaintiffs.

16             MR. GELERNT:  Good morning, Your Honor.  Lee Gelernt

17      from the ACLU, for plaintiffs.

18             MS. SUNG:  Good morning, Your Honor, Esther Sung,

19      with the National Immigration Law Center, for the plaintiffs.

20             MR. ROCAH:  Good morning, Your Honor.  David Rocah,

21      ACLU of Maryland, for plaintiffs.

22             THE COURT:  Good morning to you all.

23             MR. WALL:  Good morning, Your Honor.  Jeffrey Wall

24      for the United States.

25             MR. KNEEDLER:  Good morning, Your Honor.  Edwin

1   Kneedler, from the Department of Justice, for the United

2   States.

3          MR. GARG:  Good morning, Your Honor.  Arjun Garg,

4   from the Department of Justice, for the defendants.

5          MR. SCHWEI:  Good morning.  Daniel Schwei, from the

6   Defendant of Justice, for the defendants.

7          THE COURT:  Good morning to everyone.  I know there's

8   other counsel in the audience and others as well.

9          We're here on the motion for a temporary restraining

10  order and a preliminary injunction filed by the various

11  plaintiffs.  I think the procedure I had suggested was 30

12  minutes for each side.  I understand the plaintiff would like

13  to reserve five minutes for rebuttal.  And to the extent that I

14  feel the need to go beyond that, we'll make sure each side gets

15  equal time.

16         So we'll hear first from the plaintiffs.  I understand

17  it's Mr. Jadwat?

18              **ARGUMENT BY MR. JADWAT FOR PLAINTIFFS**

19         MR. JADWAT:  Yes, Your Honor.  Thank you.  And we are

20  dividing the argument to the extent that Mr. Cox will handle

21  questions regarding standing harms and the 50,000 refugee

22  limit, the Section 5(d) PI, which is also pending.

23         THE COURT:  Okay.

24         MR. JADWAT:  So on our constitutional claims, Your

25  Honor, this Court can begin and end with *Lemon* and *McCreary*

1   and, specifically, the purpose prong of *Lemon*.

2        Is the primary purpose of this Executive Order to

3   disfavor Muslims?  The Government never disputes that if you

4   take all of the publicly available evidence together, that it

5   shows that purpose.  Instead, it's asking the Court to turn a

6   blind eye to much of the evidence which is apparent to

7   everybody, and that's exactly what *McCreary* tells us not to do.

8             THE COURT:  So is there a limit to what the Court can

9   consider?  The Government identifies what they think is a

10  limit.  You disagree with that.  But is there some limit?

11            MR. JADWAT:  Sure.  The limit is what a reasonable

12  observer would find relevant or probative on the question of

13  what the Government's objective and purpose is.  I think that's

14  the real teaching both of *McCreary* and of other cases in the

15  Supreme Court's religious jurisprudence.

16       If you look at, for example, *Lakumi*, the Court considered

17  there reactions of audience members during a hearing regarding

18  the bill in question.

19       If you look at *McCreary* itself, the Court considered the

20  speech given by a pastor, who was not a government official, at

21  the unveiling of the Ten Commandments display.

22       The real, I think, thrust of what the Courts have said is

23  that it's a question of what a reasonable person would

24  understand, and that it doesn't make sense to blind the Court,

25  just as it doesn't make sense to presume that a reasonable

1 | person in the public would be blinded to information that's

2 | readily available and is reliable.

3 | Again, there's no question here that the President made

4 | the statements that he made, that his spokespeople made the

5 | statements they made, or that they were true.

6 | So again, it would be unnatural and not in keeping with

7 | the inquiry, that the Court is supposed to conduct under the

8 | establishment clause, to cast that aside.

9 | THE COURT:  So let's assume that I consider all those

10 | statements.  The Government, in the Second Executive Order, has

11 | provided a national security rationale for the order.

12 | Generally, the Courts defer, at least to some degree, on

13 | national security issues to the Government.

14 | Do I need to conclude that the Government's purpose in

15 | the national security -- the national security purpose is a

16 | sham and is false in order to rule in your favor?

17 | MR. JADWAT:  I think you need to conclude that the

18 | original purpose of the order -- the original purpose of the

19 | original order continues through to the second order, and

20 | that's what the Government itself has told us.  What's what the

21 | senior White House official said, that it was aimed to achieve

22 | the same effect, with a few tweaks to deal with what the courts

23 | have said.

24 | THE COURT:  But the Government, in the Executive

25 | Order, says that a purpose of the Executive Order is the need

1   to protect the public.  On what basis can I just completely

2   overrule that?

3          MR. JADWAT:  Well, I don't think you need to overrule

4   it.  I think you need to think about it in the same context

5   that the Court thought about the effort in *McCreary* to back

6   fill what it had already done by adding, in that case,

7   additional features to the display and also additional

8   statements about purpose.  Those didn't dilute sufficiently and

9   didn't divorce the third display at issue in that case from the

10  first and second displays at issue in that case, just as the

11  addition of some national security language to this order

12  doesn't divorce it from the first order and the purpose behind

13  the first order.

14         In addition, I think it's important to note that the

15  Government's invocation of these national security concerns

16  ignores the Government's own specific report on the question of

17  whether a seven-country ban or a six-country ban would serve a

18  national security purpose.

19         THE COURT:  You're talking about the DHS INA report?

20         MR. JADWAT:  That's right, and the other DHS report,

21  both of which were clearly prepared for the purpose of

22  examining whether this approach made sense.  Instead, they rely

23  on previously compiled information from the State Department

24  about things that might lead to an idea that there was some

25  increased terrorism risk in these six countries.

1          But as the Interfaith brief, amicus brief points out,

2     even if you take the order on its own terms, that is a faulty

3     application of the methodology they claim to be using, because

4     there are at least two non-Muslim countries that present

5     greater concerns on the criteria that they outline --

6               THE COURT:  Which countries are those?

7               MR. JADWAT:  Venezuela and the Philippines, I

8     believe.

9               THE COURT:  I'm sorry, the Philippines and where?

10              MR. JADWAT:  Venezuela.  I mean, if you go to the

11    questions of are they terrorist-safe havens, are there

12    issues --

13              THE COURT:  Where is that in the record?

14              MR. JADWAT:  It's in the amicus brief of the

15    Interfaith organizations.  They did an analysis of all of the

16    reports -- or all of the statements in those reports.  Again,

17    also, the amicus brief of the national security officials --

18              THE COURT:  So where would the limit be?  Because

19    suppose the administration or executive branch determines that

20    there is a need to do more or even to restrict travel from any

21    particular country for reasons completely unrelated to the

22    President's statements, how could they ever do that without you

23    coming back with the exact same argument?  Where would the

24    alleged taint from these statements end?  Is it a matter of

25    time, or is it a matter of something else?

1          MR. JADWAT:  I think time would matter.  The actual

2    nature of the order would matter.

3          THE COURT:  But national security issues may not wait

4    for time.  There could be some event that requires an action

5    tomorrow, and you would say because he made these statements a

6    month and a half ago, they can't do anything?

7          MR. JADWAT:  In that event, there would actually be

8    something to point to that would explain why they needed this

9    order now.

10         And that's, again, what *McCreary* says.  They addressed

11   this concern that you've kind of tied the hands of the

12   Government going forward.  They said no, you know, a reasonable

13   person will make a reasonable judgment, right?  This reasonable

14   observer is able to take into account what's changed, what's

15   different, both in the order itself or the law itself and in

16   the conditions on the ground.  That's all that we would be

17   asking.

18         What's absolutely clear is that we're on the other side

19   of that spectrum right now --

20         THE COURT:  Well, what I'm just trying to understand

21   then is, since they have offered some additional information,

22   are you saying that I need to find that's offered in bad faith?

23         MR. JADWAT:  I think you need to evaluate the

24   information, right, and see whether it negates what, again, is

25   an undisputed -- what they do not dispute is clear evidence of

1  an improper purpose.

2       And I think the fact that these national security

3  justifications that they've offered in the new order, one, are

4  kind of trying to backfill an order that's the same in

5  structure and the same in effect as the original order.  The

6  fact that the statements themselves, again, if you actually

7  take a look at them and see whether they make sense, they fail

8  on their own terms and --

9       THE COURT:  Well, give me a scenario where either

10 what they say in the order or what happens on the ground or

11 what analysis is provided, where you would acknowledge that an

12 action is not the result of the President's prior statements

13 but is based on a judgment by the national security officials

14 now.

15      MR. JADWAT:  Sure.  If there was a credible threat of

16 a specific -- I'm not saying this is the only scenario; I'm

17 just trying to think of one -- a credible threat of a specific

18 attack that they knew was associated -- that they had some

19 reason to think was coming from a particular group of people in

20 a particular country that was Muslim or even from an

21 organization that was, you know, an Islamic terrorist

22 organization in a particular country, and the best way to

23 account for that threat was to impose some sort of travel

24 restriction, I don't think we would say that that's necessarily

25 following through on this improper purpose.

1          But that's not what we have here.  What we have here is

2     the President saying, before he was elected, that he was going

3     to go forward with a plan to ban Muslims.  He gets elected.  A

4     week later he introduces a plan to ban Muslims.  Imperfectly.

5     Not every Muslim, but to ban Muslims.  And then when faced --

6     only when faced with resistance from the Court, goes back and

7     reengineers it -- again, in his own words -- to accommodate the

8     Court's ruling, not to go back and figure out what's the best

9     thing from a national security perspective, and to try to move

10    forward with the same plan.

11         So there's really no -- again, it would be not

12    reasonable.  It wouldn't make sense for a reasonable observer

13    to look at this new order as having been born afresh, without

14    any of the history being taken into account.

15              THE COURT:  So are you arguing that the refugee

16    provisions are impacted by these alleged statements regarding

17    the Muslim ban?  Because your brief and your argument seems to

18    focus primarily on the ban of travel from citizens of the six

19    countries.

20              MR. JADWAT:  Well, I think it's clear from the way

21    that this order is put together that the Government -- or that

22    President Trump, when he created this, thought of it as one

23    coherent system, right, and that I think the purpose --

24              THE COURT:  Where in the record is that?  You've

25    identified statements in which the President referenced the

1  concept of identifying dangerous territories and barring travel

2  from there.  I did not see references to the President

3  referring to the idea that banning refugees would be a way to

4  effectuate a Muslim ban.

5          MR. JADWAT:  Well, there are actually a lot of

6  statements, some of which are -- I think it's footnote 12 of

7  our reply -- are, again, the President's own statements

8  conflating refugees with Muslims and making very clear that, in

9  his mind, the danger of Muslims and the danger of refugees is

10  all one combined danger, and I think that's why you do see this

11  refugee ban as part of the Muslim ban.

12          And in addition, if you look at the effect of the ban,

13  again, as President Trump pointed out, the people that were

14  actually banned -- or unbanned when the court orders went into

15  effect, 70-plus percent of the people who came in in the

16  ensuing weeks were from the seven banned countries, those

17  people who came in as refugees.  There were some special

18  circumstances, perhaps, that explain that, but our

19  understanding is that over 50 percent of the refugees who

20  typically enter the United States are, in fact, Muslim.  And so

21  there's a factual -- which, of course, is very disproportionate

22  to their actual population in the world.  So if you were trying

23  to ban Muslims from the United States, banning refugees one

24  good way to do it.

25          THE COURT:  What's the most compelling statement in

1  the record that the President or one of his agents indicated

2  that banning refugees was a proxy for banning Muslims?

3          MR. JADWAT:  I just want to flag, Your Honor, that

4  I'm about halfway through our time.

5      If you could give us a moment, maybe I'll have the

6  specific statement for you in a moment.  But I think, again, if

7  you look at the whole Twitter compilation, which we provide in

8  that footnote, of the statements of the President regarding

9  refugees, that that conflation is very clear.

10          THE COURT:  Okay.  Let me ask you some questions

11  about the INA issue, Section 202 of the INA.

12          MR. JADWAT:  Sure.

13          THE COURT:  So the statute refers to visa issuance or

14  immigrant visa issuance.  The Executive Order refers to entry,

15  as does 212(f).  Isn't there a difference between those two

16  terms?  And why doesn't that make a difference in this case?

17          MR. JADWAT:  Well, there is a difference between

18  those two terms.  And in fact, it is significant in this case,

19  but it significantly supports our contention that Section 202

20  is at issue here and does prevent exactly what they're doing,

21  because even though the order talks about entry, they're not

22  barring the entry of people with visas anymore.  They're not

23  barring the entry of people with green cards.  They're only

24  effectuating this ban by barring the issuance of new visas to

25  people from these countries.

1          THE COURT:  So the Executive Order does not say

2     they're barring the issuance of visas.  I think your argument,

3     as a practical matter, that's what happening?

4          MR. JADWAT:  I think --

5          THE COURT:  Is there some action by the Secretary of

6     State that indicates that visas are now not being issued or not

7     being processed as a result of the Executive Order?

8          MR. JADWAT:  That's right.  And actually, I believe

9     it was the Government's contention that we wouldn't know

10    whether our clients were actually banned until they had had

11    both a decision on their visa application and a decision on the

12    waiver, which they say is part of the visa application process.

13    So I don't think there's actually any dispute between the

14    parties -- although I'm sure they'll tell you if I'm wrong --

15    that the way this ban operates is by freezing the issuance of

16    visas.

17         THE COURT:  Right, but what action has been taken in

18    that regard?  Is there some action by the Secretary of State

19    saying no further visas will issue to people from these

20    countries or something to that effect?

21         MR. JADWAT:  Like how do they implement it, is

22    that --

23         THE COURT:  The President's Executive Order, as I

24    read it, does not say you cannot issue a visa.  It says you

25    cannot allow entry, which is a different question.  So where is

1   the action saying no visas will be issued?

2        MR. JADWAT:  I think it's the clear implication of

3   the order, and I think it's also what they plan to do --

4        THE COURT:  Well, do you have any facts in the record

5   that indicate that that is actually what has happened?  The

6   Government said that visas will be processed to the point of

7   looking at waivers, but is there some contrary fact stating

8   that they're actually -- they've shut the door at the visa

9   office in these various countries or they've done something

10  different, like the embassy?

11       MR. JADWAT:  But even if they process them to the

12  point of deciding on a waiver, what they are not saying, I

13  think very clearly, is that they're going to issue visas to

14  applicants from these countries absent a waiver.

15       Again, I'm sure that they're probably in a better

16  position to clarify this than I am, but I really don't think

17  there's any question of fact about whether visa issuance is

18  going to happen if this order goes into effect except -- again,

19  except for people who are --

20       THE COURT:  So what would be the order you would be

21  looking for in this area?  Because INA Section 202 talks about

22  visa issuance and perhaps -- assuming you're entitled to some

23  conclusion that they can't prevent the issuance of visas, what

24  would you be asking an order to say?

25       MR. JADWAT:  Well, if it was just the Section 202 --

1          THE COURT:  Just on that, yes.

2          MR. JADWAT:  Just a pure Section 202 order I think

3    would say that they could not not -- refusing to issue visas

4    or -- implementing the terms of the order that would require

5    them to deny visas to applicants from these countries would be

6    enjoined.

7          THE COURT:  But there's nothing in the order that

8    says you can't issue a visa, as far as I can see.

9          MR. JADWAT:  Again, I --

10         THE COURT:  Would it be enjoining the terms of the

11   Executive Order or enjoining the terms of some other document

12   issued by the Secretary of State or someone else?

13         MR. JADWAT:  It would be at least enjoining the

14   effect of the Executive Order as to visa issuance.  And I think

15   more to the point, the question is not just whether Section 202

16   specifically prohibits the actions they're taking here, but

17   also whether Section 212 authorizes what they're doing here.

18      Again, I think section --

19         THE COURT:  Are you aware of any cases where a court

20   has found that a president has overreached on a 212(f) action?

21         MR. JADWAT:  No, but I'm also --

22         THE COURT:   -- for whatever reason?

23         MR. JADWAT:  There's also no 212(f) proclamation that

24   compares to this, either in its scope or in its discriminatory

25   nature.  So I don't think that the lack of -- just in the same

1  way that there's not another case involving establishment

2  clause violations with respect to the immigration laws is not,

3  I think, a knock on our case.  I think it demonstrates just how

4  unusual and extreme what the administration is doing here.

5          THE COURT:  So even if there was some order barring

6  anybody from blocking the issuance of visas, is there any basis

7  to order that the Government cannot bar entry when they present

8  at the border?  Isn't that a different situation?

9          MR. JADWAT:  Right.  Well, I mean, I do think that

10  the -- so I think the 202's effect doesn't stop at the point of

11  visa issuance, in the sense that Section 212 has to be read

12  against both Section 202, against the other provisions for

13  issuance of visas, and against the inadmissibility grounds that

14  are specified in the statute, and, of course, against RIFRA and

15  the Constitution.  I think all of those things limit the

16  ability of the Government to use 212(f) -- like, statutorily

17  limit the ability of the Government to use 212(f) in the manner

18  that it was trying to do in the first order, to actually bar

19  people at the gate.  And so I think that --

20          THE COURT:  Would you agree that entry and admission

21  are the same thing, or does entry mean something different than

22  admission as defined in the INA?

23          MR. JADWAT:  I think there's some distinctions

24  between them.  I don't think they're necessarily relevant here.

25          I just wanted to flag, Your Honor, I see we're down to

1   five minutes and --

2          THE COURT:  I'll probably extend a little bit and

3   give some time to your colleague.

4          MR. JADWAT:  Okay.

5          THE COURT:  Let me just see if I have another

6   question on that topic.

7      I did want to ask, the Government makes the argument that

8   under section B, that is 1152(a)(1)(B), that some of the

9   actions that might be taken fall within that provision, in that

10  they are not outright stopping visa issuances forever; they're

11  just modifying the procedures.  What's your response to that?

12         MR. JADWAT:  I'd make two points, Your Honor.  First,

13  it's not clear that they're not stopping them forever.  They're

14  stopping them, initially, for 90 days.  There's a provision to

15  extend the ban indefinitely or until such time as the agency

16  decides that the ban should be lifted.  And so that's just, I

17  think, a background point, but that's relevant.

18     And I don't think that a suspension of issuance is really

19  the sort of procedural thing that's encompassed in (B).  I

20  think the ordinary way that you would understand procedures

21  around issuance would be things like, you know, literally,

22  what's the procedure.  Who in the State Department has to make

23  what decision?  How are those things related to each other?

24  But I don't think that they -- especially given the meat of

25  202, like that the provisions part allows for a suspension.

1            THE COURT:  Are there any cases that set an outer

2    limit on what could be defined as an activity under section (B)

3    that doesn't implicate section (a)?

4            MR. JADWAT:  I'm not aware of any, but I'd be happy

5    to very quickly research that at the end of the hearing.

6            THE COURT:  Okay.  So why don't we stop for now.

7    Let's move on to Mr. Cox, and we'll plan to make it about ten

8    minutes and still allowing you to keep the extra rebuttal time.

9    And then we'll give the Government equal time.

10                **ARGUMENT BY MR. COX FOR PLAINTIFFS**

11           MR. COX:  Thank you, Your Honor.  Justin Cox, from

12   the National Immigration Law Center, for plaintiffs.

13       As Your Honor is obviously aware, this Executive Order

14   goes into effect at 12:01 in the morning tomorrow.  The

15   Executive Order, as we've tried to explain in our briefing,

16   threatens to inflict a variety of injuries on our plaintiffs,

17   which, collectively, have standing on a variety of

18   different types of standing --

19           THE COURT:  Can you explain or identify for me which

20   of the individual or organizational plaintiffs is your best

21   case for standing on each of the claims?  So establishment

22   clause, INA Section 202 and the Refugee Act.

23           MR. COX:  Sure.  I think the establishment clause

24   claim, there are -- and for that matter, the equal protection

25   claim, virtually all of our plaintiffs have standing in one

1    form or another.  So IRAP, for example, has third party

2    standing to represent the interests of its clients, including

3    those in the United States --

4          THE COURT:  Well, as I understand it, just to proceed

5    with this case or to get to the merits, I only need to find one

6    plaintiff.  But which is the one that's your most compelling

7    case, the easiest one to find standing from, from your

8    perspective for each of these?

9          MR. COX:  Sure.  That would probably be one of the

10   individual plaintiffs who is here.  So, for example, John Doe

11   Number 1, at page 45 of the joint record, his declaration talks

12   about how the anti-Muslim views driving the Executive Order

13   have inflicted an injury on him, this condemnation of his

14   religion.

15         The same is true of John Doe Number 3, paragraph 12 of

16   his declaration.

17         Mr. Meteab, paragraph 14, joint record 53.

18         All of these individuals have expressed that they feel

19   that their religion has been condemned by this Executive Order.

20         But beyond that, of course, it's not just a psychological

21   injury in these cases.  These individuals have -- in addition

22   to suffering the condemnation injury, have -- and will be if

23   the Executive Order goes into effect -- will be separated from

24   their families, that delay that's already significant --

25         THE COURT:  What about on the INA claim, what's your

1   best case for a plaintiff who has standing?

2          MR. COX:  On the INA claim, Your Honor, I believe

3   that we -- so the organizational plaintiffs would certainly.

4   So IRAP's clients' third-party standing would have standing

5   there because several of their clients get visas -- or would

6   get visas.  They have I-130 petitions pending --

7          THE COURT:  The theory on that is a U.S. resident

8   having standing based on the fact they have a family member who

9   wants to come over?

10         MR. COX:  Yes, Your Honor.  If you want --

11         THE COURT:  And does it have to be someone in that

12  case who is looking for an immigrant visa as opposed to coming

13  in as a refugee?

14         MR. COX:  I'm not sure that it matters doctrinally,

15  but they have both.  IRAP and HIAS have clients who have a

16  variety of immigration relief available to them.

17         If you want an individual, Mr. Harrison, the United

18  States citizen who is in Texas.  His same-sex partner is in

19  Iran and is petitioning for -- he's petitioning for a K-1 visa

20  on behalf of his partner who is in dire risk -- he's at

21  constant risk of harassment and not just persecution but

22  prosecution in Iran, where homosexuality is a crime.  So he

23  would clearly have standing with regards to that claim.

24         On the equal protection claim, I think virtually all --

25  the equal protection injury is the deprivation, the denial of

1  equal treatment.  So of course, that is --

2          THE COURT:  For the applicant or for the sponsor in

3  the United States?

4          MR. COX:  The sponsor in the United States would

5  certainly have standing to assert that because their petition

6  is being treated differently because of the relative for whom

7  they are petitioning is in one of these particular countries.

8          THE COURT:  What about Refugee Act?

9          MR. COX:  The Refugee Act, we would have -- Jane Doe

10 Number 2 would certainly have standing there because, as we

11 explained in the briefing, her family is in Saudi Arabia, on

12 the border.  They're filing a -- she has an I-130 petition

13 pending, but through the Direct Access Program, certain --

14 after that I-130 petition is approved.  It gets converted into

15 a refugee claim, which cuts the wait time, in order for her

16 sister's family to come in, from approximately 13 years to more

17 like 18 to 24 months.

18          THE COURT:  Let me ask you about the Refugee Act

19 then.  So the Government's identified some potential issues

20 with some threshold issues.  One question is whether the APA

21 applies here, and what's not clear to me is what exactly is the

22 final agency action that you're challenging?  Can you tell me

23 what that is?

24          MR. COX:  So I think there a variety of actions that

25 we've identified in the complaint as being final agency action

1    in this regard.  So the Department of State has suspended new

2    security checks, for example, for the processing of refugees --

3                THE COURT:  Are there documents that effectuate these

4    decisions, like a memo or directive or something?

5                MR. COX:  There are e-mails, for example, that go

6    out.  So, for example, on Monday, March 13th, a Department of

7    State official e-mailed to advise that, quote, there should be

8    no travel booked after March 30th of refugees.

9                THE COURT:  So does that count as a final agency

10   action?  Do you have any authority for that?

11               MR. COX:  Well, as we cited in our reply memorandum,

12   a press release can be a final agency action or it can reflect

13   final agency action.  And if a press release can, then it

14   certainly seems that a directive from the Department of State

15   to the resettlement agencies, who have this statutorily

16   codified rule in the refugee resettlement process in which

17   they're advised, for example, that the previous representations

18   made by the Department of State about how many refugees each

19   resettlement agency will be resettling in a particular year,

20   has been recalculated to reflect the new lowered admissions

21   level.  That certainly seems like final agency actions.  Legal

22   consequences certainly flow from that, and the agency's

23   decision-making process is final as of that point.  I mean,

24   there's nothing more to be done.

25               THE COURT:  So even if you get to the merits of that,

1   and then, even if I were to find that the action was in

2   conflict with the statute, what exactly is the relief that you

3   would be seeking?

4        I get the impression you would like me to order that the

5   President admit 110,000 this year, but I'm not sure how we

6   would do that.  So what actually are you looking for?

