**AS IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | Civil Action No.: 8:17-CV-00361-TDC |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. |  |
| DONALD TRUMP, et al, |  |
| Defendants. |  |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD......................................................................................................... 7

ARGUMENT ...................................................................................................................... 7

   I.   Plaintiffs Have Standing to Bring Their Claims ................................................. 8

   II.  EO-3 Violates the Immigration and Nationality Act. ....................................... 11

       A.  The President's Delegated Authority Does Not Permit Him to Override
           Congress's Policy Judgments. ................................................................... 12

       B.  EO-3 Exceeds the President's Delegated Statutory Authority Under § 1182(f). ....... 14

           1.  EO-3 Conflicts with Congress's Response to the Same Vetting and Security
               Concerns. ................................................................................................ 14

           2.  EO-3 Lacks an Adequate Finding to Justify Its Dramatic Departure from
               Congress's Scheme. ............................................................................... 17

           3.  EO-3 Conflicts with Congress's Standards for Reviewing Visa Applications..... 19

       C.  EO-3 Also Violates the INA's Anti-Discrimination Mandate.................................. 20

       D.  There is No Justiciability Bar to Plaintiffs' Statutory Claims. ................................... 22

   III. EO-3 Violates the Establishment Clause and Equal Protection........................................ 24

   IV. Plaintiffs Will Suffer Irreparable Injury in the Absence of an Injunction. ....................... 31

   V.  The Balance of the Equities and the Public Interest Favor Issuance of an Injunction...... 32

CONCLUSION................................................................................................................... 33

## INTRODUCTION

For the third time since taking office, President Trump has issued an order banning hundreds of millions of people from entering the United States. Yet again, the overwhelming majority of those who will be blocked from the country are Muslim. The ban, like its predecessors, delivers on the President's longstanding promise to exclude Muslims from the United States, striking at the very core of our Nation's founding values of religious freedom and equality. Unlike its predecessors, the new ban is indefinite, and potentially permanent. For those within its immense scope, it replaces Congress's detailed admissions system with a new one designed by the President. But Congress has not authorized the President to discard and replace its own immigration policy choices, and the Constitution does not allow him to condemn and disfavor a religion.

If the ban goes into effect, the damage will be immediate and widespread. It will separate families, disrupt businesses, imperil courses of study, block needed medical treatment, and prevent academic, artistic, scientific, and cultural exchange. Above all, it will send a message to Muslims everywhere that they are not welcome in this country. This motion therefore seeks a preliminary injunction of the visa and entry restrictions imposed by Proclamation No. 9645 ("EO-3").

## BACKGROUND

On his eighth day in office, the President signed the first ban order, barring nationals of Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen for 90 days. 82 Fed. Reg. 8977 ("EO-1"). As this Court previously observed, before the President settled on a policy of banning nationals of Muslim-majority countries en masse, there was "no consultation with the Department of State, the Department of Defense, the Department of Justice, or the Department of Homeland

Security." *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539, 545 (D. Md. 2017).High-level Executive Branch officials were "actively shielded" from learning the order's contents until after it was issued. *IRAP v. Trump*, 857 F.3d 554, 632 (4th Cir. 2017) (Thacker, J., concurring). EO-1 fulfilled months of promises to ban Muslims from the United States— promises the President stood by after his election and on the day he signed the order, and justified with assertions that "Islam hates us" and "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." *See id.* at 576. The ban was swiftly challenged and enjoined. The administration decided to replace rather than defend it. *See id.* at 573.

The second iteration of the ban, signed March 6, 2017, reproduced the original in most respects. 82 Fed. Reg. 13209 ("EO-2"). It again barred for 90 days nationals of six of the seven original countries, but omitted Iraq. EO-2 § 2(c). Like its predecessor, it provided for a worldwide review of vetting information provided by other countries, EO-1§ 3(a)-(b); EO-2 § 2(a)-(b); a mechanism to impose an indefinite ban following that review process, EO-1§ 3(e)-(f); EO-2 § 2(e)-(f); refugee-related provisions, EO-1 § 5; EO-2 § 6; and directions to publish the number of "honor killings" committed in the United States by foreign nationals, EO-1§§ 1, 10(a)(iii); EO-2 § 11(a)(iii).

This Court enjoined Section 2(c) before it went into effect, as did another district court, and both decisions were affirmed in relevant part. *IRAP*, 857 F.3d at 604-05; *Hawai'i v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017), *aff'd in relevant part,* 859 F.3d 741 (9th Cir. 2017). In affirming the injunction, the Fourth Circuit explained that the case presented a "highly unique set of circumstances," in light of the "direct link between the President's numerous campaign statements promising a Muslim ban that targets territories, the discrete action he took only one

week into office executing that exact plan, and EO-2, the 'watered down' version of that plan that 'get[s] just about everything,' and 'in some ways, more.'" 857 F.3d at 599-600.

On September 24, the President forged the next link in that same chain of events: EO-3. By its own terms, EO-3 grows out of EO-2 and implements aspects of Section 2 of that order. Section 2 of EO-2, like Section 3 of EO-1 before it, had directed reviews of the information other countries provide to facilitate the United States' vetting of visa applicants. EO-1 § 3(e); EO-2 § 2(e). It further directed that, once the vetting review was complete, the Secretary of Homeland Security would submit "a list of countries" to be subjected to an indefinite ban. EO-3 cites the study and DHS list of countries envisioned by EO-1 and EO-2, *see* EO-3 §§ 1(c), 1(h), although the ban it actually imposes is different from the DHS list and the study's findings, *see, e.g.,* EO-3 §§ 1(h)(i), 2(h), 1(g). In EO-3, the President has followed through on EO-1 and EO-2's promises of a subsequent indefinite ban. That ban encompasses nationals of eight countries: five of the six countries barred by EO-1 and EO-2—Iran, Libya, Somalia, Syria, and Yemen—along with Chad, North Korea, and Venezuela. Nationals of every banned country except Venezuela seeking *immigrant* visas, which lead to permanent resident status and the possibility of U.S. citizenship, are banned. Restrictions on *nonimmigrant* visas vary among the banned countries. *See* Second Am. Compl. at 37 (chart comparing bans imposed by the three orders).

The new ban, like the first two, will disproportionately ban Muslims. EO-2 barred approximately 180 million people, a large majority of whom are Muslim. *IRAP*, 857 F.3d at 609 (Keenan, J., concurring in part and concurring in the judgment); *IRAP*, 241 F. Supp. 3d at 545. The new ban also bars approximately 180 million people.[1] Of those, nearly 70% are Muslim.[2]

---

[1] Second Hausman Decl. Ex. BB, J.R. 725-32 (World Listing Factbook, Central Intelligence Agency). Plaintiffs have submitted additional evidence along with this motion. That evidence supplements the existing Joint Record, which plaintiffs incorporate here.

Even that figure vastly understates the disproportionate practical impact on Muslims. The five original countries and Chad are majority Muslim, and almost everyone who will be prevented from obtaining visas or entering the United States by EO-3 is from one of those six majority-Muslim nations. In contrast, virtually no one from North Korea or Venezuela—the two countries named in EO-3 that are not majority-Muslim—will be affected in that way. North Korea accounts for a miniscule number of visas. And Venezuelans are not banned as a group; instead, only officials of certain Venezuelan government agencies and their families are banned, and even then only from obtaining tourist-type visas. Data from 2016 indicate, for example, that while EO-3 would have barred 12,998 Yemenis and 7,727 Iranians from obtaining immigrant visas, it would have banned 9 North Koreans and no Venezuelans.[3]

To justify the bans, EO-3 asserts that countries were assessed against a set of baseline criteria. But EO-3 acknowledges that even though Somalia (a majority-Muslim country) satisfies the government's baseline criteria, it was banned anyway, and that even though Venezuela (a country that is not majority-Muslim) fails to meet the baseline, it was effectively exempted. EO-3 §§ 2(f), 2(h). Moreover, while EO-3 acknowledges that Iraq also did not meet the baseline criteria (but was not banned), it does not purport to disclose the entire list of countries that failed to meet the baseline criteria; additional countries may have been excluded from the ban at the final stage.

