# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

|  |  |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, et al., | Civil Action No.: 8:17-CV-00361-TDC |
| Plaintiffs, | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| DONALD TRUMP, et al, | |
| Defendants. | |

# TABLE OF CONTENTS

I.  EO-3 Is a Continuation of the First Two Executive Orders ........................................................ 1

II.  EO-3 Violates The INA ............................................................................................................. 4

III. EO-3's Entry Restrictions Violate the Constitution ................................................................. 14

IV. The Balance of Equities and the Public Interest Favor Enjoining EO-3's Ban Provisions
     in Their Entirety .................................................................................................................... 18

## I.       EO-3 Is a Continuation of the First Two Executive Orders

The government suggests that EO-3 is not in substance a continuation of EO-2's ban, despite their striking similarities; that it has no connection to the President's many promises to ban Muslims by banning nationals of Muslim countries; and that it is not the President's creation, but rather that of agency experts, whose objective application of neutral criteria happened to produce essentially an indefinite version of EO-2.  That is untenable.

EO-3's text confirms that it is fundamentally grounded in EO-2, an order that "drips with religious intolerance, animus, and discrimination."  *Trump v. Int'l Refugee Assistance Project*, 857 F.3d 554, 572 (4th Cir. 2017),[1] *vacated as moot*, No. 16-1436 (U.S. Oct. 10, 2017).  Its mechanism, structure, and even much of its text are identical to EO-2.  It repeatedly invokes EO-2, which it explains set in motion the process that led to EO-3's indefinite ban.  EO-3 pmbl., §§ 1(c), 1(f), 1(h), 1(i), 4(c).  Its effective date provisions are carefully tailored to EO-2 to ensure that its ban continues seamlessly.  *Id.* § 7(c). And the agency reports it invokes were commissioned by EO-2, which directed the Secretary of Homeland Security to produce a list of countries to ban indefinitely.  EO-2 § 2(e).

EO-3 is, clearly, the indefinite ban that President Trump promised as candidate and that he began to implement with EO-1 and EO-2, not a new and separate enactment divorced from that history.  Throughout, President Trump has made crystal clear that his overriding purpose is to impose some sort of ban, no matter what.  He called for a "much tougher version" of the ban

---

[1] *IRAP* remains compelling authority, particularly as an en banc decision addressing an earlier stage of this same litigation.  *See Kornahrens v. Evatt*, 66 F.3d 1350, 1357 (4th Cir. 1995) (relying on vacated decision as "instructive" and "persuasive").

before EO-2's vetting process was even underway, and confirmed his bottom line the day he signed EO-3—"The travel ban: the tougher, the better."[2]

The ban itself confirms that it is the President's own creation. He was the one who ordered DHS to undertake a review process in EO-1 and EO-2. He was the one who ordered that the review process culminate in a recommendation of countries to ban indefinitely. *See* EO-2 § 2(e) (ordering that the Secretary "*shall* submit to the President a list of countries recommended for inclusion in a Presidential proclamation that *would prohibit the entry* of appropriate categories of foreign nationals") (emphasis added).[3] And despite the "elaborate process" that EO-3 and the government's brief (selectively) describe, the government acknowledges that it was the *President* who "crafted" EO-3's ban provisions "in his judgment." Br. at 1, 8. All we really know about the document that the Acting DHS Secretary submitted to the President is that it includes recommendations for some type of "restrictions and limitations" on the banned countries (and perhaps others). But whatever the recommendations were, EO-3 admits a disconnect between any agency process or findings and EO-3 itself.[4]

---

[2] Donald J. Trump, A Message From Donald J. Trump, Facebook (June 5, 2017) ("We need . . . a MUCH TOUGHER version" of the "Travel Ban"), https://www.facebook.com/DonaldTrump/videos/10159253902870725; J.R. 705 (calling, on September 15, for "the travel ban into the United States" to "be far larger, tougher and more specific"); Reuters, *President Trump Adds North Korea, Venezuela and Chad to New Travel Ban*, Sept. 24, 2017, http://fortune.com/2017/09/24/donald-trump-travel-ban-north-korea/.

[3] The President did not order, for example, that the Secretary identify countries with information sharing problems and recommend steps she might deem appropriate to address those problems.

[4] There are troubling indications that White House pressure may have warped the recommendations. Reports indicate that the parallel process for reaching a recommendation regarding the new annual cap on refugees—which was addressed in both EO-1 and EO-2—was "purely political" and "corrupt." Jonathan Blitzer, *How Stephen Miller Single-Handedly Got the U.S. to Accept Fewer Refugees*, The New Yorker (Oct. 13, 2017), https://www.newyorker.com/news/news-desk/how-stephen-miller-single-handedly-got-the-us-to-accept-fewer-refugees. More specifically, senior advisor Stephen Miller, who has been intimately involved with the bans since EO-1, reportedly instructed agency officials tasked with preparing a report to inform deliberations over the new cap that "The President believes refugees

Because the government has not produced any of DHS's actual analysis, the public has not seen how the government applied the VWP criteria that animate EO-3. IRAP Br. 14-15.[5] But what is apparent based on the publicly available evidence is that the "neutral" criteria it cites cannot justify the ban the President imposed. For one thing, the government and EO-3 acknowledge that the ban does not even comport with the results of the DHS review. Iraq did not meet the review's baseline, but EO-3 does not include it in the ban, § 1(g); Somalia did meet the information-sharing baseline, but EO-3 bans it anyway, § 2(h); and Venezuela failed to meet the information-sharing baseline, but is effectively exempt from the ban, § 2(f). *See* IRAP Br. 4. Each of these post-hoc adjustments served to make the EO-3 ban a closer fit to the EO-2 ban that it replaced and extended.

