**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 19-1990**

─────────────

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, on behalf of itself and
its clients; HIAS, INC., on behalf of itself and its clients; MIDDLE EAST STUDIES
ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members;
ARAB AMERICAN ASSOCIATION OF NEW YORK, on behalf of itself and its
clients; YEMENI-AMERICAN MERCHANTS ASSOCIATION, on behalf of itself
and its members; IRAP JOHN DOE #4; IRAP JOHN DOE #5; IRAP JANE DOE
#2; MUHAMMED METEAB; MOHAMAD MASHTA; GRANNAZ
AMIRJAMSHIDI; SHAPOUR SHIRANI; AFSANEH KHAZAELI; IRANIAN
ALLIANCES ACROSS BORDERS; IAAB JANE DOE #1; IAAB JANE DOE #3;
IAAB JANE DOE #5; IAAB JOHN DOE #6; IRANIAN STUDENTS'
FOUNDATION, Iranian Alliances Across Borders Affiliate at the University of
Maryland College Park; EBLAL ZAKZOK; FAHED MUQBIL; ZAKZOK JANE
DOE #1; ZAKZOK JANE DOE #2,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED
STATES DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE; CHAD WOLF, in his official capacity as Acting
Secretary of Homeland Security; MICHAEL R. POMPEO, in his official capacity as
Secretary of State; JOSEPH MAGUIRE, in his official capacity as Acting Director
of National Intelligence; MARK A. MORGAN, in his official capacity as Senior
Official Performing the Functions and Duties of the Commissioner of U.S. Customs
and Border Protection; KENNETH T. CUCCINELLI, in his official capacity as
Acting Director of U.S. Citizenship and Immigration Services; WILLIAM P. BARR,
in his official capacity as Attorney General of the United States,

Defendants - Appellants.

--------------------------------------------------------

FORMER NATIONAL SECURITY OFFICIALS; MUSLIM BAR ASSOCIATIONS; MUSLIM LAW STUDENT ASSOCIATIONS; CUNY-CLEAR; ADVOCATES FOR YOUTH; BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE; CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW; FREEDOM FROM RELIGION FOUNDATION; JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW; LAMBDA LEGAL DEFENSE AND EDUCATION FUND; MISSISSIPPI CENTER FOR JUSTICE; NATIONAL CENTER FOR LESBIAN RIGHTS; NATIONAL URBAN LEAGUE; PEOPLE FOR THE AMERICAN WAY FOUNDATION; SOUTHERN COALITION FOR SOCIAL JUSTICE; WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS,

Amici Supporting Appellees.

─────────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge.  (8:17-cv-00361-TD; 8:17-cv-02921-TDC; 1:17-cv-02969-TDC)

─────────────

Argued:  January 28, 2020                           Decided:  June 8, 2020

─────────────

Before NIEMEYER, AGEE, and RICHARDSON, Circuit Judges.

─────────────

Reversed and remanded with instructions to dismiss by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Agee and Judge Richardson joined.

─────────────

**ARGUED:**  Joshua Paul Waldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Mark William Mosier, COVINGTON & BURLING LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Joseph H. Hunt, Assistant Attorney General, Hashim M. Mooppan, Deputy Assistant Attorney General, H. Thomas Byron III, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellants.  Nimra H. Azmi, MUSLIM ADVOCATES, Washington, D.C.; Richard B. Katskee, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C.; Lala R. Qadir, Jack Boeglin, Laura Dolbow, COVINGTON & BURLING LLP, Washington, D.C., for IAAB Appellees.  Justin B. Cox, Atlanta, Georgia, Mariko Hirose, Linda Evarts, Kathryn Claire Meyer, New York, New York, Melissa Keaney, INTERNATIONAL REFUGEE

2

ASSISTANCE PROJECT, Fair Oaks, California; Max S. Wolson, NATIONAL IMMIGRATION LAW CENTER, Los Angeles, California; Omar C. Jadwat, Lee Gelernt, Hina Shamsi, Hugh Handeyside, New York, New York, Cecillia D. Wang, Cody H. Wofsy, Spencer E. Amdur, San Francisco, California, David Cole, Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C.; David Rocah, Deborah A. Jeon, Sonia Kumar, Nicholas Taichi Steiner, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND, Baltimore, Maryland, for IRAP Appellees. Faiza Patel, Harsha Panduranga, Brennan Center of Justice, NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York; Jethro Eisenstein, PROFETA & EISENSTEIN, New York, New York; Lena F. Masri, Gadeir Abbas, Justin Sadowsky, CAIR LEGAL DEFENSE FUND, Washington, D.C.; Robert A. Atkins, Liza Velazquez, Andrew J. Ehrlich, Steven C. Herzog, Meredith Borner, Luke J. O'Brien, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, for Zakzok Appellees. Harold Hongju Koh, Rule of Law Clinic, YALE LAW SCHOOL, New Haven, Connecticut; Phillip Spector, MESSING & SPECTOR LLP, Baltimore, Maryland, for Amici Former National Security Officials. Adeel A. Mangi, Sofia G. Syed, Abigail E. Marion, PATTERSON BELKNAP WEBB & TYLER LLP, New York, New York, for Amici Muslim Bar Associations, Muslim Law Student Associations, and CUNY-Clear. Lynne Bernabei, Alan R. Kabat, BERNABEI & KABAT, PLLC, Washington, D.C., for Amici Advocates for Youth, Bend the Arc: A Jewish Partnership for Justice, Chicago Lawyers' Committee for Civil Rights under Law, Freedom from Religion Foundation, Judge David L. Bazelon Center for Mental Health Law, Lambda Legal Defense and Education Fund, Mississippi Center for Justice, National Center for Lesbian Rights, National Urban League, People for the American Way Foundation, Southern Coalition for Social Justice, and Washington Lawyers' Committee for Civil Rights and Urban Affairs.