7            MR. COX:  Well, Your Honor, in this case, an

8   injunction of Section 5(d), of the current Executive Order, and

9   Section 6(d), of the one tomorrow, should give our clients full

10  relief.  Prior to the Executive Orders, as the record is

11  undisputed on this point, the United States was on target to

12  hit this cap of 110,000 refugees.  The only thing that is

13  standing between us right now and that point was the Executive

14  Order.  That's the only thing that's changed.

15           THE COURT:  So even if one were to enjoin that

16  section, what would prevent the Executive Branch from slowing

17  down the processing to the point that they don't actually

18  process 110,000 this year?  Just as a matter of process or

19  procedure, why couldn't they just do that?

20           MR. COX:  Well, I think as a practical matter, the

21  Executive Orders have been so disruptive at this point that it

22  is perhaps unlikely to hit the 110,000 mark that we were

23  previously on track to hit.  Nonetheless, there's no reason

24  that tens of thousands of individuals, who should have been

25  resettled in this country this fiscal year, wouldn't be

1  resettled.  If the Executive Branch attempts to circumvent this

2  Court's order, I think that that would be a different question.

3  But we have no reason to believe -- there's no practical

4  consideration that we're aware of --

5      THE COURT:  Well, would it be a circumvention of the

6  order if -- I mean, all that happened in that section was the

7  President set a 50,000 person maximum.  So it didn't require

8  any change in processes or procedures; that's not in the order.

9      So what exactly would be the effect of enjoining that

10 section, in terms of the President's ability to increase or

11 decrease the specific number that end up getting admitted that

12 year, so long as he doesn't change the statutory maximum?

13     MR. COX:  Well, Your Honor, I think as a practical

14 matter in this case, the fact is that the PRM, population

15 refugee and migration, has indicated that they're limiting the

16 number of individuals who can travel in any particular week

17 because of the lowered ceiling, for example.  That's undisputed

18 in the record.  They've stopped refugee processing.  They're

19 not processing applications, and it's all because of the

20 lowered ceiling.  There's no fact question on that.

21     So as a practical matter, it seems to us undisputed that

22 this is going to have real real-world consequences for our

23 clients and their clients as well, because but for the

24 Executive Order, there was every expectation -- and in fact,

25 many of them are already booked for travel --

1          THE COURT:  So I guess the question is if I enjoin

2     that section and say, effectively, that this change in the cap

3     is invalid, and the Executive Branch continues to do what it's

4     doing, have they violated the order, or have they simply

5     processed refugees at a particular pace and not changed the

6     maximum of 110,000?

7          MR. COX:  I think that would be a question of fact,

8     Your Honor.  I think that as a practical matter, if they have

9     legitimate logistical/operational reasons for slowing down the

10    pace of refugee resettlement, that would be, certainly, a

11    different question.

12         But the record indicates that, in fact, to read from the

13    e-mail, bookings are still limited to approximately 400

14    individuals per week, globally, due to the FY17 ceiling of

15    50,000.  This e-mail, by the way, is not in the record yet

16    because we just got it, I believe, yesterday.  But it's also

17    undisputed that the entire process has just ground to a halt.

18         THE COURT:  Okay.  So then one last question on the

19    Refugee Act.  I believe the Government makes an argument that

20    the APA doesn't apply because even if there is agency action at

21    issue by State or Homeland Security, it flows from the

22    Executive Order, not from a statue or some other source of

23    authority.

24         Do you have any authority to counter that argument, that

25    if it goes through the President, it's not subject to the APA?

1          MR. COX:  Well, my recollection, Your Honor, is that

2    the cases that they cite for that proposition, in those cases

3    the agency was -- they were carrying out actions on the

4    President's order pursuant to sort of -- there was an expressed

5    statutory mandate that the President, effectively, had

6    delegated to the agencies.  That's not the case here.  In fact,

7    to the contrary.  The statute sets the procedure through which

8    the annual limit on refugee admissions is set.

9          Essentially, the argument is that the agencies are

10   supposed to follow and adhere to the process that the Refugee

11   Act sets out.  The Refugee Act says we go through this process,

12   and then at the end we have a limit.  So the President has

13   effectively ordered them to do otherwise, but that order was

14   invalid because it violates the Refugee Act itself; it's not

15   authorized by 212(f).  And so the agency is violating the

16   Refugee Act in ignoring the proper process through which this

17   limit is set each year.

18          THE COURT:  Okay.  Well, thank you very much.

19          MR. COX:  Thank you, Your Honor.

20          THE COURT:  We'll save those five minutes for the

21   Government.  So I think it's approximately 40 minutes that we

22   used for the plaintiffs.

23          So we'll hear from the Government now, Mr. Wall.

24          To clarify, we used about 35 minutes, so the Government

25   has 40 at this point.

1           **ARGUMENT BY MR. WALL FOR THE DEFENDANTS**

2           MR. WALL:  Thank you, Your Honor.  Jeffrey Wall for

3    the United States.  I'm going to address the harm and the

4    standing issues and also the merits, the establishment clause,

5    and, to the extent Your Honor wants to hear about it, the

6    statutory claims.  They didn't spend a lot of time on that in

7    their brief and argument, but we would certainly want to

8    address those if the Court is thinking about addressing them in

9    any order.

10          Mr. Garg will talk about the refugee cap.  That was

11   obviously briefed separately, put on a separate schedule.  We

12   don't read that to be the subject of their TRO or PI motion.

13   But in any event, Mr. Garg is going to address the refugee cap

14   issue --

15          THE COURT:  Right, it's a separate motion, but we

16   said we might talk about it today, as we have already.  So go

17   ahead.

18          MR. WALL:  So I'm going to defer to him on those

19   issues.

20          THE COURT:  Okay.

21          MR. WALL:  Your Honor, as you know, the Ninth Circuit

22   had concerns about the original order.  It asked the Executive

23   to narrow it, and the President, rather than litigate, did

24   exactly that.  After consulting with the attorney general, the

25   Secretaries of State and Homeland Security directly, serially

1  addressed, in the new order, the Ninth Circuit's concerns

2  and --

3          THE COURT:  Those concerns were due process concerns,

4  if I recall, at least the ones that were specifically

5  articulated.  And there's no due process challenge here, so.

6          MR. WALL:  Well, that is true in part, Your Honor,

7  but I think there were a number of concerns that the order

8  addressed.  It no longer covers lawful permanent residents; it

9  no longer covers aliens who are located in the United States;

10  it no longer singles out Syrian refugees; it no longer gives

11  any preference to victims of religious persecution; and we've

12  now clarified how the waiver process works as part of the visa

13  application and interview process, and that was a subject of

14  some concern to the plaintiffs in the Ninth Circuit.

15          I think what's remarkable is that despite all of the

16  substantial changes that the President made to the order and

17  the fact that there is no grave harm to the plaintiffs when

18  this order takes effect at 12:01 tomorrow morning, they're here

19  asking for emergency, immediate relief.

20          I want to start with the harms and then move to the

21  merits, if I could, because I want to get into the record just

22  a little bit.

23          When you asked about the individual plaintiffs, and on

24  the visa side, counsel started with John Doe 1 and Harrison.

25  As far as we can tell from our records, Mr. Harrison's fiance

1   was issued a visa within the last couple of days and, thus,

2   would not be subject to the order, and his claim would be moot.

3   Now, it's obviously on plaintiffs to come forward and update

4   the Court.  We don't have those facts, but as best we can tell,

5   his K1 visa has been issued or it is set to be issued in

6   advance of the order taking effect.

7        On John Doe 1, his wife is currently waiting on an

8   interview, a visa interview, and, of course, as part of that

9   interview will be eligible for a waiver.

10       So again, I don't think it has any imminent harm that

11  plaintiffs could demonstrate during the brief period that would

12  be covered by a TRO.

13       THE COURT:  So they raised the establishment clause

14  as one of their arguments, and that harm is not as specific as

15  a visa issuance.  I think it maybe harms -- in fact, I think

16  the Courts generally seem to indicate that irreparable harm is

17  almost presumed in that circumstance.  Do you agree with that?

18       MR. WALL:  Well, the Courts have talked about the

19  harms that flow from the First Amendment violation but, of

20  course, every time you have a First Amendment claim, you can't

21  come into court and get a TRO or a PI.  You've got to

22  demonstrate some immediate irreparable harm beyond just the

23  injury you're claiming from the violation itself.

24       Here, on the establishment clause side, they don't have

25  anyone who can do it.  The aliens, of course, don't have any

1   establishment clause rights, and they haven't claimed that they

2   do.

3         To the extent that there are people in the U.S. raising

4   those claims, what we would say is that the organizations can't

5   raise them on their client's behalf because there's no

6   hindrance to the plaintiffs raising them themselves, as they

7   have, and they also run straight into the doctrine of consular

8   nonreviewability.  It's long been the case --

9         THE COURT:  Well, but they're not arguing that a

10  particular visa should or should not be issued.  They're

11  arguing that the Government has established a disfavoring of

12  Muslims in a general sense.  So why is that covered by consular

13  nonreviewability?

14        MR. WALL:  Well, I think there's two different harms

15  to which they're pointing.  One is the delay or denial of the

16  visa, and on that side they run smack dab into consular

17  nonreviewability.

18        On the stigma side, I do think you're right but --

19        THE COURT:  But aren't they challenging the policy?

20  They're not challenging the individual determination.

21        MR. WALL:  Well, it's not -- they have asked you to

22  enjoin the entire order but, of course, the only violations

23  that these organizations and plaintiffs can claim and get

24  relief for are violations that harm them, which is to say the

25  family members or clients that they claim should be able to get

1   a visa, that are going to be denied one under the order.

2       And as far as what we're looking at for the establishment

3   clause harm is not the denial of the visa itself, which

4   judicial review has precluded it from that, but just the stigma

5   of, as they say, being associated with a policy that, in their

6   view, discriminates.  Courts have repeatedly held that that

7   kind of stigmatic injury doesn't satisfy Article III unless you

8   are the person directly subjected to the treatment at issue,

9   and that class of people is the affected aliens who have no

10  establishment-clause right in the first place.

11      So I think they've got serious problems no matter how

12  they break down the standing argument.  And in any event, even

13  if they could show a plaintiff with standing, that's not what

14  they need for a TRO.  They need immediate, imminent,

15  irreparable injury during the brief period that would be

16  covered by a TRO, and they can't point to anyone on that.

17      I mean, take their claim on the refugee side.  They point

18  to Jane Doe 2, who wants her sister to come into the country.

19  She's still at the point where -- what we're talking about is

20  an I-130, which is just a DHS document.  That petition, as far

21  as we know, hasn't even been approved.  If it does, then Jane

22  Doe 2's sister would enter the visa process, but the backlog

23  for sisters and siblings is many, many years.  The idea that

24  this order is going to operate against Jane Doe 2's sister in

25  the next couple of weeks is frankly -- it's not remotely

1  plausible.

2       So what they're lacking with regard to either visas or

3  refugees is someone who is going to face imminent injury in the

4  next couple weeks, and the only person about whom they possibly

5  could have made that claim was Mr. Harrison's fiance.  And

6  again, as I say, as far as we can tell, that K-1 visa has

7  issued, and his fiance is no longer subject to the order.

8            THE COURT:  So on standing, you raise this issue

9  of -- or you cite at least one case, I think *Lujan*, that refers

10  to the injury needing to be a legally protected interest.  As

11  far as I can tell, other Supreme Court cases since then don't

12  always use that term.  Sometimes they do; sometimes they don't.

13       How do you define that term, and how does application of

14  that term -- how can we apply that without effectively getting

15  into the merits, which we're not supposed to do?

16            MR. WALL:  Well, I think there is some overlap with

17  the merits, but courts have said that standing analysis

18  sometimes requires looking at issues that may, to some extent,

19  overlap with the merits --

20            THE COURT:  Well, it can't mean that we have to

21  resolve the merits.  So what is the line there?

22            MR. WALL:  I think the line is whether you fall --

23  what courts have said, when they're trying to figure out

24  whether you have a legally cognizable interest for standing

25  purposes, is whether you fall within the zone of interest meant

1   to be protected by the law at issue.

2        Here, I think the very real problem that they have is

3   that -- and the doctrine of consular nonreviewability is a

4   great example of this.  The alien can't challenge it.  So it

5   would be passing strange if the third party could challenge it,

6   let alone the organizational plaintiffs who want to raise it on

7   behalf of their U.S. clients.  So we're sort of two degrees

8   removed --

9        THE COURT:  But they don't have to show that they

10  would be successful on a claim, correct?

11       MR. WALL:  For standing purposes, that's right.

12       THE COURT:  For standing.

13       MR. WALL:  They've got to show likelihood of success

14  on the merits separately.

15       THE COURT:  But just to have standing, they just need

16  to show that they have a claim that -- perhaps one could frame

17  it as a claim that is not obviously foreclosed?

18       MR. WALL:  I think they've got to demonstrate a

19  concrete impending injury.  They've got to demonstrate Article

20  III injury in order to have standing.  And the problem -- it's

21  most clear -- I grant you, with the organizational plaintiffs,

22  they're the easier case because they've got no claim to legally

23  cognizable injury, because they're just --

24       THE COURT:  Well, I guess that's the question.  It

25  seems to me that HIAS has indicated that, as a practical

1  matter, they will be harmed, in the sense that money will be

2  lost in some form, and you're saying that if we look ahead,

3  there's no way they could ever recover that money from the

4  Government, so there's no standing.  Is that your argument?

5          MR. WALL:  I'm saying two things.  One, we think it

6  is very speculative that the harm that they've -- because the

7  funding comes in, as we understand it, per refugee.  So the

8  fewer refugees they process, the fewer funds come in, but the

9  less they spend.  It's not at all clear to us, based on their

10  pleadings, that they're going to suffer a financial loss.  But

11  even if they were, it's not a financial loss that's legally

12  cognizable under the immigration laws.

13          THE COURT:  Well, I guess that's the question.  If

14  it's caused by the defendants' conduct, which their theory is

15  it is; that because of this Executive Order, we now have less

16  money, and perhaps accepting the plaintiffs' version of that

17  for the moment here in the hearing, then perhaps the question

18  is is it necessary, under the law, for there to be a conclusion

19  that they're going to be able to recover from the Government?

20  Or is it enough to say the Government has actually caused this

21  injury?

22          Maybe they can't win on a breach of contract issue, but

23  they've been harmed by this action, and to the extent the

24  action is invalid, they have a right to challenge it, even if

25  they could never recover on a breach of contract theory.

1            MR. WALL:  Yeah, I'd say a couple of things.  Setting

2      aside the fact that we think the harms are speculative, but

3      assuming they are --

4            THE COURT:  Just for the moment.

5            MR. WALL:  Right, just for the moment.  It's not the

6      kind of harm that's legally cognizable, because the harm flows

7      simply from not being able to resettle refugees into the United

8      States and having to resettle them somewhere else, and that's

9      not a legally cognizable harm because those aliens have no

10     right to be resettled in the United States, and they can't

11     claim an injury from that one degree removed.

12            Even if you set that to the side, that would get you to

13     standing, but it wouldn't remotely get you to the kind of harm

14     that you would need to enter a TRO for the next couple weeks.

15            What they certainly can't show is that they're facing

16     some kind of imminent, irreparable harm over the next couple

17     weeks so that the Court needs to decide that right now, rather

18     than in the normal course of the litigation.

19            So I think they've got both of the problems.  They've got

20     the Article III problem, and they've got the TRO emergency

21     relief problem.

22            THE COURT:  So let's talk a little bit about the

23     establishment clause.  Am I correct as a matter of fact that

24     this six-country ban is not something that 212(f) has ever

25     done?  I think, at most, there's been, arguably, a relatively

1   complete ban of individual -- one country at a time on one or

2   two occasions but not more than that; is that correct?

3          MR. WALL:  I think that's right, Your Honor.  We did

4   have the Cuban ban, and then we have a couple that drew

5   nationality-based distinctions -- for Panamanians and

6   Nicaraguans, Sudanese -- that also drew other distinctions in

7   addition to nationality.

8          But I want to be very clear about what has happened here.

9   What happened under the previous Administration was they said,

10  look, there are certain nationals and travelers to various

11  countries that we're going to take out of the Visa Waiver

12  Program; we're no longer going to let nationals from these

13  listed countries qualify for the Visa Waiver Program --

14         THE COURT:  They were dual nationals, right?  Because

15  the countries weren't under the Visa Waiver Program themselves.

16         MR. WALL:  That's right; dual nationals, that's

17  right.  And what this Administration came in and did was it

18  took the same judgment, on the basis of the same risk for the

19  same listed countries, and said, basically, we're making a

20  different judgment about how much risk we're going to be

21  willing to tolerate, and what we want is a brief pause while we

22  ensure that the governments of these troubled countries are

23  able to provide us with reliable information so that we can

24  determine whether their nationals present a threat to the

25  United States or not.

1          Now, that is certainly a step beyond what the previous

2     Administration did, but it's done with respect to the same

3     countries and on the basis of the same risk.  And what the

4     President did in the new order, actually, is go country by

5     country by country and lay out exactly the kind of factual

6     record that the plaintiffs had criticized the Government for

7     not providing before in the original order.

8          So I think what this order does -- granted, it is a step

9     beyond what the previous Administration did, but it's on the

10    basis of the same distinction.  It takes the same countries

11    that have the same sort of troubled political conditions, the

12    same concerns about getting reliable information about their

13    nationals, and it says, look, we just want to put a pause on

14    this for a few months while we ensure we have vetting

15    procedures in place that will get us reliable information, and

16    while we do that, we're going to have a waiver process, as part

17    of the visa application process, to still allow people to come

18    into the country.

19               THE COURT:  So even if we accept the notion that that

20    is something that the Government's been thinking about and has

21    reached that conclusion, doesn't *McCreary* indicate that the

22    issue is which is the primary purpose, that or some religious

23    purpose?

24               MR. WALL:  Well, yes, Your Honor, but it judges the

25    purpose by looking at an official action -- the resolutions

1   passed by the city council, what they put up on the walls of

2   the courthouse, what people did in office.  The law is pretty

3   clear on this that where the official action is a facially

4   legitimate and bona fide reason, courts don't look behind it.

5        Here, this order, it doesn't say anything about religion,

6   it doesn't draw any religious distinctions, and the one

7   religious distinction that it did draw in the old order, which

8   was to provide preference for victims of religious persecution

9   the new order removed in response to establishment clause

10  concerns.  So in *McCreary* --

11       THE COURT:  So has this facially legitimate, bona

12  fide standard been applied in a case involving religion and the

13  establishment clause specifically?

14       MR. WALL:  I'm not sure about that, Your Honor.

15  Right off hand, I'd have to confer with my colleagues.  It's

16  been applied in a number of other contexts.  *Fiallo*, of course,

17  was to a federal statute.

18       But I think even if you thought that that weren't the

19  standard and you just took *McCreary* and that body of

20  establishment clause law, even those cases are clear that what

21  you look at is the official act.  And in those cases, you had

22  an explicitly religious message, and the question was just did

23  you have enough surrounding it that you could draw some secular

24  message or understanding from it.

25       That's not what we have here at all --

1        THE COURT:  Well, *McCreary* seems to go beyond where

2   it was before.  There's a lot of cases, pre-*McCreary* and going

3   back *Lemon*, in which they talk about just finding any purpose.

4   But *McCreary* seems to indicate the question is whether it was

5   more than -- whether it was a primary/predominant/preeminent

6   purpose.  That's the issue.

7        MR. WALL:  Oh, I completely agree, Your Honor, but

8   judged as against the official act, you've got to look at the

9   official action and what was the purpose for that.  Here, the

10  official action is an order that the President took after

11  consulting with three cabinet-level officials whose motives

12  have not been impugned.

13       THE COURT:  But nobody argued -- at least I don't

14  think you're arguing that we just look at the four corners of

15  the document and can't consider any outside information,

16  correct?

17       MR. WALL:  Well, I think you can consider outside

18  information that was official action.  For instance --

19       THE COURT:  So *McCreary* has language which you've

20  cited, but I don't see in there any limitation or any statement

21  that these are, in fact, the only -- it, frankly, was made in

22  passing, I think, by the Court.  It doesn't say we're

23  discussing the question of what can be considered, and here's

24  the list of things that can be considered.

25       So what authority is there that's more explicit on that

1   point, if any?

2          MR. WALL:  Well, I think in the immigration context,

3   *Mandel* and *Fiallo* couldn't be more explicit about it.  If the

4   Executive puts forward a facially legitimate and bona fide

5   reason, then that's the end of courts' analysis, with the

6   possible exception of whether you draw some narrow exception

7   under *Din*, and we can talk about that.

8          But I do want to focus on that on the establishment

9   clause side, *McCreary* is the sort of rare case in which,

10  looking at the official action, you would say, all right, we're

11  going to say that the Government's stated purpose is a sham; is

12  not, in fact, secular.  But there, the message was explicitly

13  religious.

14         Here, this is an order that draws no religious

15  distinctions at all --

16         THE COURT:  Well, there are a number of cases they

17  were facially neutral, and there's still an establishment

18  clause problem based on the context, based on the history.

19         So beyond that argument, I think you focussed on the

20  national security issue, which we've talked about a little

21  bit --

22         MR. WALL:  I don't know, Your Honor, that I think

23  that the *McCreary* line of cases is long, but for that line of

24  cases, there can be a subset in which you've got a religious

25  message that pervades, whatever the Government conduct is or

1   that's clearly illustrated by official action that's directly

2   linked to it.

3          I just want to emphasize this case has gone the opposite

4   way from *McCreary*.  In *McCreary*, the city council kept doubling

5   down, kept trying to make the same religious message.  Here,

6   the President went the opposite direction.  Plaintiffs raised

7   establishment clause concerns, and the President said I'm going

8   to take out the one provision that does anything to refer to

9   religion.

10         On its face, this does exactly what the previous

11  Administration did with the Visa Waiver Program, right?  It

12  just applies --

13         THE COURT:  Well, again, it doesn't do it on

14  nationality.  It doesn't ban them entirely.  It simply,

15  basically, created a higher level of scrutiny for those

16  individuals.

17         MR. WALL:  That's right, it created a higher level of

18  scrutiny, and this does the same for all nationals of the

19  listed countries, without regard to religion.  It applies to

20  all nationals coming in from these six-listed countries.  It

21  doesn't draw any distinctions on the basis of religion, not on

22  its face and not in operation.

23         I think what the other side hasn't provided is, as you

24  say, some long line of cases where you've got a law that

25  doesn't -- on its face, in its text or in operation -- draw any

1   religious distinction.  It doesn't send a religious message,

2   right?  There's nothing explicitly religious.  This is not the

3   Ten Commandment display in *McCreary*.  And yet, still, the Court

4   looks behind it.  And by the way, you have to go one step

5   further.  They want you to look behind it on the basis,

6   largely, of statements that were made before the President ever

7   took office.

8              THE COURT:  So hypothetically, if all those

9   statements they're referring to were made after he took office,

10  from the White House, during a press conference or otherwise,

11  would you be saying that there is no establishment clause issue

12  here nonetheless?

13             MR. WALL:  I think it would be a much harder case,

14  Your Honor, and I think we would acknowledge that.  But what

15  you don't have --

16             THE COURT:  So the operative distinction for you is

17  when the statements were made, not that the statements

18  themselves are insufficient to accomplish their aims.

19             MR. WALL:  I think there are two operative

20  distinctions.  You asked the other side where would you draw

21  the line.  I'd draw it in two places.

22       One, here, these statements occurred before we had a

23  candidate, who took an oath to support and defend the

24  Constitution, who formed an administration, who consulted with

25  the Attorney General and the Secretaries of State and Homeland

1  Security --

2       THE COURT:  Well, he didn't before the first order,

3  correct?

4       MR. WALL:  No, that's right, so that was my second

5  fault line, right?  He took the original order, went back,

6  right, and rather than fight on the same ground, serially

7  addressed all of the other side's concerns, including the

8  establishment concern, and took out the preference for victims

9  of religious persecution.

10      So I think there are two fault lines.  The first is

11 coming into office and the difference between a President and a

12 candidate, right, who swears an oath, who forms an

13 administration and consults with them.  And the second is it's

14 not the old order that's before you; it's the new order.

15      And I think the President's statements, even if you

16 consider all of them over time, have been clearer and clearer

17 that what he is concerned about are radical Islamist

18 terrorists, and that's what this order is designed to get at.

19      THE COURT:  But the portion that they're challenging

20 now changed only in that Iraq was removed for some specific

21 reasons, and there were some categories that were exempted or

22 subject to waiver, but to some degree it appears that those

23 were all made to address the due process issues.  They weren't

24 made to address establishment clause concerns.

25      MR. WALL:  Well, Your Honor, I think what addressed

1   the establishment clause concern was taking out the only

2   provision of the order that referred to religion.  What you

3   have now are provisions that do not distinguish on the basis of

4   religion.  Nationals from these countries --

5          THE COURT:  But they have an impact, a disparate

6   impact, which is not a legally-cognizable standard, but when it

7   gets into the question of identifying purpose, it's something

8   that one looks at.