---

[2] First Hausman Decl. Ex. R, J.R. 184-98 (World Listing Factbook, Central Intelligence Agency). These figures do not include Venezuela, as its ban is not applicable to the entire country, only certain officials and their families—and it is unclear how many will be affected. Without North Korea, which allows virtually none of its nationals to travel to the United States, the ban covers approximately 150 million people.

[3] Second Hausman Decl. Ex. DD, 741 (Kathryn Casteel & Andrea Jones-Rooy, "Trump's Latest Travel Order Still Looks a Lot Like a Muslim Ban," FiveThirtyEight (Sept. 28, 2017)).

As to Somalia and the other countries banned by all three versions, EO-3 relies on general country conditions information very similar to that cited in EO-2. Like its predecessors, EO-3 does not cite any visa vetting failures or otherwise explain how the President concluded that existing vetting procedures were or might be inadequate. And the government has declined to release a full or redacted version of the July 9 or September 15 DHS reports that EO-2 ordered and EO-3 cites. *See* EO-3 §§ 1(c), 1(h).

EO-3 shares the basic structure of both EO-1 and EO-2. Each invokes 8 U.S.C. § 1182(f), and each bars nationals of various countries from obtaining visas or entering the United States, subject to a case-by-case waiver procedure. As the Fourth Circuit observed, such use of nationality was the "exact form" the President had earlier promised for his Muslim ban. *IRAP*, 857 F.3d at 594. Then-candidate Trump "call[ed] for a total and complete shutdown of Muslims entering the United States," citing his belief that "Islam hates us," and that "[w]e can't allow people coming into this country who have this hatred." *Id.* (internal quotation marks omitted, alterations in original). He then convened a commission to formulate a plan to implement a Muslim ban "legally." J.R. 247. The commission recommended using nationality as a proxy for religion. *Id.* Trump then announced "that he would attempt to circumvent scrutiny of the Muslim ban by formulating it in terms of nationality, rather than religion," explaining that "[p]eople were so upset when I used the word Muslim" that he would instead start "talking territory instead of Muslim." *IRAP*, 857 F.3d at 594 (internal quotation marks omitted). Consistent with these promises, EO-1, EO-2, and EO-3 all ban enormous numbers of people, disproportionately Muslim, purportedly on the basis of nationality.

Even the mechanism of the ban, § 1182(f), directly connects the President's promises to each version of the ban. Then-candidate Trump made the initial pledge to ban Muslims in the

days following an attack in San Bernardino, California. A year and a half later, he noted that he had "called for a ban after San Bernardino, and was met with great scorn and anger but now, many are saying I was right to do so."[4] He reiterated his call for a ban, and explained that he would impose it pursuant to the "power to suspend entry into the country" under § 1182(f). *Id.* He further indicated that a temporary ban would be followed by more permanent measures. *Id.* And as President, he has in fact invoked § 1182(f) to ban large numbers of Muslims, first temporarily and now indefinitely.

Finally, all three versions of the order share a decisionmaker: the person who promised a Muslim Ban. Candidate Trump promised a ban on Muslims, and never repudiated that promise. President Trump, one week into office, issued EO-1 without consulting any of the relevant national security agencies. The same day, he told the country that the ban's waiver provision was meant to benefit Christians over Muslims. *See* J.R. 201. After he issued EO-2 to replace it, he repeatedly asserted that the alterations were urged only by his lawyers, and in his view he "should have stayed with the original."[5] He announced his plan to impose a "much tougher version," even before EO-2's review process was underway. *Id.* And he called for "the travel ban into the United States" to "be far larger, tougher and more specific."[6] Now, he has issued EO-3, the indefinite Muslim ban he had planned and promised all along.

Plaintiffs include individuals whose family members are seeking visas and will be subject to EO-3's indefinite ban. They also include organizational plaintiffs, whose clients and members are in the same position, and which will suffer institutional injuries from the ban. They

---

[4] Second Hausman Decl. Ex. E, J.R. 525 ("Transcript: Donald Trump's National Security Speech," Politico, June 13, 2016).

[5] Second Hausman Decl. Ex. S, J.R. 664 ("Donald J. Trump (@realDonaldTrump), Twitter, June 5, 2017).

[6] Second Hausman Decl. Ex. Z, J.R. 705 ("Trump urges 'larger, tougher' travel ban after London bombing," The Hill, Sep. 15, 2017).

challenge EO-3's entry and visa restrictions as a violation of the Establishment Clause, equal protection, and the Immigration and Nationality Act ("INA"). The ban goes into effect for their relatives, clients, and members on October 18, and they respectfully move this Court for a preliminary injunction before or soon after that date.

## LEGAL STANDARD

The Court should issue a preliminary injunction when plaintiffs show: (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). To show a likelihood of success on the merits, plaintiffs "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).

## ARGUMENT

Plaintiffs are likely to succeed on the merits of their statutory and constitutional claims, and an injunction is warranted. The individual and organizational plaintiffs have standing to challenge EO-3, which condemns and marginalizes them and their clients and members; threatens to indefinitely separate them from loved ones; and impedes the work and mission of the organizational plaintiffs. The ban violates the INA by claiming a sweeping new power to override the policy judgments of Congress without any finding of actual problems with visa vetting, and by establishing just the kind of national origins visa system Congress emphatically rejected. Nor is there any justiciability barrier to this Court's consideration of such statutory claims. The new ban also violates the Establishment Clause (as well as equal protection). It is yet another attempt to make good on the President's promised Muslim ban, and so—as the Fourth Circuit held with regard to its immediate predecessor—is not bona fide and violates the

Constitution's guarantee of religious neutrality.  Finally, plaintiffs face imminent and irreparable injury if the ban is not enjoined, outweighing any countervailing government interest in enforcing this unconstitutional ban.

## I.        Plaintiffs Have Standing to Bring Their Claims

"[O]ne party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quotation marks omitted). In this case, every plaintiff has standing.

The individual plaintiffs include Muslim U.S. citizens and lawful permanent residents in the United States seeking visas for their barred loved ones.  This Court and the Fourth Circuit have found standing in identical circumstances.  *See IRAP*, 857 F.3d at 582-87.  The ban threatens to upend the plaintiffs' plans to reunite with family, subjects them to "[f]eelings of marginalization and exclusion," *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012), and it conveys the message "that they are outsiders, not full members of the political community."  *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309 (2000) (quotation marks omitted).

The plaintiffs are all personally injured by EO-3's message of condemnation and exclusion.  For example, Mr. Mashta no longer feels at home in this country, and was unable to sleep after the announcement of EO-3; he had to take time off from work as a result.  Mashta Decl. ¶¶ 3-4, J.R. 467.  John Doe #5, who has personally experienced anti-Islamic harassment, feels that with EO-3 "the government is legitimizing the bad things that people say about Muslims."   Doe #5 Decl. ¶ 8, J.R. 447.   For Ms. Khazaeli, the bans have "taken the discrimination that my family has previously endured because people have seen us as Muslim and made it into law."  Khazaeli Decl. ¶ 18, J.R. 466.  John Doe #4 feels "demeaned" by EO-3's

religious intent, and he has perceived the bans as "collective punishment." Doe #4 Decl. ¶¶ 9-10, J.R. 461-62. The same is true for YAMA's and MESA's members, *see* Mubarez Decl. ¶¶ 1-2, 13, J.R. 481, 484; Second Mesa Decl. ¶ 4, J.R. 428, clients of AAANY and IRAP, *see* Issa-Ibrahim Decl. ¶ 15, J.R. 440; Third Heller Decl. ¶¶ 15-16, 24, J.R. 451, 452, and the other individual plaintiffs in this case, *see, e.g.*, Second Meteab Decl. ¶¶ 6-8, J.R. 473-74; Second Doe #1 Decl. ¶¶ 3-4, J.R. 444-45; Second Doe #3 Decl. ¶¶ 3-4, J.R. 458; Ziaolhagh Decl. ¶¶ 8-9, J.R. 479-80.