Even looking beyond those three countries, the EO-3 ban is inconsistent with its stated information-sharing and public safety criteria. EO-3 § 1(c). *See* David Bier, CATO Institute, *Travel Ban Is Based on Executive Whim, Not Objective Criteria*, Oct. 9, 2017 ("[N]o set of failed or met factors can explain the proclamation's choices of which countries to ban.").[6]

Numerous countries fail to meet one or more of the global baseline criteria but are not included in the ban. With regard to identity management, *see* EO-3 § 1(c)(i), at least 86 countries did not issue electronic passports in 2017, and many others had nationals still using older non-electronic passports. *Id.* At least 16 countries never report lost or stolen passports, and, as of mid-2014, a large number of other countries rarely did. *Id.* Similarly, many countries do not meet one or more of EO-3's national security and public-safety risk assessment

cost more, and the results of this study shouldn't embarrass the President." *Id.*; J.R. 78, 123-25, 607, 615, 628-29.

[5] In the Hawaiʻi litigation, the district court has ordered the government to produce a copy of the September DHS report by October 14. No. 17-cv-00050, Dkt. No. 371. The government has objected but made it available for possible *in camera* review. Dkt. Nos. 376; 377.

[6] *Available at* https://www.cato.org/blog/travel-ban-based-executive-whim-not-objective-criteria.

criteria.  EO-3 § 1(c)(ii)-(iii).  As of May 2017, 12 countries regularly refused to accept U.S. deportees—only one of which was banned—and on September 13, 2017, just before EO-3 was issued, the United States sanctioned four non-banned countries for this reason.  Bier, *Executive Whim*; *see also* IRAP Br. 15.  In 2016, the State Department identified 13 terrorist safe havens, but only three are subject to EO-3's ban.  Bier, *Executive Whim.*  And as 49 national security officials point out, EO-3 does not ban "non-Muslim majority countries such as Belgium where there have been widely-documented problems with information sharing, and whose nationals have carried out terrorist attacks on Europe."  J.R. 773 ¶ 12.

Unsurprisingly, "the only concrete evidence to emerge from this administration . . . has shown . . . that country-based bans are ineffective."  J.R. 771 ¶ 10.[7]  EO-3 in fact defeats its own stated purpose, because it would severely disrupt "counterterrorism, foreign policy, and national security partnerships that are critical to our obtaining the necessary information sharing and collaboration in intelligence"; it likewise "strain[s] our relationships with partner countries in Europe and the Middle East, on whom we rely for vital counterterrorism cooperation, undermining years of effort to bring them closer."  J.R. 773 ¶ 13(a).[8]

## II.  EO-3 Violates The INA

The government's brief confirms that the power it claims for the President under 8 U.S.C. §§ 1182(f) and 1185(a) is limitless.  Indeed, it contends that the President may remake our

---

[7] The DHS Office of Intelligence and Analysis memorandum analyzing the ban in the January Order similarly found that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." J.R. 771 ¶ 10.

[8] For example, Chad has recently withdrawn hundreds of troops from an anti-terrorism campaign, apparently as a result of being banned in EO-3. Boureima Balima, Chad Withdraws Troops From Fight Against Boko Haram in Niger, October 13, 2017, https://af.reuters.com/article/africaTech/idAFKBN1CI0PF-OZATP.

immigration system without "*any* predicate findings whatsoever," whenever "'he feels it is in the national interest.'" Br. 19 n.8, 20 & n.9, 30 (emphasis added). That interpretation cuts to the heart of our constitutional system. "[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). And in particular, Congress did not grant the President the power to rewrite the immigration laws, an excruciatingly detailed set of provisions that Congress has routinely amended since its enactment in 1952.

1.      The government does not deny that EO-3 reinstates a national-origin-based approach to admission that Congress repudiated in 1965—and that its argument would allow the President, unilaterally, to reinstate the pre-1965 admissions system in its entirety. IRAP Br. 20-22. Instead, the government asserts that even as it abolished the national-origin system, Congress left the President the option of overruling that choice at any point by limiting "the universe of potentially eligible immigrants" on national-origin grounds under § 1182(f). Br. 32-33. That is not only wholly illogical, but misrepresents what Congress did. As President Johnson emphasized, in 1965 Congress thoroughly rejected the "un-American" quota system, under which "[f]amilies were kept apart because a husband or a wife or a child had been born in the wrong place." Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill, Liberty Island, New York, Oct. 3, 1965.