---

NIEMEYER, Circuit Judge:

This action — consisting of three separate actions with varying procedural histories that have been consolidated and that currently challenge the President's Proclamation 9645 imposing restrictions on the entry of foreign nationals from specified countries — is back before us for the third time, after having twice been addressed by the Supreme Court. The plaintiffs' complaints allege that the Proclamation violates their rights under the Establishment Clause, as well as under other clauses of the Constitution, because it lacks a rational relationship to legitimate national security concerns and is motivated solely by anti-Muslim animus.

The government filed a motion to dismiss the plaintiffs' complaints for failure to state a claim based mainly on the Supreme Court's recent decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), which reversed a preliminary injunction against the enforcement of Proclamation 9645 that had been issued on facts that are essentially the same as those alleged in the complaints before us. The *Hawaii* Court held that the government had "set forth a sufficient national security justification to survive rational basis review" and therefore that the plaintiffs had not demonstrated that they were likely to succeed on the merits of their claims. *Id.* at 2423.

The district court found *Hawaii* to be inapposite, concluding that *Hawaii*'s holding was limited to the review of a preliminary injunction, where the question was whether the plaintiffs, without having yet had the opportunity to engage in discovery, had demonstrated that they were likely to succeed on the merits of their constitutional claims. The district court concluded therefore that *Hawaii* does not control here, where the question is whether

4

the plaintiffs have plausibly stated a claim upon which relief can be granted. Taking the plaintiffs' factual allegations in the light most favorable to them, the court held that the plaintiffs had put forth "factual allegations sufficient to show that the Proclamation [was] not rationally related to the legitimate national security and information-sharing justifications identified in the Proclamation [but] . . . was motivated *only* by an illegitimate hostility to Muslims." (Emphasis added). It thus denied the government's motion to dismiss the plaintiffs' constitutional claims.

Reviewing the district court's interlocutory order by virtue of its certification under 28 U.S.C. § 1292(b) and our order granting permission to appeal, we conclude that the district court misunderstood the import of the Supreme Court's decision in *Hawaii* and the legal principles it applied. Informed by *Hawaii*, we reverse and remand with instructions to dismiss the plaintiffs' complaints.

## I

### A.  Background

Shortly after taking office in January 2017, President Donald Trump issued Executive Order 13769, which restricted for 90 days the entry into the United States of foreign nationals from seven countries — Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen — while the Secretary of Homeland Security conducted a review of the adequacy of information provided by all foreign governments about their nationals seeking to enter the United States. The enumerated countries had been previously identified by Congress or prior administrations as posing heightened terrorism risks. Soon thereafter, however, a

district court in the State of Washington issued a nationwide injunction enjoining the enforcement of several provisions of the executive order, *see Washington v. Trump*, No. 17-141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017), and the Ninth Circuit denied the government's motion to stay the order pending its appeal, *see Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam).

Rather than challenge that decision further, the President issued a revised executive order — Executive Order 13780 — which again directed the Secretary of Homeland Security to "conduct a worldwide review to identify whether, and if so what, additional information [would] be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the [Immigration and Nationality Act ("INA")] . . . in order to determine that the individual is not a security or public-safety threat." Exec. Order No. 13780, 82 Fed. Reg. 13209, § 2(a) (Mar. 6, 2017). This executive order suspended for 90 days the entry of foreign nationals from six countries — Iran, Libya, Somalia, Sudan, Syria, and Yemen — with the stated purpose of reducing the "investigative burdens on relevant agencies" during the pendency of the worldwide review and mitigating the risk that dangerous individuals would be admitted before the government finished implementing "adequate standards . . . to prevent infiltration by foreign terrorists." *Id.* § 2(c); *see also id.* § 1(d) (noting that each of the six countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones").

As with the first executive order, the enforcement of Executive Order 13780 was also promptly enjoined, first by the district court in this case and then by a district court in

Hawaii. *See Int'l Refugee Assistance Project (IRAP) v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017); *Hawaii v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017). And both injunctions were upheld on appeal, although on different grounds. *See IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam). The Supreme Court granted certiorari in both cases and, pending its review, stayed the injunctions in part, allowing the entry restrictions to go into effect as to those foreign nationals who lacked "a credible claim of a bona fide relationship with a person or entity in the United States." *Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017) (per curiam). But when the 90-day suspension period provided by Executive Order 13780 lapsed before the Court could take further action, the Court recognized that the challenges had become moot, and it vacated both our judgment affirming the district court's grant of preliminary injunctive relief, as well as the Ninth Circuit's. *See Trump v. IRAP*, 138 S. Ct. 353 (2017) (mem.); *Trump v. Hawaii*, 138 S. Ct. 377 (2017) (mem.).

On September 24, 2017, the President issued Proclamation 9645, which is the subject of this appeal, entitled, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." 82 Fed. Reg. 45161 (Sept. 24, 2017). This Proclamation recounted how the worldwide review prescribed by Executive Order 13780 had culminated with the submission to the President in July 2017 of a report from the Department of Homeland Security ("DHS"), which established a "baseline" for information required from foreign governments to help the United States be able "to confirm the identity of individuals seeking entry . . . and to assess whether they [were] a security or public-safety threat."

Procl. § 1(c).  That baseline, which was developed by the Secretary of Homeland Security in consultation with the Secretary of State and the Director of National Intelligence, included criteria for three categories of information: (1) an *identity-management information category*, which focused on whether a foreign government ensured the integrity of its nationals' travel documents by issuing electronic passports, reporting lost or stolen passports, and making available additional identity-related information; (2) a *national security and public-safety information category*, which considered whether a foreign country shared information on its nationals' criminal history and suspected terrorist links, provided travel document exemplars, and facilitated the United States' receipt of information about passengers and crew traveling to the United States; and (3) a *national security and public-safety risk assessment category*, which focused on various indicators of national security risk, including whether the country was a known or potential terrorist safe haven and whether it regularly failed to receive its nationals when they were subject to final orders of removal from the United States.  *Id*.