9          MR. WALL:  But as you recognize, not a

10  legally-cognizable theory under the establishment clause.  The

11  statements which they try to get at for the purpose part of

12  their establishment clause claim are preelection statements by

13  a candidate Trump, not President Trump.

14         They're pointing to the history of the order.  This order

15  is different in the way that it functions.

16         And you're right, it does it with respect to the same

17  countries that the previous order did, except for Iraq, because

18  conditions had changed with respect to Iraq just in the last

19  few weeks.  But, of course, those were the same countries

20  singled out by Congress and the previous Administration on what

21  everybody concedes, I think, are religion-neutral grounds,

22  because they were state sponsors of terrorism or countries of

23  concern because ISIL and Al Qaeda operate there heavily.

24         And so the distinction on which this Administration

25  borrowed from the previous Administration, that distinction

1   nobody has claimed was ever drawn on the basis of religion.

2        And so I just think this is a very, very tough context

3   with this law, which draws no religious distinctions on its

4   face or in operations, to try to press that claim.  I think in

5   some sense they're trying to fight the last battle and not

6   really wanting -- in *McCreary* and all these cases, it's still

7   what is the law before the Court?  How does that law operate?

8   What does it do?  Here, this order comfortably passes that

9   test.

10        THE COURT:  So a factual question based on what the

11   plaintiffs have asserted.  They assert that even though the

12   first order has been in effect and still is in effect, at least

13   the portions that weren't enjoined, the State Department and

14   Homeland Security have not started issuing the reports that

15   were required by that.  Is that correct or not?

16        MR. WALL:  My understanding is that the internal

17   review and consultation has begun.  I don't think that there

18   have been any reports issued.  I believe that's right.

19        There are certain portions of the order dealing with

20   suspension of entry that have been enjoined.  We have not been

21   attempting to enforce those.  Those will be revoked and

22   replaced by the new order when it takes effect.

23        THE COURT:  But the reporting requirements were not

24   enjoined, and you're saying they're working on it, but they

25   haven't issued any reports, even though I think the 30-day

1   report has already been due.  Not that the Government always

2   meets deadlines for reports, I understand.

3         MR. WALL:  Your Honor, I would have to check on that.

4   I'm not entirely sure what has happened with that provision.

5         THE COURT:  Okay.  So let me ask about the statutory

6   argument.  To some degree I want to address the same issue I

7   raised with the plaintiffs, the distinction between an entry

8   and a visa issuance and what does that do here.  Because it

9   does appear to some degree that, at a minimum, the practical

10  effect seems to be that visas are either not being issued or

11  their processing has been slowed down.

12        First of all, can you tell us, factually, if that's

13  correct?

14        MR. WALL:  Well, my understanding is that the State

15  Department is continuing to process visas as it did before, and

16  once the new order takes effect, the question will simply be

17  during the interview -- the visa interview, whether the

18  applicant is eligible for a waiver, and that will all be part

19  of the current process.  There's no additional process to it.

20        THE COURT:  But will they be denied a visa because

21  they're from this country and they can't get a waiver?  Or will

22  they be given a visa and just told, look, you're still going to

23  have to wait before you can actually go to the United States?

24        MR. WALL:  No.  My understanding is that they will be

25  denied a visa if they are a national from the listed country,

1  and they don't qualify for a visa during the brief pause that

2  this order places on the process so that we can check to make

3  sure that the vetting procedures are reliable.

4       And so we haven't focussed here on the distinction

5  between admission and entry for that reason.  Although we have

6  focussed on why 1152 doesn't apply for other reasons.  It only

7  applies to the issuance of immigrant visas.  The vast majority

8  of people covered by this order are not seeking immigrant

9  visas.  It doesn't apply to procedures.  That's clearly what

10 this is.  It's a temporary pause to reassess procedures, which,

11 by its definition, is a procedural change.

12      And even if you got past all of that, 1182(f) has always

13 been read and treated as a sort of catch-all power under the

14 immigration laws, so that where the President determines that

15 some class not picked up by other immigration provisions is

16 actually -- he needs to suspend entry immediately in the

17 interests of the United States, that's the power that the

18 President has.

19           THE COURT:  But isn't that the issue, is that 1182(f)

20 or 212(f) allows the President to bar entry?  It doesn't say

21 anything about altering the visa process.  Aren't those two

22 different things?  Even if we can say, because of emergency

23 reasons or otherwise, you can't come into the country, cannot

24 present for admission at the border to Customs and Border

25 Protection, that issuing visas is not covered by 212(f)?

1          MR. WALL:  Your Honor, that would be an additional

2     reason why the order would be perfectly lawful.  We have not

3     tried to push --

4          THE COURT:  But it would be a reason why the 212(f)

5     authority might not allow the Government to change the visa

6     processes, because the authority just goes to barring entry.

7          MR. WALL:  Well, but if the Court said that, I think

8     it's true then -- and issued any emergency relief, I think it's

9     true then we would have to continue to process and issue visas.

10    But then we could physically stop everyone at the border, since

11    entry is the actual physical entry into the country, and we

12    haven't depended on that distinction because we haven't wanted

13    to set up a system in which we're issuing visas to people and

14    then literally stopping them at the border.  So we haven't

15    tried to draw that distinction, but if the Court did, I think

16    that's what would result.

17          THE COURT:  It would seem to be a chaotic approach.

18    Although perhaps from a timing standpoint, it might help people

19    in that situation get the visa steps out of the way and not

20    delay them in that regard.  Because otherwise, they would be

21    delayed by a certain period of time.

22          MR. WALL:  But I would point out even then, Your

23    Honor, under 1185(a), the President would still have the power

24    to suspend those visas, because he's got the power to place

25    limitations and exceptions on other provisions in the

1  immigration laws.  So I think --

2          THE COURT:  When has that been done for that

3  particular step of suspending visas?  I know it's been used for

4  other reasons, including the Iran hostage crisis situation.

5          MR. WALL:  Your Honor, I don't know that it has, but

6  no court has ever read into 1182(f) any limits on the

7  President's authority to suspend entry into the United States.

8  So if this Court or others went down that road, we would be, I

9  think, in uncharted water.  The understanding up to now has

10  always been that the President could detain any -- suspend the

11  entry of any class of aliens when he deemed it in the national

12  interest.

13          And I just want to -- I do want to walk through all the

14  statutory arguments, but I want to be very clear about where

15  they lead.

16          I think on plaintiffs' approach that what they're

17  committed to saying is that if the President got actionable

18  intelligence tomorrow that a Yemeni national, knowing nothing

19  more, were about to bring a bomb into the United States, the

20  President could not temporarily suspend the entry of Yemeni

21  nationals into the United States without violating other

22  provisions of the immigration laws.  That is not the way courts

23  have ever understood 1182(f).  They have understood it as a

24  catchall provision for just that sort of circumstance.

25          THE COURT:  Well, their argument might be that but,

1   again, as I read the statute, it focuses on visa issuance,

2   which may or may not -- I mean, that's a technical issue.  As a

3   practical matter, I think you're right; the issue would be

4   whether they could enter under that provision.

5        You also cite Section (b), I believe, that indicates

6   there might be some exceptions to the nondiscrimination

7   provisions regarding processing.  What authority, if any, do

8   you have that would closely approximate this situation,

9   indicating that -- I know, for example, the location of an

10  office was added as part of that.  But either way, that was

11  deemed part of this issue or at least enough that they put it

12  into the statute.

13       But given in that case they had to add that language, do

14  you have any cases or other authority that indicate that this

15  activity of suspending for 90 days would fall safely within

16  that provision?

17            MR. WALL:  I don't know of good cases one way or the

18  other, Your Honor.

19       On the scope of the procedures provision, I'd say two

20  things.  One, I think it's pretty clear that where you're

21  talking about taking a temporary three-month pause to assess

22  procedures, that what you're talking about is, by definition, a

23  procedural change.

24       And to the extent that it were ambiguous, the President

25  and the Attorney General are entitled to deference in their

1   reading of the immigration laws.  And indeed, that's codified,

2   as you know, in the immigration laws; that the Attorney

3   General's interpretation of these laws is concerning.

4        So to the extent I think there's doubt about what

5   1152(a)(2) means or (b) means, I think our interpretation ought

6   to prevail both for the deference reason and because their

7   interpretation raises a very serious constitutional question

8   about the scope of the President's constitutional authority to

9   detain people at the border.

10       That's never been an issue before because courts have

11  treated 1182(f) as contiguous with the President's

12  constitutional authority.  He can suspend any class of aliens

13  when he determined it in the national interest.  If plaintiffs

14  are right, the Courts can look behind that and narrow that

15  authority.  That's going to raise a serious constitutional

16  question, which is itself a reason not to interpret the statute

17  that way.

18            THE COURT:  But the Justice Department -- or no one

19  has actually yet interpreted that provision formally to say

20  that the delay of three months or delay of any kind is covered

21  by that, as opposed to changing procedures.

22            MR. WALL:  Well, a couple of things, Your Honor --

23            THE COURT:  I suppose they might try to interpret it

24  if it was forced to do so at some point.

25            MR. WALL:  We would have to examine that issue.  But

1  certainly under 1185(a) and that general power, the Office of

2  Legal Counsel did say that you could have nationality-based

3  restrictions with certain classes of Iranians, and the

4  following year after it was enacted, President Carter did

5  exactly that with Iranian students.

6          And then, obviously, we have the Cuban, Panamanian and

7  Nicaraguan orders under 1182(f).

8          And the Supreme Court statement in *Sale* that it was

9  perfectly clear, the Supreme Court said, perfectly clear that

10  the President could put up a naval blockade to stop Haitian

11  migrants from coming into this country.

12          So I think at least the Supreme Court and the Office of

13  Legal Counsel --

14          THE COURT:  Wasn't that case dealing with

15  extraterritoriality of the authority, rather than just the

16  basic notion of whether that activity was covered?

17          MR. WALL:  I don't think so, Your Honor.  It was

18  dealing with an order that prevented unlawful entry by sea.

19  And I grant that the order itself may not have drawn a

20  nationality-based distinction, but it was clearly aimed at the

21  Haitian refugee crisis, and the Supreme Court casting it that

22  way and thinking of it that way said perfectly clear that the

23  President can do this.

24          The plaintiffs -- to the extent we want to talk about

25  sort of where the case is, the plaintiffs haven't come forward

1    with a single case that reads into 1182(f) any limit with

2    respect to any order that the President has ever put out,

3    provided that it made the national security determination.

4    Once the President puts forward that facially legitimate

5    reason, that it is in the country's national security interest,

6    courts haven't looked behind it, and they haven't narrowed the

7    scope of the President's authority under that statute.  It

8    would be a really, really serious thing to do.

9         Now, we already talked about 1152.  There is also an

10   argument about the other provisions of 1182(a), and if you want

11   to talk about it, I'd be happy to address it.  But otherwise --

12        THE COURT:  I'm not sure it's really necessary at

13   this point, but I appreciate that.

14        Just in terms of the -- I think you said you were also

15   covering the overall relief at issue or asked for some sort

16   of -- assuming we get this far, which I know is not where you

17   want to go but, hypothetically, the relief that the plaintiffs

18   are seeking some sort of nationwide injunction.  Given that

19   there are not just people around the country who have these

20   issues in this Uniform Rule of Naturalization concept, but, in

21   fact, plaintiffs are scattered in different places, what would

22   be -- you asked this to be narrowed only to the individual

23   plaintiffs, and then they ask for the nation.  There are a

24   number of options in between.  Is there one that is focussed on

25   the broad harm, but not nationwide, that you could offer that

1    is principled?

2          MR. WALL:  Yes.  So this is a critically important

3    question, and I just -- if I can lay out a couple things that I

4    don't think the Court should do, and then what I think could be

5    the middle ground, if you will.

6          So the first thing is I don't think the Court should

7    enjoin the entire order because there are provisions of the

8    order that, although they say they're challenging the entire

9    thing, they don't brief them, they don't --

10          THE COURT:  No, I understand.  There's the

11    assessments, the biometric entry, there's various issues.

12          MR. WALL:  Exactly.  So we would say not against the

13    entire order.

14          We would say it can't be facial because many of the

15    applications of the challenge provisions, for instance, with

16    respect to aliens abroad, who have no close connection, no

17    family or relative in the United States, we would say those

18    applications are clearly lawful.  No one's constitutional

19    rights are even arguably implicated.

20          So we'd say it can't be facial.  We'd say it has to be as

21    applied challenges to people who are denied a waiver, and

22    courts can decide those on more developed records.

23          And we would say it can't be nationwide.  It has to be

24    limited to the particular alleged violations here.

25          So I think at the most -- I don't want to help the other

1   side craft its TRO, but I think, at the most, the Court could

2   enter a TRO or a preliminary injunction with respect to the

3   particular aliens that the family members here seek to bring

4   over -- that covers the individual plaintiffs -- and the

5   particular refugees who have a close relationship with Iraq or

6   HIAS, who face an imminent risk of injury and who are otherwise

7   eligible for refugee admission.

8        Now, again, we don't think any form of emergency relief

9   is necessary because they can't show the harm.  But if the

10  Court disagrees with us, the relief has got to be tailored to

11  the plaintiffs here and the violations they're claiming.  It

12  can't be nationwide, and it can't be facial --

13       THE COURT:  Doesn't that depend on what the harm is?

14  I mean, the statute is one thing.  Would you have a different

15  analysis for the establishment clause?

16       MR. WALL:  No, not at all, Your Honor.  A facial

17  challenge or a theory that something is wrong in all its

18  applications, and I know that's what their establishment clause

19  claim is, that it's tainted in every root and branch, that's

20  just a legal theory about why something is lawful or unlawful.

21       Article III and rules on equitable relief still require

22  that the relief has got to be tailored to these plaintiffs.

23  Otherwise, if they can get nationwide relief on behalf of

24  plaintiffs who aren't before the Court, it effectively converts

25  it into a class action without all the procedures that are

1    required, and it shuts off other courts from considering --

2           THE COURT:  So do you think the Ninth Circuit's

3    injunction was unlawful?  It was due process, but it was

4    certainly affecting people who weren't in the case and even

5    people who might not have had a good argument for why they

6    should be allowed to enter.

7           MR. WALL:  We think that the nationwide injunction

8    was certainly too broad, but the circumstances there were a

9    little different, because the old order covered lots of groups

10   that this one doesn't cover.  And the Ninth Circuit didn't say

11   that it shouldn't enter a narrower injunction.  It said we're

12   not sure how to do that; we're going to send it back to the

13   Executive and let the Executive take a first crack at it.

14          Now we have.  We've narrowed the order, and it is now

15   very possible -- and Virginia did something like this.  The

16   Western District of Wisconsin did something like this.  It's

17   now possible for this Court to enter relief that, as Article

18   III requires, is tailored to the plaintiffs before the Court.

19   The particular refugees that these organizations want to bring

20   in, the particular family members these plaintiffs want to

21   bring in, that's the only thing that could be the subject of

22   equitable relief.

23          THE COURT:  So going back to the establishment clause

24   as one perhaps more complicated area for this.  It seems most

25   of the time there's an establishment clause violation.  The

1    remedy might be to remove the offending activity.

2         So given that there's a slew of these Ten Commandment

3    cases, it might say take down the whole display.  It doesn't

4    matter that others -- it doesn't say take it down whenever the

5    plaintiffs come to the courthouse.  It says just take it down

6    generally, because it has a pernicious effect generally,

7    because the Government is endorsing this -- regardless of who

8    walks in the door and regardless of whether they actually were

9    part of the lawsuit or not.

10        What is the equivalent here?  If this is an order that is

11   unconstitutional in that regard, it doesn't necessarily matter

12   then whether the people trying to enter or the family members

13   who are waiting for someone to enter were or were not part of

14   the lawsuit.  How is it different from that situation?

15             MR. WALL:  So I think the difference, Your Honor, is

16   that in the religious message cases, you're right.  The relief

17   to which that particular plaintiff is entitled, not having the

18   Ten Commandments on the courthouse wall, also inures to the

19   benefit of others.

20        But this is a case in which it is possible for the Court

21   and, thus, we would say, constitutionally required for the

22   Court to enter narrower relief.  Because these plaintiffs,

23   these organizations and individuals are complaining about

24   restrictions on their particular ability to bring other folks

25   into the country.  The Court can address that --

1          THE COURT:  But there are others who have that same

2    issue, who did not file suit.

3          MR. WALL:  Well, but they filed suit in other places.

4    If the Court enters a facial nationwide injunction, what it

5    effectively does is it converts it into a class action, and it

6    prevents other courts from addressing the same issues at the

7    same time.

8          Now, again, for us, this is all the reason why we ought

9    to be seeing as-applied challenges once the waiver system plays

10   itself out.  Many of the plaintiffs here are not in line to

11   have an interview in any imminent period.  And the ones who

12   are -- and it's not clear that they're already, but maybe there

13   are one or two.  Once they have the visa interview and we know

14   they've been denied a waiver, then they can bring an as-applied

15   challenge, and you've got an actual record to decide it.

16         So I think the kinds of questions you're raising are

17   not -- they shouldn't counsel in favor of broader relief.  They

18   should counsel in favor of saying the plaintiffs have run into

19   court too soon.  We ought to allow the order to take effect.

20   We ought to see if, in fact, these plaintiffs suffer any

21   injury.  Some of them, based on their pleadings, are likely not

22   to because they qualify for a waiver.  And if they don't get a

23   waiver, then they come, they bring an as-applied challenge, and

24   we can adjudicate it on a record where we actually know what

25   happened.

1          THE COURT:  So you mentioned TRO at one point.  You

2    mentioned preliminary injunction.  Does the Government have a

3    view on which of those is appropriate here?

4          Because I noticed in the Ninth Circuit they filed a TRO

5    at one point, and it was immediately appealed anyway and

6    treated as a preliminary injunction.  So is that the effect one

7    way or the other?

8          MR. WALL:  So I think our view would be that if --

9          THE COURT:  By either side.

10          MR. WALL:  -- the Court wants to grant emergency

11    relief, it should grant the temporary restraining order they've

12    asked for, and then we can confer with the other side about

13    whether it should be converted into a preliminary injunction,

14    and then come back to the Court.

15          I mean, they've come in and said we're going to suffer

16    harm now; we want a TRO.  We think that's wrong.  None of them

17    have shown any imminent, concrete harm coming in the next few

18    weeks.

19          But if Your Honor decides otherwise, which would be the

20    premise for any injunctive relief today, than I think today it

21    should be a TRO, and then we'll confer with the other side on

22    whether to convert it to a preliminary junction.

23          THE COURT:  But what else is there to do?  We've

24    briefed this.  We've argued it on a difficult schedule but,

25    still, we've covered a lot of ground.

1              MR. WALL:  Your Honor, I have to say I think the

2     plaintiffs don't provide nearly as much detail as they could or

3     should, at least on the individual plaintiffs and also on some

4     of the organizational plaintiffs, where they are in the process

5     and what injuries they face over the next couple of weeks.  As

6     I say, as far as we can tell, one of the plaintiff's claims is

7     moot.

8              So I think that they're -- again, the burden is on them

9     to supply that, and they haven't.  So it ought to cut against

10    emergency relief.  But in the event you enter it, I don't think

11    it's clear that nothing will change over the next few weeks.

12             THE COURT:  Okay.  Thank you.  Let me get five

13    minutes with Mr. Garg, and then I'll add five minutes to the

14    plaintiffs' rebuttal.

15             MR. WALL:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17             **ARGUMENT BY MR. GARG FOR THE DEFENDANTS**

18             MR. GARG:  Good morning, Your Honor.  Arjun Garg for

19    the defendants.

20             THE COURT:  Good morning.  So I think on this issue

21    of the Refugee Act, I think I raised some of the issues that

22    I'm interested in with the plaintiffs, the question of the

23    applicability of the APA.

24             So why is it that these actions of suspending refugee

25    security checks, suspending all screening interviews, why

1    aren't those actions that can be challenged?

2            MR. GARG:  Your Honor, I think plaintiffs' counsel

3    said it himself actually.  What they're really challenging is

4    the President's action.  The specific agency activities that

5    are going on --

6            THE COURT:  But they can be challenging both, and

7    then we could say the challenge to the President is one thing,

8    but there's a different issue we need to analyze.

9            MR. GARG:  Your Honor, I don't think you can say

10   that, because they're not saying here's what would be a

11   stronger claim, if they're saying that they're challenging

12   agency activity, what the agencies are doing.  They would say,

13   well, look, we know there's a 50,000 refugee cap -- we're going

14   to accept that for purposes of this argument -- but you changed

15   our allocation, as a resettlement agency, from 4,000 to 2,000,

16   and that was not the right number to change it; you took our

17   number way down further than you took anyone else's number.

18   That might be a claim where you're really targeting what the

19   agency did.

20           All they're targeting are the basic implementation

21   actions that any agency would have to do if the President said,

22   okay, we're going to limit this year's refugee flow to 50,000.

23   The words that were said was it's all due to the lowered

24   ceiling.

25           And so what the agencies are doing here are ministerial

1    actions that carry out the President's directive.  So you can't

2    get around the bar on review of Presidential action under the

3    APA by pointing to those ministerial implementing actions.

4          THE COURT:  So suppose the State Department and

5    Homeland Security took the actions for resource reasons.  They

6    said we don't have enough people because of hiring freezes or

7    otherwise; we're going to reduce or even suspend screening

8    interviews for the rest of the fiscal year.  Could they

9    challenge that?

10          MR. GARG:  Your Honor, I don't believe they could.

11    They haven't pointed to any provision of law that --

12          THE COURT:  Well, let's say that they have this

13    argument that that violates the statute itself.  They're not

14    worried about the President having done anything; they're just

15    saying the statute says 110.  I'm not saying I agree this would

16    be a good theory, but assuming that's their theory, why would

17    that not be something they could challenge under the APA, that

18    the agencies have violated the statute by taking these actions?

19          MR. GARG:  Your Honor, first of all, I don't think --

20    those actions, in themselves, are not final agency action.

21    There's not a consummation of a final process in terms of did

22    an alien who was seeking refugee status actually get denied.

23    There's no final decision.  It's just a later decision because

24    processes are, in the interim, suspended.

25          As far as agency action, again, what legal consequences

1   are flowing from this?  No decision has been made one way or

2   another on a refugee applicant's application.  So what is the

3   legal consequence to the refugee from this decision that we

4   need to pause our processes for budgetary reasons or whatever

5   it may be?

6        As to the organizations themselves, they don't point

7   to -- and this gets a little bit to what was being discussed

8   before.  They don't point to any specific entitlement to I was

9   guaranteed 4,000 refugees; there was a contract there that I

10  was guaranteed to it.  They weren't given an expectation level

11  that was never guaranteed.  There's no legal consequence that

12  flows from an adjustment of that expectation level where there

13  was never a guarantee.

14       So I don't think they could claim final agency action,

15  even if you are accepting that there was some legally plausible

16  basis to say that a statute restricted the agency from changing

17  it's processes.

18            THE COURT:  So on the merits of the statute itself, I

19  assume one of your arguments is that -- and you've done the

20  brief saying that the statute doesn't prevent a change in the

21  maximum or a lowering of the maximum.  It just prevents a

22  change in the -- an increase, absent some procedural steps.

23       Is there some point though where -- I mean, let's say the

24  President said zero this year.  Would that violate the Refugee

25  Act in the sense that it goes beyond the concept that there

1  needs to be -- that Congress has said we're going to have a

2  program?

3         MR. GARG:  Your Honor, I don't believe it would

4  violate the Refugee Act.  If the President had a reason where

5  he determined it would be detrimental to the interests of the

6  United States, based on whatever information he's learned, that

7  we cannot have refugee flows this year at all, 1182(f) would

8  authorize that.  I don't see that there's any limit that he can

9  only cut it by half but not all the way.  I think 1182(f)

10 contemplates whatever the President thinks is necessary to

11 protect the national interest.

12        THE COURT:  Okay.  Thank you very much.  Let's go

13 back to the plaintiff for ten minutes.

14        **REBUTTAL ARGUMENT BY MR. COX FOR THE PLAINTIFFS**

15        MR. COX:  Thank you, Your Honor.  I just wanted to

16 address a handful of issues with regard to standing and

17 irreparable injury.

18     First, with regard to Mr. Harrison, actually, no visa has

19 been issued for him.  The record is clear.  His application has

20 been approved, but that's a very separate step from a visa

21 being issued.  The record is undisputed that the visa has not

22 been issued.  And for that reason, he won't qualify for the

23 exception in Section (3)(A) of the next Executive Order, which

24 requires that a visa to have been issued prior to, essentially,

25 12:01 a.m. tomorrow.