These harms, which stem from plaintiffs' "personal contact" with the ban, are "cognizable forms of injury." *IRAP*, 857 F.3d at 582 (quotation marks omitted). *See also Awad v. Ziriax*, 670 F.3d 1111, 1120-23 (10th Cir. 2012) (plaintiff had standing to challenge law based on its allegedly anti-Muslim message); *Catholic League for Religious and Civil Rights v. City and Cty. of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) (plaintiffs had standing to challenge city's resolution based on its allegedly anti-Catholic message).

EO-3 indefinitely prolongs the individual plaintiffs' separation from loved ones. *See IRAP*, 857 F.3d at 583. Like its predecessors, it "operate[s] by design" to deny visa issuance. *Id.* In fact, its impact is even more assured, because it has no end date. Like Doe #1, who the Fourth Circuit held had standing, many of the individual plaintiffs have petitions on behalf of relatives whose pending visa applications are "nearing the end of the lengthy immigrant visa process." *Id.* at 584. Mr. Mashta, Ms. Ziaolhagh, Mr. Shirani, and John Doe #4 all have approved I-130 petitions for their relatives, and those relatives have already completed their interviews and are awaiting the administrative processing of their visas. Mashta Decl., Ex. A ¶ 5, J.R. 470; Ziaolhagh Decl. ¶¶ 3, 5, J.R. 478-79; Doe #4 Decl. ¶¶ 4-5, J.R. 460-61; Shirani Decl. ¶¶ 3-4, J.R. 476. The other individual plaintiffs also have relatives seeking visas. Doe #5 Decl. ¶ 5, J.R. 447

(immediate relative awaiting visa interview); Amirjamshidi Decl. Ex. A ¶¶ 5-6, J.R. 424 (pending visitor visa application); Khazaeli Decl. ¶¶ 10-11, J.R. 464-65 (relative seeking visitor visa). YAMA's and MESA's members are in the same situation. Mubarez Decl. ¶¶ 14-15, 19-21, J.R. 484-86; Second Mesa Decl. ¶¶ 5-6, J.R. 429.

The organizational plaintiffs also have standing because EO-3 threatens to divert their resources, hamper their operations, and damage their core missions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that a diversion of resources constitutes Article III injury). IRAP has had to divert resources to counsel clients and respond to questions about EO-3, and anticipates that this diversion of resources will continue as long as EO-3 remains in effect. Third Heller Decl. ¶¶ 4-13, J.R. 449-51. AAANY's immigration services program—which makes up a third of its budget—will be undermined by EO-3, and AAANY's immigration-related employees' positions will be at risk. Issa-Ibrahim Decl. ¶¶ 8, 14-17, J.R. 438, 440-41. And MESA's mission of bringing together scholars of Middle Eastern Studies will suffer, as will its finances, which rely heavily on the annual meeting that many members and other scholars will no longer be able to attend. MESA Decl. ¶¶ 8, 10-19, J.R. 430-33.

In addition, IRAP and AAANY have third-party standing arising from the injuries EO-3 imposes on their clients. Third-party standing is warranted where an organization is itself injured, where it has a close relation to the individuals whose behalf it raises claims, and where there is a hindrance to the individuals' ability to protect their interests. *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991). Here, IRAP and AAANY are themselves injured, and each has clients who will be injured by EO-3 and who cannot adequately protect their own interests. AAANY has more than twenty members with pending visa petitions whose relatives will be banned by EO-3. Issa-Ibrahim Decl. ¶ 24, J.R. 443; *see also id.* at ¶¶ 19-23, J.R. 441-42 (describing individual

clients' cases). IRAP also has clients seeking visas for loved ones abroad. Third Heller Decl. ¶¶ 21-24, J.R. 452. The clients of these organizations face significant obstacles in raising claims themselves. *See* Second Heller Decl. ¶ 27, J.R. 453; Issa-Ibrahim Decl. ¶ 25, J.R. 443.

## II. EO-3 Violates the Immigration and Nationality Act.

The President's proclamation authority cannot reasonably be read to allow him to unilaterally revise the INA or to override the immigration law and policy judgments of Congress. But that is precisely what EO-3 does. It imposes a new immigration system on hundreds of millions of individuals for the foreseeable future. It conflicts with congressional choices on the proper response to country-specific vetting concerns, and the standards for adjudicating visa applications. And it reinstitutes a national-origin-based immigration system and ethnic exclusion rules that Congress not only renounced, but explicitly outlawed, decades ago. Thus, even without considering its improper religious purpose, EO-3 exceeds the President's authority.

In fact, EO-3 itself reads very much "like a statute," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952)—just not one Congress has enacted. On an indefinite (and perhaps permanent) basis, it bars all immigrant visas from seven countries. It also goes line-by-line through the INA, barring some categories of nonimmigrant visas while permitting others. In place of Congress's categories, it introduces new admissions criteria of the President's choosing: a requirement to show "undue hardship," new consular discretion to deny visas to eligible applicants, and a list of illustrative situations in which the President has determined that visas "may"—or may not—"be appropriate." EO-3 § 3(c)(iv). As the Supreme Court explained in a prior immigration case, the Framers were "acutely conscious" of the danger posed by subjecting national policy decisions to the "arbitrary action of one person." *INS v. Chadha*, 462 U.S. 919,

951 (1983).  The President cannot lawfully rewrite the INA by proclamation, as he has sought to do here.

## A.  The President's Delegated Authority Does Not Permit Him to Override Congress's Policy Judgments.

"The power the President has in the immigration context, and certainly the power he has by virtue of the INA, is not his by right, but derives from 'the statutory authority conferred by Congress.'"  *IRAP*, 241 F. Supp. 3d at 554 (quoting *Abourezk v. Reagan,* 785 F.2d 1043, 1061 (D.C. Cir. 1986) (R.B. Ginsburg, J.).  The statutory authority the government claims in this case is boundless.  It previously argued on appeal that as long as a § 1182(f) proclamation contains a bare recital that the banned entry "would be detrimental to the Nation's interests," there is no limit to what parts of the INA the President can cancel or revise.  Pet'rs Br. 41, 44, 50, *IRAP v. Trump*, No. 16-1436 (U.S.), *filed* Aug. 10, 2017.

Under the government's interpretation of § 1182(f), the President could override not only the provisions of the INA implicated here, *see infra*, but any others as well.  The President could declare that immigrant workers are detrimental to the interests of the United States, and then ban all entry on employment-based visas indefinitely.  He could declare that U.S. interests require solely an education- or skills-based immigration system, and then ban all entry on family-based visas.  Under the government's view, it would be no obstacle that Congress had enacted a detailed and extensive employment- *and* family-based immigration system.  8 U.S.C. § 1153(a) ("Preference allocation for family-sponsored immigrants"); *id.* § 1153(b) ("Preference allocation for employment-based immigrants").