Indeed, the 1965 Act—including but not limited to its nondiscrimination guarantee—was designed to prevent precisely the kinds of harms that EO-3 inflicts on the plaintiffs in this case. *See, e.g.*, Doe #4 Decl. ¶¶ 2, 7, J.R. 460-61 (plaintiff forced to choose between his professorship and his wife); *see also* 8 U.S.C. §§ 1153, 1151(b)(2)(A)(i). This impact of EO-3 on family

reunification is no accident: even as he called for a "larger, tougher and more specific" ban, the President also expressed his opposition to "CHAIN MIGRATION." J.R. 705-06; *contra* Br. 31.

Unsurprisingly, the government cites no evidence that Congress sought to authorize the President to replace the categories, standards, and procedures that it has established. That opponents in Congress expressed concern about the breadth of § 1182(f), Br. 19 n.8, or that some opinions have described it in broad terms in dicta, does not suggest congressional intent to sign away its constitutional role in lawmaking. *See also Clinton*, 524 U.S. at 452 (Kennedy, J., concurring) ("Abdication of responsibility is not part of the constitutional design.").

Nor does the immigration context alter the force of these bedrock principles. The Supreme Court has been careful to police the boundaries between Congress and the President even in the contexts of immigration and foreign affairs. IRAP Br. 13 (collecting cases); *see also INS v. Chadha*, 462 U.S. 919, 940-41, 52 (1983). And *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 544-47 (1950), does not remotely "foreclose[]" plaintiffs' argument that the President's authority is circumscribed by Congress. Br. 26. *Knauff* rejected a challenge to "the decision to admit or to exclude" a particular noncitizen during "the national emergency of World War II" pursuant to duly promulgated regulations expressly authorized by statute. 338 U.S. at 543-44. But it made clear that the executive could wield broad authority only in "carrying out the congressional intent." *Id.*; *see Carlson v. Landon*, 342 U.S. 524, 541-42 (1952). There is no authority to support the government's theory that in this context the President may "be a lawmaker," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), and get a free pass from the courts.

2.     As this Court previously concluded, §1182(f) does not override § 1152(a)'s nondiscrimination mandate. *IRAP*, 241 F. Supp. 3d at 553-56. Even more clearly than EO-2,

EO-3 violates Section 1152(a)(1) by singling out immigrant visas for denial on the basis of nationality. *See IRAP*, 241 F. Supp. at 554 (reading § 1182(f) to allow a temporary nationality-based ban on entry but not on visa issuance). Moreover, because EO-3's *entry* ban is indefinite, it renders visas wholly ineffectual, which achieves exactly what §1152(a)(1) prohibits. *Accord Hawaii v. Trump*, 859 F.3d 741, 776-77 (9th Cir. 2017).

In the government's telling, the President can simply ignore the nondiscrimination requirement, since "§§ 1182(f) and 1185(a) limit the universe of individuals eligible to receive visas, and § 1152(a)(1)(A) prohibits discrimination on the basis of nationality within that universe of eligible individuals." Br. 32. But §§ 1182(f) and 1185(a)—unlike 8 U.S.C. § 1182(a)—do not purport to limit visa eligibility at all. Ultimately this, like the rest of the government's statutory contentions, is no more than an assertion that the President has the authority to override Congress's enacted policy judgments.

3. The government misses the point of plaintiffs' argument that the President has cast aside Congress's visa application scheme, along with the judgments Congress made in crafting and adjusting the Visa Waiver Program. IRAP Br. 14-20.

Under the visa and entry process Congress created, noncitizens are generally subject to the normal, rigorous, individualized visa application process. But nationals of a country that participates in the Visa Waiver Program generally are *not* subject to that individualized process on shorter visits to the United States. As plaintiffs have explained (without disagreement from the government) the "baseline" criteria apparently set forth in the undisclosed DHS report and echoed in EO-3 are the same factors Congress laid out as requirements to participate in the Visa Waiver Program. IRAP Br. 15. Thus, in Congress's judgment, a country's inability to share sufficient information to participate in the Visa Waiver Program should subject its citizens to the

ordinary individualized vetting process.  But in the President's judgment, that same failure to share information may be sufficient to ban every one of that country's citizens from the United States.  That is another way in which the President's view of his § 1152(f) authority would permit him to override Congress's judgments.

The normal visa application scheme also puts the lie to EO-3's assertion that its restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States."  EO-3 § 1(h)(i); Br. 22, 23.  Ordinary visa applicants must *individually* provide the information and documentation necessary to identify themselves, and *they* bear the burden of demonstrating their eligibility (and negating all grounds of inadmissibility).  8 U.S.C. § 1361; 8 U.S.C. § 1202(a).[9]  Law enforcement records from the relevant government[10]—provided by the applicant—along with the noncitizen's biographic information, names, and photographs, are compared against multiple national security databases.  *See supra* note 9 at 4-5; *see generally* Amicus Br. of Janet A. Napolitano and Other Former Federal Immigration Officials,[11] *Trump v. IRAP*, Nos. 16-1436 & 16-1540, at 12-15.  Following this review, each applicant (with narrow exceptions) must submit to an in-person interview with a consular officer.  8 U.S.C. § 1202(h).

---

[9] This information includes 10-fingerprint scans of nearly all visa applicants, which are compared against multiple law enforcement databases.  *See Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs* at 3, 114th Cong., 2d Sess. (Mar. 15, 2016), https://goo.gl/qaRwQD.