The Proclamation then described how DHS had "collected data on the performance of all foreign governments" relative to the baseline, Procl. § 1(d), and evaluated those data to determine that 16 countries were "inadequate" with respect to their identity-management protocols, information-sharing practices, and security-risk factors and that another 31 countries were "at risk" of becoming inadequate, *id*. § 1(e).  It also explained how the State Department thereafter followed up on DHS's evaluation by "conduct[ing] a 50-day engagement period to encourage all foreign governments, not just the 47 identified as either 'inadequate' or 'at risk,' to improve their performance with respect to the baseline."

8

*Id.* § 1(f). As a result of that engagement, many foreign governments improved their performance significantly. For example, 29 countries provided DHS with exemplars of their travel documents, and 11 agreed to share information on known or suspected terrorists. *Id.*

As the Proclamation recounted, following the engagement period, the Secretary of Homeland Security concluded that the governments of Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen remained "inadequate" so as to warrant restrictions on the ability of their nationals to enter the United States. Procl. § 1(g). Iraq was likewise deemed "inadequate," but the Secretary concluded that entry restrictions with respect to Iraqi nationals were not warranted because of the Iraqi government's "close cooperative relationship" with the United States and the significant presence of American military forces there, among other reasons. *Id.* The Secretary recommended instead that Iraqi nationals seeking entry be subject to "additional scrutiny." *Id.* Separately, the Secretary determined that although the government of Somalia "generally satisfie[d] the information-sharing requirements of the baseline," its inability to cooperate with the United States in certain respects and the terrorist threats within its territory "present[ed] special circumstances" warranting the imposition of entry restrictions on certain of its nationals. *Id.* § 1(i). The Secretary thus submitted another formal report to the President on September 15, 2017, which recommended that he limit the entry into the United States of foreign nationals from eight countries — Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen, and Somalia. *See id.* §§ 1(h)–(i).

The Proclamation stated that the President evaluated the Secretary of Homeland Security's recommendations with the aid of various members of his Cabinet and White House staff, including the Secretary of State, the Secretary of Defense, and the Attorney General, *see* Procl. § 1(h)(i), and ultimately decided to impose certain restrictions on the entry of individuals from the eight countries, *see id.* §§ 1(h)–(i).  In doing so, the President expressly invoked "the authority vested in [him] by the Constitution and the laws of the United States of America," including 8 U.S.C. §§ 1182(f) and 1185(a).  *Id.* Preamble.  The Proclamation stated that, in the President's judgment, the restrictions were necessary "to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information"; "to elicit improved identity-management and information-sharing protocols and practices from foreign governments"; and otherwise "to advance [the] foreign policy, national security, and counterterrorism objectives" of the United States.  *Id.* § 1(h)(i).

The restrictions, as set forth in Section 2 of the Proclamation, varied by country based on findings that were made as to each country's "distinct circumstances."  Procl. § 1(h)(i).  Three countries — Iran, North Korea, and Syria — were found inadequate under the DHS baseline, and the entry of all of their nationals, either as immigrants or nonimmigrants, was suspended, except for Iranians seeking to enter the United States on nonimmigrant student and exchange-visitor visas.  *Id.* §§ 2(b)(ii), (d)(ii), (e)(ii).  Three other countries — Chad, Libya, and Yemen — were found to be inadequate with respect to the DHS baseline but were nonetheless considered to be "valuable counterterrorism partner[s]," and therefore the Proclamation suspended only "[t]he entry into the United

States of [their] nationals . . . as immigrants, and as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas." *Id*. §§ 2(a), (c), (g). Because Somalia generally satisfied the information-sharing requirements of the DHS baseline but was found to have "significant identity-management deficiencies," as well as a significant terrorist presence within its territory, *id*. § 2(h)(i), the Proclamation suspended immigrant entry for its nationals and provided for "additional scrutiny" of those seeking to enter as nonimmigrants, *id*. § 2(h)(ii). Finally, for Venezuela, the Proclamation adopted more focused entry restrictions — *i.e.*, suspending the entry of certain government officials and their family members on nonimmigrant business and tourist visas — that responded to the country's refusal to cooperate fully on immigration issues while accounting for the fact that the United States was nevertheless capable of independently verifying the identity of Venezuelan entrants through other sources. *Id.* § 2(f).

The Proclamation's restrictions applied to nationals of the eight countries who were outside the United States on the effective date and who did not have a valid visa or comparable travel document. *See* Procl. § 3(a). It exempted, among others, lawful permanent residents and foreign nationals who had been granted asylum. *Id.* § 3(b). Moreover, the restrictions were made waivable by U.S. immigration officials in cases where affected foreign nationals demonstrated that denying them entry would cause them undue hardship, that their entry would not pose a threat to national security or public safety, and that their entry would be in the national interest. *See id*. § 3(c)(i); *see also id.* § 3(c)(iv) (listing examples of when a waiver might be appropriate, such as if the foreign national

"ha[d] previously established significant contacts with the United States" or "s[ought] to enter . . . to visit or reside with a close family member").

Finally, the Proclamation required the Secretary of Homeland Security, in consultation with other Cabinet officers, to assess the circumstances of the eight countries on a regular basis (*i.e.*, every 180 days), taking into account any change in their performance relative to the DHS baseline, and to recommend whether the restrictions should be modified, continued, or terminated. *See* Procl. § 4.

Pursuant to this review process, in April 2018 the President accepted the Secretary of Homeland Security's assessment that Chad had sufficiently improved its practices, and he lifted the entry restrictions on its nationals. *See* Proclamation No. 9723, 83 Fed. Reg. 15937 (Apr. 10, 2018). And even more recently, in January 2020, the President issued Proclamation 9983, stating that DHS had updated the methodology it used to assess compliance with the baseline criteria and had conducted a new worldwide review using its refined performance metrics. *See* Proclamation No. 9983, 85 Fed. Reg. 6699 (Jan. 31, 2020). Following this review and consistent with the recommendation of the Acting Secretary of Homeland Security, the Secretary of State, the Secretary of Defense, and other Cabinet-level officers, the President decided (1) to "leave unaltered the existing entry restrictions imposed by Proclamation 9645" on Iran, North Korea, Syria, Libya, Yemen, Somalia, and Venezuela and (2) to impose new "entry restrictions and limitations on nationals from six additional countries" — namely, Burma, Eritrea, Kyrgyzstan, Nigeria, Sudan, and Tanzania — who seek to enter the United States as immigrants. *Id*. Preamble.