1          Second, with regard to HIAS, HIAS plainly will be injured

2     by this Executive Order for all the reasons explained in the

3     second Hatfield declaration.  And the argument that the

4     Government is putting forward here is actually the same

5     argument that then-Governor of Indiana Mike Pence put forward

6     in the *Exodus* case that we cited.  And for all the reasons

7     explained in that opinion and that Your Honor has explored,

8     that argument is simply wrong.

9          With regards to irreparable injury, of course the

10    definition here is an injury that can't be remedied by any

11    other way.  And in a variety of ways, irreparable injury will

12    occur at 12:01 a.m. tomorrow, absent an injunction.

13         So first, of course, we have the establishment clause

14    violation.  At 12:01 a.m. tomorrow, there will be an official

15    policy in this country, absent an injunction, condemning Islam,

16    and that can't be remedied, as courts have routinely said,

17    through any other way.

18         It certainly can't be remedied with the sort of narrow

19    injunction that the Government is proposing, where,

20    essentially, you put up a curtain over the statue of the Ten

21    Commandments when the particular plaintiffs walk by, but then

22    you take it down when anyone else is around and the plaintiff

23    is gone --

24              THE COURT:  Let me ask the question I asked Mr. Wall

25    regarding the TRO versus the PI.  I don't know if the answer is

1  different depending on the outcome but, theoretically, it

2  should be similar, in that are we ready for a preliminary

3  injunction or not or ready for a denial of a preliminary

4  injunction or not?  Is there any reason why we can't go

5  straight to that, given that there's been briefing and there

6  have been arguments one way or the other?

7            MR. COX:  I guess the one thing I would say on that,

8  Your Honor, is that we've covered a lot of ground in the

9  briefing but, of course, there are some issues that, perhaps,

10  if Your Honor thought additional briefing would be necessary,

11  then I think certainly a TRO would be appropriate in that

12  instance.

13       In the Washington case, the reason they converted it to a

14  preliminary injunction is because there was no time limit on

15  it.  And so in our view, so long as there was a time limit that

16  kept it within the confines of the rule, that -- and Your Honor

17  wanted supplemental briefing on additional issues, that it

18  would be appropriate to do a TRO first and then perhaps convert

19  it into a preliminary injunction later.

20            THE COURT:  So supplemental briefing or supplemental

21  argument.  Obviously, at that point we would come back.  But

22  otherwise, you're comfortable one way or the other?

23            MR. COX:  I think so, yes.

24            THE COURT:  Perhaps more one way than the other, but

25  you're comfortable.

1          MR. COX:  Yes, Your Honor.  We would defer to Your

2    Honor's preferences with regards to what the Court would find

3    helpful in that regard.

4          Back to irreparable injury for a moment.  The Government

5    points to the possibility of waivers as eliminating irreparable

6    injury.  But of course, that can't eliminate the equal

7    protection or establishment clause injury.  As the case law has

8    held, a discriminatory process that's set up itself inflicts

9    the injury.

10          If there was, as I mentioned on a call on Friday, a

11    special permitting process for black folks who want to live in

12    a particular neighborhood, you wouldn't say their claims not

13    ripe until after they apply and get denied.  You would say that

14    being subjected to that process itself is part and parcel with

15    the injury; and, therefore, their claims are ripe even without

16    having to go through that process.

17          And then with regards to the delay, the Government does

18    not dispute, as a factual matter, that the Executive Order will

19    prolong the times in which our plaintiffs and their families

20    will be separated.  Instead, the Government sort of asserts

21    that that's not irreparable because they're already separated,

22    which doesn't make a lot of sense in our view, particularly

23    with regards to particular plaintiffs.

24          So Mr. Mohammed, for example, who is from Somalia, his

25    family, his wife and kids, are not here yet.  They have refugee

1   applications approved, but they don't have travel documents.

2   And in the meantime, his kids are not being educated.  They're

3   not in school, and so they're missing out on vital education.

4   I think that the idea that even an additional couple of weeks

5   delay of separation, in the abstract, is irreparable.  You

6   can't remedy that with damages.

7        And when so many of the plaintiffs and the organizational

8   plaintiffs' clients are living in dangerous and deplorable

9   conditions, it's particularly irreparable.  Any additional

10  delay is irreparable.

11       And with regard to the organizational plaintiffs and

12  their clients, Your Honor, the Government asserts that you

13  can't take into account the irreparable injury to third parties

14  but hasn't actually cited any cases that support that

15  proposition.

16       Again, here the *Exodus* case is on point, where the

17  irreparable injury was to the Syrian refugee clients, and yet

18  the resettlement agency was the one asserting their rights, and

19  the court found that that injury was irreparable.

20       THE COURT:  Let me ask again on this issue -- again,

21  it's all hypothetical, but on this issue of an injunction.  I

22  understand there's another case in the Ninth Circuit on similar

23  issues.  I know you're not in that case, but the Government

24  certainly is.

25       Do you have plaintiffs in the Ninth Circuit?  I could

1   see, one way or the other, if there were conflicting opinions,

2   some confusion if courts go to the breadth of a nationwide

3   injunction in that situation.

4         MR. COX:  So none of our individual plaintiffs are in

5   the Ninth Circuit.  I believe that our organizational

6   plaintiffs both operate in some fashion in the Ninth Circuit

7   and have clients who -- I haven't confirmed this, but just

8   given the pure numbers, it seems possible that they would have

9   clients in the Ninth Circuit as well.

10      I'm getting confirmation from HIAS and IRAP that they do,

11   indeed, have clients that would be within the Ninth Circuit,

12   yes, Your Honor.

13         THE COURT:  Let me go back to an issue that Mr. Wall

14   raised, this facially legitimate bona fide standard.  Why does

15   that not apply here?

16         MR. COX:  If I would defer to Mr. Jadwat on that

17   issue.

18         THE COURT:  Okay.  Well, why don't we just switch out

19   just for the last few minutes on that.  I think that was my

20   last main question.

21         MR. COX:  Fair enough.  Thank you, Your Honor.

22      **REBUTTAL ARGUMENT BY MR. JADWAT FOR THE PLAINTIFFS**

23         MR. JADWAT:  To start there, Your Honor, on the

24   facially legitimate and bona fide question, two main points.

25      First, the Ninth Circuit explained that the origins of

1   that test and the situations in which it's been applied are

2   typically situations involving the application of a rule to a

3   particular visa --

4          THE COURT:  But not always.  Not every case is like

5   that.  Where is the line between those situations and your

6   situation, to the extent you can argue on a different side of

7   it?

8          MR. JADWAT:  Right.  I think there's a couple lines.

9   First, there is no case involving an Executive order involving

10  a claim under the establishment clause.  There's no case that's

11  on all fours with this case, where the court has applied a

12  facially legitimate and bona fide test.

13         And if you look across the variety of constitutional

14  claims that have been brought with respect to actions in the

15  immigration sphere, sometimes, very occasionally, honestly,

16  it's the facially legitimate and bona fide test.  Many other

17  situations, again, as the Ninth Circuit pointed out, it's the

18  standard constitutional analysis that you would apply to that

19  question anywhere else.

20         But the other point that I don't want to lose here is

21  that, ultimately, in our view, it doesn't matter.  If you look

22  both at Justice Kennedy's decision in *Din*, if you look at the

23  case out of the Eastern District of Virginia addressing the

24  first Executive Order, if you look at the Napolitano case out

25  of the Second Circuit, *AAR versus Napolitano,* or if you look,

1  for that matter, at *Abourezk*, the case that the Government

2  cites in their brief for a different issue, there is review

3  available under that facially legitimate and bona fide

4  standard, and what they try to read out of the standard is the

5  bona fide part.

6          THE COURT:  But on this idea that there may be some

7  constitutional challenges that fall outside of that standard,

8  again, other than saying your case doesn't fall within it, what

9  would be the line that one could draw or the principle one

10  could apply that say what types of cases fall on this side and

11  what types of cases fall on that side?

12          MR. JADWAT:  I think here, the question is -- maybe

13  I'll back into the question.  I think there is evidence here,

14  that's available at the outset of the case, that takes it out

15  of the sphere of the concerns that animate the facially

16  legitimate and bona fide standard.

17      There's no question here about us delving into what the

18  Government -- what some particular visa issuer might have been

19  thinking, or the reasons why, inside the Government, the

20  Government might have undertaken this action.

21      We're going under the establishment clause based on what

22  a reasonable observer would understand based on the facts that

23  are available to the public.

24          THE COURT:  So what's the rule then?

25          MR. JADWAT:  So I think the rule would be that the

 1   facially legitimate and bona fide standard, when it does apply,

 2   applies when there are these concerns about reaching through

 3   and into and behind government processes in order to raise the

 4   claim, but that's not what we're doing here.

 5              THE COURT:  Okay.

 6              MR. JADWAT:  There are a few other points I'd like to

 7   raise --

 8              THE COURT:  We've run out of time now, I think.  I

 9   think we've been going for quite a while.  Okay.  Well, thank

10   you very much.

11        I'll take the matter under advisement.  I appreciate

12   everyone's advocacy, both in the briefs and in the session

13   today.  And again, I'll try to issue a written ruling,

14   hopefully today, but not necessarily.

15        Is there anything else we should discuss on this case

16   while we're here as a matter of process?

17        Okay, thank you very much.

18        (The hearing concluded at 11:15 a.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3        I, Cindy S. Davis, Federal Official Court Reporter in and

4   for the United States District Court for the Southern District

5   of Maryland, do hereby certify that I reported, by machine

6   shorthand in my official capacity, the proceedings had in the

7   case of International Refugee Assistance Project, et al.,

8   versus Donald J. Trump, et al., case number 8:17-cv-00361-TDC,

9   in said court on March 15, 2017.

10       I further certify that the foregoing 74 pages constitute

11  the official transcript of said proceedings, as taken from my

12  machine shorthand notes to the best of my ability.

13       In witness whereof, I have hereto subscribed my name this

14  16th day of March, 2017.

15

16

17

18

19                        *Cindy S. Davis*

20       _____
                          CINDY S. DAVIS, RPR
21                        FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**1**

**1** [3] - 21:11, 30:24, 31:7
**110** [1] - 64:15
**110,000** [5] - 25:5, 25:12, 25:18, 25:22, 27:6
**1152** [2] - 49:6, 55:9
**1152(a)(1)(B** [1] - 19:8
**1152(a)(2** [1] - 53:5
**1182(a** [1] - 55:10
**1182(f** [7] - 49:12, 49:19, 51:6, 53:11, 55:1, 66:7, 66:9
**1182(f)** [2] - 51:23, 54:7
**1185(a** [2] - 50:23, 54:1
**11:15** [1] - 74:18
**12** [2] - 13:6, 21:15
**12:01** [5] - 20:14, 30:18, 66:25, 67:12, 67:14
**13** [1] - 23:16
**13th** [1] - 24:6
**14** [1] - 21:17
**15** [1] - 75:9
**16th** [1] - 75:14
**18** [1] - 23:17

**2**

**2** [2] - 23:10, 33:18
**2's** [2] - 33:22, 33:24
**2,000** [1] - 63:15
**20** [1] - 3:4
**2017** [2] - 75:9, 75:14
**202** [9] - 14:11, 14:19, 16:21, 16:25, 17:2, 17:15, 18:12, 19:25, 20:22
**202's** [1] - 18:10
**212** [2] - 17:17, 18:11
**212(f** [8] - 17:20, 17:23, 18:16, 18:17, 37:24, 49:20, 49:25, 50:4
**212(f)** [2] - 14:15, 28:15
**24** [1] - 23:17
**29** [1] - 3:5

**3**

**3** [1] - 21:15
**3)(A** [1] - 66:23
**30** [1] - 5:11
**30-day** [1] - 47:25

**30th** [1] - 24:8
**35** [1] - 28:24

**4**

**4,000** [2] - 63:15, 65:9
**40** [2] - 28:21, 28:25
**400** [1] - 27:13
**45** [1] - 21:11

**5**

**5** [1] - 3:3
**5(d** [2] - 5:22, 25:8
**50** [1] - 13:19
**50,000** [5] - 5:21, 26:7, 27:15, 63:13, 63:22
**53** [1] - 21:17

**6**

**6(d** [1] - 25:9
**62** [1] - 3:6
**66** [1] - 3:7

**7**

**70-plus** [1] - 13:15
**71** [1] - 3:8
**74** [1] - 75:10

**8**

**8:17-cv-00361-TDC** [1] - 75:8

**9**

**90** [2] - 19:14, 52:15

**A**

**a.m** [4] - 66:25, 67:12, 67:14, 74:18
**AAR** [1] - 72:25
**ability** [5] - 18:16, 18:17, 26:10, 59:24, 75:12
**able** [5] - 10:14, 32:25, 36:19, 37:7, 38:23
**Abourezk** [1] - 73:1
**abroad** [1] - 56:16
**absent** [4] - 16:14, 65:22, 67:12, 67:15
**absolutely** [1] - 10:18
**abstract** [1] - 70:5
**accept** [2] - 39:19,

63:14
**accepting** [2] - 36:16, 65:15
**Access** [1] - 23:13
**accommodate** [1] - 12:7
**accomplish** [1] - 44:18
**account** [4] - 10:14, 11:23, 12:14, 70:13
**achieve** [1] - 7:21
**acknowledge** [2] - 11:11, 44:14
**ACLU** [4] - 4:8, 4:14, 4:17, 4:21
**act** [2] - 40:21, 41:8
**Act** [12] - 20:22, 23:8, 23:9, 23:18, 27:19, 28:11, 28:14, 28:16, 62:21, 65:25, 66:4
**action** [31] - 10:4, 11:12, 15:5, 15:17, 15:18, 16:1, 17:20, 23:22, 23:25, 24:10, 24:12, 24:13, 25:1, 27:20, 36:23, 36:24, 39:25, 40:3, 41:9, 41:10, 41:18, 42:10, 43:1, 57:25, 60:5, 63:4, 64:2, 64:20, 64:25, 65:14, 73:20
**actionable** [1] - 51:17
**actions** [14] - 17:16, 19:9, 23:24, 24:21, 28:3, 62:24, 63:1, 63:21, 64:1, 64:3, 64:5, 64:18, 64:20, 72:14
**activities** [1] - 63:4
**activity** [5] - 20:2, 52:15, 54:16, 59:1, 63:12
**actual** [4] - 10:1, 13:22, 50:11, 60:15
**add** [2] - 52:13, 62:13
**added** [1] - 52:10
**adding** [1] - 8:6
**addition** [5] - 8:11, 8:14, 13:12, 21:21, 38:7
**additional** [8] - 8:7, 10:21, 48:19, 50:1, 68:10, 68:17, 70:4, 70:9
**address** [9] - 29:3, 29:8, 29:13, 45:23, 45:24, 48:6, 55:11, 59:25, 66:16

**addressed** [5] - 10:10, 30:1, 30:8, 45:7, 45:25
**addressing** [3] - 29:8, 60:6, 72:23
**adhere** [1] - 28:10
**adjudicate** [1] - 60:24
**adjustment** [1] - 65:12
**administration** [4] - 9:19, 18:4, 44:24, 45:13
**Administration** [8] - 38:9, 38:17, 39:2, 39:9, 43:11, 46:20, 46:24, 46:25
**admission** [5] - 18:20, 18:22, 49:5, 49:24, 57:7
**admissions** [2] - 24:20, 28:8
**admit** [1] - 25:5
**admitted** [1] - 26:11
**advance** [1] - 31:6
**advise** [1] - 24:7
**advised** [1] - 24:17
**advisement** [1] - 74:11
**advocacy** [1] - 74:12
**affected** [1] - 33:9
**affecting** [1] - 58:4
**afresh** [1] - 12:13
**agencies** [4] - 24:15, 28:6, 28:9, 63:12, 63:25, 64:18
**agency** [21] - 19:15, 23:22, 23:25, 24:9, 24:12, 24:13, 24:19, 24:21, 27:20, 28:3, 28:15, 63:4, 63:12, 63:15, 63:19, 63:21, 64:20, 64:25, 65:14, 65:16, 70:18
**agency's** [1] - 24:22
**agents** [1] - 14:1
**ago** [1] - 10:6
**agree** [4] - 18:20, 31:17, 41:7, 64:15
**ahead** [2] - 29:17, 36:2
**aimed** [1] - 7:21, 54:20
**aims** [1] - 44:18
**al** [4] - 4:4, 75:7, 75:8
**Al** [1] - 46:23
**alien** [2] - 35:4, 64:22
**aliens** [8] - 30:9, 31:25, 33:9, 37:9, 51:11, 53:12, 56:16,

57:3
**alleged** [3] - 9:24, 12:16, 56:24
**allocation** [1] - 63:15
**allow** [4] - 15:25, 39:17, 50:5, 60:19
**allowed** [1] - 58:6
**allowing** [1] - 20:8
**allows** [2] - 19:25, 49:20
**almost** [1] - 31:17
**alone** [1] - 35:6
**altering** [1] - 49:21
**ambiguous** [1] - 52:24
**Amendment** [2] - 31:19, 31:20
**amicus** [3] - 9:1, 9:14, 9:17
**analysis** [6] - 9:15, 11:11, 34:17, 42:5, 57:15, 72:18
**analyze** [1] - 63:8
**animate** [1] - 73:15
**annual** [1] - 28:8
**answer** [1] - 67:25
**anti** [1] - 21:12
**anti-Muslim** [1] - 21:12
**anyway** [1] - 61:5
**APA** [6] - 23:20, 27:20, 27:25, 62:23, 64:3, 64:17
**apparent** [1] - 6:6
**appealed** [1] - 61:5
**appear** [1] - 48:9
**applicability** [1] - 62:23
**applicant** [2] - 23:2, 48:18
**applicant's** [1] - 65:2
**applicants** [2] - 16:14, 17:5
**application** [9] - 9:3, 15:11, 15:12, 30:13, 34:13, 39:17, 65:2, 66:19, 72:2
**applications** [5] - 26:19, 56:15, 56:18, 57:18, 70:1
**applied** [8] - 40:12, 40:16, 56:21, 60:9, 60:14, 60:23, 72:1, 72:11
**applies** [5] - 23:21, 42:13, 43:19, 49:7, 74:2
**apply** [9] - 27:20, 34:14, 49:6, 49:9, 69:13, 71:15, 72:18,

73:10, 74:1
**appreciate** [2] -
55:13, 74:11
**approach** [3] - 8:22,
50:17, 51:16
**appropriate** [3] -
61:3, 68:11, 68:18
**approved** [4] - 23:14,
33:21, 66:20, 70:1
**approximate** [1] -
52:8
**Arabia** [1] - 23:11
**area** [2] - 16:21,
58:24
**arguably** [2] - 37:25,
56:19
**argue** [1] - 72:6
**argued** [2] - 41:13,
61:24
**arguing** [4] - 12:15,
32:9, 32:11, 41:14
**Argument** [5] - 3:3,
3:4, 3:6, 3:7, 3:8
**ARGUMENT** [6] -
5:18, 20:10, 29:1,
62:17, 66:14, 71:22
**argument** [23] - 3:5,
5:20, 9:23, 12:17,
15:2, 19:7, 27:19,
27:24, 28:9, 29:7,
33:12, 36:4, 42:19,
48:6, 51:25, 55:10,
58:5, 63:14, 64:13,
67:3, 67:5, 67:8,
68:21
**arguments** [4] -
31:14, 51:14, 65:19,
68:6
**Arjun** [2] - 5:3, 62:18
**Article** [5] - 33:7,
35:19, 37:20, 57:21,
58:17
**articulated** [1] - 30:5
**as-applied** [3] - 60:9,
60:14, 60:23
**aside** [2] - 7:8, 37:2
**assert** [2] - 23:5,
47:11
**asserted** [1] - 47:11
**asserting** [1] - 70:18
**asserts** [2] - 69:20,
70:12
**assess** [1] - 52:21
**assessments** [1] -
56:11
**Assistance** [2] - 4:4,
75:7
**associated** [2] -
11:18, 33:5
**assume** [2] - 7:9,

65:19
**assuming** [4] -
16:22, 37:3, 55:16,
64:16
**attack** [1] - 11:18
**attempting** [1] -
47:21
**attempts** [1] - 26:1
**Attorney** [3] - 44:25,
52:25, 53:2
**attorney** [1] - 29:24
**audience** [2] - 5:8,
6:17
**authority** [14] -
24:10, 27:23, 27:24,
41:25, 50:5, 50:6,
51:7, 52:7, 52:14,
53:8, 53:12, 53:15,
54:15, 55:7
**authorize** [1] - 66:8
**authorized** [1] -
28:15
**authorizes** [1] -
17:17
**available** [6] - 6:4,
7:2, 22:16, 73:3,
73:14, 73:23
**aware** [4] - 47:19,
20:4, 20:13, 26:4

## B

**B)** [1] - 19:19
**backfill** [1] - 11:4
**background** [1] -
19:17
**backlog** [1] - 33:22
**bad** [1] - 10:22
**ban** [20] - 8:17, 12:3,
12:4, 12:5, 12:17,
12:18, 13:4, 13:11,
13:12, 13:23, 14:24,
15:15, 19:15, 19:16,
37:24, 38:1, 38:4,
43:14
**banned** [3] - 13:14,
13:16, 15:10
**banning** [4] - 13:3,
13:23, 14:2
**bar** [4] - 18:7, 18:18,
49:20, 64:2
**barring** [7] - 13:1,
14:22, 14:23, 14:24,
15:2, 18:5, 50:6
**based** [13] - 11:13,
22:8, 36:9, 38:5,
42:18, 47:10, 54:2,
54:20, 60:21, 66:6,
73:21, 73:22
**basic** [1] - 54:16

63:20
**basis** [10] - 8:1, 18:6,
38:18, 39:3, 39:10,
43:21, 44:5, 46:3,
47:1, 65:16
**battle** [1] - 47:5
**begin** [1] - 5:25
**begun** [1] - 47:17
**behalf** [4] - 22:20,
32:5, 35:7, 57:23
**behind** [7] - 8:12,
40:4, 44:4, 44:5,
53:14, 55:6, 74:3
**benefit** [1] - 59:19
**best** [6] - 11:22,
12:8, 20:20, 22:1,
31:4, 75:12
**better** [1] - 16:15
**between** [10] - 14:15,
14:17, 15:13, 18:24,
25:13, 45:11, 48:7,
49:5, 55:24, 72:5
**beyond** [8] - 5:14,
21:20, 31:22, 39:1,
39:9, 41:1, 42:19,
65:25
**bill** [1] - 6:18
**biometric** [1] - 56:11
**bit** [5] - 19:2, 30:22,
37:22, 42:21, 65:7
**black** [1] - 69:11
**blind** [2] - 6:6, 6:24
**blinded** [1] - 7:1
**blockade** [1] - 54:10
**blocking** [1] - 18:6
**body** [1] - 40:19
**bomb** [1] - 51:19
**bona** [11] - 40:4,
40:11, 42:4, 71:14,
71:24, 72:12, 72:16,
73:3, 73:5, 73:16,
74:1
**booked** [2] - 24:8,
26:25
**bookings** [1] - 27:13
**Border** [1] - 49:24
**border** [6] - 18:8,
23:12, 49:24, 50:10,
50:14, 53:9
**born** [1] - 12:13
**borrowed** [1] - 46:25
**branch** [2] - 9:19,
57:19
**Branch** [3] - 25:16,
26:1, 27:3
**breach** [2] - 36:22,
36:25
**breadth** [1] - 71:2
**break** [1] - 33:12
**brief** [13] - 9:1, 9:14,

9:17, 12:17, 29:7,
31:11, 33:15, 38:21,
49:1, 56:9, 65:20,
73:2
**briefed** [2] - 29:11,
61:24
**briefing** [7] - 20:15,
23:11, 68:5, 68:9,
68:10, 68:17, 68:20
**briefs** [1] - 74:12
**bring** [7] - 51:19,
57:3, 58:19, 58:21,
59:24, 60:14, 60:23
**broad** [2] - 55:25,
58:8
**broader** [1] - 60:17
**brought** [1] - 72:14
**budgetary** [1] - 65:4
**burden** [1] - 62:8
**BY** [6] - 5:18, 20:10,
29:1, 62:17, 66:14,
71:22

## C

**cabinet** [1] - 41:11
**cabinet-level** [1] -
41:11
**candidate** [3] -
44:23, 45:12, 46:13
**cannot** [5] - 15:24,
15:25, 18:7, 49:23,
66:7
**cap** [5] - 25:12, 27:2,
29:10, 29:13, 63:13
**capacity** [1] - 75:6
**cards** [1] - 14:23
**carry** [1] - 64:1
**carrying** [1] - 28:3
**Carter** [1] - 54:4
**case** [46] - 8:6, 8:9,
8:10, 14:16, 14:18,
18:1, 18:3, 20:21,
21:5, 21:7, 22:1,
22:12, 25:7, 26:14,
28:6, 32:8, 34:9,
35:22, 40:12, 42:9,
43:3, 44:13, 52:13,
54:14, 54:25, 55:1,
58:4, 59:20, 67:6,
68:13, 69:7, 70:16,
70:22, 70:23, 72:4,
72:9, 72:10, 72:11,
72:23, 72:24, 73:1,
73:8, 73:14, 74:15,
75:7, 75:8
**cases** [22] - 6:14,
17:19, 20:1, 21:21,
28:2, 34:11, 40:20,
40:21, 41:2, 42:16,