That cannot be right.  Congress did not delegate wholesale its authority to make immigration law.  U.S. Const. art. I, § 8, cl. 4.  *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (holding that statute involving "travel controls" could not "grant the Executive totally unrestricted

freedom of choice"); *see also Kent v. Dulles*, 357 U.S. 116, 129 (1958) (facially broad delegation "construe[d] narrowly" in foreign affairs context in light of constitutional concerns). And it certainly did not do so through § 1182(f), which it enacted mere months after the Supreme Court had recognized limitations on Congress's ability to delegate its power in an immigration case. *See* Pub. L. 82-414, §212, 66 Stat. 163 (1952); *Carlson v. Landon*, 342 U.S. 524, 542-44 (1952) (holding that a "delegation of legislative power" is "permissible" only when "the executive judgment is limited by adequate standards"); *see also Mahler v. Eby*, 264 U.S. 32, 40-41 (1924).

No other President has used § 1182(f) to override Congress's policy judgments. For example, President Reagan suspended the entry of certain Cuban nationals in 1986 to retaliate against the Cuban government for its failure to abide by a migration agreement—a diplomatic event Congress did not and could not practicably address. Proclamation No. 5,517, 51 Fed. Reg. 30,470 (Aug. 26, 1986). President Bush's 1992 suspension of unauthorized entry by sea likewise responded to an urgent influx of unauthorized migrants. Exec. Order No. 12,807, 57 Fed. Reg. 23133 (May 24, 1992); *see Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 163-64 (1993) (describing escalating crisis). Most § 1182(f) suspensions have been far narrower, reaching only a handful of individuals who had contributed to specific and recent harmful situations abroad. *See generally* Kate M. Manuel, Executive Authority to Exclude Aliens, 6-10, Cong. Res. Serv., Jan. 23, 2017 (listing § 1182(f) suspensions); 9 Foreign Affairs Manual 302.14-3(B)(1)(b)(2)-(3) (2016). In each case, the suspension addressed a threat to U.S. interests to which Congress had not already responded.

That makes sense: Section 1182(f) is meant to grant authority *consistent* with the INA, not to permit a President to unilaterally override Congress's immigration policy judgments. *Accord Abourezk*, 785 F.2d at 1049 n.2 (explaining that § 1182(f) applies to "cases that [are] not

covered by one of the categories in [the INA]"); *Allende v. Shultz*, 845 F.2d 1111, 1118-19 (1st Cir. 1988) (same).[7]

### B. EO-3 Exceeds the President's Delegated Statutory Authority Under § 1182(f).

EO-3 extends beyond anything that could plausibly be consistent with the INA. It rewrites our entire immigration system for hundreds of millions of people—including millions of Americans—whose visa petitions are now subject to an admission system designed by the President, not the one enacted by Congress. For those millions of people, EO-3 imposes a nationality-based regime, where people from certain countries can immigrate to the United States, and people from other countries by default cannot. And the government can no longer seek to avoid these grave separation-of-powers questions by painting the ban as a "temporary pause." EO-3 supplants the INA's scheme *permanently*, unless the President chooses to modify it. The Supreme Court recently reminded us that "[i]mmigration policy shapes the destiny of the Nation." *Arizona v. United States*, 567 U.S. 387, 415 (2012). With EO-3, the President has attempted to seize that power for himself alone. But he lacks the authority to do so.

EO-3 contradicts multiple policy judgments Congress has enacted into law. Each conflict is enough to invalidate the order for exceeding the President's authority under § 1182(f).

### 1. EO-3 Conflicts with Congress's Response to the Same Vetting and Security Concerns.

EO-3 frames its country bans as a response to the banned countries' failure to meet a list of "baseline" criteria related to information-sharing, passport practices, and country conditions. *See* EO-3 §§ 1(c)(i)-(iii), 1(d)-(g), 1(h)(ii)-(iii). The government has described these as "new

_____

[7] The same is true for 8 U.S.C. § 1185(a). Although EO-3 invokes it and the government has cited it in this case, the government has explained how § 1185(a) might provide a meaningfully different suspension authority. That is a sensible concession: Unlike § 1182(f), § 1185(a) does not speak to entry suspensions, it requires that any conditions on entry be "reasonable," and it is subject to the same separation-of-powers principles as § 1182(f).

standard[s]."[8]  White House, Fact Sheet, *Proclamation on Enhancing Vetting Capabilities*, at 3, Sept. 24, 2017.  But none of EO-3's baseline criteria are new:  They are lifted directly from the statutory requirements for a country to participate in the Visa Waiver Program (VWP).[9]  8 U.S.C. § 1187.  In other words, Congress has considered the same problems—other countries' "[i]dentity-management information," sharing of "[n]ational security and public-safety information," and "risk" factors.  EO-3 § 1(c)(i)-(iii); *compare* 8 U.S.C. § 1187(a)(3)(B) (electronic passports), (c)(2)(D) (lost or stolen passports), (c)(2)(F) (terrorism and public-safety information sharing), (a)(12)(D)(ii) (terrorist safe havens), (c)(5)(B)(ii) (civil wars, ungoverned territory), (c)(2)(E) (receiving nationals subject to removal orders).  And Congress's solution, enacted into law, is to exclude those countries from the VWP, not to outright ban their nationals.

The President has thus nullified Congress's approach to the same issues.  Under Congress's system, if a country fails to meet the VWP requirements, its nationals cannot enter without visas, and instead must undergo the individualized visa vetting process.  8 U.S.C. §§ 1202(a)-(d), 1202(f), 1361.  The President, on the other hand, bars people from entering *at all* because of their country's failure to meet the VWP requirements.  With EO-3, the President has simply wiped out Congress's considered judgment about the proper response to the same circumstances.

EO-3 similarly rejects Congress's recent response to conditions in the specific countries it bans.  *See Hawai'i*, 859 F.3d at 773-74.  Like EO-1 and EO-2, the latest order explains that a "terrorist presence" or being a "terrorist safe haven" could justify banning a country.  EO-3 §§

---

[8] Second Hausman Decl. Ex. EE, J.R. 747 (White House, Fact Sheet, "Proclamation on Enhancing Vetting Capabilities," Sept. 24, 2017).
[9] The Visa Waiver Program, first enacted by Congress in 1986, allows certain travelers to enter the United States for temporary visits without visas.  *See* U.S. Dep't of State, *Visa Waiver Program*, https://travel.state.gov/content/visas/en/visit/visa-waiver-program.html.

1(c)(iii), 2(a)-(h); *compare* EO-2 § 1(e). But Congress has already addressed these same circumstances. In 2015, Congress considered and addressed the possibility, in light of recent events, that nationals of certain countries—including those banned in EO-1, EO-2, and now EO-3—might prove an unacceptable risk. A number of proposals for outright bans were advanced, but Congress rejected them all. *See, e.g.*, H.R. 3314, 114th Cong., *introduced* July 29, 2015; S. 2302, 114th Cong., *introduced* Nov. 18, 2015.

Instead, Congress decided to amend the VWP to make certain visitors to and dual nationals of the countries in question ineligible for visa-less travel. *See* Pub. L. 114-113, div. O, tit. II, § 203, 129 Stat. 2242 (codified at 8 U.S.C. § 1187(a)(12)). It also empowered the Executive Branch to add new countries to the list if it finds they are "safe haven[s] for terrorists" or have a "significant [terrorist] presence." 8 U.S.C. § 1187(a)(12)(D)(ii). The newly ineligible visitors and dual nationals are now subject to the same stringent vetting procedures that Congress has long applied to countries outside the Visa Waiver Program, under which the applicant bears the burden to produce adequate documentation, *see* 8 U.S.C. § 1202(a)-(d), must "submit to an in person interview with a consular officer," *id.* § 1202(f), and must be denied a visa if she fails to convince the consular officer about any ground of inadmissibility, *id.* § 1361.