[10] *See* 8 U.S.C. § 1202(b) (requiring these records for immigrant visa applications).  The relevant government is generally the government of the country in which the noncitizen resides, not the country of which the noncitizen is a national; millions of nationals of the banned countries are living abroad. *See* Amicus Br. of the Cato Institute, Nos. 16-1436 & 16-1540, at 24-25, *available at*  http://www.scotusblog.com/wp-content/uploads/2017/09/16-14362c-16-1540-bsac-The-Cato-Institute.pdf. In fact, Dr. Hamadmad's sister, who is a Syrian national, has never been inside Syria. Zakzok Br. 4.

[11] *Available at* http://www.scotusblog.com/wp-content/uploads/2017/09/16_1436_16_1540_bsac_Janet_A_Napolitano.pdf

The government has still provided no reason to second-guess the adequacy of the procedures Congress has established to process visa applicants. Rather, it can point only to findings that some *governments* are not providing certain information—which, again, Congress deemed to be a reason to impose individual vetting, not to ban applicants altogether.

The government suggests that anything the President does to tighten visa vetting is necessarily in line with congressional intent. Br. 30 & n.15. But that is clearly wrong. Statutes involve a balancing of interests, and Congress's plan represents a balance of security needs against other interests, such as family reunification and contributions to our economy and society. In essence, the President disagrees with the balance Congress struck. But, where Congress has spoken, it is not the case that the "President is entitled to . . . make his own judgment as to how much risk to tolerate." Pet'rs Br. 48, *Trump v. IRAP,* No. 16-1436.

Nor does it help the government to cloak this version of the ban in the foreign affairs power. Any presidential revision of the INA could be repackaged as an exercise of the foreign-affairs power, but in that situation, the President is operating at the "lowest ebb" of his power, given that the measures he is taking are "incompatible with the expressed or implied will of Congress." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

And, as plaintiffs previously explained, the waiver provision does not save the ban. IRAP Br. 19-20. If anything, it exacerbates the problem by setting up an entirely different standard to adjudicate visa applications than the one Congress enacted. The government's blithe assertion that the President can set up an alternative, potentially permanent visa adjudication

system under standards of his own creation underscores that the President does *not* have the "greater authority" to impose the ban at all. Br. 30.[12]

4.     No previous President has invoked the 1182(f) power so broadly, and none has done so to address a problem that Congress already specifically confronted. *Contra* Br. 21-22. President Carter authorized restrictions on Iranian nationals in 1979 and 1980 *before* Congress passed the Hostage Relief Act of 1980, which in any event addressed only benefits for individuals held hostage. And President Reagan suspended the entry of Cuban nationals as immigrants following a breakdown in negotiations that occurred one month, not fifteen months, earlier.[13]     Both imposed restrictions on immigrant visas only after each crisis had persisted.[14]

The government repeatedly invokes a straw man: That *any* constraints on the President's authority will disable him at "the brink of war." Br. 31, 34. But this case could hardly be farther

---

[12] The waivers the government points to in prior proclamations, Br. 30, bear no resemblance to EO-3's displacement of Congress's system and standards. *See, e.g.*, Proclamation 8693, 76 Fed. Reg. 44751 (July 24, 2011) (reiterating section 1182(f)'s "interests of the United States" standard).

[13] *See U.S., Cuba Fail to Reach Accord on Immigration*, Associated Press, July 10, 1986, available at http://articles.latimes.com/1986-07-10/news/mn-22586_1_radio-marti; *contra* Br. 27. President Reagan's previous suspension of the entry Cuban nationals as nonimmigrants had followed Cuba's initial withdrawal, in May 1985, from an immigration agreement. *See* Proclamation No. 5377, 50 Fed. Reg. 41329 (Oct. 4, 1985). President Bush's suspension of entry for Haitians in 1992 addressed only noncitizens "without necessary documentation," Exec. Order. 12,807 (May 24, 1992), and so created no conflict with Congressional immigration policy.

[14] Nor does the brevity of the findings in several previous 1182(f) proclamations suggest that EO-3, which is far broader and rewrites a substantial portion of the INA, needs no further explanation. Br. 21 & n.11. The proclamations on which the government relies imposed suspensions on a small number of individuals and addressed discrete problems that Congress had not considered. S*ee* Proclamation No. 8693 (July 24, 2011) (suspending the entry of individuals subject to United Nations Security Council travel bans); Proclamation No. 8342 (Jan. 16, 2009) (suspending entry of foreign government officials who had failed to combat human trafficking); Proclamation No. 6958 (Nov. 22, 1996) (suspending the entry of Sudanese government and military officials); Proclamation No. 5887 (Oct. 22, 1988) (suspending the entry of Nicaraguan government officials); Proclamation No. 5829 (June 10, 1988) (suspending the entry of policymakers in Noriega/Solis Palma regime).

from that scenario, and ruling for Plaintiffs would not have that effect.  Here, the President has sought through a months-long process to impose a new immigration system of his own design in place of the one Congress has enacted, without any evidence that the existing system is inadequate.  The "grave" risk here, *id*., is to the separation of powers.