B.  Proceedings

Shortly after Proclamation 9645 was issued in September 2017, 23 individuals and 7 organizations either commenced an action or amended a complaint in a preexisting action, and the three separate actions were consolidated in this challenge to the legality of the Proclamation.  The individual plaintiffs include U.S. citizens and lawful permanent residents who have relatives seeking to enter the United States from countries subject to the Proclamation's entry restrictions.  One or more of these plaintiffs have relatives who have been denied visas pursuant to the Proclamation and have been deemed ineligible for a waiver.  The plaintiffs named as defendants the President, several Cabinet officers and other high-ranking officials, DHS, the Department of State, and the Office of the Director of National Intelligence.

The plaintiffs' complaints alleged that Proclamation 9645, like the two executive orders that preceded it, was motivated by "anti-Muslim animus" and had used the citizenship of the identified foreign countries as "a proxy for religion" in order to limit the entry of Muslims into the United States, in violation of the First Amendment's Establishment Clause and other constitutional provisions.  To advance those allegations, the complaints relied mainly on a series of statements the President had begun making when he was a presidential candidate, starting with a written statement he released a few days after the December 2015 terrorist attack in San Bernardino, California, that called for "a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."  They alleged that then-candidate Trump also made statements like "Islam hates us" and the United States was "having problems

with Muslims coming into the country." The complaints alleged further that candidate Trump began to indicate in the summer of 2016 that, instead of suspending the entry of all Muslims, he would instead use the authority of the presidency to temporarily ban "immigration from nations tied to Islamic terror" until "extreme vetting" mechanisms could be put in place for those areas of the world. In addition to the constitutional claims, the complaints alleged that the Proclamation also violated the INA, the Administrative Procedure Act ("APA"), and other statutes.

On the plaintiffs' motion, the district court issued a nationwide preliminary injunction on October 17, 2017, against the Proclamation's enforcement, concluding that the plaintiffs were likely to succeed in showing that the Proclamation violated both the INA and the Establishment Clause. *See IRAP v. Trump*, 265 F. Supp. 3d 570, 606–29, 631–32 (D. Md. 2017). With respect to the latter, the court relied heavily on the President's statements from campaign rallies and on Twitter and reasoned that the Proclamation stood in the "shadow" of the President's two previous executive orders. *Id.* at 622. The court also found that "the Proclamation fail[ed] adequately to explain . . . the need [for] . . . an unprecedented, sweeping nationality-based travel ban against majority-Muslim nations." *Id.* at 626. At bottom, the court found that the plaintiffs were likely to show that the "primary purpose" of the Proclamation was "the desire to impose a Muslim ban" and that therefore it likely violated the Establishment Clause. *Id.* at 628. Finding that the other criteria for a preliminary injunction were also satisfied, the court enjoined enforcement of the Proclamation's entry restrictions as to foreign nationals — except for those from North

14

Korea and Venezuela — who "ha[d] a credible claim of a bona fide relationship with a person or entity in the United States." *Id.* at 631.

On the government's motion, the Supreme Court issued an order staying the district court's injunction pending appeal. *Trump v. IRAP*, 138 S. Ct. 542 (2017) (mem.).

On appeal, we affirmed the district court's injunction. *IRAP v. Trump*, 883 F.3d 233 (4th Cir. 2018) (en banc). "Examining official statements from President Trump and other executive branch officials, along with the Proclamation itself," we "conclude[d] that the Proclamation [was] unconstitutionally tainted with animus toward Islam" and that the plaintiffs were likely to succeed on the merits of their Establishment Clause claim. *Id.* at 256–57.

Around the same time as our ruling, the Ninth Circuit also affirmed a preliminary injunction issued by a district court in Hawaii against the Proclamation. *Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017) (per curiam). In doing so, however, the Ninth Circuit relied on the plaintiffs' INA claims without reaching their Establishment Clause claim. *See id.* at 702.

The Supreme Court granted the government's petition for a writ of certiorari in the *Hawaii* case, 138 S. Ct. 923 (2018), and held the government's petition in these cases, pending its decision in the *Hawaii* case.

On June 26, 2018, the Supreme Court reversed the Ninth Circuit's judgment, concluding that the grant of a preliminary injunction against the Proclamation was an abuse of discretion "[b]ecause plaintiffs ha[d] not shown that they [were] likely to succeed on the merits of their claims." *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018). First, the Court

concluded that the plaintiffs had failed to make the requisite likelihood-of-success showing with respect to their INA claims because "[t]he Proclamation [was] squarely within the scope of Presidential authority" afforded by that statute. *Id.* at 2415. And second, as more relevant here, the Court concluded that the plaintiffs had not shown that they were likely to succeed on the merits of their Establishment Clause claim because "the Government ha[d] set forth a sufficient national security justification" for the Proclamation "to survive rational basis review." *Id.* at 2423.

A few days after handing down its ruling in *Hawaii*, the Supreme Court granted the government's writ of certiorari in these cases, vacated our judgment affirming the district court's preliminary injunction against the Proclamation, and remanded the cases to us "for further consideration in light of *Trump v. Hawaii*." *Trump v. IRAP*, 138 S. Ct. 2710 (2018) (mem.). We, in turn, "remanded [the] case[s] to the district court for further proceedings consistent with the Supreme Court's decision." *IRAP v. Trump*, 905 F.3d 287 (4th Cir. 2018) (mem.).

On remand, two groups of plaintiffs filed amended complaints while the third simply dropped certain claims with the result that the plaintiffs as a whole abandoned their statutory claims under the INA and two other statutes but retained their claims under the APA. They also continued to allege that Proclamation 9645 violated the Establishment Clause, as well as other clauses of the First and Fifth Amendments.

The government filed a motion to dismiss the complaints for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), relying principally on the Supreme Court's decision in *Hawaii*.