42:23, 42:24, 43:24,
47:6, 52:14, 52:17,
59:3, 59:16, 70:14,
73:10, 73:11
**cast** [1] - 7:8
**casting** [1] - 54:21
**catch** [1] - 49:13
**catch-all** [1] - 49:13
**catchall** [1] - 51:24
**categories** [1] -
45:21
**caused** [2] - 36:14,
36:20
**ceiling** [4] - 26:17,
26:20, 27:14, 63:24
**Center** [4] - 4:11,
4:13, 4:19, 20:12
**certain** [2] - 23:13,
38:10, 47:19, 50:21,
54:3
**certainly** [16] - 22:3,
23:5, 23:10, 24:14,
24:21, 24:22, 27:10,
29:7, 37:15, 39:1,
54:1, 58:4, 58:8,
67:18, 68:11, 70:24
**CERTIFICATE** [1] -
75:1
**certify** [2] - 75:5,
75:10
**challenge** [11] - 30:5,
35:4, 35:5, 36:24,
56:15, 57:17, 60:15,
60:23, 63:7, 64:9,
64:17
**challenged** [1] - 63:1
**challenges** [3] -
56:21, 60:9, 73:7
**challenging** [8] -
23:22, 32:19, 32:20,
45:19, 56:8, 63:3,
63:6, 63:11
**change** [10] - 26:8,
26:12, 27:2, 49:11,
50:5, 52:23, 62:11,
63:16, 65:20, 65:22
**changed** [6] - 10:14,
25:14, 27:5, 45:20,
46:18, 63:14
**changes** [1] - 30:16
**changing** [2] - 53:21,
65:16
**chaotic** [1] - 50:17
**check** [2] - 48:3, 49:2
**checks** [2] - 24:2,
62:25
**Cindy** [1] - 75:3
**CINDY** [1] - 75:20
**Circuit** [13] - 29:21,
30:14, 58:10, 61:4,

70:22, 70:25, 71:5,
71:6, 71:9, 71:11,
71:25, 72:17, 72:25
  **Circuit's** [2] - 30:1,
58:2
  **circumstance** [2] -
31:17, 51:24
  **circumstances** [2] -
13:18, 58:8
  **circumvent** [1] - 26:1
  **circumvention** [1] -
26:5
  **cite** [3] - 28:2, 34:9,
52:5
  **cited** [4] - 24:11,
41:20, 67:6, 70:14
  **cites** [1] - 73:2
  **citizen** [1] - 22:18
  **citizens** [1] - 12:18
  **city** [2] - 40:1, 43:4
  **Civil** [1] - 4:3
  **claim** [27] - 9:3,
20:24, 20:25, 21:25,
22:2, 22:23, 22:24,
23:15, 31:2, 31:20,
32:23, 32:25, 33:17,
34:5, 35:10, 35:16,
35:17, 35:22, 37:11,
46:12, 47:4, 57:19,
63:11, 63:18, 65:14,
72:10, 74:4
  **claimed** [2] - 32:1,
47:1
  **claiming** [2] - 31:23,
57:11
  **claims** [8] - 5:24,
20:21, 29:6, 32:4,
62:6, 69:12, 69:15,
72:14
  **clarified** [1] - 30:12
  **clarify** [2] - 16:16,
28:24
  **class** [6] - 33:9,
49:15, 51:11, 53:12,
57:25, 60:5
  **classes** [1] - 54:3
  **clause** [30] - 7:8,
18:2, 20:22, 20:23,
29:4, 31:13, 31:24,
32:1, 33:3, 33:10,
37:23, 40:9, 40:13,
40:20, 42:9, 42:18,
43:7, 44:11, 45:24,
46:1, 46:10, 46:12,
57:15, 57:18, 58:23,
58:25, 67:13, 69:7,
72:10, 73:21
  **clear** [21] - 10:18,
10:25, 12:20, 13:8,
14:9, 16:2, 19:13,

23:21, 35:21, 36:9,
38:8, 40:3, 40:20,
51:14, 52:20, 54:9,
54:22, 60:12, 62:11,
66:19
  **clearer** [2] - 45:16
  **clearly** [7] - 8:21,
16:13, 22:23, 43:1,
49:9, 54:20, 56:18
  **client's** [1] - 32:5
  **clients** [15] - 15:10,
21:2, 22:5, 22:15,
25:9, 26:23, 32:25,
35:7, 70:8, 70:12,
70:17, 71:7, 71:9,
71:11
  **clients'** [1] - 22:4
  **close** [2] - 56:16,
57:5
  **closely** [1] - 52:8
  **codified** [2] - 24:16,
53:1
  **cognizable** [7] -
34:24, 35:23, 36:12,
37:6, 37:9, 46:6,
46:10
  **coherent** [1] - 12:23
  **colleague** [1] - 19:3
  **colleagues** [1] -
40:15
  **collectively** [1] -
20:17
  **combined** [1] - 13:10
  **comfortable** [2] -
68:22, 68:25
  **comfortably** [1] -
47:8
  **coming** [7] - 9:23,
11:19, 22:12, 43:20,
45:11, 54:11, 61:17
  **Commandment** [2] -
44:3, 59:2
  **Commandments** [3]
- 6:21, 59:18, 67:21
  **committed** [1] -
51:17
  **compares** [1] - 17:24
  **compelling** [2] -
13:25, 21:6
  **compilation** [1] -
14:7
  **compiled** [1] - 8:23
  **complaining** [1] -
59:23
  **complaint** [1] - 23:25
  **complete** [1] - 38:1
  **completely** [3] - 8:1,
9:21, 41:7
  **complicated** [1] -
58:24

  **concedes** [1] - 46:21
  **concept** [3] - 13:1,
55:20, 65:25
  **concern** [5] - 10:11,
30:14, 45:8, 46:1,
46:23
  **concerned** [1] -
45:17
  **concerning** [1] -
53:3
  **concerns** [14] - 8:15,
9:5, 29:22, 30:1, 30:3,
30:7, 39:12, 40:10,
43:7, 45:7, 45:24,
73:15, 74:2
  **conclude** [2] - 7:14,
7:17
  **concluded** [1] -
74:18
  **conclusion** [3] -
16:23, 36:18, 39:21
  **concrete** [2] - 35:19,
61:17
  **condemnation** [2] -
21:13, 21:22
  **condemned** [1] -
21:19
  **condemning** [1] -
67:15
  **conditions** [4] -
10:16, 39:11, 46:18,
70:9
  **conduct** [3] - 7:7,
36:14, 42:25
  **confer** [3] - 40:15,
61:12, 61:21
  **conference** [1] -
44:10
  **confines** [1] - 68:16
  **confirmation** [1] -
71:10
  **confirmed** [1] - 71:7
  **conflating** [1] - 13:8
  **conflation** [1] - 14:9
  **conflict** [1] - 25:2
  **conflicting** [1] - 71:1
  **confusion** [1] - 71:2
  **Congress** [2] -
46:20, 66:1
  **connection** [1] -
56:16
  **consequence** [2] -
65:3, 65:11
  **consequences** [3] -
24:22, 26:22, 64:25
  **consider** [5] - 6:9,
7:9, 41:15, 41:17,
45:16
  **consideration** [1] -
26:4

  **considered** [4] -
6:16, 6:19, 41:23,
41:24
  **considering** [1] -
58:1
  **constant** [1] - 22:21
  **constitute** [1] - 75:10
  **Constitution** [2] -
18:15, 44:24
  **constitutional** [9] -
5:24, 53:7, 53:8,
53:12, 53:15, 56:18,
72:13, 72:18, 73:7
  **constitutionally** [1] -
59:21
  **consular** [4] - 32:7,
32:12, 32:16, 35:3
  **consultation** [1] -
47:17
  **consulted** [1] - 44:24
  **consulting** [2] -
29:24, 41:11
  **consults** [1] - 45:13
  **consummation** [1] -
64:21
  **contemplates** [1] -
66:10
  **contention** [2] -
14:19, 15:9
  **context** [4] - 8:4,
42:2, 42:18, 47:2
  **contexts** [1] - 40:16
  **contiguous** [1] -
53:11
  **continue** [1] - 50:9
  **continues** [2] - 7:19,
27:3
  **continuing** [1] -
48:15
  **contract** [1] - 36:22,
36:25, 65:9
  **contrary** [2] - 16:7,
28:7
  **convert** [2] - 61:22,
68:18
  **converted** [3] -
23:14, 61:13, 68:13
  **converts** [1] - 57:24,
60:5
  **corners** [1] - 41:14
  **correct** [7] - 35:10,
37:23, 38:2, 41:16,
45:3, 47:15, 48:13
  **council** [2] - 40:1,
43:4
  **counsel** [6] - 4:7,
5:8, 30:24, 60:17,
60:18, 63:2
  **Counsel** [2] - 54:2,
54:13

  **count** [1] - 24:9
  **counter** [1] - 27:24
  **countries** [24] - 8:25,
9:4, 9:6, 12:19, 13:16,
14:25, 15:20, 16:9,
16:14, 17:5, 23:7,
38:11, 38:13, 38:15,
38:19, 38:22, 39:3,
39:10, 43:19, 43:20,
46:4, 46:17, 46:19,
46:22
  **country** [21] - 8:17,
9:21, 11:20, 11:22,
25:25, 33:18, 37:24,
38:1, 39:4, 39:5,
39:18, 48:21, 48:25,
49:23, 50:11, 54:11,
55:19, 59:25, 67:15
  **country's** [1] - 55:5
  **couple** [12] - 31:1,
33:25, 34:4, 37:1,
37:14, 37:16, 38:4,
53:22, 56:3, 62:5,
70:4, 72:8
  **course** [15] - 13:21,
18:14, 21:20, 23:1,
31:8, 31:20, 31:25,
32:22, 37:18, 40:16,
46:19, 67:9, 67:13,
68:9, 69:6
  **COURT** [122] - 4:22,
5:7, 5:23, 6:8, 7:9,
7:24, 8:19, 9:6, 9:9,
9:13, 9:18, 10:3,
10:20, 11:9, 12:15,
12:24, 13:25, 14:10,
14:13, 15:1, 15:5,
15:17, 15:23, 16:4,
16:20, 17:1, 17:7,
17:10, 17:19, 17:22,
18:5, 18:20, 19:2,
19:5, 20:1, 20:6,
20:19, 21:4, 21:25,
22:7, 22:11, 23:2,
23:8, 23:18, 24:3,
24:9, 24:25, 25:15,
26:5, 27:1, 27:18,
28:18, 28:20, 29:15,
29:20, 30:3, 31:13,
32:9, 32:19, 34:8,
34:20, 35:9, 35:12,
35:15, 35:24, 36:13,
37:4, 37:22, 38:14,
39:19, 40:11, 41:1,
41:13, 41:19, 42:16,
43:13, 44:8, 44:16,
45:2, 45:19, 46:5,
47:10, 47:23, 48:5,
48:20, 49:19, 50:4,
50:17, 51:2, 51:25,

53:18, 53:23, 54:14, 55:12, 56:10, 57:13, 58:2, 58:23, 60:1, 61:1, 61:9, 61:23, 62:12, 62:16, 62:20, 63:6, 64:4, 64:12, 65:18, 66:12, 67:24, 68:20, 68:24, 70:20, 71:13, 71:18, 72:4, 73:6, 73:24, 74:5, 74:8, 75:21
**court** [8] - 13:14, 17:19, 31:21, 51:6, 60:19, 70:19, 72:11, 75:9
**Court** [40] - 4:3, 5:25, 6:5, 6:8, 6:16, 6:19, 6:24, 7:7, 8:5, 12:6, 29:8, 31:4, 34:11, 37:17, 41:22, 44:3, 47:7, 50:7, 50:15, 51:8, 54:8, 54:9, 54:12, 54:21, 56:4, 56:6, 57:1, 57:10, 57:24, 58:17, 58:18, 59:20, 59:22, 59:25, 60:4, 61:10, 61:14, 69:2, 75:3, 75:4
**Court's** [3] - 6:15, 12:8, 26:2
**courthouse** [3] - 40:2, 59:5, 59:18
**COURTROOM** [1] - 4:2
**courts** [12] - 7:22, 34:17, 34:23, 40:4, 51:22, 53:10, 55:6, 56:22, 58:1, 60:6, 67:16, 71:2
**Courts** [6] - 6:22, 7:12, 31:16, 31:18, 33:6, 53:14
**courts'** [1] - 42:5
**cover** [1] - 58:10
**covered** [10] - 31:12, 32:12, 33:16, 49:8, 49:25, 53:20, 54:16, 58:9, 61:25, 68:8
**covering** [1] - 55:15
**covers** [3] - 30:8, 30:9, 57:4
**Cox** [6] - 3:4, 3:7, 4:10, 5:20, 20:7, 20:11
**COX** [27] - 4:10, 20:10, 20:11, 20:23, 21:9, 22:2, 22:10, 22:14, 23:4, 23:9, 23:24, 24:5, 24:11, 25:7, 25:20, 26:13,

27:7, 28:1, 28:19, 66:14, 66:15, 68:7, 68:23, 69:1, 71:4, 71:16, 71:21
**crack** [1] - 58:13
**craft** [1] - 57:1
**created** [3] - 12:22, 43:15, 43:17
**credible** [2] - 11:15, 11:17
**crime** [1] - 22:22
**crisis** [2] - 51:4, 54:21
**criteria** [1] - 9:5
**critically** [1] - 56:2
**criticized** [1] - 39:6
**Cuban** [2] - 38:4, 54:6
**current** [2] - 25:8, 48:19
**curtain** [1] - 67:20
**Customs** [1] - 49:24
**cut** [2] - 62:9, 66:9
**cuts** [1] - 23:15

### D

**dab** [1] - 32:16
**damages** [1] - 70:6
**danger** [3] - 13:9, 13:10
**dangerous** [2] - 13:1, 70:8
**Daniel** [2] - 4:14, 5:5
**David** [1] - 4:20
**Davis** [1] - 75:3
**DAVIS** [1] - 75:20
**days** [3] - 19:14, 31:1, 52:15
**deadlines** [1] - 48:2
**deal** [1] - 7:22
**dealing** [3] - 47:19, 54:14, 54:18
**decide** [3] - 37:17, 56:22, 60:15
**decides** [2] - 19:16, 61:19
**deciding** [1] - 16:12
**decision** [9] - 15:11, 19:23, 24:23, 64:23, 65:1, 65:3, 72:22
**decision-making** [1] - 24:23
**decisions** [1] - 24:4
**declaration** [3] - 21:11, 21:16, 67:3
**decrease** [1] - 26:11
**deemed** [2] - 51:11, 52:11
**defend** [1] - 44:23

**Defendant** [1] - 5:6
**Defendants** [2] - 3:5, 3:6
**DEFENDANTS** [2] - 29:1, 62:17
**defendants** [3] - 5:4, 5:6, 62:19
**defendants'** [1] - 36:14
**defer** [4] - 7:12, 29:18, 69:1, 71:16
**deference** [2] - 52:25, 53:6
**define** [1] - 34:13
**defined** [2] - 18:22, 20:2
**definition** [3] - 49:11, 52:22, 67:10
**degree** [5] - 7:12, 37:11, 45:22, 48:6, 48:9
**degrees** [1] - 35:7
**delay** [8] - 21:24, 32:15, 50:20, 53:20, 69:17, 70:5, 70:10
**delayed** [1] - 50:21
**delegated** [1] - 28:6
**delving** [1] - 73:17
**demonstrate** [4] - 31:11, 31:22, 35:18, 35:19
**demonstrates** [1] - 18:3
**denial** [4] - 22:25, 32:15, 33:3, 68:3
**denied** [7] - 33:1, 48:20, 48:25, 56:21, 60:14, 64:22, 69:13
**deny** [1] - 17:5
**Department** [12] - 5:1, 5:4, 8:23, 19:22, 24:1, 24:6, 24:14, 24:18, 47:13, 48:15, 53:18, 64:4
**depended** [1] - 50:12
**deplorable** [1] - 70:8
**deprivation** [1] - 22:25
**DEPUTY** [1] - 4:2
**designed** [1] - 45:18
**despite** [1] - 30:15
**detail** [1] - 62:2
**detain** [2] - 51:10, 53:9
**determination** [1] - 32:20, 55:3
**determine** [1] - 38:24
**determined** [2] - 53:13, 66:5
**determines** [2] -

9:19, 49:14
**detrimental** [1] - 66:5
**developed** [1] - 56:22
**DHS** [3] - 8:19, 8:20, 33:20
**difference** [5] - 14:15, 14:16, 14:17, 45:11, 59:15
**different** [20] - 10:15, 15:25, 16:10, 18:8, 18:21, 20:18, 26:2, 27:11, 32:14, 38:20, 46:15, 49:22, 55:21, 57:14, 58:9, 59:14, 63:8, 68:1, 72:6, 73:2
**differently** [1] - 23:6
**difficult** [1] - 61:24
**dilute** [1] - 8:8
**Din** [2] - 42:7, 72:22
**dire** [1] - 22:20
**Direct** [1] - 23:13
**direction** [1] - 43:6
**directive** [3] - 24:4, 24:14, 64:1
**directly** [3] - 29:25, 33:8, 43:1
**disagree** [1] - 6:10
**disagrees** [1] - 57:10
**discriminates** [1] - 33:6
**discriminatory** [2] - 17:24, 69:8
**discuss** [1] - 74:15
**discussed** [1] - 65:7
**discussing** [1] - 41:23
**disfavor** [1] - 6:3
**disfavoring** [1] - 32:11
**disparate** [1] - 46:5
**display** [5] - 6:21, 8:7, 8:9, 44:3, 59:3
**displays** [1] - 8:10
**disproportionate** [1] - 13:21
**dispute** [3] - 10:25, 15:13, 69:18
**disputes** [1] - 6:3
**disruptive** [1] - 25:21
**distinction** [11] - 39:10, 40:7, 44:1, 44:16, 46:24, 46:25, 48:7, 49:4, 50:12, 50:15, 54:20
**distinctions** [8] - 18:23, 38:5, 38:6, 40:6, 42:15, 43:21, 44:20, 47:3

**distinguish** [1] - 46:3
**District** [4] - 58:16, 72:23, 75:4
**dividing** [1] - 5:20
**divorce** [2] - 8:9, 8:12
**doctrinally** [1] - 22:14
**doctrine** [2] - 32:7, 35:3
**document** [3] - 17:11, 33:20, 41:15
**documents** [2] - 24:3, 70:1
**Doe** [8] - 21:10, 21:15, 23:9, 30:24, 31:7, 33:18, 33:22, 33:24
**Donald** [2] - 4:4, 75:8
**done** [8] - 8:6, 16:9, 24:24, 37:25, 39:2, 51:2, 64:14, 65:19
**door** [2] - 16:8, 59:8
**doubling** [1] - 43:4
**doubt** [1] - 53:4
**down** [12] - 18:25, 25:17, 27:9, 33:12, 43:5, 48:11, 51:8, 59:3, 59:4, 59:5, 63:17, 67:22
**draw** [10] - 40:6, 40:7, 40:23, 42:6, 43:21, 43:25, 44:20, 44:21, 50:15, 73:9
**drawn** [2] - 47:1, 54:19
**draws** [2] - 42:14, 47:3
**drew** [2] - 38:4, 38:6
**driving** [1] - 21:12
**dual** [2] - 38:14, 38:16
**due** [7] - 27:14, 30:3, 30:5, 45:23, 48:1, 58:3, 63:23
**during** [6] - 6:17, 31:11, 33:15, 44:10, 48:17, 49:1

### E

**e-mail** [2] - 27:13, 27:15
**e-mailed** [1] - 24:7
**e-mails** [1] - 24:5
**easier** [1] - 35:22
**easiest** [1] - 21:7
**Eastern** [1] - 72:23
**educated** [1] - 70:2
**education** [1] - 70:3

**Edwin** [1] - 4:25
**effect** [21] - 7:22,
11:5, 13:12, 13:15,
15:20, 16:18, 17:14,
18:10, 20:14, 21:23,
26:9, 30:18, 31:6,
47:12, 47:22, 48:10,
48:16, 59:6, 60:19,
61:6
**effectively** [6] - 27:2,
28:5, 28:13, 34:14,
57:24, 60:5
**effectuate** [2] - 13:4,
24:3
**effectuating** [1] -
14:24
**effort** [1] - 8:5
**either** [6] - 11:9,
17:24, 34:2, 48:10,
52:10, 61:9
**elected** [2] - 12:2,
12:3
**eligible** [3] - 31:9,
48:18, 57:7
**eliminate** [1] - 69:6
**eliminating** [1] - 69:5
**embassy** [1] - 16:10
**emergency** [7] -
30:19, 37:20, 49:22,
50:8, 57:8, 61:10,
62:10
**emphasize** [1] - 43:3
**enacted** [1] - 54:4
**encompassed** [1] -
19:19
**end** [6] - 5:25, 9:24,
20:5, 26:11, 28:12,
42:5
**endorsing** [1] - 59:7
**enforce** [1] - 47:21
**enjoin** [4] - 25:15,
27:1, 32:22, 56:7
**enjoined** [4] - 17:6,
47:13, 47:20, 47:24
**enjoining** [4] - 17:10,
17:11, 17:13, 26:9
**ensuing** [1] - 13:16
**ensure** [2] - 38:22,
39:14
**enter** [12] - 13:20,
33:22, 37:14, 52:4,
57:2, 58:6, 58:11,
58:17, 59:12, 59:13,
59:22, 62:10
**enters** [1] - 60:4
**entire** [5] - 27:17,
32:22, 56:7, 56:8,
56:13
**entirely** [2] - 43:14,
48:4

**entitled** [3] - 16:22,
52:25, 59:17
**entitlement** [1] - 65:8
**entry** [21] - 14:14,
14:21, 14:22, 14:23,
15:25, 18:7, 18:20,
18:21, 47:20, 48:7,
49:5, 49:16, 49:20,
50:6, 50:11, 51:7,
51:11, 51:20, 54:18,
56:11
**equal** [7] - 5:15,
20:9, 20:24, 22:24,
22:25, 23:1, 69:6
**equitable** [2] - 57:21,
58:22
**equivalent** [1] -
59:10
**especially** [1] - 19:24
**essentially** [3] -
28:9, 66:24, 67:20
**established** [1] -
32:11
**establishment** [31] -
7:8, 18:1, 20:21,
20:23, 29:4, 31:13,
31:24, 32:1, 33:2,
33:10, 37:23, 40:9,
40:13, 40:20, 42:8,
42:17, 43:7, 44:11,
45:8, 45:24, 46:1,
46:10, 46:12, 57:15,
57:18, 58:23, 58:25,
67:13, 69:7, 72:10,
73:21
**establishment-
clause** [1] - 33:10
**Esther** [1] - 4:18
**et** [4] - 4:4, 75:7, 75:8
**evaluate** [1] - 10:23
**event** [5] - 10:4,
10:7, 29:13, 33:12,
62:10
**evidence** [4] - 6:4,
6:6, 10:25, 73:13
**exact** [1] - 9:23
**exactly** [10] - 6:7,
14:20, 23:21, 25:2,
26:9, 29:24, 39:5,
43:10, 54:5, 56:12
**examine** [1] - 53:25
**examining** [1] - 8:22
**example** [11] - 6:16,
21:1, 21:10, 24:2,
24:5, 24:6, 24:17,
26:17, 35:4, 52:9,
69:24
**except** [3] - 16:18,
16:19, 46:17
**exception** [3] - 42:6,

66:23
**exceptions** [2] -
50:25, 52:6
**executive** [1] - 9:19
**Executive** [34] - 6:2,
7:10, 7:24, 7:25,
14:14, 15:1, 15:7,
15:23, 17:11, 17:14,
20:13, 20:15, 21:12,
21:19, 21:23, 25:8,
25:10, 25:13, 25:16,
25:21, 26:1, 26:24,
27:3, 27:22, 29:22,
36:15, 42:4, 58:13,
66:23, 67:2, 69:18,
72:9, 72:24
**exempted** [1] - 45:21
**Exodus** [2] - 67:6,
70:16
**expectation** [3] -
26:24, 65:10, 65:12
**explain** [4] - 10:8,
13:18, 20:15, 20:19
**explained** [4] -
23:11, 67:2, 67:7,
71:25
**explicit** [2] - 41:25,
42:3
**explicitly** [3] - 40:22,
42:12, 44:2
**explored** [1] - 67:7
**expressed** [2] -
21:18, 28:4
**extend** [2] - 19:2,
19:15
**extent** [10] - 5:13,
5:20, 29:5, 32:3,
34:18, 36:23, 52:24,
53:4, 54:24, 72:6
**extra** [1] - 20:8
**extraterritoriality** [1]
- 54:15
**extreme** [1] - 18:4
**eye** [1] - 6:6