By choosing these procedures over more extreme ban proposals, Congress *reaffirmed* its confidence in its existing vetting system—and its rejection of blanket nationality-based bans. As the principal sponsor explained, Congress would now require the individuals in question "to apply for a visa and go through the formal visa screening process" in "an abundance of caution." 4 Cong. Rec. H9051 (Dec. 8, 2015) (Rep. Miller); *see also id.* at H9054-55 (Dec. 8, 2015) (Rep. Lee) (emphasizing the importance of the visa interview); *id.* at H9057 (Dec. 8, 2015) (Rep. Schiff) (emphasizing the "in-person interview" and "more rigorous security screening processes"

of the visa application process).  Moreover, the Executive Branch's new authority to suspend countries from the Visa Waiver Program would provide "leverage" to promote "[i]nformation sharing" about terrorist threats.  *Id.* at H9051 (Dec. 8, 2015) (Rep. Miller); *see* H.R. Rep. No. 114-369, at 3-4 (2015) (explaining that this authority would allow the government to pressure countries "to provide terrorism-related information").

Notably, both prior orders relied specifically on the 2015 enactment for their list of banned countries.  EO-1 § 3(c); EO-2 § 1(b)(i).  EO-3 does not, instead purporting to rely on a new methodology developed by DHS and other agencies.  Yet the lists of banned countries are strikingly similar: five of the six countries banned by EO-2 remain banned today.  It was *not* Congress's intent that those countries be banned altogether, as opposed to subject to the ordinary, rigorous visa application process. EO-3 nullifies these careful and recent congressional choices. Despite Congress's decision to deploy "appropriately targeted improvements" as to these countries, 4 Cong. Rec. H9057 (Dec. 8, 2015) (Rep. Schiff), EO-3 outright *bans* them, displacing Congress's targeted approach entirely.

### 2. EO-3 Lacks an Adequate Finding to Justify Its Dramatic Departure from Congress's Scheme.

EO-3 provides no rational explanation for why Congress's system is (or even might be) inadequate.  Based on concerns about the possibility of vetting errors, the order suspends our immigration system for some 180 million people indefinitely, perhaps permanently.  And yet it cites not a single vetting error of any kind for the banned countries, or any changed circumstances that prompted the need for this unprecedented action.  Neither did either of its predecessors, even after multiple agencies spent weeks "compil[ing] additional factual support" to retroactively justify the President's second ban.  Gov't Stay Reply at 2-3, Doc. 102, No. 17-1351 (4th Cir. filed Apr. 5, 2017).  EO-2 cited only a *single* terrorism-related incident involving

a national of a banned country—a refugee who arrived as a toddler.  *See* EO-2 § 1(h).  EO-1

cited no vetting errors in almost two decades.  *See Aziz v. Trump*, 234 F. Supp. 3d 724, 729 (E.D.

Va. 2017) (noting that the government had not "even described the process by which the

president concluded that this action was necessary").  EO-3 does not even acknowledge that its

"baseline" criteria are simply the requirements for VWP participation.

Section 1182(f) does not allow the President to impose such dramatic and lasting changes

based merely on an "unsupported conclusion."  *IRAP*, 857 F.3d at 609 (Keenan, J., concurring in

part and concurring in the judgment); *see Hawai'i*, 859 F.3d at 770-74.  Before he can suspend

entry, the President must actually "find that entry of any members of the identified class *would

be* detrimental to the interests of the United States."  *IRAP*, 857 F.3d at 609 (Keenan, J.,

concurring in part and concurring in the judgment) (emphasis in original).  Without a single word

about vetting failures, or any other reason to question the efficacy of Congress's existing vetting

system, EO-3 fails this predicate requirement.

In reality, vetting failures for nationals of the banned countries are vanishingly rare.  *See*

David Bier, *The Basic Premise of Trump's Travel Ban is Wrong*, Cato Institute, Sept. 26, 2017

(documenting only one fatal attack by a foreign national who radicalized before entering the

United States; that individual was not from one of the banned countries).[10]  *See also* Joint

Declaration of Former National Security, Foreign Policy and Intelligence Officials ¶¶ 6-9, J.R.

754 (finding "no evidence from the government for the why country suddenly needs to shift from

[the] tested system of individualized vetting").  Moreover, in the banned countries, consular

officers have *already* been denying visa applications at a much higher rate than for other

countries.  *See* Br. for Cato Inst. at 9-11, No. 16-1436, *filed* Sept. 9, 2017 (denial rates for banned

---

[10] Second Hausman Decl. Ex. CC, J.R. 735-37.

countries "79 percent higher than for all other nationalities"). The Congressional scheme requires applicants, not their governments, to produce the information necessary to demonstrate that they are eligible for visas. 8 U.S.C. § 1361. And Congress has repeatedly tightened visa screening protocols in recent years. *See, e.g.*, Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. 110-53, 121 Stat. 266; Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458, §§7201, 7203, 118 Stat. 3638; Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. 107-173, tit. II, 116 Stat. 543. EO-3 provides no reason to discard this system.

### 3. EO-3 Conflicts with Congress's Standards for Reviewing Visa Applications.

EO-3 impermissibly alters the visa-processing standards Congress has chosen. Under Congress's standards, a visa applicant must establish, "to the satisfaction of the consular officer," that she is eligible for the visa and not subject to any inadmissibility bars, 8 U.S.C. § 1361, which include a long list of "criminal," "security," "terrorist," and "foreign policy" grounds. *Id.* § 1182(a)(2), (a)(3)(A)-(C), (F); 22 C.F.R. § 40.6(a) ("The burden of proof is upon the applicant . . . ."); *see also, e.g.*, 8 U.S.C. § 1182(a)(3)(A) (aliens who may engage in unlawful activity); *id.* § 1182(a)(3)(B)(i)(I)-(II) (aliens who have engaged or will engage in terrorist activity); *id.* § 1182(a)(3)(B)(i)(V) (members of terrorist organizations). If the applicant can establish that she is eligible and not inadmissible, the consular officer must grant her the visa. *Id.*

EO-3 conflicts with that approach by imposing new requirements on top of Congress's. EO-3 requires an applicant from the banned countries to establish, "to the consular officer's . . . satisfaction," that she does "not pose a threat to the national security or public safety of the United States." EO-3 § 3(c)(i)(B). And EO-3 goes further. In addition to satisfying the INA's criteria, applicants from the affected countries must *also* establish that denying entry would

cause "undue hardship," and that "entry would be in the national interest." EO-3 § 3(c)(i)(A), (B).

EO-3's visa requirements thus contradict Congress's choice of admissions standards. Congress does not require visa applicants to demonstrate "undue hardship."[11] And Congress itself has decided whose "entry would be in the national interest" by providing categories of people who are eligible for visas. The President cannot simply replace those categories with his own list. *See* EO-3 § 3(c)(iv)(A)-(J). Moreover, those additional requirements have nothing to do with the Order's supposed rationales: security and vetting. EO-3 does not explain where they come from. Nor does it make any "find[ing]" as to why the entry of people who cannot meet its hardship prong, for example, would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f).

### C. EO-3 Also Violates the INA's Anti-Discrimination Mandate.

By banning the use of immigrant visas from certain countries, EO-3 resurrects the discriminatory national-origins quota system that Congress abolished in 1965. That system was designed to maintain "the ethnic composition of the American people." *IRAP*, 241 F. Supp. 3d at 553 (quoting H. Rep. No. 89-745, at 9 (1965)). President Johnson, in his signing statement, declared that "for over four decades the immigration policy of the United States has been twisted and has been distorted by the harsh injustice of the national origins quota system." Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill (Oct. 3, 1965). Indeed, the "legislative history surrounding the 1965 Act is replete with the bold anti-discriminatory principles of the Civil Rights Era." *Olsen v. Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997).