5.      The government claims that EO-3 is wholly immune from statutory review.  Br. 10-14. Every court of appeals to consider this plea for unlimited deference has emphatically rejected it. *See Hawaii*, 859 F.3d at 768-69; *IRAP*, 857 F.3d at 587-88; *Washington v. Trump*, 847 F.3d 1151, 1161-64 (9th Cir. 2017).[15]

        The government cannot find a single case adopting its novel and sweeping non-review "principle."  Br. 10.[16]  In fact, it concedes that the Supreme Court itself reviewed a statutory claim against a § 1182(f) suspension in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), despite the government's (extensively briefed) argument that § 1182(f) suspensions were immune from judicial review.  Br. 12.  The most it can conjure are cases involving the consular non-reviewability doctrine, which only applies to individual visa denials by consular officials abroad.  Even the case on which the government relies most heavily, *Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999), repeatedly characterized the doctrine as applying only

---

[15] The plaintiffs also have standing to press their statutory claims here for the same reasons that they had standing to press their statutory claims against EO-2.  *IRAP*, 241 F. Supp. 3d at 551. And the organizational plaintiffs' financial injuries—for example, AAANY may have to cut immigration navigator positions, Issa-Ibrahim Decl. ¶ 16, J.R. 440—are far from abstract. MESA has explained in detail how the ban will prevent scholars from attending its conference, Second Baron Decl. ¶¶ 11-15, J.R. 431-32.  The government's assertion that IRAP and AAANY "have not identified any client with an Article III injury," Br. at 18, is belied by the record.  See J.R. 441-43 ¶¶ 18-24; J.R. 451-53, ¶¶ 16, 22-24.

[16] In fact, the government itself did not discover this "longstanding principle[]" (Br. 10) until its petition for certiorari in this case.  At every stage of this litigation until that point, the government only asserted the one principle that actually does exist (but plainly does not bar review of the bans): consular non-reviewability.  *See IRAP*, 857 F.3d at 587; *Hawaii*, 859 F.3d at 768.

to "*a consular official's* decision to issue or withhold a visa." *Id.* at 1159 (emphasis added); *see id.* at 1160, 1162. *Saavedra Bruno* made no mention of a broader principle that would bar review of generalized admissions policies.[17] And the government does not even address the multiple cases holding that such policies, unlike individual decisions, *are* subject to review. PI Mot. 23-24 (collecting cases).[18]

Nor do any of the government's other cases indicate that there is some sweeping background principle against judicial review of admissions policies. Rather, they simply acknowledge that the federal government has broad *substantive* authority to regulate immigration, but they otherwise review the claims—including statutory claims, where raised—on the merits. *See Fiallo v. Bell*, 430 U.S. 787, 792-99 (1977); *Knauff*, 338 U.S. at 544-47 (reviewing two statutory claims against regulations promulgated under a presidential proclamation). Those cases, moreover, turned largely on "the need for special deference to *congressional* policy choices in the immigration context." *Fiallo*, 430 U.S. at 793 (emphasis added)). That consideration has no force here, where the question is whether the President has contravened Congress's will. If anything, respect for Congress's judgment requires *more* searching merits review here.

Because the government's asserted non-review principle does not exist, the APA provisions it cites do not foreclose review. *See* 5 U.S.C. §§ 701(a)(1), 702(1) (cited at Br. 11).

_____

[17] The government also cites a series of statutes that similarly deny review of *individual* visa and exclusion decisions. Br. 10-11. These statutes are likewise poor evidence of a broader non-review principle.

[18] Contrary to the government's suggestion, Br. 10, it is perfectly normal for a legislative scheme to make individual fact-finding by executive officers immune from review, even where "high-level government policy" is not. *IRAP*, 857 F.3d at 587. Such schemes are common throughout the law. *See, e.g.*, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 675-76 (1986) (statute granted review of "a regulation" but not a single "determination" made under that regulation); *cf. Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671, 676-77 (D.C. Cir. 1994) ("There are ample reasons for distinguishing the two situations.").

The government's invocation of those provisions turns entirely on the existence of such a background principle. *See Saavedra Bruno*, 197 F.3d at 1158 (applying those provisions to individual visa denials because of consular non-reviewability). In other words, those APA provisions would only foreclose review if the Court had *already* concluded that review was unavailable.

Finally, the government argues that Plaintiffs lack a cause of action. It first points out that the President is not subject to the APA, Br. 12, but of course the Court can review presidential action under its inherent equitable authority. *See* IRAP Br. 23 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-85 (2015); *Dames & Moore v. Regan*, 453 U.S. 654, 669-88 (1981) (reviewing multiple executive orders in equity)). The government does not even mention *Dames & Moore*.

In any event, the government barely disputes that the APA provides a cause of action against the agencies that are already implementing portions of EO-3, and will implement the balance, absent injunctive relief, on October 18.[19] It argues only that Plaintiffs fall outside the relevant zone of interest. Br. 13 (citing zone of interest cases). But this Court has already rejected that argument, *see IRAP*, 241 F. Supp. 3d at 551, as has the Ninth Circuit, *Hawaii*, 859 F.3d at 766-67. Other courts of appeals have come to the same conclusion. *See LAVAS v. Dep't of State*, 45 F.3d 469, 471-72 (D.C. Cir. 1995), *vacated on other grounds*, 117 S. Ct. 378 (1996).