In an order and memorandum opinion dated May 2, 2019, the district court granted without prejudice the government's motion to dismiss the plaintiffs' APA claims, concluding that the plaintiffs had "not identified an articulable final agency action." *IRAP v. Trump*, 373 F. Supp. 3d 650, 667 (D. Md. 2019). The court gave the plaintiffs time to amend their complaints, but the plaintiffs elected not do so, and those claims are no longer at issue. The court, however, denied the government's motion with respect to the plaintiffs' constitutional claims, rejecting its argument that those claims were foreclosed by *Hawaii*. The court began by recognizing that "the Supreme Court ha[d] deemed the [*Kleindienst v.*] *Mandel* standard to be applicable to the Establishment Clause claim" and that therefore *Mandel* also "applie[d] to Plaintiffs' other constitutional claims." [*] *Id*. at 669–70. Indeed, the court specifically acknowledged that "the *Mandel* standard has been applied to claims that an immigration policy or statute infringes a U.S. citizen's rights under the Constitution, without regard to which constitutional right is alleged to have been infringed." *Id*. at 670. Nonetheless, the court appeared to understand the *Mandel* standard and the rational basis standard to be one and the same, and therefore it considered only whether the plaintiffs' constitutional claims were viable under the rational basis standard. *See id*.

Ultimately, the district court concluded that the plaintiffs had "provided detailed allegations for why the Proclamation [was] not rationally related to its stated national

---

[*] In *Mandel*, the Supreme Court held that in reviewing decisions of the political branches to exclude aliens "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests" of those within the United States. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972).

security interests and [was] instead grounded in the illegitimate and unconstitutional purpose of disadvantaging Muslims." *IRAP*, 373 F. Supp. 3d at 672.   In reaching its conclusion, the court focused on (1) the plaintiffs' "detailed allegations of statements by the President exhibiting religious animus toward Muslims and articulating a desire to ban Muslims from entering the United States"; (2) their allegations that the Proclamation's entry restrictions had "deviate[d]" in several respects from "the baseline criteria [that had been] established to identify nations that lacked sufficient vetting or information sharing"; (3) their "allegations of a systematic refusal to grant waivers to individuals who me[t] [the] stated criteria"; and (4) their allegations regarding DHS's previous determination "that a person's country of citizenship [was] unlikely to be a reliable indicator of potential terrorist activity," as well as the existence of other sources of "legal authority to exclude any potential national security threat."  *Id*. at 672–74.

Based on these allegations, the court concluded that the plaintiffs had plausibly alleged that the Proclamation "was motivated *only* by an illegitimate hostility to Muslims" and was "not rationally related to the legitimate national security and information-sharing justifications identified in the Proclamation."  *IRAP*, 373 F. Supp. 3d at 674 (emphasis added).  The court further reasoned that this conclusion was not precluded by *Hawaii* because the Supreme Court had determined only that, on the limited record before it, the plaintiffs in that case were not likely to succeed on the merits.  That holding, the district court reasoned, "d[id] not answer whether under the highly deferential Rule 12(b)(6) standard, Plaintiffs ha[d] stated a plausible claim for relief so as to proceed further."  *Id*. at 675.  After also rejecting separate arguments advanced by the government as to why the

18

plaintiffs' constitutional claims should be dismissed, the court denied the government's motion to dismiss any of those claims. *See IRAP v. Trump*, 404 F. Supp. 3d 946 (D. Md. 2019).

Following entry of its order denying the government's Rule 12(b)(6) motion, the district court granted the government's motion for certification of the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) but denied the government's motion for a stay of discovery pending appeal.

By order dated September 11, 2019, we granted the government's motion for permission to appeal under § 1292(b). We also granted its motion for a stay of all district court proceedings.

II

Proclamation 9645 restricts the entry of foreign nationals from specified countries, giving reasons for doing so that are related to national security, and it makes no reference to religion. In their complaints, the plaintiffs nonetheless claimed that "[t]he Proclamation [was] irrational [as] a national-security measure and [was] inexplicable by anything but animus toward Muslims," in violation of the Establishment Clause and other clauses of the Constitution. To make their claims, they relied heavily on statements against Muslims made by the President and his advisers both before and after he was elected. Taking the complaints' factual allegations as true and in the light most favorable to the plaintiffs at the motion to dismiss stage, the district court concluded that the plaintiffs had sufficiently

alleged that the Proclamation "was motivated only by an illegitimate hostility to Muslims" and therefore that they had stated plausible claims for relief. *IRAP*, 373 F. Supp. 3d at 674.

For its primary argument on appeal, the government contends that the district court's decision "cannot be squared with *Hawaii*," which "is binding here and forecloses [the] plaintiffs' constitutional claims." In *Hawaii*, the Supreme Court reversed a preliminary injunction entered against enforcement of Proclamation 9645, holding on virtually the same facts as alleged in the complaints here that "the Government ha[d] set forth a sufficient national security justification to survive rational basis review" and therefore that the "plaintiffs ha[d] not demonstrated a likelihood of success on the merits of their [Establishment Clause] claim." 138 S. Ct. at 2423. The government argues that instead of following the Supreme Court's "controlling" decision, the district court "rel[ied] upon, and credit[ed], precisely the same arguments that the Supreme Court rejected in *Hawaii*." And, according to the government, "[t]he district court also fundamentally misunderstood the legal standard for applying rational-basis review at the motion to dismiss stage," as revealed by its "call for a 'more fulsome' record" and its focus on the President's actual motivations for issuing the Proclamation. Finally, the government contends that the Supreme Court's decision in *Hawaii* "strongly suggest[ed] that the Proclamation should more properly be analyzed under *Mandel* rather than rational-basis review." In *Mandel*, the Supreme Court held that the Executive's exercise of delegated power to bar a foreign national's entry should be reviewed only as to "whether the Executive gave a 'facially legitimate and bona fide' reason for its action." *Hawaii*, 138 S. Ct. at 2419 (quoting

20

*Mandel*, 408 U.S. at 769).  And under that standard, the government reasons, there is no doubt that Proclamation 9645 "survives that more deferential standard."