# F

**face** [7] - 34:3, 43:10,
43:22, 43:25, 47:4,
57:6, 62:5
**faced** [2] - 12:5, 12:6
**facial** [5] - 56:14,
56:20, 57:12, 57:16,
60:4
**facially** [12] - 40:3,
40:11, 42:4, 42:17,
55:4, 71:14, 71:24,
72:12, 72:16, 73:3,
73:15, 74:1
**facing** [1] - 37:15

**fact** [21] - 11:2, 11:6,
13:20, 14:18, 16:7,
16:17, 22:8, 26:14,
26:20, 26:24, 27:7,
27:12, 28:6, 30:17,
31:15, 37:2, 37:23,
41:21, 42:12, 55:21,
60:20
**facts** [3] - 16:4, 31:4,
73:22
**factual** [4] - 13:21,
39:5, 47:10, 69:18
**factually** [1] - 48:12
**fail** [1] - 11:7
**fair** [1] - 71:21
**faith** [1] - 10:22
**fall** [8] - 19:9, 34:22,
34:25, 52:15, 73:7,
73:8, 73:10, 73:11
**false** [1] - 7:16
**families** [2] - 21:24,
69:19
**family** [9] - 22:8,
23:11, 23:16, 32:25,
56:17, 57:3, 58:20,
59:12, 69:25
**far** [9] - 17:8, 30:25,
33:2, 33:20, 34:6,
34:11, 55:16, 62:6,
64:25
**fashion** [1] - 71:6
**fault** [2] - 45:5, 45:10
**faulty** [1] - 9:2
**favor** [3] - 7:16,
60:17, 60:18
**features** [1] - 8:7
**Federal** [1] - 75:3
**federal** [1] - 40:17
**FEDERAL** [1] - 75:21
**few** [7] - 7:22, 39:14,
46:19, 61:17, 62:11,
71:19, 74:6
**fewer** [2] - 36:8
**Fiallo** [2] - 40:16,
42:3
**fiance** [3] - 30:25,
34:5, 34:7
**fide** [1] - 40:4,
40:12, 42:4, 71:14,
71:24, 72:12, 72:16,
73:3, 73:5, 73:16,
74:1
**fight** [2] - 45:6, 47:5
**figure** [2] - 12:8,
34:23
**file** [1] - 60:2
**filed** [3] - 5:10, 60:3,
61:4
**filing** [1] - 23:12
**fill** [1] - 8:6

**final** [11] - 23:22,
23:25, 24:9, 24:12,
24:13, 24:21, 24:23,
64:20, 64:21, 64:23,
65:14
**financial** [2] - 36:10,
36:11
**First** [2] - 31:19,
31:20
**first** [20] - 5:16, 8:10,
8:12, 8:13, 18:18,
19:12, 33:10, 45:2,
45:10, 47:12, 48:12,
56:6, 58:13, 64:19,
66:18, 67:13, 68:18,
71:25, 72:9, 72:24
**fiscal** [2] - 25:25,
64:8
**five** [5] - 5:13, 19:1,
28:20, 62:12, 62:13
**flag** [2] - 14:3, 18:25
**flow** [3] - 24:22,
31:19, 63:22
**flowing** [1] - 65:1
**flows** [4] - 27:21,
37:6, 65:12, 66:7
**focus** [2] - 12:18,
42:8
**focuses** [1] - 52:1
**focussed** [4] - 42:19,
49:4, 49:6, 55:24
**folks** [1] - 59:24,
69:11
**follow** [1] - 28:10
**following** [2] - 11:25,
54:4
**footnote** [2] - 13:6,
13:22
**FOR** [6] - 5:18,
20:10, 29:1, 62:17,
66:14, 71:22
**forced** [1] - 53:24
**foreclosed** [1] -
35:17
**foregoing** [1] - 75:10
**forever** [2] - 19:10,
19:13
**form** [3] - 21:1, 36:2,
57:8
**formally** [1] - 53:19
**formed** [1] - 44:24
**forms** [1] - 45:12
**forward** [9] - 10:12,
12:3, 12:10, 31:3,
42:4, 54:25, 55:4,
67:4, 67:5
**four** [1] - 41:14
**fours** [1] - 72:11
**frame** [1] - 35:16
**frankly** [2] - 33:25,

41:21
**freezes** [1] - 64:6
**freezing** [1] - 15:15
**Friday** [1] - 69:10
**full** [1] - 25:9
**functions** [1] - 46:15
**funding** [1] - 36:7
**funds** [1] - 36:8
**FY17** [1] - 27:14

## G

**GARG** [8] - 5:3,
62:17, 62:18, 63:2,
63:9, 64:10, 64:19,
66:3
**Garg** [6] - 3:6, 5:3,
29:10, 29:13, 62:13,
62:18
**gate** [1] - 18:19
**Gelernt** [1] - 4:16
**GELERNT** [1] - 4:16
**general** [3] - 29:24,
32:12, 54:1
**General** [2] - 44:25,
52:25
**General's** [1] - 53:3
**generally** [4] - 7:12,
31:16, 59:6
**given** [9] - 6:20,
19:24, 48:22, 52:13,
55:18, 59:2, 65:10,
68:5, 71:8
**globally** [1] - 27:14
**Government** [39] -
6:3, 6:9, 7:10, 7:13,
7:20, 7:24, 10:12,
12:21, 16:6, 18:7,
18:16, 18:17, 19:7,
20:9, 27:19, 28:21,
28:23, 28:24, 32:11,
36:4, 36:19, 36:20,
39:6, 42:25, 48:1,
50:5, 59:7, 61:2, 67:4,
67:19, 69:4, 69:17,
69:20, 70:12, 70:23,
73:1, 73:18, 73:19,
73:20
**government** [2] -
6:20, 74:3
**Government's** [8] -
6:13, 7:14, 8:15, 8:16,
15:9, 23:19, 39:20,
42:11
**governments** [1] -
38:22
**Governor** [1] - 67:5
**grant** [4] - 35:21,
54:19, 61:10, 61:11
**granted** [1] - 39:8

**grave** [1] - 30:17
**great** [1] - 35:4
**greater** [1] - 9:5
**green** [1] - 14:23
**ground** [7] - 10:16,
11:10, 27:17, 45:6,
56:5, 61:25, 68:8
**grounds** [2] - 18:13,
46:21
**group** [1] - 11:19
**groups** [1] - 58:9
**guarantee** [1] - 65:13
**guaranteed** [3] -
65:9, 65:10, 65:11
**guess** [4] - 27:1,
35:24, 36:13, 68:7

## H

**Haitian** [2] - 54:10,
54:21
**half** [2] - 10:6, 66:9
**halfway** [1] - 14:4
**halt** [1] - 27:17
**hand** [1] - 40:15
**handful** [1] - 66:16
**handle** [1] - 5:20
**hands** [1] - 10:11
**happy** [2] - 20:4,
55:11
**harassment** [1] -
22:21
**harder** [1] - 44:13
**harm** [19] - 29:3,
30:17, 31:10, 31:14,
31:16, 31:22, 32:24,
33:3, 36:6, 37:6, 37:9,
37:13, 37:16, 55:25,
57:9, 57:13, 61:16,
61:17
**harmed** [2] - 36:1,
36:23
**harms** [6] - 5:21,
30:20, 31:15, 31:19,
32:14, 37:2
**Harrison** [3] - 22:17,
30:24, 66:18
**Harrison's** [2] -
30:25, 34:5
**Hatfield** [1] - 67:3
**havens** [1] - 9:11
**hear** [3] - 5:16,
28:23, 29:5
**hearing** [5] - 4:6,
6:17, 20:5, 36:17,
74:18
**heavily** [1] - 46:23
**held** [2] - 33:6, 69:8
**help** [2] - 50:18,
56:25

**helpful** [1] - 69:3
**hereby** [1] - 75:5
**hereto** [1] - 75:13
**HIAS** [6] - 22:15,
35:25, 57:6, 67:1,
71:10
**higher** [2] - 43:15,
43:17
**himself** [1] - 63:3
**hindrance** [1] - 32:6
**hiring** [1] - 64:6
**history** [3] - 12:14,
42:18, 46:14
**hit** [3] - 25:12, 25:22,
25:23
**Homeland** [5] -
27:21, 29:25, 44:25,
47:14, 64:5
**homosexuality** [1] -
22:22
**honestly** [1] - 72:15
**Honor** [61] - 4:8,
4:12, 4:16, 4:18, 4:20,
4:23, 4:25, 5:3, 5:19,
5:25, 14:3, 18:25,
19:12, 20:11, 20:13,
22:2, 22:10, 25:7,
26:13, 27:8, 28:1,
28:19, 29:2, 29:5,
29:21, 30:6, 38:3,
39:24, 40:14, 41:7,
42:22, 44:14, 45:25,
48:3, 50:1, 50:23,
51:5, 52:18, 53:22,
54:17, 57:16, 59:15,
61:19, 62:1, 62:15,
62:18, 63:2, 63:9,
64:10, 64:19, 66:3,
66:15, 67:7, 68:8,
68:10, 68:16, 69:1,
70:12, 71:12, 71:21,
71:23
**Honor's** [1] - 69:2
**hopefully** [1] - 74:14
**hostage** [1] - 51:4
**House** [2] - 7:21,
44:10
**hypothetical** [1] -
70:21
**hypothetically** [2] -
44:8, 55:17

## I

**I-130** [4] - 22:6,
23:12, 23:14, 33:20
**idea** [5] - 8:24, 13:3,
33:23, 70:4, 73:6
**identified** [3] - 12:25,
23:19, 23:25

**identifies** [1] - 6:9
**identify** [2] - 4:7,
20:19
**identifying** [2] - 13:1,
46:7
**ignores** [1] - 8:16
**ignoring** [1] - 28:16
**III** [5] - 33:7, 35:20,
37:20, 57:21, 58:18
**illustrated** [1] - 43:1
**immediate** [3] -
30:19, 31:22, 33:14
**immediately** [2] -
49:16, 61:5
**immigrant** [4] -
14:14, 22:12, 49:7,
49:8
**Immigration** [4] -
4:10, 4:13, 4:19,
20:12
**immigration** [11] -
18:2, 22:16, 36:12,
42:2, 49:14, 49:15,
51:1, 51:22, 53:1,
53:2, 72:15
**imminent** [7] - 31:10,
33:14, 34:3, 37:16,
57:6, 60:11, 61:17
**impact** [2] - 46:5,
46:6
**impacted** [1] - 12:16
**impending** [1] -
35:19
**imperfectly** [1] - 12:4
**implement** [1] -
15:21
**implementation** [1] -
63:20
**implementing** [2] -
17:4, 64:3
**implicate** [1] - 20:3
**implicated** [1] -
56:19
**implication** [1] - 16:2
**important** [2] - 8:14,
56:2
**impose** [1] - 11:23
**impression** [1] - 25:4
**improper** [2] - 11:1,
11:25
**impugned** [1] - 41:12
**INA** [8] - 8:19, 14:11,
16:21, 18:22, 20:22,
21:25, 22:2
**inadmissibility** [1] -
18:13
**including** [3] - 21:2,
45:7, 51:4
**increase** [2] - 26:10,
65:22

**increased** [1] - 8:25
**indeed** [2] - 53:1,
71:11
**indefinitely** [1] -
19:15
**Indiana** [1] - 67:5
**indicate** [5] - 16:5,
31:16, 39:21, 41:4,
52:14
**indicated** [3] - 14:1,
26:15, 35:25
**indicates** [2] - 15:6,
27:12, 52:5
**indicating** [1] - 52:9
**individual** [10] -
20:20, 21:10, 22:17,
30:23, 32:20, 38:1,
55:22, 57:4, 62:3,
71:4
**individuals** [7] -
21:18, 21:21, 25:24,
26:16, 27:14, 43:16,
59:23
**inflict** [1] - 20:16
**inflicted** [1] - 21:13
**inflicts** [1] - 69:8
**information** [10] -
7:1, 8:23, 10:21,
10:24, 38:23, 39:12,
39:15, 41:15, 41:18,
66:6
**injunction** [20] -
5:10, 25:8, 55:18,
57:2, 58:3, 58:7,
58:11, 60:4, 61:2,
61:6, 61:13, 67:12,
67:15, 67:19, 68:3,
68:4, 68:14, 68:19,
70:21, 71:3
**injunctive** [1] - 61:20
**injured** [1] - 67:1
**injuries** [2] - 20:16,
62:5
**injury** [28] - 21:13,
21:21, 21:22, 22:25,
31:23, 33:7, 33:15,
34:3, 34:10, 35:19,
35:20, 35:23, 36:21,
37:11, 57:6, 60:21,
66:17, 67:9, 67:10,
67:11, 69:4, 69:6,
69:7, 69:9, 69:15,
70:13, 70:17, 70:19
**inquiry** [1] - 7:7
**inside** [1] - 73:19
**instance** [3] - 41:18,
56:15, 68:12
**instead** [3] - 6:5,
8:22, 69:20
**insufficient** [1] -

44:18
**intelligence** [1] - 51:18
**interest** [7] - 34:10, 34:24, 34:25, 51:12, 53:13, 55:5, 66:11
**interested** [1] - 62:22
**interests** [3] - 21:2, 49:17, 66:5
**Interfaith** [2] - 9:1, 9:15
**interim** [1] - 64:24
**internal** [1] - 47:16
**International** [2] - 4:3, 75:7
**interpret** [2] - 53:16, 53:23
**interpretation** [3] - 53:3, 53:5, 53:7
**interpreted** [1] - 53:19
**interview** [8] - 30:13, 31:8, 31:9, 48:17, 60:11, 60:13
**interviews** [2] - 62:25, 64:8
**introduces** [1] - 12:4
**inures** [1] - 59:18
**invalid** [3] - 27:3, 28:14, 36:24
**invocation** [1] - 8:15
**involving** [5] - 18:1, 40:12, 72:2, 72:9
**Iran** [1] - 22:19, 22:22, 51:4
**Iranian** [1] - 54:5
**Iranians** [1] - 54:3
**IRAP** [3] - 21:1, 22:15, 71:10
**IRAP's** [1] - 22:4
**Iraq** [4] - 45:20, 46:17, 46:18, 57:5
**irreparable** [6] - 31:16, 31:22, 33:15, 37:16, 66:17, 67:9, 67:11, 69:4, 69:5, 69:21, 70:5, 70:9, 70:10, 70:13, 70:17, 70:19
**ISIL** [1] - 46:23
**Islam** [1] - 67:15
**Islamic** [1] - 11:21
**Islamist** [1] - 45:17
**issuance** [18] - 14:13, 14:14, 14:24, 15:2, 15:15, 16:17, 16:22, 16:23, 17:14, 18:6, 18:11, 18:13, 19:18, 19:21, 31:15, 48:8, 49:7, 52:1

**issuances** [1] - 19:10
**issue** [37] - 8:9, 8:10, 14:11, 14:20, 15:19, 15:24, 16:13, 17:3, 17:8, 27:21, 29:14, 33:8, 34:8, 35:1, 36:22, 39:22, 41:6, 42:20, 44:11, 48:6, 49:19, 50:9, 52:2, 52:3, 52:11, 53:10, 53:25, 55:15, 60:2, 62:20, 63:8, 70:20, 70:21, 71:13, 71:17, 73:2, 74:13
**issued** [14] - 15:6, 16:1, 17:12, 31:1, 31:5, 32:10, 34:7, 47:18, 47:25, 48:10, 50:8, 66:19, 66:21, 66:22, 66:24
**issuer** [1] - 73:18
**issues** [17] - 7:13, 9:12, 10:3, 23:19, 23:20, 29:4, 29:19, 34:18, 45:23, 55:20, 56:11, 60:6, 62:21, 66:16, 68:9, 68:17, 70:23
**issuing** [3] - 47:14, 49:25, 50:13
**itself** [14] - 6:19, 7:20, 10:15, 28:14, 31:23, 33:3, 53:16, 54:19, 60:10, 64:13, 65:18, 69:8, 69:14

## J

**Jadwat** [5] - 3:3, 3:8, 4:8, 5:17, 71:16
**JADWAT** [42] - 4:8, 5:18, 5:19, 5:24, 6:11, 7:17, 8:3, 8:20, 9:7, 9:10, 9:14, 10:1, 10:7, 10:23, 11:15, 12:20, 13:5, 14:3, 14:12, 14:17, 15:4, 15:8, 15:21, 16:2, 16:11, 16:25, 17:2, 17:9, 17:13, 17:21, 17:23, 18:9, 18:23, 19:4, 19:12, 20:4, 71:22, 71:23, 72:8, 73:12, 73:25, 74:6
**Jane** [4] - 23:9, 33:18, 33:21, 33:24
**Jeffrey** [1] - 4:23, 29:2
**John** [4] - 21:10,

21:15, 30:24, 31:7, 31:17
**joint** [2] - 21:11, 21:17
**judged** [1] - 41:8
**judges** [1] - 39:24
**judgment** [4] - 10:13, 11:13, 38:18, 38:20
**judicial** [1] - 33:4
**junction** [1] - 61:22
**jurisprudence** [1] - 6:15
**Justice** [5] - 5:1, 5:4, 5:6, 5:18, 72:22
**justifications** [1] - 11:3
**Justin** [2] - 4:10, 20:11

## K

**K-1** [2] - 22:19, 34:6
**K1** [1] - 31:5
**Karen** [1] - 4:12
**keep** [1] - 20:8
**keeping** [1] - 7:6
**Kennedy's** [1] - 72:22
**kept** [3] - 43:4, 43:5, 68:16
**kids** [1] - 69:25, 70:2
**kind** [8] - 10:11, 11:4, 33:7, 37:6, 37:13, 37:16, 39:5, 53:20
**kinds** [1] - 60:16
**KNEEDLER** [1] - 4:25
**Kneedler** [1] - 5:1
**knock** [1] - 18:3
**knowing** [1] - 51:18

## L

**lack** [1] - 17:25
**lacking** [1] - 34:2
**Lakumi** [1] - 6:16
**language** [3] - 8:11, 41:19, 52:13
**largely** [1] - 44:6
**last** [6] - 27:18, 31:1, 46:18, 47:5, 71:19, 71:20
**law** [1] - 10:15, 35:1, 36:18, 40:2, 40:20, 43:24, 47:3, 47:7, 64:11, 69:7
**Law** [4] - 4:11, 4:13, 4:19, 20:12
**lawful** [1] - 30:8, 50:2, 56:18, 57:20

**laws** [8] - 18:2, 36:12, 49:14, 51:1, 51:22, 53:1, 53:2, 53:3
**lawsuit** [2] - 59:9, 59:14
**lay** [2] - 39:5, 56:3
**lead** [2] - 8:24, 51:15
**learned** [1] - 66:6
**least** [10] - 7:12, 9:4, 17:13, 30:4, 34:9, 41:13, 47:12, 52:11, 54:12, 62:3
**Lee** [1] - 4:16
**Legal** [2] - 54:2, 54:13
**legal** [5] - 24:21, 57:20, 64:25, 65:3, 65:11
**legally** [9] - 34:10, 34:24, 35:22, 36:11, 37:6, 37:9, 46:6, 46:10, 65:15
**legally-cognizable** [2] - 46:6, 46:10
**legitimate** [12] - 27:9, 40:4, 40:11, 42:4, 55:4, 71:14, 71:24, 72:12, 72:16, 70:3, 73:16, 74:1
**Lemon** [3] - 5:25, 6:1, 41:3
**less** [2] - 36:9, 36:15
**level** [6] - 24:21, 41:11, 43:15, 43:17, 65:10, 65:12
**lifted** [1] - 19:16
**likelihood** [1] - 35:13
**likely** [1] - 60:21
**limit** [17] - 5:22, 6:8, 6:10, 6:11, 9:18, 18:15, 18:17, 20:2, 28:8, 28:12, 28:17, 55:1, 63:22, 66:8, 68:14, 68:15
**limitation** [1] - 41:20
**limitations** [1] - 50:25
**limited** [2] - 27:13, 56:24
**limiting** [1] - 26:15
**limits** [1] - 51:6
**line** [10] - 34:21, 34:22, 42:23, 43:24, 44:21, 45:5, 60:10, 72:5, 73:9
**lines** [2] - 45:10, 72:8
**linked** [1] - 43:2
**list** [1] - 41:24
**listed** [5] - 38:13,

38:19, 43:19, 43:20, 48:25
**literally** [2] - 19:21, 50:14
**litigate** [1] - 29:23
**litigation** [1] - 37:18
**live** [1] - 69:11
**living** [1] - 70:8
**located** [1] - 30:9
**location** [1] - 52:9
**logistical/operational** [1] - 27:9
**look** [22] - 6:16, 6:19, 11:7, 12:13, 13:12, 14:7, 36:2, 38:10, 39:13, 40:4, 40:21, 41:8, 41:14, 44:5, 48:22, 53:14, 63:13, 72:13, 72:21, 72:22, 72:24, 72:25
**looked** [1] - 55:6
**looking** [8] - 16:7, 16:21, 22:12, 25:6, 33:2, 34:18, 39:25, 42:10
**looks** [2] - 44:4, 46:8
**lose** [1] - 72:20
**loss** [2] - 36:10, 36:11
**lost** [1] - 36:2
**lowered** [4] - 24:20, 26:17, 26:20, 63:23
**lowering** [1] - 65:21
**Lujan** [1] - 34:9

## M

**MACH** [1] - 4:14
**Mach** [1] - 4:14
**machine** [2] - 75:5, 75:12
**mail** [2] - 27:13, 27:15
**mailed** [1] - 24:7
**mails** [1] - 24:5
**main** [2] - 71:20, 71:24
**majority** [1] - 49:7
**mandate** [1] - 28:5
**Mandel** [1] - 42:3
**manner** [1] - 18:17
**March** [4] - 24:6, 24:8, 75:9, 75:14
**mark** [1] - 25:22
**Maryland** [2] - 4:21, 75:5
**matter** [23] - 4:2, 9:24, 9:25, 10:1, 10:2, 15:3, 20:24, 25:18, 25:20, 26:14, 26:21,

27:8, 33:11, 36:1,
37:23, 52:3, 59:4,
59:11, 69:18, 72:21,
73:1, 74:11, 74:16
**matters** [1] - 22:14
**maximum** [5] - 26:7,
26:12, 27:6, 65:21
**McCreary** [19] - 5:25,
6:7, 6:14, 6:19, 8:5,
10:10, 39:21, 40:10,
40:19, 41:1, 41:2,
41:4, 41:19, 42:9,
42:23, 43:4, 44:3,
47:6
**mean** [11] - 9:10,
18:9, 18:21, 24:23,
26:6, 33:17, 34:20,
52:2, 57:14, 61:15,
65:23
**means** [2] - 53:5
**meant** [1] - 34:25
**meantime** [1] - 70:2
**meat** [1] - 19:24
**meets** [1] - 48:2
**member** [1] - 22:8
**members** [5] - 6:17,
32:25, 57:3, 58:20,
59:12
**memo** [1] - 24:4
**memorandum** [1] -
24:11
**mentioned** [3] - 61:1,
61:2, 69:10
**merits** [10] - 21:5,
24:25, 29:4, 30:21,
34:15, 34:17, 34:19,
34:21, 35:14, 65:18
**message** [7] - 40:22,
40:24, 42:12, 42:25,
43:5, 44:1, 59:16
**Meteab** [1] - 21:17
**methodology** [1] -
9:3
**middle** [1] - 56:5
**might** [14] - 8:24,
19:9, 29:16, 50:5,
50:18, 51:25, 52:6,
53:23, 58:5, 59:1,
59:3, 63:18, 73:18,
73:20
**migrants** [1] - 54:14
**migration** [1] - 26:15
**Mike** [1] - 67:5
**mind** [1] - 13:9
**minimum** [1] - 48:9
**ministerial** [2] -
63:25, 64:3
**minutes** [11] - 5:12,
5:13, 19:1, 20:8,
28:20, 28:21, 28:24,