---

[11] Congress knows how to require a showing of hardship when it wants to. *See, e.g.*, 8 U.S.C. § 1229b(b)(1)(D).

Congress therefore overhauled and reoriented the entire immigration system, renouncing both the national-origin-based system and the ethnic racial and discrimination it effectuated. And Congress specifically provided that "no person shall . . . be discriminated against in the issuance of an immigrant visa because of the person's . . . nationality." 8 U.S.C. § 1152(a)(1)(A). This anti-discrimination mandate could not be clearer. Save for the enumerated exceptions not at issue here, *id.*, no one can be denied an immigrant visa solely because of his or her nationality.

Yet that is exactly what EO-3 explicitly does. It provides that nationals of Chad, Iran, Libya, North Korea, Syria, Yemen, and Somalia may not come to the United States "as immigrants," indefinitely, solely because of their nationality. EO-3 § 2(a)-(h); *see id.* § 1(h)(ii) (explaining that the Order "distinguish[es] between the entry of immigrants and nonimmigrants" and bars the use of immigrant visas). The breadth of this nationality-based ban is breathtaking and has no post-1965 parallel. This is nothing less than a modern-day national-origins system. Congress has emphatically rejected that approach. *See IRAP*, 857 F.3d at 635-38 (Thacker, J., concurring); *Hawai'i*, 859 F.3d at 776-79 (same).

It makes no difference that the Order bars "entry" using immigrant visas, instead of explicitly barring the visas themselves. The effect is the same. Denying visas to a disfavored group of visa applicants, and denying *entry* to that same disfavored group of visa applicants, has the same practical import. And, in fact, EO-3's principal effect on immigrants from the banned countries will be the denial of visas. The government has repeatedly admitted that it will implement EO-3 "by denying visas." Br. for the Petitioners, *IRAP v. Trump*, Nos. 16-1436 & 16-1540, at 51-52. And anyone who *already* has a visa is not banned. *See* EO-3 § 3(a)(ii). So the Order operates to restrict who can receive a visa—a restriction based entirely on nationality.

Thus, in its actual operation, EO-3 is not an entry ban, but a visa ban. *See Hawai'i*, 859 F.3d at 776-77 ("We cannot blind ourselves to the fact that, for nationals of the" banned countries, the order "is effectively a ban on the issuance of immigrant visas."). Indeed, the State Department describes it as a "Presidential Proclamation on Visas."[12] It is hard to imagine a clearer attempt to circumvent § 1152(a).

And, contrary to the government's argument in prior briefs, §1152(a) does not conflict with § 1182(f), because the latter does not extend so far as to authorize the President to override Congress's policy judgments. *See supra* Part I.A. But if there were any conflict between the two provisions, § 1152(a) would control. It is later-enacted and more specific, in that it specifically addresses nationality discrimination in the issuance of visas, while § 1182(f) is silent as to visa issuance in general and discrimination in particular. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 & n.7 (1976).

### D. There is No Justiciability Bar to Plaintiffs' Statutory Claims.

The government may contend, as it has at other stages of this litigation, that plaintiffs' statutory claims are non-justiciable. That is not so. The Court has authority to review whether EO-3 complies with statutory law. *See IRAP*, 857 F.3d at 587 (rejecting non-reviewability argument as "a dangerous idea"); *Hawai'i*, 859 F.3d at 768-69 (same).

The Supreme Court itself has reached the merits of a statutory challenge to a § 1182(f) suspension. In *Sale*, 509 U.S. 155, plaintiffs claimed that an Executive Order issued pursuant to 8 U.S.C. § 1182(f)—the same statute EO-3 invokes—violated the INA. *Id.* at 165-66, 172 & n.27. The Supreme Court reviewed the claim on the merits, *id.* at 170-89, despite the government's arguments that the Court lacked authority to review the statutory claim. *See* U.S.

---

[12] Second Hausman Decl. Ex. B, J.R. 506 (U.S. Dep't of State, "Presidential Proclamation on Visas").

Br. 13-18 & n.9, 55-57, 1992 WL 541276, Reply Br. 1-4, 1993 WL 290141, *Sale v. Haitian Ctrs. Council, Inc.* (No. 92-344). Indeed, courts regularly review whether executive action—including presidential action—complies with the statutes Congress has enacted, even when matters of foreign policy are at issue. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (calling the interpretation of statutes "a familiar judicial exercise").

Those decisions are consistent with "the strong presumption in favor of judicial review of administrative action." *INS v. St. Cyr*, 533 U.S. 289, 298 n.9 (2001) (collecting cases). This review is available both under the Administrative Procedure Act and in equity more broadly. *See* 5 U.S.C. §§ 702, 706 (providing for relief against federal agencies); *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-85 (2015) (describing "a long history of judicial review of illegal executive action" in equity); *Dames & Moore v. Regan*, 453 U.S. 654, 669-88 (1981) (reviewing statutory claim against the President in equity); *Sale*, 509 U.S. at 170-89 (same). The presumption of judicial review can only be overcome when Congress expresses a "clear and convincing" intent to "restrict access to judicial review" of the challenged action. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 671 (1986).

Courts have recognized a very narrow exception for non-constitutional claims challenging a "consular official's decision to issue or withhold a visa." *Bustamante v. Mukasey*, 531 F.3d 1059, 1061 (9th Cir. 2008) (internal quotation marks omitted).[13] But that doctrine only applies to "a particular determination in a particular case," not a statutory claim against a "general" policy. *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985); *see Patel v. Reno*, 134 F.3d 929, 931-32 (9th Cir. 1997) (same); *Mulligan v.*

---

[13] The Supreme Court has never explicitly endorsed that doctrine. It has reviewed constitutional claims against individual visa denials on the merits. *See Kliendienst v. Mandel*, 408 U.S. 753 (1972); *Kerry v. Din*, 135 S. Ct. 2128 (2015).

*Schultz*, 848 F.2d 655, 657 (5th Cir. 1988) (same). No court has ever held that executive orders, proclamations, or other general policies are immune from review. *See IRAP*, 857 F.3d at 587 (finding "authority to review high-level government policy"); *cf. United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 544-47 (1950) (noting in dicta that an individual decision "to exclude a given alien" may not be reviewable, but reviewing two statutory claims against an executive order on the merits). And even in challenges to consular visa denials, the D.C. Circuit has explained that to avoid reaching constitutional questions unnecessarily, a court *must* consider statutory claims. *Abourezk v. Reagan*, 785 F.2d 1043, 1052 (D.C. Cir. 1986) (R.B. Ginsburg, J.); *accord id.* at 1062 n.1 (Bork, J., dissenting).

### III.    EO-3 Violates the Establishment Clause and Equal Protection.

EO-3 is the next step in the progression that started with the President's calls for a Muslim Ban and led to the six-country ban enjoined by this Court and the Fourth Circuit. Nothing about EO-3 breaks the clear and direct chain: This ban, like its predecessors, remains an attempt to make good on the President's promise to ban Muslims. The Fourth Circuit's en banc decision affirming this Court's injunction therefore dictates the result here.

The Fourth Circuit determined that cases applying the "facially legitimate and bona fide test to challenges to individual visa denials" provided the proper framework, while also giving effect to cases holding that the government's immigration power is "subject to important constitutional limitations." *IRAP v. Trump*, 857 F.3d at 589 (citing, *inter alia*, *Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring in the judgment); *Mandel*, 408 U.S. at 770; *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *Chadha*, 462 U.S. at 941.[14] Where plaintiffs have "seriously called into question whether the stated reason for the challenged action was provided in good faith," the

_____

[14] As plaintiffs previously argued, Mandel does not apply.