---

[19] The government's contention that APA review is not available under 5 U.S.C. 701(a)(2) depends entirely on its incorrect view, on the merits, that § 1182(f) grants the President limitless power. Br. 13-14. As for final agency action, the defendant agencies are *already* carrying out parts of EO-3, and their implementation will have "legal consequences" for the plaintiffs; both prongs of finality are therefore easily satisfied. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1813-14 (2016). *See generally* Pls.' Reply Mem (dkt. # 98) at 12-14 (final agency action need not take any particular form).

## III.  EO-3's Entry Restrictions Violate the Constitution

1.  The plaintiffs' constitutional claims are cognizable.  The government argues that because EO-3 does not deny visas to the plaintiffs *themselves*, it cannot injure them, or violate their rights, in a legally relevant manner.  That argument has been rejected at every stage of this case, and fails here for the same reasons.  *See IRAP*, 857 F.3d at 582-87.

The government cannot deny that the Supreme Court has repeatedly decided the claims of individuals in the United States who—just like the plaintiffs here—allege that the government is injuring them and violating their rights through its use of the immigration power, even when the government does so by refusing to allow foreign nationals abroad to travel to the United States.  *See Kleindienst v. Mandel*, 408 U.S. 753, 764-65 (1972); *Kerry v. Din*, 135 S. Ct. 2128, 2140-42 (1972); *cf.* Oral Arg., *Washington v. Trump*, No. 17-35105, 2017 WLNR 4070578 (9th Cir. Feb. 7, 2017) (federal government conceding that "a U.S. citizen with a connection to someone seeking entry" would have standing to challenge EO-1).

The Court has also recognized that injuries resulting from government regulation targeting others are cognizable under the Establishment Clause.  In *Two Guys From Harrison-Allentown v. McGinley*, 366 U.S. 582 (1961), the plaintiff company had standing to challenge a Sunday closing law, even though only the company's employees—not the company itself—had been regulated, prosecuted, and fined for violating a previous version of the law, or threatened with prosecution under the new version.  *Id.* at 585-87; *see also Two Guys From Harrison-Allentown, Inc. v. McGinley*, 179 F. Supp. 944, 946 (E.D. Pa. 1959) (plaintiff sought injunction preventing enforcement of law against its employees).  Contrary to the government's suggestion, *Two Guys*' companion case, *McGowan v. Maryland*, 366 U.S. 420 (1961), did not say that only direct regulation can cause an Establishment Clause injury.  Instead, it explained that the

plaintiffs in that case could not allege that their Free Exercise Clause rights were violated when they never even explained what their religious beliefs were. *Id.* at 429. But it went on to hold that the plaintiffs *did* have standing to raise their Establishment Clause claims, since they had suffered a "direct economic injury" under the challenged law. *Id.* at 430. *McGowan* and *Two Guys* underscore that the question is whether the challenged action *injures* the plaintiff, not whether it directly regulates him or her.

Both this Court and the Fourth Circuit were correct to focus on that question and to conclude that plaintiffs who would suffer a particularized injury as a consequence of the government's constitutional violation could sue to enforce their rights. *See* 241 F. Supp. 3d at 552; 857 F. 3d at 585-86. This Court and the Fourth Circuit were also correct to reject the government's attempt to analogize this case to *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464 (1982), in which the plaintiffs were complete strangers to the challenged conduct, "abstractly disagreeing" with a transfer of property far away that they had never seen, who claimed no injury of isolation, exclusion, or condemnation, *id.* at 485. *See* 241 F. Supp. 3d at 552; 857 F.3d at 585; *see also id.* at 585 n.11 (explaining why *In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008), is inapposite); *id.* at 585 n.10 (finding that "[p]laintiffs' injuries are . . . consistent with the injuries that other courts have recognized in Establishment Clause cases that do not involve religious displays or prayer") (citing *Awad v. Ziriax*, 670 F.3d 1111, 1122 (10th Cir. 2012) and *Catholic League for Religious & Civil Rights v. City & County of San Francisco*, 624 F.3d 1043, 1052 (9th Cir. 2010) (en banc)).

2.      The en banc Fourth Circuit correctly held that where *Mandel* applies,[20] the government may "defeat a constitutional challenge" if the challenged action is *both* "facially legitimate" and "bona fide," *IRAP*, 857 F.3d at 590; but "where a plaintiff makes 'an affirmative showing of bad faith' that is 'plausibly alleged with sufficient particularity,' courts may 'look behind' the challenged action to assess its 'facially legitimate' justification." *Id.* at 590-91 (citing *Din*, 135 S. Ct. at 2141).

The government offers two responses, neither of which is convincing.  First, it asserts that subsequent Supreme Court precedent contradicts the Fourth Circuit's interpretation of *Mandel*.  But contrary to the government's contention, Br. 36-37, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017), does *not* discuss or describe *Mandel*'s standard.  Indeed, it does not cite *Mandel* at all.  Instead, it discusses *Fiallo v. Bell*, a challenge to a statute that did not involve a plaintiff seeking to "look behind" the enactment's text—and therefore one in which the Court had no occasion to address how such evidence should be treated.  430 U.S. at 798-99.