The plaintiffs contend that the district court correctly concluded that resolution of the government's motion to dismiss was not controlled by *Hawaii*, arguing that the difference in outcomes between *Hawaii* and the decision below follows from "the different standards applicable to preliminary-injunction and motion-to-dismiss rulings."  According to the plaintiffs, "the Supreme Court [in reversing the entry of a preliminary injunction] did not determine the ultimate merits of the *Hawaii* plaintiffs' constitutional claim — it instead ruled only that there was not a sufficient likelihood of success on the merits to warrant preliminary injunctive relief."  Moreover, the plaintiffs argue, the Supreme Court reached this decision "by weighing the limited evidence in a record created solely of publicly available evidence and without discovery."  Accordingly, they conclude, "*Hawaii* does not foreclose" their constitutional claims, and the district court correctly "applied the well-established standard for deciding motions to dismiss" in holding that they had "plausibly allege[d] that the Proclamation does not rationally further a legitimate state interest" and instead "that the *only* rational explanation for the Proclamation is anti-Muslim animus."  (Emphasis added).

We review the district court's order denying the government's motion to dismiss de novo.  And the legal standard for assessing the sufficiency of a complaint on such motion is well established.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face'" in the sense that the complaint's factual allegations allow "the court to draw a reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "plausibility standard is not akin to a 'probability requirement,'" but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id*. The question, in other words, is whether the complaint's "well-pleaded factual allegations," *id*. at 679, "plausibly suggest an entitlement to a relief," *id*. at 681 — an issue that necessarily turns on the substantive standard that applies to the plaintiffs' claims. Here, there are two standards that may govern the plaintiffs' claims that Proclamation 9645's restrictions on the entry of foreign nationals from specified countries violates their constitutional rights — the *Mandel* standard, on the one hand, and the rational basis standard, on the other. While important differences exist between the two standards, they are both "highly constrained" forms of judicial review, *Hawaii*, 138 S. Ct. at 2420, and our application of either standard leads to the same result.

A.    *Mandel* standard

Addressing Proclamation 9645 in the face of the same allegation of anti-Muslim animus that is raised here, the Supreme Court in *Hawaii* stated that the issue "is not whether to denounce the statements" of the President and his advisers. 138 S. Ct. at 2418. "It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility." *Id*. And in answering that question, the Court recognized that, under its longstanding precedent, the President's statements would not factor into the analysis to the extent that "the Executive

gave a 'facially legitimate and bona fide' reason for its action." *Id*. at 2419 (quoting *Mandel*, 408 U.S. at 769). This is so, the Court explained, because "the authority of the political branches over admission" means that when the Executive provides a "'facially legitimate and bona fide reason'" for its action in denying entry to foreign nationals, "'courts will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of U.S. citizens." *Id*. (quoting *Mandel*, 408 U.S. at 770). Thus, judicial review of such Executive action must be exceedingly narrow and "highly constrained." *Id*. at 2420.

"For more than a century," the Supreme Court "has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii*, 138 S. Ct. at 2418 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also, e.g.*, *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889) ("The power of exclusion of foreigners [is] an incident of sovereignty belonging to the [federal] government . . . as a part of those sovereign powers delegated by the [C]onstitution [such that] . . . its exercise . . . when, in the judgment of the government, the interests of the country require it, cannot be . . . restrained on behalf of any one"); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("[E]very sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners . . . or to admit them only in such cases and upon such conditions as it may see fit to prescribe. In the United States this power is vested in the national government, to which the [C]onstitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political

23

department of the government" (citations omitted)); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty.  The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation").  The Supreme Court invoked and relied on these longstanding principles of immigration jurisprudence in *Mandel*.

In *Mandel*, a Belgian journalist and author, Ernest Mandel, was denied a nonimmigrant visa to enter the United States to participate in and speak at a series of academic conferences.  In denying him admission to the United States, the Attorney General relied on 8 U.S.C. §§ 1182(a)(28)(D), 1182(a)(28)(G)(v), and 1182(d)(3)(A), which then provided that aliens who advocated or published "the economic, international, and governmental doctrines of world communism" were to be excluded unless granted a waiver by the Attorney General.  Mandel admitted that he was a Marxist who fell within the scope of those statutory entry restrictions, and the Attorney General refused to grant him a waiver, reciting as grounds that Mandel had violated the conditions of a prior waiver.  *Mandel*, 408 U.S. at 756, 758–59.  Mandel and the university professors in the United States who had invited him to speak filed an action challenging the constitutionality of the relevant statutory provisions and the Attorney General's exercise of his authority under those provisions.  *Id*. at 759–60.  They alleged that the relevant statutory provisions and the Attorney General's denial of a waiver were unconstitutional because they deprived the American plaintiffs of their First Amendment rights to hear and meet with Mandel.  *Id*. at 760.

Despite the Supreme Court's recognition of the professors' First Amendment rights and the fact that Mandel's exclusion implicated those rights, *see Mandel*, 408 U.S. at 762–65, the Court held that Mandel's exclusion was lawful, *see id*. at 769–70.  It explained that, based on "ancient principles of the international law of nation-states," Congress could categorically bar those who advocated Communism from entry, noting that "the power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers — a power to be exercised exclusively by the political branches of government."  *Id*. at 765 (cleaned up).  And significantly, with respect to the plaintiffs' constitutional challenge to the Attorney General's denial of a waiver, the Court forbade judges from interfering with the Executive's "facially legitimate and bona fide" exercise of its immigration authority.  *Id.* at 770.  Specifically, the Court held that "when the Executive exercises . . . power [delegated by Congress to admit or exclude foreign nationals] negatively on the basis of a facially legitimate and bona fide reason, *the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests*" of U.S. citizens.  *Id.* (emphasis added).