62:13, 66:13, 71:19
**missing** [1] - 70:3
**modifying** [1] - 19:11
**Mohammed** [1] -
69:24
**moment** [6] - 14:5,
14:6, 36:17, 37:4,
37:5, 69:4
**Monday** [1] - 24:6
**money** [3] - 36:1,
36:3, 36:16
**month** [1] - 10:6,
52:21
**months** [3] - 23:17,
39:14, 53:20
**moot** [2] - 31:2, 62:7
**morning** [15] - 4:12,
4:14, 4:16, 4:18, 4:20,
4:22, 4:23, 4:25, 5:3,
5:5, 5:7, 20:14, 30:18,
62:18, 62:20
**most** [7] - 13:25,
21:6, 35:21, 37:25,
56:25, 57:1, 58:24
**motion** [3] - 5:9,
29:12, 29:15
**motives** [1] - 41:11
**move** [3] - 12:9,
20:7, 30:20
**MR** [135] - 4:8, 4:10,
4:14, 4:16, 4:20, 4:23,
4:25, 5:3, 5:5, 5:18,
5:19, 5:24, 6:11, 7:17,
8:3, 8:20, 9:7, 9:10,
9:14, 10:1, 10:7,
10:23, 11:15, 12:20,
13:5, 14:3, 14:12,
14:17, 15:4, 15:8,
15:21, 16:2, 16:11,
16:25, 17:2, 17:9,
17:13, 17:21, 17:23,
18:9, 18:23, 19:4,
19:12, 20:4, 20:10,
20:11, 20:23, 21:9,
22:2, 22:10, 22:14,
23:4, 23:9, 23:24,
24:5, 24:11, 25:7,
25:20, 26:13, 27:7,
28:1, 28:19, 29:1,
29:2, 29:18, 29:21,
30:6, 31:18, 32:14,
32:21, 34:16, 34:22,
35:11, 35:13, 35:18,
36:5, 37:1, 37:5, 38:3,
38:16, 39:24, 40:14,
41:7, 41:17, 42:2,
42:22, 43:17, 44:13,
44:19, 45:4, 45:25,
46:9, 47:16, 48:3,
48:14, 48:24, 50:1,

50:7, 50:22, 51:5,
52:17, 53:22, 53:25,
54:17, 56:2, 56:12,
57:16, 58:7, 59:15,
60:3, 61:8, 61:10,
62:1, 62:15, 62:17,
62:18, 63:2, 63:9,
64:10, 64:19, 66:3,
66:14, 66:15, 68:7,
68:23, 69:1, 71:4,
71:16, 71:21, 71:22,
71:23, 72:8, 73:12,
73:25, 74:6
**MS** [2] - 4:12, 4:18
**Muslim** [8] - 9:4,
11:20, 12:5, 12:17,
13:4, 13:11, 13:20,
21:12
**Muslims** [9] - 6:3,
12:3, 12:4, 12:5, 13:8,
13:9, 13:23, 14:2,
32:12

## N

**name** [1] - 75:13
**Napolitano** [2] -
72:24, 72:25
**narrow** [4] - 29:23,
42:6, 53:14, 67:18
**narrowed** [3] - 55:6,
55:22, 58:14
**narrower** [2] - 58:11,
59:22
**nation** [1] - 55:23
**national** [20] - 7:11,
7:13, 7:15, 8:11, 8:15,
8:18, 9:17, 10:3, 11:2,
11:13, 12:9, 42:20,
48:25, 51:11, 51:18,
53:13, 55:3, 55:5,
66:11
**National** [4] - 4:10,
4:13, 4:19, 20:12
**nationality** [5] - 38:5,
38:7, 43:14, 54:2,
54:20
**nationality-based**
[3] - 38:5, 54:2, 54:20
**nationals** [10] -
38:10, 38:12, 38:14,
38:16, 38:24, 39:13,
43:18, 43:20, 46:4,
51:21
**nationwide** [8] -
55:18, 55:25, 56:23,
57:12, 57:23, 58:7,
60:4, 71:2
**Naturalization** [1] -
55:20

**nature** [2] - 10:2,
17:25
**naval** [1] - 54:10
**nearly** [1] - 62:2
**necessarily** [4] -
11:24, 18:24, 59:11,
74:14
**necessary** [5] -
36:18, 55:12, 57:9,
66:10, 68:10
**need** [6] - 5:14,
7:14, 7:17, 7:25, 8:3,
8:4, 9:20, 10:22,
10:23, 21:5, 33:14,
35:15, 37:14, 63:8,
65:4
**needed** [1] - 10:8
**needing** [1] - 34:10
**needs** [3] - 37:17,
49:16, 66:1
**negates** [1] - 10:24
**neighborhood** [1] -
69:12
**neutral** [2] - 42:17,
46:21
**never** [5] - 6:3,
36:25, 53:10, 65:11,
65:13
**new** [11] - 11:3,
12:13, 14:24, 24:1,
24:20, 30:1, 39:4,
40:9, 45:14, 47:22,
48:16
**next** [8] - 33:25,
34:4, 37:14, 37:16,
61:17, 62:5, 62:11,
66:23
**Nicaraguan** [1] -
54:7
**Nicaraguans** [1] -
38:6
**Ninth** [14] - 29:21,
30:1, 30:14, 58:2,
58:10, 61:4, 70:22,
70:25, 71:5, 71:6,
71:9, 71:11, 71:25,
72:17
**nobody** [2] - 41:13,
47:1
**non** [1] - 9:4
**non-Muslim** [1] - 9:4
**nondiscrimination**
[1] - 52:6
**none** [2] - 61:16,
71:4
**nonetheless** [2] -
25:23, 44:12
**nonreviewability** [4]
- 32:8, 32:13, 32:17,
35:3

**normal** [1] - 37:18
**note** [1] - 8:14
**notes** [1] - 75:12
**nothing** [5] - 17:7,
24:24, 44:2, 51:18,
62:11
**noticed** [1] - 61:4
**notion** [2] - 39:19,
54:16
**Number** [4] - 4:3,
21:11, 21:15, 23:10
**number** [10] - 26:11,
26:16, 30:7, 40:16,
42:16, 55:24, 63:16,
63:17, 75:8
**numbers** [1] - 71:8

## O

**oath** [2] - 44:23,
45:12
**objective** [1] - 6:13
**observer** [6] - 6:12,
10:14, 12:12, 73:22
**obviously** [6] -
20:13, 29:11, 31:3,
35:17, 54:6, 68:21
**occasionally** [1] -
72:15
**occasions** [1] - 38:2
**occur** [1] - 67:12
**occurred** [1] - 44:22
**OF** [1] - 75:1
**offending** [1] - 59:1
**offer** [1] - 55:25
**offered** [3] - 10:21,
10:22, 11:3
**Office** [2] - 54:1,
54:12
**office** [6] - 16:9,
40:2, 44:7, 44:9,
45:11, 52:10
**official** [15] - 6:20,
7:21, 24:7, 39:25,
40:3, 40:21, 41:8,
41:9, 41:10, 41:18,
42:10, 43:1, 67:14,
75:6, 75:11
**OFFICIAL** [2] - 75:1,
75:21
**Official** [1] - 75:3
**officials** [3] - 9:17,
11:13, 41:11
**old** [3] - 40:7, 45:14,
58:9
**Omar** [1] - 4:8
**once** [4] - 48:16,
55:4, 60:9, 60:13
**one** [52] - 11:3,
11:17, 12:22, 13:10,

13:23, 14:1, 20:25, 21:5, 21:6, 21:7, 21:9, 23:7, 23:20, 25:9, 25:15, 27:18, 31:14, 32:15, 33:1, 34:9, 35:16, 36:5, 37:11, 38:1, 40:6, 43:8, 44:4, 46:8, 52:17, 52:20, 53:18, 55:24, 57:14, 58:10, 58:24, 60:13, 61:1, 61:5, 61:6, 62:6, 63:7, 65:1, 65:19, 68:6, 68:7, 68:22, 68:24, 70:18, 71:1, 73:9
**One** [1] - 44:22
**one's** [1] - 56:18
**ones** [2] - 30:4, 60:11
**operate** [4] - 33:24, 46:23, 47:7, 71:6
**operates** [1] - 15:15
**operation** [2] - 43:22, 43:25
**operations** [1] - 47:4
**operative** [2] - 44:16, 44:19
**opinion** [1] - 67:7
**opinions** [1] - 71:1
**opposed** [2] - 22:12, 53:21
**opposite** [2] - 43:3, 43:6
**options** [1] - 55:24
**order** [90] - 4:5, 5:10, 7:11, 7:16, 7:18, 7:19, 8:11, 8:12, 8:13, 9:2, 10:2, 10:9, 10:15, 11:3, 11:4, 11:5, 11:10, 12:13, 12:21, 14:21, 16:3, 16:18, 16:20, 16:24, 17:2, 17:4, 17:7, 18:5, 18:7, 18:18, 23:15, 25:4, 26:2, 26:6, 26:8, 27:4, 28:4, 28:13, 29:9, 29:22, 30:1, 30:7, 30:16, 30:18, 31:2, 31:6, 32:22, 33:1, 33:24, 34:7, 35:20, 39:4, 39:7, 39:8, 40:5, 40:7, 40:9, 41:10, 42:14, 45:2, 45:5, 45:14, 45:18, 46:2, 46:14, 46:17, 47:8, 47:12, 47:19, 47:22, 48:16, 49:2, 49:8, 50:2, 54:18, 54:19, 55:2, 56:7, 56:8, 56:13, 58:9, 58:14,

59:10, 60:19, 61:11, 72:9, 74:3
**Order** [24] - 6:2, 7:10, 7:25, 14:14, 15:1, 15:7, 15:23, 17:11, 17:14, 20:13, 20:15, 21:12, 21:19, 21:23, 25:8, 25:14, 26:24, 27:22, 36:15, 66:23, 67:2, 69:18, 72:24
**ordered** [1] - 28:13
**Orders** [2] - 25:10, 25:21
**orders** [2] - 13:14, 54:7
**ordinary** [1] - 19:20
**organization** [2] - 11:21, 11:22
**organizational** [8] - 20:20, 22:3, 35:6, 35:21, 62:4, 70:7, 70:11, 71:5
**organizations** [6] - 9:15, 32:4, 32:23, 58:19, 59:23, 65:6
**original** [7] - 7:18, 7:19, 11:15, 29:22, 39:7, 45:5
**origins** [1] - 71:25
**otherwise** [10] - 28:13, 44:10, 49:23, 50:20, 55:11, 57:6, 57:23, 61:19, 64:7, 68:22
**ought** [5] - 53:5, 60:8, 60:19, 60:20, 62:9
**outcome** [1] - 68:1
**outer** [1] - 20:1
**outline** [1] - 9:5
**outright** [1] - 19:10
**outset** [1] - 73:14
**outside** [3] - 41:15, 41:17, 73:7
**overall** [1] - 55:15
**overlap** [2] - 34:16, 34:19
**overreached** [1] - 17:20
**overrule** [2] - 8:2, 8:3
**own** [5] - 8:16, 9:2, 11:8, 12:7, 13:7

**P**

**pace** [2] - 27:5, 27:10
**page** [1] - 21:11
**pages** [1] - 75:10
**Panamanian** [1] -

54:6
**Panamanians** [1] - 38:5
**paragraph** [2] - 21:15, 21:17
**parcel** [1] - 69:14
**part** [15] - 13:11, 15:12, 19:25, 30:6, 30:12, 31:8, 39:16, 46:11, 48:18, 52:10, 52:11, 59:9, 59:13, 69:14, 73:5
**particular** [22] - 9:21, 11:19, 11:20, 11:22, 23:7, 24:19, 26:16, 32:10, 51:3, 56:24, 57:3, 57:5, 58:19, 58:20, 59:17, 59:24, 67:21, 69:12, 69:23, 72:3, 73:18
**particularly** [2] - 69:22, 70:9
**parties** [2] - 15:14, 70:13
**partner** [2] - 22:18, 22:20
**party** [3] - 21:1, 22:4, 35:5
**passed** [1] - 40:1
**passes** [1] - 47:8
**passing** [2] - 35:5, 41:22
**past** [1] - 49:12
**pastor** [1] - 6:20
**pause** [6] - 38:21, 39:13, 49:1, 49:10, 52:21, 65:4
**Pence** [1] - 67:5
**pending** [4] - 4:2, 5:22, 22:6, 23:13
**people** [24] - 11:19, 13:13, 13:15, 13:17, 14:22, 14:23, 14:25, 15:19, 16:19, 18:19, 32:3, 33:9, 39:17, 40:2, 49:8, 50:15, 50:18, 53:9, 55:19, 56:21, 58:4, 58:5, 59:12, 64:6
**per** [2] - 27:14, 36:7
**percent** [2] - 13:15, 13:19
**perfectly** [1] - 50:2, 54:9, 54:22
**perhaps** [11] - 13:18, 16:22, 25:22, 35:16, 36:16, 36:17, 50:18, 58:24, 68:9, 68:18, 68:24
**period** [4] - 31:11,

33:15, 50:21, 60:11
**permanent** [1] - 30:8
**permitting** [1] - 69:11
**pernicious** [1] - 59:6
**persecution** [4] - 22:21, 30:11, 40:8, 45:9
**person** [6] - 6:23, 7:1, 10:13, 26:7, 33:8, 34:4
**perspective** [2] - 12:9, 21:8
**pervades** [1] - 42:25
**petition** [4] - 23:5, 23:12, 23:14, 33:20
**petitioning** [3] - 22:19, 23:7
**petitions** [1] - 22:6
**Philippines** [2] - 9:7, 9:9
**physical** [1] - 50:11
**physically** [1] - 50:10
**PI** [4] - 5:22, 29:12, 31:21, 67:25
**picked** [1] - 49:15
**place** [3] - 33:10, 39:15, 50:24
**places** [4] - 44:21, 49:2, 55:21, 60:3
**plainly** [1] - 67:1
**plaintiff** [7] - 5:12, 21:6, 22:1, 33:13, 59:17, 66:13, 67:22
**plaintiff's** [1] - 62:6
**PLAINTIFFS** [4] - 5:18, 20:10, 66:14, 71:22
**Plaintiffs** [5] - 3:3, 3:4, 3:7, 3:8, 43:6
**plaintiffs** [57] - 4:9, 4:11, 4:13, 4:15, 4:17, 4:19, 4:21, 5:11, 5:16, 20:12, 20:16, 20:20, 20:25, 21:10, 22:3, 28:22, 30:14, 30:17, 30:23, 31:3, 31:11, 32:6, 32:23, 35:6, 35:21, 39:6, 47:11, 48:7, 53:13, 54:24, 54:25, 55:17, 55:21, 55:23, 57:4, 57:11, 57:22, 57:24, 58:18, 58:20, 59:5, 59:22, 60:10, 60:18, 60:20, 62:2, 62:3, 62:4, 62:22, 67:21, 69:19, 69:23, 70:7, 70:11, 70:25, 71:4, 71:6
**plaintiffs'** [5] - 36:16,

51:16, 62:14, 63:2, 70:8
**plan** [5] - 12:3, 12:4, 12:10, 16:3, 20:7
**plausible** [2] - 34:1, 65:15
**plays** [1] - 60:9
**pleadings** [2] - 36:10, 60:21
**point** [27] - 10:8, 16:6, 16:12, 17:15, 18:10, 19:17, 24:23, 25:11, 25:13, 25:17, 25:21, 28:25, 33:16, 33:17, 33:19, 42:1, 50:22, 53:24, 55:13, 61:1, 61:5, 65:6, 65:8, 65:23, 68:21, 70:16, 72:20
**pointed** [3] - 13:13, 64:11, 72:17
**pointing** [3] - 32:15, 46:14, 64:3
**points** [5] - 9:1, 19:12, 69:5, 71:24, 74:6
**policy** [3] - 32:19, 33:5, 67:15
**political** [1] - 39:11
**population** [2] - 13:22, 26:14
**portion** [1] - 45:19
**portions** [2] - 47:13, 47:19
**position** [1] - 16:16
**possibility** [1] - 69:5
**possible** [5] - 42:6, 58:15, 58:17, 59:20, 71:8
**possibly** [1] - 34:4
**potential** [1] - 23:19
**power** [5] - 49:13, 49:17, 50:23, 50:24, 54:1
**practical** [9] - 15:3, 25:20, 26:3, 26:13, 26:21, 27:8, 35:25, 48:9, 52:3
**pre** [1] - 41:2
**pre-McCreary** [1] - 41:2
**precluded** [1] - 33:4
**preelection** [1] - 46:12
**preference** [3] - 30:11, 40:8, 45:8
**preferences** [1] - 69:2
**preliminary** [10] - 5:10, 57:2, 61:2, 61:6,

61:13, 61:22, 68:2,
68:3, 68:14, 68:19
**premise** [1] - 61:20
**prepared** [1] - 8:21
**present** [4] - 9:4,
18:7, 38:24, 49:24
**President** [41] - 7:3,
12:2, 12:22, 12:25,
13:2, 13:13, 14:1,
14:8, 25:5, 26:7,
27:25, 28:5, 28:12,
29:23, 30:16, 39:4,
41:10, 43:6, 43:7,
44:6, 45:11, 46:13,
49:14, 49:18, 49:20,
50:23, 51:10, 51:17,
51:20, 52:24, 54:4,
54:10, 54:23, 55:2,
55:4, 63:7, 63:21,
64:14, 65:24, 66:4,
66:10
**president** [1] - 17:20
**President's** [13] -
9:22, 11:12, 13:7,
15:23, 26:10, 28:4,
45:15, 51:7, 53:8,
53:11, 55:7, 63:4,
64:1
**Presidential** [1] -
64:2
**press** [4] - 24:12,
24:13, 44:10, 47:4
**presume** [1] - 6:25
**presumed** [1] - 31:17
**pretty** [2] - 40:2,
52:20
**prevail** [1] - 53:6
**prevent** [4] - 14:20,
16:23, 25:16, 65:20
**prevented** [1] - 54:18
**prevents** [2] - 60:6,
65:21
**previous** [8] - 24:17,
38:9, 39:1, 39:9,
43:10, 46:17, 46:20,
46:25
**previously** [2] - 8:23,
25:23
**primarily** [1] - 12:18
**primary** [2] - 6:2,
39:22
**primary/**
**predominant/**
**preeminent** [1] - 41:5
**principle** [1] - 73:9
**principled** [1] - 56:1
**PRM** [1] - 26:14
**probative** [1] - 6:12
**problem** [5] - 35:2,
35:20, 37:20, 37:21,

42:18
**problems** [2] - 33:11,
37:19
**procedural** [4] -
19:19, 49:11, 52:23,
65:22
**procedure** [4] - 5:11,
19:22, 25:19, 28:7
**procedures** [11] -
19:11, 19:20, 26:8,
39:15, 49:3, 49:9,
49:10, 52:19, 52:22,
53:21, 57:25
**proceed** [1] - 21:4
**proceedings** [2] -
75:6, 75:11
**process** [33] - 15:12,
16:11, 24:16, 24:23,
25:18, 27:17, 28:10,
28:11, 28:16, 30:3,
33:22, 36:8, 39:16,
39:17, 45:23, 48:15,
48:19, 49:2, 49:21,
50:9, 58:3, 62:4,
64:21, 69:8, 69:11,
69:14, 69:16, 74:16
**processed** [3] - 15:7,
16:6, 27:5
**processes** [6] - 26:8,
50:6, 64:24, 65:4,
65:17, 74:3
**processing** [6] -
24:2, 25:17, 26:18,
26:19, 48:11, 52:7
**proclamation** [1] -
17:23
**Program** [5] - 23:13,
38:12, 38:13, 38:15,
43:11
**program** [1] - 66:2
**prohibits** [1] - 17:16
**Project** [2] - 4:4, 75:7
**prolong** [1] - 69:19
**prong** [1] - 6:1
**proper** [1] - 28:16
**proposing** [1] -
67:19
**proposition** [2] -
28:2, 70:15
**prosecution** [1] -
22:22
**protect** [2] - 8:1,
66:11
**protected** [2] -
34:10, 35:1
**Protection** [1] -
49:25
**protection** [4] -
20:24, 22:24, 22:25,

69:7
**provide** [4] - 14:7,
38:23, 40:8, 62:2
**provided** [4] - 7:11,
11:11, 43:23, 55:3
**providing** [1] - 39:7
**provision** [11] - 19:9,
19:14, 43:8, 46:2,
48:4, 51:24, 52:4,
52:16, 52:19, 53:19,
64:11
**provisions** [11] -
12:16, 18:12, 19:25,
46:3, 49:15, 50:25,
51:22, 52:7, 55:10,
56:7, 56:15
**proxy** [1] - 14:2
**psychological** [1] -
21:20
**public** [3] - 7:1, 8:1,
73:23
**publicly** [1] - 6:4
**pure** [2] - 17:2, 71:8
**purpose** [26] - 4:5,
6:1, 6:2, 6:5, 6:13,
7:14, 7:15, 7:18, 7:25,
8:8, 8:12, 8:18, 8:21,
11:1, 11:25, 12:23,
39:22, 39:23, 39:25,
41:3, 41:6, 41:9,
42:11, 46:7, 46:11
**purposes** [3] - 34:25,
35:11, 63:14
**pursuant** [1] - 28:4
**push** [1] - 50:3
**put** [9] - 12:21,
29:11, 39:13, 40:1,
52:11, 54:10, 55:2,
67:5, 67:20
**puts** [2] - 42:4, 55:4
**putting** [1] - 67:4

## Q

**Qaeda** [1] - 46:23
**qualify** [4] - 38:13,
49:1, 60:22, 66:22
**questions** [4] - 5:21,
9:11, 14:10, 60:16
**quickly** [1] - 20:5
**quite** [1] - 74:9
**quote** [1] - 24:7

## R

**radical** [1] - 45:17
**raise** [6] - 32:5, 34:8,
35:6, 53:15, 74:3,
74:7
**raised** [5] - 31:13,

43:6, 48:7, 62:21,
71:14
**raises** [1] - 53:7
**raising** [3] - 32:3,
32:6, 60:16
**rare** [1] - 42:9
**rather** [4] - 29:23,
37:17, 45:6, 54:15
**rationale** [1] - 7:11
**reached** [1] - 39:21
**reaching** [1] - 74:2
**reactions** [1] - 6:17
**read** [5] - 15:24,
18:11, 27:12, 29:12,
49:13, 51:6, 52:1,
73:4
**readily** [1] - 7:2
**reading** [1] - 53:1
**reads** [1] - 55:1
**ready** [2] - 68:2, 68:3
**real** [5] - 6:14, 6:22,
26:22, 35:2
**real-world** [1] - 26:22
**really** [9] - 12:11,
16:16, 19:18, 47:6,
55:8, 55:12, 63:3,
63:18
**reason** [17] - 11:19,
17:22, 25:23, 26:3,
40:4, 42:5, 49:5, 50:2,
50:4, 53:6, 53:16,
55:5, 60:8, 66:4,
66:22, 68:4, 68:13
**reasonable** [9] -
6:11, 6:23, 6:25,
10:12, 10:13, 12:12,
73:22
**reasons** [9] - 9:21,
27:9, 45:21, 49:6,
49:23, 51:4, 64:5,
65:4, 67:2, 67:6,
73:19
**reassess** [1] - 49:10
**Rebuttal** [2] - 3:7,
3:8
**REBUTTAL** [2] -
66:14, 71:22
**rebuttal** [3] - 5:13,
20:8, 62:14
**recalculated** [1] -
24:20
**recognize** [1] - 46:9
**recollection** [1] -
28:1
**record** [17] - 4:7,
9:13, 12:24, 14:1,
16:4, 21:11, 21:17,
25:10, 26:18, 27:12,
27:15, 30:21, 39:6,
60:15, 60:24, 66:19,

66:21
**records** [2] - 30:25,
56:22
**recover** [3] - 36:3,
36:19, 36:25
**reduce** [1] - 64:7
**reengineers** [1] -
12:7
**refer** [1] - 43:8
**referenced** [1] -
12:25
**references** [1] - 13:2
**referred** [1] - 46:2
**referring** [3] - 13:3,
44:9
**refers** [3] - 14:13,
14:14, 34:9
**reflect** [1] - 24:12,
24:20
**refugee** [25] - 5:21,
12:15, 13:11, 22:13,
23:15, 24:16, 26:15,
26:18, 27:10, 28:8,
29:10, 29:13, 33:17,
36:7, 54:21, 57:7,
62:24, 63:13, 63:22,
64:22, 65:2, 65:3,
66:7, 69:25, 70:17
**Refugee** [14] - 4:3,
20:22, 23:8, 23:9,
23:18, 27:19, 28:10,
28:11, 28:14, 28:16,
62:21, 65:24, 66:4,
75:7
**refugees** [20] - 13:3,
13:8, 13:9, 13:17,
13:19, 13:23, 14:2,
14:9, 24:2, 24:8,
24:18, 25:12, 27:5,
30:10, 34:3, 36:8,
37:7, 57:5, 58:19,
65:9
**refusing** [1] - 17:3
**regard** [11] - 15:18,
24:1, 34:2, 43:19,
50:20, 59:11, 66:16,
66:18, 67:1, 69:3,
70:11
**regarding** [6] - 5:21,
6:17, 12:16, 14:8,
52:7, 67:25
**regardless** [2] - 59:7,
59:8
**regards** [5] - 22:23,
67:9, 69:2, 69:17,
69:23
**related** [1] - 19:23
**relationship** [1] -
57:5
**relative** [2] - 23:6,