Fourth Circuit held, courts must "look behind the stated reason for the challenged action." *IRAP*, 857 F.3d at 591.

EO-2 presented such circumstances. The Fourth Circuit noted plaintiffs' "ample evidence" that the proffered reason for EO-2 was "not the true reason," including:

> . . . then-candidate Trump's numerous campaign statements expressing animus towards the Islamic faith; his proposal to ban Muslims from entering the United States; his subsequent explanation that he would effectuate this ban by targeting "territories" instead of Muslims directly; the issuance of EO-1, which targeted certain majority-Muslim nations and included a preference for religious minorities; an advisor's statement that the President had asked him to find a way to ban Muslims in a legal way; and the issuance of EO-2, which resembles EO-1 and which President Trump and his advisors described as having the same policy goals as EO-1. Plaintiffs also point to the comparably weak evidence that EO-2 is meant to address national security interests, including the exclusion of national security agencies from the decisionmaking process, the post hoc nature of the national security rationale, and evidence from DHS that EO-2 would not operate to diminish the threat of potential terrorist activity.

*Id.* at 591-92 (citations omitted). Concluding that plaintiffs had "more than plausibly alleged that EO-2's stated national security interest was provided in bad faith, as a pretext for its religious purpose," the Fourth Circuit held that it was no longer bound to "defer to that reason and instead [could] 'look behind' EO-2." *Id*. at 592. Accordingly, the Court applied the "normal constitutional tools"—the Establishment Clause—to EO-2. *Id*. at 592. The same evidence of bad faith exists with respect to EO-3, and so this Court should do the same here.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Supreme Court has thus "often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

When the government acts with the ostensible purpose of denigrating or excluding a particular religion or its adherents, it violates several different Establishment Clause tests that the Supreme Court has articulated. *See, e.g.*, *Larson*, 456 U.S. at 246 (striking down "law granting a denominational preference"); *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 593-94 (1989) ("The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from making adherence to a religion relevant in any way to a person's standing in the political community.") (quotation marks omitted); *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 864 (2005) ("[G]overnment action must have 'a secular . . . purpose,'" that is "genuine, not a sham, and not merely secondary to a religious objective.").

"The evidence in the record," the Fourth Circuit observed, "create[d] a compelling case that EO-2's primary purpose is religious," in violation of the Establishment Clause. *Id*. at 594. The Court explained, citing the many statements made by the President and his advisors, that:

> These statements, taken together, provide direct, specific evidence of what motivated both EO-1 and EO-2: President Trump's desire to exclude Muslims from the United States. The statements also reveal President Trump's intended means of effectuating the ban: by targeting majority-Muslim nations instead of Muslims explicitly. And after courts enjoined EO-1, the statements show how President Trump attempted to preserve its core mission: by issuing EO-2—a "watered down" version with "the same basic policy outcomes."

*Id*. at 595. Rejecting the government's many arguments to ignore some or all of the probative evidence, the Court observed that the deference owed to the President "must yield in certain circumstances, lest we abdicate our own duties to uphold the Constitution." *Id*. at 601. And, examining all the evidence, EO-2 simply could not be "divorced from the cohesive narrative linking it to the animus that inspired it." *Id*.

The same is true of EO-3.  Far from breaking the "cohesive narrative," the continuity from EO-2 to the current version is stark.  EO-3 is on its face a successor to and continuation of EO-2.  The new order implements the indefinite ban that EO-2 expressly contemplated and that the President has long promised.  It does so in reliance on the same kind of blanket, countrywide invocations of 8 U.S.C. § 1182(f) imposed by EO-2.  EO-3 relies on the same rationales about country conditions and information sharing, and, like EO-2, it does not identify any failures in the vetting system that justify these drastic and unprecedented measures.  And, like its predecessors, the new ban overwhelmingly targets Muslims.  Indeed, five of the six almost entirely Muslim countries subject to EO-2 remain banned by EO-3.

To be sure, the new ban is not the same as earlier ones in every respect.  And the government is likely to place particular weight on the inclusion of two non-Muslim-majority countries to argue that finally—on his third attempt—the President has imposed a ban that does not seek to bar Muslims because of their religion.  But any such suggestion is wrong.

First, the inclusion of two such countries appears to be little more than the kind of "litigating position" that reasonable observers easily see through.  *IRAP*, 857 F.3d at 596 (quoting *McCreary*, 545 U.S. at 848).  *McCreary* is instructive.  After a court held that a Ten Commandments display and a modified successor display violated the Establishment Clause, the defendant counties installed yet another version, "the third within a year."  545 U.S. at 854-55.  The third version included new, non-religious documents that, according to the counties, rendered the purpose of the display religion-neutral.  *Id.* at 871-72.  Although the counties "cited several new purposes for the third version," the Court examined all the relevant circumstances and concluded that a reasonable observer "would probably suspect that the Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally

required to embody religious neutrality." *Id*. at 871, 873. *McCreary*, like this case, involved "recent evidence of purpose" bearing on a challenge to "the latest step in developing litigation brought as a challenge to institutional practices that unquestionably violated the Establishment Clause." *Id*. at 873 n.22 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000)). Here, as in *McCreary*, the Court cannot "turn a blind eye to the context in which this policy arose." *Santa Fe*, 530 U.S. at 315.

Second, the minimal ways in which EO-3 affects the two non-Muslim-majority countries undermines the suggestion that the inclusion of those countries makes any difference for Establishment Clause purposes. Visa applications from North Korea will be blocked. But even before EO-3, such applications were close to nonexistent. *See supra* n.3. That country's inclusion is thus little more than symbolic, in contrast to the very real effect the ban will have on large numbers of Muslims. *Id*. And for Venezuela, EO-3 applies differently, such that its impact will be a tiny fraction of that felt by the Muslim-majority countries: The entire populations of the Muslim-majority countries are subject to the bans, which include all immigrants and most non-immigrants—consistent with the President's promise of a Muslim ban, and with the countrywide bans imposed by EO-1 and EO-2. But for Venezuela, only certain government officials and their family members are banned, and only with regard to tourist-type visas. A reasonable observer, examining such starkly different treatment, would conclude that the government was "simply reaching for any way" to obfuscate the principal purpose of the ban. *McCreary*, 545 U.S. at 873.

Third, the fact that the ban applies to some non-Muslims is no answer to the Establishment Clause violation. Just as the Fourth Circuit observed with regard to EO-2, which banned non-Muslims from the six listed countries, the new ban's "practical operation is not

severable from the myriad statements explaining its operation as intended to bar Muslims from the United States." *IRAP*, 857 F.3d at 597. That the order is "overinclusive" by barring a handful of non-Muslims is simply "not responsive to the purpose inquiry." *Id*. To discern purpose, the court must look to "the full context" of EO-3. *Id*. And, just as in *IRAP*, the full context here is clear: EO-3, like its predecessors that expressly directed its issuance, has a primarily anti-Muslim purpose and message.

Fourth, as was the case for EO-2, any claim that the primary purpose of EO-3 is security-related is "belied by the evidence in the record." *IRAP*, 857 F.3d at 596. The government has still provided no evidence of vetting failures that would justify such drastic bans, no evidence to refute the testimony of recent national security officials or the DHS reports that were released after EO-2, and no indication that a national from the banned countries has carried out a successful terror attack on U.S. soil in the last 40 years. And it is little surprise, and hardly indicates a real security need, that DHS recommended a list of countries to include in an indefinite ban—that is precisely what the President previously ordered it to do. *See* EO-2 § 2(e) (ordering DHS to submit "a list of countries recommended for inclusion in a Presidential proclamation" banning entry). Moreover, the President has continued to express his overriding desire to impose a multi-country ban, including before the review that supposedly prompted EO-3 was complete, or even underway. *Compare* J.R. 664 (calling for a "much tougher" ban on June 5), *with* EO-3 § 1(h) (President received DHS recommendation September 15); *id.* § 1(c) (President received initial DHS report July 9). And in any event, those reports were commissioned by an order whose purpose, this Court and the Fourth Circuit have held, at least as to the 90-day ban, was to target Muslims..