Second, in a footnote, Br. 37 n.17, the government suggests that under *Mandel* and *Din*, as long as the government "identif[ies] a factual basis . . . that is the end of the analysis."  Br. 37 n.17.  But that assertion cannot be squared with what *Din* actually says: that if there is an "an affirmative showing of *bad faith*," the analysis continues.  135 S. Ct. at 2141.

3.      EO-3 shares the improper purpose that rendered both EO-1 and EO-2 unconstitutional.  Once again, the government does not deny that the President promised to ban Muslims using nationality bans.  And now that EO-1 and EO-2 are not at issue, the government hardly contests that their purpose was to carry out that promise.  But it argues that the President's previous

---

[20] Plaintiffs maintain that *Mandel* need not be applied here, *accord* 241 F. Supp. 3d at 563-64, but their constitutional claims succeed whether or not it is applied.

"statements . . . are not connected to [EO-3]" and that "the specific sequence of events leading to the issuance of [EO-3] severs any connection" to EO-2's purpose.  Br. 41.

Plaintiffs have already shown that EO-3 is the next step in a chain of actions designed to carry out the President's explicit promise to ban Muslims.[21]  The text of EO-2 and EO-3, the substance of their bans, and the President's own explanations that he would first enact a temporary ban and then follow it with more permanent measures all strengthen that conclusion.  IRAP Br. 27.  No reasonable observer would find that adding a few more non-Muslims to the ban, or removing a few Muslims, "severs any connection" (Br. 41) between EO-3, the previous bans, and the President's statements.  IRAP Br. 28-29.[22]

Nor would the fact that agencies produced the vetting report or list of recommendations commissioned by EO-2 outweigh the ample evidence of improper purpose for a reasonable observer.  IRAP Br. 29.  Even if the report and recommendations were unimpeachable—and, based on EO-3's description, they are not—EO-3 is not the report or the recommendations.  *See supra Part I.*  In fact, the process described in EO-3 underlines the President's religious purpose: when the criteria the agency applied in its review suggested that at least one large non-Muslim country (Venezuela) should be banned, and a Muslim country (Somalia) should be unbanned, EO-3 did the opposite.  *Id.*

---

[21] The government mischaracterizes plaintiffs' claims as "rely[ing] almost exclusively on the Fourth Circuit's prior conclusion that EO-2 was motivated primarily by religion."  Br. 40; *see also* Br. 38.  That is not what Plaintiffs have done.  *See* IRAP Br. 24, 27-30 (explaining why EO-3 has an improper religious purpose).

[22] Similarly, no reasonable observer could believe that a single positive comment about Islam by the President during a speech in Saudi Arabia amounts to a "repudiation" of EO-1, EO-2, and their religious purpose.  Br. 43.  The President did not mention or evoke the bans at all in that speech.  *See also Trump Cites Fake Story to Endorse Racist Mass Murder as Anti-Terror Tactic*, Toronto Star (Aug. 17, 2017) (President "endorsed a fictional war crime against Muslims" after Saudi speech), https://www.thestar.com/news/world/2017/08/17/donald-trump-endorses-racist-mass-murder-as-an-anti-terror-tactic-citing-fake-story.html.

Not only do *McCreary County v. American Civil Liberties Union of Kentucky*, 545 U.S. 844, 862 (2005), and *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 308 (2000), support the plaintiffs' constitutional claims, but so do the cases cited by the government. In *Felix v. City of Bloomfield*, 841 F.3d 848 (10th Cir. 2016), the Tenth Circuit found that adding more monuments to accompany a Ten Commandments display was *not* a "curative effort[] . . . sufficient to overcome an objective observer's impression that the display, considered in its full historical context, is a government endorsement of religion," or to "disassociate the monument from its previous religious effect" such that an objective observer would be persuaded that "the government's principal or primary message is nonreligious." *Id.* at 863-64 (citation omitted). Similarly, in *Books v. City of Elkhart*, 235 F.3d 292, 304 (7th Cir. 2000), an "eve-of-litigation resolution stating a secular purpose" could not cure the Establishment Clause violation. And *McGowan* explained that a religious purpose for Sunday closing laws had existed "centuries ago," but surveyed hundreds of years of law and history in determining that the specific Maryland law at issue did not have a religious purpose. 366 U.S. at 444-45. This case could not be more different. As the Supreme Court has explained, "an implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense." *McCreary*, 545 U.S. at 874.

**IV.  The Balance of Equities and the Public Interest Favor Enjoining EO-3's Ban Provisions in Their Entirety**

This Court, the Fourth Circuit, and the Supreme Court have all rejected the argument that abstract harm to the government can outweigh the concrete irreparable harms that plaintiffs face. *See IRAP*, 137 S. Ct. at 2088-89; *IRAP*, 857 F.3d at 602-04; *IRAP*, 241 F. Supp. 3d at 564-65. Yet the government again claims that an abstract injury would result from a court taking any action to "interfere" with the President's exercise of his authority as President, Br. 44, and does

not offer evidence or even an assertion that any concrete harm would occur if EO-3 were enjoined. Enjoining an unconstitutional and illegal executive action would instead promote the public interest. *See, e.g.*, *IRAP*, 857 F.3d at 604 ("[U]pholding the Constitution undeniably promotes the public interest.").