Since its decision in *Mandel*, the Court has consistently "reaffirmed and applied its deferential standard of review across different contexts and constitutional claims."  *Hawaii*, 138 S. Ct. at 2419.  In *Fiallo*, for instance, the Court declined to scrutinize a statute that gave a different immigration preference to a child born out of wedlock depending on whether it was the child's mother or father who was a citizen or lawful permanent resident of the United States.  Although that statute involved two suspect classifications — gender

and legitimacy — the Court, citing *Mandel*, nonetheless concluded that "it is not the judicial role in cases of this sort to probe and test the justifications" of immigration policies. *Fiallo*, 430 U.S. at 799.

Likewise, in *Kerry v. Din*, 135 S. Ct. 2128 (2015), the Court considered a suit by a U.S. citizen who alleged that the government had violated the Due Process Clause by denying her husband's visa application without adequate explanation, providing only a citation to the statutory provision under which the visa was denied. Writing for himself and Justice Alito to provide the fourth and fifth votes in favor of the government, Justice Kennedy concluded that the case was "control[led]" by "[t]he reasoning and the holding in *Mandel*." *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the judgment). He explained that "respect for the political branches' broad power over the creation and administration of the immigration system" meant that, because the government had provided Din with a facially legitimate and bona fide reason for its action, Din had no viable constitutional claim. *Id*. at 2141.

And most recently, of course, the Court in *Hawaii* not only confirmed *Mandel*'s continuing vitality but also its applicability in assessing the constitutionality of the very Proclamation that is before us. *See, e.g.*, 138 S. Ct. at 2419 (rejecting "[t]he principal dissent['s] suggest[ion] that *Mandel* has no bearing on this case" and emphasizing that "*Mandel*'s narrow standard of review 'has particular force' in admission and immigration cases that overlap with 'the area of national security'" (quoting *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the judgment))). Moreover, the Court noted that under the *Mandel* standard, the analysis of Proclamation 9645 would end once a court concluded that

the Proclamation, *on its face*, provided reasons that were "facially legitimate and bona fide." *Hawaii*, 138 S. Ct. at 2420. And the Court so concluded, finding that "[t]he Proclamation is expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices." *Id*. at 2421.

Even were it not for this conclusion by the Supreme Court, we would determine independently that Proclamation 9645 does indeed provide on its face legitimate and bona fide reasons for its entry restrictions. The Proclamation itself states that, following a comprehensive, global review, the eight countries selected for some form of entry restriction were found to have inadequate practices for providing information to U.S. immigration officials or to otherwise present a heightened risk of terrorism. The Proclamation also states that, in the judgment of the President of the United States, country-specific entry restrictions were necessary to "prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information"; "elicit improved identity-management and information-sharing protocols and practices from foreign governments"; and otherwise "advance [the] foreign policy, national security, and counter-terrorism objectives" of the United States. Procl. § 1(h)(i). These are most certainly "facially legitimate and bona fide" reasons within the meaning of *Mandel*, and our review could end with that conclusion. *See Hawaii*, 138 S. Ct. at 2420.

The *Hawaii* Court's analysis of Proclamation 9645 did not, however, end with a facial analysis of the Proclamation under *Mandel*, even though the Court indicated that it could have. This was because, as the Court explained, the government had suggested "that

it may be appropriate here for the inquiry to extend beyond the facial neutrality of the order." *Hawaii*, 138 S. Ct. at 2420.  The Court accommodated that suggestion, stating, "For our purposes today we assume that we may look behind the face of the Proclamation to the extent of applying rational basis review." *Id.*  But in doing so, the Court in no way undermined the conclusion that *Mandel* provides the applicable standard.

In the decision before us, the district court agreed that *Mandel* was controlling. Nonetheless, it failed to apply its standard of review properly, moving past the face of the Proclamation to consider in its analysis external statements made by the President.  The district court stated that *Hawaii* "does not instruct courts to disregard these statements or any public pronouncements of a President." *IRAP*, 373 F. Supp. 3d at 672.  But the Court's extensive discussion of *Mandel* in *Hawaii* indicates just the opposite.  *See, e.g.*, *Hawaii*, 138 S. Ct. at 2420 (recognizing that a "conventional application of *Mandel*" would "ask[] *only* whether the policy is facially legitimate and bona fide" (emphasis added)).

As the Supreme Court did, however, we too will proceed beyond consideration of only the facially stated purposes of Proclamation 9645 and determine whether the plaintiffs have alleged plausible constitutional claims under the rational basis standard of review.

## B.  Rational basis standard

Under the rational basis standard, the plaintiffs' claims challenging the constitutionality of Proclamation 9645 must fail if the Proclamation is even "plausibly related to the Government's stated objective to protect the country and improve vetting processes" — *i.e.*, if, despite the President's statements, the policy "can reasonably be

understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 138 S. Ct. at 2420; *see also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The Proclamation must be afforded "a strong presumption of validity," and "those attacking the rationality of the [policy] have the burden to negative *every conceivable basis* which might support it." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314–15 (1993) (emphasis added) (cleaned up). Moreover, under the deferential standard, it is "entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction *actually motivated*" the decisionmaker. *Id.* at 315 (emphasis added). When the rational basis review standard is applicable, the Supreme Court, as the Court observed in *Hawaii*, "hardly ever strikes down a policy as illegitimate." 138 S. Ct. at 2420.

Applying the rational basis standard of review to the Proclamation that is before us, the *Hawaii* Court concluded, in no uncertain terms, that "[t]he Proclamation does not fit [the] pattern" established by the handful of cases where a challenged policy did not survive rational basis review. 138 S. Ct. at 2420. "It cannot be said," the Court concluded, "that it is impossible to discern a relationship" between Proclamation 9645 and "legitimate state interests," nor can it be said "that the policy is inexplicable by anything but animus." *Id.* at 2420–21 (cleaned up). Rather, "there is persuasive evidence that the entry suspension has a legitimate grounding in national security concerns, quite apart from [the] religious hostility" that the plaintiffs allege here as the Proclamation's only plausible basis. *Id.* The Supreme Court gave a number of reasons for this conclusion.