56:17
**relatively** [1] - 37:25
**release** [2] - 24:12, 24:13
**relevant** [3] - 6:12, 18:24, 19:17
**reliable** [5] - 7:2, 38:23, 39:12, 39:15, 49:3
**relief** [22] - 22:16, 25:2, 25:10, 30:19, 32:24, 37:21, 50:8, 55:15, 55:17, 57:8, 57:10, 57:21, 57:22, 57:23, 58:17, 58:22, 59:16, 59:22, 60:17, 61:11, 61:20, 62:10
**religion** [11] - 21:14, 21:19, 40:5, 40:12, 43:9, 43:19, 43:21, 46:2, 46:4, 46:21, 47:1
**religion-neutral** [1] - 46:21
**religious** [17] - 6:15, 30:11, 39:22, 40:6, 40:7, 40:8, 40:22, 42:13, 42:14, 42:24, 43:5, 44:1, 44:2, 45:9, 47:3, 59:16
**rely** [1] - 8:22
**remarkable** [1] - 30:15
**remedied** [3] - 67:10, 67:16, 67:18
**remedy** [2] - 59:1, 70:6
**remotely** [2] - 33:25, 37:13
**remove** [1] - 59:1
**removed** [4] - 35:8, 37:11, 40:9, 45:20
**repeatedly** [1] - 33:6
**replaced** [1] - 47:22
**reply** [2] - 13:7, 24:11
**report** [4] - 8:16, 8:19, 8:20, 48:1
**reported** [1] - 75:5
**REPORTER** [2] - 75:1, 75:21
**Reporter** [1] - 75:3
**reporting** [1] - 47:23
**reports** [6] - 9:16, 47:14, 47:18, 47:25, 48:2
**represent** [1] - 21:2
**representations** [1] - 24:17
**require** [3] - 17:4,

26:7, 57:21
**required** [3] - 47:15, 58:1, 59:21
**requirements** [1] - 47:23
**requires** [4] - 10:4, 34:18, 58:18, 66:24
**research** [1] - 20:5
**reserve** [1] - 5:13
**resettle** [2] - 37:7, 37:8
**resettled** [3] - 25:25, 26:1, 37:10
**resettlement** [6] - 24:15, 24:16, 24:19, 27:10, 63:15, 70:18
**resettling** [1] - 24:19
**resident** [1] - 22:7
**residents** [1] - 30:8
**resistance** [1] - 12:6
**resolutions** [1] - 39:25
**resolve** [1] - 34:21
**resource** [1] - 64:5
**respect** [8] - 18:2, 39:2, 46:16, 46:18, 55:2, 56:16, 57:2, 72:14
**response** [2] - 19:11, 40:9
**rest** [1] - 64:8
**restraining** [2] - 4:5, 5:9, 61:11
**restrict** [1] - 9:20
**restricted** [1] - 65:16
**restriction** [1] - 11:24
**restrictions** [2] - 54:3, 59:24
**result** [3] - 11:12, 15:7, 50:16
**review** [4] - 33:4, 47:17, 64:2, 73:2
**revoked** [1] - 47:21
**RIFRA** [1] - 18:14
**rights** [2] - 32:1, 56:19, 70:18
**ripe** [2] - 69:13, 69:15
**risk** [7] - 8:25, 22:20, 22:21, 38:18, 38:20, 39:3, 57:6
**road** [1] - 51:8
**ROCAH** [1] - 4:20
**Rocah** [1] - 4:20
**root** [1] - 57:19
**routinely** [1] - 67:16
**RPR** [1] - 75:20
**rule** [6] - 7:16, 24:16, 68:16, 72:2, 73:24,

73:25
**Rule** [1] - 55:20
**rules** [1] - 57:21
**ruling** [2] - 12:8, 74:13
**run** [4] - 32:7, 32:16, 60:18, 74:8

---

# S

**safe** [1] - 9:11
**safely** [1] - 52:15
**Sale** [1] - 54:8
**same-sex** [1] - 22:18
**satisfy** [1] - 33:7
**Saudi** [1] - 23:11
**save** [1] - 28:20
**scattered** [1] - 55:21
**scenario** [2] - 11:9, 11:16
**schedule** [2] - 29:11, 61:24
**school** [1] - 70:3
**SCHWEI** [1] - 5:5
**Schwei** [1] - 5:5
**scope** [4] - 17:24, 52:19, 53:8, 55:7
**screening** [2] - 62:25, 64:7
**scrutiny** [2] - 43:15, 43:18
**sea** [1] - 54:18
**Second** [2] - 7:10, 72:25
**second** [6] - 7:19, 8:10, 45:4, 45:13, 67:1, 67:3
**Secretaries** [2] - 29:25, 44:25
**Secretary** [3] - 15:5, 15:18, 17:12
**Section** [15] - 5:22, 14:11, 14:19, 16:21, 16:25, 17:2, 17:15, 17:17, 18:11, 18:12, 20:22, 25:8, 25:9, 52:5, 66:23
**section** [8] - 17:18, 19:8, 20:2, 20:3, 25:16, 26:6, 26:10, 27:2
**secular** [2] - 40:23, 42:12
**Security** [5] - 27:21, 29:25, 45:1, 47:14, 64:5
**security** [17] - 7:11, 7:13, 7:15, 8:11, 8:15, 8:18, 9:17, 10:3, 11:2, 11:13, 12:9, 24:2,

42:20, 55:3, 55:5, 62:25
**see** [11] - 10:24, 11:7, 13:2, 13:10, 17:8, 18:25, 19:5, 41:20, 60:20, 66:8, 71:1
**seeing** [1] - 60:9
**seek** [1] - 57:3
**seeking** [4] - 25:3, 49:8, 55:18, 64:22
**seem** [2] - 31:16, 50:17
**send** [2] - 44:1, 58:12
**senior** [1] - 7:21
**sense** [11] - 6:24, 6:25, 8:22, 11:7, 12:12, 18:11, 32:12, 36:1, 47:5, 65:25, 69:22
**separate** [3] - 29:11, 29:15, 66:20
**separated** [3] - 21:23, 69:20, 69:21
**separately** [2] - 29:11, 35:14
**separation** [1] - 70:5
**serially** [2] - 29:25, 45:6
**serious** [4] - 33:11, 53:7, 53:15, 55:8
**serve** [1] - 8:17
**session** [1] - 74:12
**set** [8] - 20:1, 26:7, 28:8, 28:17, 31:5, 37:12, 50:13, 69:8
**sets** [2] - 28:7, 28:11
**Setting** [1] - 37:1
**seven** [2] - 8:17, 13:16
**seven-country** [1] - 8:17
**several** [1] - 22:5
**sex** [1] - 22:18
**sham** [2] - 7:16, 42:11
**shorthand** [2] - 75:6, 75:12
**show** [6] - 33:13, 35:9, 35:13, 35:16, 37:15, 57:9
**shown** [1] - 61:17
**shows** [1] - 6:5
**shut** [1] - 16:8
**shuts** [1] - 58:1
**siblings** [1] - 33:23
**side** [19] - 5:12, 5:14, 10:18, 30:24, 31:24, 32:16, 32:18, 33:17,

37:12, 42:9, 43:23, 44:20, 57:1, 61:9, 61:12, 61:21, 72:6, 73:10, 73:11
**side's** [1] - 45:7
**significant** [2] - 14:18, 21:24
**significantly** [1] - 14:19
**similar** [2] - 68:2, 70:22
**simply** [5] - 27:4, 37:7, 43:14, 48:16, 67:8
**single** [1] - 55:1
**singled** [1] - 46:20
**singles** [1] - 30:10
**sister** [5] - 33:18, 33:22, 33:24
**sister's** [1] - 23:16
**sisters** [1] - 33:23
**situation** [7] - 18:8, 50:19, 51:4, 52:8, 59:14, 71:3, 72:6
**situations** [4] - 72:1, 72:2, 72:5, 72:17
**six** [5] - 8:17, 8:25, 12:18, 37:24, 43:20
**six-country** [2] - 8:17, 37:24
**six-listed** [1] - 43:20
**slew** [1] - 59:2
**slowed** [1] - 48:11
**slowing** [2] - 25:16, 27:9
**smack** [1] - 32:16
**Somalia** [1] - 69:24
**someone** [4] - 17:12, 22:11, 34:3, 59:13
**sometimes** [4] - 34:12, 34:18, 72:15
**somewhere** [1] - 37:8
**soon** [1] - 60:19
**sorry** [1] - 9:9
**sort** [13] - 11:23, 19:19, 28:4, 35:7, 39:11, 42:9, 49:13, 51:24, 54:25, 55:15, 55:18, 67:18, 69:20
**source** [1] - 27:22
**Southern** [1] - 75:4
**special** [2] - 13:17, 69:11
**specific** [9] - 8:16, 11:16, 11:17, 14:6, 26:11, 31:14, 45:20, 63:4, 65:8
**specifically** [4] - 6:1, 17:16, 30:4, 40:13

**specified** [1] - 18:14
**spectrum** [1] - 10:19
**speculative** [2] - 36:6, 37:2
**speech** [1] - 6:20
**spend** [2] - 29:6, 36:9
**sphere** [2] - 72:15, 73:15
**spokespeople** [1] - 7:4
**sponsor** [2] - 23:2, 23:4
**sponsors** [1] - 46:22
**standard** [10] - 40:12, 40:19, 46:6, 71:14, 72:18, 73:4, 73:7, 73:16, 74:1
**standing** [28] - 5:21, 20:17, 20:18, 20:21, 20:25, 21:2, 21:7, 22:1, 22:4, 22:8, 22:23, 23:5, 23:10, 25:13, 29:4, 33:12, 33:13, 34:8, 34:17, 34:24, 35:11, 35:12, 35:15, 35:20, 36:4, 37:13, 66:16
**standpoint** [1] - 50:18
**start** [2] - 30:20, 71:23
**started** [2] - 30:24, 47:14
**state** [1] - 46:22
**State** [15] - 8:23, 15:6, 15:18, 17:12, 19:22, 24:1, 24:7, 24:14, 24:18, 27:21, 29:25, 44:25, 47:13, 48:14, 64:4
**statement** [4] - 13:25, 14:6, 41:20, 54:8
**statements** [23] - 7:4, 7:5, 7:10, 8:8, 9:16, 9:22, 9:24, 10:5, 11:6, 11:12, 12:16, 12:25, 13:6, 13:7, 14:8, 44:6, 44:9, 44:17, 44:22, 45:15, 46:11, 46:12
**States** [22] - 4:24, 5:2, 13:20, 13:23, 21:3, 22:18, 23:3, 23:4, 25:11, 29:3, 30:9, 37:8, 37:10, 38:25, 48:23, 49:17, 51:7, 51:19, 51:21, 56:17, 66:6, 75:4

**stating** [1] - 16:7
**statue** [2] - 27:22, 67:20
**status** [1] - 64:22
**statute** [16] - 14:13, 18:14, 25:2, 28:7, 40:17, 52:1, 52:12, 53:16, 55:7, 57:14, 64:13, 64:15, 64:18, 65:16, 65:18, 65:20
**statutorily** [2] - 18:16, 24:15
**statutory** [5] - 26:12, 28:5, 29:6, 48:5, 51:14
**step** [5] - 39:1, 39:8, 44:4, 51:3, 66:20
**steps** [2] - 50:19, 65:22
**stigma** [2] - 32:18, 33:4
**stigmatic** [1] - 33:7
**still** [12] - 20:8, 27:13, 33:19, 39:17, 42:17, 44:3, 47:6, 47:12, 48:22, 50:23, 57:21, 61:25
**stop** [4] - 18:10, 20:6, 50:10, 54:10
**stopped** [1] - 26:18
**stopping** [4] - 19:10, 19:13, 19:14, 50:14
**straight** [2] - 32:7, 68:5
**strange** [1] - 35:5
**stronger** [1] - 63:11
**structure** [1] - 11:5
**students** [1] - 54:5
**subject** [7] - 27:25, 29:12, 30:13, 31:2, 34:7, 45:22, 58:21
**subjected** [2] - 33:8, 69:14
**subscribed** [1] - 75:13
**subset** [1] - 42:24
**substantial** [1] - 30:16
**success** [1] - 35:13
**successful** [1] - 35:10
**Sudanese** [1] - 38:6
**suffer** [1] - 36:10, 60:20, 61:15
**suffering** [1] - 21:22
**sufficiently** [1] - 8:8
**suggested** [1] - 5:11
**suit** [2] - 60:2, 60:3
**SUNG** [1] - 4:18
**Sung** [1] - 4:18

**supplemental** [3] - 68:17, 68:20
**supply** [1] - 62:9
**support** [2] - 44:23, 70:14
**supports** [1] - 14:19
**suppose** [3] - 9:19, 53:23, 64:4
**supposed** [3] - 7:7, 28:10, 34:15
**Supreme** [6] - 6:15, 34:11, 54:8, 54:9, 54:12, 54:21
**surrounding** [1] - 40:23
**suspend** [7] - 49:16, 50:24, 51:7, 51:10, 51:20, 53:12, 64:7
**suspended** [2] - 24:1, 64:24
**suspending** [4] - 51:3, 52:15, 62:24, 62:25
**suspension** [3] - 19:18, 19:25, 47:20
**swears** [1] - 45:12
**switch** [1] - 71:18
**Syrian** [2] - 30:10, 70:17
**system** [3] - 12:23, 50:13, 60:9

## T

**tailored** [3] - 57:10, 57:22, 58:18
**taint** [1] - 9:24
**tainted** [1] - 57:19
**talks** [3] - 14:21, 16:21, 21:11
**target** [1] - 25:11
**targeting** [2] - 63:18, 63:20
**TDC-17-0361** [1] - 4:3
**teaching** [1] - 6:14
**technical** [1] - 52:2
**temporarily** [1] - 51:20
**temporary** [5] - 4:5, 5:9, 49:10, 52:21, 61:11
**ten** [2] - 20:7, 66:13
**Ten** [5] - 6:21, 44:3, 59:2, 59:18, 67:20
**tens** [1] - 25:24
**term** [3] - 34:12, 34:13, 34:14
**terms** [10] - 9:2, 11:8, 14:16, 14:18, 17:4,

17:10, 17:11, 26:10, 55:14, 64:21
**territories** [1] - 13:1
**terrorism** [2] - 8:25, 46:22
**terrorist** [2] - 9:11, 11:21
**terrorist-safe** [1] - 9:11
**terrorists** [1] - 45:18
**test** [4] - 47:9, 72:1, 72:12, 72:16
**Texas** [1] - 22:18
**text** [1] - 43:25
**THE** [126] - 4:2, 4:22, 5:7, 5:23, 6:8, 7:9, 7:24, 8:19, 9:6, 9:9, 9:13, 9:18, 10:3, 10:20, 11:9, 12:15, 12:24, 13:25, 14:10, 14:13, 15:1, 15:5, 15:17, 15:23, 16:4, 16:20, 17:1, 17:7, 17:10, 17:19, 17:22, 18:5, 18:20, 19:2, 19:5, 20:1, 20:6, 20:19, 21:4, 21:25, 22:7, 22:11, 23:2, 23:8, 23:18, 24:3, 24:9, 24:25, 25:15, 26:5, 27:1, 27:18, 28:18, 28:20, 29:1, 29:15, 29:20, 30:3, 31:13, 32:9, 32:19, 34:8, 34:20, 35:9, 35:12, 35:15, 35:24, 36:13, 37:4, 37:22, 38:14, 39:19, 40:11, 41:1, 41:13, 41:19, 42:16, 43:13, 44:8, 44:16, 45:2, 45:19, 46:5, 47:10, 47:23, 48:5, 48:20, 49:19, 50:4, 50:17, 51:2, 51:25, 53:18, 53:23, 54:14, 55:12, 56:10, 57:13, 58:2, 58:23, 60:1, 61:1, 61:9, 61:23, 62:12, 62:16, 62:17, 62:20, 63:6, 64:4, 64:12, 65:18, 66:12, 66:14, 67:24, 68:20, 68:24, 70:20, 71:13, 71:18, 71:22, 72:4, 73:6, 73:24, 74:5, 74:8
**themselves** [6] - 11:6, 32:6, 38:15, 44:18, 64:20, 65:6
**then-Governor** [1] -

67:5
**theoretically** [1] - 68:1
**theory** [8] - 22:7, 36:14, 36:25, 46:10, 57:17, 57:20, 64:16
**therefore** [1] - 69:15
**They've** [1] - 35:13
**they've** [16] - 11:3, 16:8, 16:9, 26:18, 33:11, 35:18, 35:19, 35:22, 36:6, 36:23, 37:19, 37:20, 60:14, 61:11, 61:15
**thinking** [4] - 29:8, 39:20, 54:22, 73:19
**thinks** [1] - 66:10
**third** [5] - 8:9, 21:1, 22:4, 35:5, 70:13
**third-party** [1] - 22:4
**thousands** [1] - 25:24
**threat** [4] - 11:15, 11:17, 11:23, 38:24
**threatens** [1] - 20:16
**three** [3] - 41:11, 52:21, 53:20
**three-month** [1] - 52:21
**threshold** [1] - 23:20
**thrust** [1] - 6:22
**tied** [1] - 10:11
**timing** [1] - 50:18
**today** [5] - 29:16, 61:20, 74:13, 74:14
**together** [2] - 6:4, 12:21
**tolerate** [1] - 38:21
**tomorrow** [8] - 10:5, 20:14, 25:9, 30:18, 51:18, 66:25, 67:12, 67:14
**took** [11] - 38:18, 40:19, 41:10, 44:7, 44:9, 44:23, 45:5, 45:8, 63:16, 63:17, 64:5
**topic** [1] - 19:6
**tough** [1] - 47:2
**track** [1] - 25:23
**transcript** [1] - 75:11
**travel** [8] - 9:20, 11:23, 12:18, 13:1, 24:8, 26:16, 26:25, 70:1
**travelers** [1] - 38:10
**treated** [4] - 23:6, 49:13, 53:11, 61:6
**treatment** [2] - 23:1, 33:8

**tried** [3] - 20:15, 50:3, 50:15
**TRO** [16] - 29:12, 31:12, 31:21, 33:14, 33:16, 37:14, 37:20, 57:1, 57:2, 61:1, 61:4, 61:16, 61:21, 67:25, 68:11, 68:18
**troubled** [2] - 38:22, 39:11
**true** [5] - 7:5, 21:15, 30:6, 50:8, 50:9
**Trump** [6] - 4:4, 12:22, 13:13, 46:13, 75:8
**try** [6] - 12:9, 46:11, 47:4, 53:23, 73:4, 74:13
**trying** [9] - 10:20, 11:4, 11:17, 13:22, 18:18, 34:23, 43:5, 47:5, 59:12
**TUMLIN** [1] - 4:12
**Tumlin** [1] - 4:12
**turn** [1] - 6:5
**tweaks** [1] - 7:22
**Twitter** [1] - 14:7
**two** [15] - 9:4, 14:15, 14:18, 19:12, 32:14, 35:7, 36:5, 38:2, 44:19, 44:21, 45:10, 49:21, 52:19, 60:13, 71:24
**types** [3] - 20:18, 73:10, 73:11
**typically** [2] - 13:20, 72:2

**U**

**U.S** [3] - 22:7, 32:3, 35:7
**ultimately** [1] - 72:21
**unbanned** [1] - 13:14
**uncharted** [1] - 51:9
**unconstitutional** [1] - 59:11
**under** [22] - 7:7, 19:8, 20:2, 33:1, 36:12, 36:18, 38:9, 38:15, 42:7, 46:10, 49:13, 50:23, 52:4, 54:1, 54:7, 55:7, 64:2, 64:17, 72:10, 73:3, 73:21, 74:11
**understood** [2] - 51:23
**undertaken** [1] - 73:20
**undisputed** [6] -

10:25, 25:11, 26:17, 26:21, 27:17, 66:21
**Uniform** [1] - 55:20
**United** [22] - 4:24, 5:1, 13:20, 13:23, 21:3, 22:17, 23:3, 23:4, 25:11, 29:3, 30:9, 37:7, 37:10, 38:25, 48:23, 49:17, 51:7, 51:19, 51:21, 56:17, 66:6, 75:4
**unlawful** [1] - 54:18, 57:20, 58:3
**unless** [1] - 33:7
**unlikely** [1] - 25:22
**unnatural** [1] - 7:6
**unrelated** [1] - 9:21
**unusual** [1] - 18:4
**unveiling** [1] - 6:21
**up** [8] - 26:11, 40:1, 49:15, 50:13, 51:9, 54:10, 67:20, 69:8
**update** [1] - 31:3

**V**

**variety** [6] - 20:16, 20:17, 22:16, 23:24, 67:11, 72:13
**various** [4] - 5:10, 16:9, 38:10, 56:11
**vast** [1] - 49:7
**Venezuela** [2] - 9:7, 9:10
**version** [1] - 36:16
**versus** [4] - 4:4, 67:25, 72:25, 75:8
**vetting** [2] - 39:14, 49:3
**victims** [3] - 30:11, 40:8, 45:8
**view** [6] - 33:6, 61:3, 61:8, 68:15, 69:22, 72:21
**views** [1] - 21:12
**violate** [2] - 65:24, 66:4
**violated** [2] - 27:4, 64:18
**violates** [1] - 28:14, 64:13
**violating** [2] - 28:15, 51:21
**violation** [4] - 31:19, 31:23, 58:25, 67:14
**violations** [5] - 18:2, 32:22, 32:24, 56:24, 57:11
**Virginia** [1] - 58:15, 72:23

**virtually** [2] - 20:25, 22:24
**visa** [44] - 14:13, 14:14, 15:11, 15:12, 15:24, 16:8, 16:17, 16:22, 17:8, 17:14, 18:11, 19:10, 22:12, 22:19, 30:12, 30:24, 31:1, 31:5, 31:8, 31:15, 32:10, 32:16, 33:1, 33:3, 33:22, 34:6, 39:17, 48:8, 48:17, 48:20, 48:22, 48:25, 49:1, 49:21, 50:5, 50:19, 52:1, 60:13, 66:18, 66:20, 66:21, 66:24, 72:3, 73:18
**Visa** [4] - 38:11, 38:13, 38:15, 43:11
**visas** [26] - 14:22, 14:24, 15:2, 15:6, 15:16, 15:19, 16:1, 16:6, 16:13, 16:23, 17:3, 17:5, 18:6, 18:13, 22:5, 22:6, 34:2, 48:10, 48:15, 49:7, 49:9, 49:25, 50:9, 50:13, 50:24, 51:3
**vital** [1] - 70:3

**W**

**wait** [3] - 10:3, 23:15, 48:23
**waiting** [2] - 31:7, 59:13
**waiver** [14] - 15:12, 16:12, 16:14, 30:12, 31:9, 39:16, 45:22, 48:18, 48:21, 56:21, 60:9, 60:14, 60:22, 60:23
**Waiver** [4] - 38:11, 38:13, 38:15, 43:11
**waivers** [2] - 16:7, 69:5
**walk** [2] - 51:13, 67:21
**walks** [1] - 59:8
**WALL** [53] - 4:23, 29:1, 29:2, 29:18, 29:21, 30:6, 31:18, 32:14, 32:21, 34:16, 34:22, 35:11, 35:13, 35:18, 36:5, 37:1, 37:5, 38:3, 38:16, 39:24, 40:14, 41:7, 41:17, 42:2, 42:22,

43:17, 44:13, 44:19, 45:4, 45:25, 46:9, 47:16, 48:3, 48:14, 48:24, 50:1, 50:7, 50:22, 51:5, 52:17, 53:22, 53:25, 54:17, 56:2, 56:12, 57:16, 58:7, 59:15, 60:3, 61:8, 61:10, 62:1, 62:15
**wall** [1] - 59:18
**Wall** [6] - 3:5, 4:23, 28:23, 29:2, 67:24, 71:13
**walls** [1] - 40:1
**wants** [4] - 22:9, 29:5, 33:18, 61:10
**Washington** [1] - 68:13
**water** [1] - 51:9
**ways** [1] - 67:11
**week** [3] - 12:4, 26:16, 27:14
**weeks** [10] - 13:16, 33:25, 34:4, 37:14, 37:17, 46:19, 61:18, 62:5, 62:11, 70:4
**Western** [1] - 58:16
**whereof** [1] - 75:13
**White** [2] - 7:21, 44:10
**whole** [2] - 14:7, 59:3
**wife** [2] - 31:7, 69:25
**willing** [1] - 38:21
**win** [1] - 36:22
**Wisconsin** [1] - 58:16
**witness** [1] - 75:13
**words** [2] - 12:7, 63:23
**works** [1] - 30:12
**world** [2] - 13:22, 26:22
**worried** [1] - 64:14
**written** [1] - 74:13

**Y**

**year** [10] - 24:19, 25:5, 25:18, 25:25, 26:12, 28:17, 54:4, 64:8, 65:24, 66:7
**year's** [1] - 63:22
**years** [2] - 23:16, 33:23
**Yemeni** [2] - 51:18, 51:20
**yesterday** [1] - 27:16
**yourselves** [1] - 4:7

**Z**

**zero** [1] - 65:24
**zone** [1] - 34:25