The Fourth Circuit was unmoved by the government's prior assertion that EO-2 was adopted based on the recommendations of agency officials. *IRAP*, 857 F.3d at 577, 598. Moreover, here it is so far unclear what those recommendations were, or what they were based on. For example, the decision to ban nationals of Chad, "one of the most effective counterterrorism partners in the region," left officials in the State Department and the military "befuddled and frustrated." Joint Declaration of Former National Security, Foreign Policy and Intelligence Officials ¶ 11, J.R. 755-56 (citation and internal quotation marks omitted). And the government has not explained, for instance, whether DHS recommended that the much narrower ban be imposed on Venezuela and the far more sweeping bans be imposed on the Muslim-majority countries; and it has not disclosed whether there are additional countries that fail to meet the baseline, but are nonetheless excepted from the ban. Indeed, the government has declined to release even redacted versions of the reports that supposedly underlie EO-3's drastic alteration of our immigration system, or any other evidence for that matter.

But ultimately the answers to those questions—while they would be enlightening—are unnecessary. In assessing an Establishment Clause claim, the Court does not look only to "the latest news about the last in a series of governmental actions, however close they may all be in time and subject." *McCreary*, 545 U.S. at 866. That is because "the world is not made brand new every morning," and "reasonable observers have reasonable memories." *Id.* Here, the evidence of purpose is essentially the same as this Court and the Fourth Circuit recognized with regard to EO-2. EO-3 likewise violates the Establishment Clause.

For similar reasons, EO-3 also violates equal protection. "[T]he Religion Clauses . . . and the Equal Protection Clause as applied to religion . . . all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or

duties or benefits." *Hassan v. City of New York*, 804 F.3d 277, 290 n.2 (3d Cir. 2015) (quoting *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring in the judgment) (alterations in original, internal quotation marks omitted)); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam); *Washington v. Trump*, 847 F.3d 1151, 1167-68 (9th Cir. 2017); *United States v. Brown*, 352 F.3d 654, 668 & n.18 (2d Cir. 2003). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985). Here, the same direct and circumstantial evidence that reveals an Establishment Clause violation also demonstrates a violation of equal protection.

## IV. Plaintiffs Will Suffer Irreparable Injury in the Absence of an Injunction.

The same injuries that establish plaintiffs' standing also constitute irreparable harm. *See IRAP*, 857 F.3d at 601-02 (condemnation); *Hawaii*, 859 F.3d at 782-83 ("prolonged separation from family members").

EO-3's condemnation of plaintiffs' religion will not remain on hold while their relatives' applications are processed; rather, every day the ban is in effect is an injury. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (citations and quotation marks omitted).

Likewise, the time that the individual plaintiffs and the organizational plaintiffs' clients and members will spend separated from their families could not possibly be addressed by damages. Ms. Khazaeli's husband has terminal cancer, and her sister-in-law will likely never see

him again if EO-3 takes effect. Khazaeli Decl. ¶ 12, J.R. 465. AAANY has clients whose parents are stranded in war zones in Yemen and Syria, Issa-Ibrahim Decl. ¶ 21-22, J.R. 442-43, and a client whose husband has not yet seen his newborn son, *id.* ¶ 19, J.R. 441. John Doe #4 finds life without his wife "excruciatingly difficult," and is unable to start a family while he waits. Doe #4 Decl. ¶¶ 6-7, J.R. 461. Mr. Shirani is forced to choose between access to medical care (for complications from a tumor in his inner ear) and being with his wife in Iran. Shirani Decl. ¶ 5, J.R. 476.

In addition, the organizational plaintiffs will suffer various kinds of irreparable harm. For example, IRAP has diverted resources to produce materials on EO-3, Third Heller Decl. ¶¶ 6-8, J.R. 450, and to counsel clients and family members in the U.S. and abroad about its effects, *id.* ¶¶ 10-14, J.R. 450-51. YAMA's members have felt the impact of the bans partly through friends and acquaintances abroad, as well as through family members. Mubarez Decl. ¶¶ 13-14, J.R. 484. And MESA will be harmed not only by EO-3's impact on its members, but also by EO-3's impact on nonmembers unable to attend its meeting. Second Baron Decl. ¶ 17, J.R. 432-33.

## V. The Balance of the Equities and the Public Interest Favor Issuance of an Injunction.

Plaintiffs' injuries far outweigh any harm to the government an injunction would cause. *See IRAP*, 857 F.3d at 602-04; *Hawaii*, 859 F.3d at 783-85. The government is "in no way harmed" by an injunction that "prevents [it] from enforcing restrictions likely to be found unconstitutional." *IRAP*, 857 F.3d at 603 (quoting *Centro Tepeyac*, 722 F.3d at 191). And the Fourth Circuit "reject[ed] the notion that the President, because he or she represents the entire nation, suffers irreparable harm whenever an executive action is enjoined." *Id.*

Nor is the government harmed by adhering to visa procedures that have been in place for years, and that Congress has determined serve the public interest. It has come forward with no evidence to suggest that vetting failures are likely absent its unprecedented ban. The government's invocation of national security is not a "silver bullet that defeats all other asserted injuries." *Id.* at 603; *see also* Joint Declaration of Former National Security, Foreign Policy and Intelligence Officials ¶¶ 13-15, J.R. 756-57 (explaining why "Travel Ban 3.0 would undermine the national security of the United States). Nor are its foreign affairs interests. And the public interest also strongly favors a preliminary injunction: when courts "protect the constitutional rights of the few, it inures to the benefit of all." *Id.* at 604.

## CONCLUSION

The Court should grant the motion for a preliminary injunction.

Respectfully submitted,                     Dated:  October 6,  2017

/s/ Omar C. Jadwat

Omar C. Jadwat†
Lee Gelernt†
Hina Shamsi†
Hugh Handeyside†
Sarah L. Mehta†
David Hausman††
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org
lgelernt@aclu.org
hshamsi@aclu.org
hhandeyside@aclu.org
smehta@aclu.org
dhausman@aclu.org

Cecillia D. Wang†
Cody H. Wofsy†
Spencer E. Amdur†
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org
cwofsy@aclu.org
samdur@aclu.org

David Cole†
Daniel Mach†
Heather L. Weaver†
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 675-2330

Karen C. Tumlin†
Nicholas Espíritu†
Melissa S. Keaney†
Esther Sung†
National Immigration Law Center
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
Tel: (213) 639-3900
Fax: (213) 639-3911
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

Justin B. Cox (Bar No. 17550)
National Immigration Law Center
PO Box 170208
Atlanta, GA 30317
Tel: (678) 279-5441
Fax: (213) 639-3911
cox@nilc.org

Fax: (202) 457-0805
dcole@aclu.org
dmach@aclu.org
hweaver@aclu.org

David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar No.19670)
American Civil Liberties Union
 Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
steiner@aclu-md.org

*Counsel for Plaintiffs*

†Admitted *Pro Hac Vice*
†† Application for admission *Pro Hac Vice* pending

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2017, I electronically filed this Motion for Plaintiffs with the Court Clerk using the ECF system, which will send notification to Defendants' registered counsel.

Dated: October 6, 2017                     /s/ Omar Jadwat
                                           Omar Jadwat