The harms that EO-3 inflicts on plaintiffs and their clients and members, moreover, are concrete and irreparable. In addition to their constitutional injuries, the indefinite nature of EO-3 means that affected families face the prospect of permanent separation; at a minimum, their reunification would be delayed absent a preliminary injunction. The government argues that these harms are speculative. Br. 44. Yet several of the plaintiffs have relatives who have already completed their visa interviews and are merely awaiting the issuance of their visas. Ziaolhagh Decl. ¶¶ 3, 5, J.R. 478-79; Doe #4 Decl. ¶¶ 4-5, J.R. 460-61; Shirani Decl. ¶¶ 3-4, J.R. 476.

That preliminary injunction, moreover, should cover EO-3's ban provision (§ 2) in all of its applications. Contrary to the government's suggestion, injunctive relief should not be limited to the plaintiffs and their family members. This Court, the Fourth Circuit, and the Supreme Court all rejected that proposed limitation on relief with respect to EO-2. *IRAP*, 137 S. Ct. 2080, 2087. As explained above, EO-3 exceeds the Executive's statutory authority; to the extent that any of the defendants would implement it,[23] therefore, those actions "are invalid" as a categorical matter. *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2449 (2014); *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (explaining that when courts hold government action unlawful, "the ordinary result" under the APA "is that the rules are vacated— not that their application to the individual petitioners is proscribed"). The nature of EO-3's

---

[23] *See, e.g.*, J.R. 506-09 (Department of State's "Important Announcement" regarding its implementation of EO-3).

constitutional violations, moreover, means that "enjoining it only as to Plaintiffs would not cure the constitutional deficiency." *IRAP*, 857 F.3d at 605.

Nor should an injunction of EO-3's indefinite bans be limited by the "bona fide relationship" requirement the Supreme Court adopted when partially staying this Court's preliminary injunction of EO-2's 90-day entry ban. The equities balance differently in the context of EO-3's impact on the plaintiffs here. *IRAP*, 137 S. Ct. at 2088. An indefinite ban will impose multiple injuries on the organizational plaintiffs that flow from harms to individuals who lack formal, established relationships with United States persons or entities. YAMA's members have been harmed by the ban through the harm to friends and acquaintances abroad. Mubarez Decl. ¶¶ 13-14, J.R. 484. MESA's mission will be harmed not only through EO-3's impact on its members, but also by EO-3's impact on nonmembers unable to attend its meeting. Second Baron Decl. ¶ 17, J.R. 432-33. And IRAP has diverted resources to produce materials and counsel individuals abroad about the effects of EO-3. Third Heller Decl. ¶¶ 6-8, 10-14, J.R. 450-51. Finally, given that EO-3's bans are indefinite, such a limited injunction would allow the President to persist in his misappropriation of congressional authority over immigration, including by instituting exactly the kind of nationality-based discrimination that 8 U.S.C. § 1152(a)(1)(A) prohibits. Only an injunction of the entry restrictions in all their applications can forestall these irreparable harms.

Dated: October 14, 2017

Respectfully submitted,

/s/ Omar C. Jadwat

Karen C. Tumlin†
Nicholas Espíritu†
Melissa S. Keaney†
Esther Sung†
National Immigration Law Center
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
Tel: (213) 639-3900
Fax: (213) 639-3911
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

Justin B. Cox (Bar No. 17550)
National Immigration Law Center
PO Box 170208
Atlanta, GA 30317
Tel: (678) 279-5441
Fax: (213) 639-3911
cox@nilc.org

Kathryn Claire Meyer††
Mariko Hirose††
International Refugee Assistance Project
40 Rector Street, 9th Floor
New York, New York 10006
Tel: (646) 459-3044
Fax: (212) 533-4598
kmeyer@refugeerights.org
mhirose@refugeerights.org

Omar C. Jadwat†
Lee Gelernt†
Hina Shamsi†
Hugh Handeyside†
Sarah L. Mehta†
David Hausman†
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org
lgelernt@aclu.org
hshamsi@aclu.org
hhandeyside@aclu.org
smehta@aclu.org
dhausman@aclu.org

Cecillia D. Wang†
Cody H. Wofsy†
Spencer E. Amdur†
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org
cwofsy@aclu.org
samdur@aclu.org

David Cole†
Daniel Mach†
Heather L. Weaver†
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 675-2330

Fax: (202) 457-0805
dcole@aclu.org
dmach@aclu.org
hweaver@aclu.org

David Rocah (Bar No. 27315)
Deborah A. Jeon (Bar No. 06905)
Sonia Kumar (Bar No. 07196)
Nicholas Taichi Steiner (Bar
No.19670)
American Civil Liberties Union
Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD  21211
Tel: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
steiner@aclu-md.org


*Counsel for Plaintiffs*

†Admitted *Pro Hac Vice*
†† Application for admission *Pro Hac Vice* pending

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 14, 2017, I electronically filed this Motion for Plaintiffs with the Court Clerk using the ECF system, which will send notification to Defendants' registered counsel.

Dated: October 14, 2017                             <u>/s/ Omar Jadwat</u>
                                                      Omar Jadwat