29

*First*, "[t]he Proclamation is expressly premised on legitimate purposes" — *i.e.*, "preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices" — and its "text says nothing about religion." *Hawaii*, 138 S. Ct. at 2421. While "five of the seven nations currently included in the Proclamation have Muslim-majority populations," "that fact alone does not support an inference of religious hostility, given that the policy covers just 8% of the world's Muslim population and is limited to countries that were previously designated by Congress or prior administrations as posing national security risks." *Id.*

*Second*, the Proclamation "reflects the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies." *Hawaii*, 138 S. Ct. at 2421. While the plaintiffs in *Hawaii* — much like the plaintiffs here — had argued that "deviations from the review's baseline criteria resulting in the inclusion of Somalia and omission of Iraq" should "discredit the findings of the review," the Court observed that the Proclamation had explained why those "determinations were justified by the distinct conditions in each country." *Id.* Nor was the Court convinced that the relative brevity of the final report could be used to cast "doubt[] [on] the thoroughness of the multi-agency review" process. *Id.*

*Third*, and "[m]ore fundamentally," the Court addressed the plaintiffs' suggestion "that the policy [was] overbroad and d[id] little to serve national security interests." *Hawaii*, 138 S. Ct. at 2421. It responded, "[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters." *Id.* "[T]he Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of

30

litigation involving sensitive and weighty interests of national security and foreign affairs."
*Id.* at 2422 (cleaned up).

*Fourth*, the Court rejected the argument — specifically echoed by the plaintiffs here
— that "Congress ha[d] already erected a statutory scheme that fulfills the President's
stated concern about deficient vetting." *Hawaii*, 138 S. Ct. at 2422 n.6 (cleaned up).  It
explained that "[n]either the existing inadmissibility grounds nor the narrow Visa Waiver
Program address the failure of certain high-risk countries to provide a minimum baseline
of reliable information." *Id.*

And *fifth*, the Court pointed to "[t]hree additional features of the entry policy [as]
support[ing] the Government's claim of a legitimate national security interest." *Hawaii*,
138 S. Ct. at 2422.  "First, since the President introduced entry restrictions in January 2017,
three Muslim-majority countries — Iraq, Sudan, and Chad — ha[d] been removed from
the list of covered countries," and the Proclamation "establishe[d] an ongoing process" to
determine whether the restrictions on the remaining countries should be terminated.  *Id.*
"Second, for those countries that remain subject to entry restrictions, the Proclamation
include[d] significant exceptions for various categories of foreign nationals," "permit[ting]
nationals from nearly every covered country to travel to the United States on a variety of
nonimmigrant visas." *Id.*  And "[t]hird, the Proclamation create[d] a waiver program open
to all covered foreign nationals seeking entry as immigrants or nonimmigrants." *Id.*

Based on these reasons, the Court concluded that, despite the religious hostility of
certain external statements, "*the Government ha[d] set forth a sufficient national security
justification to survive rational basis review*." *Hawaii*, 138 S. Ct. at 2423 (emphasis

31

added). And every reason that the *Hawaii* Court gave to reach its conclusion applies here. Yet, despite the Supreme Court's clear and unambiguous conclusion about the justification for Proclamation 9645, the district court in this case concluded that the plaintiffs had plausibly alleged that the same Proclamation reflected *no* legitimate purpose. In doing so, it erred as a matter of law. Therefore, even to the extent that the plaintiffs' constitutional claims are subject to rational basis review, rather than the *Mandel* standard, the district court should have dismissed them for failing to state a claim to relief that is plausible on its face.

To avoid this conclusion, the plaintiffs attempt to devalue the import of the Supreme Court's decision in *Hawaii*. They argue that *Hawaii* was limited so as not to be controlling here because the Court simply concluded that the plaintiffs before it had "not demonstrated *a likelihood of success* on the merits of their constitutional claim," 138 S. Ct. at 2423 (emphasis added), whereas they are entitled to the benefit of all they have alleged in their complaints. Yet, while it is true that the Court's *holding* in *Hawaii* was that the plaintiffs there had failed to show "that they [were] likely to succeed on the merits of their claims," the *reason* for that holding was the Court's predicate unconditional conclusion that the Proclamation "survive[s] rational basis review." *Id.* And, although that conclusion was reached in the context of assessing a preliminary injunction, the rational basis finding was not stated on a "likelihood" basis. Rather, the Court stated definitively that "because there [was] persuasive evidence that the entry suspension ha[d] a legitimate grounding in national security concerns, quite apart from any religious hostility," it was required to "accept that independent justification." *Id.* at 2421.

The plaintiffs argue similarly that the *Hawaii* Court reached what was merely a preliminary assessment of the merits of the constitutional challenge by "weighing the limited evidence in a record created solely of publicly available evidence and without discovery." With a different record after the benefit of discovery, according to the plaintiffs, it is at least plausible that they will be able to overcome the government's evidence and establish their entitlement to relief. But this argument fails to account for the extremely deferential nature of the rational basis standard. Again, the rational basis test asks only whether "there are '*plausible* reasons'" for the government's action, *Beach Communications*, 508 U.S. at 313, regardless of "whether the conceived reason[s] . . . actually motivated" the decisionmaker, *id.* at 315. And because the Supreme Court has already stated that it is possible to "discern a relationship" between the Proclamation's entry restrictions and "legitimate state interests," such that the Proclamation is not "inexplicable by anything but animus," *Hawaii*, 138 S. Ct. at 2420–21 (cleaned up), we completely fail to see how the plaintiffs' claims could possibly — let alone plausibly — survive rational basis review.

At bottom, in view of the Supreme Court's conclusions with respect to Proclamation 9645 in *Hawaii*, we conclude that the plaintiffs' constitutional claims in this case lack the plausibility necessary to survive the government's motion to dismiss under Rule 12(b)(6). Accordingly, we reverse the district court's order of May 2, 2019, denying the government's motion to dismiss the constitutional claims and remand with instructions to dismiss the plaintiffs' complaints with prejudice.

REVERSED AND REMANDED
WITH INSTRUCTIONS